# EXHIBIT A

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**UAB E ENERGIJA (LITHUANIA)**

Claimant

and

**REPUBLIC OF LATVIA**

Respondent

**ICSID Case No. ARB/12/33**

---

# AWARD

---

*Members of the Tribunal*
Dr. Paolo Michele Patocchi, President of the Tribunal
Prof. Dr. August Reinisch, Arbitrator
Mr. Samuel Wordsworth QC, Arbitrator

*Secretary of the Tribunal*
Ms. Geraldine R. Fischer

*Date of dispatch to the Parties:* 22 December 2017

REPRESENTATION OF THE PARTIES

*Representing UAB E energija (Lithuania)*:

From 15 August 2012 until 8 September 2017:
Mr. George Burn

As from 8 September 2017:
Mr. Mark Beeley

As from 15 August 2012:
Mr. Alexander Slade

Vinson & Elkins RLLP
20 Fenchurch Street
24th Floor
London EC3M 3BY
United Kingdom

and

As from 15 August 2012:
Mr. Agris Repšs
ZAB Sorainen
Kr. Valdemāra iela 21
LV-1010 Riga
Republic of Latvia

*Representing the Republic of Latvia*:

From 15 August 2012 until 21 February 2016:
Mr. Ivars Mēkons
Assistant Director, International Affairs

As from 22 February 2016:
Ms. Ilze Dubava
Legal Adviser, Legal Department

As from 28 June 2016:
Ms. Nērika Lizinska
Legal Adviser, Legal Department

State Chancellery, Latvia
Brīvības Boulevard 36
LV-1520 Riga
Republic of Latvia

i

TABLE OF CONTENTS

I.     INTRODUCTION AND PARTIES ................................................................ 1
II.    PROCEDURAL HISTORY ........................................................................ 2
III.   FACTS ...................................................................................................... 10
       A.   Heating in Rēzekne and the 2004 Gas Supply Agreement (2004) .......... 10
       B.   The Original Arrangements And Main Events (End Of 2004-2005) ..................... 13
       C.   The Operation of the Heating System by Latgales Enerǵija and Main
            Events in 2006 ......................................................................................... 38
       D.   The Energy Crisis Declared by the Rēzekne City Council and Other Main
            Events in 2007 ......................................................................................... 49
       E.   Main Events in 2008 ................................................................................ 83
       F.   Main Events in 2009 and Beyond ............................................................ 97
       G.   The Lithuanian Decisions Relied on by the Respondent (From 2005 to
            2011) ..................................................................................................... 107
       H.   The Negotiations between the Parties from 1 September 2008 Onwards ............. 108
IV.    THE PARTIES' REQUESTS FOR RELIEF .............................................. 113
       A.   The Claimant .......................................................................................... 113
       B.   The Respondent ...................................................................................... 115
V.     JURISDICTION ....................................................................................... 116
       A.   The Parties' Prayers for Relief on Jurisdiction and the Respondent's
            "Preliminary Objections" ....................................................................... 117
       B.   The Claimant's Position on Jurisdiction ................................................. 118
       C.   The Respondent's Objections to Jurisdiction ......................................... 122
       D.   The Claimant's Reply to the Respondent's "Preliminary Objections" to
            Jurisdiction ............................................................................................ 125
       E.   The Reasons for the Tribunal's Decision on Jurisdiction ....................... 130
       F.   The Tribunal's Decision on Jurisdiction ................................................. 146
VI.    THE    RESPONDENT'S    APPLICATION    FOR    TERMINATION,    AND,
       ALTERNATIVELY, FOR A STAY OF THE PROCEEDINGS ............................ 146
       A.   The Parties' Prayers for Relief on the Stay of Proceedings ................... 146
       B.   The Respondent's Position ...................................................................... 147
       C.   The Claimant's Position .......................................................................... 148
       D.   The Reasons for the Tribunal's Decision on the Respondent's Application
            for a Stay and Termination of the Proceedings ...................................... 149
       E.   The Tribunal's Decision the Respondent's Application for Termination,
            and, Alternativey, a Stay of the Proceedings ......................................... 151
VII.   LIABILITY .............................................................................................. 151
       A.   The Parties' Prayers for Relief on Liability ........................................... 151
       B.   The Claimant's Case on Liability ........................................................... 152
       C.   The Respondent's Case On Liability ....................................................... 200
       D.   The Reasons for the Tribunal's Decision on Liability ............................ 225
       E.   The Tribunal's Decision on Liability ...................................................... 323

ii

VIII. QUANTUM .................................................................................................... 323

    A.   The Parties' Prayers for Relief on Quantum ........................................... 323

    B.   The Claimant's Case on Quantum .......................................................... 324

    C.   The Respondent's Case on Quantum ...................................................... 326

    D.   The Reasons for the Tribunal's Decision on Quantum .......................... 326

    E.   The Tribunal's Decision on Quantum .................................................... 334

IX.   COSTS ........................................................................................................... 334

X.    AWARD .......................................................................................................... 337

i.    FREQUENTLY USED ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| BIT | The Agreement between the Government of the Republic of Lithuania and the Government of the Republic of Latvia on the Promotion and Protections of Investments dated 7 February 1996 |
| C-(…) | Claimant's Exhibit No. (…) |
| | C-1.1 means the first document in Exhibit C-1 in case the Claimant has filed several documents in one exhibit |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| CLA-(…) | Claimant's Legal Authority No. (…) |
| | The legal exhibits filed by the Claimant attached to Cl. Rep. Tribunal, p. 18 paragraph 58 were numbered from 1 onwards; the Tribunal renumbered such exhibits from CLA-46 (Municipalities and Local Government Act) onwards until CLA-61. |
| Council | The Rēzekne City Council |
| Energy Crisis Committee | The committee established by decision No. 388 (C-24) made by the Rēzekne City Council on 9 October 2007, see also footnote 299 below |
| ECT | Energy Charter Treaty |
| Heating Supply Development Strategy, Rēzekne | The strategy document approved by the Rēzekne City Council by decision No. 21 of 21 September 2007 C-213 |
| ICSID Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings (2006) |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| ICSID Institution Rules | Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings |
| 2001 ILC Articles | The International Law Commission's Articles on State Responsibility |

iv

| | |
|---|---|
| LVL | Latvian Lats |
| Methodology, the | Cabinet of Ministers Regulations No. 281 of 26 June 2001, amended in 2008 (Methodology for Calculation of Tariffs for Public Utilities in the Fields Regulated by Local Municipalities) C-35<br>The original 2001 text as well as the amendments made in 2008 are set out in this exhibit; the 2008 amendments are highlighted in yellow |
| MWh | Megawatt hour |
| p. (…)<br><br>[page (…)] | This Award contains references to the documentary evidence<br>–   to electronic page numbering in the format "[page 1]", and<br>–   to hard copy page numbering in the format "p. 1". |
| R-(…) | Respondent's Exhibit No. (…)<br>R-1.1 means the first document in Exhibit R-1 in case the Respondent has filed several documents in one exhibit |
| RCC | Rēzekne City Council |
| Regulator, the | the Multi-industry Public Utility Regulator of the Latgale Municipalities |
| RLA-(…) | Respondent's Legal Authority No. (…) |
| Transcript, Day dd, page/line(s) | Transcript of the Hearing on the Preliminary Objections and the Merits |
| Working Group | The working group established by the Rēzekne City Council to draft the strategic plan for the development of the heat supply system (Council decision No. 188 dated 11 May 2007) |

ii.   THE PARTIES' SUBMISSIONS

| | |
|---|---|
| RfA | Request for Arbitration, 15 August 2012 |
| Cl. Mem. | Claimant's Memorial, 6 December 2013 |
| Resp. Obj. J. & C-Mem. | Respondent's Memorial on Preliminary Objections [to Jurisdiction] and Request for Bifurcation and Counter-Memorial on the Merits, 18 April 2014 |
| Resp. Req. Bifurc. | Respondent's Clarificatory Statement on the Request for Bifurcation, 12 May 2014 |
| Cl. Rep. Bifurc. | Claimant's Response to the Respondent's Request for Bifurcation, 19 May 2014 |

v

| Cl. Rep. | Claimant's Reply on the Merits and Counter-Memorial on Preliminary Objections, 10 October 2014 |
| --- | --- |
| Resp. Rej. | Respondent's Rejoinder on the Merits and Reply on Preliminary Objections, 12 December 2014 |
| Cl. Rej. J. | Claimant's Rejoinder on Preliminary Objections, 2 January 2015 |
| Cl. Skeleton | Claimant's Skeleton Argument, 9 February 2015 |
| Resp. Skeleton | Respondent's Skeleton Argument, 9 February 2015 |
| Resp. Rep. Tribunal | Respondent's Answer to Questions Put by the Tribunal Concerning Domestic Judicial Proceedings, 25 February 2015 |
| Cl. Rep. Tribunal | Claimant's Response to Questions Raised by the Tribunal, 20 March 2015 |
| Resp. P-H (PO8) | Respondent's Post-Hearing Submission in Response to the Tribunal's Questions Posed in Procedural Order No. 8, 20 March 2015 |
| Resp. Rep. (PO8) | Respondent's Rebuttal Submission (Procedural Order No. 8 Dated 9 March 2015, point 2) – Respondent's Applications, 10 April 2015 |
| Cl. Rep. P-H | Claimant's Rebuttal to Respondent's Post-Hearing Submission, 1 June 2015 |
| Resp. Rep. (PO9) | Respondent's Response to the Tribunal's Procedural Order No. 9, 1 June 2015 |

iii.   SHORT TITLES FOR CERTAIN AGREEMENTS

| Short Title | Exhibit | Original Title |
| --- | --- | --- |
| Agreement on the Settlement of Debt | C-80 | Agreement on the Settlement of Debt dated 15 November 2005 between<br>–    Rēzeknes Siltumtīkli<br>–    Latgales Enerģija |
| Amended Long-Term Agreement | C-16 | Agreement on Amendments to the Agreement for Lease, Renovation and Operation of the Long-Term Assets of 28 January 2005, dated 10 February 2006 between<br>–    Rēzeknes Siltumtīkli<br>–    Latgales Enerģija |
| Amendment Agreement | C-173 | Amendment Agreement in Connection with Various Agreements Relating to Debt and Equity Investment in UAB E-energija dated 5 March 2008 between<br>–    UAB Energijos Taupymo Centras ("ETC")<br>–    UAB E Energy Invest ("EEI") |

vi

| Short Title | Exhibit | Original Title |
|---|---|---|
| | | – Mr. Virginijus Strioga (the "Sponsor") |
| | | – UAB E-Energija (the "Company", and, together with ETC and EEI "the Obligors") |
| | | – European Bank for Reconstruction and Development ("EBRD") |
| Amendment No. 1 to the Gas Supply Agreement | C-61 | Supplementation 1 to Agreement No. 1580 on Construction of a New Natural Gas Infrastructure for Gasification of the City of Rēzekne Due to Long-Term Supplies of Natural Gas to the User for Combustion Facilities of Various Mutually Replaceable Fuels (Natural Gas and Oil Products) dated 29 April 2004 between |
| | | – Latvijas Gāze ("LG") |
| | | – the Municipality of Rēzekne ("the RPD") |
| | | – Rēzeknes Siltumtīkli ("the User") |
| Amendment No. 3 to the Gas Supply Agreement[1] | C-81 | Supplementation 3 to Agreement No. 1580 on Construction of a New Natural Gas Infrastructure for Gasification of the City of Rēzekne Due to Long-Term Supplies of Natural Gas to the User for Combustion Facilities of Various Mutually Replaceable Fuels (Natural Gas and Oil Products) dated 29 April 2004 between |
| | | – Latvijas Gāze ("LG") |
| | | – the Municipality of Rēzekne ("the RPD") |
| | | – Rēzeknes Siltumtīkli ("the User") |
| 2005 Assignment Agreement | C-64 | Assignment Agreement dated 4 August 2005 between |
| | | – AS "SEB Latvijas Unibanka" ("Assignor") |
| | | – AS "Lohmus, Haavel & Viisemann" ("Assignee") |
| 2006 Assignment Agreement | C-105 | Assignment Agreement dated 13 December 2006 between |
| | | – AS "Lohmus, Haavel & Viisemann" ("Assignor") |
| | | – Latgales Enerģija ("Assignee") |
| 2007 Assignment Agreement | C-159 | Assignment Agreement dated 4 December 2007 between |
| | | – Latgales Enerģija ("Assignor") |
| | | – LE Remonts ("Assignee") |
| 2008 Assignment Agreement | C-182 | Assignment Agreement Nr. 100/2008 0685 dated 25 June 2008 between |
| | | – Latgales Enerģija ("Assignor") |
| | | – UAB E energija ("Assignee") |
| EBRD Loan | C-165 | Loan Agreement dated 18 December 2007 between |

---

[1] There is no Amendment No. 2 to the Gas Supply Agreement in evidence.

| Short Title | Exhibit | Original Title |
|---|---|---|
| Agreement | | – European Bank for Reconstruction and Development ("EBRD"), <br> – UAB E energija ("the Borrower") |
| February 2005 Agreement | <u>C-8</u> | Agreement dated 10 February 2005 between <br> – Rēzekne City Council ("the Council") <br> – Latgales Enerģija ("the Operator") |
| February 2006 Agreement | <u>C-17</u> | Agreement on Mutual Operations with the Aim to Decrease Energy Rate in the City of Rēzekne, dated 10 February 2006 between <br> – Rēzekne City Council <br> – Latgales Enerģija |
| Gas Supply Agreement | <u>C-40</u> | Agreement No. 1580 on Construction of a New Natural Gas Infrastructure for Gasification of the City of Rēzekne Due to Long-Term Supplies of Natural Gas to the User for Combustion Facilities of Various Mutually Replaceable Fuels (Natural Gas and Oil Products) dated 29 April 2004 between <br> – Latvijas Gāze ("LG") <br> – the Municipality of Rēzekne ("the RPD") <br> – Rēzeknes Siltumtīkli ("the User") |
| Guarantee Agreement | <u>C-43</u> | Guarantee Agreement dated 30 December 2004 between <br> – UAB E energija ("Guarantor") <br> – AS "Latvijas Unibanka" ("Creditor") |
| Investment Services Agreement | <u>C-63</u> | Investment Services Agreement dated 4 August 2005 between <br> – AS Lõhmus, Haavel & Viisemann ("LHV") <br> – UAB E energija ("the Client") |
| Latvian Treasury Loan Agreement | <u>R-20</u> [pages 2 ff.] | Loan Agreement dated 10 October 2007 between <br> – The Treasury of the Republic of Latvia (Lender) <br> – Rēzekne City Council (Borrower) |
| Long-Term Agreement | <u>C-4</u> | Agreement for Lease, Renovation and Operation of Long-Term Assets dated 28 January 2005 between <br> – Rēzeknes Siltumtīkli ("the Lessor") <br> – Latgales Enerģija ("the Operator") |
| October 2007 Agreement | <u>C-26</u> | Agreement between <br> – Latgales Enerģija (Burkovskis) <br> – UAB E Enerģija (Burkovskis) <br> – Rēzeknes Siltumtīkli (Mežals) <br> – Rēzeknes City Council (Vjakse) <br> – Rēzeknes Enerģija (Škinčs/Melnis) |

| Short Title | Exhibit | Original Title |
|---|---|---|
| Rēzeknes Enerģija Gas Supply Agreement | C-151 | Natural Gas Delivery Agreement dated 17 October 2007 between<br>– Latgales Enerģija (User)<br>– Rēzeknes Enerģija (Supplier) |
| Sampo Banka Guarantee | C-102 | Guarantee dated 30 November 2006 between<br>– JSC Sampo Banka ("the Bank")<br>– UAB E energija ("the Guarantor") |
| Sampo Banka Loan Agreement | C-101 | Loan Agreement No. SB-26/3519 dated 30 November 2006 between<br>– JSC Sampo Banka ("the Bank")<br>– Latgales Enerģija ("the Borrower") |
| Sampo Banka Pledge | C-103 | Commercial Pledge No. SB-26/3519/1 between<br>– JSC Sampo Banka ("the Commercial Pledgee")<br>– UAB E energija ("the Commercial Pledgor") |
| Share Purchase Agreement | C-92 | Share Purchase Agreement (with Repo Option) dated 8 June 2006 between<br>– UAB E energija<br>– SIA Energo Sistēmas |
| Shareholders' Agreement | C-45 | Shareholders' Agreement dated 14 January 2005 between<br>– UAB E energija<br>– Juris Vanags<br>– Ļevs Voronovs<br>– Mārtiņš Lauva<br>– SIA Energo Sistēmas<br>– SIA Latgales Enerģija |

## iv.   DRAMATIS PERSONAE

| | Name | Title |
|---|---|---|
| 1. | Abramova, Dagmāra | Rēzeknes City Council, Councillor |
| 2. | AS Danske Bank | Latvian branch of Danish bank |
| 3. | AS Latvijas Gāze | Latvian company specialised in the importation, transportation, storage and sale of natural gas |
| 4. | AS Lohmus, Haavel & Viisemann | Latvian branch of Estonian investment bank |
| 5. | AS Rēzeknes Siltumtīkli | Latvian company owned by the Rēzekne Municipality |
| 6. | AS SEB Latvijas Unibanka | Latvian bank |
| 7. | Beeley, Mark | Vinson & Elkins, Partner, counsel for the Claimant as from 8 September 2017 |
| 8. | Bērziņš, Intar | Energo Sistēmas), SIA Latgales Energija, Member of the |

ix

| | Name | Title |
|---|---|---|
| | | Management Board |
| 9. | Briedis, Edgar | ZAB Soraisen, Attorney representing Latgales Enerģija in certain Latvian proceedings |
| 10. | Burkovskis, Arnoldas | Latgales Energija, Manager |
| 11. | Burn, George | Vinson & Elkins, Partner, counsel for the Claimant until 8 September 2017; formerly of Salans LLP |
| 12. | Dubava, Ilze | State Chancellery, Republic of Latvia, as from 7 September 2016 |
| 13. | E Enerģija UAB | Lithuanian company, the Claimant |
| 14. | Hansel Realty Management Spain S.L. | Spanish company |
| 15. | Jautakis, Aleksas | UAB E Enerģija, Chief Financial Officer |
| 16. | Klimanovs, Ilja | Rēzekne City Council, Deputy Chairman |
| 17. | Latvenergo | Latvian state-owned electric utility company |
| 18. | LE Remonts | Latvian company |
| 19. | Lizinska, Nērika | State Chancellery, Republic of Latvia, as from 7 September 2016 |
| 20. | Locis, Ivars | Rēzekne City Council, Deputy Executive Director |
| 21. | Mēkons, Ivars | State Chancellery, Republic of Latvia, until 7 September 2016 |
| 22. | Meļņikovs, Sergejs | Latgales Enerģija, Member of the Management Board |
| 23. | Melnis, Rihards | Rēzeknes Enerģija, Member of the Management Board |
| 24. | Mežals, Aldis | Rēzeknes Siltumtīkli, Member of the Management Board |
| 25. | Muceniece, Maija | Rēzeknes City Council, Councillors |
| 26. | the Multi-industry Public Utility Regulator of the Latgale Municipalities ("the Regulator") | Latvian authority |
| 27. | Nikonovs, Vladimirs | Rēzeknes City Council, Councillor |
| 28. | Patmalnieks, Arturs | Rēzeknes City Council, Head of the Legal Department |
| 29. | Rēzeknes Vēstis | Local newspaper, Rēzekne |
| 30. | Repšs, Agris | ZAB Soraisen, Attorney |
| 31. | Rodl & Partner SIA | Audit Group |
| 32. | Rogozina, Svetlana | Rēzeknes Siltumtīkli, Accountant |
| 33. | Salans LLP | Law firm formerly acting for the Claimant |
| 34. | Sampo Banka | Latvian branch of Finnish bank |
| 35. | SIA AVT Nafta | Latvian company |
| 36. | SIA Dinaburga Rosme | Latvian company |
| 37. | SIA Energo Sistēmas | Latvian company |
| 38. | SIA Latgales Enerģija | Latvian company controlled by the Claimant |
| 39. | SIA Rēzeknes Enerģija | Latvian company owned by the Rēzekne Municipality |
| 40. | SIA Rēzeknes Namsaimnieks | Latvian company, estate agent |
| 41. | SIA Rēzekne Ūdens | Latvian water sewerage company |
| 42. | SIA Rēzekne Siltumserviss | Latvian company active in heat supply and heat supply network |
| 43. | Škinčs, Edgars | Rēzeknes Enerģija/ Rezeknes Namsaimnieks, Member of the Management Board |
| 44. | Slade, Alexander | Vinson & Elkins, Attorney; formerly of Salans LLP |

x

|     | Name | Title |
| --- | --- | --- |
| 45. | Spradzenko, Gunars | Rēzeknes City Council, Member |
| 46. | Strioga, Virginijus | E Enerġija UAB, Chief Executive Officer/General Manager |
| 47. | Uškāne, Evisa | Latgales Enerġija, Chairman of the Management Board |
| 48. | Vekšina, Velta | Rēzeknes City Council, Head of the Financial Department |
| 49. | Vjaske, Juris Guntis | Rēzekne City Council, Chairperson |
| 50. | Vanags, Juris | Latgales Enerġija, shareholder |
| 51. | Vinsons & Elskins RLLP | Law firm acting for the Claimant in these proceedings |
| 52. | Voronovs, Levs | Latgales Enerġija, shareholder |
| 53. | ZAB Sorainen | Law firm acting for the Claimant in these proceedings |

xi

## I.     INTRODUCTION AND PARTIES

1.     This arbitration concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") pursuant to *(i)* the Agreement between the Government of the Republic of Lithuania and the Government of the Republic of Latvia on the Promotion and Protection of Investments dated 7 February 1996, which entered into force on 23 July 1996 (the "BIT" or "Treaty") and *(ii)* the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "ICSID Convention").[2]

2.     The Claimant is UAB E energija (Lithuania) ("E energija" or the "Claimant").  It is a limited liability company established under the laws of the Republic of Lithuania and incorporated in Lithuania.[3]  E energija carries out business in the energy sector and has, in particular, a number of concessions for central heating services in Lithuania, Ukraine and Latvia.

3.     E energija indirectly owns 58% of the shares in SIA Latgales Enerģija ("Latgales Enerģija"), a limited liability company established under the laws of the Republic of Latvia and incorporated in Latvia.[4]  E energija incorporated Latgales Enerģija as the entity through which it would invest in the concession for district heating in the Latvian city of Rēzekne (the "Rēzekne Project").

4.     The Respondent is the Republic of Latvia ("Latvia" or the "Respondent").

5.     The Claimant and the Respondent are hereinafter collectively referred to as the "Parties".  The Parties' respective representatives and their addresses are listed in page (i) above.

6.     The dispute relates to the rights asserted by the Claimant under the BIT against the Republic of Latvia in connection with the Rēzekne Project.

---

[2]  RfA ¶ 1.

[3]  C-1.

[4]  RfA ¶ 5, see also paragraph 74 below.

1

## II.    PROCEDURAL HISTORY

7.     On 15 August 2012 ICSID received a request for arbitration from the Claimant against the Republic of Latvia, together with Exhibits C-1 through C-33 and Legal Authorities CLA-1 through CLA-22 (the "Request" or "RfA").

8.     On 15 October 2012 the Secretary-General of ICSID registered the Request, as supplemented by letters dated 14 September 2012, 4 October 2012 and 10 October 2012, in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration.  In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute a Tribunal as soon as possible in accordance with Rule 7(d) of the Centre's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

9.     In the absence of an agreement between the Parties, the Claimant elected to submit the arbitration to a three-member Tribunal, as provided in Article 37(2)(b) of the ICSID Convention.

10.    On 8 March 2013 Mr. Samuel Wordsworth QC, a British national, accepted his appointment by the Claimant as arbitrator.

11.    On 22 April 2013 Prof. Dr. August Reinisch, an Austrian national, accepted his appointment by the Chairman of the ICSID Administrative Council in accordance with Article 38 of the ICSID Convention.

12.    On 12 June 2013 Dr. Paolo Michele Patocchi, a Swiss national, accepted his appointment as President of the Tribunal by the Chairman of the ICSID Administrative Council in accordance with Article 38 of the ICSID Convention.

13.    On 12 June 2013 the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "ICSID Arbitration Rules"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was, therefore, constituted on that date.  Ms. Geraldine R. Fischer, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

14.    On 11 September 2013 the Tribunal held a first session with the Parties in London. The Parties confirmed that the Members of the Tribunal had been validly appointed.

It was agreed, *inter alia*, that: *(i)* the applicable Arbitration Rules would be those in effect from 10 April 2006; *(ii)* the procedural language would be English, and *(iii)* the place of the proceedings would be London, United Kingdom.  The Parties agreed on a timetable for the jurisdictional/merits phase of the proceedings, including production of documents.  On 10 October 2013, after consultation with the Parties, the President of the Tribunal issued Procedural Order No. 1 which embodied the Parties' agreements on procedural matters including the procedural timetable (the "Timetable", Annex A to Procedural Order No. 1).

15.     In Procedural Order No. 2 of 26 November 2013 the Tribunal modified the Timetable further to the Claimant's application.

16.     On 6 December 2013 the Claimant filed a Memorial with the following supporting documents:

- Witness Statement of Mr. Virginijus Strioga ("CWS-1");
- Witness Statement of Mr. Aleksas Jautakis ("CWS-2");
- Witness Statement of Ms. Svetlana Rogozina ("CWS-3");
- Witness Statement of Ms. Evisa Uškāne ("CWS-4");
- Witness Statement of Mr. Levs Voronovs ("CWS-5");
- Expert Report on *Quantum* from Dr. Serena Hesmondhalgh of The Brattle Group ("ER Hesmondhalgh I");
- Factual Exhibits C-34 to C-215; and
- Legal Authorities CLA-23 to CLA-42.

17.     On 18 April 2014 the Respondent submitted its Memorial on Preliminary Objections ("Preliminary Objections") and Request for Bifurcation ("Request for Bifurcation") and Counter-Memorial on the Merits with the following supporting documents:

- Expert Report on Valuation Quantification of Damages Prepared by Mr. Michael Peer of KPMG Baltics SIA ("ER Peer I");
- Factual Exhibits R-1 to R-14; and
- Legal Authorities RLA-1 to RLA-15.

18.     In its Preliminary Objections and Request for Bifurcation the Respondent requested *inter alia* that the Tribunal stay the proceedings.

19.     On 1 May 2014 the Claimant wrote to the Tribunal regarding the Respondent's submission of 18 April 2014, stating that such submission did not contain an application for bifurcation.   The Claimant further requested confirmation that the Tribunal would proceed in accordance with the Timetable set out in Annex A of Procedural Order No. 1 of 10 October 2013 ("Applicable Timetable if Tribunal Decides to Join Preliminary Objections to the Merits").

20.     On 5 May 2014 the President of the Tribunal directed the Respondent to clarify by 12 May 2014 whether it sought bifurcation, and, if so, on what basis.   The Tribunal also directed the Claimant to answer the Respondent's letter of 12 May 2014 as well as the Respondent's request for a stay of proceedings by 19 May 2014.

21.     On 12 May 2014 the Respondent submitted its Clarificatory Statement on its Request for Bifurcation stating that it sought bifurcation.

22.     On 19 May 2014 the Claimant submitted its Response opposing the Respondent's Request for Bifurcation.

23.     On 30 May 2014 the Tribunal in Procedural Order No. 3 denied the Respondent's Request for Bifurcation and joined the Respondent's "preliminary objections" to the merits, stating that a further decision setting out reasons would be sent to the Parties as soon as possible in the following weeks.   The Tribunal also denied the Respondent's application for a stay of these proceedings pending a final and binding decision by the courts of Latvia on Case No. C03051107.   On 21 January 2015 the Tribunal in Procedural Order No. 3*bis* gave reasons for its decision declining the bifurcation and the stay of proceedings sought by the Respondent.

24.     On 18 August 2014 the Tribunal ruled on the Parties' requests for production of documents in Procedural Order No. 4.

25.     On 1 October 2014 the Tribunal decided on certain document production issues and amended the Timetable in Procedural Order No. 5.

26.     On 10 October 2014 the Claimant filed a Reply on the Merits and Counter-Memorial on the Respondent's Preliminary Objections with the following supporting documents:

4

- Second Witness Statement of Mr. Virginijus Strioga ("CWS-6");

- Second Witness Statement of Mr. Aleksas Jautakis ("CWS-7");

- Second Witness Statement of Ms. Svetlana Rogozina ("CWS-8");

- Second Expert Report on *Quantum* from Dr. Serena Hesmondhalgh of The Brattle Group ("ER Hesmondhalgh II");

- Expert Report of Dr. Dagnija Blumberga ("ER Blumberga I");

- Factual Exhibits C-216 to C-252; and

- Legal Authorities CLA-43 to CLA-45.

27. On 12 December 2014 the Respondent filed a Rejoinder on the Merits and Reply on Preliminary Objections with the following supporting documents:

- Third Expert Report on Quantification of Damages prepared by Mr. Michael Peer of KPMG Baltics SIA ("ER Peer III");[5]

- Factual Exhibits R-15 to R-21; and

- Legal Authorities RLA-16 to RLA-19.

28. On 2 January 2015 the Claimant filed a Rejoinder on the Respondent's Preliminary Objections.

29. On 19 January 2015 the Tribunal held a pre-hearing organisational meeting with the Parties via telephone conference. The Tribunal then decided the points of procedure and organisation in dispute between the Parties in Procedural Order No. 6 of 16 February 2015.

30. On 9 February 2015 the Parties filed their Skeleton Arguments.

31. A hearing on the Preliminary Objections and the Merits took place from 23 to 27 February 2015 in London, United Kingdom ("Hearing"). In addition to the Members of the Tribunal, the Secretary of the Tribunal, the Hearing was attended by the following persons:

---

[5] ER Peer I was filed by the Respondent on 18 April 2014, see paragraph 17 above. ER Peer III ¶ 1.2.1 mentions an ER Peer II dated 1 September 2014, which was KPMG's re-calculation of the heating tariffs and the underlying detailed calculations obtained from the Regulator's archive which the Respondent provided to the Claimant in the document production phase pursuant to Procedural Order No. 4 ¶ 13. ER Peer II was not filed in these proceedings.

For the Claimant:

Mr. George Burn                     Vinson & Elkins
Mr. Alexander Slade                 Vinson & Elkins
Ms. Ciara Ros                       Vinson & Elkins
Mr. Agris Repšs                     Sorainen
Mr. Martins Paparinskis             Sorainen
Ms. Žydruole Ažukiene               UAB E energija
Ms. Raminta Barauskiene             UAB E energija
Ms. Ilinca Popescu                  The Brattle Group

For the Respondent:

Mr. Ivars Mēkons                    Latvian State Chancellery
Mr. Ermīns Darapoļskis              Attorney, the Rēzekne Municipality

32.    The following persons were examined:

On behalf of the Claimant:

Mr. Virginijus Strioga              UAB E energija
Mr. Aleksas Jautakis                UAB E energija
Ms. Evisa Uškāne                    SIA Latgales Enerģija
Dr. Serena Hesmondhalgh             The Brattle Group
Dr. Dagnija Blumberga               Riga Technical University

On behalf of the Respondent:

Mr. Michael Peer                    KPMG
Mr. Andris Puriņš                   KPMG

33.    In addition to the examination of the persons mentioned above, the Tribunal heard opening and closing arguments.

34.    An audio recording and a full transcript of the Hearing was provided to the Parties.

35.    During the Hearing, on 23 February 2015 the Claimant objected to the introduction of new documents by the Respondent.  On the same day the Claimant nevertheless consented to the inclusion of Exhibit R-22.  The Tribunal subsequently admitted Exhibit R-23.

36.    On 26 February 2015 the Tribunal in Procedural Order No. 7 authorised the Respondent to file a short report setting out Mr. Peer's comments on the new points made by Dr. Hesmondhalgh at the Hearing.  The Claimant was in turn authorised to file its comments on such short report.

37.    On 9 March 2015 the Tribunal in Procedural Order No. 8 confirmed the directions given to the Parties at the Hearing with respect to the specific questions on which the Parties were entitled to file short submissions.

38.    On 20 March 2015 the Claimant filed its submission to answer the questions set out in the Tribunal's Procedural Order No. 8 including sixteen exhibits containing English translations of Latvian statutes, which the Tribunal renumbered in accordance with applicable procedural rules as follows:

- Legal Authorities CLA-46 (first translation) to CLA-61 (last translation).

39.    On the same day the Respondent filed its submission to answer the questions set out in the Tribunal's Procedural Order No. 8 with the following supporting documents:

- Fourth Expert Report on Quantification of Damages prepared by Michael Peer of KPMG Baltics SIA ("ER Peer IV");
- Expert Report regarding Loans and Guarantees provided in the context of Damages prepared by Michael Peer of KMPG Baltics SIA ("ER Peer IVB");
- Factual Exhibits R-22 to R-35; and
- Legal Authorities RLA-20 to RLA-39.

40.    On 26 March 2015 the Claimant pointed out in a message to the Tribunal that the Respondent had disregarded the terms of Procedural Orders No. 1 and No. 8 by submitting new evidence with its submission of 20 March 2015.  On 30 March 2015 the Claimant elaborated on its objection and requested that certain Factual Exhibits (R-24, R-25, R-26, R-27, R-28, R-29, R-30, R-32, R-33 and R-35) and Legal Authorities (RLA-21, RLA-22, RLA-24, RLA-34, RLA-37 and RLA-38) be struck off the record.

41.    On 10 April 2015 the Claimant filed the Third Expert Report on *quantum* from Dr. Serena Hesmondhalgh of The Brattle Group ("ER Hesmondhalgh III").  The Claimant further reiterated its request that the Tribunal strike the Respondent's unauthorised documents from the record or permit the Claimant to respond to them.

42.     On the same day the Respondent sought leave to comment on the Claimant's submissions dated 20 and 30 March 2015 and filed its Rebuttal Submission in accordance with Procedural Order No. 8, together with the following supporting documents:

   • Factual Exhibits R-36 and R-37.

43.     On 15 April 2015 the Claimant objected to the Respondent's request to comment on its submissions of 20 and 30 March 2015 as well as to the filing of Exhibits R-36 and R-37.

44.     On 13 May 2015 the Tribunal in Procedural Order No. 9 authorised the Parties to file a short rebuttal to the submissions filed on 20 March 2015 and indicated that, upon the filing of such rebuttal, no further submissions would be admitted.  The Parties filed their rebuttal submissions by 1 June 2015 in accordance with Procedural Order No. 9.

45.     On 21 October 2016 the Claimant informed ICSID that all the proceedings to which Latgales Enerģija had been a party before the Latvian courts had been concluded, that all funds that had been frozen had been paid out by the court and that Latgales Enerģija had not received any amount out of such funds.

46.     On 11 November 2016 the Respondent replied in accordance with the Tribunal's directions of 26 October 2016 that *(i)* Case No. C03051107 had been concluded by a judgment of the Supreme Court of Latvia dated 30 November 2015 and made available in a full version on 12 February 2016; Latgales Enerģija had not challenged that judgment and therefore the Claimant had accepted the economic outcome of the whole dispute; *(ii)* on 11 August 2016 the bailiff had issued the calculation regarding the distribution of the seized funds, which was not challenged by Latgales Enerģija either; the Respondent confirmed in its letter "the fact that the Claimant has not received any amount back from the previously seized funds";[6] contending that such

---

[6] However, the Respondent further stated that "the Claimant has now, after proper local adjudication, been entitled to the previously seized funds (without prejudice to the reasonable demand that its subsidiary shall pay out its debts, and having been given the opportunity to challenge bailiff's actions with regard to the current distribution of the previously seized funds)".

circumstance could not be relied upon against it under the Treaty; and *(iii)* the Respondent maintained its position on double-counting.

47.     On 11 November 2016 the Tribunal invited further comments from the Parties limited to five pages, and indicated that either Party was authorised to produce the 30 November 2015 judgment; the Parties' comments were received on 6 and 19 December 2016 respectively.

48.     On 6 December 2016 the Claimant replied that by its previous communication it had simply intended to inform the Tribunal of the final outcome of one factual issue on which the Parties' experts had expressed an opinion, namely that there might be a double recovery in case the Claimant or Latgales Enerģija had ever recovered part of the frozen funds.   The Claimant rejected the points made by the Respondent, confirming that Latgales Enerģija had not received any funds and was not entitled to receive any; it also provided a breakdown showing that the majority of the funds were paid to Rēzeknes Siltumtīkli (more precisely EUR 1,282,246.76 out of EUR 1,571,697.66).

49.     On 19 December 2016 the Respondent sent its comments, to which it attached *(i)* the Supreme Court judgment dated 30 November 2015 in Case No. C03051107, *(ii)* the decision of the judge of the Chamber of Civil Cases of the Supreme Court dated 29 June 2016 dismissing Latgales Enerģija's application for cassation filed against the 30 November 2015 judgment as well as two further exhibits.   The Respondent first summarised the Parties' respective cases in its submission, and then commented on the "special role attributed by the Claimant to civil case No. C03051107".   The Respondent pointed out that the 30 November 2015 judgment decided that Latgales Enerģija was under a duty to pay the full price of the natural gas supplied, and not only to the extent of the latest natural gas tariff approved by the Regulator.   As to the allocation of Latgales Enerģija's frozen funds decided by the bailiff, the figures indicated by the Respondent are not entirely in line with those indicated by the Claimant (according to the Respondent EUR 123,115.49 were allocated to a debt owed to JSC Lariva, the assignee of Explicit Consulting Group Ltd.; EUR 1,092,006.06 to Rēzeknes Siltumtīkli); that was said to be a normal distribution of the funds in enforcement proceedings and the funds were therefore to be regarded "under the Treaty, as released from injunction to the benefit of the Claimant".   The

9

Respondent concluded that the Claimant by its conduct in relation to the Latvian proceedings as a whole expressed "[its] interest and willingness to abide by the final verdict in domestic civil procedure No. 03051107 (…)".

50.   On 7 September 2016 the Tribunal was informed that the Respondent was no longer represented by Mr. Ivars Mēkons but rather by Ms. Ilze Dubava and Ms. Nērika Lizinska, legal advisers with the State Chancellery of Latvia.  On 8 September 2017 the Tribunal was further informed that Mr. George Burn left Vinson & Elkins who continued to be instructed in the present matter.  The Claimant requested all future correspondence to be addressed to Mr. Mark Beeley and Mr. Alexander Slade.

51.   The proceedings were closed on 11 October 2017.

## III.   FACTS

52.   In this section of the present Award the Tribunal will outline the facts of the case as far as possible in chronological order from 2004 onwards.  The facts of the case are uncontested to a considerable extent.

### A.   HEATING IN RĒZEKNE AND THE 2004 GAS SUPPLY AGREEMENT (2004)

53.   The city of Rēzekne, the capital of the Latvian eastern province of Latgale, is the seventh largest city in Latvia.  It had a population of approximately 25,000 inhabitants in 2004 when the Parties started their talks.  Rēzekne was then in a region with a high unemployment rate, low wages, a negative migration rate and low economic activity.[7]

54.   The Rēzekne Municipality, which at the relevant time controlled the body regulating district heating services in Rēzekne, acts through its decision-making body, the Rēzekne City Council ("RCC"), comprised of local politicians appointed in local elections.[8]

55.   In Latvia the heating supply for a city, town or a district is centralized; heat and hot water are piped directly into homes and businesses from a number of large boiler

---

[7]  Resp. Obj. J. & C-Mem. ¶ 3.2.  See also Gas Supply Agreement, C-40 p. 3, ¶ E.  These factors are also described in the "Guidelines for the Development of the Rēzekne City Heat Supply System" submitted by Latgales Enerģija to the Municipality (see paragraph 164 below), C-44 pp. 6-9.

[8]  On the 2005 elections, see paragraphs 128 and 139 ff. below.

houses. District heating providers owned and controlled by the local municipalities and having the status of municipality undertakings supply heating to consumers and small businesses. The heating provider in any one region enjoys a monopoly in the supply of district heating.[9]

56. In 2004 the heating system ran on black oil and diesel. These were amongst the most expensive fuels used for district heating in Latvia.[10]

57. The Ministry of Economy of the Republic of Latvia had confirmed the need to switch from those fuels to natural gas and develop the infrastructure required in order for natural gas to be used.[11]

58. Heating prices ("tariffs") were regulated by the State in order to protect the interest of users.[12]

59. The body in charge of setting tariffs for district heating services for the territory of Rēzekne was the Multi-Industry Public Utility Regulator of the Latgale Municipalities (the "Regulator") at all relevant times for the purposes of these proceedings. The Regulator had been established by 31 Municipalities and had started to work in late August 2002.[13]

60. The tariff in force when the heating system was leased to Latgales Enerǵija in spring 2005 was LVL 21.50/MWh for residents and LVL 22.26/MWh for other users[14] in accordance with the Regulator's decision No. 9 dated 10 November 2003.[15]

61. Prior to 2015, district heating and hot water had been provided by AS Rēzeknes Siltumtīkli ("Rēzeknes Siltmtīkli"), a public limited liability company[16] wholly owned by the Rēzekne Municipality.[17]

---

[9] RfA ¶¶ 17-18.

[10] RfA ¶ 22.

[11] See paragraph F of the Gas Supply Agreement, C-40, p. 3.

[12] See Sect. 5 of the Public Utility Regulators Act (CLA-49) and Sect. 3 of the Energy Act (CLA-48).

[13] C-36.

[14] Ms. Rogozina explains in her first Witness Statement that "other users" is a general expression including companies owned by public entities, private companies as well as individual merchants (CWS-3 ¶ 11).

[15] This decision is recalled in the Regulator's decision No. 18 of 2 November 2005 (C-77 [page 1]). See also the first Witness Statement of Ms. Rogozina, CWS-3 ¶ 15.

62.    Rēzeknes Siltumtīkli had been operating the system at a loss, and, by mid-2004, it was in default with respect to its obligations to suppliers.  The system was "highly subsidized and economically inefficient"[18] also due to technical causes.[19]  Rēzeknes Siltumtīkli took out loans from AS "Latvijas Unibanka" ("Latvijas Unibanka")[20] and AS "Baltic Trust Bank"[21] ("Baltic Trust Bank").  The loans were secured by pledges granted by Rēzeknes Siltumtīkli and the Municipality over their real estate.[22]  There was a risk that Rēzeknes Siltumtīkli might be unable to ensure the supply of heating services during the heating season of September 2004-May 2005.[23]

63.    On 29 April 2004 the Rēzekne Municipality, Rēzeknes Siltumtīkli and Latvijas Gāze entered into a long-term gas supply agreement (the "Gas Supply Agreement")[24] for a twenty-year period (Clause 19.2 of the Gas Supply Agreement).  Under the terms of the agreement the Rēzekne Municipality undertook to purchase and pay a minimum

---

[16]  See the Long-Term Agreement, C-4 p. 4, Clause 1.1(g) and C-4 p. 7, Clause 3.2.1(a); see also the first whereas clause of the February 2005 Agreement, C-8 [page 8].

[17]   See the first whereas clause of the Long-Term Agreement, C-4 p. 4, the first whereas clause of the February 2005 Agreement, C-8 [page 8] and Clause 1 of the February 2006 Agreement, C-16.
Rēzeknes Siltumtīkli acknowledged that it was wholly owned by the Rēzekne Municipality in proceedings it brought before the Latvian courts, as noted by the Supreme Court of Latvia in its decision of 7 April 2014, R-8 ¶ 11.

[18]  Resp. Obj. J. & C-Mem. ¶ 3.1.

[19]   For instance, the central boiler house in Rancāna iela had been commissioned back in 1975 and heat loss in the underground heat networks reached a figure of 20% (C-44 p. 12; 14); the majority of the heating lines were installed in the 1970s and 1980s and their life cycle was of some 20 years (C-44 p. 14).

[20]  See Clauses 2.1.1, 2.1.2 and 2.1.8 of the Guarantee Agreement, C-43, as well as Clause 3.2.2(b) of the Long-Term Agreement, C-4.

[21]  See Clause 3.2.2(b) of the Long-Term Agreement, C-4.

[22]   See Clause 2.1.5 of the Guarantee Agreement, C-43, and Clause 3.2.2(b) of the Long-Term Agreement, C-4.  The former provision mentions "the commercial pledge and mortgage" provided by Rēzeknes Siltumtīkli whereas the latter mentions only a "mortgage".

[23]   See the second whereas clause of the February 2005 Agreement (C-8 [page 8]) which reads as follows:

> whereas the Council as the Lessor's shareholder organized a tender in 2004 on concession of the Lessor's heating supply resources and whereas the tender results were revoked, which resulted in insufficient amount of funds at the Lessor's disposal in the heating season 2004/2005 to settle accounts with its existing creditors, as well as to be able to provide fully-fledged heating supply services in the administrative territory of the Rēzekne city municipality.

[24]  C-40; the full title of the agreement is "Agreement No. 1580 on Construction of a New Natural Gas Infrastructure for Gasification of the City of Rēzekne Due to Long-Term Supplies of Natural Gas to the User for Combustion Facilities of Various Mutually Replaceable Fuels (Natural Gas and Oil Products)".
This agreement was amended and supplemented by the parties on 1 June 2005, C-61, see paragraph 136 below and on 19 December 2005, C-81, see paragraph 160 below.

quantity of natural gas each year (namely 87.5% of 24 million nm$^3$ per year),[25] and a failure to pay was sanctioned by a contractual penalty.[26]

64.     Clause 8.3 of the Gas Supply Agreement provides that payments for the natural gas are made by the Municipality.

65.     Clause 16.1 of the Gas Supply Agreement expressly states that the Municipality's liability under the terms of the agreement is maintained in case the Municipality were "to authorise the User or another person to perform all the obligations or (…) part [of them] on behalf of the [Rēzekne] Municipality".

66.     In addition to the typical sale and purchase obligations in a gas supply agreement, the Gas Supply Agreement contains further provisions relating to the infrastructure required to use natural gas.   Paragraph D of the preamble states that one of the purposes of the agreement "… is [the] gasification of the City of Rēzekne requested by RPD [the Rēzekne Municipality] and the User …".   More specifically, Latvijas Gāze undertook in Clause 2.2 to "make all necessary investments in a new natural gas supply infrastructure" up to the City borders.   The Gas Supply Agreement further provides in Clause 2.4 that Rēzeknes Siltumtīkli will for its part build "gas pipes and equipment regulating gas pressure" from its boiler house façade to the consumers' or other users' places.

## B.     THE ORIGINAL ARRANGEMENTS AND MAIN EVENTS (END OF 2004-2005)

### (1)     THE DECISION BY THE RĒZEKNE MUNICIPALITY TO HAVE RECOURSE TO A FOREIGN INVESTOR IN ORDER TO PROVIDE HEATING SERVICES (2004)

67.     In early 2004 the Rēzekne Municipality called for tenders to improve the quality and the efficiency of the district heating system.   Aside from a few indications in Mr. Strioga's first Witness Statement,[27] the record contains limited information in this respect.   Bidders were to submit their bids by 30 March 2004, 2:00 *p.m.*; the bid opening would take place two hours later.[28]   The committee in charge would hold a

---

[25]   C-40, Clauses 3.1 and 8.3.

[26]   C-40, Clause 3.4.

[27]   CWS-1 ¶¶ 7-10; Mr. Strioga was E energija's CEO and controlling shareholder at all relevant times.

[28]   C-223.

closed session on the following day to select a bidder.[29]  It is common ground that, in the end, no suitable candidate emerged.[30]

68.    The Rēzekne Municipality then entered into direct negotiations with E energija and two Latvian companies, R.S. and SIA Wesemann.[31]

69.    On 3 August 2004 the Rēzekne City Council adopted resolution No. 199 which authorised Rēzeknes Siltumtīkli to lease out its fixed assets, that is the heating infrastructure, for a long-term period "taking into consideration the current actual and financial status of joint stock company Rēzeknes Siltumtīkli (…)".[32]

70.    On 25 November 2004 Mr. Strioga, and Mr. Arnoldas Burkovskis, E energija's CFO, gave a presentation to the Rēzekne City Council.[33]  The purpose of the presentation was to persuade the Council that the privatization of the heating system was the better option.[34]

71.    The presentation addressed in particular the investment that would be required as a matter of urgency, in an amount of EUR 7.7 million.[35]  In his witness statement Mr. Strioga indicated that such investment "would have been made within 5 years (2006-2011)"; the investment was divided into three phases, the third phase being so-called cogeneration.[36]

72.    The presentation further dealt with Rēzeknes Siltumtīkli's financial situation, including debts in an amount of LVL 1,190,000 and the aid from EU structural funds, which was regarded as insufficient.[37]  The involvement of an investor was presented

---

[29]  C-223.

[30]  Resp. Obj. J. & C-Mem. ¶ 3.1.  See also the second whereas clause of the February 2004 Agreement, C-8 [page 8].

[31]  CWS-1 ¶ 9.

[32]  R-24.1; this resolution is stated to be contained in Appendix No. 2B to the Long-Term Agreement, Art. 14 of the Long-Term Agreement, C-4 p. 37; however, such resolution is not part of Exhibit C-4 (either in the Latvian or the English language).

[33]  C-41.

[34]  CWS-1 ¶ 11.

[35]  C-41 [page 3]; broken down as follows: (i) replacement of boilers and boiler equipment: EUR 4.1 million; (ii) modernization of heat units: EUR 3.2 million and (iii) renovation of heating mains: EUR 0.4 million.

[36]  CWS-1 ¶ 14.

[37]  C-41 [pages 2-3].

as one possible solution, subject to a number of different commercial and legal arrangements.

73.     E energija's own proposal for the Rēzekne City Council completed the presentation. According to such proposal Rēzeknes Siltumtīkli could lease its heating infrastructure to E energija for a period of 20 to 30 years, in consideration of E energija's undertaking to invest an amount from EUR 10 to 12 million in the same period. Alternatively, the lease could relate to Rēzeknes Siltumtīkli as a whole: "lease of RS property or lease of RS itself (lease of business)".[38]   The heating price would be reduced to 21.15 LVL/MWh from March 2005.[39]

E energija would undertake to review the heat price taking into account changes only in the prices of gas, electricity and water as well as the impact of changes in inflation and taxation.  E energija would further assume Rēzeknes Siltumtīkli's debts and treat them as rent payment.  Upon expiry of the lease the value of the heating infrastructure to be returned to Rēzeknes Siltumtīkli would not be less than the value at the start of the lease period.[40]

### (2)     THE INCORPORATION OF LATGALES ENERĢIJA (20 DECEMBER 2004)

74.     Latgales Enerģija was incorporated on 20 December 2004 as a limited liability company having its registered office in Riga, Latvia.[41]

### (3)     THE GUARANTEE AGREEMENT (30 DECEMBER 2004)

75.     The renegotiation of Rēzeknes Siltumtīkli's debts took place in the latter part of 2004 and required a number of meetings and discussions.[42]

76.     On 30 December 2004 E energija (as the "Guarantor") entered into a Guarantee Agreement with AS "Latvijas Unibanka" ("Latvijas Unibanka", as the "Creditor")

---

[38] C-41 [page 4].

[39] C-41 [page 4].

[40] C-41 [page 4].

[41] C-5; as of that date, E energija was Latgales Enerģija's sole shareholder with 200 shares with a nominal value of LVL 100 each (C-5 [page 14]), duly paid in (C-42; C-55).

[42] CWS-1 ¶ 21.

15

(the "Guarantee Agreement")[43] to provide "guarantee and security" with respect to the obligations arising under the "Main Agreements" entered into by Rēzeknes Siltumtīkli and Latvijas Unibanka.  The bank held security over Rēzeknes Siltumtīkli's assets and would not permit them to be leased without adequate security being provided, as explained by Mr. Strioga and Mr. Jautakis.[44]

77.    The amounts stated to be owed by Rēzeknes Siltumtīkli as of the time of the execution of the Guarantee Agreement arose under different loans or credit lines, for a total amount of LVL 2,536,256.[45]   E energija undertook to guarantee such debts, unconditionally and irrevocably, having waived its right to demand that the Creditor should first assert its right to payment as against Rēzeknes Siltumtīkli as the Debtor.[46]

The amount set out above corresponded to both Rēzeknes Siltumtīkli's short-time debts to Latvijas Unibanka mentioned in Clause 4.4.3(a) of the Long-Term Agreement and Rēzeknes Siltumtīkli's long-time debts to Latvijas Unibanka mentioned in Clause 4.4.4(a) of the Long-Term Agreement (see paragraphs 88 and 89 below).

The Guarantee Agreement related also to the obligations of the Rēzekne City Council as the guarantor with respect to the credit agreements mentioned in Clauses 1.6 and 1.7 of the Guarantee Agreement.

---

[43]   C-43. The Guarantee Agreement is set out in two-column format with the English and the Latvian texts in parallel; in case of discrepancies between the two texts, the English version shall prevail according to Clause 4.6.  The Guarantee Agreement is stated to be governed by the laws of the Republic of Latvia (Clause 4.3).

[44]   CWS-1 ¶ 38 and CWS-2 ¶ 23.

[45]   C-43, Clauses 1.3 to 1.7.  As explained by Mr. Jautakis in his first Witness Statement (CWS-2 ¶ 24), these sums were then reflected in Clauses 4.4.3(a) and 4.4.4(a) of the Long-Term Agreement (C-4) and were "taken over" by Latgales Enerģija in due course, see paragraph 88 below.

The breakdown of the total amount was as follows:

   (i)     LVL 746,660 (under Credit Agreement No. RA 02155);
   (ii)    LVL 921,866 (under Credit Agreement No. RA 02219);
   (iii)   LVL 127,730 (under Credit Agreement No. RA 02300);
   (iv)    LVL 350,000 (under Credit Agreement No. RA 03357); and
   (v)     LVL 390,000 (under Credit Agreement No. RA 04454).

[46]   C-43, Clauses 2.1 and 2.1.8.

### (4)    THE AGREEMENT FOR LEASE, RENOVATION AND OPERATION OF LONG-TERM ASSETS (28 JANUARY 2005) (THE "LONG-TERM AGREEMENT")

78.    A draft agreement was reviewed by representatives of Rēzeknes Siltumtīkli, the Rēzekne City Council and Latgales Enerģija on 27 January 2005.[47]

79.    On 28 January 2005 an agreement entitled "Agreement for Lease, Renovation and Operation of Long-Term Assets" was signed by Rēzeknes Siltumtīkli (as the "Lessor") and Latgales Enerģija (as the "Operator") (the "Long-Term Agreement").[48] The Long-Term Agreement is stated to be governed by the laws of the Republic of Latvia (Clause 11.1). The signature of the Long-Term Agreement had been authorised on the same day by Rēzeknes Siltumtīkli's Council upon the Board's request.[49]

80.    The first clause in the recitals of the Long-Term Agreement recalls the resolution of the Rēzekne City Council to "allow Rēzeknes Siltumtīkli to lease out its fixed assets for a long-term period". The second clause in the recitals of the same agreement mentions Latgales Enerģija's readiness and willingness "to modernise the heating supply system" and enable "a transfer from heavy oil fuel to natural gas as a resource for heating energy production", "increase effectiveness of use of energy resources" and "fulfil the obligations of AS Rēzeknes Siltumtīkli against its creditors".[50]

81.    The subject-matter of the Long-Term Agreement is set out in Clause 2.2 as follows:[51]

> 2.2    The subject of the Agreement shall be lease of the Assets and investment into the Assets located in the city of Rēzekne and currently run by Lessor. By entering into the present Agreement the Lessor shall undertake to lease to the Operator the Assets, and the Operator shall undertake to use the Assets in order to operate the Business and settle accounts with the Lessor in the order and on conditions described in the Agreement.
>
> 2.3    The Operator does not assume any liability or obligations of the Lessor and/or the Municipality other than liabilities directly undertaken under the Agreement.

---

[47] R-24 [pages 3-4].

[48] C-4; the Long-Term Agreement is set out in two-column format with the English and the Latvian texts in parallel; in case of discrepancies between the two texts, the Latvian version shall prevail according to Clause 13.4.

[49] R-24 [pages 2 and 5].

[50] C-4 p. 4.

[51] C-4 p. 6.

82.    The term "Assets" is defined in Clause 1.1(a) of the Long-Term Agreement as "all long-term assets" owned by Rēzeknes Siltumtīkli, including land, buildings, constructions, technological equipment and machines and other fixed and intangible assets set out in Appendix No. 1 to the Long-Term Agreement.  Rēzeknes Siltumtīkli represented and warranted *inter alia* that it was the owner of the assets and had all agreements and employees to carry on the Business as a going concern.[52]

83.    The term "Business" means "the heat production, supply and division business and power generation business operated by the Lessor".[53]

84.    The Long-Term Agreement was entered into for a period of 30 years.[54]

85.    Upon expiry of the lease, all investments made by Latgales Enerģija as well as any improvements, modernization or rearrangement as well as any new structures would become the property of Rēzeknes Siltumtīkli pursuant to the terms of a deed to be executed by reference to the market price at the time of the transfer.[55]  The Assets would be returned to Rēzeknes Siltumtīkli in accordance with Clause 7.1.5 of the Long-Term Agreement.

86.    Latgales Enerģija had the right, in its own discretion, to execute all works for major or current reconstruction or repair of the Assets necessary to renovate or modernize such Assets and to use them freely and without hindrance to supply heat and/or power to the consumers,[56] all improvements to the Assets to be transferred to Rēzeknes Siltumtīkli upon expiry of the lease.[57]

87.    Latgales Enerģija would own all revenue and profit received during the term of the lease and would be entitled to use such revenue and profit in its own discretion.[58]

88.    Latgales Enerģija undertook to pay Rēzeknes Siltumtīkli an amount of LVL 5,100,000 in total including VAT, which amount included *(i)* the book value as

---

[52] C-4, Clause 3.2.4(a).
[53] C-4, Clause 1.1(b).
[54] C-4, Clause 4.2.1.
[55] C-4, Clause 7.1.3.
[56] C-4, Clauses 4.3.5 and 7.1.2, 2nd sentence.
[57] C-4, Clause 4.3.6.
[58] C-4, Clause 4.3.9.

of 1 January 2005 of Rēzeknes Siltumtīkli's short-time debts to creditors in an amount of LVL 1,448,977,[59] which debts Latgales Enerģija agreed to "take over from Rēzeknes Siltumtīkli",[60] the creditors being Latvijas Unibanka, SIA "AVT Nafta" and SIA "Dinaburga Rosme", *(ii)* a yearly amount of LVL 200,000 to settle Rēzeknes Siltumtīkli's debts in the first three years[61] and a yearly amount of LVL 85,185 for each year of lease except in the first three years,[62] as well as *(iii)* a further payment by Latgales Enerģija covering depreciation and an additional five percent of the book value of the Assets upon returning such Assets to Rēzeknes Siltumtīkli.[63]

89.   In addition to Rēzeknes Siltumtīkli's short-term debts, Latgales Enerģija was "entitled" under Clause 4.4.4 to "take over" Rēzeknes Siltumtīkli's long-term debts to Latvijas Unibanka amounting to LVL 746,660 arising out of Credit Agreement No. RA 02155 and LVL 921,866 arising out of Credit Agreement No. RA 02219 (a total amount of LVL 1,668,526) as well as Rēzeknes Siltumtīkli's long-term debts to Baltic Trust Bank in an amount of LVL 680,817.

90.   Latgales Enerģija further undertook to take over all of Rēzeknes Siltumtīkli's employees (set out in Appendix 3) in accordance with Latvian Law.[64]

91.   Clause 6 of the Long-Term Agreement deals with Rēzeknes Siltumtīkli's rights and obligations in some further detail.

92.   Clause 7 of the Long-Term Agreement deals with Latgales Enerģija's rights and obligations in some further detail; in particular Latgales Enerģija undertook to invest not less than EUR 1.5 million in the heat supply facilities within three years of the date on which the Long-Term Agreement had entered into force in order to ensure that Rēzeknes Siltumtīkli could perform the duties owed to Latvijas Gāze and undertaken under the Gas Supply Agreement[65] (Clause 7.1.1), and to increase its

---

[59]  This amount was reassessed at LVL1,220,799.50 when the Assets and the Employees were taken over by Latgales Enerģija (C-49), see paragraph 119 below.  It was then increased in 2006 in the Amended Long-Term Agreement, see paragraph 166 below.

[60]  C-4, Clauses 4.4.1 and 4.4.3.

[61]  C-4, Clause 4.4.1(a).

[62]  C-4, Clause 4.4.1(b).

[63]  C-4, Clause 4.4.2.

[64]  C-4, Clause 5.

[65]  C-40, see paragraph 63 above.

share capital to LVL 500,000 within two weeks of the entry into force of the Long-Term Agreement (Clause 7.7).[66]

93.    Clause 8 deals with Latgales Enerģija's position as the Operator in relevant part as follows:[67]

> 8.1    For the period the Agreement is valid, the Operator shall remain to be the exclusive heat supplier and shall undertake to supply heat and power energy to all the consumers who used to be supplied heat and power by means of the Assets leased according to the Agreement before the moment such Agreement has been signed.
>
> 8.2    The Operator shall supply heat and power to the consumers and service heat, power and hot water supply systems following the technological obligations of the Operator stated by the laws.   The order and conditions for servicing heat and power energy supply and systems of each consumer shall be defined in the agreement for supply of heat and power energy, consumption and payment to be signed with each consumer.

94.    The Long-Term Agreement would enter into force provided that the conditions precedent in Clause 12.4 were met, including the execution of an agreement between the Municipality and Latgales Enerģija relating to the performance of the Long-Term Agreement in accordance with Clause 12.4.3 (this agreement was entered into on 10 February 2005, see paragraph 100 below).

95.    The Long-Term Agreement contains express terms under which each party is entitled to terminate it unilaterally, provided that certain requirements are met.   Clause 12.5.2 deals with unilateral termination by Rēzeknes Siltumtīkli and reads as follows:[68]

> 12.5.2  Unilaterally by the Lessor in the event
>
> a)      the licence to perform Business is revoked due to fault of the Operator, or
>
> b)      the Operator fails without any legal grounds to make the lease payments in the order set by the Agreement for more than three consecutive payments (months).
>
> In such a case the Lessor shall warn and notify the Operator in writing about such default of the Agreement and fix the period of time of not less than 30

---

[66]  Latgales Enerģija's initial share capital as of December 2004 was of LVL 20,000, see paragraph 74 above.

[67]  C-4 pp. 29-30.

[68]  C-4 p. 33.

(thirty) days for the Operator to cure the default.  In the event the Operator fails to cure the default, the Agreement shall be deemed to have been terminated on the end of the term specified in such notification.

96.    Clause 12.7 of the Long-Term Agreement states that neither party can terminate the Agreement under Clauses 12.5.2 or 12.5.3 "during the period from July 1 to the end of the heating season next year of any calendar year".

97.    Clause 12 further deals with the monetary consequences of termination under Clause 12.5.2 in Clause 12.6 which reads as follows in relevant part:[69]

12.6    Settlement of accounts between the Parties and sanctions in case the Agreement is terminated prior to its term set in Clause 4.2:

12.6.1  In case the Agreement is terminated on the basis of the clauses 12.5.2 or 12.5.3, the Lessor must within 30 (thirty) days from the day the Agreement was terminated repay to the Operator all the investment the Operator has made into the assets leased (less depreciation) and take over all rights of claiming any consumers' unpaid amounts to the Operator for the nominal value of such debts (including interest and penalties) having accumulated within one year prior to the date of termination of the Agreement.

12.6.2  In the event the Lessor terminates the Agreement on the basis of clause 12.5.2, the Operator shall pay the penalty fee to the Lessor equal to 10 (ten) per cent of the amount the Operator has invested (less depreciation) into the assets leased.

98.    On 28 January 2005 the Rēzekne City Council approved the Long-Term Agreement.[70]

99.    The Long-Term Agreement was amended by the parties on 10 February 2006 (see paragraphs 166 ff. below).

**(5)    THE FEBRUARY 2005 AGREEMENT (10 FEBRUARY 2005)**

100.   The Rēzekne Municipality (through the Rēzekne City Council or the "Council") and Latgales Enerǧija (as the "Operator") made an agreement on 10 February 2005 (the "February 2005 Agreement").[71]   The expression "the Agreement" in the February 2005 Agreement refers to the Long-Term Agreement[72] and the "Lessor" to Rēzeknes

---

[69]   C-4 p. 34.

[70]   R-24 [page 6].

[71]   C-8.

[72]   C-8 [page 8], fourth whereas clause.

Siltumtīkli.[73]   As recalled in paragraph 94 above, the Long-Term Agreement itself contemplated the execution of a contract between the Municipality and Latgales Enerģija.

101.   Under the February 2005 Agreement Latgales Enerģija undertook *inter alia* the following duties to the Council:

(i)   to provide centralized heating supply services in the city of Rēzekne (Clause 1.1);

(ii)   to maintain and repair where required the heating supply system to ensure good-quality heating supply services (Clause 1.2);

(iii)   to coordinate the reconstruction work relating to the heating infrastructure and to start construction work after obtaining the permit required to that effect (Clause 1.3);

(iv)   to take any steps as may be required, as soon as possible, to obtain the production, distribution and transfer licences from the competent authority (Clause 1.4);

(v)   to ensure that rates would be increased only due to force majeure or as a result of an increase in the prices of gas, electricity, water or other energy sources, provided that such increase had resulted in an increase of 5% in the costs of production, distribution or transfer of one unit of thermal energy, unless otherwise provided by law, rates to be adjusted in any event in accordance with Latvian law (Clause 1.6); and,

(vi)   to perform its obligations to the creditors of Rēzeknes Siltumtīkli mentioned in the Long-Term Agreement (Clause 1.7).

102.   In the February 2005 Agreement the Rēzekne City Council undertook *inter alia* the following duties to Latgales Enerģija:

---

[73]   C-8 [page 8], first whereas clause.

(i)      not to hinder performance of the Long-Term Agreement by Latgales Enerģija (Clause 2.2) and,

(ii)     in accordance with Latvian law, to take all decisions required so that Latgales Enerģija could perform the Long-Term Agreement fully and without delay (Clause 2.8).

103.    Among the terms setting out the Rēzekne City Council's duties to Latgales Enerģija, Clause 2.10 reads as follows in relevant part:[74]

> 2.10   The Operator is and remains the only supplier of centralised heating to all consumers who received thermal energy from the Lessor at the moment that the Agreement is concluded. The Operator has the excusive rights to sell and supply centralised heating to residents, industrial consumers and cooperatives of residential houses in the city of Rēzekne. The Council undertakes not to adopt decisions and not to perform direct or indirect activities that would cause direct or indirect competition to the Operator's business in relation to the centralised heating supply and maintenance and servicing the heating supply networks, or any other operation undertaken by the Operator under the Agreement.
>
> The Council undertakes to ensure that the municipality functions determined by the law with regard to provision of centralised heating services are not transferred to other persons and the municipality would not get involved in other projects of centralised heating supply, including installation of co-generation stations (…).

104.    The February 2005 Agreement refers also to the Gas Supply Agreement[75] in Clause 4 which reads as follows in relevant part:[76]

> 4.    The parties agree that the Operator is entitled to enter an agreement with AS "Latvijas Gāze" on performance of Gas Purchase Agreement No 1580 [the Gas Supply Agreement, C-40]. If the mentioned agreement with AS "Latvijas Gāze" is not entered and transfer to gas heating is delayed due to the Council or third party fault resulting in failure of AS "Latvijas Gāze" to finish construction of natural gas infrastructure and preparation for operation in compliance with Gas Purchase Agreement No 1580, the Council undertakes to compensate the Operator for the losses incurred because the Operator keeps using black fuel oil instead of natural gas after the date when the natural gas infrastructure had to be constructed and prepared for operation in production of thermal energy under Gas Purchase Agreement No 1580 in the wording in force at the date of entering the Agreement.

---

[74] C-8 [page 10].

[75] C-40, see paragraph 63 above.

[76] C-8 [page 12].

> In any case the Council is not released from obligations undertaken by Gas Purchase Agreement No 1580 on purchase of a specified amount of gas for the needs of the city of Rēzekne, and respectively – if these obligations are not performed and AS "Latvijas Gāze" claims damages from the Council or the Lessor, or the Operator and/or a contractual penalty, the Council undertakes to pay AS "Latvijas Gāze" for these losses and pay the contractual penalties.

105.   The February 2005 Agreement further makes provision in Clause 6 for the remedies in case of breach of contract (damages as well as a penalty).

106.   The February 2005 Agreement was supplemented on 10 February 2006 (see paragraphs 169 ff. below).

### (6)   E ENERGIJA'S FURTHER INVESTMENT IN THE CAPITAL OF LATGALES ENERĢIJA (FEBRUARY-MAY 2005)

107.   In February 2005 E energija sold 98 out of its 200 shares in Latgales Enerģija to Levs Voronovs, Juris Vanags, Mārtiņš Lauva and SIA Energo Sistēmas, and its share in Latgales Enerģija's capital was reduced to LVL 10,200.[77]

108.   Further capital was contributed by all shareholders and E energija made a further contribution in an amount of EUR 300,000 and LVL 46,022.[78]  As a consequence, E energija's share in Latgales Enerģija's capital was equal to LVL 265,200 with a majority of 2,652 shares out of 5,200 shares as of 3 May 2005.[79]

### (7)   LOANS BY E ENERGIJA TO LATGALES ENERĢIJA (FROM FEBRUARY 2005 ONWARDS)

109.   E energija granted a number of loans to Latgales Enerģija from 18 February 2005 onwards.[80]  In the year 2005, E energia granted eight loans to Latgales Enerģija (one

---

[77]  C-5 and CWS-2 ¶ 9.

[78]  C-55 [page 3] and [page 5]; CWS-2 ¶ 10.

[79]  C-5 [page 15].

[80]  C-51 [pages 1-43].  This exhibit contains sixteen loans and/or amendments to existing loans granted by E energija to Latgales Enerģija from 2005 to 2007 included.  The original version of the loans is in the Russian language (in four cases in the Russian and Latvian language).

CWS-2 ¶ 14 with a table.  The dates in the table fail to reflect the correction in handwriting for the first two loans which is March (not February, as indicated).

24

of which was increased from EUR 380,000 to EUR 1 million in the same year), for a total amount of EUR 2,325,000.[81]

110.    The loans set out the borrower's duty to repay the loan with interest; they contain no provision as to their purpose or the manner in which the loan is to be used by the borrower, aside from the cases in which a loan was intended to consolidate or increase the amount of previous loans and a few other exceptions in cases where E energija would directly pay a third party.  Mr. Jautakis explained in his first Witness Statement that E energija granted all of these loans in connection with Latgales Enerģija's obligations arising under the Long-Term and the February 2005 Agreements.[82]

111.    E energija granted three further loans to Latgales Enerģija in 2006,[83] and four further loans, or amendments to pre-existing loans, were executed in 2007.[84]

### (8)    RĒZEKNES SILTUMTĪKLI'S ASSETS AND EMPLOYEES TAKEN OVER BY LATGALES ENERĢIJA (25 FEBRUARY 2005)

112.    It is common ground that the Long-Term Agreement entered into force in February 2005.  On 25 February 2005 Rēzeknes Siltumtīkli and Latgales Enerģija declared[85] that the Assets and the Employees had been transferred to Latgales Enerģija in accordance with Clause 4.3.1 of the Long-Term Agreement.[86]

113.    The licences required to operate the system were granted by the Regulator on 30 May 2005 (see paragraphs 129 ff. below).  The record does not, however, indicate a precise date on which Latgales Enerģija started to operate the heating system.[87]

114.    After taking over the heating system, Latgales Enerģija provided a continuous heating service in the city based on the tariff then in force.[88]

---

[81]  C-51; Cl. Mem. ¶ 43 mentions an amount of LVL 1,444,532 equal to EUR 2,055,383; however, the principal of all loans granted in 2005 is stated in EUR and the total amount is EUR 2,325,000.

[82]  CWS-2 ¶ 15.

[83]  C-51 [pages 46-55], see also paragraph 197 below.

[84]  C-51 [pages 59-69], see also paragraphs 312 ff. below.

[85]  C-9.

[86]  C-4.

[87]  RfA ¶ 59 "the middle of the heating season 2004/2005".

[88]  RfA ¶ 38.

115.   The conversion of the heating system to natural gas would be ready only in November 2005 (see paragraph 156 below).

116.   As explained by Mr. Strioga in his first Witness Statement, the old boilers were not replaced, but modified in order that they could burn both heavy fuel oil and natural gas, which enabled the Claimant to modernize the existing boiler houses with a comparatively small investment.  The works were implemented by UAB Energijos Taupymo Centras ("Energijos Taupymo Centras" or "ETC"), the Claimant's parent company incorporated in Lithuania, together with the Russian producers of the boilers.[89]

117.   Latgales Enerģija did not enter into any written agreement with Rēzeknes Siltumtīkli for the supply of natural gas.  Nor did it succeed in entering into any agreement with Latvijas Gāze or adhering to the Gas Supply Agreement existing between Latvijas Gāze, the Municipality of Rēzekne and Rēzeknes Siltumtīkli.[90]

The question whether Latgales Enerģija has nevertheless a duty to pay for the natural gas supplied by Latvijas Gāze is in dispute in these proceedings, as it was in dispute in proceedings before the Latvian courts.  The Tribunal's decision on this point is set out in paragraph 936 below.

118.   When Latgales Enerģija started to supply heating in 2005, it applied the tariff that had been granted to Rēzeknes Siltumtīkli before the Long-Term Agreement[91] and the

---

[89]  CWS-1 ¶¶ 4; 40.

[90]  C-40, see paragraph 63 above.  Latgales Enerģija's unsuccessful attempts to have a direct contract with Latvijas Gāze are referred to in Latgales Enerģija's letter to the Regulator dated 28 October 2005, C-75; then in 2006 Latvijas Gāze declined (C-88) the novation of the agreement proposed by Latgales Enerģija (C-86).

According to Mr. Strioga's first Witness Statement (CWS-1 ¶ 20), the Municipality was under a contractual duty to take or pay a minimum amount of 21 million nm$^3$ a year under the Gas Supply Agreement (C-40, Clause 3.1) in consideration for the large investment to be made in the heating infrastructure and Latvijas Gāze had no interest to change its contracting parties.

In its judgment dated 7 April 2014 (R-8 ¶ 11, see also paragraph 389 below) the Supreme Court of Latvia referred to a finding made by the court of first instance whereby the defendant (Latgales Enerģija) "had not concluded an agreement with AS 'Latvijas Gāze'".  This finding was not criticized by the Supreme Court.

The fact that Latgales Enerģija had no contract with Latvijas Gāze is also mentioned in the preamble to the Rēzeknes Enerģija Gas Supply Agreement (C-151).

[91]  C-4.

February 2005 Agreement[92] were entered into (see paragraphs 60 ff. above). However, Latgales Enerģija applied for a revised tariff on 13 October 2005 (see paragraphs 152 ff. below).

119.  On 25 February 2005 the book value of Rēzeknes Siltumtīkli's short-time debts to creditors as of 1 January 2005, stated to be in an amount of LVL 1,448,977 in Clauses 4.4.1 and 4.4.3 of the Long-Term Agreement, was reassessed at LVL 1,220,799.50.[93]

### (9)   RĒZEKNES SILTUMTĪKLI'S SHORT-TERM DEBTS TAKEN OVER BY LATGALES ENERĢIJA (FROM FEBRUARY 2005 ONWARDS)

120.  From February 2005 onwards Latgales Enerģija entered into a number of contracts to take over Rēzeknes Siltumtīkli's debts in accordance with the Long-Term Agreement (see paragraph 88 above) and the February 2005 Agreement (see paragraph 101 above).  The Amended Long-Term Agreement made on 10 February 2006[94] increased the amount of Rēzeknes Siltumtīkli's indebtedness (see paragraph 167 below).

### (A)   RĒZEKNES SILTUMTĪKLI'S INDEBTEDNESS TO AVT NAFTA

121.  On 4 February 2005 SIA "AVT Nafta" ("AVT Nafta") assigned the debt it owned against Rēzeknes Siltumtīkli to Latgales Enerģija in an amount of LVL 240,000; the assignment agreement mentions that AVT Nafta obtained a loan from Latgales Enerģija in an amount of LVL 200,000, an amount which Latgales Enerģija instructed its bank to pay on 7 February 2005.[95]

122.  On 22 June 2005 a second assignment agreement was executed between the same parties with respect to a debt owned by AVT Nafta against Rēzeknes Siltumtīkli in an amount of LVL 250,000, which amount included the previous amount of LVL 240,000.[96]  Under Clause 3 of such second assignment, part of the price would be paid by Latgales Enerģija by setting off its claim for payment under the 4 February 2005 loan in an amount of LVL 210,000 (which included LVL 10,000 interest).

---

[92]  C-8.
[93]  C-49.  Latvijas Unibanka: LVL 865,420.26; AVT Nafta: LVL 226,870.33 and Dinaburga Rosme: LVL 128,509.00.
[94]  C-16.
[95]  C-48 [page 2].
[96]  C-58.

Latgales Enerģija instructed its bank to pay the balance of LVL 40,000 on 19 June 2005.[97]

123. On 27 June 2005 Latgales Enerģija and Rēzeknes Siltumtīkli then agreed that "the Company (Latgales Enerģija) (….) on 22 June 2005 settled liabilities towards SIA 'AVT NAFTA' in the total amount of LVL 250,000".[98]   Latgales Enerģija and Rēzeknes Siltumtīkli further agreed that Latgales Enerģija had therefore become a creditor of Rēzeknes Siltumtīkli for such amount.   The agreement further contemplated that such amount would be paid by Rēzeknes Siltumtīkli under a separate agreement, under which Rēzeknes Siltumtīkli would set off its debt and consider that it had received an advance payment of the rent owed by Latgales Enerģija under the Long-Term Agreement.

(B) RĒZEKNES SILTUMTĪKLI'S INDEBTEDNESS TO DINABURGA ROSME

124. On 6 April 2005 SIA Dinaburga Rosme ("Dinaburga Rosme") assigned the debt it owned against Rēzeknes Siltumtīkli to Latgales Enerģija in an amount of LVL 128,509.[99]   Latgales Enerģija paid the same amount to Dinaburga Rosme in 14 instalments in 2005 and 2006.[100]

(C) RĒZEKNES SILTUMTĪKLI'S INDEBTEDNESS TO LATVIJAS UNIBANKA

125. On 27 May 2005 Latgales Enerģija and Rēzeknes Siltumtīkli agreed that "the Company (Latgales Enerģija) (…) on 3 May 2005 (… and) on 26 May 2005 settled liabilities towards AS 'SEB Latvijas Unibanka' in the total amount of LVL 65,000 and LVL 95,777.92", that Latgales Enerģija had made such payment on behalf of Rēzeknes Siltumtīkli pursuant to the terms of the Long-Term Agreement and that Latgales Enerģija had therefore become a creditor of Rēzeknes Siltumtīkli for such amount.[101]   The agreement further contemplated that such amount would be set off

---

[97] C-48 [page 1], see also the explanations in Mr. Jautakis' first Witness Statement, CWS-2 ¶¶ 37-39.
[98] C-59.
[99] C-52.
[100] C-53.
[101] C-57.

under a separate agreement against the rent owed by Latgales Enerģija under the Long-Term Agreement.[102]

126.   On 14 July 2005 Latgales Enerģija and Rēzeknes Siltumtīkli made a similar agreement with respect to an amount of LVL 370,000 paid by Latgales Enerģija to Latvijas Unibanka.[103]   Exhibit C-56 shows that Latgales Enerģija paid Latvijas Unibanka LVL 95,777.92 and LVL 370,000, but there is no evidence of a payment of LVL 65,000.   However, in the 27 May 2005 agreement Rēzeknes Siltumtīkli expressly acknowledged that Latgales Enerģija on 3 May 2005 paid LVL 65,000 to Latvijas Banka.[104]

127.   By July 2005 Latgales Enerģija had therefore settled Rēzeknes Siltumtīkli's indebtedness to Latvijas Unibanka in an amount of LVL 530,777.92.

### (10)   LOCAL ELECTIONS IN LATVIA (MARCH 2005)

128.   In March 2005 local elections were held in Latvia.  The election results in Rēzekne were cancelled due to allegations of bribery.  Further elections took place in August 2005 (see paragraphs 139 ff. below).

### (11)   LATGALES ENERĢIJA'S LICENCES (30 MAY 2005)

129.   On 30 May 2005 the Regulator granted Latgales Enerģija the licence for the production of thermal energy No. 002-05 for the period from 30 May 2005 to 29 May 2025.[105]  The licence sets out special conditions in Appendix No. 1.

130.   On the same day the Regulator granted Latgales Enerģija the licence for the transmission of thermal energy No. 003-05[106] for the same period of time, as well as the licence for the sale of thermal energy No. 004-05.[107]

---

[102] C-57.
[103] C-57.2.
[104] C-57.1.
[105] C-10.
[106] C-11.
[107] C-12.

131.    Each licence sets out special conditions in its Appendix No. 1.  Aside from the fact that each licence relates to a specific kind of activity, which is reflected in the Appendix of each licence, the three Appendices contain almost identical language.

132.    Clause 1 of the licences sets out Latgales Enerġija's duty to provide uninterrupted and good quality public utility services of production, transfer and distribution and sale, respectively, of thermal energy in accordance with applicable laws and regulations, the "development plan of the city of Rēzekne", Regulator's decisions as well as treaties and standards applicable in Latvia.

133.    Clauses 6 and 7 read as follows:[108]

> 6.      The Multi-Industry Public Utility Regulator of Latgale Municipalities determines the following tasks for SIA "Latgales Enerġija":
>
> 6.1     During the licence validity term, to ensure that all the existing users of thermal energy would be equipped with measurement tools for commercial recording, to know the energy consumed by each user and to be able to predict the future consumption of heat;
>
> 6.2     To decrease heat loss at the heating mains;
>
> 6.3     To prepare a long-term development plan;
>
> 6.4.    To seek the option to participate at various tenders with projects to attract funding from the state and international financial institutions.
>
> 7.      **Each year**, the licence holder must **submit the following documents** to the Multi-Industry Public Utility Regulator of Latgale Municipalities:
>
> 7.1     **By 31 December each year**, a plan of activities for the following year in line with the long-term development plan of SIA "Latgales Enerġija" including data about the planned amount of production, transfer and distribution, and sale of thermal energy, measures to improve service quality and safety, to ensure environment protection, improvement of the material base (general plan for all types of heating supply services licenced – production, transfer, distribution and sale).
>
> 7.2     **By the end of the quarter of the year**, a report regarding the results of the previous year in provision of heating supply services in line with the priorities indicated in Clause 6 of these conditions by including the report in the general company report on fulfilment of the annual plan of operations for the previous year, as well as other information every time upon a request of the Multi-industry Public Utility Regulator of Latgale Municipalities.

134.    Clause 9 states four grounds upon which the licence may be revoked.[109]

---

[108]  C-10 [page 5] (original emphasis).

135. Clause 12 states that production, distribution and transfer and sale, respectively, of thermal energy shall be performed only at the rate approved by the Regulator.

### (12) THE FIRST AMENDMENT OF THE GAS SUPPLY AGREEMENT WITH LATVIJAS GĀZE (1 JUNE 2005)

136. On 1 June 2005 the Rēzekne City Council, Rēzeknes Siltumtīkli and Latvijas Gāze agreed to amend and supplement the Gas Supply Agreement[110] ("Amendment No. 1 to the Gas Supply Agreement").[111]

137. Under Clause 3 of the amended Gas Supply Agreement the Rēzekne City Council agreed to start the commercial acceptance of natural gas according to Clause 3 of the Agreement at 9:00 *a.m.*, 15 October 2005 at the latest.

138. Latgales Enerģija, which had taken over the heating infrastructure in February 2005 (see paragraphs 112 ff. above), was not consulted.[112]  Latgales Enerģija received a copy of the agreement on 2 November 2005.[113]

### (13) FRESH LOCAL ELECTIONS IN RĒZEKNE (20 AUGUST 2005)

139. As the March 2005 election results in Rēzekne had been cancelled (see paragraph 128 above), further elections took place on 20 August 2005.

140. The elected Mayor (*i.e.* the chairman of the Rēzekne City Council) was Mr. Juris Guntis Vjakse.

---

[109]  The parties interchangeably use the terms "cancelation", "annulment", "suspension" and "revocation" with reference to the revocation of the licences on 3 June 2008 (see paragraphs 337 ff. below).  The Tribunal's use of the expressions "to revoke the licences" or "the revocation of the licences" is without prejudice to the Tribunal's findings in this case.

[110]  C-40, see paragraph 63 above.

[111]  C-61.  The full title of the agreement is "Supplementation 1 to Agreement No. 1580 on Construction of a New Natural Gas Infrastructure for Gasification of the City of Rēzekne Due to Long-Term Supplies of Natural Gas to the User for Combustion Facilities of Various Mutually Replaceable Fuels (Natural Gas and Oil Products)".

[112]  Cl. Mem. ¶ 76; CWS-1 ¶ 19; there is no specific rebuttal on the record on the Respondent's part.

[113]  C-76.

**(14)   RĒZEKNES SILTUMTĪKLI'S LONG-TERM DEBTS TAKEN OVER BY LATGALES ENERĢIJA (FROM AUGUST 2005 ONWARDS)**

(A)    THE INVESTMENT SERVICES AGREEMENT (4 AUGUST 2005)

141.   On 4 August 2005 E energija (as "the Client") and AS Lōhmus, Haavel & Viisemann (as "LHV") entered into an "Investment Services Agreement" (the "Investment Services Agreement").[114]   The purpose of this agreement was to obtain LHV's assistance to refinance Rēzeknes Siltumtīkli's loans from Latvijas Unibanka contemplated by Clause 4.4.4[115] of the Long-Term Agreement[116] and taken over from Latvijas Unibanka.

142.   LHV would in its own name take over two loans granted by Latvijas Unibanka to Rēzeknes Siltumtīkli, on the Claimant's account, under the terms of an assignment agreement which it would execute with Latvijas Unibanka, Clause 2.2 of the Investment Services Agreement.[117]   E energija undertook to transfer a sum of LVL 1,113,895 or any other amount to LHV based on the Assignment Agreement between LHV and Latvijas Unibanka (Clause 2.1 of the Investment Services Agreement) and to pay the fees set out in Clause 3 of the same agreement.

143.   LVH undertook in turn to transfer any payments received from Rēzeknes Siltumtīkli to E energija's account (Clause 1.3 of the Investment Services Agreement).

Mr. Jautakis explained in his first Witness Statement that the reason for the resort to a third party such as LHV to take over Rēzeknes Siltumtīkli's long-term debts was that Rēzeknes Siltumtīkli would be more likely to repay its debts.[118]

---

[114]   C-63.

[115]   The reference to Clause 4.4.3 of the Long-Term Agreement in Mr. Jautakis' first Witness Statement (CWS-2 ¶¶ 46 and 47) is inaccurate, see also Cl. Mem. ¶ 60.  Clause 4.4.4 of the Long-Term Agreement entitled Latgales Enerģija to take over Rēzeknes Siltumtīkli's long-term debts to Latvijas Unibanka in a total amount of LVL 1,668,526 and Baltic Trust Bank in an amount of LVL 680,817, see paragraph 89 above.

[116]   C-4, see paragraph 89 above.

[117]   C-63, Clause 2.4 of the Investment Services Agreement refers to the two loans mentioned in Clause 4.4.4 of the Long-Term Agreement.

[118]   CWS-2 ¶ 50.

(B)     THE ASSIGNMENT AGREEMENT (4 AUGUST 2005)

144.   On the same day, Latvijas Unibanka and LVH executed the Assignment Agreement
(the "2005 Assignment Agreement")[119] contemplated by the Investment Services
Agreement, the amount of Latvijas Unibanka's claim for payment against Rēzeknes
Siltumtīkli being LVL 1,125,196[120] in respect of both loans under Credit Agreement
No. RA 02155 (as amended by a number of covenants) and Credit Agreement
No. RA 02219, Clauses 1.1 and 1.2 of the 2005 Assignment Agreement.

(C)     PAYMENT BY E ENERGIJA (12 AUGUST 2005)

145.   On 12 August 2005 E energija paid Latvijas Unibanka the amount of
LVL 1,125,196.96 on behalf of LHV.[121]

(D)     THE AGREEMENT ON SETTLEMENT OF DEBT (15 NOVEMBER 2005) AND
REIMBURSEMENT BY LATGALES ENERĢIJA OF RĒZEKNES SILTUMTĪKLI'S
DEBTS UNDER THE LOANS

146.   On 15 November 2005 Latgales Enerģija executed the Agreement on Settlement of
Debt with Rēzeknes Siltumtīkli (the "Agreement on the Settlement of Debt")[122] and
undertook to repay Rēzeknes Siltumtīkli's loan debt arising under the two loans
granted by Latvijas Unibanka for October, November and December 2005 as well as
January and February 2006 in an amount of LVL 62,252.85 including interest
(Clause 1).  Clause 2 of the same agreement provides that Latgales Enerģija shall
continue to pay Rēzeknes Siltumtīkli's debts arising under those loans in accordance
with the Debt Repayment Schedule attached as Appendix 1 to the Agreement on
Settlement of Debt (which Appendix is not in evidence).

---

[119]  C-64.

[120]  Clause 1.1 of the Assignment Agreement states that the claim for payment of Latvijas Unibanka
against Rēzeknes Siltumtīkli as of the date of the Assignment Agreement is for an amount of
LVL 1,125,196.  The reasons for the decrease in amount from LVL 1,668,526 (see footnote 115 above)
and the amount of LVL 1,125,196 (Clause 1.2 of the Assignment Agreement) are not explained, but no
explanation is required in view of the fact that Latvijas Unibanka accepted such amount in the
Assignment Agreement.

[121]  C-65.  Mr. Jautakis' first Witness Statement (CWS-2 ¶ 49) indicates that E energija paid Lōhmus the
amount of LVL 1,125,196.96, but Exhibit C-65 indicates that the beneficiary of the payment is Latvijas
Unibanka.   It would seem that E energija directly paid Latvijas Unibanka the amount of
LVL 1,125,196.96 which was to have been paid by LHV, thereby settling the debt for the same amount
owed to LHV under the Investment Services Agreement.

[122]  C-80.

The Agreement on Settlement of Debt does not say to which entity Latgales Enerġija would make the payments contemplated by the agreement; such payments were to be made to LHV according to the Claimant,[123] as confirmed in due course by Clause 1.2(d) of the Amended Long-Term Agreement.[124]

147.   Between November 2005 and November 2006 Latgales Enerġija paid LHV a total amount of LVL 141,927.[125]

148.   Further arrangements would be made in 2006 (see paragraphs 199 ff. and 205 ff. below) and 2008 (see paragraphs 377 ff. below).

### (15)   FIRST REFERENCES TO A HEAT SUPPLY DEVELOPMENT PLAN (OCTOBER 2005)

149.   The first communications mentioning a "heat supply development plan" took place in late 2005.  The discussion relating to this topic continued in the following years (see paragraphs 164 ff. below for 2006).

150.   On 12 October 2005 the Regulator informed the Rēzekne City Council that *(i)* municipalities should organise heating supply in their territory, *(ii)* municipalities might specify the development of heating supply within the "development plan" for their territory in coordination with the Regulator and *(iii)* Section 27 of the Methodology specified that the investment required was included in the calculation of the net profit for each heating supply service (production, distribution and sale) "in accordance with the heat supply system development plan as approved by the corresponding local government."[126]  The Regulator asked the Rēzekne City Council to advise whether there was "an effective and coordinated development plan of the city heating supply containing planned and already made investments of 'Latgales Enerġija' Ltd. in development and improvement of the city heating supply".[127]

---

[123]   Cl. Mem. ¶ 62.

[124]   C-16.

[125]   C-83 [pages 1-12]; CWS-2 ¶ 52.

[126]   C-35 [page 7].

[127]   C-69.

No answer to the Regulator's enquiry is in evidence on the part of Rēzekne City Council.

151. On 27 October 2005 Rēzeknes Siltumtīkli wrote to Latgales Enerģija referring to the Regulator's 12 October 2005 letter to the City Council and asked whether Latgales Enerģija had "specified and coordinated with local government the municipal heat supply development plan including both specified and intended investments in this field".[128]

Rēzeknes Siltumtīkli letter further asked when Latgales Enerģija would start to use natural gas as a fuel.

There is no answer in evidence on the part of Latgales Enerģija to the first question;[129] as to the second question, Latgales Enerģija answered on 7 November 2005 (see paragraph 156 below).

### (16) LATGALES ENERĢIJA'S APPLICATIONS TO THE REGULATOR FOR A NEW TARIFF (13 OCTOBER 2005 AND 10 NOVEMBER 2005) – THE REGULATOR'S DECISIONS

152. According to a statement issued by Rēzeknes Siltumtīkli for the attention of the Regulator on 13 October 2005,[130] the prime cost of 1 MWh was in an amount of LVL 28.26 in 2004. According to the same statement issued by Latgales Enerģija on the same day,[131] the prime cost of 1 MWh was in an amount of LVL 38.24 in the period from 15 February to 31 August 2005. The tariff then in force (see paragraph 60 above) no longer covered the costs for the production of heat.

---

[128] C-74.

[129] The Claimant alleges that the Regulator had asked Latgales Enerģija whether the heat supply development plan had been approved and "Latgales Enerģija responded that it had not", RfA ¶ 63. However, in his first Witness Statement Mr. Strioga does not confirm that allegation (CWS-1 ¶ 67).

[130] C-70.

[131] C-71.

153. On 8 November 2005 Latgales Enerģija published a proposed tariff of LVL 32.96/MWh for residents and LVL 34.25/MWh for other users in the *Rēzeknes Vēstis* newspaper.[132]

154. On 19 December 2005 the Regulator approved a new tariff of LVL 27.60/MWh for residents and LVL 29.02/MWh (without VAT) for other users in decision No. 19.[133]

155. The Regulator's published decision was stated to be based on Section 2.1 and Section 26 of the Cabinet of Ministers Regulations No. 281 of 26 June 2001, amended in 2008 (Methodology for Calculation of Tariffs for Public Utilities in the Fields Regulated by Local Municipalities, "the Methodology").[134]

The approval was based in substance on the proposition that "[t]he approved tariff will cover the most necessary costs", which addressed Latgales Enerģija's argument reported in the decision that "[t]he grounds for the increase of tariffs are the growing fuel and electric energy prices" and that "the present tariffs do not cover the company's operating costs".[135]

The Regulator's decision of 19 December 2005 did not refer to a "development plan".

### (17)   RĒZEKNE HEATING SYSTEM CONVERTED TO USE NATURAL GAS (NOVEMBER 2005)

156. By November 2005 Latgales Enerģija had converted the heating infrastructure so that it could use natural gas.  On 7 November 2005 Latgales Enerģija sent Rēzeknes Siltumtīkli and the Rēzekne City Council a notice informing them that, as of that day, they were ready to supply heating using natural gas as fuel and requesting the delivery

---

[132]   C-79.  The figure of LVL 34.25/MWh is mistakenly indicated as LVL 22.26 in the English translation of the published decision in C-15 [page 1] (accurate in C-82 [page 1]).  It is unclear, moreover, whether this publication is the actual fresh application for a new tariff made by Latgales Enerģija, as contended by the Claimant (Cl. Mem. ¶¶ 95; the Regulator's decision refers to an application by Latgales Enerģija of 10 November 2005).

[133]   C-14; published version: C-82.

[134]   C-35.

[135]   C-82 [pages 1-2].

of 5 million cubic metres of natural gas in 2005 and 21 million cubic metres of natural gas in 2006.[136]

157.  As there was no written agreement to which Latgales Enerģija was a party with respect to the supply of natural gas (see paragraph 117 above), Rēzeknes Siltumtīkli invoiced Latgales Enerģija for the gas supplied based on the invoices received from Latvijas Gāze.  Latgales Enerģija in turn paid such invoices directly to Latvijas Gāze. In an interview given on 13 September 2007, Mr. Vjakse confirmed that this was the arrangement under which Latvijas Gāze was paid for the natural gas supplied.[137]

158.  It is in dispute between the Parties whether Latgales Enerģija owed Latvijas Gāze a duty to pay for the natural gas supplied (see paragraphs 586 ff. and 726 ff. below).

159.  The Claimant alleges that by December 2005 Latgales Enerģija had made the investment required to convert the heating infrastructure to accept natural gas and had started to use natural gas to produce thermal energy in Rēzekne.[138]

However, the actual gasification of the system was only partial as of the end of 2005, in that it related to two out of three heat sources, namely the boiler houses in Rancāna iela 1 (also often referred to as Rīgas iela) and Atbrīvošanas alejā 155a.[139]

### (18)   THE THIRD AMENDMENT OF THE GAS SUPPLY AGREEMENT WITH LATVIJAS GĀZE (19 DECEMBER 2005)

160.  On 19 December 2005 the Rēzekne Municipality, Rēzeknes Siltumtīkli and Latvijas Gāze agreed to amend and supplement the Gas Supply Agreement[140] ("Amendment

---

[136]  C-78.

[137]  C-134.

[138]  RfA ¶ 39.

[139]  C-44 p. 11: "Since November [2005] partial transition to gas heating has been carried out. (…)  To eliminate these problems, Latgales Enerģija SIA at the end of 2005 carried out the transition from fuel oil to gas as fuel in two heat production sources.  Therefore currently the boiler houses in Rancāna iela 1 and Atbrīvošanas alejā 155a have gas-heated boilers.  However, this cannot be called a complete gasification of the heat supply system (…)".  See also C-44 p. 16, ¶ 4.1 and C-213 [Rēzekne Heating Supply Development Strategy for 2007-2013] p. 20.

Mr. Strioga indicates in his first Witness Statement (CWS-1 ¶ 93) that "the infrastructure had of course been modified to use natural gas, but only to the hot water supply" in September 2007.

[140]  C-40, see paragraph 63 above.

No. 3 to the Gas Supply Agreement" or "Amendment No. 3").[141]  Latgales Enerģija was neither consulted nor informed of this Amendment.[142]

161.    Amendment No. 3 to the Gas Supply Agreement increased the minimum amount of natural gas which the Municipality undertook to take or pay, from 87.5% (Clause 3.1 of the Gas Supply Agreement[143]) to 88.16%, and replaced the amount of 21 million $nm^3$ in the original Gas Supply Agreement with the figure of 21,157,895 $nm^3$, thereby increasing the minimum quantity of gas to be taken by the Municipality by 157,895 $nm^3$.[144]

162.    The Parties further agreed that Latvijas Gāze would not claim from the Municipality a penalty of LVL 227,920 with respect to the year 2005.[145]

163.    Clause 6 of the Amendement No. 3 reiterated that the Municipality retained "liability for timely and complete payment of invoices" under Clause 8.3 of the Gas Supply Agreement,[146] and Rēzeknes Siltumtīkli was authorised by the Municipality to pay the invoices for natural gas issued by Latvijas Gāze.

## C.    THE OPERATION OF THE HEATING SYSTEM BY LATGALES ENERĢIJA AND MAIN EVENTS IN 2006

### (1)    LATGALES ENERĢIJA'S "GUIDELINES FOR THE DEVELOPMENT OF THE RĒZEKNE CITY HEAT SUPPLY SYSTEM" (20 JANUARY 2006)

164.    On 20 January 2006[147] Latgales Enerģija sent the Municipality a 28-page document entitled "Guidelines for the development of the Rēzekne City heat supply system".[148] The Municipality received the draft "Guidelines", since the Mayor received

---

[141]  <u>C-81</u>.  The full title of the agreement is "Supplementation 3 to Agreement No. 1580 on Construction of a New Natural Gas Infrastructure for Gasification of the City of Rēzekne Due to Long-Term Supplies of Natural Gas to the User for Combustion Facilities of Various Mutually Replaceable Fuels (Natural Gas and Oil Products) Incineration Equipment".  If an Amendment No. 2 to the Gas Supply Agreement was made by the Parties, it is not in evidence.

[142]  Cl. Mem. ¶ 77, an allegation that was not specifically denied by the Respondent.

[143]  <u>C-40</u>.

[144]  <u>C-81</u>, Clauses 1 and 2.

[145]  <u>C-81</u>, Clause 5.

[146]  <u>C-40</u>, see also paragraph 64 above.

[147]  Cl. Mem. ¶ 19; see also <u>CWS-1</u> ¶ 66.

[148]  <u>C-44</u>.  Page 23 is missing in the Latvian original and the translation therefore contains an omission indicated by the expression "omitted text".

comments on the draft from Ms. Adamova, Deputy Chairperson of the Council, and Mr. Zeile, Chairman of the Rēzekne City Task Force for the Supervision of Heat Energy Affairs.   However, the Municipality did not acknowledge receipt of this document[149] and did not contact Latgales Enerģija in this regard until 3 November 2016 after the Regulator had rejected a new tariff proposed by Latgales Enerģija (see paragraph 188 below).

165.   Latgales Enerģija's "Guidelines" outlined the heating system in the City of Rēzekne in their introductory part.   They then identified two major problems, namely excessively high costs of heat production, broken down in nine distinct aspects,[150] and environmental pollution,[151] for which they outlined possible solutions.[152]

### (2)   THE AMENDED LONG-TERM AGREEMENT (10 FEBRUARY 2006)

166.   On 10 February 2006 Latgales Enerģija and Rēzeknes Siltumtīkli executed a contract entitled "Agreement on Amendments to the Agreement for Lease, Renovation and Operation of the Long-Term Assets of 28 January 2005" (the "Amended Long-Term Agreement")[153] which varied the terms of the Long-Term Agreement.[154]

167.   The amount of the short-term debts to be taken over by Latgales Enerģija was increased from a total amount of LVL 1,448,977 to LVL 2,476,773.60 (Clause 1.2 of the Amended Long-Term Agreement varying Clause 4.4.3 of the Long-Term Agreement[155]).[156]   That amount included Rēzeknes Siltumtīkli's debts owed to the

---

[149]   R-25 [pages 1-3].

[150]   1. Losses for self-consumption for heating fuel oil storage reservoirs; 2. obsolete heating failing to reach the maximum efficiency level; 3. loss of heat due to obsolete insulation of the heating lines; 4. cost of repairs for obsolete pipelines; 5. location of heating lines in underground channels and ensuing heat losses; 6. excessive diameter of certain pipeline segments and ensuing costs of electricity to operate pumping devices; 7.  poor insulation of the buildings where the heating is used;  8. large amounts of electricity required to operate pumping devices and 9. increase in the price of fuel oil from January to November 2005 (Tribunal's wording).

[151]   C-44 p. 15, ¶ 3.3.

[152]   C-44 pp. 16-24, ¶¶ 4-5.

[153]   C-16.

[154]   C-4, see paragraphs 78 ff. above.

[155]   See paragraph 88 above.

[156]   As pointed out by the Claimant (Cl. Mem. ¶ 57), Clause 1.2 of the Amended Long-Term Agreement accurately sets out the total amount of Rēzeknes Siltumtīkli's debts to be taken over by Latgales Enerģija and the amount of LVL 2,472,094.80 in Clause 1.3(c) is inaccurate.

creditors mentioned in Clause 4.4.3 of the Long-Term Agreement[157] as well as Rēzeknes Siltumtīkli's long-term debt to LHV.[158]

168.　Clause 1.3(a) and (b) of the Amended Long-Term Agreement fixed the lease payments to be made by Latgales Enerģija in the first two years of the lease (as LVL 185,326.40 and LVL 150,000 respectively, for a total amount of LVL 335,326.40,[159] which brought to total amount to be paid by Latgales Enerģija to LVL 2,812,100 (Clause 1.3(c) of the Amended Long-Term Agreement). The amount of LVL 2,476,773.60 (erroneously indicated as LVL 2,472,094.80 in Clause 1.3(c) of the Amended Long-Term Agreement) was to be considered as "the security deposit for the following payments" and would be set off[160] under a separate agreement.

### (3)　THE AGREEMENT ON MUTUAL OPERATIONS WITH THE AIM TO DECREASE ENERGY RATE IN THE CITY OF RĒZEKNE (10 FEBRUARY 2006)

169.　On 10 February 2006 Latgales Enerģija and the Rēzekne City Council executed a contract entitled "Agreement on Mutual Operations with the Aim to Decrease Thermal Energy Rate in the City of Rēzekne" (the "February 2006 Agreement").[161] The recitals of the February 2006 Agreement refer to the recent increase in the rates of thermal energy and the need to minimize social tensions in Rēzekne.[162]

170.　The February 2006 Agreement sets out in Clause 1 the duties undertaken by the Rēzekne City Council in its capacity as Rēzeknes Siltumtīkli's sole shareholder, in consideration of which Latgales Enerģija undertakes in Clauses 2 to 4 to decrease the thermal energy rates by the agreed amounts.

171.　More specifically, the Rēzekne City Council undertook *inter alia*:

---

[157]　LVL 128,509 owed to Dinaburga Rosme, LVL 250,000 owed to AVT Nafta and LVL 530,777.92 owed to Latvijas Unibanka.

[158]　In an amount of LVL 1,567,486.68.

[159]　As pointed out by the Claimant (Cl. Mem. ¶ 57), the sum of LVL 185,326.40 and LVL 150,000 is LVL 335,326.40 and the amount of LVL 340,005.20 in Clause 1.3(c) of the Amended Long-Term Agreement is inaccurate.

[160]　The Tribunal accepts that the verb "written off" in the English translation of the Amended Long-Term Agreement from the original Latvian is a translation mistake as contended by the Claimant (Cl. Mem. ¶ 58).

[161]　C-17.

[162]　C-17 p. 1.

(i)     to review and adopt a Council decision approving the Amended Long-Term Agreement by 10 February 2006 (Clause 1);

(ii)    "to coordinate and approve the guidelines for development of heating supply system of the city of Rēzekne prepared by the Operator and the Council" (Clause 1.2);[163]

(iii)   to ensure pursuant to the Long-Term Agreement that Rēzeknes Siltumtīkli should as of 10 February 2006 accept back the black fuel oil storage business and energy boiler; and to accept the resolution of Rēzeknes Siltumtīkli's council relating to the transfer of a 1000m$^3$ container located at Atbrīvošanas alejā 155a for use by Latgales Enerġija, free of charge, until 30 July 2008;

(iv)    to ensure pursuant to the Long-Term Agreement that Rēzeknes Siltumtīkli or a third party should take back the bath-house building as of 1 January 2006 and provide bath-house services as of 1 March 2006 and take over all employees of the bath-house preserving their social guarantees; and to ensure that Rēzeknes Siltumtīkli or the third party enter into an agreement with the Operator by 28 February 2006 for the supply of hot water in consideration of payment of the rate determined by the Regulator (Clause 1.4); and

(v)     to inform the Regulator about the content of the February 2006 Agreement (Clause 1).

172.    Latgales Enerġija undertook more specifically to decrease the thermal energy rate for heating of premises by 2.05 LVL/MWh for residents and 0.43 LVL/MWh for other users in case the Council performed its obligations under Clauses 1.1, 1.4 and 1.5 of

---

[163]   C-17, Clause 1.2 reads as follows:

(…) thus, with the aim to help the Council to minimise the potential social stress in the city of Rēzekne in relation to increase in thermal energy rates, the Parties agreed to conclude the following agreement:

1.      The Council as the sole shareholder of AS "Rēzeknes siltumtīkli" undertakes to perform the below activities until 28 February 2006 (unless the below sub-clauses provide different terms):

1.1     (…).

1.2     By a Council decision, to coordinate and approve the guidelines for development of heating supply system of the city of Rēzekne prepared by the Operator and the Council;

41

the February 2006 Agreement (Clause 2).  Further decreases were contemplated by Clause 3.

173.    Clause 4 provided that in case the Council timely and fully performed the obligations undertaken under the Agreement, Latgales Enerġija would apply a further decrease in thermal energy rates until 1 October 2006 and apply a rate of LVL 25.02/MWh for residents and LVL 28.59/MWh for other users.

174.    The February 2006 Agreement further contained terms dealing with the event of a breach of contract by each party.  Clause 5 dealt with Latgales Enerġija's contractual rights in case the Rēzekne City Council failed to perform any of the obligations undertaken in Clauses 1.1 to 1.5;[164] Clause 6 dealt with the Rēzekne City Council's contractual rights in case Latgales Enerġija failed to perform the obligations undertaken in Clauses 2 to 4 of the February 2006 Agreement.

175.    The Rēzekne City Council was to perform the obligations undertaken under Clauses 1.1 through 1.5 of the February 2006 Agreement by 28 February 2006 (unless otherwise expressly provided by such clauses).

176.    There is no correspondence between the parties in February 2006, the month in which the Rēzekne City Council was due to perform the obligations contemplated by Clause 1 of the February 2006 Agreement, on the record, either confirming performance of

---

[164]  C-17, Clause 5 reads as follows:

    5.    In case any of the obligations indicated in Clauses 1.1-1.5 is not performed by the Council of AS "Rēzeknes siltumtīkli", SIA "Latgales enerġija" unilaterally decreases the rent paid to AS "Rēzeknes siltumtīkli" for the period from 25.02.2006 to 24.02.2007 for the actual lost income calculated by multiplying the actual amount of sold heating and the difference between the rate approved by the Multi-industry Public Utility Regulator of Latgale Municipalities: 27.60 LVL/MWh for residents and 29.03 LVL/MWh for other users, and the actual applied rate. Likewise SIA "Latgales enerġija" is entitled to terminate this agreement at any time, but not before 01.03.2006, and claim compensation for the lost income.

The expression "the Council of AS 'Rēzeknes siltumtīkli'" in Clause 5 of the English version is ambiguous; in the Tribunal's view, it has the same meaning as "the Council" as the sole shareholder of AS "Rēzeknes siltumtīkli" in Clause 1 since Rēzeknes Siltumtīkli is not in terms a party to this agreement.

the agreement by either side or otherwise.  There is no correspondence in evidence for the period immediately following either.[165]

177. From February 2006 until 1 October 2006, Latgales Enerģija applied the rates of LVL 25.02/MWh for residents and LVL 28.59/MWh for other users, *i.e.* the rates decreased pursuant to Clause 4 of the February 2006 Agreement.[166]

178. On 19 October 2006, after the Regulator rejected Latgales Enerģija's application for a new tariff,[167] Latgales Enerģija wrote to the Rēzekne City Council in relation to the performance of the February 2006 Agreement, and more specifically in relation to the "guidelines for the city heat supply system", pointing out that it had carried out all the activities required on its part to comply with Clause 1.2 of the February 2006 Agreement and that it had received no answer from the Council in spite of its reminders.[168]  Latgales Enerģija gave notice to the Council that it would have no choice but to resort to Clause 5 of the February 2006 Agreement[169] unless the Council adopted the "guidelines" within the following two months.

179. It is the Claimant's case that the Rēzekne City Council failed in particular to approve the "guidelines for the development of the heating supply system", and thereby failed to live up to its side of the bargain.[170]

---

[165] The first communications in which Latgales Enerģija took the view that the Rēzekne City Council was in breach of its contractual obligation with respect to the heat supply development plan were made later in 2006 and 2007 (see C-96 [19 October 2006] and paragraph 178 below; C-112 [2 February 2007] and paragraph 207 below; C-116 [6 March 2007] and paragraph 209 below; C-118 [19 April 2007] and paragraph 210 below; C-121 [29 May 2007] and paragraph 214 below; C-129 [13 July 2007]).  Most of these communications were addressed to the Rēzekne City Council; when Rēzeknes Siltumtīkli was the addressee, the Rēzekne City Council would be copied in.

[166] See CWS-1 ¶ 71; CWS-3 ¶ 17, last sentence; see also C-157 and paragraph 294 below.

Ms. Rogozina was not called to be cross-examined at the Hearing, see paragraph 32 above.

[167] See C-19 and paragraph 184 below.

[168] C-96.

[169] Quoted in paragraph 174 above, footnote 164 as well as in Latgales Enerģija's letter.

[170] Cl. Mem. ¶¶ 121-122.

43

(4)   **LATGALES ENERĢIJA'S APPLICATION TO THE REGULATOR FOR A NEW TARIFF (12 JUNE 2006) – THE REGULATOR'S DECISION (13 OCTOBER 2006) – THE DECISIONS BY THE LATVIAN ADMINISTRATIVE COURTS (17 NOVEMBER 2007 AND 15 APRIL 2009)**

180.   From February to the end of September 2006 Latgales Enerģija applied a reduced rate in accordance with Clause 4 of the February 2006 Agreement (see paragraph 177 above).

181.   In the meantime, Latvijas Gāze had been authorised by the Latvian Public Utilities Commission to raise the price of natural gas.[171]

182.   On 12 June 2006 Latgales Enerģija applied to the Regulator seeking an increased tariff in an amount of LVL 33.38/MWh for residents and LVL 33.92/MWh for other users of thermal energy (from the approved rates of LVL 27.60/MWh and LVL 29.02/MWh respectively[172]).   In its calculations attached to its application Latgales Enerģija indicated that the new price charged by Latvijas Gāze for the natural gas had risen from LVL 83.06 to LVL 113.76 (which represented an increase of 36%), and the new price for electricity from LVL 29 to LVL 34 (which represented an increase of 17%).[173]

183.   On 15 August 2006 Latgales Enerģija asked the Regulator to cancel its previous application of 12 June 2006 and submitted fresh calculations for the rate applicable to residents, seeking a rate of LVL 30.91/MWh for residents, and LVL 33.92/MWh for other users of thermal energy.   Ms. Rogozina explains in her first Witness Statement that such step was caused by a change in VAT rules.[174]

184.   On 13 October 2006 the Regulator denied Latgales Enerģija's application by a unanimous vote.[175]   The reasons for this decision are discussed in paragraphs 901 ff. below.

---

[171]   Board Decision No. 73 of 22 March 2006, <u>C-89</u>; see also <u>CWS-3</u> ¶ 18.
[172]   <u>C-18</u>; see also paragraph 154 above.
[173]   <u>C-18</u> [page 5].
[174]   <u>CWS-3</u> ¶ 19.
[175]   Decision No. 17, <u>C-19</u>; <u>R-35.1</u>.

44

185.    On 17 November 2006 Latgales Enerģija challenged the Regulator's decision before the Administrative District Court.[176]

186.    Since the challenge of the Regulator's 13 October 2006 decision had not been heard yet by the time the Regulator had made decision No. 12 of 11 June 2007, which was also challenged by Latgales Enerģija, on 22 June 2007 Latgales Enerģija amended its 17 November 2006 application to set aside so as to include *only* the Regulator's decision No. 12 dated 11 June 2007.[177]   There was therefore no decision by the Administrative District Court in relation to the Regulator's decision No. 17 dated 13 October 2006.  The Administrative District Court eventually made its decision on 15 April 2009.[178]

### (5)    FURTHER STEPS TOWARDS A "HEAT SUPPLY DEVELOPMENT PLAN" (2006)

187.    Having been notified of the Regulator's decision No. 17 rejecting the proposed tariff, on 19 October 2006 Latgales Enerģija complained to the Rēzekne City Council of the losses it was incurring due to the Council's failure to reply to the "guidelines" that had been sent (see paragraph 164 above), and threatening to decrease the lease payment under Clause 5 of the February 2006 Agreement[179].[180]

188.    On 3 November 2006 the Rēzekne City Council replied asking Latgales Enerģija to be provided with the "heat supply development plan" for the period 2006-2007 and pointing to a number of points that such plan must include.[181]

---

[176]   C-100.  The application to have the Regulator's decision of 13 October 2006 set aside was based first on the proposition that the three coefficients that were not used in Latgales Enerģija calculations filed in support of the proposed new tariff could not be applied because they would be part of the heat supply development plan which the Municipality had failed to approve (C-100 ¶ 17).  Moreover, Latgales Enerģija contended that the Regulator's decision No. 19 dated 19 December 2005 had not applied the three coefficients relied upon by the Regulator in the decision sought to be set aside, and the Regulator had thereby departed from its previous practice so as to make it impossible for the applicant to apply for new tariffs (C-100 ¶¶ 18-19).

Secondly, Latgales Enerģija contended that the Regulator was *bound* under Sect. 19.5 of the Public Utility Regulators Act (CLA-49) and Sect. 59 of the Administrative Procedure Act (CLA-47) to request an applicant to file missing documents to prove the costs on which a proposed tariff was to be based before a decision on a proposed tariff could be made.

[177]   C-125 ¶¶ 9-10.

[178]   C-192, see paragraph 392 below.

[179]   C-17, see paragraph 169 above.

[180]   C-96, see paragraph 178 above.

[181]   C-97.

45

189.    On 15 November 2006 Latgales Enerģija answered and sent the Rēzekne City Council *(i)* a one-page "heat supply development plan" for the years 2006-2009[182] and *(ii)* the "draft heat supply development concept" for the years 2006-2014.[183]   Latgales Enerģija did not in November 2006 refer to the document previously sent to the Municipality on 20 January 2006.[184]   The Council received Latgales Enerģija's 15 November letter on 17 November 2006.[185]

190.    On 29 December 2006 the Rēzekne City Council acknowledged receipt of the "draft heat supply development concept 2006-2014" submitted by Latgales Enerģija.[186]   The Council commented that the draft was not in accordance with applicable legislation and did not correspond to the actual state of heat supply in the city of Rēzekne.

191.    One of the reasons given by the Rēzekne City Council was the following: "The claim that the Rēzekne City Council has transferred heat supply functions to Latgales Enerģija SIA does not correspond to the legal and actual situation".[187]

This statement relates to the following passage in Latgales Enerģija's draft reading as follows: "(…) the company [Latgales Enerģija] has taken over from the City Council the duties specified in Section 15 of the Law on Local Governments, *i.e.* ensuring provision of utilities or, more particularly, heat supply.  In connection with this LLC Latgales Enerģija is performing its activities and thereby also planning and development [sic] of centralised heat supply in Rēzekne City".[188]

192.    The plan was finally approved by the City Council on 21 September 2007 under the name "Heating Supply Development Strategy" (see paragraph 228 below).[189]

---

[182]  C-99 Enclosure 1.

[183]  A 22-page document, not in evidence at the Hearing as C-99 contains only the covering letter dated 15 November 2006; this document was filed by the Respondent after the Hearing, R-31.2.

[184]  C-44, see paragraph 164 above.

[185]  C-99.

[186]  C-106.

[187]  C-106.

[188]  R-31.2 [page 5].

[189]  C-137; C-213.

### (6)    Rēzeknes Siltumtīkli's Claims against Latgales Enerġija Relating to the Depreciation of the Leased Assets

193.    A difference of views developed in 2006 with respect to the lease payments to be made by Latgales Enerġija under Clauses 4.4.2 and 7.1.5 of the Long-Term Agreement.[190]

According to Rēzeknes Siltumtīkli, Latgales Enerġija had to pay an amount for depreciation of the assets every month under the terms of the Long-Term Agreement, whereas Latgales Enerġija took the view that such payment had to be made upon returning the assets to the lessor at the end of the term of the lease.[191]

194.    On 7 November 2006 Rēzeknes Siltumtīkli sent Latgales Enerġija a "pre-trial objection" requesting settlement of an alleged debt of LVL 563,098.69 by 20 November 2006, failing which Rēzeknes Siltumtīkli would bring proceedings to recover such amount; Rēzeknes Siltumtīkli further invoked Clause 12.5.2 of the Long-Term Agreement which entitles the lessor to terminate the agreement unilaterally in certain cases.[192]

195.    On 5 December 2006 Latgales Enerġija answered Rēzeknes Siltumtīkli's claim of 7 November 2006, taking the view that any amounts to which the lessor might be entitled under Clause 4.4.2 of the Long-Term Agreement were not yet due and owing. Nevertheless, Latgales Enerġija invited Rēzeknes Siltumtīkli to negotiate a solution without prejudice which could help solve the lessor's financial difficulties.[193]

### (7)    Supplementing Certain Arrangements Made in 2005

196.    A number of arrangements made by the Claimant or Latgales Enerġija in 2005 were supplemented in 2006; in some respects further arrangements were made.

### (A)    Further Loans by E energija to Latgales Enerġija

197.    E energija granted three further loans to Latgales Enerġija in 2006 in connection with the Rēzekne Project for a total amount of EUR 1,150,000.  This amount was not all

---

[190]  C-4, see paragraphs 85 and 88 above.
[191]  See CWS-4 ¶ 7.
[192]  C-98.
[193]  C-104 [page 3].

paid in cash; the Claimant also paid sums directly to Rēzeknes Siltumtīkli's creditor Dinaburga Rosma and to its parent company Energijos Taupymo Centras, and took over debts owed to Energijos Taupymo Centras.[194]

<p style="text-align:center">(B)    FURTHER INVESTMENT BY E ENERGIJA IN LATGALES ENERĢIJA (8 JUNE 2006)</p>

198.    On 8 June 2006 E energija purchased 364 shares in Latgales Enerģija from Energo Sistēmas for an amount of EUR 70,000 under the terms of a Share Purchase Agreement.[195]

<p style="text-align:center">(C)    LOAN FROM JSC SAMPO BANKA TO LATGALES ENERĢIJA – E ENERGIA'S GUARANTEE AND PLEDGE (30 NOVEMBER 2006)</p>

199.    On 30 November 2006 JCS Sampo Banka ("Sampo Banka") granted Latgales Enerģija a loan amounting to LVL 2 million (the "Sampo Banka Loan Agreement").[196]  According to Clause 2.1 of such agreement the purpose of the loan was to enable Latgales Enerģija to purchase LHV's claims against Rēzeknes Siltumtīkli (referred to in Clause 1.2(d) of the Amended Long-Term Agreement[197]), and to make further investments into the modernization of the heating infrastructure of the city of Rēzekne.

200.    The disbursement of the loan was subject to a number of conditions set out in Clause 5.2, including the condition that parent company guarantee be issued under which E energija would guarantee performance of Latgales Enerģija's duties to Sampo Banka under the Sampo Banka Loan Agreement.

201.    The Sampo Banka Loan Agreement was subsequently amended on 26 April 2007.[198]

202.    E energija signed the Guarantee provided to Sampo Banka on 30 November 2006 (the "Sampo Banka Guarantee") and undertook to pay any amounts as may be due and payable under the Sampo Banka Loan Agreement, as a principal debtor and irrespective of the validity and legal effect of said Loan Agreement, having waived

---

[194] C-51 [pages 46 ff.]; see also paragraph 111 above.
[195] C-92, Clause 3.1; see also CWS-2 ¶¶ 12-13.
[196] C-101; part of this exhibit is illegible; the Respondent did not raise any objections.
[197] C-16, see paragraph 167 above.
[198] C-120.

<p style="text-align:center">48</p>

"all rights of objection and defence" under the same Loan Agreement, and any right to set off, counterclaim or deduce any amounts (first and third paragraphs of the Sampo Banka Guarantee).[199]

203.  On 30 November 2006 E energija also executed a Commercial Pledge Agreement with Sampo Banka to secure any claims the bank might have under the Sampo Banka Loan Agreement, pledging all the shares owned in Latgales Enerģija up to an amount of LVL 2.6 million.[200]

204.  Latgales Enerģija was eventually unable to repay the loan to Danske Bank which succeeded to Sampo Bank, and which in turn claimed payment under the Guarantee Agreement against the Claimant.[201]

    (D)    RĒZEKNES SILTUMTĪKLI'S LONG-TERM DEBTS TAKEN OVER BY LATGALES ENERĢIJA

205.  On 13 December 2006 Latgales Enerģija took over the debt owned by LHV against Rēzeknes Siltumtīkli under the terms of an Assignment Agreement.[202]  LHV's claim for payment against Rēzeknes Siltumtīkli arose under the two loan agreements referred to in Clause 4.4.4 of the Long-Term Agreement (see paragraph 89 above) and was then in an amount of LVL 1,103,097.82, including cumulated interest and a premium (Clause 1.2 of the 2006 Assignment Agreement).

206.  Latgales Enerģija paid that amount in two instalments in December 2006 and 2007.[203]

**D.  THE ENERGY CRISIS DECLARED BY THE RĒZEKNE CITY COUNCIL AND OTHER MAIN EVENTS IN 2007**

**(1)  FURTHER STEPS TOWARDS A "HEAT SUPPLY DEVELOPMENT PLAN" OR "STRATEGY" (JANUARY-SEPTEMBER 2007)**

207.  On 2 February 2007 Latgales Enerģija answered Rēzekne City Council's letter of 29 December 2006,[204] and to some extent addressed the criticism voiced by the

---

[199]  C-102.

[200]  C-103.

[201]  Cl. Mem. ¶ 66, see also paragraph 406 below.

[202]  C-105.

[203]  C-83 [pages 14-15].

Council in relation to the "draft heat supply development concept" that Latgales Enerģija had sent to the Council on 15 November 2006 (see paragraph 189 above).[205]

208.    On 19 February 2007 the Rēzekne City Council indicated that it was creating a working group to resolve the matter and asked Latgales Enerģija to delegate two representatives to the meetings of the working group,[206] which Latgales Enerģija did on 28 February 2007.[207]   The working group was not established until 11 May 2007 (see paragraph 213 below).

209.    On 6 March 2007 Latgales Enerģija gave notice to the Rēzekne City Council that it would not be able to perform its obligation to invest not less than EUR 1.5 million in accordance with the Long-Term Agreement[208] due to the Council's failure to comply with its duty to develop a "heat supply development concept" in accordance with the February 2006 Agreement[209] and to the absence of any reply by Rēzeknes Siltumtīkli, which was copied in, as to Latgales Enerģija's repair and investment proposals.[210]

The Arbitral Tribunal notes that the investment proposals relied upon by Latgales Enerģija are not in evidence.

210.    On 18 April 2007 Latgales Enerģija gave substantially the same notice to Rēzeknes Siltumtīkli and copied in the Rēzekne City Council.[211]

211.    On 13 July 2007 Latgales Enerģija sent Rēzeknes Siltumtīkli a further reminder that Rēzeknes Siltumtīkli's failure to answer affected in particular *(i)* the installation of two heating boilers with a total capacity of 30 MW and *(ii)* the installation of cogeneration facilities at Rīgas iela/Rancāna iela 1 (4-5 MW) and Atbrīvošanas alejā 155a (2 MW).[212]

---

[204]   C-106, see paragraph 190 above.
[205]   C-112.
[206]   C-114.
[207]   C-115.
[208]   C-4, Clause 7.1.1, see paragraph 92 above.
[209]   C-17, Clause 1.2.
[210]   C-116.
[211]   C-118.
[212]   C-129.

212.   There is no answer to either letter in evidence by the Rēzekne City Council or Rēzeknes Siltumtīkli; Latgales Enerģija sent further reminders in 2008 (see paragraphs 329 ff. below).

213.   On 11 May 2007 the Rēzekne City Council established a working group (the "Working Group")[213] to draft the strategic plan for the development of the heat supply system and present an interim report by 1 July 2007.[214]

214.   On 29 May 2007 Latgales Enerģija again reminded[215] the Rēzekne City Council that it was in breach of its contractual obligation to agree and approve "guidelines for the development plan of the heating supply system" in accordance with the February 2006 Agreement,[216] pointing out that it was entitled under Clause 5 of that agreement to decrease the lease payments to be made to Rēzeknes Siltumtīkli.[217]

215.   On the same day Latgales Enerģija applied for a new tariff to the Regulator (these developments will be dealt with separately in paragraphs 230 ff. below, save insofar as they are relevant to the "heat supply development plan").  On the following day the Regulator asked Latgales Enerģija to provide "information regarding the approved Rēzekne City heat supply development plan, which must be in place" in accordance with the Methodology.[218]  On 6 June 2006 Latgales Enerģija answered that the approval of such plan was exclusively a matter for the Rēzekne City Council, to which the Regulator should therefore turn, adding that to the best of its knowledge the

---

[213]   The Working Group consisted of the following persons (Council decision No. 188, R-30 [page 1]): three employees of the Council (Mr. I. Locis, Ms. Groce and Mr. Patmalnieks); four invited specialists, of whom two members of the Council (Mr. G. Spradzenko, Deputy of RCC and Member of the Board of SIA Rēzekne Ūdens [water sewerage company]; Mr. E. Škinčs, Member of the Boad of SIA Rēzekne Namsaimnieks [estate agent]; Mr. O. Skurjats, member of the Board of SIA Siltumserviss [company active in heat supply and heat supply network] and Ms. D. Abramova, Deputy of RCC); and Ms. Viļumovska.

Further persons took part in the meetings of the Working Group.  At least one representative of Latgales Enerģija (R-30 [pages 2-46]) attended the meetings of the Working Group save for the meetings of 19 July, 31 July and 11 September 2007.

According to the minutes produced by the Respondent, the Working Group had sixteen meetings from 14 May to 19 September 2007 (R-30 [pages 2-46]).

[214]   Council decision No. 188, R-30 [page 1].

[215]   See paragraph 178 above.

[216]   C-17, Clause 1.2, see paragraph 171 above.

[217]   C-121.

[218]   C-122.

plan had not been adopted.[219]   On 11 June 2007 the Regulator denied Latgales Enerģija's application for a new tariff.[220]

216.   On 12 June 2007 the Rēzekne City Council answered Latgales Enerģija's 29 May 2007 letter, pointing out that the Working Group in charge of developing the "strategic plan for the development of the Rēzekne city heat supply system" had repeatedly[221] requested Latgales Enerģija to provide information on whether the introduction of new facilities and technologies would affect the thermal energy tariff, but had not received any answers.[222]  The delay had therefore been caused by Latgales Enerģija, and Latgales Enerģija's allegation that the Council was responsible for such delay was unjustified.  The Council further denied that Latgales Enerģija was entitled to reduce the amount of the lease payments owed under the Long-Term Agreement without an amendment of the same, which had to be made in writing.

217.   On 4 July 2007 Latgales Enerģija claimed in a letter sent both to Rēzeknes Siltumtīkli and the Rēzekne City Council that the Regulator's refusal to approve a new tariff[223] had been ultimately caused by the Rēzekne City Council's failure to approve a "heat supply system development plan".[224]   Relying on the Rēzekne City Council's obligations under Clause 1.2 of the February 2006 Agreement with particular respect to the approval of the "heat supply system development plan",[225] Latgales Enerģija reiterated that it was under no obligation to decrease the heat energy tariff under the terms of the February 2006 Agreement and presented a calculation of the amount of LVL 138,069.24 which it was entitled to deduct from the lease payments owed to Rēzeknes Siltumtīkli under Clause 5 of the February 2006 Agreement.[226]

218.   On 9 July 2007 Rēzekne City Council rejected Latgales Enerģija's complaints and claim for compensation, stating it had performed all its obligations and met all the requirements in order for the thermal energy tariff to be reduced by Latgales Enerģija,

---

[219]  C-123.
[220]  C-21, see more in detail paragraph 233 below.
[221]  The requests mentioned in this letter are not in evidence.
[222]  C-124.
[223]  C-21, see more in detail paragraph 233 below.
[224]  C-128.1.
[225]  C-17, see paragraph 171 above.
[226]  C-128 [pages 2-3].

having recalled its criticism of the "guidelines" received from Latgales Enerġija on 17 November 2006.[227]   The letter addressed the tasks to be undertaken by the Council and Latgales Enerġija within the Working Group and criticised Latgales Enerġija for failing to provide sufficiently clear and detailed information, without which it was impossible to evaluate the situation and forecast the necessity and scope of the investments required for the period 2007-2013.[228]   A 19-page document was attached to that letter which is not in evidence.

219.   On 18 July 2007 Latgales Enerġija replied that the development of the "heat supply development plan" was an obligation on the Municipality under the Energy Act (Section 51, Part 1) and the Municipality's rejection of Latgales Enerġija's claim for compensation was contrary to the provisions of the February 2006 Agreement.[229] Latgales Enerġija did not, however, answer the Council's criticism in relation to the alleged failures of its representatives to provide information required by the working group in charge of the "heat supply development plan".

On 19 July 2007 the Rēzekne City Council reiterated that the Working Group had received only partial information from Latgales Enerġija, which was requested to provide the following by 24 July 2007 on five key items set out in the letter.[230]   The draft "strategic plan" would be submitted for approval by 14 September 2007, the letter indicated.

220.   On 19 July 2007 Latgales Enerġija complained to the Council that it had been notified of a Working Group meeting on that very day at 10:20 *a.m.* after the meeting had started at 10:00 *a.m.*; adequate notice was requested for future meetings.[231]

221.   On 23 July 2007 Latgales Enerġija answered the Council's 19 July 2007 request as follows:[232]

---

[227]   C-99, see paragraph 189-190 above.
[228]   C-128 [page 8].
[229]   C-128 [page 13].
[230]   C-128 [page 15].
[231]   C-128 [page 19].
[232]   C-128 [page 21].

(i)      as at July 2007 there was no updated information regarding the investments planned; a survey of the prices of potential suppliers would be required which would take between five to seven weeks, to update the information in relation to the heat supply main network, the scope of boiler reconstruction, the measures to improve energy efficiency etc.; expected prices had increased, but the volume of investment had not changed;

(ii)     there had been no changes in the schedule of the planned investments; however, the timing of the schedules depended on the timing of their approval so that if approval was delayed, completion of the works would be delayed;

(iii)    the sources of the planned investments would be as follows: up to 90% bank resources, and 10% equity capital; and

(iv)    as to the question how the planned investments would affect the energy efficiency measures, the answer was provided to Mr. Vjakse on 1 July 2007 and during the meetings of the Working Group. Within two years of obtaining the investments:

— self-consumption in the boilers would decline to 8.1% (in 2006 it was 11.3%);

— losses in the heat transmission network would decline to 17.2 (currently 18.1%);

— the amount of fuel consumed for the production of 1 MWh heat would decline to 136 kg of the assumed fuel (currently 151.2 kg); and

— the energy consumption would fall to 22.9 kWh (currently 24 kWh); the number of employees at the boiler houses would fall by 15% while the salaries will increase by 20% as employees would have to have higher qualifications; the heat energy tariff was expected to grow by 7% (at the inflation of 0 from July 2007).

54

222.   On 30 July 2007 Latgales Enerģija sent a two-page "investment plan" covering a seven-year period starting from the date of the approval of the "Rēzekne city heat supply system development strategic plan".[233]

223.   On the following day the Council replied that the information provided by Latgales Enerģija on 23 July 2007 was insufficient as it failed to reflect essential cost items. The letter stated that an expert had been involved to develop the "Rēzekne city heat supply strategic plan" and additional information was requested.[234]

224.   On 11 September 2007 a meeting of the Working Group took place. Latgales Enerģija had announced that it would be unable to attend.[235]  As indicated in the minutes of the meeting, a draft Development Plan was available by then.[236]

During that meeting Ms. Abramova, sitting on the Working Group as an invited specialist and a member of the City Council, suggested to make "editorial comments" to the draft Development Plan: "when talking about future development, to use the word 'operator', without mentioning SIA Latgales enerģija as the only possible operator of thermal energy".[237]  The minutes indicate that Mr. I. Locis, head of the Working Group and Vice-Executive Director of the City Council, would make the editorial changes by 13 September 2007 and prepare the document for review.[238]  The record does not show whether the minutes of this particular meeting were provided to Latgales Enerģija.

225.   On 13 September 2007 the Rēzekne City Council sent Latgales Enerģija a 54-page document setting out the "strategy for the development of the Rēzekne city heat supply" further to Latgales Enerģija's request.[239]  Latgales Enerģija was invited to participate in an unscheduled session of the City Development, Infrastructure and Public Order Committee in the morning of the following day, and the meeting of the

---

[233]   C-128 [page 25].
[234]   C-128 [page 31].
[235]   R-30 [page 43].
[236]   R-30 [page 43].
[237]   R-30 [page 44].
[238]   R-30 [page 44].
[239]   C-133.

55

subsection of the Rēzekne City Council in the afternoon,[240] but informed the Mayor that it was unable to attend and requested a postponement.[241]  It is not clear whether a meeting took place on 14 September 2007 as there are no minutes of such a meeting on the record and it is recalled that no witnesses have been put forward by the Respondent.

226.    On 17 September 2007 the Rēzekne City Council invited Latgales Enerģija to participate in the meeting of its deputies that would take place on 19 September 2007 on the "development strategy [for the] heat supply" in Rēzekne for 2007-2013.[242] Latgales Enerģija indicated on the very same day that it would attend.[243]

227.    On 19 September 2007 the Working Group met.[244]  No representative from Latgales Enerģija attended.   One of the items discussed was the manner in which the Development Plan in the making should refer to Latgales Enerģija.  Ms. Abramova reiterated her suggestion that Latgales Enerģija should not be mentioned "as the only possible operator";[245] another member of the City Council, Mr. Petkevičs, concurred and suggested that Latgales Enerģija should be mentioned "only in the descriptive part, when characterising the current situation".[246]  The record does not show whether the minutes of this particular meeting were provided to Latgales Enerģija.

228.    On 21 September 2007 the Rēzekne City Council approved the heat supply development strategy for the city of Rēzekne for 2007-2013.[247]   The document entitled "Rēzekne Heating Supply Development Strategy for 2007-2013" is in evidence as Exhibit C-213.

---

[240]  C-133.

[241]  Latgales Enerģija was unable to attend the meeting of the Working Group scheduled to take place on 14 September 2007 due to prior commitments and had applied to the Mayor for a ten-day postponement on 11 September 2007 (R-30 [page 55]); on the following day Latgales Enerģija restated its application stating that it had not received the Development Plan to be discussed (R-30 [page 56]); on 13 September 2007 the Mayor sent the Plan but maintained the date for the meeting on the following day (R-30 [page 57]).

[242]  C-135.

[243]  C-135.

[244]  R-30 [pages 45-46].

[245]  R-30 [page 45].

[246]  R-30 [page 45].

[247]  Decision No. 364, C-137.

229.  As the next sub-sections will recall, the finalization of the Rēzekne Heating Supply Development Strategy for 2007-2013 was not, by far, the sole event worth recalling in the second part of 2007.  By 21 September 2007 a number of equally significant events had taken place:

(i)  the Regulator had denied Latgales Enerģija's application for a new tariff;

(ii)  Latvijas Gāze had stopped deliveries of natural gas;

(iii)  Rēzekne's Mayor had given an interview indicating that Latgales Enerģija might no longer be the exclusive supplier of thermal energy in spite of the express terms contained in the Long-Term Agreement and the February 2006 Agreement; and

(iv)  Rēzeknes Siltumtīkli had sued Latgales Enerģija in the Latgale Regional Court and had obtained an injunction freezing Latgales Enerģija's bank account.

The following sub-sections will deal with those developments.

**(2)  LATGALES ENERĢIJA'S APPLICATION TO THE REGULATOR FOR A NEW TARIFF (29 MAY 2007) AND THE REGULATOR'S DECISION (11 JUNE 2007) – LATGALES ENERĢIJA'S APPLICATION TO THE REGULATOR FOR A NEW TARIFF (5 NOVEMBER 2007) AND THE REGULATOR'S DECISIONS (9 NOVEMBER 2007 AND 7 DECEMBER 2007)**

230.  The tariff in force in 2007 (LVL 27.6/MWh for residents and LVL 29.02/MWh for other users) had been approved by the Regulator on 19 December 2005.[248]

From February to October 2006 Latgales Enerģija had applied a reduced tariff of LVL 25.02/MWh for residents and 28.59/MWh for other users (see paragraph 177 above) in accordance with Clause 4 of the February 2006 Agreement.[249]

On 19 October 2006 the Regulator had denied Latgales Enerģija's application for a new tariff.[250]  In 2006 the price charged by Latvijas Gāze in accordance with the decision by the Public Utilities Commission had risen by some 36%.[251]

---

[248]  See paragraph 154 above; see also the Regulator's decision No. 12 of 11 June 2007, C-21 [page 4] and the Regulator's decision No. 28 of 9 November 2007, C-27 [page 5].

[249]  C-17, see paragraph 173 above.

231.    On 28 March 2007 the Public Utilities Commission authorised Latvijas Gāze to increase the price of natural gas.[252]  By reference to the tariff issued by the Regulator on 19 December 2005, the increase in the price of natural gas was of the order of 55% up to 129%.[253]

232.    On 29 May 2007 Latgales Enerģija applied to the Regulator seeking a tariff ranging from LVL 32.67/MWh to LVL 41.62/MWh from 1 September 2007 onwards.[254]

233.    On 11 June 2007 the Regulator denied Latgales Enerģija application by a unanimous vote.[255]  The reasons for the decision are discussed in paragraphs 904 ff. below.

234.    On 22 June 2007 Latgales Enerģija challenged the Regulator's decision before the Administrative District Court in the same proceedings which it had brought against the Regulator's prior decision of 13 October 2006.[256]

---

[250]   C-19, see also paragraph 178.

[251]   C-89, see also paragraph 182 above.

[252]   Board Decision No. 83, C-117.

[253]   See CWS-3 ¶ 23.

[254]   C-20.  The date in C-20 contains is a spelling mistake, the year is not "2006" but "2007"; the stamp also shows that this application was received by the Regulator on 30 May 2007.
Ms. Rogozina gives the figures of LVL 33.80/MWh to LVL 42.75/MWh in her first Witness Statement, CWS-3 ¶ 23.

[255]   Decision No. 12, C-21; R-35.2.

[256]   C-125; see also paragraphs 185-186 above.
The application to set aside rests on a breach by the Regulator of Sect. 5 of the Administrative Procedure Act and Sect. 15(12) of the same Act.  The first provision is to the effect that in administrative proceedings institutions and courts shall, within the scope of applicable provisions of law, protect the rights and legal interests of private persons (CLA-47).  The second provision is said to embody the principle of prohibition against legal obstruction by institution and courts.
Sect. 5 of the Administrative Procedure Act (CLA-47) reads as follows:
> Principle of Observance of the Rights of Persons
> In administrative proceedings, especially in adopting decisions on the merits, institutions and courts shall, within the scope of the applicable norms of law, facilitate the protection of the rights and legal interests of private persons.
Sect. 15(12) of the Administrative Procedure Act (CLA-47) reads as follows:
> Institutions and courts may not refuse to decide an issue on the grounds that such issue is not regulated by law or other external regulatory enactment (prohibition of legal obstruction by institutions and courts). They may not refuse to apply a norm of law on the grounds that such norm does not provide for the mechanism of application, it is not exhaustive or no other regulatory enactments have been issued which would more closely regulate the application of the relevant norm. This shall not apply only in cases where an institution, which is required to apply this norm or participate in its application in another way, has not been established or is not operating.

235.  The Administrative District Court eventually made its decision on 15 April 2009 and dismissed Latgales Enerģija's application.[257]

236.  On 28 September 2007 Latgales Enerģija applied again to the Regulator seeking a new tariff from 1 November 2007 onwards.[258]  The proposed tariff ranged from 35.95 LVL/MWh to 44.16 LVL/MWh depending on the natural gas rate.  Reliance was placed on changes in the natural gas rates and in the minimum salary as well as other factors.

237.  In the autumn of 2007 a number of significant events took place which the Tribunal will discuss in the following sub-sections of this Award:

(i)     on 11 September 2007 Latvijas Gāze stopped the supply of natural gas (see paragraph 248 below); as a consequence, Latgales Enerģija experienced difficulties in providing heating to certain areas of the city of Rēzekne;

(ii)    on 4 October 2007 the Regulator warned Latgales Enerģija that it might revoke the three licences issued to Latgales Enerģija (see paragraph 262 below);

(iii)   the Municipality declared an energy crisis in the city of Rēzekne on 9 October 2007 (see paragraph 264 below);

(iv)    the heat supply development strategy for the city of Rēzekne for 2007-2013 had just been approved by the Municipality on 21 September 2007[259] (see paragraph 228 above); and

(v)     on 11 October 2007 the Regulator decided to take over Latgales Enerģija's zone (see paragraph 274 below).

---

[257]  C-192, see paragraph 392 below.

[258]  C-140.

Ms. Rogozina gives the figures of LVL 33.80/MWh to LVL 42.75/MWh in her first Witness Statement, CWS-3 ¶ 23.

[259]  Decision No. 364, C-137; C-213.

238.    On 5 November 2007 Latgales Enerģija wrote to the Municipality announcing that if the Regulator approved the new tariff proposed by Latgales Enerģija, Latgales Enerģija would apply reduced rates as set out in that letter.[260]

239.    On 9 November 2007 the Regulator unanimously approved new tariffs.[261]   Latgales Enerģija submits that the approved tariffs would have enabled it to pay the increased prices for natural gas.[262]

240.    However, on 7 December 2007 the Regulator revoked its previous decision No. 28 dated 9 November 2007 and dismissed Latgales Enerģija's application for a new tariff dated 18 September 2007.[263]   The decision does not state whether it is a majority decision or a unanimous decision.

241.    The decision states that on 29 November 2007 Rēzeknes Enerģija had written a letter to the Regulator (*not in evidence*) stating that the amount of natural gas which Latvijas Gāze was to supply was 21,000 nm$^3$ whereas Latgales Enerģija's application contained a smaller amount, which proved in the Regulator's opinion that the calculations on which Latgales Enerģija's application was based were not in accordance with "the actual situation" and that the rates submitted were therefore to the detriment of the public interest.   Such information had been knowingly supplied by Latgales Enerģija and the Regulator's decision was therefore to be reviewed.   The Regulator found that Latgales Enerģija had obtained a new tariff "by illegal means" and that the approved tariff was "unreasonably high".[264]

242.    The decision does not state that Latgales Enerģija's comments were sought on Rēzeknes Enerģija's 29 November 2007 letter before reviewing the Regulator's decision dated 9 November 2007.

243.    On 12 December 2007 Latgales Enerģija challenged the Regulator's decision before the Administrative District Court.[265]   The court dismissed Latgales Enerģija's

---

[260]  C-154.

[261]  Decision No. 28, C-27.

[262]  Cl. Mem. ¶ 190.

[263]  Decision No. 35 dated 7 December 2007, C-28.

[264]  C-28 [page 18].

[265]  C-164.

60

application on 30 October 2009.[266]  Latgales Enerģija appealed against that judgment and the Administrative Regional Court dismissed the appeal on 23 September 2010.[267]

244.    Latgales Enerģija had started to charge users according to the revised tariffs approved by the Regulator on 9 November 2007 as it took the view that the effects of the Regulator's decision of 7 December 2007 were stayed pending the resolution of Latgales Enerģija's challenge.[268]  However, the Rēzekne City Council did not accept Latgales Enerģija's position (see paragraphs 324 ff. below).

### (3)    TOWARDS THE DECLARATION OF AN ENERGY CRISIS BY THE RĒZEKNE CITY COUNCIL (9 OCTOBER 2007)

245.    Owing to the Regulator's refusal to approve a new tariff in 2006 (see paragraph 184 above) and in 2007 (see paragraphs 233 and 240 above) and to the increase in the gas prices charged by Latvijas Gāze allowed by the competent authority in 2006 and 2007 (see paragraphs 181 and 231 above) Latgales Enerģija felt that it would no longer be in a position to pay the amounts which Latvijas Gāze was invoicing Rēzeknes Siltumtīkli.  On 2 July 2007 it informed Rēzeknes Siltumtīkli that, as of 11 June 2007, it would pay for the natural gas supplied by Latvijas Gāze in accordance with the tariff applied by the Regulator when the heating tariff was approved, namely "LVL 83.60/1000 m$^3$".[269]

246.    On 25 July 2007 Latgales Enerģija informed Rēzeknes Siltumtīkli that it paid less than Latvijas Gāze had invoiced Rēzeknes Siltumtīkli for June 2007, by some LVL 10,000.[270]

Latgales Enerģija did not pay the outstanding balance to Latvijas Gāze.  Neither did Rēzeknes Siltumtīkli and the Rēzekne City Council which were the contracting parties to the Gas Supply Agreement with Latvijas Gāze.[271]

---

[266] R-4 ¶ 5.

[267] R-4, see paragraph 401 below.

[268] Cl. Mem. ¶ 199.

[269] C-127.

[270] C-130.

[271] C-40, see paragraph 63 above; C-61, see paragraph 136 above; and C-81, see paragraph 160 above.

247.   On 29 August 2007 Latvijas Gāze warned the Rēzekne City Council and Rēzeknes Siltumtīkli that it would suspend supplies of natural gas unless the Rēzekne City Council paid in full for the natural gas supplied to Rēzeknes Siltumtīkli until the end of July 2007.[272]  On 10 September 2007 Latvijas Gāze sent the Rēzekne City Council and Rēzeknes Siltumtīkli a second warning.[273]  On 11 September 2007 the Rēzekne City Council asked Latvijas Gāze not to interrupt supplies of natural gas.[274]

248.   On 11 September 2007 Latvijas Gāze stopped its natural gas supply just before the beginning of the heating season.

249.   In its letter to the Rēzekne City Council and Rēzeknes Siltumtīkli dated 14 September 2007 Latvijas Gāze stated that the City Council had not paid for the natural gas received in July 2007 in full and the City Council's request to maintain supplies had been rejected by its Board; the amount claimed by Latvijas Gāze was of approx. LVL 148,000 plus an advance payment of LVL 400,000 for October 2007 and interest on delayed payment, to be calculated.[275]

250.   As a consequence of the interruption in the supply of natural gas, Latgales Enerģija had to switch back to its reserves of heavy fuel oil, which it did, in order to provide heating and hot water.[276]

251.   On 13 September 2007 the Mayor of Rēzekne gave an interview that was published on 15 September 2007 in the local paper *Rēzeknes Vēstis*.[277]  In his answer to the question put to him[278] the Mayor reportedly answered as follows:

> First of all I want to reassure residents and to confirm that supply of hot water and heating would be provided.
>
> And now I will explain how this difficult situation occurred.  Everybody knows that the lease agreement with company Latgales enerģija is disadvantageous for

---

[272] This communication is mentioned in C-132, but is not itself in evidence.

[273] C-132.

[274] The letter is not in evidence, but is referred to in R-32.

[275] R-32.

[276] CWS-1 ¶ 93 and Transcript, Day 2, 68/15-24.  See also Latgales Enerģija's letter to the Regulator dated 30 October 2007, C-153 ¶ 13.

[277] C-134.

[278] The question put to the Mayor was: "Gas supply stopped in Rēzekne.  The problem with the heat supply has again run into a dead end… What should Rēzekne residents expect, how does the council intends [sic] to solve the problem?"

the city.  The same can be said about the agreement with Latvijas Gāze.  The agreement on gas supply has been concluded among AS Latvijas Gāze, AS Rēzeknes siltumtīkli and Rēzekne Council, instead of concluding directly with the producer of thermal energy.  Latvijas Gāze issues an invoice for gas consumption to Rēzeknes siltumtīkli, and the latter, in its turn, issues an analogous invoice to Latgales enerģija that serves as the final link in the chain of payments for gas.  After all, this company uses gas and receives payment from the heat consumers.  However, if a single santims remains unpaid for the consumed gas, the council bears the liability, as the municipality is the guarantor for payments under the agreement with Latvijas Gāze.  So far, Rēzeknes siltumtīkli prevented occurrence of debts.  However, two months ago, when the Regulator rejected a project to increase the thermal energy tariffs (considering them to be unreasonably high), Latgales enerģija begun to pay only a part of the accrued amount, that is, failed to pay the difference between the current rate and the increased rate they desired, which was rejected by the Regulator.  Thus, a debt of LVL 29,164 occurred.

Latgales enerģija took the following position: you, the council, hinder and cause obstacles for the Regulator to increase the tariffs.

We would like to note that the council does not determine and does not influence the tariffs, this is in the power of the Regulator, not the council. Apparently, Latgales enerģija is thus trying to impose a pressure on the Regulator...

The City Council can easily pay the debt to Latvijas Gāze. The debt amount is small.  The best variant how to do it is by amending the budget in the end of the year to transfer this money to Rēzeknes siltumtīkli increasing its share capital, thereafter these funds would cover the debt.  Therefore we addressed the management of Latvijas Gāze with a request to extend the payment term of the invoice for the gas until 1 January 2008.  This issue will be discussed at a board meeting of AS Latvijas Gāze on Friday (14 September).

Of course, we are interested in a direct agreement between Latvijas Gāze and the operator, heating company.  However, with regard to Latgales enerģija, Latvijas Gāze has a categorical position: there will be no direct agreement with this company...

The situation reached a critical point. This cannot go any further. Therefore, last week the board of AS Rēzeknes siltumtīkli made a decision to instruct board member Aldis Mežals to hire a law office from Riga to draft documents that are required to bring a claim to court against SIA Latgales enerģija.

On 14 September, a claim will be brought to the administrative court to collect the debt from Latgales enerģija at three positions: for the continued delay in payment of depreciation to akciju sabedrība Rēzeknes siltumtīkli (in the amount of 75 thousand lats); for the failure under the agreement to take over the debt of Rēzeknes siltumtīkli, in the amount of one million lats; for failure to pay the invoices of Latvijas Gāze for the consumed gas.

I will explain that as of the beginning of operations Latgales enerģija did not pay a santims for depreciation (however, according to law, deductions should be done annually).  In relation to taking over the debt of Rēzeknes Siltumtīkli, Latgales enerģija did not take it over, it assigned the debt (that is, did not take over the debt itself, but the right of claim, to collect the debt); as a result, this million lats was distributed across the entire remaining lease term and counted in the rent payment.

Therefore, company Rēzeknes siltumtīkli faced limited cash income that would allow the payment.

What will be our further steps? Tomorrow (14 September), six companies that provide heating in Latvia will receive letters with a description and analysis of the situation with the heating supply in Rēzekne and an offer to take up provision of heating in our city. I am sure, there will be persons who would want to take this up. Then we will announce a tender and choose a company that would meet our requirements. The main and mandatory condition would be: conclusion of a direct agreement between Latvijas Gāze and the operator; also requirements that the tariff of the heating in Rēzekne would not exceed 30 lats for five years.

I can tell that the future of Latgales enerģija in our city will be decided on 25 September. By this date, the regular payment for the gas should be paid, and in case Latgales enerģija fails to pay it, then I would bring a question to deputies regarding termination of the agreement with this company. In case the payment is made, then the question of gas payment is removed, and we sit down at the table of negotiations to discuss issues of heating supply in the city.

In conclusion I would like to address the residents of our city: don't panic. There will be no interruption in supply of hot water and heating. I can ensure that much has been done to solve the problem, but it has not been publicly advertised. For three months, I have been negotiating with several companies persuading them that Rēzekne has a future. And I can guarantee that in case of necessity a new company, large, serious and reliable, would appear here. Previously we did not have alternatives. Now we have them.

252. On 19 September 2007 Latgales Enerģija wrote to the Mayor with reference to the interview published in *Rēzeknes Vēstis*, asking whether it was accurate that a letter had been, or would be, sent to six Latvian heat supply companies with a proposal to supply thermal energy in Rēzekne, and whether in such case Latgales Enerģija would be able to take part in the competition.[279]  No answer to that letter is in evidence.

253. On 20 September 2007 the differences of opinion between Rēzeknes Siltumtīkli and Latgales Enerģija regarding the time when payment of depreciation was owed by Latgales Enerģija (see paragraphs 193 ff. above) suddenly came to a head. Rēzeknes Siltumtīkli sued Latgales Enerģija in the Latgale Regional Court seeking *inter alia* payment of certain amounts (see paragraph 302 below). Rēzeknes Siltumtīkli finally sought, and obtained, the attachment of Latgales Enerģija's funds held by banks and payments owed by any third parties.

254. The Claimant takes the view that the claims were spurious[280] and the application for an attachment was calculated to prevent Latgales Enerģija's from using its bank account to make and receive payments and to disrupt Latgales Enerģija's business

---

[279] C-136.
[280] Cl. Mem. ¶¶ 155;157.

64

operations and create further difficulties in order for stable and uninterrupted heating to be provided just before the heating season began.[281]

255.   On 21 September 2007 the Latgale Regional Court granted the attachment sought to secure the claimant's claims for an amount up to LVL 880,354.02 with immediate effect.[282]

256.   Latgales Enerģija's operations were almost completely halted by the attachment.[283]

257.   In the week of 24 September 2007[284] the Board of Education of the Rēzekne City Council made a request in writing to Latgales Enerģija in order that the schools and nursery schools in the city should be heated.  The Social Care Directorate made a similar request in relation to the Social Care Centre for the Retired.[285]

258.   On 28 September 2007 the Rēzekne City Council decided to establish SIA Rēzeknes Enerģija ("Rēzeknes Enerģija") as a Municipality-owned company according to www.rezekne.lv.[286]  The Respondent has neither denied this piece of information nor disproved it by documentary evidence filed in rebuttal.

259.   On 1 October 2007 www.rezekne.lv reported that there was no heating in two secondary schools and three nursery schools of the Rēzekne Northern District.[287]  On the same day the Board of Education of the Rēzekne City Council sent the Regulator a statement complaining of the current heating problems.[288]  Latgales Enerģija has

---

[281] Cl. Mem. ¶¶ 160-161; 178.

[282] C-138 [page 3].

[283] CWS-1 ¶ 95; CWS-3 ¶ 38.

[284] The Claimant alleges that the request in order for heating to be started was made on 1 October 2007 and the Municipality Educational Department complained to the Regulator on the same day (Cl. Mem. ¶¶ 150-151).  However, the exhibit relied upon by the Claimant (C-142) indicates that the request in order for heating to be started was made in the preceding week which started on Monday 24 September 2007.

[285] C-142.

[286] C-142.

[287] C-142.

[288] C-22 [page 5] ¶ 6.

admitted that the supply of heating services was interrupted in the city of Rēzekne, especially in the northern district.[289]

260.   On 2 October 2007 Rēzeknes Enerģija was incorporated by the Rēzekne City Council with a paid-in capital of LVL 2,000, subsequently increased to LVL 4,002,000 on 30 October 2007 relying on a loan from the Treasury (see paragraphs 261 and 271 below).[290]

261.   On 3 October 2007 the Local Government Loan and Guarantee Control and Monitoring Council approved the decision by the Rēzekne City Council to apply for a loan from the Treasury for an amount of LVL 4 million to invest in the share capital of Rēzeknes Enerģija.[291]   On 4 October 2007 the Rēzekne City Council applied to the Treasury for such loan.[292]   On 9 October 2007 the Rēzekne City Council decided to pay an amount of LVL 4 million for Rēzeknes Enerģija's capital increase.[293]

262.   On 4 October 2007 the Regulator sent Latgales Enerģija a warning[294] stating that the licences were at risk of being revoked, but not before 4 January 2008.[295]   Latgales Enerģija was requested to submit explanations to the Regulator by 7 November 2007 on the breaches of the conditions of the licences mentioned in the warning;[296] Latgales Enerģija answered the Regulator's warning on 30 October 2007.[297]

---

[289]   See the Claimant's Notice of Dispute, C-3 ¶ 31.4; see also the statement of Latgales Enerģija's representative Mr. Meļņikovs before the Energy Crisis Committee, C-146 [page 1] and, finally, Latgales Enerģija's answer to the Regulator's warning, C-153 ¶¶ 12-13, where the period specified by Latgales Enerģija goes from 11 September 2007 to 17 October 2007.

[290]   C-206 [page 3].

[291]   R-20 [page 8].

[292]   R-20 [page 9].

[293]   R-20 [page 1].

[294]   The full title of this decision is "Warning on invalidation of licences No 002-05 for production of thermal energy, No 003-05 transfer and distribution of thermal energy, No 004-05 sale of thermal energy issued to SIA 'Latgales Enerģija'".

[295]   C-22 [page 6]; see more in detail at paragraph 989 below.

[296]   C-22 [page 6].

[297]   C-153, see paragraph 297 below.

263. On 8 October 2007 the Board of Directors of the Latvian Public Utilities Commission met.  According to the account made by the Mayor of Rēzekne the Commission determined that an emergency situation was to be announced.[298]

264. On 9 October 2007 the Rēzekne City Council made a unanimous decision declaring that there was an energy crisis in the city of Rēzekne and to establish an "energy crisis centre" (the "Energy Crisis Committee").[299]

265. Latgales Enerģija was not heard or consulted before that decision was made.[300]

266. On the same day the Rēzekne City Council notified Latgales Enerģija of its decision and informed Latgales Enerģija that a meeting of the Energy Crisis Committee would take place at 5:00 *p.m.* that day, asking that a Latgales Enerģija representative attend.[301]  Latgales Enerģija acknowledged receipt of that decision on 9 October 2007.[302]

In the same letter the Rēzekne City Council asked Latgales Enerģija to supply heating and hot water in the city within 24 hours, schools and nursery schools to be given priority.

### (4)  THE ENERGY CRISIS IN RĒZEKNE (FROM 9 OCTOBER 2007 ONWARDS)

267. After the Rēzekne City Council declared the existence of an energy crisis in Rēzekne on 9 October 2007, there was an acceleration of events in October 2007 as follows:

---

[298] C-145 [page 2].

[299] Decision No. 388, C-24.
The Committee was chaired and managed by the Mayor, Mr. Vjakse, and further included Mr. G. Spradzenko (Member of RCC), Mr. E. Škinčs (Member of the Board of Rēzeknes Namsaimnieks [the largest of the four companies that were entrusted with the management of the housing facilities of the Rēzekne Municipality, C-213 p. 12]); Mr. A. Mežals (Member of the Board of Rēzeknes Siltumtīkli); Mr. I. Locis (Deputy Executive Director of the Council) and Ms. V. Vekšina (Manager of the Financial Department of RCC).

[300] Mr. Strioga first Witness Statement, CWS-1 ¶ 98.

[301] C-144.

[302] C-144.
The Claimant's allegation that Latgales Enerģija read the announcement of the energy crisis in the press because it was not notified the decision (Cl.Mem. ¶ 189; see also Mr. Voronovs' first Witness Statement, CWS-5 ¶ 11) is therefore inaccurate.

(i)     on 9 October 2007 the members of the Energy Crisis Committee met for the first time (see paragraph 268 below);

(ii)    on 10 October 2007 Latgales Enerģija was requested again to supply heating within 24 hours to six schools and nursery schools in the Rēzekne Northern District (see paragraph 269 below);

(iii)   on 11 October 2015 Latgales Enerģija's zone was taken over by the Regulator's decision of that day (see paragraph 274 below);

(iv)    on 11 October 2007 the members of the Energy Crisis Committee met for the second time (see paragraph 272 below);

(v)     on 12 October 2007 Rēzeknes Enerģija was appointed by decision of the Rēzekne City Council as the person in charge of providing thermal energy in Rēzekne (see paragraph 275 below);

(vi)    on 13 October 2007 the members of the Energy Crisis Committee met for the third time in an enlarged meeting (see paragraph 276 below);

(vii)   on 15 October 2007 the Rēzekne City Council ordered the Municipal Police to guard the boiler houses (see paragraph 280 below);

(viii)  on 17 October 2007 Latvijas Gāze resumed the supplies of natural gas and entered into a gas supply agreement with Rēzeknes Enerģija (see paragraphs 281 and 283 below);

(ix)    on 17 October 2007 the Latgale Regional Court lifted the attachment of Latgales Enerģija's funds (see paragraph 282 below);

(x)     on 25 October 2007 Latgales Enerģija, UAB E Enerģija, Rēzeknes Siltumtīkli, the Rēzekne City Council and Rēzeknes Enerģija made an agreement setting out the action to be taken promptly by the contracting parties in order to deal with the current problems (see paragraph 286 below);

(xi)    on 26 October 2007 Rēzeknes Siltumtīkli appealed against the decision lifting the attachment (see paragraph 290 below); and

(xii)   on 30 October 2007 Latgales Enerģija answered the Regulator's warning of 5 October 2007 (see paragraph 297 below).

These events will be recalled in some detail in the following sub-sections.

(A)   TOWARDS THE REGULATOR'S DECISION TAKING OVER LATGALES ENERĢIJA'S ZONE (11 OCTOBER 2007)

268.   The first meeting of the Energy Crisis Committee took place on 9 October 2007.[303] The meeting ended with the Mayor proposing to send Latgales Enerģija a request in writing to supply heating to the six schools and nursery schools within 24 hours as of receipt of the letter and to inform the Regulator and a number of Ministries of the decision made.

269.   The request that heating be provided within 24 hours was confirmed by the Mayor in a letter dated 10 October 2007.[304]

270.   On 10 October 2007 the Rēzekne City Council submitted an application to the Regulator; that application is not in evidence, but it is mentioned in the Regulator's decision No. 26 dated 11 October 2007.[305]

271.   In the meantime, on 10 October 2007 the Rēzekne City Council had signed the Loan Agreement with the Treasury of the Republic of Latvia (the "Latvian Treasury Loan Agreement") which it had entered into in order to fund the increase in the share capital of Rēzeknes Enerģija (see paragraph 261 above).[306]

272.   The next meeting of the Energy Crisis Committee took place on 11 October 2007.[307] The meeting ended with a decision to apply to the Latvian Public Utilities Commission.  Asked by the Mayor to comment on the situation, Mr. Meļņikovs stated that the northern boiler was not running at all, Latgales Enerģija was seeking to buy fuel without using funds and to have its bank account unblocked.

---

[303]  C-145 [page 2].

[304]  C-145 [page 1].

[305]  C-23 [pages 9 ff.].

[306]  R-20 [pages 2 ff.].

[307]  C-146.

273.   On 11 October 2007 the Rēzekne City Council submitted an application to the Regulator, which is not in evidence, but is mentioned in the Regulator's decision No. 26 dated 11 October 2007.[308]

274.   On 11 October 2007 the Regulator decided to take over Latgales Enerģija's zone forthwith.[309]  On 31 March 2010 Latgales Enerģija's application to have that decision set aside was dismissed by the Administrative Regional Court, then it was dismissed anew on 24 November 2011.[310]

(B)   THE APPOINTMENT OF RĒZEKNES ENERĢIJA AS THE PERSON RESPONSIBLE TO PROVIDE HEATING SERVICES IN RĒZEKNE (12 OCTOBER 2007)

275.   On 12 October 2007 the Rēzekne City Council appointed Rēzeknes Enerģija "as the person in charge of provision of thermal energy in in the administrative territory of Rēzekne".[311]

276.   The third meeting of the Energy Crisis Committee took place on 13 October 2007 and lasted five hours and fifteen minutes.[312]  The meeting ended with the decision to execute the Council's decision of the previous day to delegate the task to provide heating to the Municipality to Rēzeknes Enerģija.[313]

277.   After summarizing recent events the Mayor presented two options; the minutes of the meeting do not reflect the discussion on those two options clearly,[314] but those options

---

[308]   C-23 [page 10].

[309]   C-23 [pages 9 ff.].

[310]   R-3, see paragraph 402 below.

[311]   C-25.  The decision is stated to be based on Sect. 15(1)(1) of the Municipalities Act (CLA-46) and Sect. 28(2) of the Public Utility Regulators Act (CLA-49).

[312]   The minutes are exhibited as C-147; in addition, an audio recording was made which is not in evidence.

The Centre was chaired and managed by the Mayor Mr. Vjakse and further included Mr. G. Spradzenko, Ms. M. Muceniece, Mr. I. Klimanovs, Mr. M. Bartaševičs, Mr. E. Jurkāns, Ms. D. Abramova, Mr. V. Nikonovs, Mr. A. Pušņakovs (Councillors of Rēzekne City Council); Mr. I. Locis (Deputy Executive Director of the Rēzekne City Council); Ms. V. Vekšina (Head of the Financial Department of Rēzekne City Council); Mr. A. Patmalnieks (Head of the Legal Department of the Rēzekne City Council, joining at 3:00 *p.m.*); Ms. S. Baltace (Adviser to the Mayor); Ms. D. Zirniņa (Head of the Public Relations Department of the Rēzekne City Council).  In addition, the meeting was attended by Mr. Strioga (E enerģija), Messrs L. Voronovs, I. Bērziņš, S. Meļņikovs (Latgales Enerģija), Mr. E. Škinčs (Member of the Board of Rēzeknes Enerģija); Mr. A. Mežals (Member of the Board of Rēzeknes Siltumtīkli).

[313]   C-147 ¶ 16.

[314]   C-147.

70

82

are clearly outlined in a document prepared by the Mayor.[315]  At the hearing, only the Claimant brought witnesses to testify on what was said at that meeting.[316]

278.  According to Option No. 1, Latgales Enerģija's activity would be limited to the production of thermal energy; Rēzeknes Enerģija would be in charge of the transmission and distribution, as well as the sale of thermal energy.  According to Option No. 2, Rēzeknes Enerģija would take over production, transmission and distribution as well as the sale of thermal energy and Latgales Enerģija would drop out of the picture altogether, save for any legal proceedings which it might bring, as such an event was expressly identified as a risk.[317]

279.  Both options thus excluded that Latgales Enerģija would keep the position that had been agreed upon under the agreements made with the Rēzekne City Council on the one hand (see paragraphs 100 ff. and 169 ff. above), and Rēzeknes Siltumtīkli on the other (see paragraphs 78 ff. and 166 ff. above).

280.  On 15 October 2007 the Rēzekne City Council ordered the Municipal Police to guard the property of Rēzeknes Siltumtīkli in the three boiler houses.[318]  This was the Municipality's reaction to an apparent belief that Latgales Enerģija had brought in private security to protect the premises, a point that was briefly discussed in the 13 October 2007 Energy Crisis Committee meeting.[319]

281.  On 17 October 2007 Latvijas Gāze resumed the supplies of natural gas.[320]

282.  On 17 October 2007 the Latgale Regional Court revoked its previous decision of 21 September 2007[321] granting an attachment on Latgales Enerģija's assets (for more details see paragraph 305 below).[322]

---

[315] C-148.
[316] See in particular CWS-1 ¶¶ 102-104.
[317] C-148.
[318] C-149.
[319] C-147 ¶ 5.
[320] C-153 ¶ 12.
[321] C-138, see paragraph 255 above.
[322] C-150.

(C)   THE RĒZEKNES ENERĠIJA GAS SUPPLY AGREEMENT (17 OCTOBER 2007)

283.   On 17 October 2007 Latgales Enerġija (as "the User") entered into a gas supply agreement with Rēzeknes Enerġija (as "the Supplier") (the "Rēzeknes Enerġija Gas Supply Agreement").[323]

284.   Clauses 2.2 and 4.2 of the Rēzeknes Enerġija Gas Supply Agreement provide that Latgales Enerġija has a duty to pay the invoices for actual consumption of natural gas issued by Rēzeknes Enerġija.

(D)   THE OCTOBER 2007 AGREEMENT (25 OCTOBER 2007)

285.   On 23 October 2007 a meeting took place which paved the way for the execution of a contract two days later.[324]

286.   On 25 October 2007 an agreement was made between Latgales Enerġija, UAB E Energija, Rēzeknes Siltumtīkli, the Rēzekne City Council and Rēzeknes Enerġija (the "October 2007 Agreement").[325]   The October 2007 Agreement contemplated the actions to be taken by each party, subdivided into three distinct stages as follows:

(i)      Stage I, covering the period from 25 October to 28 October 2007;

(ii)     Stage II, covering the period from 25 October to 30 November 2007; and

(iii)    Stage III, covering the period until 30 May 2008.

287.   Stage I (Clauses *(a)* to *(e)*) in essence contemplated five points as follows:

*(a)*   the parties undertook to take all necessary actions in relation to bailiffs in order to remove the attachment of Latgales Enerġija's accounts in the shortest possible time to ensure free flow of funds;  Rēzeknes Siltumtīkli was entitled to challenge the court decisions only in order to have the attachment removed;  the parties would then reach a settlement by 30 May 2008 on the claim brought by

---

[323] C-151.

[324] See CWS-1 ¶ 105 and Transcript, Day 2, 75-76 [Strioga].

[325] C-26.

72

Rēzeknes Siltumtīkli; no new proceedings would be brought and no new claims would be made within the proceedings currently pending;

*(b)*    Latgales Enerģija undertook to grant discounts to users as from the date when the Regulator would approve new rates;

*(c)*    Latgales Enerģija would submit its calculations relating to a new rate to the Rēzekne City Council ten days before submitting them to the Regulator (see paragraph 291 below);

*(d)*    the parties undertook to sign a statement of acceptance and delivery upon the installation and commissioning of a Witomax boiler at Atbrīvošanas alejā 155a; and

*(e)*    Rēzeknes Siltumtīkli would give approval by 15 November 2007 in order for a sub-lease agreement to be signed with SIA "LE Remonts" ("LE Remonts") and with SIA LE Koģenerācija ("LE Koģenerācija") and would issue the documents required in order for an application for the installation, commissioning and operation of a cogeneration plant to be submitted to AS Latvenergo.

288.    Stage II (Clauses *(f)* to *(i)*) in essence contemplated four further points as follows:

*(f)*    Rēzeknes Siltumtīkli would agree with E energija and Latgales Enerģija on certain annotations to be cancelled in the Land Registry in relation to Rēzeknes Siltumtīkli's assets; a separate agreement was concluded between the Claimant and Rēzeknes Siltumtīkli on 25 October 2007 to this effect; [326]

*(g)*    the parties would prepare and submit to each other a list of complaints relating to the Long-Term Agreement (see also paragraph 294 below);

*(h)*    the parties undertook to refrain from public announcements and complaints unless previous agreement had been reached in that respect; and

*(i)*    Rēzeknes Enerģija undertook to supply natural gas to Latgales Enerģija in accordance with the Rēzeknes Enerģija Gas Supply Agreement; Rēzeknes Enerģija

---

[326]  R-33.

The Respondent contends that the purpose and effect of this agreement goes far beyond what is contemplated by the October 2007 Agreement, see paragraph 1125 below.

and Latgales Enerģija would agree on a more detailed agreement within one month as of the conclusion of the October 2007 Agreement.[327]

289.   Finally, Stage III (Clauses *(j)* to *(k)*) in essence contemplated two points as follows:

*(j)*   Rēzeknes Siltumtīkli undertook to submit proposed amendments for the revision of the Long-Term Agreement by 29 February 2008; and

*(k)*   Latgales Enerģija would submit its own suggestions and objections in relation to the proposed amendments submitted by Rēzeknes Siltumtīkli by 25 March 2008, which the parties would start to review within 15 days; the parties would coordinate their amendments to the Long-term Agreement by 30 May 2008.

290.   On 26 October 2007 however, Rēzeknes Siltumtīkli filed an ancillary complaint against the Latgale Regional Court's judgment of 17 October 2007 that had revoked the attachment on Latgales Enerģija's assets[328].[329]   As a consequence, Latgales Enerģija's bank account remained frozen.   That was a breach of the October 2007 Agreement on the part of Rēzeknes Siltumtīkli and the Municipality (see more in detail paragraphs 964-967 below).

291.   On 5 November 2007 Latgales Enerģija offered the Rēzekne City Council reduced rates (see paragraph 238 above).[330]   The reason for which Latgales Enerģija proposed reduced rates to the Rēzekne City Council rather than the Regulator lies in paragraph *(c)* of the October 2007 Agreement (C-26, see also paragraph 287 above), in spite of the fact that the letter does not expressly refer to the October 2007 Agreement.[331]

292.   On 7 November 2007 Latgales Enerģija wrote to the Rēzekne City Council, Rēzeknes Siltumtīkli and Rēzeknes Enerģija with respect to the performance of their obligations under the October 2007 Agreement, pointing out that funds in its bank account were still frozen by the attachment, requesting explanations as to the reasons why the

---

[327]   Clause 8.1 (in handwriting after the signature page) of the Rēzeknes Enerģija Gas Supply Agreement (C-151) seems to indicate that the parties did not have sufficient time to work out all contract terms properly.

[328]   C-150, see paragraph 282 above and paragraph 306 below.

[329]   C-152.

[330]   C-154.

[331]   See also CWS-3 ¶ 26.

provisions of the October 2007 Agreement had not been complied with and expressing its concerns that it would not otherwise be able to perform its own obligations under the October 2007 Agreement.[332]

There is no answer to that letter on the record, either by the Rēzekne City Council, Rēzeknes Siltumtīkli or Rēzeknes Enerģija.

293. On 29 November 2007 Latgales Enerģija informed the Regulator that it might be unable to provide heat services.[333] On 7 December 2007 the Regulator asked whether Latgales Enerģija's statements should be understood as an application in order for the Regulator to revoke Latgales Enerģija's licences.[334] On 12 December 2007 Latgales Enerģija answered that its 29 November letter was sent simply to inform the Regulator of the existing difficulties.[335]

294. On 30 November 2007 Latgales Enerģija sent the Rēzekne City Council and Rēzeknes Siltumtīkli the list of its claims in relation to the Long-Term Agreement in accordance with Clause *(g)* of the October 2007 Agreement.[336] The list included claims against the Rēzekne City Council[337] and claims against Rēzeknes Siltumtīkli.[338]

---

[332] C-155.

[333] C-158.

[334] C-161.

[335] C-163.

[336] C-157.

[337] Latgales Enerģija presented four claims against the Rēzekne City Council:

  (i)    a claim for compensation of losses in an amount of LVL 138,069.24 arising from the lower rates applied by Latgales Enerģija from 1 February to 1 October 2006 in spite of the fact that the Rēzekne City Council had not approved the heat supply development plan by 28 February 2006 as contemplated by the February 2006 Agreement (C-157 ¶ 1.1);

  (ii)   a claim for compensation of losses in the period from 11 September to 17 October 2007 due to the need to use more expensive fuels and more expensive electricity to provide heating (C-157 ¶ 1.2);

  (iii)  a claim in order that the Rēzekne City Council sign the acceptance, delivery and commissioning documents relating to the Witomax boiler (C-157 ¶ 1.3); and

  (iv)   a claim for compensation of the legal costs incurred in the administrative proceedings (C-157 ¶ 1.4).

[338] Latgales Enerģija presented four claims against Rēzeknes Siltumtīkli:

  (i)    a claim for the compensation of the losses incurred due to Rēzeknes Siltumtīkli's failure to comply with the October 2007 Agreement with respect to the revocation of the attachment of Latgales Enerģija's bank account (C-157 ¶ 2.1);

On 30 November 2007 Latgales Enerģija wrote to Rēzeknes Enerģija that it was under no obligation for the time being to pay for the natural gas supplied since its bank account had been attached and the Rēzekne City Council, Rēzeknes Enerģija and Rēzeknes Siltumtīkli were in breach of their contractual duties under the October 2007 Agreement,[339] in particular with respect to the duty to lift the attachment. Reliance was placed by Latgales Enerģija on Article 1591 of the Latvian Civil Code.[340]

The letter is not in evidence; it was referred to in Rēzeknes Enerģija's statement of claim before the Riga Regional Court[341] and the judgment made by the same court on 2 March 2010.[342]

No answer to those letters is in evidence either on the part of Rēzeknes Enerģija.

Rēzeknes Enerģija's position in this respect is summarised in the judgment by the Riga Regional Court dated 2 March 2010.[343]  Rēzeknes Enerģija took the view that the sole provision of the 2007 October Agreement which gave rise to a contractual duty binding on it was Clause 1, Stage II *(i)*[344] with which Rēzeknes Enerģija had complied; Latgales Enerģija was not entitled to rely on the alleged breach of contract of other contracting parties to withhold performance of a duty owed to Rēzeknes Enerģija.

295. On 10 December 2007 the Rēzekne City Council replied to Latgales Enerģija's letter dated 30 November 2007 pointing out that on 28 February 2006 "the Council did not have any document that could have been approved" as Latgales Enerģija had sent the

---

(ii)     a claim to obtain Rēzeknes Siltumtīkli's permission in order for Latgales Enerģija to enter into a sub-lease agreement with RE Remont and LE Koģenerācia with respect to the cogeneration plant (C-157 ¶ 2.2);

(iii)    a claim for compensation of the legal costs incurred in connection with the proceedings brought by Rēzeknes Siltumtīkli on 20 September 2007 (C-157 ¶ 2.3); and

(iv)     a claim for the payment of interest on a loan (C-157 ¶ 2.4).

[339]  C-26.

[340]  CLA-55, *exceptio non adimpleti contractus.*

[341]  C-225 [page 2].

[342]  C-239 [page 2]; see also paragraph 382 below.

[343]  C-239 [page 4].

[344]  C-239 [page 4], erroneously mentions Clause I, Stage II,(g) in the English translation; the original Latvian refers to Clause I, Stage II,(i) of the October 2007 Agreement (C-26).

Council its proposed guidelines only on 19 December 2006 and that "[u]pon such conditions" the Council began to hold meetings of the Working Group for the development of the strategic plan.[345]

296.   In a letter to Rēzeknes Siltumtīkli dated 27 December 2007 Latgales Enerģija pointed out that Rēzeknes Siltumtīkli had failed to comply with its obligations under the October 2007 Agreement by filing its complaint against the decision of the Latgale Regional court on 26 October 2007 (see paragraph 290 above and paragraph 306 below). Latgales Enerģija asked Rēzeknes Siltumtīkli to tell the court at the hearing scheduled to take place on 3 January 2008 that it did not maintain its complaint as far as the revocation of the attachment of Latgales Enerģija's bank account was concerned.[346]

(E)   LATGALES ENERĢIJA'S ANSWER TO THE REGULATOR'S WARNING (4 OCTOBER 2007)

297.   On 30 October 2007 Latgales Enerģija answered the Regulator's warning dated 4 October 2007[347] explaining the situation and applying for a discharge of the warning (see more in detail at paragraph 990 below).[348]

(F)   THE 2007 ASSIGNMENT AGREEMENT (4 DECEMBER 2007)

298.   On 4 December 2007 Latgales Enerģija assigned its claims for payment for heating and hot water supplied to Rēzekne residents to LE Remonts (the "2007 Assignment Agreement"),[349] one of the Claimant's wholly-owned subsidiaries according to the Claimant.[350]   The assignment related to an amount of LVL 379,480.94 owed to Latgales Enerģija for heating and hot water supplied to Rēzekne residents in the period from 1 to 20 November 2007.

The purpose of such assignment was to enable Latgales Enerģija to continue to operate and supply heat despite the attachment affecting its bank account.

---

[345] R-29 [page 18].
[346] C-156 [page 7].
[347] C-22, see paragraph 262 above.
[348] C-153.
[349] C-159.
[350] Cl. Mem. ¶ 197.

299.    On 11 December 2007 the Regulator took the view that Latgales Enerģija was in breach of the conditions of the licence and the applicable law and requested Latgales Enerģija to explain the situation.[351]

300.    On 19 December 2007 Latgales Enerģija answered the Regulator's letter denying any breach.[352]

### (5)    THE PROCEEDINGS BROUGHT BY RĒZEKNES SILTUMTĪKLI AGAINST LATGALES ENERĢIJA (20 SEPTEMBER 2007) AND THE ATTACHMENT OF LATGALES ENERĢIJA'S BANK ACCOUNT (21 SEPTEMBER 2007)

301.    Differences of opinion between Rēzeknes Siltumtīkli and Latgales Enerģija regarding the time when payment of depreciation was owed by Latgales Enerģija had emerged in 2006 as recalled in paragraphs 193 ff. above.  In his interview given on 13 September 2007 the Mayor had referred to that dispute in some detail, indicating that Rēzeknes Siltumtīkli had instructed counsel from Riga the week before in order to sue Latgales Enerģija.[353]

302.    On 20 September 2007 Rēzeknes Siltumtīkli brought an action against Latgales Enerģija before the Latgale Regional Court[354] under the terms of the Long-Term Agreement[355] seeking payment of the amounts of LVL 778,415.41 for the lease of the assets, LVL 72,774.20 for a contractual penalty and LVL 29,164.41 for an outstanding debt for gas delivered, in total LVL 880,354.02 and recovery against Latgales Enerģija.[356]

Rēzeknes Siltumtīkli further sought a declaration that the Long-Term Agreement was terminated as of the date of the judgment to be made and that Rēzeknes Siltumtīkli was entitled to recover the possession of the leased assets, as well as a declaration that Latgales Enerģija was bound to pay in full the invoices presented by Latvijas Gāze.

---

[351]  C-162, see more in detail paragraph 993 below.

[352]  C-166, see paragraph 994 below.

[353]  C-134, see paragraph 251 above.

[354]  The document instituting the proceedings is not in evidence, but its content is summarised in C-138 p. 2.

[355]  C-4.

[356]  C-138 [page 2].

Finally, Rēzeknes Siltumtīkli sought the attachment of Latgales Enerģija's assets and funds in cash held by banks and payments owed by any third parties.

303.   On 21 September 2007 the Latgale Regional Court granted Rēzeknes Siltumtīkli's application and attached funds held in Latgales Enerģija's bank account, including debts owed by third parties to Latgales Enerģija, for an amount up to LVL 880,354.02, with immediate effect.[357]

304.   On 5 October 2007 Latgales Enerģija applied to the Latgale Regional Court to have the attachment cancelled.[358]

305.   On 17 October 2007 the Latgale Regional Court revoked its decision granting the attachment dated 21 September 2007, upheld Latgales Enerģija's jurisdictional objection and transferred the case to the Riga Regional Court on jurisdictional grounds.[359]

306.   On 26 October 2007 Rēzeknes Siltumtīkli brought an ancillary complaint against the Latgale Regional Court's judgment of 17 October 2007 before the Supreme Court, asking the Supreme Court to set aside the judgment revoking the attachment of Latgales Enerģija.[360]

---

[357] C-138 [page 3].

[358] C-143.

The application sought a review of the attachment decision (C-138) as a matter of urgency on the basis that the heating season would start by the following week according to the previous practice, and Latgales Enerģija would increasingly need to use its money to purchase the fuel required for its operations; if the attachment was maintained for more than two weeks, the city of Rēzekne might be left without heating and hot water (C-143 ¶¶ 5-7). Latgales Enerģija raised an objection to the jurisdiction of the court relying on the fact that its registered office was in Riga, but asked nonetheless the Court to cancel the attachment decision as a matter of urgency (C-143 ¶¶ 16; 19-21; 54).

[359] C-150 [page 3].

[360] C-152.

Rēzeknes Siltumtīkli contended that the judgment by the Latgales Regional Court should be set aside and a decision should be made on the merits. It argued that the subject-matter of Rēzeknes Siltumtīkli's action was the possession of the leased facilities including the immovable property since Rēzeknes Siltumtīkli had sought the termination of the Long-Term Agreement. Rēzeknes Siltumtīkli further contended that the Latgales Regional Court had jurisdiction on the basis that the assets in dispute were in Rēzekne and that jurisdiction lay also with the courts of the place where damage to the property in dispute had been caused. The losses suffered by Rēzeknes Siltumtīkli could be caused by a breach of contract, not only by a tort as found by the Latgales Regional Court.

307.   This complaint was filed one day after the October 2007 Agreement[361] was executed. The Claimant contends that this was a breach of the October 2007 Agreement by the Rēzekne City Council and Rēzeknes Siltumtīkli.[362]

308.   As a result of that complaint, Latgales Enerģija's bank account remained blocked.[363] The Supreme Court made its decision on 3 January 2008 upholding Rēzeknes Siltumtīkli's appeal, so that the attachment remained in force.[364]

309.   The first decision on the merits was made by the Riga Regional Court on 9 July 2009.[365]

### (6)   THE PROCEEDINGS BROUGHT BY RĒZEKNES ENERĢIJA AGAINST LATGALES ENERĢIJA (27 DECEMBER 2007)

310.   On 27 December 2007 Rēzeknes Enerģija brought an action against Latgales Enerģija in the Riga Regional Court seeking payment of an amount of LVL 810,819 plus interest, and post-judgment interest, for deliveries of natural gas made to, and accepted by, Latgales Enerģija.[366]  Rēzeknes Enerģija further sought the attachment of Latgales Enerģija's movable assets, an injunction restraining Latgales Enerģija from dealing in emission allowances and the registration of a prohibition in the greenhouse gas emission register with respect to Latgales Enerģija's allowances for 2008-2012.[367] Rēzeknes Enerģija rested its claim on the Gas Supply Agreement entered into with Latgales Enerģija.[368]

311.   Rēzeknes Enerģija supplemented and increased its claim in 2008 (see paragraph 368 below) and in 2009 (see paragraph 381 below).

---

[361] C-26, see paragraph 286 above.

[362] Cl. Mem. ¶ 180.

[363] Cl. Mem. ¶ 181; CWS-4 ¶ 11.

[364] CWS-4 ¶ 11; the decision is not in evidence.

[365] C-194, see paragraph 386 below.

[366] C-225 [page. 5].

[367] C-225 [page 5].

[368] C-151, see paragraph 283 above.

### (7)   SUPPLEMENTING CERTAIN ARRANGEMENTS MADE IN 2005 AND 2006 – NEW ARRANGEMENTS

#### (A)   FURTHER LOANS BY E ENERGIJA TO LATGALES ENERĠIJA

312.   On 21 January 2007 E energija amended the loan granted to Latgales Enerġija on 21 August 2006 by extending the date of reimbursement.[369]

313.   On 16 October 2007 E energija granted a further loan to Latgales Enerġija in an amount of EUR 150,000.[370]   Then on 1 December 2007 E energija agreed to extend the date of reimbursement of this loan.[371]

314.   On 16 November 2007 E energija granted a further loan to Latgales Enerġija in an amount of LVL 100,000.[372]

#### (B)   RESTRUCTURING OF E ENERGIJA'S LOANS TO LATGALES ENERĠIJA (24 AUGUST 2007)

315.   At the end of September 2006 the amounts owed by Latgales Enerġija to the Claimant under various loans amounted to EUR 1,454,864 including interest.[373]   On 24 August 2007 the loan was restructured and was taken over by Sampo Banka.[374]   This arrangement lasted only a few months according to Mr. Jautakis' evidence, since the loan was transferred back from Sampo Banka to the Claimant in February 2008.[375] The Claimant's allegations and the explanations contained in Mr. Jautakis' first Witness Statement were not challenged by the Respondent; Mr. Jautakis was not cross-examined at the Hearing.[376]

---

[369]   C-51 [page 59].

[370]   C-51 [page 61].

[371]   C-51 [page 66].

[372]   C-51 [page 68].

[373]   See also CWS-2 ¶ 17; C-119 [page 24] ¶ 24 (EUR 974,256 + EUR 434,481 + EUR 46,127 = EUR 1,454,864).

[374]   See CWS-2 ¶ 18.

[375]   See CWS-2 ¶ 19; see also paragraph 377 below.

[376]   Transcript, Day 2, 82/14.

(C)   CONTRACTS BETWEEN THE CLAIMANT AND THE EUROPEAN BANK FOR RECONSTRUCTION AND DEVELOPMENT (SEPTEMBER/DECEMBER 2007)

316.   A Subscription Agreement was entered into by E energija and the European Bank for Reconstuction and Development ("the Subscription Agreement") on 26 September 2007.[377]

317.   The Claimant further relies on a Loan Agreement it concluded with the European Bank for Reconstruction and Development ("EBRD") on 18 December 2007 ("the EBRD Loan Agreement").[378]

318.   Both exhibits contain an unsigned version of such agreements.[379]  It is not in dispute, however, that the Claimant concluded these agreements with the EBRD.[380]

319.   According to Section 2.01 of the EBRD Loan Agreement, an amount of EUR 3.189 million was allocated for the Rēzekne Project.[381]

320.   The Claimant drew on the loan in 2008,[382] but admits that it did not draw on the loan in connection with the Rēzekne Project.[383]

(D)   THE AGREEMENT BETWEEN THE CLAIMANT AND RĒZEKNES SILTUMTĪKLI (25 OCTOBER 2007)

321.   An agreement was entered into by the Claimant and Rēzeknes Siltumtīkli on 25 October 2007 pursuant to Clause *(f)* of the October 2007 Agreement[384].[385]

---

[377]   C-139.

[378]   C-165; see also Cl. Mem. ¶ 80.

[379]   The Claimant does not indicate the date on which such agreements were signed (Cl. Mem. ¶ 80). In his first Witness Statement, Mr. Strioga indicates that the EBRD Loan Agreement was eventually signed in "December 2007" (CWS-1 ¶ 55).

[380]   In particular, the Respondent relies on the fact that the EBRD is one of the Claimant's shareholders (see paragraph 471 below; Resp. Letter dated 5 October 2012 and Resp. Obj. J. & C-Mem. ¶ 4.7), which the Managing Director of the EBRD for Central and South Eastern Europe confirmed in his letter dated 22 April 2010 (C-240). See also CWS-2 ¶ 73; Mr. Jautakis gave evidence but was not cross-examined at the Hearing, see Transcript, Day 2, 82/14.

[381]   C-165, for details and the breakdown of such amount in 2007 and 2008, see C-165 [page 72]: Exhibit F at F-3; see also CWS-2 ¶ 68.

[382]   See CWS-1 ¶ 56; CWS-2 ¶ 74; see paragraph 374 below.

[383]   See paragraph 375 below.

[384]   C-26, see paragraphs 285 ff. above.

[385]   R-33.

322.     The purpose of this agreement was to free Rēzeknes Siltumtīkli's property in the Land Register from the encumbrances then recorded for the benefit of the Claimant in consideration of payment by Rēzeknes Siltumtīkli of the debt owed to the Claimant (Clauses 1 and 2 of the October 2007 Agreement).

323.     It is the Respondent's case that Clause 3 of this agreement contains a general waiver of "any commercial claim directly and indirectly (including, through its subsidiary Latgales Enerģija) against Rēzeknes Siltumtīkli".[386]

## E.    MAIN EVENTS IN 2008

### (1)    TOWARDS THE REVOCATION OF LATGALES ENERĢIJA'S LICENCES BY THE REGULATOR (3 JUNE 2008)

#### (A)    THE DISPUTE AS TO THE APPLICABLE RATES

324.     Latgales Enerģija in fact continued to provide heating despite the Regulator's decision taking over its zone and the appointment of Rēzeknes Enerģija as the person in charge of providing heating services (11/12 October 2007, see paragraphs 274 ff. above). After mid-December 2007 Latgales Enerģija had started to charge users in accordance with the revised tariff approved by the Regulator on 9 November 2007 as it took the view that the effects of the Regulator's decision of 7 December 2007 were stayed due to Latgales Enerģija's application for review (see paragraph 244 above).

In January 2008 the Rēzekne City Council wrote to users indicating *(i)* that the rate applicable was the tariff approved on 19 December 2005 (see paragraph 154 above) and *(ii)* that this was the sole rate which Latgales Enerģija was entitled to apply.[387] The same information was provided in the press.[388]

325.     There was widespread confusion in the public as to the applicable rates.  The local newspaper echoed users' anger and frustration.[389]

---

[386]  Resp. P-H (PO8) ¶ 23; see the Tribunal's finding on this point in paragraphs 1130 ff. below.

[387]  C-184.2.

[388]  C-169.

[389]  C-170 and C-171.

In spite of the apparently neutral stance of the Rēzekne City Council (C-169), the press reported that the Council had stated "unofficially" that the rates applied by Latgales Enerģija were "illegal" (C-170), and

326. The Mayor himself received the inhabitants and answered question on the recalculation of rates according to the local newspaper.[390]  The Claimant alleged that the Municipality provided template letters for consumers to write to Latgales Enerģija refusing to pay Latgales Enerģija's invoices.[391]  This allegation is based solely on Ms. Uškāne's Witness Statement;[392] however, the Claimant has not referred to or produced any specific templates or letters based on such templates.  The Tribunal finds that the Claimant has failed to prove such allegation.

327. On 25 January 2008 Latgales Enerģija issued a press release answering the criticism to which it had been subjected in the press and elsewhere and recapitulated the difficulties in having new rates approved.[393]

328. On 31 March 2008 the Rēzekne City Council asked Latgales Enerģija to invoice the Rēzekne residents in accordance with the rates approved by the Regulator on 19 December 2005 (see paragraph 154 above) and to recalculate the invoices issued in the previous months.[394]  On 7 April 2008 Latgales Enerģija objected.[395]

(B)    THE WIDER DISPUTE BETWEEN LATGALES ENERĢIJA, THE RĒZEKNE CITY COUNCIL AND THE COMPANIES CONTROLLED BY THE COUNCIL

329. On 16 April 2008 Latgales Enerģija reminded the Mayor that Rēzeknes Siltumtīkli still had not granted the permit for the reconstruction of the Northern boiler house at Atbrīvošanas alejā 155a in accordance with the Heating Supply Development Strategy[396] approved by the Rēzekne City Council on 21 September 2007.[397]  No answer to that letter is in evidence.

---

that the Mayor had told the press that the Council's Reception Centre would show users how to calculate the rates according to the December 2005 tariff (C-170).

[390] C-171.

[391] Cl. Mem. ¶ 201.

[392] CWS-4 ¶ 24.

[393] C-172.

Whereas it is Latgales Enerģija's case that it was entitled to rely on the rates approved by the Regulator on 9 November 2007, this exhibit states *inter alia* that "… the rate approved on 09.11.2007 has no legal effect or legal foundation".  This does not seem to be a translation mistake.

[394] C-174.

[395] C-175.

[396] C-213.

330.    On 25 April 2008 Latgales Enerģija wrote again to the Mayor, copying in the Regulator, reiterating its request that the permit for the reconstruction be issued.[398] No answer to that letter is in evidence.

331.    On 6 May 2008 Latgales Enerģija asked Latvijas Gāze to issue technical specifications for gas supply in the Northern boiler.[399]  No answer to that letter is in evidence.

332.    These reminders followed up earlier reminders sent to Rēzekne City Council[400] and Rēzeknes Siltumtīkli[401] back in 2007.  Whereas in 2007 the investment relating to the Northern boiler was hampered by the absence of a "heat supply development plan", in 2008 the "Heating Supply Development Strategy"[402] had been in place for more than six months; yet the permit for the works had not been delivered.

333.    On 15 May 2008 Rēzeknes Siltumtīkli wrote to the Regulator pointing out that Latgales Enerģija had failed to invest a minimum of EUR 1.5 million in the first three years in which the Long-Term Agreement[403] had been in force in breach of Clause 7.1.1 of such agreement and complaining about the condition of the heating infrastructure.[404]

        Latgales Enerģija was not copied in on this letter.

334.    On 19 May 2008 the Regulator wrote to the Rēzekne City Council that Latgales Enerģija had failed to comply with the conditions of the licences[405] and that the

---

[397]  C-176.1.  For the year 2008, out of a total investment of LVL 1.4 million, the Heating Supply Development Strategy allocated an investment of LVL 1.3 million to the boiler house at Atbrīvošanas alejā 155a (also known as the Northern boiler house), C-213 p. 23.

[398]  C-176.2.

[399]  C-176.4.

[400]  C-116, see paragraph 209 above.

[401]  C-118 and C-129, see paragraph 210 above.

[402]  C-213.

[403]  C-4.

[404]  C-231.

[405]  C-10; C-11; C-12.

licences could therefore be revoked as a consequence.  The letter is not in evidence, but it is referred to in the Council's letter to Latgales Enerģija dated 20 May 2008.[406]

335.   On 20 May 2008 the Rēzekne City Council wrote to Latgales Enerģija pointing out "several circumstances" which in its view called into question Latgales Enerģija's ability to "solve issues concerning the heat supply".[407]  The letter referred on the one hand to the Regulator's letter of 19 May 2008 and the opinion expressed therein by the Regulator (see paragraphs 334 ff. above) and, on the other, to difficulties reported to the Council by Rēzeknes Siltumtīkli[408] and Rēzeknes Enerģija.[409]

The letter stated that the Council did not wish to interfere with the process of heat production and distribution, and ended with an invitation to Latgales Enerģija to establish a constructive partnership with Rēzeknes Siltumtīkli and Rēzeknes Enerģija.

336.   On 2 June 2008 Latgales Enerģija rejected the criticism expressed in the Council's letter.[410]

### (2)   THE REVOCATION OF LATGALES ENERĢIJA'S LICENCES BY THE REGULATOR (3 JUNE 2008)

337.   On 3 June 2008 the Regulator revoked Latgales Enerģija's three licences to produce, transmit and sell thermal energy[411] in its decision No. 10.[412]  The decision stated that it would come into force as of its adoption, that it should be enforced as a matter of urgency and that its enforceability would not be prevented in case an application for judicial review had been filed against it.  The reasons for this decision are discussed in paragraph 996 below.

---

[406]   C-178.

[407]   C-178.

[408]   As to Rēzeknes Siltumtīkli's view, the Council in essence restated the content of Rēzeknes Siltumtīkli's letter of 15 May 2008 (C-231, see paragraph 332 above).

[409]   As to Rēzeknes Enerģija's view, the Council referred to the debt owed by Latgales Enerģija to Rēzeknes Enerģija and stressed that Rēzeknes Siltumtīkli doubted Latgales Enerģija's ability to pay its debts.

[410]   C-179.

[411]   C-10; C-11; C-12.

[412]   C-29 [page 15].

338.    On 5 June 2008 Latgales Enerģija challenged the Regulator's 3 June 2008 decision.[413] The District Court of Administrative Cases dismissed the application on 16 June 2009.[414]  A further appeal by Latgales Enerģija was dismissed on 6 May 2010.[415]

339.    On 5 June 2008 Rēzeknes Siltumtīkli sent Latgales Enerģija a notice requesting Latgales Enerģija to rectify its breaches of contract within thirty days, failing which the Long-Term Agreement would be "deemed terminated".[416]  The notice mentioned a breach of Clause 7.3 of the Long-Term Agreement[417] and added that an accurate account of the violations of laws and regulations was provided in the Regulator's decision revoking the licences.  Rēzeknes Siltumtīkli's notice of termination followed on 10 September 2008.[418]

### (3)    THE RĒZEKNE CITY COUNCIL'S TEMPORARY APPOINTMENT OF RĒZEKNES SILTUMTĪKLI AND RĒZEKNES ENERĢIJA AS THE PRODUCER AND THE DISTRIBUTOR/SELLER OF THERMAL ENERGY (13 JUNE 2008)

340.    On 13 June 2008 the Rēzekne City Council appointed its deputy executive director, Mr. Ivars Locis, as the person in charge of organising the provision of heating in the city of Rēzekne.[419]

341.    On the same day Mr. Locis, acting as the person in charge under the Council's decision No. 270, appointed *(i)* Rēzeknes Siltumtīkli as the temporary new producer of thermal energy and *(ii)* Rēzeknes Enerģija as the temporary new provider, distributor and seller of thermal energy; the decision is stated to have been made as a matter of urgency.[420]

342.    The decision further stated that as from 3 June 2008 Latgales Enerģija was no longer entitled to provide any services of thermal energy, including hot water supply and heating.

---

[413]  R-2 p. 1.
[414]  R-2 p. 4; see paragraph 390 below.
[415]  R-2, see paragraph 391 below.
[416]  C-180.
[417]  C-4.
[418]  C-185, see paragraph 356 below.
[419]  Decision No. 270, C-30.
[420]  Decision No. 1, C-181.

343.   The Claimant alleges that decision No. 1 by Mr. Locis was communicated to Latgales Enerġija in a letter dated 27 June 2008.[421]   The Claimant alleges that it appealed both 13 June 2008 decisions on 4 July 2008.[422]   Such appeal is not in evidence; neither are any decisions as may have been made further to such appeal.

### (4)   RĒZEKNE CITY COUNCIL'S REQUEST TO HAVE THE LEASED ASSETS TRANSFERRED TO RĒZEKNES SILTUMTĪKLI AND RĒZEKNES ENERĠIJA (27 JUNE 2008)

344.   On 27 June 2008 Mr. Locis, acting as the person in charge, wrote to Latgales Enerġija.[423]   The letter first recapitulated Mr. Locis' decision No. 1 of 13 June 2008 (see paragraph 341 above), adding that a new provider of heating services would have to be appointed by 1 November 2008.

345.   Having reiterated that Latgales Enerġija had been no longer entitled to provide heating services as from 3 June 2008, Mr. Locis requested Latgales Enerġija to appoint a representative by 7 July 2008[424] "to transfer the assets (premises, boilers and others)" to Rēzeknes Siltumtīkli and Rēzeknes Enerġija "to ensure the function of thermal energy provision".

346.   On 7 July 2008 Latgales Enerġija answered Mr. Locis' letter of 27 June 2008 explaining that it did not see any grounds to transfer the property leased from Rēzeknes Siltumtīkli; having challenged in judicial proceedings both the Regulator's decision of 3 June 2008[425] and Mr. Locis' decision No. 1 of 13 June 2008,[426] Latgales Enerġija explained that it saw no reason to comply with Mr. Locis' decision of 27 June 2008; any attempt to enforce such decision in the circumstances would be unlawful.[427]

---

[421]   RfA ¶ 108; C-31.
[422]   RfA ¶¶ 109; 111; Cl. Mem. ¶ 262(12), see also C-3 ¶ 48.
[423]   C-31.
[424]   C-31 states "7 June 2008"; this is a translation mistake.
[425]   C-29, see paragraph 337 above.
[426]   C-181, see paragraph 341 above.
[427]   C-32.

(5)   **Rēzekne City Council's Order that Latgales Enerģija Provide Access to the Boiler Houses and Surrender the Leased Assets (14 July 2008)**

347.   On 7 July 2008 Mr. Locis, a Board Member of Rēzeknes Siltumtīkli and a bailiff went to Latgales Enerģija's offices in Rēzekne and demanded that Latgales Enerģija hand over the leased assets.  Latgales Enerģija admits that it refused to do so,[428] but that no enforcement took place there and then.[429]

348.   Latgales Enerģija alleges that it received on 11 July 2008 the court decision ruling that the court did not have jurisdiction to review either the Rēzekne City Council's decision of 13 June 2008[430] or the decision made by the person in charge of providing thermal energy in Rēzekne on the same day[431].[432]   The court decision is not in evidence.

349.   On 14 July 2008 the Rēzekne City Council ordered Latgales Enerģija immediately to provide access to all assets at all three boiler houses and transfer all other means required for the provision of heating to Rēzeknes Siltumtīkli and Rēzeknes Enerģija.[433]

350.   On or about 24 July 2008 Latgales Enerģija applied to the Administrative District Court to have this decision set aside;[434] the court decided on 25 May 2010.[435]

(6)   **The Claimant's Notice of Dispute (1 September 2008)**

351.   On 1 September 2008 the Claimant sent the Respondent a Notice of Dispute under Article 7(1) of the BIT[436].[437]

---

[428]   RfA ¶ 110; Cl. Mem. ¶ 265(12); Latgales Enerģija's refusal is confirmed by the Council's decision No. 316 of 14 July 2008 (C-33 [pages 15-16]).

[429]   Notice of Dispute, C-3 ¶ 50; RfA ¶ 110.

[430]   C-30.

[431]   C-181.

[432]   RfA ¶ 111; Cl. Mem. ¶ 265(13); C-3 ¶ 51.

[433]   Decision No. 316, C-33; see also paragraphs 1038 ff. below.

[434]   R-5 ¶ 1-2.

[435]   R-5, see paragraph 397 below.

[436]   BIT, CLA-1, this provision is reproduced in paragraph 497 below.

[437]   C-3.

352.    In the Notice of Dispute, the Claimant contended that the requirement of a dispute concerning investment between one of the Parties to the BIT and the investor of the other Party was met.  The Notice added that there were no temporal issues regarding the applicability of the BIT in the present case.

353.    Claimant relied on five principles under the BIT: *(i)* Article 4(1) on expropriation, *(ii)* Article 3(1) on fair and equitable treatment, *(iii)* Article 3(1) on full protection and security, *(iv)* Article 3(2) on arbitrary or discriminatory measures and *(v)* the most-favoured nation clause in Article 3(3) in connection *inter alia* with Articles 2(2) and 3(1) of the Latvia-Romania BIT.[438]

354.    The Notice of Dispute contains a statement of facts subdivided in four parts, setting out *(i)* the situation of heating services in Rēzekne before the Claimant's investment, *(ii)* the individualised invitation made by the Rēzekne Municipality to the Claimant with the long-term legal guarantees surrounding the investment, *(iii)* the result of the Claimant's investment on the heating services provided and *(iv)* the *volte-face* by the Rēzekne Municipality and its instrumentalities when they saw the emergence of an efficient and profitable business, and the concerted effort of the Rēzekne Municipality, its instrumentalities, the police and the bailiffs to drive out the investor and take over its business.

355.    As to *quantum*, the Claimant argued that the breach of international law caused a damage in an amount of LVL 7,141,757.08, as well as lost profits in an amount of LVL 5,018,252, amounting to LVL 12,160,009.08 altogether.[439]

(7)    **TERMINATION OF THE LONG-TERM AGREEMENT BY RĒZEKNES SILTUMTĪKLI (10 SEPTEMBER 2008)**

356.    On 10 September 2008 Rēzeknes Siltumtīkli sent Latgales Enerģija a notice of termination under Clause 12.5.2 of the Long-Term Agreement[440].[441]

---

[438]  Latvia-Romania BIT, <u>CLA-22</u>.

[439]  <u>C-3</u> [page 37].

[440]  <u>C-4</u>, see paragraph 95 above.

[441]  <u>C-185</u>.

**(8)   THE TAKING OVER OF THE LEASED ASSETS BY RĒZEKNES SILTUMTĪKLI AND THE FURTHER COURSE OF THE DISPUTE**

(A)   RĒZEKNE CITY COUNCIL'S DECISION AUTHORISING THE USE OF FORCE TO ENFORCE THE 14 JULY 2008 DECISION (15 SEPTEMBER 2008)

357.   On 15 September 2008 the Rēzekne City Council authorised the use of force to enforce the 14 July 2008 Council's decision,[442] with which Latgales Enerģija refused to comply of its free will (see paragraph 1041 below).[443]

The decision was stated to be enforceable forthwith, and any appeal would not operate so as to stay its enforceability.

(B)   THE FORCIBLE RECOVERY OF THE LEASED ASSETS (16 SEPTEMBER 2008)

358.   On 16 September 2008 Latgales Enerģija's administrative building (unlike the customer service centre) was taken over, as well as the boiler houses.   All assets of Latgales Enerģija were taken over including those leased to Latgales Enerģija under the Long-Term Agreement.   Latgales Enerģija challenged this decision without success (see paragraph 396 below).

359.   Personal assets were handed back on 6 October 2008 (see paragraph 362 below).

360.   Latgales Enerģija's personnel were able to continue to work from the customer service centre for a few days.[444]

361.   From 16 September 2008 onwards, Latgales Enerģija's assets as well as the leased assets came into possession of Rēzeknes Siltumtīkli and Rēzeknes Enerģija which started to operate the heating system.   They have remained the operators of the heating system ever since.[445]

---

[442]   C-33, see paragraph 349 above.

[443]   Decision No. 449, "Execution order on application of direct force", C-186.

[444]   See CWS-3 ¶ 49.

[445]   RfA ¶ 115.  The Respondent did not specifically deny this allegation.

91

(C)    THE DEED OF 6 OCTOBER 2008

362.   On 6 October 2008 two Rēzeknes Siltumtīkli representatives and certain Latgales Enerģija representatives signed a document entitled "Deed" reading as follows:[446]

> Drawn up in the presence of AS Rēzeknes Siltumtīkli reg. No 40003215480 and SIA Latgales Enerģija reg. No 40003717325 representatives confirming that SIA Latgales Enerģija has received all the property located in the office at Rīgas iela 1, in Rēzekne and all the property belonging to SIA Latgales Enerģija, including all the documents, computer hardware, fixed assets and low value items.
>
> SIA Latgales Enerģija verifies that all the property is received and SIA Latgales Enerģija has claims neither of material character, nor of legal character against AS Rēzeknes Siltumtīkli regarding the transfer of property located [at] the office at Rīgas iela 1, in Rēzekne.
>
> This Deed is drawn up in 2 counterparts.

(D)    THE FIRST MEETING BETWEEN THE PARTIES (5 DECEMBER 2008)

363.   On 5 December 2008 a first meeting took place between the Parties in order to seek an amicable solution to the dispute.  Further meetings would take place in 2009 and 2010, and a final meeting took place on 1 April 2011.[447]

### (9)    THE PROCEEDINGS BROUGHT BY RĒZEKNES SILTUMTĪKLI AGAINST LATGALES ENERĢIJA

364.   On 4 June 2008 Rēzeknes Siltumtīkli increased the amount of its original claims (see paragraph 302 above) against Latgales Enerģija.  Such amendments are not in evidence, but are referred to in the decision by the Riga Regional Court[448] and the Supreme Court of Latvia.[449]

### (10)    THE PROCEEDINGS BROUGHT BY RĒZEKNES ENERĢIJA AGAINST LATGALES ENERĢIJA

365.   On 3 January 2008 the Riga Regional Court granted an attachment on Latgales Enerģija's moveable property for an amount up to LVL 815,690.51 and enjoined Latgales Enerģija to refrain from dealing with any emission quotas as Latgales

---

[446] C-188.

[447] RfA ¶ 11; see Respondent's letter to the Secretary-General dated 6 September 2012.

[448] C-194 p. 4.

[449] C-246 p. 6.

Enerģija may have been allocated.[450]   Such interim relief was granted further to Rēzeknes Enerģija's application of 27 December 2007, which had been made in connection with the action brought to claim payment of unpaid invoices relating to the delivery of natural gas.[451]

366.   On 11 February 2008 Latgales Enerģija sought a declaration by way of counterclaim that the Rēzeknes Enerģija Gas Supply Agreement[452] was null and void.   The counterclaim is not in evidence, but it was referred to in the decision of 16 April 2008 (see paragraph 369 below).

367.   On 27 February 2008 Latgales Enerģija applied to the Riga Regional Court to have the 3 January 2008 decision set aside;[453] the application was supplemented on 3 April 2008 on the point of emission quotas.[454]

368.   On 10 April 2008 Rēzeknes Enerģija supplemented its statement of claim; the amount of the debt sought to be enforced was increased to LVL 2,528,766.10 excluding interest based on further deliveries of natural gas made and invoiced by Rēzeknes Enerģija after 27 December 2007.[455]   A further supplement was filed in 2009 (see paragraph 381 below).

369.   On 16 April 2008 the Riga Regional Court granted Latgales Enerģija's application in part, revoking the 3 January 2008 injunction relating to the emission quotas; the application to have the attachment revoked altogether was dismissed.[456]   Latgales Enerģija's counterclaim for a declaration that the Rēzeknes Enerģija Gas Supply Agreement was null and void was held in abeyance pending payment of the full court fee.

---

[450]   C-168 [page 3].
[451]   C-225, see paragraph 310 above.
[452]   C-151, see paragraph 283 above.
[453]   C-226.
[454]   C-228.
[455]   C-229.
[456]   C-230.

370.    On 1 July 2008 the Riga Regional Court extended the attachment to Latgales
        Enerģija's bank accounts, including the accounts with AS Hansabanka and
        AS Parexbanka, for an amount up to LVL 2,534,237.10.[457]

### (11)    THE PROCEEDINGS BROUGHT BY RĒZEKNES SILTUMTĪKLI AGAINST LATGALES ENERĢIJA AND THE CLAIMANT (13 AUGUST 2008)

371.    On 13 August 2008 Rēzeknes Siltumtīkli brought an action against Latgales Enerģija
        and the Claimant before the Riga Regional Court.   The document initiating the
        proceedings is not in evidence; Rēzeknes Siltumtīkli's claims are summarised in the
        judgment made by the Supreme Court of Latvia on 7 March 2013.[458]

        Rēzeknes Siltumtīkli sought a declaration that its duties and its debts arising under
        Credit Agreement Nos. RA 02155 and 02219 (as amended by several covenants)
        signed with Latvijas Unibanka (and referred to in the Guarantee Agreement[459] and
        Long-Term Agreement[460]) had been discharged[461] and that the pledges registered in
        the Land Registry pursuant to such agreements had therefore also been discharged as
        a consequence, and any entries in the Land Registry in relation to such pledges were
        to be deleted; and, finally, a declaration that the 2008 Assignment Agreement[462] was
        invalid.[463]

372.    The Riga Regional Court dismissed the action on 23 September 2010.   The judgment
        is not in evidence, but its reasons and findings are summarised in the judgment by the
        Latvian Supreme Court of 7 March 2013.[464]

---

[457]   C-183 = C-232 [page 3].

[458]   R-10 pp. 1-6, ¶ [1], see also paragraph 404 below.

[459]   C-43, see paragraph 76 above.

[460]   C-4, see paragraph 89 above.

[461]   The translation in R-10.1 ¶¶ [1](1) and (2) says "terminated".

[462]   C-182, see also paragraph 378 below.

[463]   Rēzeknes Siltumtīkli's statement of claim is summarised in R-10 (pp. 1-6, ¶ [1]). Latgales Enerģija's and E enerģija's answer is summarised in R-10.1 ¶ 2.

[464]   R-10 p. 7, ¶ 3, see also paragraph 404 below.

### (12)   SUPPLEMENTING CERTAIN ARRANGEMENTS MADE IN THE 2005-2007 PERIOD – NEW ARRANGEMENTS

#### (A)   CONTRACTS BETWEEN THE CLAIMANT AND THE EUROPEAN BANK FOR RECONSTRUCTION AND DEVELOPMENT

373.    The Claimant alleges that the EBRD loan (see paragraphs 317 ff. above) "would have ensured that Latgales Enerģija could make the further necessary investments in the heating system".[465]

374.    Mr. Strioga explains in his first Witness Statement that the EBRD loan was drawn in 2008,[466] which is confirmed by Mr. Jautakis' first Witness Statement.[467]

375.    However, the Claimant further states that the part of the loan marked for Rēzekne was never drawn, and the planned investments were never made; it is also admitted that the Claimant did not pay interest to the EBRD on this part of the loan.[468]   The Claimant alleges that nevertheless a considerable portion of the expense of organising and negotiating the loan from the EBRD was incurred in relation to the part allocated to Rēzekne.[469]

376.    On 5 March 2008 the Amendment Agreement in Connection with Various Agreements Relating to Debt and Equity Investment in UAB E Energija (the "Amendment Agreement) was entered into by ETC, UAB E Energy Invest ("EEI", a company incorporated in Lithuania), Mr. Virginijus Strioga (the "Sponsor"), UAB E-Energija (the "Company", and, together with ETC and EEI "the Obligors") and the EBRD.[470]   This agreement amended *inter alia* the Subscription Agreement[471] and the EBRD Loan Agreement.[472]   EBRD's shareholding in the Claimant was increased to 23,5%.[473]

---

[465] Cl. Mem. ¶ 81.

[466] CWS-1 ¶ 56.

[467]   CWS-2 ¶ 74, according to which two tranches of the loan were received on 23 July 2008 and 19 September 2008, and a third tranche on 24 December 2009.

[468] RfA ¶ 40; CWS-1 ¶ 56.

[469] RfA ¶ 40.

[470] C-173.

[471] C-139.

[472] C-165.

[473] Sect. 2.01(b) of the Amendment Agreement; see also CWS-2 ¶ 73.

Exhibit C-173 contains an unsigned version of the Amendment Agreement.   The Respondent raised no objections in this respect.

(B)   RĒZEKNES SILTUMTĪKLI'S LONG-TERM DEBTS TAKEN OVER BY THE CLAIMANT (25 JUNE 2008)

377.   In February 2008 the Claimant took over from Sampo Banka the loan granted by the bank to Latgales Enerģija on 24 August 2007 (see paragraph 315 above) in an amount of LVL 1,135,028.[474]

378.   On 25 June 2008 Latgales Enerģija assigned to the Claimant the debt of Rēzeknes Siltumtīkli, which it had purchased from LHV in 2006 (see paragraph 205 above), under the terms of an assignment agreement ("the 2008 Assignment Agreement").[475] The amount which Latgales Enerģija owed the Claimant under the outstanding loan was set off against the purchase price which the Claimant owed Latgales Enerģija under the 2008 Assignment Agreement under the terms of an agreement of even date (the "Supplement to the Assignment Agreement dated 25 June 2008").[476]

379.   On 13 August 2008 Rēzeknes Siltumtīkli challenged the validity of the 2008 Assignment Agreement before the Latvian courts (see paragraph 371 above).   On 7 March 2013 the Supreme Court held, on appeal, that the 2008 Assignment Agreement was valid, but it also decided that Latgales Enerģija no longer owned a debt against Rēzeknes Siltumtīkli on the basis that Latgales Enerģija owed itself a debt to Rēzeknes Siltumtīkli under the Long-Term Agreement which gave rise to a merger of rights and liabilities.[477]   Mr. Jautakis in his first Witness Statement refers to a Latvian decision of 2009 holding that the assignment was invalid, but no such decision is in evidence.[478]

380.   Further arrangements were made in 2009 (see paragraph 411 below).

---

[474] C-141 [page 25], Sect. 21; CWS-2 ¶ 19.
[475] C-182.
[476] C-182; see also CWS-2 ¶ 19.
[477] R-10 p. 1, see paragraphs 404 ff. below.
[478] CWS-2 ¶ 20.

96

## F.   MAIN EVENTS IN 2009 AND BEYOND

### (1)   THE CIVIL PROCEEDINGS BROUGHT BY RĒZEKNES ENERĢIJA AGAINST LATGALES ENERĢIJA

381.   On 14 January 2009 Rēzeknes Enerģija filed a second supplement to its claims against Latgales Enerģija.[479]  The supplemented claim takes into account supplies of natural gas made by the plaintiff and the payments made by the defendant, the plaintiff claiming payment of an amount of LVL 2,434,423.01 excluding interest.

382.   On 2 March 2010 the Riga Regional Court made a judgment for Rēzeknes Enerģija and dismissed Latgales Enerģija's counterclaim.[480]  Latgales Enerģija appealed this decision, but the appeal was dismissed;[481] neither the appeal nor the decision on the appeal is in evidence.

### (2)   THE CIVIL PROCEEDINGS BROUGHT BY RĒZEKNES SILTUMTĪKLI AGAINST LATGALES ENERĢIJA

383.   Rēzeknes Siltumtīkli had brought an action against Latgales Enerģija on 20 September 2007 and the Latgale Regional Court had granted an attachment on Latgales Enerģija's funds on the following day (see paragraphs 301 ff. above).

Rēzeknes Siltumtīkli had not applied to the court in order that the attachment should be lifted despite the undertakings contained in the October 2007 Agreement and Latgales Enerģija's complaints.[482]

384.   Rēzeknes Siltumtīkli amended its claims on the merits twice, first on 4 June 2008[483] and then on 17 June 2009.[484]

385.   On 30 June 2009 Latgales Enerģija filed its answer to Rēzeknes Siltumtīkli's statement of claim.[485]

---

[479]  C-233; for the original claim filed on 18 December 2007, see C-225 and paragraph 310 above; for the first supplement, see C-229 and paragraph 368 above.

[480]  C-239.

[481]  Cl. Rep. ¶ 67.

[482]  C-26, see paragraphs 286 ff. above.

[483]  C-246 p. 6.

[484]  C-246 p. 6.

386.   On 9 July 2009 the Riga Regional Court granted Rēzeknes Siltumtīkli's claims in substantial part as follows:[486] *(i)* the court "revoked" the Long-Term Agreement;[487] *(ii)* the court awarded the claim for payment of the lease with respect to depreciation[488] as well as *(iii)* the claim for payment of gas delivered and used. However, the court dismissed *(iv)* the claim for payment of a contractual penalty and *(v)* the request for a declaration that Latgales Enerģija was bound to pay the invoices issued by Latvijas Gāze.[489]

387.   On 29 July 2009 Latgales Enerģija appealed against this judgment before the Supreme Court of Latvia.[490]

388.   On 20 April 2012 the Court Panel for Civil Matters of the Supreme Court of Latvia dismissed Latgales Enerģija's appeal.[491]

389.   Latgales Enerģija filed an application to have this judgment set aside in cassation proceedings.   On 7 April 2014 the Supreme Court allowed the application, set the

---

[485]   C-234.

Latgales Enerģija answered Rēzeknes Siltumtīkli's claim for unpaid rent contending that the Long-Term Agreement (C-4) was still in force and that the part of the rent relating to the depreciation of the assets would be payable at the time the assets had to be returned to the plaintiff; therefore, Latgales Enerģija was not in default (C-234 [pages 1-2]).   It also followed that there were no grounds upon which the Long-Term Agreement could be terminated (C-234 [page 3]).

Rēzeknes Siltumtīkli's notice of termination of the Long-Term Agreement (C-180, see paragraph 339 above) was inconsistent with the terms of the Long-Term Agreement and it could therefore have no effects whatsoever (C-234 [page 3]).

Finally, Latgales Enerģija answered that it was not bound to pay the invoices issued by Latvijas Gāze to Rēzeknes Siltumtīkli for the natural gas supplied (C-234 [pages 3 ff.]).   This was so on the basis that the plaintiff did not have a licence to sell natural gas.

[486]   C-194.

[487]   It is unclear whether the court declared that Rēzeknes Siltumtīkli's notice of termination was effective and the Long-Term Agreement had terminated pursuant to such notice, or whether the Long-Term Agreement was revoked by virtue of the judgment of the court.

[488]   The court held that the part of the lease payments owed for depreciation under Clause 4.4.2(a) of the Long-Term Agreement was not payable until such time when the leased infrastructure would be transferred back to the lessor, and Latgales Enerģija's argument was accepted in this respect.   As a consequence, the claim for a contractual penalty was dismissed.   However, payment of the part of the lease relating to depreciation was ordered since the Long-Term Agreement was no longer in force according to the court.

[489]   C-194 [page 10 (penultimate paragraph)], contains a typo in the original (the original text in Latvian could not be checked as it was cut off in the pages filed attached to the translation) or a translation mistake; "invoices issued by JSC Latgales Enerģija" should read "invoices issued by Latvijas Gāze".

[490]   C-235.

[491]   The court stated that the judgment by the Riga Regional Court was "correct and sufficiently substantiated"; the court therefore agreed with the court below and did not need to repeat the reasons given by the Riga Regional Court (C-246 p. 15).

judgment aside and remitted the case to another court of appeal in order for a fresh decision to be made.[492]  On 30 November 2015 the Chamber of Civil Cases of the Supreme Court of Latvia found that the Long-Term Agreement had been unilaterally terminated on 16 September 2008 and awarded Rēzeknes Siltumtīkli its claim for payment of the rent and for unpaid gas (judgment filed by the Respondent in this arbitration on 19 December 2016).[493]

### (3)   DISMISSAL OF LATGALES ENERĢIJA'S CHALLENGE AGAINST THE REGULATOR'S DECISION TO REVOKE THE LICENCES (3 JUNE 2008) AND THE JUDGMENT OF 16 JUNE 2009 (6 MAY 2010)

390.   On 16 June 2009 the Administrative District Court dismissed Latgales Enerģija's application[494] to have the Regulator's decision No. 10 dated 3 June 2008[495] set aside by which the Regulator had revoked the three licences granted to Latgales Enerģija.[496] Latgales Enerģija appealed against that decision.[497]

---

[492]  R-8.

[493]  The court found that Latgales Enerģija was under an obligation to pay for the gas supplied by Latvijas Gāze in the amounts invoiced by Latvijas Gāze.  The judgment considers the provisions of the Long-Term Agreement, but not the February 2005 Agreement.

[494]  Latgales Enerģija's application is not in evidence, but it is summarised in the Administrative Court of Appeal decision in R-2.  Latgales Enerģija made the following arguments.

First, the licences could be revoked only subsequent to a decision suspending them in accordance with Sects. 17 to 19 of Regulation No. 664 on the Licensing of Public Utilities (CLA-56) and imposing a time limit in order for the service provider to cure the breach(es) which caused the suspension.  In the present case the Regulator had failed to suspend the licences and fix a time limit in order for Latgales Enerģija to cure any alleged breaches.

Secondly, a licence may be revoked provided, however, that a prior warning has been given to the service provider at least three months in advance; the licence may be revoked within the month following the expiry of the three-month time limit; a failure to comply with the one-month time limit requires the whole procedure to be repeated.  In the present case the licences were revoked almost five months after the expiry of the notice period.  Latgales Enerģija's right to a stable and predictable legal position had been breached.

Thirdly, the licences were revoked on a basis other than that which had been mentioned in the Regulator's warning of 4 October 2007 (C-22, see paragraph 262 above).

The Regulator opposed that both of the time limits relied upon by Latgales Enerģija were not applicable to the revocation of a licence by the Regulator, and that Latgales Enerģija had been given an opportunity to be heard and had failed to comply with the Regulator's decisions.

[495]  C-29, see also paragraph 337 above.

[496]  R-2 ¶ 3.

Latgales Enerģija's application to set aside was dismissed on 16 June 2009 on the basis that *(i)* the law did not require that a decision revoking a licence should be preceded by one suspending the licence; *(ii)* the Regulator had proceeded in accordance with the provisions of the Public Utility Regulators Act (CLA-49); *(iii)* the Regulator was bound to give the utilities provider a three-month notice prior to revoking a licence; *(iv)* however, the Regulator was not bound to make a decision within a month as from the day on which the three-month time limit had expired as the Regulator was entitled to proceed on a

391.   On 6 May 2010 the Administrative Regional Court[498] dismissed Latgales Enerģija's appeal against the 16 June 2009 decision.[499]

### (4)   DISMISSAL OF LATGALES ENERĢIJA'S CHALLENGE AGAINST THE REGULATOR'S DECISION NO. 12 DATED 11 JUNE 2007 (15 APRIL 2009)

392.   On 15 April 2009 the Administrative District Court dismissed Latgales Enerģija's application[500] to have the Regulator's Decision No. 12 dated 11 June 2007[501] set aside (by which the Regulator had rejected the new tariffs proposed by Latgales Enerģija on 29 May 2007[502]).[503]   The reasons given by the court are recalled and discussed in paragraph 906 below.

393.   On 14 May 2009 Latgales Enerģija appealed against the 15 April 2009 decision by the Administrative District Court and applied to the court in order to be granted a fresh time limit in which to bring its appeal.   The appeal and the application are not in evidence.[504]

394.   On 27 May 2009 Latgales Enerģija's application was denied and the appeal was dismissed.   This decision is not in evidence.[505]

---

case-by-case basis and it was not necessary, therefore, to repeat the procedure as contended by the applicant; and (v) the breaches of paragraphs 7.1, 7.2 and (indirectly) 6.2 of the licences had been substantiated in the Regulator's decision and the applicant had been notified in previous correspondence and had been provided with an opportunity to cure such breaches.   The Regulator's decision was therefore in accordance with law and the application to set aside was to be dismissed.

[497]   R-2 ¶ 4.

[498]   The translation filed by the Respondent (R-2) indicates the name of the court as "the Regional Court of Administrative Cases", the Respondent's exhibit list as the "Latvian Administrative Appeal court" (*Administratīvā apgabaltiesa* is the name in the original decision).

[499]   The reasons for dismissal of the appeal are set out in four paragraphs as the Administrative Court of Appeal held that the judgment by the court below was accurate and the Court of Appeal concurred with the court below.

[500]   C-100, see paragraph 185 above, as amended in C-125 (see paragraphs 186 and 234 above).

[501]   Originally the decision sought to be set aside was the Regulator's decision No. 17 dated 13 October 2006 (C-19, see paragraph 184 above); the Regulator's decision No. 12 dated 11 June 2007 (C-21, see paragraph 233 above) was also challenged with the amended application, and Latgales Enerģija limited its challenge to the latter decision in its amended application (see paragraph 186 above).

[502]   C-20, see also paragraph 232 above.

[503]   C-192.

[504]   See R-1 p. 1.

[505]   See, however, R-1 p. 1.

395.   Latgales Enerģija appealed against the decision of 27 May 2009, and the appeal was dismissed on 24 September 2009.[506]

### (5)   DISMISSAL OF LATGALES ENERĢIJA'S COMPLAINT AGAINST THE ENFORCEMENT OF THE COUNCIL'S DECISION NO. 316 OF 14 JULY 2008 BY FORCIBLE MEANS (2 JULY 2009)

396.   On 2 July 2009 the Administrative District Court dismissed Latgales Enerģija's complaint against the Rēzekne City Council and the State Police that the enforcement of Rēzekne City Council's decision No. 316 dated 14 July 2008[507] by forcible means was unlawful.[508]   Latgales Enerģija's complaint is not in evidence.

---

[506]   R-1.  It is unclear whether the appeal was denied by the Latvian Administrative Appeal Court, as stated in the Respondent's exhibit list, or the Administrative District Court, as stated in the translation of Exhibit R-1; the name of the court in Latvian is *Administratīva rajona tiesa*.  The Tribunal takes it that it is the Administrative District Court.

[507]   C-33, see paragraph 349 above.

[508]   R-6.

The court stated that its decision related solely to the question whether the procedure of enforcement by forcible means was lawful, not the question whether the decision to be enforced was itself lawful (R-6 ¶ 5).  The court considered that the decision to be enforced had come into force and had not been executed voluntarily by Latgales Enerģija (R-6 ¶ 10).  The court found that the decision to be enforced was not final and enforceable, but an exception to the rule applied where the decision to be enforced stated that enforcement was required as a matter of urgency to avert a danger to State security, public order, the life or the health or property of citizens.  The court found that there was a risk in the present case that the supply of heating in the city of Rēzekne could not be ensured unless the heating infrastructure was taken over, and that the decision to be enforced contained sufficient indications as to the need to ensure that heating services should continue to be provided (R-6 ¶ 10).  This was so in spite of the fact that the decision to be enforced had been made on 14 July 2008 and the warning preceding enforcement was dated 15 September 2008 (R-6 ¶ 10).

The court further found that the warning contained all the indications required by law, including a direction to the addressee to comply with the decision voluntarily; Latgales Enerģija's objections raised on that basis were without foundation (R-6 ¶ 11).

The court went on to examine whether the 15 September 2008 (C-186) warning of enforcement by forcible means contained an advance notice which was in accordance with the Administrative Procedure Act, since enforcement by forcible means had been announced for the following day, when enforcement in fact took place.  The court found that the warning was lawful considering the urgency and the need to protect the health and property of the city inhabitants (R-6 ¶ 12).

The court found that Latgales Enerģija had not argued that the use of force was disproportionate and that there were no elements on the record suggesting that direct force had been applied at all, or had been applied inappropriately (R-6 ¶ 13).

The court dismissed Latgales Enerģija's complaint also insofar as it was directed against the State Police, having found that Latgales Enerģija argued that the police officers had not applied physical force "but their presence was sufficient to give an impression that the use of such force was real".  Considering that Latgales Enerģija could reasonably be expected to resist the enforcement of the decision by forcible means, the presence of police officers was lawful and justified (R-6 ¶ 14).

The court finally considered Latgales Enerģija's complaint that it had been denied access to its property left in the building as a consequence of the fact that it was denied access to its offices.  The court found that Rēzeknes Siltumtīkli had drawn up a notice to Latgales Enerģija requesting the offices premises to

**(6)    DISMISSAL OF LATGALES ENERĢIJA'S CHALLENGE AGAINST THE COUNCIL'S DECISION NO. 316 OF 14 JULY 2008 (25 MAY 2010)**

397.    On 25 May 2010 the Administrative District Court dismissed Latgales Enerģija's challenge against the Rēzekne City Council's decision No. 316 dated 14 July 2008[509] (by which the Council had decided that Latgales Enerģija was immediately to provide access to all assets at all three boiler houses and transfer all other means required for the provision of heating to Rēzeknes Siltumtīkli and Rēzeknes Enerģija).[510]

398.    The Administrative District Court considered that the Regulator's decision revoking the licences had to be enforced as a matter of urgency as the Rēzekne City Council had a duty to decide how to organise the heat supply services for the residents of the city.   The Council's assessment was reasonable in that the restriction of Latgales Enerģija's private rights had to give way to the public interest represented by the interest of the 25,000 residents of Rēzekne to be provided with heat supply services.

399.    The Court finally dismissed Latgales Enerģija's complaint that the Council's decision amounted to a forced taking of Latgales Enerģija's property which was not based on law and did not provide for a fair compensation; the Court stated that it was true that the Council had not considered the issue of the value of Latgales Enerģija's investment in its decision, and Latgales Enerģija was therefore entitled to proceed in accordance with the terms of the Long-Term Agreement and claim the market price of the investments made.

---

vacated on 16 September 2008 and asking Latgales Enerģija personnel to return on 22 September 2008 to receive their personal belongings and vacate the premises.   Latgales Enerģija maintained that it had received such notice only on 22 September 2008.   Rēzeknes Siltumtīkli then sent Latgales Enerģija a letter on 29 September 2008 stating that Latgales Enerģija's belongings would be transferred on 6 October 2008.   The Court concluded that Rēzeknes Siltumtīkli therefore had taken possession of Latgales Enerģija's belongings for some time, but had taken prompt action to return them.   That was a breach of procedure, but its importance was not sufficient to cause the whole enforcement procedure to be unlawful (R-6 ¶ 15).

[509]  C-33, see paragraph 349 above.

[510]  R-5.

(7)   **DISMISSAL OF LATGALES ENERĢIJA'S CHALLENGE AGAINST THE REGULATOR'S DECISION NO. 35 DATED 7 DECEMBER 2007 AND THE JUDGMENT DATED 30 OCTOBER 2009 (23 SEPTEMBER 2010)**

400.   On 12 December 2007 Latgales Enerģija had challenged the Regulator's decision No. 35 of 7 December 2007[511] by which the Regulator had annulled its previous decision of 9 November 2007 approving the draft tariffs proposed by Latgales Enerģija; the challenge was dismissed by a decision of the Administrative Regional Court of 30 October 2009[512].[513]

401.   Latgales Enerģija appealed against that judgment; the appeal was dismissed by the Administrative Regional Court on 23 September 2010.[514]

(8)   **DISMISSAL OF LATGALES ENERĢIJA'S CHALLENGE AGAINST THE REGULATOR'S DECISION NO. 26 DATED 11 OCTOBER 2007 AND THE JUDGMENT DATED 31 MARCH 2010 (24 NOVEMBER 2011)**

402.   On 31 March 2010 the Administrative District Court dismissed Latgales Enerģija's application to have the Regulator's decision No. 26 of 11 October 2007[515] set aside.[516] Latgales Enerģija appealed against this judgment.  The appeal was dismissed by the Administrative Regional Court on 24 November 2011.[517]

403.   The Administrative Regional Court stated that it was not in dispute that Latgales Enerģija had failed to provide heat supply to the entire Northern housing estate of Rēzekne including six schools.[518]  The court then considered Latgales Enerģija's defence that the failure to provide heat supply had been caused by coordinated action on the part of the Rēzekne City Council and Rēzeknes Siltumtīkli, which it dismissed as unproven.  The court dealt with three distinct points.

---

[511] C-28, see paragraph 240 above.

[512] The decision is not on the record, but it is summarised in R-4 ¶¶ 1 and 5.

[513] C-164.

[514] R-4.

[515] C-23, see paragraph 274 above.

[516] R-3.  The translation filed by the Respondent (R-3 p. 1) indicates the name of the court as "the Administrative Regional Court"; however, the Latvian original text refers to the decision of the *Administratīvās rajona tiesa* of 31 March 2010, the decision was therefore made by the Administrative District Court (same inaccuracy in the translation in R-3 ¶ 4).

[517] R-3 ¶ 4.

[518] R-3 ¶¶ 9-10.

103

First, the court found that it was Latgales Enerģija's failure to pay in full the amounts for which Latvijas Gāze issued invoices to Rēzeknes Siltumtīkli in June, July, August and September 2007 which gave rise to the Council's debt to Latvijas Gāze and the suspension by Latvijas Gāze of the natural gas supply.  As a consequence, the Council announced the energy crisis which was the basis for the Regulator's decision.[519]

Secondly, the court held that Latgales Enerģija's argument that the Regulator's decision was affected by a conflict of interest on the basis that deputies of the Council had taken part in its making was without foundation.[520]

Thirdly, the court examined Latgales Enerģija's defence that the attachment of funds obtained by Rēzeknes Siltumtīkli on Latgales Enerģija's bank account (see paragraphs 253 to 255 above) was the cause of Latgales Enerģija's inability to pay.  The court found that such might have been the case; however, even in such case Latgales Enerģija was not released from its duty to provide its services on a continuous basis throughout the period of validity of the licences and in accordance with the terms thereof.[521]

### (9)   THE CIVIL PROCEEDINGS BROUGHT BY RĒZEKNES SILTUMTĪKLI AGAINST LATGALES ENERĢIJA AND THE CLAIMANT

404.   Rēzeknes Siltumtīkli appealed against the judgment made by the Riga Regional Court on 23 September 2010 dismissing the action brought against Latgales Enerģija and the Claimant on 13 August 2008 (see paragraph 371 above).

405.   On 7 March 2013 the Latvian Supreme Court allowed the appeal.[522]

---

[519]  R-3 ¶ 12.

[520]  R-3 ¶ 13.

[521]  R-3 ¶ 14.

[522]  R-10.

The court decided as follows: *(i)* Rēzeknes Siltumtīkli's obligations and debts under the two credit agreements were terminated;  *(ii)* the pledges registered pursuant to such agreements were discharged; *(iii)* the entries relating to such pledges in the Land Registry were to be deleted; *(iv)* Rēzeknes Siltumtīkli's was released from the duty to comply with the decision of the court below; and *(v)* Rēzeknes Siltumtīkli's claim that the assignment between Latgales Enerģija and UAB be declared to be invalid was dismissed.

(10)    SUPPLEMENTING CERTAIN ARRANGEMENTS MADE IN THE 2005-2008
        PERIOD – NEW ARRANGEMENTS

(A)    PAYMENT BY THE CLAIMANT UNDER THE PARENT COMPANY
       GUARANTEE DELIVERED TO SAMPO BANKA/DANSKE BANK

406.    On 30 June 2009 Danske Bank (formerly Sampo Banka[523]) requested the Claimant to
        pay an amount of LVL 1,218,056.16 under the Sampo Banka Guarantee[524].[525]  Danske
        Bank stated in its request to the Claimant that Latgales Enerģija had failed to pay its
        debt under the Sampo Banka Loan Agreement.[526]  According to Mr. Jautakis' first
        Witness Statement, the Claimant paid the principal amount (LVL 1,118,056.16) as
        well as interest (LVL 184,091.68), and thus a total amount of LVL 1,302,147.84 to
        Danske Bank.  Reliance is placed on Exhibit C-196.[527]

407.    On 5 August 2009 Danske Bank and the Claimant agreed on a repayment schedule
        contemplating ten instalments;[528] the repayment schedule was amended twice, first
        under the terms of an agreement dated 17 May 2010[529] and then under the terms of an
        agreement dated 26 April 2011.[530]

408.    On 9 November 2012 Danske Bank confirmed to the Claimant's auditors that the
        Claimant had no outstanding obligations to the bank.[531]

409.    The payment by the Claimant of a total amount of LVL 1,302,147.84 to Danske Bank
        was alleged by the Claimant in its first memorial of 6 December 2013;[532] such
        evidence was not disputed by the Respondent in its first Counter-Memorial.
        Mr. Jautakis' evidence was not challenged by the Respondent at the Hearing (see
        paragraph 315 above).  However, the Respondent challenged that there was evidence

---

[523]  The merger between JSC Sampo Banka and Danske Bank A/S took effect on 30 June 2008, C-193
       and C-195, Preamble, Clause 2.
[524]  C-102, see paragraph 202 above.
[525]  C-193.
[526]  C-101, see paragraph 199 above.
[527]  CWS-2 ¶ 61.
[528]  C-195.
[529]  C-203.
[530]  C-204.
[531]  C-208.
[532]  Cl. Mem. ¶¶ 62, 70, 361(4) and confirmed by CWS-2 ¶ 61.

that the Claimant paid the amount of the guarantee to Danske Bank for the first time in a post-Hearing submission on March 2015.[533]

410. The Tribunal dismisses that objection based on the documents in evidence in relation to the guarantee provided by the Claimant to Danske Bank, as amended, and Danske Bank's request for payment.[534]  If the Respondent intended to challenge the statement made by Danske Bank to the Claimant's auditors,[535] it should have raised this point in its pleadings and called the auditors and cross-examined them at the Hearing.

        (B)    Arrangements Following the 2008 Assignment Agreement

411. The circumstances in which the 2008 Assignment Agreement was made are summarised in paragraphs 377 ff. above.

412. Mr. Jautakis' first Witness Statement[536] explains that the Latvian courts held in 2009 that the 2008 Assignment Agreement between the Claimant and Latgales Enerģija was invalid; however, no such decision is in evidence, as noted in paragraph 379 above.  In the same passage of his first Witness Statement, Mr. Jautakis refers to Exhibit C-190, which states that on 30 June 2009 the Claimant and Latgales Enerģija "cancelled the agreement and cession was left in SIA Latgales Enerģija".[537]  That allegation is not supported by documentary evidence.

413. Mr. Jautakis further explains in his first Witness Statement that the Claimant then assigned its right to claim from Latgales Enerģija to Hansel Realty Management Spain S.L., a Spanish company.[538]  This assignment refers to a debt of Latgales Enerģija in an amount of EUR 1,386,967.69 (without interest and penalties) arising under a loan agreement dated 30 June 2009 which is not in evidence.  Mr. Jautakis explains that no monies have been recovered to date from Latgales Enerģija in spite of a judgment by the Vidzeme Urban District Court of the city of Riga.[539]

---

[533]  Resp. P-H (PO8) ¶ 22.

[534]  C-102; C-193; C-195; C-203; C-204.

[535]  C-208.

[536]  CWS-2 ¶ 20.

[537]  C-190, Sect. 17.

[538]  CWS-2 ¶ 20; C-197.

[539]  CWS-2 ¶ 20; C-198.

(C)     THE EBRD LOAN (29 OCTOBER 2009)

414.    On 29 October 2009 the EBRD Loan Agreement[540] was renegotiated.[541]  Mr. Jautakis explains that this revision was made upon the EBRD's request, and the interest rate charged on tranche 2 was increased from 1.95% to 5% per annum.[542]

## G.     THE LITHUANIAN DECISIONS RELIED ON BY THE RESPONDENT (FROM 2005 TO 2011)

415.    The Respondent contends that the Claimant should have taken certain precautions before entering into the Long-Term Agreement in order to avoid contentious issues, such as the question of who was responsible to devise a "heat supply development plan".

Reliance is placed by the Respondent on Exhibit R-19 which includes news published in Lithuania as well as twelve decisions made by Lithuanian judicial authorities, in support of the allegation that "it is actually Claimant's (its ultimate beneficiary—Mr. Virginijus Strioga's) common practice to enter into deals with high potential that serious contentious issues will later arise (mainly, due to lack of precisely defined rules of cooperation) and subject to tedious litigation proceedings (…) rather than properly arranging for future cooperation in advance by all involved parties".[543]

416.    The Tribunal will examine that aspect in due course in light of Exhibit R-19 and the Parties' pleadings (see paragraphs 547 ff. below).[544]

---

[540]  C-165.

[541]  C-199.

[542]  CWS-2 ¶ 86.

[543]  Resp. Rej. ¶ 33.

[544]  Exhibit R-19 contains the following:

    I.     Articles and Publications in Printed and Online Media

        (i)     M. Jokūbaitis, *Lietuvos Rytas*, 10 June 2010, "Will They Follow the Ukmergė Example?"

        (ii)    L. Laikraštis, 21 October 2010, *The News*, "The Kubilius-Sekmokas Caucus Are Working for Gangsters"

        (iii)   *BNS News Service*, 23 October 2014, [untitled]

        (iv)    www.15min.lt, 8 May 2012, "The Supreme Court: Termination of Heating Supply Contract with Miesto Energija by Ukmergė Authorities Was Legitimate"

        (v)     BNS News Service, 4 July 2013, printed from www.vz.lt, "Scaent Baltic, E Energija and Lemminkainen Lietuva Avoid Publicity"

**H.    THE NEGOTIATIONS BETWEEN THE PARTIES FROM 1 SEPTEMBER 2008 ONWARDS**

417.    The present account of the negotiations between the Parties is based *inter alia* on the correspondence filed by the Respondent with the ICSID Secretary-General attached to its letter dated 6 September 2012 by way of two attachments (filed electronically as "Enclosure 1" and "Enclosure 2").  Such correspondence was not re-filed before the Tribunal in accordance with the requirements of Procedural Order No. 1 and it will therefore be identified simply by reference to the original electronic file in which it was filed designated by the expressions "Enclosure 1" and "Enclosure 2".

418.    The Claimant's Notice of Dispute dated 1 September 2008 was received by the Respondent on 25 September 2008.[545]  On 24 November 2008 the State Chancellery of Latvia invited Mr. Strioga to a meeting with Mr. Mēkons, the representative of the State Chancellery in charge of the matter.[546]  The meeting took place on 5 December 2008; thereafter, Mr. Mēkons put a number of questions to the Claimant's representatives,[547] which the Claimant answered on 22 December 2008.[548]

---

(vi)    http://ekonomika.balsas.lt, article first appeared on 6 September 2011, [untitled]

II.    Documents of Lithuanian Judicial Authorities

(i)    Decision of the Court of Appeal of Lithuania, 4 December 2007, No. 124/2007

(ii)    Decision of the Court of Appeal of Lithuania, 5 December 2011, No. 2A-1472/2011

(iii)    Decision of the Court of Appeal of Lithuania, 17 December 2007, No. 2A-453/2007

(iv)    Decision of the Supreme Administrative Court of Lithuania, 13 June 2006, No A-469-1065-06

(v)    Decision of the Supreme Administrative Court of Lithuania, 14 August 2008, No A-39-1439-08

(vi)    Decision of the Supreme Administrative Court of Lithuania, 10 October 2011, No A-858-419-1

(vii)    Decision of the Supreme Administrative Court of Lithuania, 13 November 2007, No A-143-1044-07

(viii)    Ruling of the Public Prosecutor's Office Of Ukmergė District County, 29 April 2005, No. 88-2-0002-05

(ix)    Ruling of the Public Prosecutor's Office Of Ukmergė District County, 23 March 2005, No. 88-2-0002-05

(x)    Decision of the Vilnius County Administrative Court, September 2006

(xi)    Decision of the National Commission For Energy Control And Prices, 26 October 2006, No. O3-79

(xii)    Ruling of the Supreme Court of Lithuania, 19 December 2007, No. 3K-3-97/2007.

[545]  Respondent's letter dated 25 September 2008, Enclosure 1.

[546]  Respondent's letter dated 24 November 2008, Enclosure 1.

[547]  Respondent's email dated 10 December 2008, Enclosure 2.

[548]  Claimant's email dated 22 December 2008, Enclosure 2.

419.    The Parties then agreed between the end of 2008 and the beginning of January 2009 to have a conference call for further discussions which took place on 9 January 2009, as confirmed by Mr. Mēkons' email of the same date.[549]

420.    On 11 March 2009 Latvia's Prime Minister Mr. Ivars Goldmanis informed the Claimant that the suggested action plan prepared by the State Chancellery would be transferred to the new Prime Minister, once appointed, which was not to be construed as an acknowledgement that any applicable provisions of law had been breached by the Republic of Latvia.[550]

421.    On 27 April 2009 Latvia's Prime Minister Valdis Dombrovskis informed the Claimant that the Government had asked a third neutral party having knowledge of the circumstances in dispute to give his views about particular aspects of the Notice of Dispute, which was not to be construed as an acknowledgment of any liability on the part of the Respondent.[551]

422.    The Parties agreed to meet again on 27 August 2009, but they failed to reach agreement.[552]

423.    On 23 September 2009 Mr. Mēkons sent the Government's proposal to counsel for the Claimant and Mr. Strioga,[553] which the Claimant rejected on 29 September 2009, calling it a "zero compensation proposal" and pointing out that it was entitled "to move the dispute to international arbitration".[554]

424.    A meeting was then scheduled for 1 October 2009[555] and a further meeting for 19 October 2009.[556]

---

[549]  Respondent's email dated 9 January 2009, Enclosure 2.

[550]  Respondent's letter dated 11 March 2009, Enclosure 1.

[551]  Respondent's letter dated 27 April 2009, Enclosure 1.

[552]   Respondent's email dated 24 August 2009 and Mr. Strioga's answer dated 25 August 2009, Enclosure 2.

[553]  Respondent's email dated 23 September 2009, Enclosure 2.

[554]  Claimant's letter dated 29 September 2009, Enclosure 1.

[555]  Respondent's email dated 30 September 2009, Enclosure 2.

[556]   Respondent's email dated 15 October 2009, and the Claimant's answer dated 16 October 2009, Enclosure 2.

109

425.   On 27 October 2009 the Respondent made a further proposal for a settlement involving no monetary compensation.[557]   That communication is relevant to the interpretation of the Claimant's Board Minutes dated 1 December 2009 and will therefore be quoted verbatim:[558]

> Dear Aleksas [Mr. Jautakis],
>
> As I expressed to you this morning, and, in line with last week's discussion, I wish to outline in writing the view of the Rēzekne municipality concerning the settlement model.
>
> The Rēzekne municipality, after carefully [sic] analysis of the financial position of SIA "Latgales Enerģija", namely, the claims of the creditors and different charges and interest over the assets of the company, **considers that a fair solution would be a solution not involving additional payment from any of the parties.**
>
> In addition to waiver of claims against the company, all assets of SIA "Latgales Enerģija" attached for the benefit of the Rēzekne municipality would be lifted by virtue of an application of the Rēzekne municipality to the relevant court, thus releasing the frozen funds of the company.   As a reciprocal commitment from SIA "Latgales Enerģija" and UAB "E enerģija", we expect all claims against the State and the Rēzekne municipality to be waived accordingly.
>
> If, unfortunately, you deem such a solution unacceptable, the State Chancellery will immediate put forward its alternative proposal for the settlement model, namely, the mediation pursuant to the Latvian-Lithuanian BIT.   As a dispute pursuant to a BIT emanates from a certain set of factual circumstances (no BIT contains abstract obligations of the State apart from actual State behaviour within its territory), we consider it proper to bring to the attention of the mediator or the mediation panel all claims surrounding the circumstances (that is, claims of E enerģija and claims of the Rēzekne municipality).   With due regard to international practice, the State Chancellery is of the view that mediation is an expedite, confidential and cost-efficient solution.

426.   The Claimant rejected the Respondent's proposal on 6 November 2009.   That communication is also relevant to the interpretation of the Claimant's Board Minutes dated 1 December 2009 and it reads as follows:

> Dear Mr. Ivars Mēkons,
>
> Referring to your proposal sent by e-mail correspondence dated 27th October 2009, we are informing that such resolution is not acceptable to us, because, as we understand it, the resolution proposal does not include monetary compensation to us.
>
> As indicated in our claim and through all the subsequent communication, we are of a position that our investment in Latvia was expropriated without proper compensation for the incurred losses of the investor.   Consequently, fair

---

[557]   Respondent's email dated 27 October 2009, Enclosure 2 (original emphasis).
[558]   C-247.

110

resolution of the dispute cannot in our view be achieved if no compensation is offered.

As far as mediation is concerned, we could have seen its benefit at the early stage of our attempts to resolve the dispute amicably. However, taking into consideration that our intensive mutual attempts to reach a settlement already last 14 months and have not resulted in any approximation of the positions of the parties, we do not see how at this stage the mediation procedure can lead to the settlement of the dispute.

Based on that, regretfully we have to conclude that we are left with no other alternative but to bring this matter to arbitration.

427.   On 25 November 2009 the Respondent took note of the rejection of its proposal by the Claimant and suggested mediation again in the following terms:[559]

(…)

Therefore, as I already explained to you, as an alternative to a "zero-zero payments" solution, **as a feasible alternative I deem the mediation process, whereby the parties, pursuant to the BIT, would have an impartial professional evaluation on the merits of their claims**. Mediation, of course, generally is not binding and the parties are free to accept or reject the proposals from the mediation panel. **However, and the practice increasingly confirms this, especially in the BITs disputes, that the disputing parties can beforehand freely enter into a contractual commitment to abide by the resolution of the mediation panel**. *As the mediation panel should be chosen from the pool of arbitrators and energy experts, the mediation package which I propose is actually akin to the arbitration process with much more efficient (the merits would be considered from both legal and professional aspects), expedite and cheaper solution*.

(…)

In my last email I did not have the opportunity to explain in details the mediation package. Therefore, I would indeed appreciate if you consider this and engage in further talks regarding this proposal.

428.   On 27 November 2009 the Respondent answered two questions from the Claimant in relation to the proposed mediation, indicating *(i)* that the Republic of Latvia would enter into "a legally binding agreement on the process of settlement …" and *(ii)* that the ICSID Conciliation Rules could be used.[560]

429.   It is in this context which the Claimant's Board made the resolution evidenced by the Board Minutes dated 1 December 2009.[561]

---

[559]   C-236 (original emphasis).
[560]   Respondent's email dated 27 November 2009, Enclosure 2.
[561]   C-247.

430.    On 25 January 2010 the Respondent made a further proposal for a settlement,[562] which the Claimant rejected on 5 February 2010.[563]   On the same date, the Claimant answered a further email by the Respondent, indicating what its minimum requirements for a settlement would be in financial terms,[564] whereupon the Respondent proposed that the Parties turn again to the mediation proposal.

431.    On 8 February 2010 the Claimant answered as follows: "As we informed [the] State Chancellery by our letter dated on 6/11/2009 No. 186, we do not see how at this stage the mediation procedure can lead to the settlement of the dispute.   We do not have ground on changing our decission [sic]".[565]

432.    On 25 February 2010 the Respondent volunteered to draft "a settlement agreement as regards mediation".[566]   No answer to that email is in evidence.

433.    On 25 June 2010 the Claimant enquired with the Respondent whether all the possibilities to resolve the dispute amicably had been exhausted in light of the fact that their upcoming Board meeting would have the investment dispute on the agenda.[567]

434.    On 14 July 2010 the Deputy Director of the State Chancellery answered suggesting a meeting in person or a conference call to be attended by the Claimant, the State Chancellery and the Rēzekne municipality and asking the Claimant to contact Mr. Mēkons.[568]

435.    Thereafter, negotiations halted.   The final meeting took place on 1 April 2011 which followed a meeting on 18 March 2011.[569]   The following correspondence was exchanged by email between the Parties after the 18 March 2011 meeting.

436.    On 21 March 2011 the Claimant wrote the following to the Respondent:[570]

---

[562]  Respondent's email dated 25 January 2010, Enclosure 2.
[563]  Claimant's email dated 5 February 2010 11:36:15 *a.m.* GMT+2, Enclosure 2.
[564]  Respondent's email dated 5 February 2010 12:19:23 *p.m.* GMT+2, Enclosure 2.
[565]  Claimant's email dated 8 February 2010, Enclosure 2.
[566]  Respondent's email dated 25 February 2010, Enclosure 2.
[567]  C-242.
[568]  C-241.
[569]  Claimant's email dated 21 March 2011, Enclosure 2.

> Following your meeting with Mr. Virginijus Strioga, E energija CEO last Friday, I am writing to agree on the date and time convenient for you for the meeting in Riga this week to further discuss the Rēzekne case and potential international arbitration.
>
> (…)

437.  The Legal Adviser to the Latvian Prime Minister followed up with her own email confirming the meeting for 1 April 2011 and had pointed out the following in her email to the Claimant:[571]

> Let me also emphasise that this meeting shall not be considered as a meeting under the auspices of the Latvian-Lithuanian investment protection treaty.  For certain factual and legal reasons the Republic of Latvia sees the investment dispute as closed, and, consequently, the meeting shall be deemed solely as a good faith effort of Latvia outside the scope of the State's international obligations and with no negative legal or financial consequences arising out of it to Latvia.

438.  The Claimant's answer confirms its intention to attend the meeting of 1 April 2011.  It does not express any agreement or disagreement with the passage set out in the preceding paragraph.

## IV.  THE PARTIES' REQUESTS FOR RELIEF

### A.  THE CLAIMANT

439.  In its Request for Arbitration the Claimant seeks the following relief:[572]

> (…) the Claimant respectfully requests the Arbitral Tribunal to:
>
> (a)   declare that the Respondent has breached Articles 4(1), 3(1) and 3(2) of the BIT;
>
> (b)   order the Respondent to pay damages for the material loss incurred in an amount to be established, but which the Claimant currently estimates will represent in excess of EUR 7 million, an amount which the Claimant reserves the right to quantify at a subsequent stage in this arbitration by expert evidence;
>
> (c)   order the Respondent to pay the costs of this arbitration, including all expenses that the Claimant has incurred or shall incur herein in respect of the fees and expenses of the arbitrators, the International Centre for the Settlement of Investment Disputes, legal counsel, experts and consultants, as well as its own internal costs;

---

[570]  Claimant's email dated 21 March 2011, Enclosure 2.

[571]  Respondent's email dated 24 March 2011, Enclosure 2.

[572]  RfA ¶ 169.

(d)  order the Respondent to pay interest at a rate to be established on the amount of the award; and

(e)  order such other and further relief as the arbitrators shall deem just and proper.

440.  In its first Memorial the Claimant amended the relief originally sought on three points:[573]

(i)  the amount in point (b) in the preceding paragraph was increased to EUR 9,820,000; and

(ii)  point (d) on interest, set out in the preceding paragraph, was replaced by two paragraphs reading as follows:

(d)  order the Respondent to pay interest, compounded quarterly, at the rates set out in paragraph 366 above on the amount of the damages awarded from the date of expropriation until the date of the award;

(e)  order the Respondent to pay interest, compounded quarterly, at the rates set out in paragraph 366 above on the amount awarded from the date [of] the award until payment by the Respondent; and

441.  In its Reply on the Merits and Counter-Memorial on Preliminary Objections the Claimant requests that the Tribunal deny the Respondent's "preliminary objections" to jurisdiction.   The Claimant decreased the amount sought on the merits to EUR 8,300,000,[574] then increased such amount to EUR 8,390,000 in its Skeleton Argument.[575]

442.  In its Response to Questions Raised by the Tribunal the Claimant seeks an award of costs in a total amount of EUR 3,083,279.25, which includes a success fee.[576]   The breakdown of such amount is as follows:

(i)  EUR 1,835,005.31 for legal fees and expenses of Salans/Vinson & Elkins (including a success fee of EUR 1,298,900);

(ii)  EUR 604,768.73 for legal fees and expenses of Sorainen;

---

[573] Cl. Mem. ¶ 370.
[574] Cl. Rep. ¶ 178.
[575] Cl. Skeleton ¶ 22.
[576] Cl. Rep. Tribunal ¶¶ 67 ff.

114

    (iii)      EUR 263,474.72 for expert costs (Brattle Group and Dr. Blumberga); and

    (iv)      EUR 380,030.49 for ICSID/Tribunal costs.

443.    In the alternative, should the Tribunal consider that success fees should not be awarded as part of any award on costs, the Claimant seeks an award of costs in a total amount of EUR 1,688,928.85.[577]  The breakdown of such amount is as follows:

    (i)      EUR 744,945.98 for legal fees and expenses of Salans/Vinson & Elkins;

    (ii)      EUR 300,477.66 for legal fees and expenses of Sorainen;

    (iii)      EUR 263,474.72 for expert costs (Brattle Group and Dr. Blumberga); and

    (iv)      EUR 380,030.49 for ICSID/Tribunal costs.

## B.    THE RESPONDENT

444.    In its Memorial on Preliminary Objections and Request for Bifurcation, and Counter-Memorial on the Merits the Respondent seeks the following relief:[578]

> (…) the Respondent kindly requests the Tribunal to:
>
> 1)    declare that, in accordance with Article 41(6) of the ICSID Arbitration Rules, the dispute is not within the competence of the Tribunal because of aspects mentioned in Section 4.1) and 4.2) of this document;
>
> *or*
>
> 2)    declare that, in accordance with Article 41(6) of the ICSID Arbitration Rules, this arbitration proceeding is to be suspended pending the final and binding adjudication in Latvian courts of the local judicial civil proceeding No. C03051107,
>
> *or*
>
> 3)    declare that the Respondent has not breached the Treaty; *and*
>
> 4)    deny all Claimant's requests for relief (as specified in the Claimant's Memorial, paragraphs 370 to 371):
>
> *but, in any case,*

---

[577] Cl. Rep. Tribunal ¶¶ 67 ff.
[578] Resp. Obj. J. & C-Mem. ¶ 5.

> 5)     order the Claimant to compensate all expenses incurred by the Respondent pertaining to this arbitration proceeding (together with the Latvian statutory interest rate of 6% a year until payment), as well as the fees and expenses of the Honorable Members of the Tribunal.

445. The Respondent's Rejoinder on the Merits does not contain a section setting out the relief sought.

446. The Respondent maintains in its Skeleton Argument that it sought the dismissal of all of the Claimant's claims and an award of costs covering its fees, costs and expenses as well as the Tribunal's fees, costs and expenses, and that it sought the stay or the termination of the proceedings (and an award of costs also in such case).

447. In its Post-Hearing Submission in Response to the Tribunal's Questions the Respondent seeks an award of costs in an amount of no less than EUR 162,556.28.[579] The breakdown of such amount is as follows:

(i)     EUR 12,247.27 for the legal fees and expenses of the State Chancellery;

(ii)     EUR 114,035 for consultancy fees (in connection with the expert report);

(iii)     EUR 17,069.86 for translation costs;

(iv)     EUR 2,121.37 for courier services; and

(v)     EUR 17,082.78 for the legal fees and expenses of the Rēzekne Municipality.

448. In its Response to the Tribunal's Procedural Order No. 9 the Respondent increased the amount claimed for legal fees and expenses from EUR 12,247.27 to EUR 16,246.27 and therefore the Respondent seeks an award of costs in an amount of no less than EUR 166,555.28.[580]

## V.    JURISDICTION

449. The Tribunal will summarise the Parties' submissions before stating the reasons for its decision on the Respondent's "preliminary objections" to jurisdiction.

---

[579] Resp. P-H (PO8) ¶ 24.
[580] Resp. Rep. (PO9) ¶ 39.

## A.   THE PARTIES' PRAYERS FOR RELIEF ON JURISDICTION AND THE RESPONDENT'S "PRELIMINARY OBJECTIONS"

### (1)   THE RESPONDENT

450.   In its Memorial on Preliminary Objections and Request for Bifurcation, and Counter-Memorial on the Merits the Respondent seeks the following relief:[581]

> Considering the above mentioned factual and legal description of the situation, the Respondent kindly requests the Tribunal to:
>
> 1)      declare that, in accordance with Article 41(6) of the ICSID Arbitration Rules, the dispute is not within the competence of the Tribunal because of aspects mentioned in Section 4.1) and 4.2) of this document;
>
> *or*
>
> 2)      declare that, in accordance with Article 41(6) of the ICSID Arbitration Rules, this arbitration proceeding is to be suspended pending the final and binding adjudication in Latvian courts of the local judicial civil proceeding No. C03051107;
>
> *or*
>
> (…)

451.   The Respondent's Reply on Preliminary Objections does not set out a prayer for relief.

452.   In its Skeleton Argument the Respondent requests the Tribunal "under the Tribunal's discretionary competence, to suspend or terminate the proceedings on grounds enumerated in Respondent's pleadings".[582]

### (2)   THE CLAIMANT

453.   In its Reply on the Merits and Counter-Memorial on Preliminary Objections the Claimant requests the following relief:[583]

> The Claimant therefore respectfully requests the Arbitral Tribunal to:
>
> (a)      deny the requests for relief set out by the Respondent in section 5 of the Counter-Memorial on the Merits and Preliminary Objections on Jurisdiction;

---

[581] Resp. Obj. J. & C-Mem. ¶ 5.

[582] Resp. Skeleton p. 4.

[583] Cl. Rep. ¶ 178.

117

(b)      (…)

454.   In its Rejoinder on Preliminary Objections the Claimant restates substantially the same relief.[584]

**B.     THE CLAIMANT'S POSITION ON JURISDICTION**

**(1)     JURISDICTION RATIONE PERSONAE**

455.   In its Memorial the Claimant refers to the arguments made in its Request for Arbitration regarding the Tribunal's jurisdiction *ratione personae* in which the Claimant submitted the following:[585]

   (i)      both Parties have consented to arbitration in accordance with the ICSID Convention and the BIT;

   (ii)     the Claimant is an "investor" under the BIT, and

   (iii)    the Claimant is a national of the Republic of Lithuania.

   (A)     CONSENT OF BOTH PARTIES TO ICSID ARBITRATION

456.   The Claimant submits that both the Republic of Lithuania and the Republic of Latvia are Contracting States to the ICSID Convention as they signed and ratified the ICSID Convention on 6 July 1992 and 7 September 1997 respectively.[586]

457.   The Claimant contends that the Respondent consented to ICSID jurisdiction under Articles 7(1) and 7(2) of the BIT[587] on 23 July 1996 when the BIT entered into force.[588]

458.   The Claimant further submits that it attempted to settle the dispute with the Respondent amicably on several occasions through written correspondence and meetings held with the Respondent's representatives of Respondent after the written

---

[584] Cl. Rej. J. ¶ 13.

[585] Cl. Mem. ¶¶ 224-228; RfA ¶ 8.

[586] RfA ¶ 9.

[587] BIT, CLA-1; this provision is reproduced in paragraph 497 below.

[588] RfA ¶ 10.

Notice of Dispute[589] given in accordance with the BIT was served on the Respondent on 2 September 2008.  No amicable settlement could be reached despite all efforts on the part of the Claimant.[590]

### (B)   CLAIMANT AS AN INVESTOR UNDER THE BIT

459.   The Claimant contends that it is an investor within the meaning of Article 1(2)(a)(ii) of the BIT[591] as it is a "company constituted under the laws of the Republic of Lithuania and registered in the territory of Lithuania in conformity with its laws and regulations".[592]

### (C)   CLAIMANT AS A NATIONAL OF THE REPUBLIC OF LITHUANIA

460.   The Claimant further contends that it is "a national of another Contracting State" within the meaning of Article 25(2)(b) of the ICSID Convention since it is a legal entity and registered tax payer incorporated in, and a national of, Lithuania on the date that the Request was submitted.[593]

### (2)   JURISDICTION RATIONE MATERIAE

461.   In its Memorial the Claimant refers to the argument set out in its Request for Arbitration with respect to the Tribunal's jurisdiction *ratione materiae*, in which the Claimant made the following submissions on the Tribunal's jurisdiction *ratione materiae*:[594]

(i)      the Claimant made an "investment" within the meaning of the BIT;

(ii)     the Claimant made an "investment" within the meaning of Article 25 of the ICSID Convention;

(iii)    the dispute between the Claimant and the Respondent constitutes a "dispute" within the meaning of the BIT; and

---

[589] C-3.
[590] RfA ¶ 11.
[591] BIT, CLA-1.
[592] RfA ¶ 12.
[593] RfA ¶ 13.
[594] Cl. Mem. ¶¶ 224-228; RfA ¶¶ 14 ff.

(iv)    such dispute constitutes a "legal dispute arising directly out of an investment" within the meaning of Article 25 of the ICSID Convention.

(A)    AN "INVESTMENT" WITHIN THE MEANING OF THE BIT

462.    The Claimant submits that it made an "investment" within the meaning of Article 1(1) of the BIT,[595] which investment includes the following in the present case:[596]

(i)    the shares in Latgales Enerģija (Article 1(1)(b) of the BIT);[597]

(ii)    the provision of loans to Latgales Enerģija to fund Latgales Enerģija's operations (Article 1(1)(c) of the BIT);[598]

(iii)    the guarantee of a loan to Rēzekne Municipality (Article 1(1)(c) of the BIT);[599]

(iv)    the guarantee of a loan to Latgales Enerģija to fund Latgales Enerģija's operations (Article 1(1)(c) of the BIT);[600]

(v)    the know-how and expertise in heating services which the Claimant provided to Latgales Enerģija (Article 1(1)(d) of the BIT);[601] and

(vi)    the provision of operational management expertise (Article 1(1)(d) of the BIT). [602]

463.    In its Request for Arbitration the Claimant substantiated the allegation of the investment made in Latvia by relying on a number of further elements, in addition to those summarised in the preceding paragraph.[603]   However, the Claimant did not maintain these elements in its Memorial.

---

[595]   BIT, CLA-1.

[596]   Cl. Mem. ¶¶ 227-228; see also Transcript, Day 1, 18-22.

[597]   RfA ¶¶ 28-29; Cl. Mem. ¶¶ 39-41; 227.

[598]   Cl. Mem. ¶¶ 42-47; 227.

[599]   Cl. Mem. ¶¶ 67-69; 72; 227.

[600]   Cl. Mem. ¶¶ 62; 66; 70-72; 227.

[601]   Cl. Mem. ¶¶ 88; 227.

[602]   Cl. Mem. ¶ 227.

[603]   RfA ¶ 46.

      (B)    AN "INVESTMENT" WITHIN THE MEANING OF ARTICLE 25 OF THE ICSID CONVENTION

464.    The Claimant contends that it has made an "investment" also within the meaning of Article 25 of the ICSID Convention as it made both a long-term[604] and substantial[605] commitment to take over the Municipality-owned district heating system, which required an assumption of risk[606] and was significant for the development of the Republic of Latvia.[607]

      (C)    A "DISPUTE CONCERNING INVESTMENT" WITHIN THE MEANING OF THE BIT

465.    The Claimant contends that its dispute with the Respondent constitutes a "dispute concerning investment" within the meaning of Article 7(1) of the BIT[608] as such dispute concerns breaches of the BIT that arose directly out of the Claimant's investment, such as the expropriation of Claimant's investment, the breach of the fair and equitable treatment obligation, the breach of the full protection and security obligation, the arbitrary and discriminatory treatment of Claimant's investment and the breaches of the most-favoured nation treatment obligation.[609]

      (D)    A "LEGAL DISPUTE ARISING DIRECTLY OUT OF AN INVESTMENT" WITHIN THE MEANING OF ARTICLE 25 OF THE ICSID CONVENTION

466.    Finally, Claimant submits that its dispute with the Respondent constitutes a "legal dispute arising directly out of an investment" within the meaning of Article 25 of the ICSID Convention as such dispute concerns the existence of legal rights and

---

Such additionnal elements are as follows:

(i)    the right to provide heating services in Rēzekne for thirty years under the Long-Term Agreement (RfA ¶ 46; see also RfA ¶ 32);

(ii)    the assumption, and repayment, of the debts owed by Rēzeknes Siltumtīkli (RfA ¶¶ 46; 41-43; Cl. Mem. ¶¶ 48-66; Cl. Rep. ¶¶ 157-158);

(iii)    the "monetary investments" into the heating supply infrastructure (RfA ¶¶ 46; 36; 38-40; Cl. Mem. ¶¶ 73-86);

(iv)    the licences and other required permissions and certificates granted to Latgales Enerģija for the provision of heating services in Rēzekne (RfA ¶¶ 35; 46); and

(v)    "other investments" (RfA ¶ 46).

[604] RfA ¶ 49.1.

[605] RfA ¶ 49.2.

[606] RfA ¶ 49.3.

[607] RfA ¶¶ 48-50, especially ¶ 49.4.

[608] BIT, CLA-1; this provision is reproduced in paragraph 497 below.

[609] RfA ¶¶ 51-52.

obligations as well as the breaches of the BIT by the Respondent which relate to the investment made by Claimant in Latvia.[610]

## C.    THE RESPONDENT'S OBJECTIONS TO JURISDICTION

### (1)    JURISDICTION *RATIONE PERSONAE*

467.    The Respondent has not specifically challenged the Claimant's submissions on jurisdiction *ratione personae*.

### (2)    THE PARTIES' CONSENT TO ICSID ARBITRATION

468.    In its Memorial on Preliminary Objections the Respondent submits its "preliminary objections to jurisdiction".[611]  Further to the Claimant's comment that such objections were "probably issues of admissibility rather than jurisdiction", the Respondent replies that Article 41 of the ICSID Arbitration Rules covers both issues of jurisdiction and admissibility.[612]

469.    The Respondent's "preliminary objections" are as follows.

#### (A)    LACK OF A CONDITION PRECEDENT FOR THE SUBMISSION OF THE REQUEST FOR ARBITRATION

470.    The Respondent objects that the Claimant's decision dated 1 December 2009[613] allegedly authorising the Request for Arbitration requires mediation to be started prior to arbitration; such condition precedent is not met in the present case.[614]

The Respondent states that such a document has legal effects for potential respondents; any ambiguities in such documents are to be interpreted and construed in the interest of the party which did not draft the documents.[615]

---

[610]  RfA ¶¶ 53-54.
[611]  Resp. Obj. J. & C-Mem. ¶¶ 4.1 ff.
[612]  Resp. Rej. ¶ 39.
[613]  C-247.
[614]  Resp. Obj. J. & C-Mem. ¶¶ 4.2-4.4.
[615]  Resp. Obj. J. & C-Mem. ¶¶ 4.2-4.4.

(i)   *Lack of Consent by the European Bank for Reconstruction and Development*

471.   The Respondent objects that all actions required in order for the Request for Arbitration to be filed were not completed since the Claimant's internal document dated 1 December 2009[616] allegedly authorising the Request for Arbitration required approval by the EBRD as a shareholder; such approval is not in evidence.[617]

### (3)   JURISDICTION *RATIONE MATERIAE*

(A)   LACK OF A DISPUTE WITHIN THE MEANING OF ARTICLE 25 OF THE ICSID CONVENTION

472.   The Respondent submits that there is a lack of a dispute within the meaning of Article 25 of the ICSID Convention relying on the international law principles of acquiescence, extinctive prescription and estoppel, as well as the Claimant's bad faith.[618]

473.   The Respondent contends that the pursuit of an international investment claim is barred if there is undue delay or if a potential claimant by its clear conduct induced a potential respondent to rely on the fact that a potential claim would no longer be pursued; reliance is placed on a number of awards on the principles of acquiescence, estoppel and prescriptive extinction[619].[620]

The Respondent argues that by its voluntary and unconditional conduct the Claimant caused the Republic of Latvia to rely on the fact that the investment claims would not be pursued beyond negotiations since:

---

[616] C-247.

[617] Resp. Obj. J. & C-Mem. ¶¶ 4.5- 4.8.

[618] Resp. Obj. J. & C-Mem. ¶¶ 4.9 ff., especially ¶ 4.11.

[619] *M.C.I. Power Group L.C. and New Turbine Inc. v. Republic of Ecuador*, ICSID Case No. ARB/03/6, Award, 31 July 2007, RLA-11; *Grand River Enterprises Six Nations Ltd. et al. v. United States of America*, UNCITRAL, Decision on Objections to Jurisdiction, 20 July 2006, RLA-12; *Pope & Talbot Inc. v. Government of Canada,* UNCITRAL, Interim Award, 26 June 2000 ("*Pope & Talbot v. Canada*"), RLA-13/CLA-43.

[620] Resp. Obj. J. & C-Mem. ¶¶ 4.9-4.12.

(i)     42 months lapsed <u>after</u> the expiry of a time limit after which a claim may be brought to ICSID under Article 7(2) of the BIT;[621]

(ii)    the Claimant did not send the Respondent any communication after negotiations had been conducted from 1 September 2008 to 14 June 2010, the date of the latest letter by the State Chancellery of Latvia calling on the Claimant to proceed with the negotiation in case the Claimant deemed that any of its rights had been breached; and

(iii)   there had been isolated communications on 21, 24 and 28 March 2011 and 1 April 2011, in which the Government of Latvia expressly stated that such communications would be made outside the investment protection treaty and that the Government regarded the Claimant's claims as time barred; the Claimant confirmed its participation in the 1 April 2011 meeting, but no further communication followed;[622]

474.   According to the Respondent, the submission of the Claimant's Request for Arbitration 42 months after a period authorised in the BIT, 25 months after the Claimant did not respond to the Respondent's express request to proceed with the negotiation process and 17 months after the Claimant agreed to participate in a meeting held outside the investment protection treaty shows the Claimant's bad faith.[623]

475.   The Respondent objects that there is a "reasonable doubt" that the Claimant brought this arbitration in good faith to influence the Lithuanian authorities or show that certain legal remedies lie in case of an expropriation of the Claimant's assets in light of the fact that two municipalities in Lithuania, Prienų and Ukmergė, terminated their cooperation with the Claimant in connection with district heating services to be provided by the Claimant relying on the Claimant's improper conduct and a "series of

---

[621]  BIT, <u>CLA-1</u>; this provision is reproduced in paragraph 497 below.
[622]  Resp. Obj. J. & C-Mem. ¶ 4.13.
[623]  Resp. Obj. J. & C-Mem. ¶ 4.14.

events" which took place between 2010 and 2012; reliance was placed by the Respondent on Exhibits <u>R-11</u> to <u>R-14</u>.[624]

(B)    LACK OF A DISPUTE CONCERNING INVESTMENT WITHIN THE MEANING OF THE BIT

476.    In its first letter to the ICSID Secretariat dated 27 August 2012 the Respondent takes the view that the basis for the claims asserted by the Claimant in its Request for Arbitration was not the alleged breach of a bilateral investment protection treaty, but the alleged breach of a private contract.

477.    This objection was elaborated upon by the Respondent in due course and the Respondent argues in particular that the Claimant "loads the Tribunal with typical **commercial issues** that, according to the *Vivendi doctrine* (…), are essentially contractual claims outside the scope of international investment law".[625]

## D.    THE CLAIMANT'S REPLY TO THE RESPONDENT'S "PRELIMINARY OBJECTIONS" TO JURISDICTION

### (1)    GENERAL COMMENTS ON THE RESPONDENT'S "PRELIMINARY OBJECTIONS"

478.    The Claimant contends that the Respondent does not challenge *(i)* consent under the BIT and the ICSID Convention, *(ii)* that the Claimant is an investor of Lithuania under the BIT and a national of Lithuania for the purposes of the ICSID Convention, *(iii)* that the Claimant has made an investment for the purposes of the BIT and the ICSID Convention, and *(iv)* that there is a dispute within the meaning of the BIT and the ICSID Convention.[626]

479.    Therefore, the Respondent does not, in the Claimant's view, challenge "the Tribunal's standing to consider claims brought by E energija under the terms of the BIT and the ICSID Convention"; Latvia rather argues that the Tribunal is precluded from considering the claims which it otherwise has jurisdiction to entertain.[627]    The

---

[624] Resp. Obj. J. & C-Mem. ¶ 4.15.  At the Hearing the Respondent relied on the same circumstances, not in support of an objection to jurisdiction or admissibility, but as a ground for a stay of the proceedings or the termination of the proceedings (Transcript, Day 1, 149/3-5).

[625] Resp. Obj. J. & C-Mem. ¶ 2.1(4) (original emphasis).

[626] Cl. Rep. ¶ 128.

[627] Cl. Rep. ¶ 129.

Respondent's objections go to the admissibility of such claims rather than the Tribunal's jurisdiction.[628]

480.   According to the Claimant, the Respondent has the burden of proving that its objections prevent the Tribunal from considering the Claimant's claims and the threshold must be a high one; for example, see the interim award in *Chevron v. Ecuador*[629].[630]

### (2)   THE CLAIMANT'S REPLY TO THE RESPONDENT'S OBJECTION BASED ON THE LACK OF INTERNAL AUTHORISATION

481.   The Claimant submits *(i)* that the jurisdiction of this Tribunal is governed solely by Article 25 of the ICSID Convention, the requirements of which are met in the present case, *(ii)* that Article 36(2) of the ICSID Convention and ICSID Institution Rules 2(1)(f) and 2(2) do not deal with the jurisdiction of ICSID or the Tribunal and *(iii)* that a failure to comply with Article 36(2) and Institution Rules 2(1)(f) and 2(2) could, at the most, constitute only a procedural defect in the Request for Arbitration, but not a bar to jurisdiction.[631]

482.   The Claimant's argument may be summarised as follows:

(i)    the Request for Arbitration complies with ICSID Institution Rule 2 as it was filed with the power of attorney appointing Salans LLP and Sorainen as the counsel acting for the Claimant, signed by the Claimant's CEO Mr. Strioga,[632] which meets the requirements of Institution Rules 2(1)(f) and 2(2); that was the only "necessary internal action" required;[633]

(ii)   moreover, Mr. Strioga subsequently confirmed in his letter dated 3 October 2012[634] that "all necessary internal actions" had been taken "to authorise the

---

[628] Cl. Rep. ¶ 130.

[629] *Chevron Corporation and Texaco Petroleum Corporation v. Republic of Ecuador,* UNCITRAL, Interim Award, 1 December 2008 ("*Chevron v. Ecuador*"), CLA-44 ¶¶ 138-139; 143.

[630] Cl. Rep. ¶ 131.

[631] Cl. Rep. ¶ 132.

[632] C-2.

[633] Cl. Rep. ¶¶ 134-135.

[634] C-247.

filing of the Request for Arbitration", and that is in itself sufficient, since Mr. Strioga has authority to act alone on behalf of the Claimant as recorded in the Register of Legal Entities in Lithuania;[635]

(iii)   no board decision was required;[636] the minutes of the Claimant's Board meeting of 1 December 2009 attached to Mr. Strioga's letter of 3 October 2012 were provided "by way of further support",[637] but they need not be examined since they are irrelevant in order to decide whether the Claimant authorised the filing of the Request for the purposes of Institution Rules 2(1)(f) and 2(2);[638]

(iv)   in any event, the Claimant contends that the Respondent misreads the minutes of the Claimant's Board meeting of 1 December 2009 in two respects:[639]

(1)   the Respondent relies on the minutes of the Claimant's Board meeting of 1 December 2009, in particular on the sentence "Decided: Apply to international arbitrage in case Latvian Government rejects the proposed UAB E energija scenario: SIA 'Latgales Enerģija' cash should be released from the executor's account then the case would be brought to the mediation panel" and concludes that resort to mediation was a condition precedent to the institution of arbitration proceedings; and

the Respondent's construction of that sentence is inaccurate; that sentence indicates that the Claimant would apply to arbitration in case Latvia rejected a certain proposal made by the Claimant; such proposal contemplated a resort to mediation in case Latgales Enerģija's funds, which had been attached, had been released;[640] however, those funds

---

[635]  C-1.
[636]  Cl. Rep. ¶ 137.
[637]  Cl. Rep. ¶ 136.
[638]  Cl. Rep. ¶¶ 136-137.
[639]  C-247.
[640]  Cl. Rep. ¶ 140.

127

were not in fact released[641] and the Board's decision to commence arbitration was, and remains, valid;[642] and

(2)    the Respondent relies on the minutes of the Claimant's Board meeting of 1 December 2009[643] to object that arbitration could be commenced only with the EBRD's approval; and

the Respondent's submission is without foundation as no Board decision was required to bring this arbitration; in any event, the reference to the EBRD is not contained in the part of the minutes that sets out the decision, but in a "commentary";[644] the EBRD was in fact approached by the Claimant "for support in relation to an arbitration", which it provided in the form of a letter to Latvia;[645] Ms. Göransson, the EBRD representative on the Claimant's Board, attended the Board meeting of 1 December 2009 and approved the decision.[646]

### (3)    THE CLAIMANT'S REPLY TO THE RESPONDENT'S OBJECTIONS BASED ON ESTOPPEL, ACQUIESCENCE AND EXTINCTIVE PRESCRIPTION

483.    The Claimant's reply to the Respondent's objections may be summarised as follows:

(i)    *on estoppel*: the Claimant disputes that it is estopped from asserting its claims; reliance is placed on *Pope & Talbot v. Canada* with respect to the three ingredients of estoppel;[647] the Claimant replies *(i)* that the Respondent has failed to show that the Claimant ever made any statement that it would not pursue the claims set out in the Notice of Dispute,[648] and *(ii)* that the Respondent failed to show any reliance on its part on such alleged statement,

---

[641]  Transcript, Day 1, 77/7.

[642]  Cl. Rep. ¶ 141.

[643]  C-247.

[644]  Cl. Rep. ¶ 143.

[645]  Cl. Rep. ¶ 144; C-237; C-240.

[646]  C-247; see also Mr. Strioga's second Witness Statement, CWS-6 ¶ 34.

[647]  *Pope & Talbot v. Canada,* RLA-13/CLA-43 ¶ 111.

[648]  C-3.

and any detriment suffered as a consequence of such alleged reliance; no issue of estoppel can therefore arise;[649]

(ii)     *on acquiescence*: the Claimant submits that the doctrine of acquiescence has two constituent elements, namely *(i)* inaction on behalf of a State or a failure to assert a claim, *(ii)* such failure must have extended over a certain period of time, and *(iii)* there must have been circumstances that would have required action (reliance was placed by the Claimant on the commentary on *The Law of International Responsibility*[650]); the Claimant submits that cogent evidence of a tacit intention to withdraw a claim must be required in a case, such as the present case, in which the investor has submitted a Notice of Dispute;[651]

in the Claimant's view, the Respondent has provided no evidence that the circumstances required action on the part of the Claimant in the present case; the BIT contains no time limits in order for claims to be brought and the Claimant submitted a detailed Notice of Dispute[652];[653] and

in particular, the Claimant argues that Latvia's letter of 12 July 2010[654] answered the Claimant's letter of 15 June 2010;[655] in its 15 June 2010 letter the Claimant had informed the Respondent that it contemplated arbitration proceedings since amicable negotiations had failed; the Respondent answered proposing a meeting or a telephone conference; admittedly, the Respondent's letter was followed by a few months in which the negotiations between the Parties halted; however, the circumstances at the time did not require action by the Claimant and the Claimant was under no obligation to bring an arbitration immediately, and the Respondent has failed to show that the duration of the silence on the part of the Claimant was sufficient to amount to an

---

[649] Cl. Rep. ¶¶ 149-150.

[650] J. Crawford, A. Pellet, S. Olleson (eds.), *The Law of International Responsibility*, Oxford 2010, <u>CLA-45</u> p. 1042.

[651] Cl. Rep. ¶¶ 151-152.

[652] <u>C-3</u>.

[653] Cl. Rep. ¶ 153.

[654] <u>C-241</u>.

[655] <u>C-242</u>.

129

abandonment of the claims set out in the Notice of Dispute and that the circumstances required action on the part of the Claimant;[656]

(iii)   *on extinctive prescription*: the Claimant acknowledges that prescriptive extinction may apply even if a State has not acquiesced in the extinction of a claim, but replies *(i)* that the BIT does not contain any time limits within which a claim is to be brought, *(ii)* that there is no general agreement as to any actual time limits in international law and *(iii)* that the mere lapse of time is not sufficient to extinguish a claim; extinctive prescription has been applied only where the lapse of time has put the respondent at a disadvantage (reliance was placed by the Claimant on the commentary on *The Law of International Responsibility*[657]);[658] the overall delay of less than 4 years between the Notice of Dispute and the Request for Arbitration is not an unreasonable period such as to bar a claim and the Respondent has suffered no prejudice;[659] and

(iv)   *on bad faith*: the Claimant denies that it brought the present arbitration against Latvia in bad faith to in order to influence the Lithuanian authorities in relation to the termination of district heating concessions in two Lithuanian municipalities and wonders how proceedings brought against one State could possibly influence the authorities of another State.[660]  The Claimant further points out that, on the one hand, the concession in Prienų had not been terminated, and, on the other, the Ukmergė concession was terminated after the local authorities attempted to negotiate an agreed termination with the Claimant; those facts therefore bore no relation to the present dispute.[661]

## E.   THE REASONS FOR THE TRIBUNAL'S DECISION ON JURISDICTION

484.   The Claimant contends that the Tribunal has jurisdiction under the BIT and the ICSID Convention, whereas the Respondent raised the following "preliminary objections" to

---

[656] Cl. Rep. ¶¶ 153-155.
[657] CLA-45 p. 3.
[658] Cl. Rep. ¶¶ 157-158.
[659] Cl. Rep. ¶ 159.
[660] Cl. Rep. ¶ 161.
[661] Cl. Rep. ¶ 162.

the Tribunal's jurisdiction, which the Tribunal joined to the merits in Procedural Order No. 3*bis*:

(i)     lack of the Claimant's internal authorisation for instituting these proceedings ("First Objection"); and

(ii)    lack of "dispute" under Article 25(1) of the ICSID Convention ("Second Objection").[662]

485.   In this section of the present Award the Tribunal will examine (1) its jurisdiction *ratione personae*, (2) the Parties' consent to ICSID arbitration (including the Respondent's First Objection) and (3) its jurisdiction *ratione materiae* (including the Respondent's Second Objection).

### (1)   JURISDICTION *RATIONE PERSONAE*

486.   The Republic of Lithuania signed and ratified the ICSID Convention on 6 July 1992 which entered into force in the Republic of Lithuania on 5 August 1992.[663]

487.   The Republic of Latvia signed and ratified the ICSID Convention on 8 August 1997 which entered into force in the Republic of Latvia on 7 September 1997.[664]

488.   The BIT[665] was ratified by the Republic of Lithuania on 19 July 1996[666] and by the Republic of Latvia pursuant to an Act of the Latvian Parliament dated 2 May 1996.[667]

489.   The BIT entered into force on 23 July 1996.[668]

490.   Article 1(2) of the BIT reads as follows:

Article 1
Definitions

For the purposes of this Agreement:

---

[662]  Resp. Obj. J. & C-Mem. ¶¶ 4.1 ff.; Procedural Order No. 3*bis*.
[663]  CLA-5.
[664]  CLA-5.
[665]  BIT, CLA-1.
[666]  CLA-2.
[667]  CLA-3.
[668]  BIT, CLA-1.

1. (omitted)

2. The term "investor" means:

    a) in respect of the Republic of Lithuania:

        (i) natural persons who are nationals of the Republic of Lithuania according to the laws of the Republic of Lithuania;

        (ii) any entity constituted under the laws of the Republic of Lithuania and registered in the territory of the Republic of Lithuania in conformity with its laws and regulations;

        (…) (omitted)

491. The Claimant is a limited liability company incorporated in Lithuania and having its registered office in Vilnius, Lithuania.[669]  The Claimant is therefore an "investor" of Lithuania within the meaning of Article 1(2)(ii) of the BIT.

492. Article 25(2)(b) of the ICSID Convention provides:

    (2) "National of another Contracting State" means:

        (b) any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration….

493. As a limited liability company incorporated in Lithuania and having its registered office in Lithuania on the date the Request was submitted to ICSID, the Claimant is also a "juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration" within the meaning of Article 25(2)(b) of the ICSID Convention.

494. The Respondent has not challenged these points.

495. The Tribunal therefore finds that there is no lack of jurisdiction *ratione personae* under the BIT and the ICSID Convention.

---

[669] C-1.

### (2)   THE PARTIES' CONSENT TO ICSID JURISDICTION

496.   The Tribunal will determine whether *(i)* the Parties consented to ICSID jurisdiction under Article 7 of the BIT and Article 25(1) of the ICSID Convention and *(ii)* whether the alleged lack of compliance by the Claimant with its internal requirements to initiate these proceedings has any effects on the Claimant's consent to ICSID jurisdiction.

497.   Article 25(1) of the ICSID Convention reads as follows:

<div align="center">

Chapter II
Jurisdiction of the Centre

</div>

Article 25

(1)   The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally.

498.   Article 7 of the BIT reads as follows:

<div align="center">

Article 7
Disputes between One Contracting Party and an Investor of the Other
Contracting Party

</div>

1.   Notice of a dispute concerning investment between one of the Parties and an investor of the other Party shall be given in writing. This shall include a detailed statement by the investor to the Contracting Party in whose territory the investment was made. The Parties shall, if possible, endeavour to settle their differences by means of a friendly agreement.

2.   If such dispute cannot be settled amicably within six months from the date of the written notification provided in paragraph 1, the dispute, at the request of either party and at the choice of the investor, shall be submitted to:

-   an ad hoc court of arbitration, for arbitration in accordance with the Arbitration Rules issued in 1976 by the United Nations Commission on International Trade Law (UNCITRAL); or to

-   the International Center for the Settlement of Investment Dispute (ICSID) established under the 1965 Convention on the Settlement of Investment Disputes between States and Nationals of Other States, for arbitration under ICSID Rules of Procedure for Arbitration Proceedings if both of the Contracting Parties have acceded to the Convention.

<div align="center">133</div>

3.     The arbitral decisions shall be final and binding on both parties to the dispute.  Each Contracting Party shall execute them in accordance with its laws and in accordance with the 1958 United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York Convention), if the Contracting Parties are members of that Convention.  The arbitration shall take place in a State that is a party to the New York Convention.

(footnotes omitted)

(A)     THE PARTIES' CONSENT TO ICSID JURISDICTION

499.   The Tribunal finds that the Respondent offered to submit certain disputes to ICSID arbitration under Article 7 of the BIT provided *(i)* that the investor gave the host State a notice of dispute in writing including a detailed statement (Article 7(1) of the BIT), and *(ii)* that the Parties endeavoured to settle their dispute amicably in the six months following the notification of the notice of dispute (Article 7(2) of the BIT).

500.   The Respondent did not dispute that these requirements were met.

501.   The Tribunal concludes that the two requirements in Article 7(1) and 7(2) of the BIT were met in the present case.  First, the Claimant delivered its Notice of Dispute on 2 September 2008 to the Respondent, thereby complying with Article 7(1) of the BIT. Secondly, the Respondent accepts that negotiations with the Claimant started on 1 September 2008[670] and continued until 14 July 2010 with a final meeting on 1 April 2011 without any settlement being reached.[671]   The Parties therefore tried to settle their dispute amicably for more than six months before the Claimant submitted the dispute to ICSID, as required by Article 7(2) of the BIT.

502.   The Tribunal also finds that the Claimant accepted the Respondent's offer contained in the BIT to settle the dispute by ICSID arbitration by filing its Request for Arbitration on 15 August 2012.   The Tribunal therefore concludes that the requirement of consent under Article 7(2) of the BIT was met, as was the requirement of "consent in writing" under Article 25(1) of the ICSID Convention.

This conclusion, however, is subject to the determination by the Tribunal of the Respondent's First Objection that the Claimant's internal documents authorising the

---

[670]  See the letter by the State Chancellery to the ICSID Secretary-General dated 6 September 2012.

[671]  RfA ¶ 11; Cl. Rep. ¶ 153; Resp. Obj. J. & C-Mem. ¶¶ 4.13(2); 4.13(3); see also the letter by the State Chancellery to the ICSID Secretary-General dated 6 September 2012.

134

request show an alleged lack of compliance with a condition precedent (*i.e.* mediation) and a failure to obtain the required EBRD approval before instituting these proceedings.

### (B)   THE RESPONDENT'S FIRST OBJECTION – LACK OF INTERNAL AUTHORISATION TO INITIATE THESE PROCEEDINGS

503.   As part of the Secretary-General's screening process, the ICSID Secretariat requested the Claimant's confirmation that it had "taken all necessary internal actions to authorise the request" pursuant to ICSID Institution Rule 2(1)(f).  In a letter dated 3 October 2012 the Claimant confirmed that "UAB 'E energija' has taken all necessary internal actions to authorise the filing of the Request" and attached UAB's Board Meeting Minutes dated 1 December 2009.[672]

504.   The Respondent's First Objection is based on these Board Minutes.  According to the Respondent, such Minutes demonstrate a "[l]ack of compliance with Article 36(2) of the ICSID Convention [and] ICSID Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings, Rule 2(1)(f) and Rule 2(2)".[673]  No other authorities aside from these provisions are relied upon by the Respondent in support of this preliminary objection.

505.   In the Tribunal's view, whether the authorising documents provided by the Claimant in the present case were such as to warrant the registration of the request is a matter for the ICSID Secretary-General.

506.   Article 36(2) of the ICSID Convention (and Institution Rule 2) deal with the registration procedure, not with the jurisdiction of a tribunal constituted under the ICSID Convention.  Jurisdiction is dealt with in Article 25 of the ICSID Convention.  Insofar as the Respondent's "preliminary objection" is based on Article 36(2) of the ICSID Convention and Institution Rule 2, such objection must therefore fail.

507.   As the Claimant argues that it consented to ICSID arbitration by filing the Request, a lack of authorisation to file the Request, if established, could operate so as to taint the Claimant's consent in the Tribunal's view.  The Tribunal will therefore examine the

---

[672] C-247.
[673] Resp. Obj. J. & C-Mem. ¶¶ 4.4; 4.8.

Respondent's contention that the Board Minutes contain conditions precedent to the initiation of arbitration that were not met, which vitiated the Claimant's consent.

508.   The passage of the Claimant's Board Minutes[674] relied upon by the Respondent reads as follows:

> **5.   Discussed.   Decision to apply with SIA "Latgales enerģija" case to arbitrage.**
>
> **Decided:** Apply to international arbitrage in case Latvian Government rejects the proposed UAB E enerģija scenario: SIA "Latgales enerģija" cash should be released from the executor's account then the case would be brought to the mediation panel.
>
> **Commentary.** UAB E enerģija will issue letter to the Latvian government regarding the decision of the board. E enerģija will also apply to EBRD regarding approval of the decision to apply to international arbitrage.

###### (i)   Board Minutes – The Reference to Mediation

509.   Based on the wording of the Board Minutes, the Tribunal finds that this resolution by the Claimant's Board, made on 1 December 2009, is a decision to apply to international arbitration in case the Government of Latvia rejected a proposal made by the Claimant in order that the Claimant's funds be released.

510.   In its submissions, the Claimant explained the meaning of the sentence set out above after "Decided" (see paragraph 482 above), and the Respondent did not specifically challenge that explanation.[675]

511.   Having considered the Parties' position in this respect, the Tribunal determines that in order for mediation to take place, the Government of Latvia would have had to accept the proposal made by the Claimant, on any plain reading of the resolution set out in paragraph 508 above.

---

[674]   C-247, attached to the Claimant's 3 October 2012 letter to Mr. Burn (original emphasis).

[675]   The Respondent accepts that it was the Party that proposed mediation (Transcript, Day 1, 147/15-16). The Respondent offered mediation on 27 October 2009 (see paragraph 425 above) after the Claimant had indicated on 23 September 2009 that it would "move the dispute to international arbitration" (see paragraph 423 above). The Claimant rejected the Respondent's mediation proposal on 6 November 2009 (see paragraph 426 above), whereupon the Respondent made a further attempt at proposing mediation on 25 November 2009 (see paragraph 426 above). When the Claimant's Board made its resolution on 1 December 2009, the Respondent's mediation proposal dated 25 November 2009 (C-236) had been neither accepted nor rejected by the Claimant. The Respondent's mediation proposal was rejected by the Claimant on 8 February 2010.

512.    The Tribunal concludes that the Respondent has failed to discharge its burden of proof with respect to the allegation that mediation was a condition precedent to arbitration.[676]

<div align="center">(ii)    <em>Board Minutes – The Reference to EBRD Approval</em></div>

513.    The Respondent further contends that approval by the EBRD was a condition precedent to the Claimant commencing arbitration, which the Claimant denies.  The passage relied upon by the Respondent in the Claimant's Board Minutes dated 1 December 2009 is reproduced in paragraph 508 above.

514.    In the Tribunal's view, the operative part of the Claimant's Board Minutes of 1 December 2009 is set out after the word "Decided".  The two sentences set out after the word "Commentary" appear to indicate what the Board would do, the decision to go to arbitration having been adopted.

515.    If approval by the EBRD had been a condition precedent to the institution of these arbitration proceedings pursuant to arrangements made by the EBRD, the reference to the EBRD would likely not have been inserted under the "Commentary" section.

516.    In the Tribunal's opinion, the Claimant's Board Minutes of 1 December 2009 are insufficient to prove that the EBRD's approval was a condition precedent to arbitration, and the Respondent has failed to discharge its burden of proof in this respect.  The Respondent's "preliminary objection" based on the EBRD's lack of approval must therefore be dismissed.

517.    As a general note, the Tribunal finds that general denials (such as that contained in the Respondent's Rejoinder on the Merits and Reply on Preliminary Objections[677]) are insufficient and must fail.

---

[676] See *e.g. Chevron v. Ecuador*, <u>CLA-44</u> ¶¶ 138-139.

[677]   Such general denial inserted at Resp. Rej. ¶ 40 reads as follows: "As a final general comment, if Respondent has not commented expressly on a certain Claimant's position in any of previous Claimant's pleadings, it does not mean that Respondent agrees with such statements or allegations of fact or law. Respondent has attempted to position its viewpoint clearly without duplicate or tedious reiterations or denials.  Respondent reserves its right to supplement its position in due time (including, invoking additional evidence or witnesses)".

<div align="center">137</div>

The Tribunal therefore finds that *(i)* the Respondent has failed to discharge its burden of proof in relation to any alleged conditions to the Claimant's consent and the First Objection is therefore dismissed, and that *(ii)* the Parties consented to ICSID arbitration, the Claimant met the notice and amicable settlement requirements in Article 7 of the BIT and there was therefore valid written consent for the purposes of Article 25(1) of the ICSID Convention.

### (3)   JURISDICTION *RATIONE MATERIAE*

518.   In this section the Tribunal will deal with the Respondent's Second Objection and determine whether it has jurisdiction *ratione materiae* under the BIT and the ICSID Convention.   Specifically, the Tribunal will decide *(i)* whether there is a "dispute concerning an investment" under Articles 1(1) and 7(1) of the BIT; *(ii)* whether there is a "legal dispute arising directly out of an investment" according to Article 25(1) of the ICSID Convention or *(iii)* whether there is no "dispute" under Article 25(1) of the ICSID Convention having regard to the principles of estoppel, acquiescence, extinctive prescription and good faith (Second Objection).

### (A)   ARTICLES 1(1) AND 7(1) OF THE BIT – A "DISPUTE CONCERNING INVESTMENT"

519.   Article 1(1) of the BIT reads as follows:

<div align="center">

Article 1
Definitions

</div>

For the purposes of this Agreement:

1.    The term "investment" shall mean every kind of asset, invested by an investor of one Contracting Party in the territory of the other Contracting Party, provided that the investment has been made in accordance with the laws and regulations of the other Contracting Party, and shall include in particular, though not exclusively:

  a)    movable and immovable property as well as any other property rights, such as mortgages, liens and pledges, and similar rights;

  b)    shares, bonds and other kinds of interest in companies;

  c)    claims to money which has been used to create an economic value or claims to any performance having an economic value;

  d)    copyrights, industrial property rights (such as patents, trade marks, industrial designs and models, trade names), know-how and good-will;

<div align="center">138</div>

> > e)      any right to conduct economic activities conferred by state authorities, including concessions to search for, extract and exploit natural resources.

> (…)

520.   It is undisputed that the Claimant made an investment in the territory of Latvia in accordance with the local laws and regulations.  The Respondent called no fact witnesses to challenge Mr. Jautakis' first Witness Statement, which contains detailed explanation as to the various transactions forming part of the Claimant's investment, and Mr. Jautakis was not cross-examined at the Hearing.[678]  The Respondent also expressly acknowledged the existence of an investor and an investment as part of its argument advanced that the Energy Charter Treaty should apply.[679]

521.   Specifically, after reviewing the documentary evidence, the Tribunal concludes as follows:

> (i)      the shares and statutory capital in Latgales Enerġija constitute an investment under Article 1(1)(b) of the BIT;

> (ii)     the loans provided by the Claimant to Latgales Enerġija to fund Latgales Enerġija's operations in Rēzekne; the guarantee provided in relation to the loans granted by Latvijas Unibanka to the Rēzekne Municipality and the guarantee provided in relation to a loan granted by Sampo Banka to Latgales Enerġija constitute an investment under Article 1(1)(c) of the BIT;[680] and

> (iii)    the know-how and expertise in heating services[681] as well as the operational management expertise[682] provided by the Claimant constitute an investment under Article 1(1)(d) of the BIT.

Latgales Enerġija is not an investor for the purposes of Article 1(1) and 1(2) of the BIT and is also not a "national of another Contracting State" within the meaning of Article 25 of the ICSID Convention as there is no agreement between the Parties that

---

[678] Transcript, Day 2, 82/14.

[679] See Resp. Obj. J. & C-Mem. ¶ 3.29.

[680] See *e.g.* C-43; C-102.

[681] CWS-1 ¶ 40 (citing technical solutions found to enable the old boilers to run on natural gas).

[682] CWS-1 ¶ 42 (discussing Mr. Strioga's operational expertise).

it should be treated as the investor.  As such, Latgales Enerġija's assets are not, therefore, "the investment"; it does not follow, however, that they are irrelevant, since for example the value of the shares in Latgales Enerġija depends on the value of such assets that include *inter alia* the right to operate the heating system in the city of Rēzekne under the Long-Term Agreement and the three licences.

522.   Moreover, the Tribunal finds that the Claimant's invocation of various BIT breaches meets the condition of a "dispute concerning investment" under Article 7(1) of the BIT.

523.   The Tribunal emphasizes again that general denials, such as those contained in the Respondent's Rejoinder on the Merits and Reply on Preliminary Objections, are insufficient in the Tribunal's view.[683]

524.   The Tribunal therefore finds that it has jurisdiction *ratione materiae* under the BIT.

(B)   ARTICLE 25(1) OF THE ICSID CONVENTION – "A LEGAL DISPUTE ARISING DIRECTLY OUT OF AN INVESTMENT"

525.   The Tribunal notes that the Respondent has not challenged the Claimant's submission that its investment qualifies as an investment under Article 25(1) of the ICSID Convention (quoted in paragraph 497 above) as understood by analysing the features discussed in Prof. Schreuer's commentary.[684]   Nor has the Respondent denied the relevance of those features.  Moreover, the Respondent has itself contended that there is an investment in the present case, albeit with reference to the Energy Charter Treaty as the Tribunal has just recalled in paragraph 520 above.

526.   After examining the features of an investment discussed in Prof. Schreuer's commentary, with the understanding that they are not meant to be taken as a list of jurisdictional requirements, the Tribunal concludes that they are met in this case.

527.   In particular, the Tribunal finds there was a long-term investment as, among other factors, the Long-Term Agreement was entered into for a period of thirty years,[685] and

---

[683]   Resp. Rej. ¶ 40, reproduced in footnote 677 above.

[684]   C. Schreuer, L. Malintoppi, A. Reinisch, A. Sinclair, *The ICSID Convention. A Commentary*, 2nd ed., Cambridge 2009, CLA-6 pp. 128-129.

[685]   C-4, Clause 4.2.1.

the February 2005 Agreement was entered into for the same period as the Long-Term Agreement.[686]  Moreover, the Claimant alleges to have made a significant monetary investment that includes LVL 3.4 million and EUR 2.821 million investments in 2005 and 2006,[687] which the Tribunal deems to be a substantial monetary commitment. The Tribunal further finds that the investment was not devoid of risk, a circumstance on which the Respondent has expressly relied by contending that the Claimant failed to conduct a proper risk assessment prior to its decision to invest.[688]  Finally, the Tribunal concludes that the project was significant for the development of the Republic of Latvia due to the importance of district heating and the supply of hot water as a critical public service, and to the need to switch from expensive and polluting fuels to natural gas, as acknowledged by the Respondent.

528.   It is plain from all the above that the Claimant made an investment in Latvia for the purposes of Article 25 of the ICSID Convention.

529.   As the Claimant has alleged various breaches of the BIT in relation to Latvia's treatment of its investment, the Tribunal finds that there is a "legal dispute arising directly out of an investment" as required by Article 25(1) of the ICSID Convention, subject to the Tribunal's decision on the Respondent's Second Objection.

(C)   THE RESPONDENT'S SECOND OBJECTION – LACK OF A "DISPUTE" UNDER ARTICLE 25(1) OF THE ICSID CONVENTION

530.   The Tribunal will now consider the Respondent's challenge that there is no dispute under Article 25(1) of the ICSID Convention due to estoppel, acquiescence, prescriptive extinction and due to the Claimant's alleged bad faith.

(i)   *Estoppel*

531.   Both Parties have relied on the *Pope & Talbot* interim award.[689]  According to this decision, estoppel requires three elements: *(i)* "a statement of fact which is clear and unambiguous"; *(ii)* a statement that "must be voluntary, unconditional and

---

[686] C-8, Clause 11.

[687] RfA ¶ 49(2).

[688] Resp. Obj. J. & C-Mem. ¶ 1.1.

[689] *Pope & Talbot v. Canada*, RLA-13/CLA-43.  The Respondent specifically relied on ¶ 11 of this interim award.

authorised"; and *(iii)* that "there must be reliance in good faith upon the statement either to the detriment of the party so relying on the statement or to the advantage of the party making the statement".[690]

532.   The Tribunal has reviewed the Parties' correspondence relating to their negotiations subsequent to the Notice of Dispute.[691]   The Respondent relies on the Claimant's alleged "voluntary and unconditional conduct" which is said to be "of such a nature as to cause a reasonable reliance in Latvia that the investment claims, as outlined in the Request, will not be pursued beyond negotiations (…)".[692]   However, no relevant conduct or statement by the Claimant has been shown to exist.   To the contrary, the communication sent by the Claimant to the Respondent immediately prior to the Parties' last meeting to discuss settlement opportunities expressly mentioned the "potential international arbitration".[693]   Reliance on a mere lapse of time is insufficient to give rise to a preclusion based on estoppel.

533.   The Respondent has failed to discharge its burden of proof with respect to the first factual requirement of an estoppel defence.   The Respondent has also failed to show its reliance on the Claimant's alleged conduct or statement that the investment claims would not be pursued beyond negotiations.   The Tribunal therefore finds that no issue of estoppel arises on the facts of this case.

(ii)   *Acquiescence*

534.   The Tribunal considers that the Respondent has not shown that the time which lapsed after the Claimant sent the Respondent its Notice of Dispute is such that the Claimant must be deemed to have accepted by conduct that its claims were extinguished.

535.   Neither Article 7 nor any other provisions of the BIT contains a time limit by which a claimant must bring arbitration proceedings.   It was therefore entirely a matter for the Claimant to decide when to bring arbitration proceedings.

---

[690]   *Pope & Talbot v. Canada*, RLA-13/CLA-43 ¶ 111.
[691]   See paragraphs 418 ff. and 501 above.
[692]   Resp.Obj. J. & C-Mem. ¶ 4.13.
[693]   See paragraph 436 above.

142

536.    The fact that the Claimant took part in the 1 April 2011 meeting after receipt of the Respondent's email dated 24 March 2011 stating that the meeting would not be held "under the auspices of the Latvian-Lithuanian investment protection treaty" on the basis that the Government of Latvia regarded "the investment dispute as closed" does not give rise to acquiescence, not least since such communication was preceded by a communication by the Claimant indicating that the objective of the meeting would be "to further discuss the Rēzekne case and potential international arbitration".[694] Moreover, the Claimant did not express any agreement to the proposition that the investment dispute was "closed".  The Respondent's objection based on acquiescence must therefore be dismissed in such circumstances.

(iii)    *Extinctive Prescription*

537.    The Respondent's objections based on prescriptive extinction are rested on the same bases as the Respondent's estoppel and acquiescence objections.

538.    The Respondent did not rebut the Claimant's reply that the BIT contained no time limits (see paragraph 483 above).  Similarly, the Respondent did not rebut the Claimant's contention that prescriptive extinction had been applied in cases in which the respondent had been put at a disadvantage by the lapse of time and that the Respondent had shown no disadvantage in the present case.

539.    The Tribunal therefore concludes that the absence of a time limit in the BIT is dispositive in the present case and that the lapse of less than four years from the date when the Notice of Dispute dated 1 September 2008 was sent to the Respondent to the date of the Request for Arbitration dated 15 August 2012 is insufficient to attract the application of the doctrine of prescriptive extinction.

540.    The Respondent's objection based on prescriptive extinction must therefore be dismissed.

---

[694]  See paragraph 436 above.

143

(iv)    *Bad Faith – Reasonable Doubt as to a Lack of Good Faith*

541.    The burden of proof in relation to allegations of bad faith on the part of the Claimant is squarely on the Respondent.[695]   The Tribunal takes the view that the standard of proof should be appropriately high considering, first, that as a general matter *bona fide* conduct must be presumed in principle;[696] secondly, that the Respondent's allegations include matters and parties which are not before this Tribunal; and, thirdly, that such allegations are based mostly on news reports.   The Respondent appears to acknowledge the difficulty in discharging its burden of proof as it stops short of making an allegation of bad faith and states that there is "reasonable doubt" that the Claimant acted in good faith.

542.    The Tribunal has considered the documentary evidence relating to the events in Prienų and Ukmergė initially filed by the Respondent (Exhibits R-11 to R-14).

543.    Exhibit R-11, dated 5 October 2010, is another similar printout stating that the Regulator suspended the licence of Miesto energija pending the state of emergency and that the contract with Miesto energija was terminated by the Municipality due to high prices.

544.    Exhibit R-12, dated 4 November 2010, is the printout from a news portal quoting another news service, *Lietuvos rytas*.   As a consequence of the Claimant's decision to raise heating prices again, the Prienų authorities reportedly decided to take over district heating, following the example of Ukmergė.   The report does not exclude a political motivation for the decision in both cities, since entrepreneurs are quoted in Exhibit R-12 as saying that "the politicians of Ukmergė and Prienų are simply preparing for municipal elections".

545.    Exhibit R-13, dated 12 January 2012, is also a printout from a news portal quoting *Lietuvos rytas*.   One concrete element in this report about Prienų relates to the negotiations that were underway between the local authorities and the operator.   This exhibit also mentions the city of Ukmergė, reportedly the only one in Lithuania to have taken over heating completely from the private operator in charge.

---

[695] See *e.g. Chevron v. Ecuador*, CLA-44 ¶¶ 137-138.
[696] See *e.g. Chevron v. Ecuador*, CLA-44 ¶ 143.

546.   Exhibit R-14, dated 17 October 2012, reports that E energija will seek compensation in an amount of 15 million litas before the courts against the Ukmergė municipality; the present arbitration proceedings are recalled in the closing paragraph.

547.   The Tribunal further considered the documentary evidence subsequently filed by the Respondent (namely Exhibit R-19) attached to its Rejoinder on the Merits and Reply on Preliminary Objections.  The Tribunal takes the view that the filing by a party of an exhibit containing one hundred odd pages attached to a submission in which the exhibit is not discussed in any detail is of very little assistance to it.

548.   In fact, Exhibit R-19 is mentioned only once in the whole submission[697] in support of one allegation relating to what could be briefly described as Mr. Strioga's reckless way of doing business in the eyes of the Respondent.

549.   The Tribunal has taken the various press reports[698] contained in Exhibit R-19 into consideration, some of which were briefly referred to by counsel for the Respondent in its opening argument.[699]   However, the Tribunal will not embark, unassisted by counsel on both sides, on an analysis of the Lithuanian decisions in Exhibit R-19, none of which were referred to in the pleadings.

550.   The Tribunal is driven to the conclusion that the Respondent has not discharged its burden of proof in relation to the allegation that the Claimant brought these arbitration proceedings to influence the authorities in Lithuania.  The Respondent's objection based on the Claimant's alleged bad faith, or the reasonable doubt that the Claimant may not have acted in good faith, must therefore be dismissed.

551.   As far as concerns the Respondent's allegation that it is the Claimant's and Mr. Strioga's common practice to enter into deals without defining clear rules of cooperation, the Tribunal considers that the Respondent has not discharged its burden of proof by filing documents relating to the Claimant's contractual arrangements with certain Lithuanian municipalities and the difficulties which arose out of such

---

[697]   Resp. Rej. ¶ 33.
[698]   For a list of the various Lithuanian news reports and judgments see footnote 544 above.
[699]   Transcript, Day 1, 149-156.

contracts.  Moreover, the Claimant's alleged common practice has not been shown to be relevant to the Tribunal's jurisdiction.

552.  Therefore, the Tribunal concludes that Respondent's objection based on an absence of good faith must be dismissed.

### F.   THE TRIBUNAL'S DECISION ON JURISDICTION

553.  The Tribunal has jurisdiction to hear the Claimant's claims under Article 25 of the ICSID Convention and Article 7 of the BIT.   The Respondent's "preliminary objections" are dismissed.

## VI.   THE RESPONDENT'S APPLICATION FOR TERMINATION, AND, ALTERNATIVELY, FOR A STAY OF THE PROCEEDINGS

554.  The Respondent's application to have these arbitration proceedings stayed was first filed on 18 April 2014 as part of the Memorial setting out the Respondent's objection to the Tribunal's jurisdiction (see paragraph 450 above).

### A.   THE PARTIES' PRAYERS FOR RELIEF ON THE STAY OF PROCEEDINGS

#### (1)   THE RESPONDENT

555.  In its Memorial on Preliminary Objections and Request for Bifurcation, and Counter-Memorial on the Merits the Respondent seeks the following relief:[700]

> Considering the above mentioned factual and legal description of the situation, the Respondent kindly requests the Tribunal to:
>
> 1)   (…)
>
> *or*
>
> 2)   declare that, in accordance with Article 41(6) of the ICSID Arbitration Rules, this arbitration proceeding is to be suspended pending the final and binding adjudication in Latvian courts of the local judicial civil proceeding No. C03051107;
>
> *or*
>
> (…)

---

[700]  Resp. Obj. J. & C-Mem. ¶ 5.

556.   In its Skeleton Argument the Respondent requests the Tribunal "under the Tribunal's discretionary competence, to suspend or terminate the proceedings on grounds enumerated in Respondent's pleadings". [701]

### (2)   THE CLAIMANT

557.   In its Reply on the Merits and Counter-Memorial on Preliminary Objections the Claimant requests the following relief: [702]

> The Claimant therefore respectfully requests the Arbitral Tribunal to:
>
> (a)   deny the requests for relief set out by the Respondent in section 5 of the Counter-Memorial on the Merits and Preliminary Objections on Jurisdiction;
>
> (b)   (…)

558.   In its Rejoinder on Preliminary Objections the Claimant restates substantially the same relief. [703]

## B.   THE RESPONDENT'S POSITION

559.   The Respondent rested its original application for a stay on the 7 April 2014 judgment by the Supreme Court of Latvia, allowing Latgales Enerģija's application for review against a judgment dated 20 April 2012 and remitting the case to a new court of appeal for a fresh decision. [704]   The Respondent argues that the Tribunal should "follow the Vivendi doctrine and allow adjudication of the underlying civil dispute by Latvian courts …". [705]   The Respondent contends that Latgales Enerģija's conduct should be attributed to the Claimant and regarded as an acknowledgment by the Claimant of the fact that the Latvian courts were properly dealing with the matter pending these arbitration proceedings; the Claimant's attempt at forum shopping trivialized both these proceedings and the Latvian proceedings in which Latgales Enerģija had actively and selectively sought procedural remedies.   The Respondent suggests that the Tribunal could only gain from allowing the Latvian courts to hear all

---

[701]   Resp. Skeleton p. 4.

[702]   Cl. Rep. ¶ 178.

[703]   Cl. Rej. J. ¶ 13.

[704]   R-8, see paragraphs 388 ff. above.

[705]   Resp. Obj. J. & C-Mem. ¶ 4.17; RLA-1.

factual and legal issues, which were numerous and technical, in relation to the termination of the Long-Term Agreement (referred to as the "Concession Agreement" by the Respondent); reliance is placed by the Respondent on *Impregilo v. Argentina*[706].[707]

560.   In its Clarificatory Statement on Bifurcation the Respondent goes a step further, arguing that the Claimant has pursued the same issues in the Latvian courts and these arbitration proceedings.[708]

561.   In its Skeleton Argument the Respondent also seeks a termination of the proceedings on procedural grounds, submitting that the Tribunal had discretion to decide whether to stay the proceedings or terminate them on procedural grounds.[709]

## C.   THE CLAIMANT'S POSITION

562.   The Claimant's position may be summarised as follows:

(i)      the Latvian proceedings relied upon by the Respondent in support of its application for a stay of proceedings were brought by the Municipality through Rēzeknes Siltumtīkli against Latgales Enerģija in September 2007; the argument that these arbitration proceedings should be stayed pending proceedings brought by Latvia itself against the Claimant's investment in Latvia cannot be sustained and the accusation that Latgales Enerģija has in bad faith engaged in forum shopping to the detriment of the Respondent is similarly without foundation;[710] the Respondent appears to suggest that Latgales Enerģija should not defend itself against Latvian proceedings lest this get in the way of the Claimant's claims under the BIT, which is a flawed argument;[711] and

---

[706]   *Impregilo S.p.A. v. Argentine Republic,* ICSID Case No. ARB/07/17, Award, 21 June 2011 ("*Impregilo v. Argentina*"), RLA-14.

[707]   Resp. Obj. J. & C-Mem. ¶¶ 4.17-4.19.

[708]   Resp. Req. Bifurc. ¶ 3(3).

[709]   Resp. Skeleton pp. 3-4; see also Transcript, Day 1, 149/3-9; 155/14-156/23.

[710]   Cl. Rep. ¶¶ 165-166.

[711]   Cl. Rep. ¶ 167.

(ii)     in any event, Latgales Enerģija's defences in the Latvian proceedings relied upon by the Respondent and the Claimant's claims in these arbitration proceedings are entirely different since the claims presently under consideration arise out of the BIT; the outcome of the Latvian proceedings is irrelevant to the Tribunal's mission since the value of the Claimant's investment in Latvia has already been irreparably destroyed; a Latvian decision on whether the Long-Term Agreement was properly terminated could make no difference to such value and could not determine whether Latvia is in breach of any of its obligations under the BIT, and the issues of lease payments and gas debt are not part of the Claimant's case in these arbitration proceedings;[712] the Respondent's reliance on the distinction made in *Impregilo*[713] between legitimate expectations and contractual rights is unclear;[714] the Claimant is not a party to the Latvian proceedings, it is not a party to the contracts forming the basis of those proceedings and the Claimant's claims in these arbitration proceedings are not claims for breach of contract so that there is no reason for the Tribunal to stay these proceedings as a consequence of the Latvian proceedings.[715]

## D.     THE REASONS FOR THE TRIBUNAL'S DECISION ON THE RESPONDENT'S APPLICATION FOR A STAY AND TERMINATION OF THE PROCEEDINGS

563.   The Respondent's application was denied by the Tribunal in Procedural Order No. 3*bis* dated 21 January 2015 (see paragraph 23 above).

564.   The Respondent made a fresh application to have these proceedings stayed or terminated on procedural grounds in its Skeleton Argument dated 9 February 2015 referring to the "grounds enumerated in the Respondent's pleadings" (see paragraph 452 above).

565.   The point was then argued at the Hearing by both Parties.[716]

---

[712] Cl. Rep. ¶¶ 168-169.

[713] *Impregilo v. Argentina*, RLA-14 ¶¶ 292-294.

[714] Cl. Rep. ¶ 172.

[715] Cl. Rep. ¶¶ 173-174.

[716] Transcript, Day 1, 72-85 [Claimant]; 145-158 [Respondent].

566.  In the Tribunal's view the Respondent's application for a stay is without foundation, as the Tribunal has already found in Procedural Order No. 3*bis*.

567.  First, the parties to the Latvian proceedings and the parties to these arbitration proceedings are not the same.  The Latvian proceedings relied upon by the Respondent in support of its application for a stay were brought by Rēzeknes Siltumtīkli against Latgales Enerģija (see paragraphs 302 ff. above).

568.  Secondly, the issues arising in these proceedings are not the same as those arising in the Latvian proceedings.  The proceedings relied upon by the Respondent in support of its application for a stay were brought under the Long-Term Agreement.  They do not relate to the standards of protection under the BIT with which this Tribunal is concerned; that much has been expressly admitted by the Respondent and such admission contradicts the Respondent's contention that the issues pending before the Latvian proceedings and this Tribunal are the same.

569.  Thirdly, the fact that there may be an overlap between contract claims and treaty claims is not sufficient *per se* to warrant a stay of proceedings.

570.  Fourth, this Tribunal has already observed in Procedural Order No. 3*bis* that the Respondent's complaint that the Claimant has been actively and selectively seeking procedural remedies in the Latvian courts is without foundation, since the Latvian proceedings relied upon by the Respondent were brought by Rēzeknes Siltumtīkli. Other proceedings were subsequently brought by Rēzeknes Enerģija against Latgales Enerģija (see paragraphs 310 ff. above), and by Rēzeknes Siltumtīkli against Latgales Enerģija and the Claimant (see paragraphs 371 ff. above).

571.  There are therefore in the Tribunal's opinion no sound and cogent reasons to stay these arbitration proceedings.

572.  As there are no reasons to stay these proceedings pending the outcome of the Latvian proceedings, there are, *a fortiori*, no reasons to terminate these proceedings.

**E.   THE TRIBUNAL'S DECISION THE RESPONDENT'S APPLICATION FOR TERMINATION, AND, ALTERNATIVEY, A STAY OF THE PROCEEDINGS**

573.   Therefore, the Respondent's application for termination, and, alternatively, for a stay of proceedings must be denied.

## VII.   LIABILITY

574.   In this section, the Tribunal will restate the Parties' prayers for relief on liability (A) before summarizing the respective cases on liability submitted by the Claimant (B) and the Respondent (C).  The Tribunal will then state the reasons for its decision on liability (D) before issuing its decision (E).

**A.   THE PARTIES' PRAYERS FOR RELIEF ON LIABILITY**

**(1)   THE CLAIMANT**

575.   In its Memorial, the Claimant requests the following relief:[717]

> The Claimant therefore respectfully requests the Arbitral Tribunal to:
>
> (a)   declare that the Respondent has breached Articles 4(1), 3(1) and 3(2) of the BIT,
>
> (b)   (…)

576.   In its Reply on the Merits and Counter-Memorial on Preliminary Objections, the Claimant requests substantially the same relief.

**(2)   THE RESPONDENT**

577.   In its Memorial on Preliminary Objections and Request for Bifurcation, and Counter-Memorial on the Merits the Respondent seeks the following relief:[718]

> Considering the above mentioned factual and legal description of the situation, the Respondent kindly requests the Tribunal to:
>
> (…)
>
> *or*

---

[717]  Cl. Mem. ¶ 370.
[718]  Resp. Obj. J. & C-Mem. ¶ 5.

3)      declare that the Respondent has not breached the Treaty; *and*

4)      deny all Claimant's requests for relief (as specified in the Claimant's Memorial, paragraphs 370 and 371);

*but, in any case,*

5)      (…)

578.   The Respondent's Rejoinder on the Merits does not set out a prayer for relief.

## B.      THE CLAIMANT'S CASE ON LIABILITY

579.   The Claimant submits that Respondent has breached Articles 3(1), 3(2) and 4(1) of the Lithuania-Latvia BIT.

580.   Some of the Claimant's claims under the BIT are contingent upon certain specific issues that are in dispute between the parties.

581.   The Tribunal will summarise the Claimant's arguments relating to these issues (see paragraphs 582 ff. below) and will then summarise the Claimant's position regarding Latvia's liability under the Treaty in the following order:

(i)      attribution (*i.e.* whether the conduct of the Municipality, the Regulator, Rēzeknes Siltumtīkli and Rēzeknes Enerģija can be attributed to the Respondent as a matter of international law, see paragraphs 621 ff. below);

(ii)     expropriation (*i.e.* whether the Respondent is liable for unlawfully expropriating the Claimant's investment without compensation, see paragraphs 648 ff. below);

(iii)    fair and equitable treatment (*i.e.* whether the Respondent breached the standard of fair and equitable treatment, see paragraphs 663 ff. below);

(iv)     full protection and security (*i.e.* whether the Respondent breached the standard of full protection and security, see paragraphs 691 ff. below);

(v)      arbitrary or discriminatory measures (*i.e.* whether the Respondent took arbitrary and discriminatory measures against the Claimant, see paragraphs 694 ff. below); and

152

(vi)    breaches of the most favoured nation clause (*i.e.* whether the Respondent breached an obligation on which the Claimant is entitled to rely by virtue of the most favoured nation clause, see paragraphs 706 ff. below).

**(1)    SPECIFIC ISSUES**

582.   The Tribunal will in turn summarise the Claimant's position relating to the following issues:

(i)     the application of the Principles of European Contract Law, UNIDROIT Principles of International Commercial Contracts and TransLex Principles advocated by the Respondent (see paragraphs 583 ff. below);

(ii)    the functional and legal independence between the different parts of the "concession arrangement" (see paragraphs 585 ff. below);

(iii)   the duty to pay for the natural gas supplied by Latvijas Gāze (see paragraphs 586 ff. below);

(iv)    the outstanding lease payments (see paragraphs 590 ff. below);

(v)     the risk allegedly assumed by the Claimant (see paragraph 593 below);

(vi)    the influence allegedly brought to bear by the Municipality on the Regulator (see paragraphs 594 ff. below);

(vii)   the review of the tariffs by the Regulator (see paragraphs 599 ff. below);

(viii)  the development plan (see paragraphs 607 ff. below);

(ix)    the revocation of Latgales Enerģija's licences to produce, transmit and sell thermal energy (see paragraphs 617 ff. below).

(A)    THE APPLICATION OF PRINCIPLES OF EUROPEAN CONTRACT LAW, UNIDROIT PRINCIPLES OF INTERNATIONAL COMMERCIAL CONTRACTS AND TRANSLEX PRINCIPLES

583.   The Claimant argues that the Principles of European Contract Law ("PECL") prayed in aid by the Respondent are inapplicable to the present dispute as such Principles do not constitute general principles of law recognized by civilized nations within the

meaning of Article 38(1)(c) of the Statute of the International Court of Justice.[719]   The Claimant submits that, in any event, such Principles could not excuse the Respondent's breaches of the BIT.[720]   Moreover, the Long-Term Agreement is expressly stated to be governed by Latvian law in its Clause 11 of the Long-Term Agreement, which operates so as to exclude the application of the PECL to that agreement.[721]

584.   The Claimant does not specifically address the Respondent's invocation of the UNIDROIT Principles of International Commercial Contracts and the TransLex Principles.

<div align="center">

(B)   THE FUNCTIONAL AND LEGAL INDEPENDENCE BETWEEN THE DIFFERENT PARTS OF THE "CONCESSION ARRANGEMENT"

</div>

585.   The Claimant criticises the distinction between private and public agreements relied upon by the Respondent as being erroneous and misleading, since the organisation of district heating is within the jurisdiction of the Municipality; reliance is placed on Section 15 of the Municipalities Act.[722]   All contracts entered into by Latgales Enerģija with the Municipality or its wholly-owned companies relating to the provision of district heating "represent" the Municipality's exercise of public powers and cannot be considered "commercial contracts" as argued by the Respondent.[723]

<div align="center">

(C)   THE DUTY TO PAY FOR THE NATURAL GAS SUPPLIED BY LATVIJAS GĀZE

</div>

586.   The Claimant strenuously denies that Latgales Enerģija was bound to pay Latvijas Gāze for the natural gas delivered, since Latgales Enerģija never entered into a direct contractual relationship with Latvijas Gāze and did not assume the Municipality's obligation to pay Latvijas Gāze for natural gas deliveries under the Gas Supply Agreement;[724] reliance is placed on Clause 2.3 of the Long-Term Agreement,[725]

---

[719]   Cl. Rep. ¶¶ 88-90.
[720]   Cl. Rep. ¶ 90.
[721]   Cl. Rep. ¶ 85.
[722]   Cl. Rep. ¶¶ 13; 17.
[723]   Cl. Rep. ¶¶ 18; 92.
[724]   C-40, see paragraph 63 above.
[725]   C-4, see paragraph 80 above.

<div align="center">154</div>

Clause 4 of the February 2005 Agreement[726] and the whereas clause of the Rēzeknes Enerģija Gas Supply Agreement[727].[728]

587.   The Claimant asserts that the Municipality was, and remained, bound to pay Latvijas Gāze for the natural gas despite the fact that Latgales Enerģija had paid for the invoices issued by Latvijas Gāze to Rēzeknes Siltumtīkli; reliance is placed on Clauses 4.1 and 16.1 of the Gas Supply Agreement,[729] Clause 6 of Amendment No. 3 to the Gas Supply Agreement[730] and the interview with Mr. Vjakse published in *Rēzeknes Vēstis* on 15 September 2007[731].[732]   Latgales Enerģija paid the invoices directly to Latvijas Gāze only in order to avoid any difficulties as might otherwise be caused by Rēzeknes Siltumtīkli's financial standing, not because it assumed any liability towards Latvijas Gāze.[733]

588.   Furthermore, the Claimant submits that the Long-Term Agreement did not constitute a transfer of an undertaking ("*Betriebsübergang*") as a matter of Latvian law, but rather constituted a lease of certain assets which the Long-Term Agreement clearly identified;[734] similarly, the Long-Term Agreement identified those debts of Rēzeknes Siltumtīkli which Latgales Enerģija agreed to assume; all of which would not have been necessary, by definition, if the Long-Term Agreement had been a transfer of an undertaking.[735]   Only Rēzeknes Siltumtīkli's employees were taken over by Latgales Enerģija under the terms of the Long-Term Agreement; that amounted to a transfer of an undertaking under the Labour Code (*not in evidence*) and not under the Commercial Code.[736]     Finally, the Claimant submits that the concept of

---

[726]  <u>C-8</u>, see paragraphs 100 ff. above.

[727]  <u>C-151</u>, see paragraphs 283-284 above.

[728]  Cl. Mem. ¶ 138; Cl. Rep. ¶ 44; Cl. Rep. Tribunal ¶ 48.

[729]  <u>C-40</u>, see paragraph 65 above.

[730]  <u>C-81</u>, see paragraph 163 above.

[731]  <u>C-134</u>, see paragraph 251 above.

[732]  Cl. Mem. ¶¶ 144-146; Cl. Rep. ¶ 43; Cl. Rep. Tribunal ¶¶ 44; 50.

[733]  Cl. Mem. ¶ 139; Cl. Rep. Tribunal ¶ 42.

[734]  Cl. Rep. ¶¶ 40-41; 80; Cl. Rep. Tribunal ¶¶ 46-47.

[735]  Cl. Rep. Tribunal ¶¶ 48-49.

[736]  Cl. Rep. Tribunal ¶¶ 47-48.

*Betriebsübergang* is not applicable in Latvia or to the transfer of contractual obligations other than employment rights.[737]

589.    The Claimant concludes that it was therefore the Municipality's obligation to pay Latvijas Gāze for the outstanding invoices when Latgales Enerģija was no longer in a position to pay the full amount to Latvijas Gāze owing to the insufficient funds it could charge and receive from its customers through the applicable tariffs.[738]

(D)    THE OUTSTANDING LEASE PAYMENTS

590.    The Claimant contends that Rēzeknes Siltumtīkli sued Latgales Enerģija under the Long-Term Agreement on 20 September 2007 solely to obtain the attachment of Latgales Enerģija's bank accounts with a view to disrupting Latgales Enerģija's operation of the heating system.[739]

591.    The Claimant asserts that, in monetary terms, the most significant part of Rēzeknes Siltumtīkli's claim was based on Latgales Enerģija's alleged obligation to make monthly payments for the depreciation of the leased assets under Clause 4.4.2 of the Long-Term Agreement.[740]   However, the depreciation was to be paid by investing in the heating infrastructure "so that by the end of the lease term the book value of the assets handed back was no less than the book value of the assets handed over at the start, plus 5%".[741]   The Latvian courts eventually confirmed that Latgales Enerģija's position in this respect was correct as a matter of Latvian law.[742]

592.    According to the Claimant, Rēzeknes Siltumtīkli's claim is significant because of its timing, as it was brought at a time when the gas supply had been suspended by Latvijas Gāze one day before the Municipality approved the heat supply development plan.[743]

---

[737]  Cl. Rep. ¶ 80.

[738]  Cl. Mem. ¶¶ 141-143; Cl. Rep. ¶¶ 46; 72; Cl. Rep. Tribunal ¶¶ 42-43; 71.

[739]  Cl. Mem. ¶¶ 155; 160-161; Cl. Rep. ¶ 56.

[740]  Cl. Mem. ¶ 157.

[741]  Cl. Mem. ¶ 157.

[742]  Cl. Mem. ¶ 159; Cl. Rep. ¶ 61; Cl. Rep. Tribunal ¶ 6.

[743]  Cl. Mem. ¶ 160; Cl. Rep. ¶ 56, see paragraph 254 above.
The Tribunal notes the Claimant's distinction between the "city plan", the "heat supply development plan" and the "operator's plan".   The Tribunal's use of these terms in the summary of the Claimant's

156

(E)      THE RISKS ALLEGEDLY ASSUMED BY THE CLAIMANT

593.    The Claimant rejects the Respondent's contention that it assumed certain risks and it
contends that it could not have anticipated the "change in approach" on the part of the
Municipality and the Regulator.[744]  Specifically, the Claimant submits that it did not
assume:

(i)      the risk that the Municipality would fail to devise and approve a heat supply
development plan;

(ii)     the risk that the Municipality would fail to comply with its own contractual
duties to Latvijas Gāze, thereby causing the suspension of the natural gas
supply;

(iii)    the risk that the Municipality would actively seek to replace Latgales Enerģija
as the heat supply operator well before Latvijas Gāze suspended the supply of
natural gas;

(iv)     the risk that the Municipality would declare an energy crisis relying on a
situation it had itself brought about;

(v)      the risk that the Municipality would prevent Latgales Enerģija from obtaining
increased tariffs despite the increase in the price of natural gas;

(vi)     the risk that the Municipality would misrepresent the content of confidential
letters to the Regulator, that would in turn base its own allegations concerning
Latgales Enerģija's breaches of the licence requirements on such
misrepresentations;

(vii)    the risk that the Municipality would seek to persuade consumers not to pay
Latgales Enerģija's invoices;

---

position is without prejudice to the Tribunal's finding regarding the existence of different plans and the
respective duties attached thereto.
[744]  Cl. Rep. ¶ 96.

157

(viii)    the risk that the Municipality (acting through Rēzeknes Siltumtīkli and Rēzeknes Enerģija) would seek to obtain an attachment of Latgales Enerģija's bank accounts;

(ix)    the risk that the Regulator would change its practice, whereby it had granted tariff increases despite the absence of a heat supply development plan; or

(x)    the risk that the Regulator would revoke Latgales Enerģija's licences based on a situation that was not only caused by the Municipality and the Regulator, but that had been addressed and explained by Latgales Enerģija in its letters to the Regulator.[745]

(F)    THE INFLUENCE BROUGHT TO BEAR BY THE MUNICIPALITY ON THE REGULATOR

594.    It is the Claimant's case that the Municipality brought influence to bear on the Regulator "to follow its political wishes".[746]   The Claimant relies on the following circumstances to show the Municipality's influence over the Regulator:[747]

(i)    the Regulator's decision of 7 December 2007[748] revoking its previous decision of 9 November 2007 approving new tariffs;[749] the 7 December 2007 decision relied on a letter sent by Rēzeknes Enerģija to the Regulator on 29 November 2007 (see paragraph 241 above) stating that Latgales Enerģija had used the wrong amount of natural gas in its calculations submitted in support of its proposal for a new tariff;

(ii)    the Regulator's letter to Latgales Enerģija dated 11 December 2007,[750] which relied on a confidential letter sent by Latgales Enerģija to Rēzeknes Siltumtīkli on 6 December 2007;[751] and

---

[745]   Cl. Rep. ¶ 97.

[746]   Cl. Rep. ¶ 21.

[747]   Cl. Mem ¶¶ 194; 207-208; Cl. Rep. ¶¶ 20; 54.

[748]   Decision No. 35, C-28, see paragraph 240 above.

[749]   Decision No. 28, C-27, see paragraph 239 above.

[750]   C-162, see paragraph 299 above.

[751]   C-160.

   (iii)    Rēzeknes Siltumtīkli's letter to the Regulator dated 15 May 2008[752] stating that Latgales Enerģija had failed to meet its investment commitments; this letter was sent before the Rēzekne City Council sent another letter to Latgales Enerģija on 20 May 2008[753] which essentially made the same accusations and before Latgales Enerģija responded to these accusations in a letter sent to the Rēzekne City Council on 2 June 2008.[754]

595.    According to the Claimant, the Regulator's disregard for the information and the explanations provided by Latgales Enerģija is further proof of the Municipality's influence over the Regulator.[755]

596.    The Claimant further refers to the Municipality's power to appoint and dismiss the members of the executive body of the Regulator as proof of the Municipality's influence over the Regulator.[756]

597.    According to the Claimant, it was well-known in Latvia that local authorities unlawfully influenced municipal regulators; reliance is placed on a report by the "Society for Transparency" (Delna),[757] Ms. Uškāne's Witness Statement,[758] Mr. Strioga's Witness Statement[759] and the fact that the Latvian government abolished local regulators in 2009.[760]

598.    Finally, the Claimant submits that the Municipality through its actions created situations in which the Regulator could adopt decisions that were technically legal, but caused considerable damage to Latgale s Enerģija's business.[761]

---

[752] C-231, see paragraph 333 above.
[753] C-178, see paragraph 335 above.
[754] C-179, see paragraph 336 above.
[755] Cl. Rep. ¶ 20.
[756] Cl. Mem. ¶ 219; Cl. Rep. ¶ 20.
[757] C-205.
[758] CWS-4 ¶¶ 33-34.
[759] CWS-1 ¶ 133.
[760] Cl. Mem. ¶ 219; Cl. Rep. ¶ 20.
[761] Cl. Rep. ¶ 22.

(G)     THE REVIEW OF TARIFFS BY THE REGULATOR

599.   The Claimant submits that Latgales Enerġija was entitled to request a review of the heating tariffs provided that the cost of natural gas had increased by more than 5%; reliance is placed on the 2001 Methodology[762] and Clause 1.6 of the February 2005 Agreement[763].[764]

600.   In the Claimant's view, Latgales Enerġija was therefore entitled to obtain new tariffs in light of the applicable Methodology *(i)* after the Public Utilities Commission decided on 22 March 2006 to increase the price of natural gas by 36 % from 1 May 2006 onwards and the price of electricity had increased by about 17 % (see paragraph 181 above), and *(ii)* after the Public Utilities Commission decided on 28 March 2007 further to increase the price of natural gas from 1 May 2007 (see paragraph 231 above).[765]  However, the Regulator refused to grant new tariffs in both instances.

601.   The Claimant rejects the grounds on which the Regulator refused to authorise new tariffs in its decisions of 13 October 2006[766] and 11 June 2007.[767]

602.   The Claimant states that *(i)* the missing list of employees, *(ii)* the missing VAT calculation, and *(iii)* the missing key to the lease payment for fixed assets relied upon by the Regulator to deny the proposed increase in tariff were minor issues that "could have been easily rectified".[768]

603.   Concerning the operator's plan on which the Regulator also rested its decisions to decline the tariffs proposed by Latgales Enerġija, the Claimant submits that Latgales Enerġija had submitted investment plans in its applications for a new tariff in 2005, 2006 and 2007; reliance is placed on attachment No. 26 to Latgales Enerġija's letter to the Regulator dated 28 September 2007[769].[770]  The Claimant states that Latgales

---

[762]  C-35.

[763]  C-8, see paragraphs 100 ff. above.

[764]  Cl. Mem. ¶ 96.

[765]  Cl. Mem. ¶¶ 96-98; 127 ff.

[766]  Decision No. 17, C-19, see paragraph 184 above.

[767]  Decision No. 12, C-21, see paragraph 233 above.

[768]  Cl. Mem. ¶ 100.

[769]  C-140 (*attachments not in evidence*).

[770]  Cl. Rep. Tribunal ¶ 41.

Enerġija had explained to the Regulator that it was not possible to devise a "meaningful" operator's plan in the absence of a heat supply development plan.[771]

604.    Regarding the coefficients which Latgales Enerġija admittedly failed to use in its proposed calculation for new tariffs, the Claimant contends that such coefficients were all dependent on the existence of a heat supply development plan which the Municipality had a duty to devise and approve (see paragraphs 607 ff. below); reliance is placed on the decision by the Administrative District Court of 15 April 2009[772].[773]

605.    The Claimant further submits that Latgales Enerġija was entitled to rely on the Regulator's practice, whereby a new tariff had been approved despite the absence of an approved heat supply development plan;[774] reliance is further placed on the "principle of confidence in the legality of an institution's actions", Section 1 of the Constitution of the Republic of Latvia and Section 10 of the Administrative Procedure Act.[775]

606.    It is the Claimant's case that the Regulator's willingness to approve new tariffs despite the lack of a heat supply development plan, "thereby permitting the operator to recover its costs properly", was part of the investment regime which the Claimant entered into.[776]

(H)    THE DEVELOPMENT PLAN

607.    It is the Claimant's case that there are three different plans relevant for present purposes:[777]

(i)     the overall city development plan (the "city plan");

(ii)    the heat supply development plan; and

---

[771] Cl. Rep. Tribunal ¶ 41.
[772] C-192, see paragraph 392 above.
[773] Cl. Mem. ¶¶ 100; 131.
[774] Cl. Mem. ¶¶ 111; 113; 114.
[775] Cl. Mem. ¶¶ 114-116.
[776] Cl. Rep. ¶ 29; Cl. Rep. P-H ¶ 23.
[777] Cl. Rep. Tribunal ¶ 19.

(iii)      the heat supply operator's development plan (the "operator's plan").

608.   The Claimant contends that the Municipality breached *(i)* its legal obligation to devise and approve the heat supply development plan already when the investment was made and throughout the duration of the investment[778] and *(ii)* its obligations under the February 2006 Agreement, by delaying to devise and approve the heat supply development plan.[779]  The Municipality approved the heat supply development plan only as late as 21 September 2007,[780] by which time Latgales Enerģija's bank accounts had been attached and the Municipality "had already decided to install a new operator".[781]

609.   In the Claimant's submission, the coefficients required by the Methodology to calculate the heating tariffs are all derived from the heat supply development plan, not the operator's plan.[782]

610.   The Claimant submits that the Municipality had the following responsibilities:

(i)      sole responsibility to devise and approve the City Plan; reliance is placed on Section 14(1) of the Municipalities Act;[783] and

(ii)     responsibility to devise and approve the heat supply development plan which is "specified in light of the overall scope of municipal development outlined in the City Plan"; reliance is placed on Section 15(1) of the Municipalities Act, Section 51 of the Energy Act, Section 17 and Section 23(3) of the Methodology in force at the relevant time as well as the decision of 15 April 2009 by the Administrative District Court (see paragraphs 392 ff. above).[784]

611.   The Claimant admits that Latgales Enerģija "had a role to play" in the preparation of the heat supply development plan as contemplated by Clause 1.2 of the February 2006

---

[778]  Cl. Mem. ¶ 134.
[779]  Cl. Mem. ¶¶ 109; 117 ff.; Cl. Rep. ¶ 25; Cl. Rep. Tribunal ¶ 38.
[780]  C-213, see paragraphs 192 and 228 above.
[781]  Cl. Mem. ¶¶ 134; 155; 182-187; Cl. Rep. ¶ 27; Cl. Rep. Tribunal ¶ 40.
[782]  Cl. Rep. ¶ 34; Cl. Rep. Tribunal ¶ 25.
[783]  Cl. Rep. Tribunal ¶ 20.
[784]  Cl. Rep. Tribunal ¶¶ 6; 21-27.

Agreement[785].[786]   However, the responsibility to "coordinate and approve" the heat supply development plan remained with the Municipality.[787]

612.   By contrast, Latgales Enerģija was responsible to devise only the operator's plan, a document that differed from the heat supply development plan; reliance is placed on Clauses 1, 6.3 and 7.1 of the licences to produce, transmit and sell thermal energy[788] and Section 8 of the Energy Act.[789]

613.   According to the Claimant, the Municipality was not entitled to delegate the responsibility to devise and approve the heat supply development plan to Latgales Enerģija in accordance with applicable law; reliance is placed on Section 41(2) of the Public Administration Act;[790] neither the licences[791] nor the provisions of the Long-Term Agreement[792] operated so as to bring about such delegation.

614.   In its rebuttal to one of the Respondent's arguments, the Claimant denies that Latgales Enerģija undertook or accepted the responsibility to devise the heat supply development plan in its correspondence with the Municipality and Rēzeknes Siltumtīkli.[793]   According to the Claimant, the Guidelines for the development of the Rēzekne City heat supply system submitted to the Municipality on 20 January 2006,[794] the one-page heat supply development plan for the years 2006-2009[795]  and the draft heat supply development concept for the years 2006-2014[796] submitted to the Municipality on 15 November 2006 were not draft heat supply development plans, but rather documents intended to provide the Municipality with a basis to devise and approve the heat supply development plan.[797]

---

[785] C-17.

[786] Cl. Rep. ¶ 26.

[787] Cl. Rep. ¶¶ 25; 28-29.

[788] C-10; C-11; C-12.

[789] Cl. Rep. Tribunal ¶¶ 28-30; 33.

[790] Cl. Rep. Tribunal ¶ 32.

[791] Cl. Rep. Tribunal ¶ 33.

[792] Cl. Rep. Tribunal ¶ 34.

[793] Cl. Rep. Tribunal ¶ 40; Cl. Rep. P-H ¶ 20.

[794] C-44, see paragraph 164 above.

[795] C-99 Enclosure 1.

[796] C-99 contains only the covering letter dated 15 November 2006, see R-31, see paragraph 189 above.

[797] Cl. Rep. Tribunal ¶¶ 37; 39.

The Municipality accepted such a position when it organised a working group in order to devise and approve the heat supply development plan; reliance is placed on the Municipality's letter to Latgales Enerģija on 19 February 2007[798].[799]

615. The Claimant contends that Latgales Enerģija, in its correspondence with the Municipality, had repeatedly pointed out the Municipality's obligation to devise and approve the heat supply development plan, and even invoked the penalty clause in Clause 5 of the February 2006 Agreement in case the Municipality failed to act; reliance is placed on Latgales Enerģija's letters sent to the Municipality on 10 May 2006,[800] 19 October 2006,[801] 2 February 2007,[802] 4 July 2007[803] and 18 July 2007[804].[805]

616. The Claimant argues that in its letter to Latgales Enerģija of 27 October 2005[806] Rēzeknes Siltumtīkli misrepresented the Regulator's letter to the Municipality of 12 October 2005[807].[808]  The Regulator had asked the Municipality whether there was an "effective and coordinated" heat supply development plan in place which contained Latgales Enerģija's "planned and already made investments", not whether Latgales Enerģija had "specified and coordinated" the heat supply development plan.[809]

(I) THE REVOCATION OF LATGALES ENERĢIJA'S LICENCES TO PRODUCE, TRANSMIT AND SELL THERMAL ENERGY

617. The Claimant does not submit that the Regulator's decision of 3 June 2008 (see paragraph 337 above) revoking Latgales Enerģija's licences to produce, transmit and sell thermal energy was made in breach of Latvian law.[810]  However, it is the

---

[798] C-114, see paragraph 208 above.
[799] Cl. Rep. Tribunal ¶ 39.
[800] C-91.
[801] C-96, see paragraph 187 above.
[802] C-112, see paragraph 207 above.
[803] R-26.
[804] R-26.
[805] Cl. Rep. Tribunal ¶¶ 38-39; Cl. Rep. P-H ¶ 19.
[806] C-74, see paragraph 151 above.
[807] C-69, see paragraph 150 above.
[808] Cl. Rep. Tribunal ¶ 36.
[809] Cl. Rep. Tribunal ¶ 36.
[810] Cl. Mem. ¶¶ 209-210; Transcript, Day 1, 37/10-14.

164

Claimant's case that the Regulator was bound under Latvian law first to issue a warning and grant Latgales Enerģija the opportunity to rectify a situation amounting to a breach of the licences before revoking them.[811]

618.  The Claimant further argues that the grounds on which the Regulator revoked the licences were "illusory" or "just plain wrong".[812]  Latgales Enerģija had extensively addressed all the issues raised by the Regulator in its correspondence with the Regulator; however, the Regulator hardly took any of these explanations into account; reliance is placed on the letter sent to the Regulator by Latgales Enerģija on 30 October 2007[813].[814]

619.  According to the Claimant, the grounds on which the Regulator revoked Latgales Enerģija's licences were the same grounds on which the Regulator issued a warning on 4 October 2007.[815]  In particular, the Claimant submits that:

(i)     Latgales Enerģija was unable to submit an operator's plan and yearly reports in the absence of the Municipality's heat supply development plan;[816]

(ii)    Latgales Enerģija's failure to provide uninterrupted good-quality heating services in September and October 2007 was due to *(i)* the Municipality's failure to pay Latvijas Gāze for the natural gas supplied, *(ii)* the Municipality's failure to adopt the heat supply development plan (which was necessary for the approval of higher tariffs) and *(iii)* the attachment of Latgales Enerģija's bank accounts sought by Rēzeknes Siltumtīkli;[817]

(iii)   Latgales Enerģija's assignment of claims to LE Remonts (see paragraph 298 above) was necessary to avoid money being paid into bank accounts that had been attached and to continue the operation of the heating system;[818]

---

[811]  RfA ¶ 89; Cl. Mem. ¶ 209.
[812]  Cl. Mem. ¶ 209.
[813]  C-153, see paragraph 297 above.
[814]  Cl. Mem. ¶ 211; Cl. Rep. ¶¶ 53-54.
[815]  C-22, see paragraphs 262 ff.; Cl. Mem. ¶¶ 209; 211; Cl. Rep. ¶ 54.
[816]  Cl. Rep. ¶ 52; Transcript, Day 1, 36/12-14; see also Cl. Rep. Tribunal ¶ 41.
[817]  Cl. Mem. ¶¶ 154-155; Cl. Rep. ¶ 52; Transcript, Day 1, 36/15-17.
[818]  Transcript, Day 1, 36/18-22; see also Cl. Mem. ¶ 197.

(iv)    Latgales Enerģija's challenge of the Regulator's decision of 7 December 2007[819] revoking its previous decision of 9 November 2007 approving new tariffs[820] prevented the Regulator's decision of 7 December 2007 from coming into force and thus the tariffs originally approved remained applicable; reliance is placed on Section 185(1) of the Administrative Procedure Act;[821] and

(v)     Latgales Enerģija was unable to invest more than EUR 1.2 million into the heating infrastructure due to *(i)* the Municipality's failure to adopt the heat supply development plan and *(ii)* Rēzeknes Siltumtīkli's refusal to approve the installation of new equipment; reliance is placed on letters sent to the Rēzekne City Council by Latgales Enerģija on 6 March 2007,[822] 18 April 2007,[823] 13 July 2007,[824] 16 April 2008[825] and 25 April 2008[826].[827]

620.    Lastly, the Claimant submits that the revocation of Latgales Enerģija's licences to produce, transmit and sell thermal energy served as a pretext in order for Rēzeknes Siltumtīkli to seek the termination of the Long-Term Agreement.[828]

### (2)   ATTRIBUTION

621.    The Claimant argues that the conduct of the Municipality (paragraphs 622 ff. below), the Regulator (paragraphs 625 ff. below), Rēzeknes Siltumtīkli and Rēzeknes Enerģija (paragraphs 629 ff. below) is attributable to the Respondent.

---

[819]  Decision No. 35, C-28, see paragraph 240 above.
[820]  Decision No. 28, C-27, see paragraph 239 above.
[821]  Cl. Mem ¶ 196; CWS-4 ¶ 15; Transcript, Day 1, 36/23-25; 37/1-2.
[822]  C-116, see paragraph 209 above.
[823]  C-118, see paragraph 210 above.
[824]  C-129, see paragraph 211 above.
[825]  C-176 [page 1]; C-177, see paragraph 329 above.
[826]  C-176 [page 3], see paragraph 330 above.
[827]  Cl. Mem. ¶¶ 84-85; 204; 208; Transcript, Day 1, 37/3-9.
[828]  Transcript, Day 1, 37/21-22; see also Cl. Mem. ¶ 212.

166

(A)   THE MUNICIPALITY

(i)   *The Principles*

622.   The Claimant contends that in order for an act to be attributable to a State under international law, the act must have been carried out by an organ of such State; reliance is placed on Article 4(1) of the 2001 ILC Articles on Responsibility of States for Internationally Wrongful Acts (the "ILC Articles"). [829]

(ii)   *The Principles Applied*

623.   The Claimant submits that the Municipality of Rēzekne (represented by and acting through the Rēzekne City Council) is a branch of local government and constitutes part of the executive branch of the Republic of Latvia.[830]   The Municipality was representing the Republic of Latvia in its "administrative and regulatory activities" and enjoyed certain autonomy while remaining under the supervision of the Cabinet of Ministers of the Republic of Latvia.[831]

624.   The Claimant submits therefore that the Municipality is an organ of the Republic of Latvia within the meaning of Article 4(1) of the ILC Articles and that the Municipality's conduct is attributable to the Respondent.[832]

(B)   THE REGULATOR

(i)   *The Principles*

625.   In addition to the principle contained in Article 4 of the ILC Articles (see paragraph 622 above), the Claimant argues that the Respondent was required to ensure that any state enterprise that it maintains or establishes act in a manner that is not inconsistent with the Claimant's obligations under the BIT; reliance is placed on the MFN clause contained in Article 3(2) of the BIT in connection with Article 2(2)(b) of the US-Latvia BIT.[833]

---

[829]   ILC Articles, CLA-7.

[830]   Cl. Mem. ¶ 233.

[831]   Cl. Mem. ¶¶ 233-234.

[832]   Cl. Mem. ¶ 234.

[833]   US-Latvia BIT, CLA-25; Cl. Mem. ¶¶ 237-238.

167

(ii)     *The Principles Applied*

626.  First, the Claimant argues that the Regulator was the body of competent jurisdiction in Latvia to set the heating tariffs for the provision of district heating services in the territory of Rēzekne.[834]  According to the Claimant, the Regulator existed to exercise administrative and regulatory functions with respect to the supply of heat as a public function entrusted to the Municipality.[835]  Its finances were at all material times administered by the Municipality, together with other municipalities, through the taxation of service providers.[836]

627.  In the Claimant's view, it follows that the Regulator is an organ of the Republic of Latvia within the meaning of Article 4(1) of the ILC Articles; the Regulator's conduct is therefore attributable to the Respondent.[837]

628.  Secondly, the Claimant argues that the Respondent was responsible for the conduct of the Regulator as it was a State enterprise established by the Respondent within the meaning of Article 2(2)(b) of the US-Latvia BIT.[838]

(C)     RĒZEKNES SILTUMTĪKLI AND RĒZEKNES ENERĢIJA

629.  The Claimant advances three arguments to support its claim that the Respondent was responsible for the conduct of Rēzeknes Siltumtīkli and Rēzeknes Enerģija.

(i)     *The Principles*

630.  The Claimant contends that Rēzeknes Siltumtīkli's and Rēzeknes Enerģija's conduct is attributable to the Respondent, first, by virtue of Article 8 of the ILC Articles;[839] secondly, by virtue of Article 5 of the ILC Articles;[840] and, thirdly, by virtue of Article 2.2(b) of the US-Latvia BIT read in conjunction with the MFN clause contained in Article 3(2) of the BIT.[841]

---

[834]  Cl. Mem. ¶ 232.
[835]  Transcript, Day 1, 38/7-11.
[836]  Cl. Mem. ¶ 232.
[837]  Cl. Mem. ¶ 234.
[838]  Cl. Mem. ¶¶ 239-241.
[839]  Cl. Rep. Tribunal ¶¶ 8-10.
[840]  Cl. Rep. Tribunal ¶¶ 8; 13; Cl. Rep. P-H ¶¶ 5-6.
[841]  Cl. Mem. ¶ 238.

(ii)    *The Principles Applied*

631.    First, the Claimant contends, relying on Article 8 of the ILC Articles, that the Respondent is responsible for the actions of Rēzeknes Siltumtīkli and Rēzeknes Enerģija since the Municipality was the sole shareholder in such companies and, in this capacity, the Municipality instructed, directed and controlled all of the operations of such companies at all relevant times.[842]   Rēzeknes Siltumtīkli and Rēzeknes Enerģija were therefore no more than an extension of the Municipality.[843]

632.    Consequently, the Claimant submits that the conduct of Rēzeknes Siltumtīkli and Rēzeknes Enerģija is attributable to the Respondent based on nine factual circumstances.[844]

633.    The Municipality authorised all of Rēzeknes Siltumtīkli's actions and assumed the responsibility therefor.[845]   To the Claimant, Rēzeknes Siltumtīkli was interchangeable with and controlled by the Municipality "such that the Municipality must have

---

[842]  Cl. Mem. ¶ 234; Cl. Rep. P-H ¶ 14.

[843]  Cl. Mem. ¶ 234.

[844]  The circumstances relied upon by the Claimant are as follows:

(i)    the members of the boards of Rēzeknes Siltumtīkli and Rēzeknes Enerģija were appointed by the chairperson of the Municipality in accordance with Latvian law (Cl. Rep. Tribunal ¶ 9);

(ii)    while Rēzeknes Siltumtīkli owned and operated the district heating system, the tender for a private operator could be called only by the Municipality and the Long-Term Agreement could be signed only with the permission of the Municipality (Cl. Rep. Tribunal ¶ 12; Transcript, Day 1, 38/12-17; Transcript, Day 4, 32/15; 19-21; 55/10-20);

(iii)    the Municipality remained under the obligation to pay for natural gas deliveries even though the gas was received by Rēzeknes Siltumtīkli (Cl. Rep. Tribunal ¶ 12; Transcript, Day 4, 32/24-25; 33/1-3; 37/13-25; 38/1-3);

(iv)    the Municipality proposed to pay the debt owed to Latvijas Gāze by increasing the share capital of Rēzeknes Siltumtīkli, instead of paying Latvijas Gāze directly or letting Rēzeknes Siltumtīkli decide how to pay its debt (Cl. Rep. Tribunal ¶ 12; Transcript, Day 4, 33/4-7);

(v)    the Municipality (and not Rēzeknes Siltumtīkli) called a tender and eventually chose a company capable of meeting its requirements (Cl. Rep. Tribunal ¶ 12);

(vi)    the Municipality (and not Rēzeknes Siltumtīkli) proposed to terminate the Long-Term Agreement through an agreement of the Council deputies (Cl. Rep. Tribunal ¶ 12);

(vii)    the Municipality (and neither Rēzeknes Siltumtīkli nor Rēzeknes Enerģija) suggested solutions to solve the heat supply crisis in October 2007 involving the use of Rēzeknes Siltumtīkli and Rēzeknes Enerģija to operate the heating system (Cl. Rep. Tribunal ¶ 12);

(viii)    the decision by Rēzeknes Siltumtīkli to commence litigation in September 2007 was taken under the direction or control of the Municipality with the sole purpose to put pressure on Latgales Enerģija's business and to obtain a transfer of heating operations to Rēzeknes Enerģija (Cl. Rep. Tribunal ¶ 12); and

(ix)    the Municipality signed the October 2007 Agreement "despite it not containing any express terms relating to the Municipality" (Transcript, Day 4, 32/21-23).

[845]  Cl. Rep. Tribunal ¶ 9.

169

assumed responsibility for it".[846]   By controlling the provision of district heating services Rēzeknes Siltumtīkli exercised a public function and the control over Rēzeknes Siltumtīkli was used by the Municipality to achieve a particular result.[847]

634.   In response to the Respondent's argument that the Municipality did not play a role in the execution of the Long-Term Agreement, the Claimant states that the Municipality exercised control over Rēzeknes Siltumtīkli and Rēzeknes Enerģija at least starting from the change in political leadership in Rēzekne onwards (see paragraphs 128 and 139-140 above) and used such companies to achieve its goal to regain control over the heating system.[848]   Furthermore, the Claimant argues that the February 2005 Agreement is irrelevant to the question whether Rēzeknes Siltumtīkli's conduct is to be attributed to the Respondent under international law.[849]

635.   Secondly, the Claimant contends, relying on Article 5 of the ILC Articles, that Rēzeknes Siltumtīkli and Rēzeknes Enerģija have been exercising delegated governmental authority to run the district heating system and their actions are therefore attributable to the Respondent since the supply of district heating services is "a public power" and the responsibility of the local municipality and thus a "governmental action" or "public function"; reliance is placed on Section 15(1) of the Municipalities Act.[850]

636.   The Claimant further contends that the Municipality's creation of Rēzeknes Siltumtīkli and the delegation of the supply of district heating services to Rēzeknes Siltumtīkli were based on the Municipalities Act; reliance is placed on Section 14(1) and Section 15(3) of the Municipalities Act and Section 40 of the Public Administration Act in force between 2003 and 2009.[851]

637.   According to the Claimant, the Respondent misconstrues Section 15 of the Municipalities Act.[852]   The Claimant agrees that Section 15 of the Municipalities Act

---

[846]  Cl. Rep. Tribunal ¶ 11.
[847]  Cl. Rep. Tribunal ¶ 11.
[848]  Cl. Rep. P-H ¶ 15.
[849]  Cl. Rep. P-H ¶ 16.
[850]  Cl. Rep. Tribunal ¶ 13; Cl. Rep. P-H ¶ 10; Transcript, Day 4, 33/8-16.
[851]  Cl. Rep. P-H ¶¶ 10-11.
[852]  Cl. Rep. P-H ¶ 7.

does not specify the means for supplying district heating services.[853]   However, the Claimant contends that Section 15 of the Municipalities Act does provide for the Municipality's obligation to organise district heating services.[854]

638.   In the Claimant's view, the Respondent has admitted that the Municipality delegated such public power to Latgales Enerģija by wrongly arguing that Rēzekne Siltumtīkli had delegated to Latgales Enerģija the duty to devise the heat supply development plan through the Long-Term Agreement; the Claimant contends that Rēzeknes Siltumtīkli delegated the day-to-day operation of the heat supply system to Latgales Enerģija under the terms of the Long-Term Agreement and Rēzeknes Siltumtīkli was in a position to delegate such public power since the Municipality had delegated such power to Rēzeknes Siltumtīkli in the first place.[855]

639.   In the Claimant's opinion, the Municipality could have passed on the Regulator's query regarding the status of the heat supply development plan to Rēzeknes Siltumtīkli[856] only provided that Rēzeknes Siltumtīkli had the authority to deal with such issue on behalf of the Municipality.[857]

640.   In response to the Respondent's contention that no governmental power had been delegated regarding the contractual obligations towards the Claimant and Latgales Enerģija, the Claimant states that the claims under the BIT relate to Rēzeknes Siltumtīkli's conduct in its exercise of governmental authority more broadly and not only to the performance of the Long-Term Agreement.[858]

641.   Furthermore, the Claimant argues that Rēzeknes Siltumtīkli's decision to commence litigation against Latgales Enerģija in September 2007 was based on considerations regarding the overall control of the supply of district heating rather than commercial considerations; the Claimant refers in particular to the context of the energy crisis during September and October 2007 and Rēzeknes Siltumtīkli's delegated power to

---

[853]  Cl. Rep. P-H ¶ 7.
[854]  Cl. Rep. P-H ¶ 7.
[855]  Cl. Rep. Tribunal ¶ 13; Cl. Rep. P-H ¶ 7.
[856]  Regulator's letter to the Municipality of 12 October 2005, C-69, see paragraph 150 above.
[857]  Cl. Rep. P-H ¶ 8.
[858]  Cl. Rep. P-H ¶ 9.

organise the heating system.[859]   The Claimant submits that other actions were also taken in the context of Rēzeknes Siltumtīkli's delegated governmental authority such as the interference with the decisions of the Regulator.[860]

642.   It is the Claimant's case that Rēzeknes Siltumtīkli continued to perform the Municipality's supervisory role over the operation of the heating system.[861]   The Claimant contends that Rēzeknes Siltumtīkli's consent was required in order for works to be undertaken on public heating assets.[862]   In light of the nature of works and the assets involved, such decisions could be made only by a company exercising the Municipality's public powers.[863]

643.   Thirdly, the Claimant argues that the Respondent was responsible for the conduct of the Rēzeknes Siltumtīkli and Rēzeknes Enerģija as they were State enterprises maintained or established by the Respondent within the meaning of Article 2(2)(b) of the US-Latvia BIT.[864]

644.   The Claimant argues that the Municipality wholly owned, financed and controlled Rēzeknes Siltumtīkli as well as Rēzeknes Enerģija.[865]

645.   The Claimant refers to its argument based Articles 5 and 8 of the ILC Articles summarised in footnote 844 above to argue that Rēzeknes Siltumtīkli and Rēzeknes Enerģija were exercising administrative or governmental authority in the field of heat supply delegated to them by the Municipality.[866]   Furthermore, Rēzeknes Siltumtīkli and Rēzeknes Enerģija were involved in approving commercial transactions and the imposition of fees, quotas or charges through "their involvement in and the signing of the October 2007 Agreement which contained an agreement as to tariffs".[867]

---

[859] Cl. Rep. Tribunal ¶ 15.
[860] Cl. Rep. Tribunal ¶ 15.
[861] Cl. Rep. Tribunal ¶ 14.
[862] Cl. Rep. Tribunal ¶ 14.
[863] Cl. Rep. Tribunal ¶ 14.
[864] Cl. Mem. ¶¶ 239-241.
[865] Cl. Mem. ¶ 239.
[866] Cl. Rep. Tribunal ¶ 16.
[867] Cl. Rep. Tribunal ¶ 16; Transcript, Day 4, 34/22-25; 35/13.

646.    The Claimant argues that the Respondent was therefore under an obligation to ensure that Rēzeknes Siltumtīkli and Rēzeknes Enerģija act in a manner consistent with the obligations that the Respondent owed to the Claimant.[868]

(D)    LATGALES ENERĢIJA

647.    In response to the Respondent's argument that Latgales Enerģija's conduct is attributable to the Claimant "for the purposes of the concession", the Claimant submits that international law does not provide for attribution of the conduct of a subsidiary to the parent company in the absence of any reason warranting a lifting of the corporate veil.[869]   Therefore, the relationship between the Respondent and the Claimant is not "defined" by any of the other agreements entered into by Latgales Enerģija and the Municipality and its wholly-owned companies.[870]

**(3)    EXPROPRIATION**

648.    The Claimant contends that it was expropriated by the Respondent in breach of Article 4(1) of the BIT.[871]

(A)    THE PRINCIPLES

649.    The Claimant argues that Article 4(1) of the BIT prohibits the expropriation, nationalization and taking of similar measures "against investments of investors of the other Contracting Party" and submits that the term "investments" refers to "every kind of asset", including "claims to money which have been used to create an economic value or claims to any performance having an economic value", "any right to conduct economic activities conferred by state authorities"[872] and contractual rights.[873]

650.    Emphasis is placed by the Claimant on a widely accepted principle whereby an expropriation may occur outright or in stages.[874]   When an expropriation takes place

---

[868]  Cl. Mem. ¶¶ 240-241.

[869]  Cl. Rep. ¶ 16.

[870]  Cl. Rep. ¶ 16.

[871]  BIT, <u>CLA-1</u>, quoted in paragraph 1070 below.

[872]  Cl. Mem. ¶ 252.

[873]   *Rudloff Case,* American-Venezuela Mixed Claims Commission, Decision on Merits, 9 Reports of International Arbitral Awards 244, <u>CLA-13</u> p. 250; *Wena Hotels Limited v. Arab Republic of Egypt,* ICSID Case No. ARB/98/4, Award, 8 December 2000 ("*Wena Hotels v. Egypt*"), <u>CLA-14</u> ¶ 98.

[874]  RfA ¶ 124; Cl. Mem. ¶ 243.

173

in stages, the terms "creeping expropriation" and "indirect expropriation" can be used interchangeably;[875] reliance is placed on a number of decisions recognizing creeping expropriation such as *Generation Ukraine v. Ukraine*,[876] *Tradex Hellas v. Albania*,[877] *Siemens v. Argentina*[878] and *BG Group v. Argentina*[879].[880]   It is therefore sufficient for the Tribunal to find that the cumulative effect of the acts complained of by the Claimant was expropriatory.[881]

### (B)   THE CLAIMANT'S COMPLAINTS

651.   The Claimant submits that its investment was unlawfully expropriated by the Respondent both outright (paragraphs 653 ff. below) and gradually over time (paragraphs 658 ff. below).[882]

652.   In the Claimant's view, unlawful expropriation in the present case is not limited to the expropriation of tangible assets, but extends to the taking or destruction of all kinds of investments by the Respondent.[883]

### (i)   *"Outright, Indirect and Unlawful Expropriation"*

653.   The Claimant contends that the forcible taking of Latgales Enerġija's business on 16 September 2008 amounts to an "outright indirect unlawful expropriation" of its investment by the Respondent.[884]   On that day the Municipality's executive decisions were enforced by armed local and state police and personnel forcibly entering the

---

[875]   RfA ¶ 126; footnote 42.

[876]   *Generation Ukraine, Inc. v. Ukraine,* ICSID Case No. ARB/00/9, Award, 16 September 2003 ("*Generation Ukraine v. Ukraine*"), CLA-30 ¶¶ 20.22; 20.26.

[877]   *Tradex Hellas S.A. v. Republic of Albania,* ICSID Case No. ARB/94/2, Award, 29 April 1999 ("*Tradex Hellas v. Albania*"), CLA-26 ¶ 191.

[878]   *Siemens A.G. v. Argentine Republic,* ICSID Case No. ARB/02/8, Award, 6 February 2007 ("*Siemens v. Argentina*"), CLA-11 ¶ 263.

[879]   *BG Group Plc. v. Argentine Republic,* UNCITRAL, Award, 24 December 2007 ("*BG Group v. Argentina*"), CLA-12 ¶¶ 260-269.

[880]   RfA ¶ 129; Cl. Mem. ¶ 249.

[881]   Transcript, Day 1, 40/20-25; 41/1-3.

[882]   Cl. Mem. ¶ 243.

[883]   Cl. Mem. ¶¶ 251-252.

[884]   Cl. Mem. ¶ 246.

174

premises of Latgales Enerġija, having expelled Latgales Enerġija's employees and appropriated all of Latgales Enerġija's assets used to operate the heating system.[885]

654.    According to the Claimant, the Municipality was aware that it infringed upon Latgales Enerġija's property rights as acknowledged in its decision of 14 July 2008;[886] the authorities in Rēzekne showed a "total disregard for the Claimant's property" when issuing the decisions and orders that required Latgales Enerġija to surrender the assets it had lawfully leased or purchased pursuant to the Long-Term Agreement without any proper legal procedure.[887]

655.    The Claimant contends that its investment was indirectly expropriated as the actions summarised above destroyed the value of Latgales Enerġija, rendered its shares worthless, and caused the loss of the value of loans and guarantees issued in support of Latgales Enerġija's business, all without prompt, adequate and effective compensation.[888]

656.    The Claimant argues that it was not in the public interest to "displace" an operator that had already invested substantial sums, planned a EUR 3.5 million investment program over the following two years and had arranged for the EBRD to provide further funds.[889]

657.    Finally, the Claimant takes the view that the expropriation was discriminatory as it was directed solely at Latgales Enerġija's business.

(ii)    *"Gradual or Creeping, Unlawful Expropriation"*

658.    It is the Claimant's case that its investment has also been gradually expropriated through a series of acts and omissions by the Municipality, the Regulator, Rēzeknes Siltumtīkli and Rēzeknes Enerġija that culminated in the events of 16 September 2008.[890]    These actions and omissions destroyed Latgales Enerġija's business and

---

[885]  RfA ¶ 124; Cl. Mem. ¶ 244.

[886]  Cl. Mem. ¶ 244.

[887]  RfA ¶124; Cl. Mem. ¶¶ 244-245.

[888]  RfA ¶¶ 125, 165; Cl. Mem. ¶¶ 245, 266, 342-344, 347, 354.

[889]  RfA ¶ 124; Cl. Mem. ¶ 245.

[890]  RfA ¶ 125; Cl. Mem. ¶ 247; Transcript, Day 1, 40/1-6.

thereby the value of the Claimant's shares in Latgales Enerģija.[891]   The loss of Latgales Enerģija's business in turn caused the indirect expropriation of the Claimant's right to reimbursement of the loans granted to Latgales Enerģija and its right to recover money it had paid to Latgales Enerģija's creditors under a guarantee agreement as the Respondent's acts and omissions caused Latgales Enerģija's inability to pay back any such sums.[892]

659.   The Claimant's specific complaints are as follows:

(i)   the Municipality did not prepare and approve the heat supply development plan as required by Latvian Law and Clause 1.2 of the February 2006 Agreement until after it had decided to take back the heating system;[893]

(ii)   on 22 March 2006 and 28 March 2007 the Public Utilities Commission of Latvia adopted decisions increasing the price that Latvijas Gāze was entitled to charge for the supply of natural gas which in turn resulted in price increases for Latgales Enerģija of 36 % as from May 2006 and 22 % as from May 2007 respectively;[894]

(iii)   on 13 October 2006 and 11 June 2007 the Regulator rejected Latgales Enerģija's application for a revision of its tariffs to account for the increase in the wholesale price of natural gas, having reversed its prior practice;[895]

(iv)   the Municipality failed to pay Latvijas Gāze for the deliveries of natural gas, in breach of the February 2005 Agreement and the Gas Supply Agreement;[896] as a result, Latvijas Gāze stopped supplying gas to Latgales Enerģija and Latgales Enerģija was forced to switch back to black fuel in September 2007, which caused a short interruption of heat supply at the start of the heating season 2007-2008;[897]

---

[891] Transcript, Day 1, 40/4-6.
[892] Transcript, Day 1, 40/6-13.
[893] RfA ¶ 131; Cl. Mem. ¶¶ 255-256; 265; Transcript, Day 1, 41/7-8.
[894] Cl. Mem. ¶ 265.
[895] RfA ¶ 131; Cl. Mem. ¶¶ 255; 257; 265; Transcript, Day 1, 41/9-11.
[896] Cl. Mem. ¶¶ 258; 265; Transcript, Day 1, 41/12-15.
[897] RfA ¶ 131; Cl. Mem. ¶¶ 258; 265.

(v)     the Municipality's wholly-owned companies brought unjustified claims against Latgales Enerģija; they sought and obtained an attachment of Latgales Enerģija bank accounts; such actions and decisions were carried out with the intention to replace Latgales Enerģija with a Municipality-owned company and ultimately to re-nationalize the heating system;[898]

(vi)    the Regulator issued warnings putting Latgales Enerģija on notice that its licences were at risk of being revoked;[899] according to the Claimant, the Regulator issued unwarranted warnings to Latgales Enerģija under the influence of the Municipality, which had created the crisis situation in the first place and actively sought to influence consumers to pay less than the full amount of their invoices or not to pay anything at all to Latgales Enerģija;[900]

(vii)   the Municipality declared an energy crisis, which was a crisis of its own making; then it refused to solve the crisis through the release of Latgales Enerģija's bank accounts in violation of its contractual obligation and Rēzeknes Siltumtīkli's contractual obligation to do so;[901]

(viii)  the Regulator decided to take over the zone of Latgales Enerģija's licences in circumstances where the crisis situation had been created by the Municipality itself;[902]

(ix)    on 12 October 2007 the Municipality adopted a decision appointing Rēzeknes Enerģija as "the person in charge of providing thermal energy in Rēzekne"; Rēzeknes Enerģija was then a newly-incorporated limited liability company, wholly-owned by the Municipality;[903]

(x)     on 7 December 2007 the Regulator annulled its previous approval of new tariffs dated 9 November 2007 based on Rēzeknes Enerģija's indications as to

---

[898]  Cl. Mem. ¶¶ 259; 260; 262; Transcript, Day 1, 41/16-20; 43/7-14.

[899]  Cl. Mem. ¶¶ 261; 265.

[900]  Cl. Mem. ¶ 261; Transcript, Day 1, 41/21-24; 43/4-6.

[901]  Transcript, Day 1, 41/25; 42/1-3; 15-17.

[902]  Transcript, Day 1, 42/7-11.

[903]  Cl. Mem. ¶ 265; Transcript, Day 1, 42/12-14.

the volume of natural gas Latgales Enerģija would use, rather than on Latgales Enerģija's own calculations;[904]

(xi)     the Municipality attempted to persuade Latgales Enerģija's employees to quit their jobs and join Rēzeknes Siltumtīkli;[905]

(xii)    the Regulator wrongly stated that Latgales Enerģija was in breach of the law because of an erroneous report received from Rēzeknes Siltumtīkli which misrepresented the assignment agreement between Rēzeknes Siltumtīkli and Latgales Enerģija that had no bearing on the heat supply;[906]

(xiii)   on 3 June 2008 the Regulator unlawfully revoked Latgales Enerģija's licences to produce, transmit and sell thermal energy relying on spurious breaches of the licence conditions, all of which had been previously "addressed and explained" by Latgales Enerģija and that had been caused by the actions of the Municipality and the Regulator; the Regulator thereby disregarded the required three-month waiting period in breach of Section 28(1) of the Public Utility Regulators Act and the fact that Latgales Enerģija had resumed a steady supply of thermal energy to Rēzekne;[907] according to the Claimant, the revocation of the licences was the culmination of a series of acts that destroyed Latgales Enerģija's business;[908]

(xiv)    on 13 June 2008 the Municipality and its deputy executive director, acting as "the person in charge of organising the provision of heating in the city of Rēzekne", decided to appoint Municipality-owned companies temporarily to produce and sell thermal energy in Rēzekne; that decision required Latgales Enerģija to hand over the assets necessary for the provision of heating services that it had leased from Rēzeknes Siltumtīkli;[909]

---

[904] Transcript, Day 1, 42/18-22.
[905] Transcript, Day 1, 42/4-6.
[906] Transcript, Day 1, 42/23-25; 43/1-3.
[907] RfA ¶ 131; Cl. Mem. ¶¶ 264; 265.
[908] Transcript, Day 1/19-22.
[909] Cl. Mem. ¶ 265.

(xv)     these decisions of 13 June 2008 entered into force despite the appeal filed by Latgales Enerģija;[910] on 7 July 2008 Rēzeknes Siltumtīkli and a bailiff went to Latgales Enerģija's offices and requested Latgales Enerģija to hand over its assets, which it "reasonably" refused to do;[911]

(xvi)    on 14 July 2008, after the court declined its jurisdiction to hear Latgales Enerģija's appeal against the decisions of 13 June 2008, the Municipality adopted a decision requiring Latgales Enerģija to provide access to the assets leased under the Long-Term Agreement, including the assets Latgales Enerģija had purchased or upgraded as a result of Claimant's investment;[912] Latgales Enerģija's appeal did not suspend the effects of the decision;[913]

(xvii)   on 16 September 2008 the Municipality's decision of 14 July 2008 was enforced by armed local and state police and personnel from Rēzeknes Siltumtīkli; Latgales Enerģija's employees were forcibly evicted from their office building; Rēzeknes Siltumtīkli's personnel took over Latgales Enerģija's offices, boiler houses and other premises and appropriated all of Latgales Enerģija's assets, including assets that were leased to Latgales Enerģija for 30 years under the Long-Term Agreement and assets belonging to Latgales Enerģija;[914] according to the Claimant, this effectively terminated the 30-year Long-Term Agreement;[915] and

(xviii)  before and throughout this whole period the Municipality had refused to consent to necessary investments in the heating system, particularly in connection with the cogeneration facilities.[916]

660.     In response to the Respondent's reliance on the findings of the Latvian courts relating to the present case, the Claimant states that no denial of justice claim was

---

[910]  Cl. Mem. ¶ 265.
[911]  Cl. Mem. ¶ 265.
[912]  Cl. Mem. ¶ 265.
[913]  Cl. Mem. ¶ 265.
[914]  RfA ¶ 131; Cl. Mem. ¶¶ 264; 265.
[915]  RfA ¶ 131.
[916]  Cl. Mem. ¶ 263; Transcript, Day 1, 43/15-18.

submitted.[917]   The Tribunal will have to make a finding regarding the Respondent's compliance only with the BIT and not Latvian law, a proposition on which the Claimant has relied more generally in support of all of its claims.[918]

661.   The Claimant argues that the acts that led to the destruction of Latgales Enerǵija's business were politically motivated and "sprang from the realisation that the Claimant had turned around the supply of district heating by investing its money and expertise to make the business profitable and stable".[919]   In the Claimant's view, it was an attractive "proposition" to bring the now profitable business back under the Municipality's control by manufacturing a crisis.[920]

662.   The Claimant finally submits that no proper legal procedure "existed" with regard to the cumulative and discriminatory acts and omissions that eventually resulted in the destruction of Latgales Enerǵija's business and seizure of its assets and that no compensation was ever paid.[921]

### (4)   FAIR AND EQUITABLE TREATMENT

663.   The Claimant contends that the Respondent has failed to provide fair and equitable treatment to its investment in breach of Article 3(1) of the BIT.[922]

### (A)   PRELIMINARY OBSERVATIONS

664.   The Claimant submits that the exact scope of the fair and equitable treatment standard is "purposefully left to the determination of the tribunal"; reliance is placed on the awards in *Mondev v. United States of America*[923] and *Waste Management v. United Mexican States*[924].[925]   The Claimant contends that tribunals have not looked just at individual acts, but also at the "cumulative effect of a number of different measures"

---

[917]  Cl. Rep. ¶ 93.

[918]  Cl. Rep. ¶ 95.

[919]  RfA ¶ 125.

[920]  RfA ¶ 125.

[921]  Cl. Mem. ¶ 266.

[922]  Cl. Mem. ¶ 298.

[923]  *Mondev International Ltd. v. United States of America,* ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002, <u>CLA-40</u> ¶ 118.

[924]  *Waste Management, Inc. v. United Mexican States,* ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004 ("*Waste Management v. Mexico*"), <u>CLA-15</u> ¶¶ 98-99.

[925]  RfA ¶ 133; Cl. Mem. ¶ 268.

in order to assess the state's compliance with the fair and equitable treatment standard; reliance is placed on the award in *El Paso v. Argentina*[926].[927]  With reference to the award in *El Paso*, the Claimant submits that the Respondent's actions outlined in the previous sub-section on expropriation also constitute, at a minimum, a creeping violation of the fair and equitable treatment standard.[928]

665.  It is the Claimant's case that various acts of the Municipality, the Regulator, Rēzeknes Siltumtīkli and/or Rēzeknes Enerģija nevertheless constitute separate breaches of the fair and equitable treatment standard "in their own right".[929]

666.  In the Claimant's view, the Regulator's decisions may well comply with Latvian law from a strictly technical point of view; however, viewed in context and as a whole, the Regulator's decisions and the Municipality's conduct amount to breaches of the fair and equitable treatment standard.[930]  The Municipality's and the Regulator's actions were directed "specifically and solely" at the Claimant's investment and were not, therefore, part of a general exercise of the Respondent's "sovereign right to regulate or form policy".[931]

667.  The Claimant relies on specific aspects of the fair and equitable treatment standard as follows:

(i)     the need for transparent and consistent state conduct to promote a stable legal environment and protect the investor's legitimate expectations;

(ii)    freedom from harassment;

(iii)   procedural propriety and due process; and

(iv)    good faith.

668.  The Tribunal will follow this outline in its summary of the Claimant's position.

---

[926]  *El Paso Energy International Company v. Argentine Republic,* ICSID Case No. ARB/03/15, Award, 31 October 2011 ("*El Paso v. Argentina*"), <u>CLA-39</u> ¶¶ 515; 518.

[927]  Cl. Mem. ¶ 270.

[928]  Cl. Skeleton ¶ 15; Transcript, Day 1, 44/3-8.

[929]  Transcript, Day 1, 44/9-12.

[930]  Transcript, Day 1, 44/16-25.

[931]  Transcript, Day 1, 45/1-4.

(B)    TRANSPARENCY AND THE INVESTOR'S LEGITIMATE EXPECTATIONS

669.    The Claimant contends that the Respondent breached the Claimant's legitimate expectations.[932]

(i)    *The Principles*

670.    The Claimant submits that the fair and equitable treatment standard requires the host State to act in a transparent manner and ensure *(i)* that there are no ambiguities in the legal framework regarding the investment and *(ii)* that any decision taken by it affecting the investment is traceable to such legal framework[933] consisting of treaties and legislation as well as on "any undertakings and representations made explicitly or implicitly by the host state", which may be contained in decrees, licences and similar executive statements as well as contractual undertakings.[934]

671.    The Claimant further submits that where the host State goes back on assurances giving rise to legitimate expectations on the part of an investor, such conduct violates the fair and equitable treatment standard;[935] reliance is placed on the award in *Tecmed v. Mexico*[936].[937]

672.    In addition to transparency and absence from ambiguity in the legal regime, the fair and equitable treatment standard requires a degree of consistency in the State's conduct; reliance is placed on the award in *Tecmed*,[938] and on the award in *MTD v. Chile*[939] which followed the approach in *Tecmed*.[940]

---

[932]  Cl. Mem. ¶ 279; Cl. Skeleton ¶ 16(1).

[933]  RfA ¶ 135; Cl. Mem. ¶ 273.

[934]  Cl. Mem. ¶ 274.

[935]  Cl. Mem. ¶ 274.

[936]  *Tecnicas Medioambientales Tecmed S.A. v. United Mexican States,* ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003 ("*Tecmed v. Mexico*"), CLA-17 ¶ 164, specifically on the statement that the refusal by the State to renew a permit was a pretext to "permanently close down a site whose operation had become a nuisance due to political reasons relating to the community's opposition expressed in a variety of forms, regardless of the company in charge of the operation and regardless of whether or not it was being properly operated".

[937]  RfA ¶ 136; Cl. Mem. ¶ 275.

[938]  *Tecmed v. Mexico*, CLA-17 ¶ 154, with specific reference to the statement that the investor "also expects the host State to act consistently, i.e. without arbitrarily revoking any preexisting decisions or permits issued by the State that were relied upon by the investor to assume its commitments as well as to plan and launch its commercial and business activities".

[939]  *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile,* ICSID Case No. ARB/01/7, Award, 25 May 2004 ("*MTD v. Chile*"), CLA-18 ¶ 113.

673.   According to the Claimant, arbitral practice has extended the fair and equitable treatment standard to include an obligation for the host State "to provide a predictable framework for investment and protection of an investor's legitimate expectations"; reliance is placed on the decision in *LG&E v. Argentina*[941].[942]

674.   Finally, the Claimant submits that a breach by the host State of a contractual undertaking towards an investor may amount to a breach of the fair and equitable treatment standard; reliance is placed on the award in *Rumeli v. Kazakhstan*[943].[944]

(ii)   *The Claimant's Specific Complaints*

675.   The Claimant argues that its legitimate expectations breached by the Respondent were as follows:

(i)   the expectation that the Municipality and the entities it controlled would abide by their contractual obligations;[945]

(ii)   the expectation that Latgales Enerġija would be able to use the assets and create new assets for the production, transmission and distribution of thermal energy for 30 years, recover the investments made and earn a profit, as provided in the Long-Term Agreement;[946]

(iii)   the expectation that the Municipality would not take steps, either by action or omission, to frustrate Latgales Enerġija's performance under the Long-Term Agreement;[947]

---

[940]  RfA ¶¶ 136-137.

[941]  *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006 ("*LG&E v. Argentina*"), <u>CLA-31</u> ¶ 131.

[942]  Cl. Mem. ¶ 276.

[943]  *Rumeli Telekom A.S. and Telsim Mobil Telekomünikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008 ("*Rumeli v. Kazakhstan*"), <u>CLA-34</u> ¶ 615. The Claimant contends that in this case the tribunal held that the use of a state organ's prerogatives to terminate a contract constituted a breach of the fair and equitable treatment standard.

[944]  Cl. Mem. ¶ 277.

[945]  Transcript, Day 1, 45/12-14; Day 4, 50/14-18.

[946]  RfA ¶ 143; Cl. Mem. ¶ 278.

[947]  RfA ¶ 143; Cl. Mem. ¶ 278.

(iv)    the expectation that the Municipality would not seek to influence the Regulator to Latgales Enerģija's detriment;[948]

(v)     the expectation that the Municipality would not engage in other projects concerned with the provision of heating services;[949]

(vi)    the expectation that the Municipality would not actively seek to replace Latgales Enerģija as the operator of the heating system and regain control over the heating system;[950]

(vii)   the expectation that the Municipality would consent to the investments required in order for the heating system to be improved and overhauled by Latgales Enerģija;[951]

(viii)  the expectation that the licences to produce, transmit and sell heating granted to Latgales Enerģija would not be withdrawn in a non-transparent manner, in bad faith and due to circumstances created by the Municipality and the Regulator themselves;[952]

(ix)    the expectation that the Municipality would perform its duties under the February 2006 Agreement and establish and approve a heat supply development plan so that a new heating tariff could be calculated;[953]

(x)     the expectation that the Regulator would not reverse its previous practice and approve tariffs that were calculated using the same methodology for the tariffs that had previously been approved by the Regulator in circumstances where no heat supply development plan existed;[954]

---

[948]  Cl. Mem. ¶ 278.
[949]  RfA ¶ 143.
[950]  Cl. Mem. ¶ 278; Transcript, Day 1, 45/15-17.
[951]  Cl. Mem. ¶ 278.
[952]  RfA ¶ 143; Cl. Mem. ¶ 278; Transcript, Day 1, 45/22-23.
[953]  RfA ¶ 143; Cl. Mem. ¶ 278.
[954]  RfA ¶ 143; Cl. Mem. ¶ 278; Transcript, Day 1, 45/18-19.

184

(xi)     the expectation that previously approved tariffs would not be cancelled in non-transparent conditions, and "wrongly", as a result of interference by the Municipality;[955]

(xii)    the expectation that Latgales Enerģija would receive natural gas to be able to provide heating services and that the Municipality would honour its contractual obligations in relation to the supply of that natural gas, including its obligation to pay Latvijas Gāze for the natural gas supplied;[956]

(xiii)   the expectation that the Municipality would not actively prevent Latgales Enerģija from operating its business by seeking the attachment of Latgales Enerģija's bank accounts, and would comply with the undertaking to remove such attachment;[957] and

(xiv)    the expectation that Latgales Enerģija would not be required to hand over the assets necessary for other Municipality-owned companies to provide heating services.[958]

676.   These expectations arose mainly from the undertakings contained in the contracts which governed the investment, in particular the Long-Term Agreement and the February 2005 Agreement; reliance is placed by the Claimant on three whereas clauses and Clause 2.3 of the Long-Agreement as well as Clauses 2, 2.2, 2.4, 2.10, 3 and 4 of the February 2005 Agreement.[959]

677.   In addition, the Claimant relies on the context in which the investment was made, in particular the initial tender (including the relevant documentation contained in Exhibit C-38) and the different investment structures contemplated by Mr. Strioga's presentation given on 25 November 2004[960];[961] the structure of the investment which was eventually adopted was based on the expectations recalled above. Without such

---

[955]  RfA ¶ 143; Cl. Mem. ¶ 278.
[956]  RfA ¶ 143; Cl. Mem. ¶ 278; Transcript, Day 1, 45/20-21; Day 4, 43/18-25; 44/1.
[957]  Cl. Mem. ¶ 278.
[958]  Cl. Mem. ¶ 278.
[959]  Transcript, Day 4, 48/14-25; 49/1-25; 50/1-25; 51/1; 8-25; 52/1-22.
[960]  C-41.
[961]  Transcript, Day 4, 45/24-25; 46/1-25; 47/1-25; 48/1-13.

185

expectations the Claimant would not have made the investment at all, or would have structured the investment differently, for instance through a joint venture with the Municipality.[962]

678.     As to the time when certain representations were made to the Claimant, the Claimant submits that it would be too narrow to consider only 28 January 2005 as the critical date when the investment was made;[963] admittedly, certain representations relied upon were made after 28 January 2005.[964]   However, such representations are part of a sequence of events that took place within a relatively short period of time, and must be properly taken into account, since the making of the investment was a process: the Claimant made its appearance in November 2004 in a critical situation in Rēzekne; the Claimant then immediately made pledges to Unibanka and others without any "contractual cover" and subsequently the Long-Term Agreement and the February 2005 Agreement were executed.[965]

(C)     FREEDOM FROM HARASSMENT

679.     The Claimant further contends that the Respondent breached the fair and equitable treatment standard as a result of a number of "harassing actions" directed against the Claimant's investment.[966]

(i)     *The Principles*

680.     The Claimant submits that the fair and equitable treatment standard also applies "in situations of harassment directed at the investor by the host State" and that the host State must grant the investor freedom from harassment by its own regulatory

---

[962]  Transcript, Day, 4, 48/3-13.

[963]  Transcript, Day 4, 53/9-11; 54/3-7.

[964]  Transcript, Day 4, 52/23-25; 52/8.

[965]  Transcript: Day 4, 53/12-25; 54/1-7.

[966]  RfA ¶ 145; Cl. Mem. ¶ 285; Cl. Skeleton ¶ 16(2).

authorities.[967]  Reliance is placed on the tribunal's finding in *Tecmed*;[968] on the award in *Desert Line v. Yemen*[969] and on tribunal's finding in *Pope & Talbot*[970].[971]

(ii)    *The Claimant's Specific Complaints*

681.    The Claimant contends that the Municipality and the Regulator harassed the Claimant's investment "until it reached the point where the Regulator believed that Latgales Enerģija had committed breaches of the licence conditions that justified the cancellation of those licences".[972]  The Claimant submits that the harassment by the Municipality and the Regulator of which it complains consists of the following:

(i)    the Municipality's failure to respond to Latgales Enerģija's attempts to advance the approval of the heat supply development plan and the delay in the approval of such plan;[973]

(ii)    the Regulator's refusal to calculate heating tariffs based on its previous consistent practice in circumstances where increased tariffs were economically critical as a result of factors outside of Latgales Enerģija's control;[974]

(iii)    the Municipality's breaches of numerous contractual obligations which could only have been calculated adversely to affect Latgales Enerģija's business;[975]

(iv)    Rēzeknes Siltumtīkli's and Rēzeknes Enerģija's claims brought against Latgales Enerģija before the Latvian courts with the intention to obtain an attachment of Latgales Enerģija's bank accounts and paralyse the company's

---

[967]  RfA ¶ 138; Cl. Mem. ¶ 280.

[968]  *Tecmed. v. Mexico*, CLA-17 ¶ 163.  The Claimant contends that in this case a licence of unlimited duration was replaced with one of limited duration, and the tribunal found that the denying the renewal of the permit's renewal was a means designed to force the investor to relocate to a new site and bear the risks and costs associated with such relocation.

[969]  *Desert Line Projects LLC v. Republic of Yemen,* ICSID Case No. ARB/05/17, Award, 6 February 2008, CLA-33 ¶ 179.

[970]  *Pope & Talbot Inc v. Government of Canada,* UNCITRAL, Award on the Merits of Phase 2, 10 April 2001, CLA-27 ¶ 181.

[971]  Cl. Mem. ¶¶ 280-282.

[972]  Cl. Mem. ¶ 284.

[973]  Cl. Mem. ¶ 284.

[974]  RfA ¶ 145; Cl. Mem. ¶ 284.

[975]  Cl. Mem. ¶ 284.

ability to conduct its business; and their subsequent refusal to permit the lifting of such attachment;[976]

(v)     the actions by the Municipality, in particular in September and October 2007, in anticipation of, or with deliberate intent to cause, Latgales Enerġija's removal as the operator of the heating system, and to appoint a Municipality-owned company or another investor;[977]

(vi)    the Regulator's decision of 11 October 2007 regarding the takeover of the zone under the licences, which was premature and based on circumstances created by actions of the Municipality and the Regulators previous unjustified decisions;[978]

(vii)   the Municipality's unjustified interference with the Regulator's decision to approve new tariffs so that the Regulator revoked that decision "on a basis that was inconsistent with the tariff calculation Methodology";[979]

(viii)  the Regulator's unjustified objection to Latgales Enerġija's financial arrangements put in place in order to receive payments from consumers and make payments to suppliers, including for natural gas;[980]

(ix)    the Municipality's attempts to dissuade consumers from paying Latgales Enerġija's invoices in full;[981]

(x)     the Municipality's refusal to consent to works being carried out on the heating system and the installation of cogeneration facilities which, together with the refusal to approve the heat supply development plan, signified that Latgales Enerġija was unable to invest the full amount of EUR 1.5 million into the heating system in the first three years of the lease, as required by the Long-

---

[976] RfA 145; Cl. Mem. ¶ 284; Transcript, Day 1, 46/11-13.
[977] Cl. Mem. ¶ 284; Transcript, Day 1 46/2-16.
[978] RfA ¶ 145; Cl. Mem. ¶ 284.
[979] Cl. Mem. ¶ 284.
[980] Cl. Mem. ¶ 284.
[981] Cl. Mem. ¶ 284.

Term Agreement, and was instead permitted to invest only EUR 1.2 million;[982]

(xi)    the Municipality's multiple attempts to appoint other individuals and its own entities to provide heating services instead of Latgales Enerģija;[983] and

(xii)   the Municipality's decision requiring Latgales Enerģija to hand over the leased assets necessary for the provision of heating services and the enforcement of that decision by armed local and state police and personnel from Rēzeknes Siltumtīkli.[984]

### (D)    PROCEDURAL PROPRIETY AND DUE PROCESS

682.   The Claimant contends that the Respondent has failed to treat the Claimant's investment with procedural propriety and due process, thereby breaching its obligations under the fair and equitable treatment standard.[985]

### (i)    *The Principles*

683.   The Claimant submits that procedural fairness "is an elementary requirement of the rule of law and a vital element of fair and equitable treatment" and that tribunals have consistently held that "the absence of a fair procedure or serious procedural shortcomings were important elements in a finding of a violation of the fair and equitable treatment standard";[986] reliance is placed by the Claimant on the awards in *Waste Management*[987] and *Tecmed*[988].[989]

---

[982] Cl. Mem. ¶ 284.

[983] RfA ¶ 145; Cl. Mem. ¶ 284.

[984] RfA ¶ 145; Cl. Mem. ¶ 284.

[985] Cl. Mem. ¶¶ 290-291; Cl. Skeleton ¶ 16(3).

[986] RfA ¶ 139; Cl. Mem. ¶ 286.

[987] *Waste Management v. Mexico*, CLA-15 ¶ 98.  The Claimant submits that the tribunal concluded that there was a breach of the fair and equitable treatment standard where the conduct attributable to the State and harmful to the claimant "involves a lack of due process leading to an outcome which offends judicial propriety – as might be the case with a manifest failure of natural justice in judicial proceedings or a complete lack of transparency and candour in an administrative process".

[988] *Tecmed v. Mexico*, CLA-17 ¶ 162.  The Claimant contends that the tribunal found that Mexico had breached the fair and equitable treatment standard *inter alia* on the basis that the regulatory authority had revoked the claimant's licence to operate a landfill and had failed to notify the claimant of its intention to do so, thereby depriving the claimant of an opportunity to state its case.

[989] RfA ¶ 140.

684.    Finally, the Claimant states that whereas denial of justice has been traditionally associated with the administration of justice in local courts, the tribunal in *Rumeli*[990] held that "[c]ourts are not the only State organs the conduct of which can amount to a denial of justice.   Administrative organs can also engage the State's international responsibility by denying justice".[991]   The Claimant points out that to reach its conclusion, the tribunal in *Rumeli*[992] had cited the finding in *Amco II* to the effect that there was "no provision of international law that makes impossible a denial of justice by an administrative body".[993]

<div align="center">(ii)    <em>The Claimant's Specific Complaints</em></div>

685.    The Claimant submits that the Latvian authorities failed to treat its investment with procedural propriety and due process and thereby violated the fair and equitable treatment standard under the BIT as follows:

(i)      when the Municipality attempted to appoint other entities to provide heating services: on the first occasion, the effect of the decision to take over the zone of Latgales Enerġija was suspended and therefore a precondition to appoint a person in charge of providing thermal energy in Rēzekne was not met; on the second occasion, the preconditions to appoint a person in charge of providing thermal energy in Rēzekne were not met and the person in charge had no authority to issue any decision directing Latgales Enerġija to return the heating system to Rēzeknes Siltumtīkli;[994]

(ii)     the legal claims filed against Latgales Enerġija by various Latvian entities aimed principally at having Latgales Enerġija's bank accounts attached in order to paralyse Latgales Enerġija's commercial activities;[995]

(iii)    Latgales Enerġija was not granted any time to remedy any alleged breaches of the licence conditions before its licences were revoked, contrary to the

---

[990] *Rumeli v. Kazakhstan*, <u>CLA-34</u> ¶ 623.

[991] Cl. Mem. ¶ 288.

[992] *Rumeli v. Kazakhstan*, <u>CLA-34</u> ¶ 623.

[993] Cl. Mem. ¶ 289.

[994] RfA ¶ 146; Cl. Mem. ¶ 290; Transcript, Day 1, 47/5-8.

[995] RfA ¶ 146; Cl. Mem. ¶ 290; Transcript, Day 1, 47/12-14.

<div align="center">190</div>

requirements of Latvian law; the Regulator should have issued a warning regarding the possible revocation of the licences and could have revoked the licences only provided that the warning went unheeded;[996]

(iv)   when deciding to revoke Latgales Enerġija's licences, the Regulator took into account "events and circumstances" that Latgales Enerġija had previously shown not to constitute breaches of its licence requirements in response to queries from the Regulator, the substance of which the Regulator failed to address;[997] and

(v)   the Municipality used its "public law powers" to circumvent the established procedure involving the person in charge of providing thermal energy in Rēzekne when issuing its decision to hand over the leased assets to the municipally-owned company; the Municipality used its "public law powers" effectively to terminate the Long-Term Agreement and regain control over the heating system.[998]

### (E)   GOOD FAITH

686.   The Claimant contends that the Municipality and the Regulator failed to act in good faith towards its investment and therefore violated the fair and equitable treatment standard under the BIT.[999]

### (i)   *The Principles*

687.   The Claimant argues that the requirement of good faith is inherent in public international law and the fair and equitable treatment standard and that tribunals have long recognized the role which good faith plays in the fair and equitable treatment obligation towards investors.[1000]   Reliance is placed by the Claimant on the awards in *Genin v. Estonia*,[1001] *Sempra v. Argentina*[1002] and *Waste Management*[1003].[1004]

---

[996] RfA ¶ 146; Cl. Mem. ¶ 290; Transcript, Day 1, 46/21-25.

[997] Cl. Mem. ¶ 290; Transcript, Day 1, 47/1-4.

[998] RfA ¶ 146; Cl. Mem. ¶ 290; Transcript, Day 1, 47/9-11.

[999] Cl. Mem. ¶ 297; Cl. Skeleton ¶ 16(4).

[1000] RfA ¶ 141; Cl. Mem. ¶ 292.

[1001]   *Alex Genin, Eastern Credit Limited, Inc. and A.S. Baltoil v. Republic of Estonia,* ICSID Case No. ARB/99/2, Award, 25 June 2001 ("*Genin v. Estonia*"), CLA-28 ¶ 367 with specific reference to the

191

688.   The Claimant submits that the fair and equitable treatment standard is an "objective standard"; proof of bad faith is not required in order to establish a breach of the applicable standard, as held by the *Tecmed* tribunal[1005] and the tribunal in *Biwater Gauff v. Tanzania*[1006].[1007]

(ii)   *The Claimant's Specific Complaints*

689.   The Claimant submits that the Municipality and the Regulator acted in bad faith, and the fair and equitable treatment standard was thereby breached by them as follows:

(i)   by the Municipality's refusal to comply with the February 2005 Agreement, the February 2006 Agreement and the October 2007 Agreement; in particular the Municipality's refusal to comply with its obligation not to frustrate the performance of the Long-Term Agreement by Latgales Enerģija and to adopt the decisions required by Latvian law in order that Latgales Enerģija could properly perform the Long-Term Agreement;[1008]

(ii)   the Regulator's refusal to calculate new tariffs in accordance with its previous practice "in the absence of a reasonable basis", especially in light of the increase in the price of natural gas;[1009]

(iii)   the Municipality's attempt to attract a new operator in summer of 2007;[1010]

---

tribunal's statement that "[a]cts that would violate this minimum standard [of fair and equitable treatment] would include…subjective bad faith".

[1002]   *Sempra Energy International v. Argentine Republic,* ICSID Case No. ARB/02/16, Award, 28 September 2007, CLA-32 ¶¶ 297-299, as authority for the proposition that good faith is "the common guiding beacon" under the fair and equitable treatment standard and "permeates the whole approach" to investment protection.

[1003]   *Waste Management. v. Mexico* , CLA-15 ¶ 138.  The Claimant submits that the tribunal found that the obligation to act in good faith was a basic obligation under the fair and equitable treatment standard and a deliberate conspiracy by government organs to destroy or frustrate an investment would constitute a breach of that standard.

[1004]   RfA ¶ 142; Cl. Mem. ¶¶ 293-294.

[1005]   *Tecmed v. Mexico*, CLA-17 ¶ 153.

[1006]   *Biwater Gauff (Tanzania) Ltd. v. United Republic of Tanzania,* ICSID Case No. ARB/05/22, Award, 24 July 2008 ("*Biwater Gauff v. Tanzania*"), CLA-36 ¶ 602.

[1007]   RfA ¶ 141; Cl. Mem. ¶¶ 294-295.

[1008]   RfA ¶ 147; Cl. Mem. ¶ 296.

[1009]   RfA ¶ 147; Cl. Mem. ¶ 296; Transcript, Day 1, 48/15-18.

[1010]   Transcript, Day 1, 47/19-20.

(iv)    the Municipality's attempt to regain control of the heating system by incorporating Rēzeknes Enerģija before declaring an energy crisis;[1011]

(v)     the attachment of Latgales Enerģija's bank accounts upon request by the Municipality, Rēzeknes Siltumtīkli's and/or Rēzeknes Enerģija and their refusal to have the attachment of those accounts lifted, knowing that this would effectively paralyse the operation of Latgales Enerģija's business;[1012]

(vi)    the announcement by the Rēzekne City Council on 9 October 2007 of an energy crisis, which was a crisis of the Municipality's own making, and the refusal to take action to remedy that crisis by having the attachment of Latgales Enerģija's bank accounts lifted;[1013]

(vii)   the Municipality's decisions to appoint two persons in charge of providing thermal energy in Rēzekne to take over the leased assets;[1014]

(viii)  the Municipality's actions to encourage consumers not to pay Latgales Enerģija's invoices in full, which, at the most, would have been an issue for the Regulator, not the Municipality;[1015]

(ix)    the Regulator's decision to cancel Latgales Enerģija's licences on grounds that Latgales Enerģija had previously shown not to constitute breaches of the licence conditions, in circumstances in which the events and the breaches complained of by the Regulator had been caused solely by the actions of the Municipality and the Regulator itself;[1016] in the Claimant's view, the cancellation was based on an intention to replace Latgales Enerģija before the new heating season;[1017] and

---

[1011]   Transcript, Day 1, 47/21-24.
[1012]   Cl. Mem. ¶ 296; Transcript, Day 1, 48/5-9.
[1013]   RfA ¶ 147; Cl. Mem. ¶ 296.
[1014]   RfA ¶ 147.
[1015]   Transcript, Day 1, 48/10-14.
[1016]   RfA ¶ 147; Cl. Mem. ¶ 296.
[1017]   Transcript, Day 1, 48/19-24.

(x)     the Municipality's decision requiring Latgales Enerġija to hand over the leased assets to Municipality-controlled companies once Latgales Enerġija's heating services had become profitable.[1018]

690.   The Claimant submits that the Municipality and the Regulator have acted in bad faith towards its investment "as from the time that Mr. Vjakse became Mayor of Rēzekne" and therefore the Respondent violated its obligations to the Claimant under the fair and equitable treatment standard.[1019]

### (5)     FULL PROTECTION AND SECURITY

691.   The Claimant contends that the Respondent had failed to provide full protection and security within the meaning of Article 3(1) of the BIT.[1020]

692.   The Claimant argued at the Hearing that the Respondent had an obligation to protect the Claimant's investment "in light of the actions taken by local authorities in Rēzekne".[1021]   The Respondent had knowledge of these actions.[1022]   The Claimant as well as Latgales Enerġija had complained of such actions to various state agencies on numerous occasions, to no avail.[1023]   The Claimant contends that while the Respondent is responsible for the actions of the Rēzekne authorities, it is itself "culpable" for failing to provide full protection and security to Respondent's investment by failing to prevent the destruction of Latgales Enerġija's business.[1024]   According to the Claimant, the Respondent had a separate and distinct obligation under the BIT in this respect.[1025]

693.   In its Skeleton Argument, the Claimant refers to the finding of the tribunal in *Azurix v. Argentina*[1026] to submit that the Respondent had failed to ensure "the stability

---

[1018]  RfA ¶ 147; Cl. Mem. ¶ 296.

[1019]  Cl. Mem.¶¶ 297-298.

[1020]  Cl. Mem. ¶ 300; Cl. Skeleton ¶ 17.

[1021]  Transcript, Day 1, 49/5-8.

[1022]  Transcript, Day 1, 49/8.

[1023]  Transcript, Day 1, 49/8-11.

[1024]  Transcript, Day 1, 49/11-16.

[1025]  Transcript, Day 1, 49/16-17.

[1026]  *Azurix Corp. v. Argentine Republic,* ICSID Case No. ARB/01/12, Award, 14 July 2006 ("*Azurix v. Argentina*"), CLA-19 ¶ 408.

afforded by a secure investment environment" and permitted the Claimant's investment to be rendered worthless.[1027]

### (6) ARBITRARY OR DISCRIMINATORY MEASURES

694.   The Claimant submits that the actions of the local authorities in Latvia towards the Claimant's investment were both arbitrary and discriminatory and impaired the management, maintenance, use and enjoyment of the Claimant's investment.[1028]

### (A) THE PRINCIPLES

695.   The Claimant complains of a breach of Article 3(1), second paragraph, of the BIT.

696.   The Claimant submits that it is sufficient to show that a measure was either arbitrary or discriminatory; reliance is placed on *Azurix*[1029] and *Siag v. Egypt*[1030].[1031]

697.   The Claimant states that tribunals had adopted different approaches as to the meaning and scope of the concept of an "arbitrary measure".[1032]   Some tribunals such as the UNCITRAL tribunal in *Lauder v. Czech Republic*,[1033] *Occidental v. Ecuador*[1034] and *CMS v. Argentina*[1035] relied on the ordinary meaning of the adjective "arbitrary" which they defined as "founded on prejudice or preference rather than on reason or fact".[1036]   Other tribunals relied on the finding of the International Court of Justice in *ELSI (United States of America v. Italy)*[1037] that contrasted arbitrary measures with the

---

[1027] Cl. Skeleton ¶ 17.

[1028] RfA ¶ 158; Cl. Mem. ¶ 312; Cl. Skeleton ¶ 19.

[1029] *Azurix v. Argentina*, CLA-19 ¶ 391.

[1030] *Waguih Elie George Siag and Clorinda Vecchi v. Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009 ¶ 457 (available at: https://www.italaw.com/sites/default/files/case-documents/ita0786_0.pdf).

[1031] Cl. Mem. ¶ 303.

[1032] Cl. Mem. ¶ 304.

[1033] *Ronald S. Lauder v. Czech Republic*, UNCITRAL Award, 3 September 2001 ("*Lauder v. Czech Republic*"), CLA-29 ¶ 221.

[1034] *Occidental Exploration and Production Company v. Republic of Ecuador,* LCIA Case No. UN3467, Award, 1 July 2004, ¶ 392 (available at: https://www.italaw.com/sites/default/files/case-documents/ita0571.pdf).

[1035] *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005 ("*CMS v. Argentina*"), RLA-30 ¶ 291.

[1036] Cl. Mem. ¶ 304.

[1037] *Case Concerning Elettronica Sicula S.p.A. (ELSI) (United States v. Italy)*, Judgment, 20 July 1989, ICJ Reports 1989, p. 15 ("*ELSI*"), CLA-24 ¶ 76.

rule of law and defined them as a "wilful disregard of due process of law, an act which shocks, or at least surprises, a sense of judicial propriety".[1038]  The Claimant further relies on the findings in *National Grid v. Argentina*,[1039] *Saluka v. Czech Republic*[1040] and *LG&E*[1041].[1042]

698.   Moreover, reliance is placed by the Claimant on the award in *AES v. Hungary*[1043].[1044]  The Claimant concludes that use by a State of its governmental powers to meddle with the contractual rights of an investor can constitute arbitrary and discriminatory measures under the BIT.[1045]

699.   As to the definition of discriminatory measures, the Claimant relies on the tribunal's finding in *Lauder* to submit that a measure need not violate domestic law in order to be discriminatory; a provision of domestic law could in fact itself be found discriminatory.[1046]  The non-discrimination standard requires "a rational justification of any differential treatment of a foreign investor"; reliance is placed on *Saluka*[1047].[1048]

700.   The Claimant finally contends that a measure may be found to be discriminatory irrespective of whether the State acted with an intention to discriminate, as found by the tribunal in *Siemens v. Argentina*[1049].[1050]  However, the Claimant states that

---

[1038] Cl. Mem. ¶ 304.

[1039] *National Grid p.l.c. v. Argentine Republic*, UNCITRAL, Award, 3 November 2008, <u>CLA-35</u> ¶ 197.

[1040] *Saluka Investments B.V. v. Czech Republic,* UNCITRAL, Partial Award, 17 March 2006 ("*Saluka v. Czech Republic*"), <u>CLA-21</u> ¶ 460.

[1041] *LG&E v. Argentina*, <u>CLA-31</u> ¶ 158.

[1042] RfA ¶ 156; Cl. Mem. ¶¶ 305-306.

[1043] *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010 ("*AES v. Hungary*"), CLA-38 ¶¶ 10.3.12-10.3.13.  The Claimant states that in this case the tribunal had to deal with the reintroduction by Hungary of "price decrees" which the tribunal found to constitute unreasonable or discriminatory measures on the basis that such measures lowered the prices the claimants received pursuant to a contractually agreed formula.

[1044] Cl. Mem. ¶ 307.

[1045] Cl. Mem. ¶ 308.

[1046] Cl. Mem. ¶ 309.

[1047] *Saluka v. Czech Republic*, <u>CLA-21</u> ¶ 460.

[1048] RfA ¶ 157.

[1049] *Siemens v. Argentina*, <u>CLA-11</u> ¶ 321.

[1050] Cl. Mem. ¶ 310.

evidence of a discriminatory intention on the part of the State is relevant to determine whether the measures are discriminatory, as found by the *LG&E* tribunal[1051].[1052]

(B)   THE CLAIMANT'S SPECIFIC COMPLAINTS

701.   According to the Claimant, the following acts and omissions constituted arbitrary measures:

(i)   the Municipality's "undue delay" to devise and approve the heat supply development plan; reliance is placed on *National Grid*;[1053]

(ii)   the Municipality's failure to comply with the February 2005 Agreement and the February 2006 Agreement; reliance is placed on *National Grid*;[1054]

(iii)   the Regulator's reversal of its previous practice and its refusal to approve new tariffs in the absence of an approved heat supply development plan; reliance is placed on *Lauder* and *National Grid*;[1055]

(iv)   Rēzeknes Siltumtīkli's and Rēzeknes Enerġija's lawsuits against Latgales Enerġija and the ensuing attachment of Latgales Enerġija's bank accounts; reliance is placed on *National Grid*;[1056]

(v)   the Municipality's refusal to permit the attachment of Latgales Enerġija's bank accounts to be lifted; reliance is placed on *National Grid*;[1057]

(vi)   the Regulator's decision of 11 October 2007 to take over Latgales Enerġija's zone without waiting for Latgales Enerġija response to the Regulator's warning of 4 October 2007; reliance is placed on *Lauder*;[1058]

---

[1051]   *LG&E v. Argentina*, CLA-31 ¶ 146.  The Claimant submits that in this case the tribunal found the measure in dispute to be discriminatory based on the effect of the measure; however, a measure will be in breach of Art. 3(1) of the BIT provided that it has been shown to be discriminatory in its effect or to be based on an intention to discriminate.

[1052]   Cl. Mem. ¶ 311.

[1053]   Cl. Mem. ¶ 313; Transcript, Day 1 49/23-25; 50/1-7.

[1054]   RfA ¶ 158; Cl. Mem. ¶ 313; Transcript, Day 1 49/23-25; 50/1-7.

[1055]   RfA ¶ 158; Cl. Mem. ¶¶ 313-314; Transcript, Day 1 49/23-25; 50/1-7.

[1056]   RfA ¶ 158; Cl. Mem. ¶ 313; Transcript, Day 1 49/23-25; 50/1-7.

[1057]   Cl. Mem. ¶ 313; Transcript, Day 1 49/23-25; 50/1-7.

[1058]   Cl. Mem. ¶ 314.

197

(vii)    the Municipality's decision of 12 October 2007 to appoint Rēzeknes Siltumtīkli and Rēzeknes Enerģija as "the persons in charge of providing thermal energy in Rēzekne";[1059]

(viii)   the Municipality's campaign "directed at reducing the sums paid by consumers"; reliance is placed on *National Grid*;[1060]

(ix)     the Regulator's decision of 7 December 2007 to revoke the decision of 9 November 2007 approving new tariffs;[1061]

(x)      the Regulator's "warnings and queries", based on factually or legally incorrect assertions by the Municipality, that later served as a basis for the revocation of Latgales Enerģija's licences; reliance is placed on *Lauder*;[1062]

(xi)     the Regulator's decision of 3 June 2008 to revoke Latgales Enerģija's licences to produce, transmit and sell thermal energy without seriously considering the explanations provided by Latgales Enerģija; reliance is placed on *Lauder*;[1063] and

(xii)    the Municipality's decision of 27 June 2008 requiring Latgales Enerģija to hand over the leased assets required to provide heating services.[1064]

702.   The Claimant contends in particular that the Municipality and the Regulator used their governmental and regulatory powers to create a crisis situation between September and October 2007 in a deliberate attempt to regain control over the heating system and force Latgales Enerģija *(i)* to relinquish its right to operate the heating system for 30 years under the Long-Term Agreement; reliance is placed on *Lauder* and *AES*[1065] and *(ii)* "to abandon its contractual right to tariff increases as a result of increased costs" through the combination of the Regulator's refusal to grant tariff increases based on

---

[1059]   RfA ¶ 158.
[1060]   Cl. Mem. ¶ 313; Transcript, Day 1 49/23-25; 50/1-7.
[1061]   RfA ¶ 158.
[1062]   Cl. Mem ¶ 314.
[1063]   Cl. Mem. ¶ 314.
[1064]   RfA ¶ 158.
[1065]   Cl. Mem. ¶¶ 315; 317.

the absence of a heat supply development plan and the Municipality's delay in approving such a plan; reliance is placed on *AES*.[1066]

703.  Finally, the Claimant argues that the Municipality and the Regulator used their governmental and regulatory powers between September 2007 and June 2008 to create a situation which would paralyse Latgales Enerģija's operation of the heating system and eventually constituted the ground for the revocation of Latgales Enerģija's licences; reliance is placed on *AES*.[1067]

704.  According to the Claimant, these actions were also discriminatory because they were directed only at the business of Latgales Enerģija.[1068]

705.  The Claimant contends that the use and enjoyment of its investment was irreparably impaired as a result of these actions and that it could no longer "sell or maintain" the investment.[1069]  The cumulative effect of these arbitrary and discriminatory measures was to destroy the value of the Claimant's investment.[1070]

### (7)   BREACHES OF THE MOST FAVOURED NATION CLAUSE

#### (A)   THE PRINCIPLES

706.  The Claimant relies on Article 3(2) of the BIT and prays in aid Articles 2(2) and 3(1) of the Latvia-Romania BIT; the latter provision states that when a Contracting Party has admitted an investment in its State territory in accordance with its laws, it shall *inter alia* "grant the necessary permits in connection with such investment"[1071].[1072]

#### (B)   THE CLAIMANT'S SPECIFIC COMPLAINTS

707.  The Claimant submits that the Municipality failed to issue the required heat supply development plan and, consequently, the Regulator failed to authorise Latgales Enerģija to charge the revised heating tariffs even though these tariff increases were

---

[1066]  Cl. Mem. ¶ 316; Transcript Day 1, 51/13-20.

[1067]  Cl. Mem. ¶ 317.

[1068]  Cl. Mem. ¶ 312.

[1069]  Cl. Skeleton ¶ 20.

[1070]  Cl. Skeleton ¶ 21.

[1071]  Latvia-Romania BIT, CLA-22.

[1072]  Cl. Mem. ¶¶ 321-322.

199

necessary in order for Latgales Enerģija's business to continue to operate due to the consecutive increases in the price of gas charged by Latvijas Gāze.[1073]   To the Claimant, tariff changes were an essential part of its investment as it is impossible for a heat supply operator to function without tariffs that accurately reflect the costs of the business in accordance with the provisions of the tariff methodology.[1074]

708.   In addition, the Regulator unreasonably refused to maintain Latgales Enerģija's licences to produce, transmit and sell thermal energy in Rēzekne in breach of its own regulations.[1075]   This impaired the management, maintenance and use of the Claimant's investment.[1076]

709.   The Claimant submits that the Respondent therefore breached the MFN clause contained in Article 3(2) of the BIT in connection with Articles 2(2) and 3(1) of the Latvia-Romania BIT[1077] as the local authorities failed to grant the necessary authorisations or permits in connection with the Claimant's investment.[1078]

## C.   THE RESPONDENT'S CASE ON LIABILITY

710.   The structure of the Respondent's defence does not mirror the outline of the Claimant's statement of case.   On the one hand, the Respondent has advanced certain arguments which are not directly related to any specific treatment standard; on the other, the Respondent's discussion of the applicable standards has been brief on most aspects.   The Respondent's position may be summarised as follows:

(i)      general denial and overall response to the Claimant's position (see paragraphs 711 ff. below);

(ii)     specific issues (see paragraphs 717 ff. below);

(iii)    attribution (see paragraphs 749 ff. below); and

---

[1073]   Cl. Mem. ¶ 323; Transcript, Day 1, 52/2-6.
[1074]   Transcript, Day 1, 82/11-17.
[1075]   Cl. Mem. ¶ 324.
[1076]   Cl. Mem. ¶ 324.
[1077]   Latvia-Romania BIT, CLA-22.
[1078]   RfA ¶ 163; Cl. Mem. ¶ 325.

200

(iv)    no violation of the BIT (see paragraphs 763 ff. below).

**(1)    GENERAL DENIAL AND OVERALL RESPONSE TO THE CLAIMANT'S POSITION**

711.    In its Counter-Memorial on the Merits, the Respondent denies and objects to all allegations of any breach of the BIT made by the Claimant and all prayers for relief submitted by the Claimant including the request for payment of damages or compensation for the involvement of experts and counsel.[1079]

712.    The Respondent argues that the Claimant's case is based on inaccurate facts and is misleading insofar as it predicates that the Claimant suffered the loss of its business. The Claimant's case is presented in a highly selective and subjective manner in point of fact and law, rests on an oversimplification of the matter in dispute and discards important aspects; the Claimant's complaints rest on witness statements signed by persons directly interested in the outcome of this case.[1080]

713.    Finally, the Claimant has put purely commercial issues before the Tribunal which are outside the scope of international investment law.

714.    According to the Respondent, the damage allegedly suffered by the Claimant is based on inflated future dividends and losses due to the failure to obtain the repayment of loans; the Long-Term Agreement was demonstrably unsuitable to generate any cash flows, as confirmed by the Respondent's expert report submitted by KPMG Baltics SIA.[1081]

715.    The Rēzekne Municipality, the Respondent argues, wished to improve the quality and economic performance of its district heating system, to transpose the existing, highly subsidized and economically inefficient system into a business-orientated system "with consideration of the social interest at large".[1082]  After the initial tender yielded no suitable results, the Claimant and the Municipality reached agreement on a "concession arrangement" regarding the district heating assets in Rēzekne.[1083]

---

[1079]  Resp. Obj. J. & C-Mem. ¶ 1.4; see also Resp. Rej. ¶¶ 5-7.
[1080]  Resp. Obj. J. & C-Mem. ¶ 3.33.
[1081]  Resp. Obj. J. & C-Mem. ¶ 2.2.
[1082]  Resp. Obj. J. & C-Mem. ¶ 3.1.
[1083]  Resp. Obj. J. & C-Mem. ¶ 3.1.

Rēzekne is a major city in Latgale, a region with "highest social sensitivity" due to widespread unemployment, low salaries, a negative migration rate and low economic activity; any fluctuation in the continuity, stability, service level or price of basic public utility services can cause serious social unrest and resistance.[1084]

716.   The Respondent contends that an overall analysis of its conduct shows such conduct to be "consistent and predictable"; only the Claimant's conduct led to the adverse effects of which the Claimant has complained.[1085]

### (2)   SPECIFIC ISSUES

717.   The Tribunal will summarise the Respondent's arguments relating to these specific issues as follows:

(i)     the application of the Principles of European Contract Law, UNIDROIT Principles of International Commercial Contracts and TransLex Principles (see paragraphs 718 ff. below);

(ii)    the functional and legal independence between the different parts of the "concession arrangement" (see paragraphs 719 ff. below);

(iii)   the duty to pay for the natural gas supplied by Latvijas Gāze (see paragraphs 726 ff. below);

(iv)    the outstanding lease payments (see paragraphs 733 ff. below);

(v)     the influence allegedly brought to bear by the Municipality on the Regulator (see paragraphs 734 ff. below);

(vi)    the review of the tariffs by the Regulator (see paragraphs 743 ff. below);

(vii)   the development plan (see paragraphs 736 ff. below); and

(viii)  the revocation of Latgales Enerģija's licences to produce, transmit and sell thermal energy (see paragraphs 743 ff. below).

---

[1084]  Resp. Obj. J. & C-Mem. ¶ 3.2.
[1085]  Resp. Obj. J. & C-Mem. ¶ 3.9.

(A)   THE APPLICATION OF PRINCIPLES OF EUROPEAN CONTRACT LAW,
UNIDROIT PRINCIPLES OF INTERNATIONAL COMMERCIAL CONTRACTS
AND TRANSLEX PRINCIPLES

718.   As the "concession arrangement" was "basically spelled out in commercial agreements", the Respondent invokes the application of the Principles of European Contract Law,[1086] the 2010 UNIDROIT Principles of International Commercial Contracts and the Trans-Lex Principles which may be considered as general principles of law recognised by civilized nations within the meaning of Article 38(1)(c) of the Statute of International Court of Justice,[1087] contending that the application of such principles is suitable where specific issues are to be decided and gaps are found to exist in the abstract principles set out in an investment treaty.[1088]

(B)   THE FUNCTIONAL AND LEGAL INDEPENDENCE BETWEEN THE
DIFFERENT PARTS OF THE "CONCESSION ARRANGEMENT"

719.   The Respondent argues that the "concession arrangement" consisted of the following commercial contracts:[1089]

(i)      the Long-Term Agreement;[1090]

(ii)     the February 2005 Agreement;[1091]

(iii)    the Amended Long-Term Agreement;[1092]

(iv)    the February 2006 Agreement;[1093] and

(v)     the October 2007 Agreement.[1094]

720.   The Respondent argues that these are typically commercial contracts, despite the fact that the Long-Term Agreement relates to the lease of public assets; hence Latgales

---

[1086] R-3.
[1087] RLA-3.
[1088] Resp. Obj. J. & C-Mem. ¶ 3.10-11; Resp. Rej. ¶¶ 18- 20.
[1089] Resp. Obj. J. & C-Mem. ¶¶ 3.4-3.5; Resp. Obj. J. & C-Mem. ¶ 3.4.
[1090] C-4, see paragraphs 78 ff. above.
[1091] C-8, see paragraphs 100 ff. above.
[1092] C-16, see paragraphs 166 ff. above.
[1093] C-17, see paragraphs 169 ff. above.
[1094] C-26, see paragraphs 286 ff. above.

203

Enerģija's duty to cooperate to seek ways to reduce the heating tariffs for Rēzekne's inhabitants.[1095]  With reference to Sections 4 and 14(2) of the Latvian Municipalities Act, the Respondent further states that Latvian law distinguishes between the public functions of local governments and their "commercial functions in carrying out their public functions".[1096]

721.  On the other hand, the "concession arrangement" consisted of Latgales Enerģija's licences issued by the Regulator for the production, transmission and sale of thermal energy in Rēzekne.[1097]  According to the Respondent, these licences were issued in the "public (administrative) law sphere".[1098]

722.  A further distinguishing factor between the two parts of the "concession arrangement" is the legal, functional and financial independence of the Regulator in line with the requirements of European law.[1099]

723.  The Respondent refutes the Claimant's argument that all the contracts concluded between Latgales Enerģija and the Municipality represent exercise of public power by the Municipality.[1100]  The treatment of the Long-Term Agreement and related agreements as commercial contracts is therefore in accordance with the "sense and meaning" of the Treaty and the applicable Latvian law.[1101]

724.  The Respondent further contends that "State contracts (…) of commercial (economic) nature (…) (for example, privatization agreements, joint venture agreements, concession agreements)" are subject to international law as a general rule.[1102]  While such contracts may contain "sovereign promises", they are still treated as commercial agreements; reliance is placed on the *ad hoc* award in *Texaco v. Libya*[1103].[1104]

---

[1095]  Resp. Obj. J. & C-Mem. ¶ 3.5.

[1096]  Resp. Obj. J. & C-Mem. ¶ 3.5.

[1097]  Resp. Obj. J. & C-Mem. ¶ 3.4.

[1098]  Resp. Obj. J. & C-Mem. ¶ 3.6.

[1099]  Resp. Obj. J. & C-Mem. ¶ 3.7, see paragraph 734 below.

[1100]  Resp. Rej. ¶¶ 13 ff.

[1101]  Resp. Rej. ¶ 15.

[1102]  Resp. Rej. ¶ 16.

[1103]  *Texaco Overseas Petroleum Company v. Government of the Libyan Arab Republic, ad hoc* Award, 19 January 1977, <u>RLA-17</u>.

[1104]  Resp. Rej. ¶ 16.

725.    The Respondent finally argues that the October 2007 Agreement gives rise only to best-effort duties as it was concluded at a time when the proceedings in the Latvian courts reached their peak and it dealt with a number of aspects, including the steps required in order to have the attachment of Latgales Enerģija's bank account lifted, in order for the parties to agree on the key points of disagreement regarding the Long-Term Agreement and to reach agreement on amendments to the Long-Term Agreement.[1105]

The Respondent asserts that this is confirmed by the fact that no party "has ever challenged the non-performance of this agreement in court".[1106]   According to the Respondent, all involved parties understood that the October 2007 Agreement was simply an agreement to cooperate in good faith and was not a "contractually binding agreement with exactly spelled out rights and obligations".[1107]   Reliance is placed by the Respondent on Articles 1:302, 5:102 and 5:105 of the PECL "as general principles of international law"; an analysis of the October 2007 Agreement under Latvian law would yield the same result.[1108]

(C)    THE DUTY TO PAY FOR THE NATURAL GAS SUPPLIED BY LATVIJAS GĀZE

726.    The Respondent contends that the Long-Term Agreement is to be characterised as a contract for the lease of a business, *i.e.* the whole heating service business in Rēzekne (*Betriebsübergang*); accordingly, the lessee stepped into the shoes of the lessor in the lessor's relationship with third parties, including Latvijas Gāze.[1109]

727.    In reply to the Claimant's submission that the German legal concept of *Betriebsübergang* is inapplicable in the present case, the Respondent submits that it used the expression *Betriebsübergang* "to denote the specific mode of mergers and acquisitions", in particular the acquisition of a business as a whole as opposed to a share deal or an asset deal limited to certain assets; reliance was placed by the Respondent on Sections 18 and 20 of the Latvian Commercial Code and Clause 5.1 of

---

[1105]   Resp. Obj. J. & C-Mem. ¶ 3.16; Resp. Rej. ¶ 23.
[1106]   Resp. Rej. ¶ 23.
[1107]   Resp. Rej. ¶ 23.
[1108]   Resp. Rej. ¶ 24.
[1109]   Resp. Obj. J. & C-Mem. ¶ 3.13.

205

the Long-Term Agreement, which expressly provides for the transfer of all of the lessor's employment contracts to the lessee.[1110]

728.  The Respondent rejects the Claimant's argument that no *Betriebsübergang* took place on the basis that all assets were not transferred; reliance is placed on Section 20(1) of the Latvian Commercial Code whereby it is permissible to transfer only certain assets.[1111]

729.  The Respondent rejects the Claimant's contention that Latvian civil law gives preference to a literal rule of interpretation and construction.[1112]  Rather, Latvian civil law is based on the civil law tradition "where similar aspects are construed reasonably and the main actual form of construction of contracts is [to determine] what the other party objectively could understand".[1113]

730.  The Respondent contends the following:

(i)  on 27 October 2005 Latgales Enerģija was given an opportunity to acquaint itself with the content of the Gas Supply Agreement, which provided for the exact amount of gas that had to be supplied to the Municipality as well as the sums to be paid thereunder; reliance is placed by the Respondent on Clause 4 of the February 2005 Agreement[1114];[1115]

(ii)  Latgales Enerģija by its subsequent conduct acknowledged its obligation to pay for the natural gas supplied, *e.g.* as the Claimant submitted that it had received and paid Latvijas Gāze's invoices;[1116]

(iii)  the Claimant attempts to show that it was entitled to pay a lower price, but the Claimant does not deny that it accepted, and at least in part paid, such invoices;[1117] and

---

[1110]  Resp. Rej. ¶ 22; Resp. P-H (PO8) ¶¶ 17-20.
[1111]  Resp. Rep. (PO9) ¶ 37.
[1112]  Resp. Rep. (PO9) ¶ 38.
[1113]  Resp. Rep. (PO9) ¶ 38.
[1114]  C-8.
[1115]  Resp. Obj. J. & C-Mem. ¶ 3.14.
[1116]  Resp. Obj. J. & C-Mem. ¶ 3.14; see also Transcript, Day 4, 129/7-21.

(iv)   Latgales Enerģija was therefore aware of, and fully understood, its duty to pay for the natural gas supplied.[1118]

In the Respondent's view, it is therefore impossible to conclude that, due to a lack of specific and clear provisions to the contrary, the lessor should pay something to the lessee in the presence of a business lease; only Latgales Enerģija itself was fully responsible to pay for all of the natural gas delivered.[1119]

731.   The Respondent alleges that the Municipality did its utmost best to persuade Latvijas Gāze to continue to supply natural gas despite Latgales Enerģija's refusal to pay for the outstanding invoices; however, Latvijas Gāze turned down the Municipality's request.[1120]   The Respondent's efforts belie the Claimant's argument that the Municipality intended to harm the "Concession Project".[1121]

732.   The Respondent further argues that the Claimant misconstrues the February 2005 Agreement and October 2007 Agreement.[1122]   Clause 4, paragraph 2 of the February 2005 Agreement, read as a whole in conjunction with the fourth recital of the same agreement and the Long-Term Agreement, means that the contracting parties intended to hold the Municipality liable towards Latgales Enerģija in case the Municipality decided to cancel the gasification of the area or request Latvijas Gāze to deliver a smaller amount of gas than it had originally undertaken to buy.[1123]

(D)   THE OUTSTANDING LEASE PAYMENTS

733.   Rēzeknes Siltumtīkli considered that Latgales Enerģija failed to make the lease payments under the Long-Term Agreement.   To request such payments, Rēzeknes Siltumtīkli sent a "notice of warning" to Latgales Enerģija in November 2006.[1124]

---

[1117]   Resp. Obj. J. & C-Mem. ¶ 3.14.
[1118]   Resp. P-H (PO8) ¶¶ 17-20.
[1119]   Resp. Obj. J. & C-Mem. ¶ 3.15.
[1120]   R-32.
[1121]   Resp. P-H (PO8) ¶ 21.
[1122]   Resp. Obj. J. & C-Mem. ¶ 3.16.
[1123]   Resp. Obj. J. & C-Mem. ¶ 3.16.
[1124]   Transcript, Day 4, 130/21-25; 131/1-18.

(E)     THE INFLUENCE ALLEGEDLY BROUGHT TO BEAR BY THE MUNICIPALITY
ON THE REGULATOR

734.    According to the Respondent, the Regulator was a legally, functionally and
financially independent entity that made its decisions based "only on strict grounds
prescribed" by the Public Utility Regulators Act, and was financed solely through fees
paid by the providers of public utilities such as Latgales Enerģija; reliance is placed
on Sections 8(6), 8(7), 8(8), 11 and 29 of the Latvian Public Utility Regulators Act[1125]
in force at the relevant time.[1126]   The Regulator's legal status, governance, operation
and competence were entirely separate from the Municipality and its decision-making
process.[1127]   The Respondent contends that the Claimant's allegations are completely
unwarranted and not proven by any evidence; reliance is placed on the decisions made
by the Latvian courts denying Latgales Enerģija's complaints with respect to the
manner in which the Regulator had applied the law[1128].[1129]

735.    The Respondent denies that the local authorities in Latvia and the entities they own
and control attempted to evict the Claimant from its business in a concerted plan.[1130]
According to the Respondent, there is no evidence on the record supporting such a
claim other than mere allegations, assumptions, emotional language and requests from
the Claimant in order that the Tribunal draw adverse inference.[1131]

(F)     THE DEVELOPMENT PLAN

736.    The Respondent contends that the parties had a "mutual cooperative obligation (…) to
do their utmost to achieve a mutually acceptable outcome" under Clause 1.2 of the
February 2006 Agreement; it was not a matter solely for Latgales Enerģija to decide
"what is acceptable in order for the Development Plan to be adopted".[1132]
Considering the Claimant's experience in various similar projects, it is "the logical
and fair construction" that the Claimant had "accepted the risk that the Development

---

[1125]   CLA-49, see paragraph 38 above; RLA-2.
[1126]   Resp. Obj. J. & C-Mem. ¶¶ 3.7-3.8.
[1127]   Resp. Obj. J. & C-Mem. ¶ 3.8.
[1128]   R-1, R-2, R-3, R-4, R-5; R-6.
[1129]   Resp. Obj. J. & C-Mem. ¶ 3.8.
[1130]   Resp. Rej. ¶ 34.
[1131]   Resp. Rej. ¶ 34.
[1132]   Resp. Obj. J. & C-Mem. ¶ 3.12.

Plan shall be developed together with the Rēzekne municipality" and that both parties would therefore determine the acceptable content of such plan.[1133]  Latgales Enerģija had assumed the risk of the mutual cooperation in the development of the Plan;[1134] it was a matter for the Claimant (through Latgales Enerģija) to come up with a proper draft.[1135]  It is admitted by the Respondent that it was the Municipality which remained ultimately responsible for devising the plan.[1136]

737.  The Respondent further states that the issues relating to the adoption of the development plan fall into four categories as follows:[1137]

(i)  the Parties' conduct and their understanding as to whose legal duty it was to devise the development plan in light of the particular arrangements;

(ii)  the timing and circumstances in which Latgales Enerģija came up with the allegations concerning the lack of a development plan;

(iii)  the Respondent's conduct after it turned out that Latgales Enerģija was unable to provide a proper development plan; and

(iv)  the reasonable risk any prudent investor would have been deemed to have assumed considering the lack of a development plan.

738.  On the *first point*, the Respondent contends that "subsequent practice" plays a paramount role in public international law, that Latgales Enerģija understood that it had been delegated the duty to devise a concrete text and submit it to the Municipality for approval, as shown the "consistent development of events" since Latgales Enerģija did not disclaim its duty provide a draft development plan and that Latgales Enerģija is therefore not entitled to rely on the Municipality's ultimate responsibility to devise the development plan to avoid its own duty.[1138]  Finally, the Administrative District

---

[1133]  Resp. Obj. J. & C-Mem. ¶ 3.12.

[1134]  Resp. Obj. J. & C-Mem. ¶ 3.23.

[1135]  Resp. P-H (PO8) ¶ 11.

[1136]  Resp. P-H (PO8) ¶ 11.

[1137]  Resp. P-H (PO8) ¶ 10.

[1138]  Resp. P-H (PO8) ¶ 11.

Court stated *inter alia* that the Municipality was entitled to delegate this obligation "freely to any private individual or entity".[1139]

739.    On the *second point*, the Respondent contends that Latgales Enerġija suddenly changed its approach to its obligations after undertaking them, that Latgales Enerġija has not been "sufficiently persistent" in making its complaint that the Municipality's failure to devise a development plan amounted to a breach of the Municipality's duties to the Claimant, and, finally, that Latgales Enerġija, having threatened to sue on four occasions relying on the absence of a development plan for the City and other alleged breaches,[1140] eventually failed to do so.[1141]

740.    On the *third point*, the Respondent submits that the Municipality in good faith invited Latgales Enerġija to participate in the drafting of a "proper" development plan after it had appeared most likely that Latgales Enerġija would not be in a position to submit a "proper document" and the Municipality took the matter in its own hands.[1142]

741.    On the *fourth and final point*, the Respondent contends that Clause 1.6 of the February 2005 Agreement expressly provides that tariffs would be adjusted in line with the applicable provisions of law, that there was therefore no representation or warranty relating to the situation in which there was no development plan in place, nor was there any waiver on the part of the Municipality for the benefit of the Claimant.[1143]   Moreover, Clause 1.2 of the February 2006 Agreement expressly provided that Latgales Enerġija should devise a draft of the development plan which the Municipality would then "*formally validate*", with the clear implication that such draft would have to comply with the law.[1144]   Clause 5 of the February 2006 Agreement specifically provided that Latgales Enerġija was entitled to claim damages for the Municipality's failure to comply with its duties under the Agreement; Latgales Enerġija did not enforce such contract term.[1145]   The Respondent further notes that the licences issued shortly after the conclusion of the Long-Term Agreement contained

---

[1139]   Transcript, Day 1, 113/5-12.
[1140]   R-26; R-27; R-28; R-29.
[1141]   Resp. P-H (PO8) ¶ 13.
[1142]   Resp. P-H (PO8) ¶ 14.
[1143]   Resp. P-H (PO8) ¶ 15.
[1144]   Resp. P-H (PO8) ¶ 15.
[1145]   Resp. P-H (PO8) ¶ 15.

various obligations that were dependent on the existence of a development plan, and that were not challenged by the Claimant.[1146]

742.    Therefore, the Claimant is not entitled to rely on the Regulator's previous practice or the first approval of the tariffs following the issuance of the licences to Latgales Enerģija.[1147]   The Regulator's first approval of Latgales Enerģija's tariffs should rather be regarded as a "good faith gesture" rather than the continuation of an alleged previous practice.[1148]   Finally, and in any event, Latgales Enerģija's draft development plan of 15 November 2006[1149] did not include any verifiable explanations of the figures it contained.[1150]

<div align="center">(G)    THE REVIEW OF THE TARIFFS BY THE REGULATOR</div>

743.    The Respondent submits that *(i)* Latgales Enerģija applied to the Regulator for the approval of increased heating tariffs on no less than four occasions,[1151] *(ii)* the Regulator approved an increase in the tariff by decision no. 19 of 19 December 2005,[1152] *(iii)* the Regulator then denied Latgales Enerģija's further requests on the basis that Latgales Enerģija had failed to show "objective business necessity" for a further increase in the tariff as required by law and *(iv)* the Regulator on 7 December 2007 revoked its decision no. 28 of 9 November 2007 increasing the tariff on the basis that Latgales Enerģija had falsely represented the gas supply costs[1153].[1154]

744.    According to Respondent, the Claimant misconstrues the applicable Latvian law in that it contends that applications for a new tariff could have been submitted only provided that a development plan had been adopted.[1155]   The Respondent submits that "the Claimant could have relied, logically, on more general development documents

---

[1146]  Resp. P-H (PO8) ¶ 15.
[1147]  Resp. P-H (PO8) ¶ 15.
[1148]  Resp. P-H (PO8) ¶ 15.
[1149]  R-31.
[1150]  Resp. P-H (PO8) ¶ 16.
[1151]  Resp. Obj. J. & C-Mem. ¶ 3.18.
[1152]  C-14.
[1153]  C-28.
[1154]  Resp. Obj. J. & C-Mem. ¶ 3.19.
[1155]  Resp. Obj. J. & C-Mem. ¶ 3.20.

<div align="center">211</div>

and still submit its own business scenario" since Section 17 of the Methodology[1156] expressly states that the utilities provider "makes up its own plan in accordance with a Development Plan **or other planning document** of the municipality".[1157]  Reliance is placed by the Respondent on the Textbook for Regulatory Implications of District Heating[1158].[1159]

745.   The Respondent further argues that the Claimant's arguments relating to the Regulator's prior practice are without foundation since the approval of the first request for a new tariff cannot amount to a "practice";[1160] the Claimant should have realized that the "concession arrangement" opened a new page in administrative practice and the previous administrative practice relating to the heat supply in Rēzekne would be history.[1161]

(H)   THE REVOCATION OF LATGALES ENERĢIJA'S LICENCES TO PRODUCE, TRANSMIT AND SELL THERMAL ENERGY

746.   The Respondent contends that Latgales Enerģija has been in continuous breach of its duties under the licences[1162] and the applicable law to the detriment of the Rēzekne inhabitants in that *(i)* Latgales Enerģija failed to submit regular yearly review reports for the previous heating season and forecasts for the future, *(ii)* Latgales Enerģija failed to submit a "proper" development plan as required by its licences and *(iii)* Latgales Enerģija failed at the start of the heating season 2007/2008 to provide any heating to the northern district of Rēzekne, three kindergartens and provided insufficient heating to six schools.[1163]  As a result, the Regulator issued the following decisions:

(i)   on 4 October 2007 the Regulator issued a warning to Latgales Enerģija recalling the operator's duty to submit regular reports for the previous period

---

[1156]  C-35.

[1157]  Resp. Obj. J. & C-Mem. ¶ 3.20 (original emphasis).

[1158]  R-7.

[1159]  Resp. Obj. J. & C-Mem. ¶ 3.20.

[1160]  Resp. Obj. J. & C-Mem. ¶ 3.40.

[1161]  Resp. Rej. ¶ 31.

[1162]  C-10; C-11; C-12.

[1163]  Resp. Obj. J. & C-Mem. ¶ 3.21.

as well as forecasts for the upcoming heating seasons and to submit the required development plan[1164];[1165]

(ii)    on 11 October 2007 the Regulator suspended Latgales Enerģija's licences[1166];[1167] and

(iii)    on 3 June 2008 the Regulator revoked Latgales Enerģija's licences because "instead of delivering a new and proper solution, [Latgales Enerģija] continued blaming the Rēzekne municipality for what had happened" and there was a risk that the same situation could occur again in the following heating season;[1168] the Respondent contends that the Claimant acknowledged its failure to submit the relevant regulatory documentation and to provide heating services in Rēzekne as facts when it argued denying its liability before the Regulator[1169].[1170]

747.    The Respondent submits that the Municipality ultimately had to appoint an interim provider for heating services in Rēzekne under the applicable law and therefore requested Latgales Enerģija to return the leased assets on 14 July 2008;[1171] the Municipality was left with no choice but to enforce the decision with the help of the police forces as the heating season was about to start and Latgales Enerģija continued to refuse to return the heating assets.[1172]

748.    The Respondent further argues that *(i)* the Claimant is not entitled to rely on the "formal duty" of the Municipality to devise and approve the development plan and the "alleged duty" of the Municipality to pay for the delivered gas in case Latgales Enerģija did not make a sufficient profit, *(ii)* the Municipality needed to avoid subsidizing the district heating system, which was clearly understood by the Claimant, *(iii)* the Claimant's argument that the Municipality had assumed the risk to cover the

---

[1164]  C-22.

[1165]  Resp. Obj. J. & C-Mem. ¶ 3.21.

[1166]  C-23.

[1167]  Resp. Obj. J. & C-Mem. ¶ 3.21.

[1168]  Resp. Obj. J. & C-Mem. ¶ 3.21.

[1169]  C-153.

[1170]  Resp. Obj. J. & C-Mem. ¶ 3.21.

[1171]  C-33.

[1172]  Resp. Obj. J. & C-Mem. ¶ 3.22.

price difference in case of an unforeseen rise in the supply costs was contrary to the very purpose of inviting private capital, *(iv)* a prudent risk management by the Claimant should have taken into account the factors that are typically involved in the district heating business and resolved them before undertaking the duties arising out of the concession (see paragraphs 781 ff. below) and, finally *(v)* there was no duty on the Municipality to guarantee the solvency and viability of the business, which was a risk to be borne by the Claimant.[1173]

The Respondent submits that the Municipality reasonably exercised its discretion so as to involve another entity in order to have heating supplied under such circumstances, bearing in mind that Latgales Enerģija had expressed its dissatisfaction with the performance of the Long-Term Agreement from the outset of the Project, had blamed the Municipality for everything and had hardly a caring attitude, so that the Municipality's decision to proceed with the enforcement of its previous decision directing Latgales Enerģija to "return" the leased assets was a logical outcome in the circumstances.[1174]   That said, the Respondent points out that actual force was never used and that the Claimant had never adduced any evidence in that regard.[1175]

### (3)   ATTRIBUTION

749.   The Tribunal will summarise the Respondent's arguments relating to attribution in the following order:

(i)      the Municipality (see paragraph 750 below);

(ii)     the Regulator (see paragraphs 751 ff. below);

(iii)    Rēzeknes Siltumtīkli and Rēzeknes Enerģija (see paragraphs 753 ff. below); and

(iv)     Latgales Enerģija (see paragraphs 762 ff. below).

---

[1173]  Resp. Obj. J. & C-Mem. ¶ 3.23.
[1174]  Resp. Obj. J. & C-Mem. ¶ 3.25.
[1175]  Resp. Obj. J. & C-Mem. ¶ 3.25.

(A)     THE MUNICIPALITY

750.   The Respondent does not contest the attribution of the Municipality' conduct to itself.

(B)     THE REGULATOR

751.   As for the Regulator, the Respondent argues that the Rēzekne Municipality's direction and control over the Regulator cannot be inferred based on the sole fact that the Municipality (together with 31 other Municipalities) appointed the members of the Regulator or that the Municipality, Rēzeknes Siltumtīkli and the Regulator interacted with one another.[1176]

752.   The Respondent argues that the Claimant has failed to discharge its burden of proof with respect to the allegations that the Municipality influenced, or sought to influence, the Regulator.[1177]

(C)     RĒZEKNES SILTUMTĪKLI AND RĒZEKNES ENERĢIJA

753.   The Respondent contends that Rēzeknes Siltumtīkli and Rēzeknes Enerģija do not come within the purview of Articles 5 and 8 of the ILC Articles.  Both entities were incorporated as commercial entities subject to private law.[1178]

754.   The Respondent explains that the Latvian State and Local Government-Owned Corporations Act[1179] determines the rules applicable to commercial entities owned by public authorities; the corporate governance of such entities and the public shareholder's authority over such entities follows the provisions in the Latvian Commercial Code.  These principles are restated also in the Municipalities Act[1180].[1181]

755.   Article 5 of the ILC Articles is not applicable to Rēzeknes Siltumtīkli and Rēzeknes Enerģija.  The Respondent relies on the following succession of events:[1182]

---

[1176]  Transcript, Day 4, 97/6-25; 98/1-22.

[1177]  Transcript, Day 1, 121/22-25; 122/1-9, see also paragraphs 734 ff. above.

[1178]  Resp. P-H (PO8) ¶¶ 8 ff.

[1179]  RLA-29.

[1180]  C-34.

[1181]  Resp. P-H (PO8) ¶ 8; Resp. Rep. (PO9) ¶ 14.

[1182]  Resp. P-H (PO8) ¶ 8; Resp. Rep. (PO9) ¶ 17.

(i)     on 3 August 2004 the Municipality issued "a general conceptual consent with reference to [the] Municipality's overall obligation under the law to *organise* the heat supply";[1183] such permission by the Municipality to lease the assets was given upon request of Rēzeknes Siltumtīkli pursuant to Section 15(1) of the Municipalities Act; such permission by the Municipality signalled respect on the part of the Municipality for Rēzeknes Siltumtīkli's "corporate interests, decisions and plans";

(ii)    then the draft Long-Term Agreement submitted by Latgales Enerģija was discussed under the auspices of Rēzeknes Siltumtīkli;[1184]

(iii)   the Management Board of Rēzeknes Siltumtīkli approved such draft;[1185]

(iv)    the Supervisory Council of Rēzeknes Siltumtīkli then in turn approved the draft;[1186] and

(v)     whereupon on 28 January 2005 the Municipality approved the Long-Term Agreement,[1187] which decision was also made pursuant to Section 15(1) of the Municipalities Act and the previous decisions of the bodies of Rēzeknes Siltumtīkli.

756.    Neither Rēzeknes Siltumtīkli nor Rēzeknes Enerģija have been delegated any public function according to the Respondent.[1188]   According to Latvian law, in particular Section 40(2) of the Public Administration Act[1189] as well as Section 15(3) of the Municipalities Act[1190] a public function may be delegated only by contract or law;[1191] however, no delegation agreement was ever concluded between the Municipality and Rēzeknes Siltumtīkli and the Claimant fails to show which legal provision provided

---

[1183]  Resp. P-H (PO8) ¶ 8 (original emphasis); R-24 [page 1].
[1184]  R-24 [pages 2-3].
[1185]  R-24 [page 2].
[1186]  R-24 [page 5].
[1187]  R-24 [page 6].
[1188]  Resp. P-H (PO8) ¶ 8; Resp. Rep. (PO9) ¶ 14.
[1189]  RLA-20.
[1190]  C-34.
[1191]  Resp. P-H (PO8) ¶ 8; Resp. Rep. (PO9) ¶ 11.

for a delegation of a public function to either Rēzeknes Siltumtīkli or Rēzeknes Enerģija.[1192]

757.   The Long-Term Agreement is a commercial contract and Rēzeknes Siltumtīkli executed such contract acting in its "private commercial capacity", as shown for instance by the Preamble and Clause 2.1.1 of the said agreement.[1193]

758.   Article 8 of the ILC Articles is not applicable to Rēzeknes Siltumtīkli and Rēzeknes Enerģija since neither company has acted "as an extended arm of the Municipality" at least in respect of the contractual duties owed to the Claimant and Latgales Enerģija.[1194]

There needs to be a "sufficiently serious involvement" of the State in the business of the company it owns, and it is not enough for a State to be involved "sporadically in certain important aspects of the matter" or "to care or [show] interest for the process or the outcome".[1195]

759.   In the present case the Municipality permitted (but did not mandate) Rēzeknes Siltumtīkli to conclude the Long-Term Agreement with a particular operator upon Rēzeknes Siltumtīkli's request, the terms of the Long-Term Agreement were freely discussed without the Municipality's involvement and a separate agreement was made between the Municipality and Latgales Enerģija subsequent to the execution of the Long-Term Agreement; therefore, Latgales Enerģija understood that Rēzeknes Siltumtīkli's (and later Rēzeknes Enerģija's) conduct was not attributable to the Municipality.[1196]   In particular, Rēzeknes Siltumtīkli acting in a commercial setting, through commercial means and on at an arm's length basis, *(i)* came up with the idea of the Long-Term Agreement, *(ii)* was free to influence the main points of the Long-Term Agreement, *(iii)* initiated local civil proceedings against Latgales Enerģija on its own in order to claim damages for breach of the said agreement and *(iv)* terminated

---

[1192]   Resp. P-H (PO8) ¶ 8; Resp. Rep. (PO9) ¶ 13.
[1193]   Resp. Rep. (PO9) ¶ 17.
[1194]   Resp. P-H (PO8) ¶ 9.
[1195]   Resp. Rep. (PO9) ¶ 15.
[1196]   Resp. P-H (PO8) ¶ 9.

217

the agreement on its own, rather than acting upon request of the Municipality or the Regulator.[1197]

760. The Respondent denies the Claimant's allegation that Rēzeknes Siltumtīkli and Rēzeknes Enerģija were involved in "imposing fees, quotas or charges" because they signed the October 2007 Agreement.[1198]  If all the parties privy to the October 2007 Agreement were attempting to lower tariffs, that was only to ease potential social tension.[1199]

761. Finally, the Respondent did not present additional arguments regarding the Claimant's submission with regard to the application of Article 2(2)(b) of the US-Latvia BIT pursuant to the MFN Clause contained in Article 3(2) of the BIT since, in the Respondent's view, Article 2(2)(b) of the US-Latvia BIT fits well into Article 5 of the ILC Articles and does not represent "an addition to the general rules of attribution existing under customary international law".[1200]

(D)   LATGALES ENERĢIJA

762. The Respondent contends that Latgales Enerģija was the Claimant's vehicle through which it operated "the concession" and therefore Latgales Enerģija's conduct is attributable to the Claimant "for the purposes of the concession".[1201]

**(4)   THE RESPONDENT'S ARGUMENTS WITH RESPECT TO THE ALLEGED BREACHES OF THE BIT**

(A)   NO BREACH OF THE BIT

763. The Respondent submits that its treatment of the Claimant's investment does not constitute a violation of the BIT.

764. The Claimant's claims are in essence based on three points: *(i)* the Municipality was bound to pay the full price for the natural gas supplied, *(ii)* the Municipality was bound to prepare a heat supply development plan for the City, and its failure to

---

[1197] Resp. Rep. (PO9) ¶ 18.
[1198] Resp. Rep. (PO9) ¶¶ 19-20.
[1199] Resp. Rep. (PO9) ¶ 20.
[1200] Resp. Rep. (PO9) ¶ 9.
[1201] Resp. Obj. J. & C-Mem. ¶ 3.3; Resp. Rej. ¶ 11.

comply with such duty caused the Regulator to dismiss the new tariffs proposed by Latgales Enerģija's and *(iii)* the Municipality and the Regulator conspired to drive Latgales Enerģija out of business.

765. The Respondent has already shown *(i)* that the duty to pay for the natural gas supplied was only on Latgales Enerģija (see paragraphs 726 ff. above), *(ii)* that it was Latgales Enerģija's obligation to provide the development plan (see paragraphs 736 ff. above) and *(iii)* that the Regulator applied Latvian law properly, as confirmed by the decisions made by the Latvian courts that are entitled to due deference; there is, moreover, no evidence of any collusion or conspiracy between the Municipality and the Regulator (see paragraph 734 above).

766. Regarding the Claimant's expropriation claim, the Respondent asserts that it is contradictory for the Claimant to make a claim for outright and gradual expropriation at the same time.[1202]  The Respondent contests the Claimant's allegation that Latgales Enerģija was actually insolvent and the contention that Latvian law prevented the liquidation of the company due to pending litigation.[1203]

767. The Respondent contends that the Claimant's complaint of a breach of its expectations due to the Municipality's alleged failure to devise a development plan of its own motion must be considered under international law, since a breach of national law does not automatically entail a breach of international law and the position under Latvian law cannot therefore be dispositive.[1204]  However, as an experienced and prudent manager, the Claimant could not have been surprised by the sharp increase in the gas supply costs and should have taken all precautions required "to avoid contentious issues" under the circumstances, such as carrying out risk management and, for example, requiring guarantees from the Municipality regarding the development plan before it entered into the "concession arrangement"; but the only guarantee Latgales Enerģija obtained was contained in Clause 1.2 of the February 2006 Agreement.[1205]

---

[1202]  Transcript, Day 1, 136/10-25; 137/1-9.

[1203]  Transcript, Day 1, 137, 137/14-25; 138/1-13.

[1204]  Resp. Rej. ¶ 32.

[1205]  Resp. Rej. ¶ 32; Resp. Rep. (PO9) ¶¶ 28-29.

768.     In such circumstances, it is fair to conclude, according to the Respondent, that the sole obligation on the State is not to adopt decisions that are arbitrary or "prejudiced decisions".[1206]   In the present case, the Respondent actively sought solutions considering the interests of the inhabitants of Rēzekne at large, and not only the commercial interests of the Claimant.[1207]   The Respondent submits that in "[s]ocially vulnerable business areas" such as district heating services, the investor's expectations cannot be the same as in "wider, general business undertakings" because a "social element plays a substantial role".[1208]   According to the Respondent, Latgales Enerģija was involved in the whole process to devise the development plan and its representatives participated in 12 out of 16 meetings of the Working Group; the correspondence contained in <u>R-30</u> showed the Municipality to be interested in finding common ground.[1209]

769.     The Respondent further points out that neither the Municipality nor Rēzeknes Siltumtīkli promised that the opportunity to have new tariffs approved without the existence of a development plan would continue for an indefinite period of time.[1210]

770.     According to the Respondent, the same test applies to the legal question whether the Respondent had breached the Claimant's expectations by failing to procure that Latvijas Gāze should not suspend the deliveries of natural gas.[1211]

771.     The Respondent submits that public international law is not "simply a supreme adjudicator" and that the Tribunal must not consider "whether Latvian courts have properly applied Latvian domestic law" in the present case; the Tribunal is called upon to determine only whether international law rules and provisions pertinent to this case were observed properly.[1212]

---

[1206]   Resp. Rep. (PO9) ¶ 32.
[1207]   Resp. Rep. (PO9) ¶ 32.
[1208]   Resp. Rep. (PO9) ¶ 32.
[1209]   Resp. Rep. (PO9) ¶ 33.
[1210]   Resp. Rep. (PO9) ¶ 34.
[1211]   Resp. Rej. ¶ 32.
[1212]   Resp. Obj. J. & C-Mem. ¶ 3.31.

772.   The Respondent has acted in a predictable and transparent manner;[1213] the commercial agreements were performed on a commercial basis in accordance with their terms and there was no sovereign interference to alter or terminate the terms and conditions of those agreements.[1214]

773.   The Respondent states that the Claimant has advanced the same arguments before the Latvian courts and in these proceedings: the Claimant attempts to show in its Memorial why Latgales Enerģija did not have to pay for the gas and why the development plan was the sole responsibility of the Municipality; however, the documents and/or the facts must be read otherwise.[1215]  The decisions of the Latvian courts with respect to the "commercial part" of the "concession agreements"[1216]  and the "public or administrative part" of the licences and other "sovereign decisions"[1217] clearly show that Latgales Enerģija's arguments made in the Latvian proceedings are essentially the same as the arguments advanced in the Claimant's Memorial in these proceedings.[1218]  In the Respondent's view, there was no apparent or clear disregard of the facts or the law in violation of the BIT, let alone any intention to harm the Claimant.[1219]

774.   The Respondent points out that the Claimant through Latgales Enerģija selectively decided which judicial decisions to appeal in the Latvian courts; particularly with regard to the "concession agreements" and the licences, the Claimant did not appeal the decision ordering Latgales Enerģija to pay its outstanding debt for the natural gas delivered as well as the decisions to suspend the licences and to enforce the "return of the assets".[1220]

775.   The Respondent submits that the whole treatment afforded to the Claimant and Latgales Enerģija was reasonable and that they were able to raise all of their

---

[1213] Resp. Rej. ¶¶ 27-30.
[1214] Resp. Rej. ¶ 28 [table].
[1215] Resp. Obj. J. & C-Mem. ¶ 3.32.
[1216] R-8; R-9; R-10.
[1217] R-1; R-2; R-3; R-4; R-5; R-6.
[1218] Resp. Obj. J. & C-Mem. ¶ 3.32.
[1219] Resp. Obj. J. & C-Mem. ¶ 3.32.
[1220] Resp. Obj. J. & C-Mem. ¶ 3.35.

221

arguments "at all times"; reliance is placed by the Respondent on the award in *Arif v. Moldova*[1221].[1222]

776.  As to the Regulator, the Respondent asserts that it requested performance of the licence conditions, not of the commercial agreements.[1223]  According to the Respondent, the Claimant was aware of the terms of the licences, in particular, the obligation to submit regular reports and forecasts, and did not challenge them in court; the Claimant cannot consider such terms as invalid simply by alleging that the Respondent did not perform some obligations.

777.  The Respondent further submits that the Claimant had a duty to restructure the existing business in order to ensure a sustainable supply of heat; that in turn required the operator to be proactive in submitting information to the State authorities.[1224]

778.  The Respondent contends that the Regulator put Latgales Enerģija on notice of the breach of various licence conditions, proceeding gradually from the 4 October 2007 warning, the 11 October 2007 suspension and then the revocation of the licences on 3 June 2008.  The revocation of the licences by the Regulator was therefore the ultimate sanction against Latgales Enerģija's repeated failure to comply with the licence conditions, the most important of which were the failure to provide good-quality uninterrupted heating services, and Latgales Enerģija's refusal to pay the full price of the natural gas.[1225]

779.  In the Respondent's view, Latgales Enerģija's argument that the Municipality had to cover the price difference arising out of an unforeseen rise in the costs of natural gas was tantamount to saying that the Municipality had to subsidise the Claimant's investment; aside from running counter to the basic purpose of inviting private

---

[1221]  *Mr. Franck Charles Arif v. Republic of Moldova,* ICSID Case No. ARB/11/23, Award, 8 April 2013, RLA-23, ¶ 453.

[1222]  Transcript, Day 1, 123/7-22.

[1223]  Resp. Rej. ¶ 28.

[1224]  Resp. Rej. ¶ 31.

[1225]  Resp. Obj. J. & C-Mem. ¶¶ 3.21; 3.23.

capital, such a proposition had no basis in the contracts signed by Latgales Enerġija.[1226]

780.   Finally, the evidence is, according to the Respondent, that it is the Claimant's or Mr. Strioga's common practice to enter into deals having a potential for serious issues to arise and litigation to take place in due course due to a lack of "precisely defined rules of cooperation"; reliance is placed by the Respondent on Exhibit <u>R-19</u> containing a number of press reports by the Lithuanian press and judgments by Lithuanian authorities.[1227]

<div style="text-align:center">

(B)   THE RISKS ASSUMED BY THE CLAIMANT VS. THE CLAIMANT'S LEGITIMATE EXPECTATIONS

</div>

781.   The Respondent submits that the investor's own conduct should be taken into account to determine the Respondent's liability under the BIT; reliance is placed on the awards in *Azinian v. United Mexican States*,[1228] *MTD*[1229] and *Noble Ventures v. Romania*[1230].[1231]   According to the Respondent, these cases all dealt with various "substantial bad faith conducts by [the] investor itself" such as improper due diligence, non-submission of relevant information and "causing the events for revocation of licence".[1232]

The Respondent submits that all these factors are pertinent in the present case.[1233]

782.   In the Respondent's view, a more reasonable and prudent investor than the Claimant would have considered the risks typically linked to the provision of district heating services in countries such as Latvia before making the investment.[1234]

783.   In particular, the Respondent submits that the Claimant should have taken into account the following risks:

---

[1226] Resp. Obj. J. & C-Mem. ¶ 3.23, see also paragraphs 726 ff. above.

[1227] See the Tribunal's index of this exhibit in footnote 544 above; Resp. Rej. ¶ 33.

[1228] *Robert Azinian, Kenneth Davitian & Ellen Baca v. United Mexican States*, ICSID Case No. ARB(AF)/97/2, Award, 1 November 1999 ("*Azinian v. Mexico*"), <u>RLA-8</u>.

[1229] *MTD v. Chile*, <u>CLA-18</u>.

[1230] *Noble Ventures, Inc. v. Romania,* ICSID Case No. ARB/01/11, Award, 12 October 2005, <u>RLA-9</u>.

[1231] Resp. Obj. J. & C-Mem. ¶ 3.34; Transcript, Day 4, 82/6-25; 83/1-25; 84/1-7.

[1232] Resp. Obj. J. & C-Mem. ¶ 3.34.

[1233] Resp. Obj. J. & C-Mem. ¶ 3.34.

[1234] Resp. Obj. J. & C-Mem. ¶ 3.23; Transcript, Day 4, 87/10-15.

<div style="text-align:center">223</div>

(i)      the general risk inherent in the fact that the Claimant did not have a comprehensive legal, financial or technical due diligence carried out;[1235]

(ii)     the risk which the Claimant assumed due to the non-existence of a heat supply development plan for the City when the Long-Term Agreement was executed, due *inter alia* to the fact that it was common practice for an operator to be the main entity devising and proposing major improvements and developments of the district heating system;[1236]

(iii)    the risk inherent in the "mutual cooperation obligation" to devise a development plan that had to be accepted by both parties (Latgales Enerġija and the Municipality) as well as the risk inherent in the absence of a timeline relating to the preparation of such plan;[1237]

(iv)     the risk of possible increases in the price Latvijas Gāze would be allowed to charge for the natural gas delivered;[1238]

(v)      the risk that an increase in the tariff Latgales Enerġija was allowed to charge had to rest on objective business needs rather than the sole fact that there had been an increase in the price of gas or electricity;[1239]

(vi)     the risk that the business may not be profitable;[1240] and

(vii)    the general risk of adverse events.[1241]

784.    According to the Respondent, however, Latgales Enerġija in fact "acted like in a non-regulated sphere of business and simply demanded a trust from all involved persons and institutions".[1242]

---

[1235]  Respondent's Closing Argument, Slide 11.
[1236]  Resp. Obj. J. & C-Mem. ¶¶ 3.24; 3.34; Resp. Rep. (PO9) ¶ 34.
[1237]  Resp. Obj. J. & C-Mem. ¶¶ 3.12; 3.23; Resp. Rep. (PO9) ¶ 34.
[1238]  Resp. Obj. J. & C-Mem. ¶ 3.24.
[1239]  Resp. Obj. J. & C-Mem. ¶ 3.24.
[1240]  Resp. Obj. J. & C-Mem. ¶ 3.23.
[1241]  Resp. Obj. J. & C-Mem. ¶ 3.24.
[1242]  Resp. Obj. J. & C-Mem. ¶ 3.24.

(C)   CHANGE OF CIRCUMSTANCES

785.   In the alternative, the Respondent submits that there has been no breach of the BIT due to a change of circumstances.[1243]

786.   To that end, the Respondent again makes reference to Article 6:111 of the PECL, in particular subparagraphs (b) and (c).[1244]

787.   The Respondent argues that the Regulator largely based its decision to revoke Latgales Enerġija's licences on Latgales Enerġija's failure to procure a "safe, continuous and reliable" delivery of district heating services in Rēzekne.[1245] According to the Respondent, even assuming that Latgales Enerġija was entitled to rely on the assumption that there would be permanent and continuous delivery of natural gas and that it would not have to prepare for emergency measures in case of a disruption of the delivery of natural gas, Latgales Enerġija "directly caused and was responsible for the circumstances that led to the revocation of the [l]icences".[1246] When it withheld payments to Latvijas Gāze, Latgales Enerġija should have realized that Latvijas Gāze was not bound to procure a "safe and sound business" to Latgales Enerġija and that Latvijas Gāze could therefore suspend or stop the delivery of natural gas.[1247]

788.   Such circumstances represent a risk to be addressed by Latgales Enerġija and which Latgales Enerġija was not entitled to shift to the Municipality.[1248]

## D.   THE REASONS FOR THE TRIBUNAL'S DECISION ON LIABILITY

789.   The Tribunal will deal with the issues in the following order:

   (i)      the applicable law (see paragraphs 790 ff. below);

   (ii)     whether the alleged conduct and breaches of the BIT complained of by the Claimant can be attributed to the Respondent insofar as the Municipality, the

---

[1243]   Resp. Obj. J. & C-Mem. ¶ 3.37.
[1244]   Resp. Obj. J. & C-Mem. ¶ 3.37.
[1245]   Resp. Obj. J. & C-Mem. ¶ 3.38.
[1246]   Resp. Obj. J. & C-Mem. ¶ 3.38.
[1247]   Resp. Obj. J. & C-Mem. ¶ 3.38.
[1248]   Resp. Obj. J. & C-Mem. ¶ 3.39.

Regulator and the two companies Rēzeknes Siltumtīkli and Rēzeknes Enerģija are concerned (see paragraph 794 ff. below);

(iii)     the claim for breach of Article 3(1) of the BIT (see paragraph 831 below);

(iv)     the claim for expropriation under Article 4(1) of the BIT (see paragraph 1067 below); and

(v)      the claim for breach of the MFN under Article 3(2) of the BIT (see paragraph 1102 below).

**(1)    APPLICABLE LAW**

790.    The Tribunal has decided that the present dispute is an investment dispute within its jurisdiction according to the provisions of the BIT and the ICSID Convention.  As an ICSID Tribunal it has to turn to the Convention's provisions in order to determine the applicable law.

791.    Article 42 of the ICSID Convention reads as follows:

<div align="center">Article 42</div>

> (1)     The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties.  In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable.

792.    In the Tribunal's view, acceptance of the offer to arbitrate in Article 7 of the BIT establishes an implicit agreement that the applicable law consists primarily of the standards of protection contained in the BIT, but that recourse may be had to general international law as well as to the domestic law of Latvia.

793.    The Tribunal finally notes that it is not in dispute that *(i)* Article 1(1) of the BIT refers to Latvian laws and regulations, *(ii)* such laws and regulations apply to the actions of Latvian executive and judicial authorities and *(iii)* the agreements entered into by Latgales Enerģija with the Municipality, Rēzeknes Siltumtīkli and Rēzeknes Enerģija are governed by such laws and regulations.  As follows from the preceding paragraph, the Tribunal considers that it is empowered by Article 42(1) of the ICSID Convention

to interpret and apply such laws and regulations in so far as necessary to determine the dispute that has been referred to it.

**(2)   THE ISSUE OF ATTRIBUTION**

794.   As reflected in Article 2 of the ILC Articles:[1249]

> *Article 2*
> *Elements of an internationally wrongful act of a State*
>
> There is an internationally wrongful act of a State when conduct consisting of an action or omission:
>
> (*a*)   is attributable to the State under international law; and
>
> (*b*)   constitutes a breach of an international obligation of the State.

795.   The issue for the purposes of the present Award is the threshold question whether the conduct of which the Claimant complains is attributable to the Respondent under international law.   The Tribunal will examine the case of the Municipality, the Regulator and the two companies Rēzeknes Siltumtīkli and Rēzeknes Enerģija.

(A)   THE MUNICIPALITY

796.   There can be no doubt—nor did the Respondent appear to contest (see paragraph 750 above)—that the Municipality's conduct is attributable to the Respondent.

797.   The relevant rule is stated in Article 4 of the ILC Articles:

> *Article 4*
> *Conduct of organs of a State*
>
> 1.   The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central Government or of a territorial unit of the State.
>
> 2.   An organ includes any person or entity which has that status in accordance with the internal law of the State.

798.   As paragraph 3 of the ILC's Commentary to that article observes, the rule which it embodies "has long been recognized in international judicial decisions".[1250]

---

[1249]   ILC Articles, <u>CLA-7</u>.

799.   Paragraph 6 of the Commentary elaborates that the rule "extends to organs of government of whatever kind or classification, exercising whatever functions, and at whatever level in the hierarchy, including those at provincial or even local level". The rule therefore encompasses an organ of local government such as the Municipality, which is given the status of part of the Latvian State by the Municipalities Act.[1251]

800.   Provided that the acts in question are performed in an official capacity, they are attributable to the State.  There is no dispute that the acts of the Municipality in this case were performed in an official capacity.

801.   All of the actions of the Municipality at issue in this case are therefore attributable to the Respondent.

                    (B)    THE REGULATOR

802.   The Claimant's allegations concern both the Regulator's refusal to grant Latgales Enerġija's applications for revised tariffs on 13 October 2006[1252] and on 11 June 2007,[1253] as well as its annulment on 7 December 2007[1254] of a prior decision to grant Latgales Enerġija's application for revised tariffs[1255] and ultimately, on 3 June 2008, its revocation of Latgales Enerġija's licences[1256] following the warning of Latgales Enerġija on 4 October 2007[1257] and the decision to take over Latgales Enerġija's zone on 11 October 2007.[1258]

---

[1250]   The Commentary is not on the record, but both Parties relied on it in the submissions filed after the Hearing (Cl. Rep. Tribunal ¶¶ 9-11 and Resp. P-H (PO8) ¶ 9).  Moreover, during the Hearing Mr. Wordsworth invited them to comment on a passage in that commentary (paragraph 6 on Art. 8) (Transcript, Day 4, 79/23-25; 80/1-15) and in the submissions to be filed after the Hearing (Transcript, Day 4, 125/7-18).  Further to that request the Parties briefly referred to that commentary during the Hearing (Transcript, Day 4, 91/21-25; 92/1-10 for the Claimant; Day 4, 179/7-13 for the Respondent). The Commentary is available at:
http://legal.un.org/ilc/texts/instruments/english/commentaries/9_6_2001.pdf.
[1251]   CLA-46.
[1252]   C-19.
[1253]   C-21.
[1254]   C-28.
[1255]   C-27.
[1256]   C-29.
[1257]   C-22.
[1258]   C-23.

803.   The arguments as to the attribution of this conduct were not well developed on either side.   Nonetheless, the material which has been put before the Tribunal readily justifies the conclusion that such conduct is attributable to the Respondent.

804.   In the Tribunal's view, the nature of the Regulator as a State organ as understood under Article 4 of the ILC Articles may be inferred from provisions of the Public Utilities Regulators Act which contain a number of relevant indications:

(i)   whether the Regulator is a central body or is part of local government, it must "operate independently and autonomously" in performing the functions determined by the Public Utilities Regulators Act "when taking decisions and issuing administrative acts in order to protect the interests of users and to promote the development of providers of public utilities in accordance with the principles of justice, transparency, neutrality, equality and proportionality";[1259]

(ii)   exceptions apart, a body such as the Regulator bound to act in accordance with the "principles of justice" may be presumed to be a State organ, and the further principles mentioned by Section 5 of the same Act are simply general principles of administrative law recognized in most jurisdictions;

(iii)   the Regulator's individual decisions are in the nature of administrative acts "binding upon specific providers and users of public utilities";[1260] and

(iv)   both an administrative act or an actual action of the Regulator may be challenged before an Administrative Regional.[1261]

805.   To the extent that the acts of the Regulator were not attributable to the Respondent under Article 4 of the ILC Articles, they would be attributable as a matter of Article 5. Article 5 of the ILC Articles reads as follows:

*Article 5*
*Conduct of persons or entities exercising elements of governmental authority*

---

[1259]   CLA-49, Section 5, see also Sections 7(2), 11(1).
[1260]   CLA-49, Sections 6(1), 7(3).
[1261]   CLA-49, Section 11(4).

> The conduct of a person or entity which is not an organ of the State under article 4 but which is empowered by the law of that State to exercise elements of the governmental authority shall be considered an act of the State under international law, provided the person or entity is acting in that capacity in the particular instance.

806.  Like Article 4, Article 5 of the ILC Articles merely codifies a well-established rule of international law.

807.  There are thus three aspects to the analysis:

    (i)  the Regulator must have exercised elements of governmental authority;

    (ii)  it must have been empowered by the Respondent's law to do so; and

    (iii)  it was acting in that capacity in regulating tariffs and granting or revoking licences.

808.  As to the first aspect, paragraph 6 of the commentary to Article 5 of the ILC Articles explains:

> Article 5 does not attempt to identify precisely the scope of "governmental authority" for the purpose of attribution of the conduct of an entity to the State. Beyond a certain limit, what is regarded as "governmental" depends on the particular society, its history and traditions. Of particular importance will be not just the content of the powers, but the way they are conferred on an entity, the purposes for which they are to be exercised and the extent to which the entity is accountable to government for their exercise. These are essentially questions of the application of a general standard to varied circumstances. The conduct of a person or entity which is not an organ of the State under article 4 but which is empowered by the law of that State to exercise elements of the governmental authority shall be considered an act of the State under international law, provided the person or entity is acting in that capacity in the particular instance.

809.  Article 5 thus directs the Tribunal to consider a range of factors, each of which may be relevant to differing extents. But in this case the Respondent accepted (indeed, insisted) that the Regulator's function relating to its decisions, including as to licences, was of a public nature, financed solely from fees levied from utility companies.[1262]  There can be little doubt that it was the exercise of an element of governmental authority as classically understood. The same can be said of the Regulator's function of approving the tariffs applicable to the licenced activity. It is also notable that, as the Respondent points out, the Regulator's decisions were subject

---

[1262]  Resp. Obj. J. & C-Mem. ¶¶ 3.7-3.8; see also <u>CLA-49</u>, Section 29.

to review in the administrative rather than civil courts.[1263]   Both the licensing and tariff-approval functions were therefore the exercise of an element of governmental authority.

810.   As to the second aspect of the analysis, the Regulator was empowered to exercise that function by statutory authority, in the form of the Public Utilities Regulators Act.  The manner of that empowerment only reinforces the conclusion that the Regulator was an entity exercising an element of governmental authority.

811.   As to the third aspect, since all of the Regulator's actions at issue in this case concerned the exercise of that authority, the Tribunal concludes that they are attributable to the Respondent.

(C)   THE COMPANIES RĒZEKNES SILTUMTĪKLI AND RĒZEKNES ENERĢIJA

812.   The Claimant founds its case to a limited degree on the conduct of Rēzeknes Siltumtīkli and Rēzeknes Enerģija, both of which are wholly owned by the Municipality: in particular, on Rēzeknes Siltumtīkli's bringing a civil suit against Latgales Enerģija on 20 September 2007 which resulted in a freezing order being granted against Latgales Enerģija the following day, and on a further suit by Rēzeknes Enerģija brought on 27 December 2007 to the same effect.  The Claimant's case, put broadly, is that these litigations were orchestrated by the Municipality to further its aim of removing Latgales Enerģija from the supply of heating to Rēzekne.

813.   The question of the attribution of these actions is more complex than that of the acts of the Municipality and the Regulator.  Accordingly, by Procedural Order No. 8 the Tribunal invited the Parties to file "a short submission on the question whether acts by Rēzeknes Siltumtīkli and/or Rēzeknes Enerģija [were] attributable to the Respondent".

814.   The Claimant submits that the actions of Rēzeknes Siltumtīkli and Rēzeknes Enerģija were attributable to the Respondent on three bases:[1264]

---

[1263]  See *e.g.* C-14; Resp. Obj. J. & C-Mem. ¶ 3.7.
[1264]  Cl. Rep. Tribunal ¶¶ 8 ff.

(i)      Rēzeknes Siltumtīkli and Rēzeknes Enerģija exercised delegated governmental authority, in the form of delegated authority to run the district heating system, thereby falling within Article 5 of the ILC Articles;

(ii)     Rēzeknes Siltumtīkli and Rēzeknes Enerģija exercised delegated administrative or governmental authority, thereby falling within Article 2(2)(b) of the US-Latvia BIT, imported into the BIT by the MFN provision in Article 3(2) of the Lithuania-Latvia BIT; and

(iii)    Rēzeknes Siltumtīkli and Rēzeknes Enerģija acted under the control and direction of the Municipality, thereby falling within Article 8 of the ILC Articles.

815.   In its Post-Hearing Brief the Respondent denies that Rēzeknes Siltumtīkli's and Rēzeknes Enerģija's actions were attributable to it on the basis of either Article 5 or Article 8 of the ILC Articles.[1265]

(i)      *Article 5 of the ILC Articles*

816.   The short answer to this argument appears to be that, even if Rēzeknes Siltumtīkli and Rēzeknes Enerģija had been empowered to exercise any element of governmental authority, they were not exercising such authority "in the particular instance", as Article 5 requires.

817.   As the Respondent observes, both litigations were brought in the civil courts, on the basis of purely commercial agreements.[1266]   As a matter of first principles – and contrary to the Claimant's contention[1267] – the mere fact that the Municipality was responsible for organising district heating is not enough to transform the consequent provision of such heating (whether by private or semi-private entities) into an exercise of governmental authority.

(ii)     *MFN in Article 3(2) of the BIT*

818.   The next strand of the Claimant's case is as follows:

---

[1265]  Resp. P-H (PO8) ¶¶ 7 ff.
[1266]  Resp. Obj. J. & C-Mem. ¶ 5.
[1267]  See *e.g.* Cl. Rep. ¶ 18.

(i)     Rēzeknes Siltumtīkli's and Rēzeknes Enerģija's conduct would be attributable to the Respondent under article 2(2)(b) of the US-Latvia BIT; and

(ii)    by virtue of the MFN provision in article 3(2) of the (Lithuania-Latvia) BIT, the Claimant is entitled to have its claim determined by reference to that provision of the US-Latvia BIT.

819.    Article 2(2)(b) of the US-Latvia BIT[1268] provides:

> Article II
>
> 2.
>
> a. (…)
>
> b. Each Party shall ensure that any state enterprise that it maintains or establishes acts in a manner that is not inconsistent with the Party's obligations under this Treaty *wherever such enterprise exercises* any regulatory, administrative or *other governmental authority* that the Party has delegated to it, such as the power to expropriate, grant licenses, approve commercial transactions, or impose quotas, fees or other charges.

820.    It appears doubtful that this provision adds anything to the Claimant's case on Article 5 of the ILC Articles.  Even if "regulatory" or "administrative" authority were in isolation capable of bearing a broader meaning than "governmental authority", it appears from the use of "other" that those terms are to be read *eiusdem generis* with "governmental authority" as generally understood.  Further, although the list of examples of such authority which follows is merely illustrative, it appears to leave little scope to suppose that the terms were intended to bear a broader meaning than the "governmental authority" referred to in Article 5 of the ILC Articles.

821.    For the same reasons discussed above in relation to Article 5 of the ILC Articles, there appears to be nothing to establish that either Rēzeknes Siltumtīkli or Rēzeknes Enerģija was exercising any such authority when it engaged in the conduct at issue. Article 2(2)(b) of the US–Latvia BIT would therefore appear inapplicable on the current facts.

822.    On this basis, it would be unnecessary to reach a view on whether the MFN provision in the BIT is capable in principle of applying in the present case.

---

[1268]  US-Latvia BIT, <u>CLA-25</u>.

<div align="center">(iii)   <i>Article 8 of the ILC Articles</i></div>

823.   The final issue is whether Rēzeknes Siltumtīkli's and Rēzeknes Enerģija's conduct is attributable to the Respondent under the test expressed in Article 8 of the ILC Articles.[1269]  This provides:

<div align="center"><i>Article 8</i><br><i>Conduct directed or controlled by a State</i></div>

> The conduct of a person or group of persons shall be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct.

824.   Paragraphs 6 and 7 of the Commentary to that article are pertinent enough to be worth quoting in full:

> Questions arise with respect to the conduct of companies or enterprises which are State-owned and controlled. If such corporations act inconsistently with the international obligations of the State concerned the question arises whether such conduct is attributable to the State. In discussing this issue it is necessary to recall that international law acknowledges the general separateness of corporate entities at the national level, except in those cases where the "corporate veil" is a mere device or a vehicle for fraud or evasion. The fact that the State initially establishes a corporate entity, whether by a special law or otherwise, is not a sufficient basis for the attribution to the State of the subsequent conduct of that entity. Since corporate entities, although owned by and in that sense subject to the control of the State, are considered to be separate, *prima facie* their conduct in carrying out their activities is not attributable to the State unless they are exercising elements of governmental authority within the meaning of article 5. This was the position taken, for example, in relation to the *de facto* seizure of property by a State-owned oil company, in a case where there was no proof that the State used its ownership interest as a vehicle for directing the company to seize the property. On the other hand, where there was evidence that the corporation was exercising public powers, or that the State was using its ownership interest in or control of a corporation specifically in order to achieve a particular result, the conduct in question has been attributed to the State.

> It is clear then that a State may, either by specific directions or by exercising control over a group, in effect assume responsibility for their conduct. Each case will depend on its own facts, in particular those concerning the relationship between the instructions given or the direction or control exercised and the specific conduct complained of. In the text of article 8, the three terms "instructions", "direction" and "control" are disjunctive; it is sufficient to establish any one of them. At the same time it is made clear that the instructions, direction or control must relate to the conduct which is said to have amounted to an internationally wrongful act.

825.   It is therefore clear that it is not enough to meet the test set out in Article 8 of the ILC Articles that Rēzeknes Siltumtīkli and Rēzeknes Enerģija were State-owned.  Nor is it

---

[1269]  ILC Articles, <u>CLA-7</u>.

<div align="center">234</div>

enough that they may in general have been subject to the Municipality's control (as the Claimant argued in its closing submissions). Rather, the specific question to be addressed in this case is whether the Respondent instructed, directed or controlled Rēzeknes Siltumtīkli's or Rēzeknes Enerģija's bringing of the litigation which resulted in Latgales Enerģija's bank accounts being frozen.

826.    There is a dearth of direct evidence as to any such instruction, direction or control in this case. That is partly a consequence of the Respondent's failure to tender any witnesses of fact for cross-examination and partly a consequence of the fact that the Respondent produced only few documents further to Procedural Order No. 4.[1270] As to the Claimant's allegation that the Municipality directed the companies' actions, the Respondent says that the suggestion is "at the best, worth a big and healthy smile".[1271]

827.    The Tribunal finds that there is, however, a body of circumstantial evidence which, taken as a whole, permits the inference that the Municipality (as an organ of the Respondent) must have instructed Rēzeknes Siltumtīkli and Rēzeknes Enerģija to bring the claims against Latgales Enerģija and must have instructed Rēzeknes Siltumtīkli not to comply with the October 2007 Agreement.

828.    The evidence giving rise to such an inference so far as Rēzeknes Siltumtīkli is concerned is as follows:

(i)      although the Municipality's sole ownership of the companies is not by itself sufficient to found an inference of direction, it is a significant background factor;

(ii)     against that background is to be considered the newspaper interview given by the Mayor of the Municipality (Mr. Vjakse) on 13 September 2007. Among the key points emerging from the interview were these:[1272]

---

[1270]  In Procedural Order No. 8 the Tribunal ordered the Respondent to state whether there were any documents responsive to the Claimant's requests for production granted by the Tribunal in Procedural Order No. 4 and, further to a renewed verification of its files, to produce any responsive documents by 20 March 2015.

[1271]  Resp. Rej. ¶ 27.

[1272]  C-134, reproduced in paragraph 251 above.

— the Municipality or the mayor himself had been in private negotiations "for three months" to identify "alternatives" to Latgales Enerģija;

— Latgales Enerģija's future as an operator in Rēzekne was said to depend on whether it paid Latvijas Gāze;

— despite that, the Mayor stated unconditionally that "[W]e will announce a tender and choose a company that would meet our requirements"; and

— the Mayor also stated, "the future of Latgales enerģija in our city will be decided on 25 September.  By this date, the regular payment for the gas should be paid, and in case Latgales enerģija fails to pay it, then I would bring a question to deputies regarding termination of the agreement with this company";

(iii)   shortly before the interview, and following the Mayor's alleged private negotiations with Latgales Enerģija's competitors, the Municipality-owned Rēzeknes Siltumtīkli had (absent any other explanation for its timing)[1273] decided to bring the civil claim against Latgales Enerģija on 20 September 2007 seeking an attachment which was granted on 21 September 2007[1274] and which prevented Latgales Enerģija from being able to pay Latvijas Gāze;

(iv)   on the same day, the Municipality adopted a Development Plan;[1275]

(v)   the name of Latgales Enerģija which featured in the draft was deleted and replaced by the word "operator" further to the suggestions made by representatives of the City Council during two meetings of the Working Group in the absence of Latgales Enerģija (see paragraphs 224 and 227 above); and

(vi)   finally, it is significant that when the lifting of the attachment of Latgales Enerģija's bank account was agreed upon as a measure to be taken as a matter of urgency pursuant to the October 2007 Agreement (see paragraph 287

---

[1273]   The bulk of the sum claimed was represented by amounts allegedly owed for depreciation of assets and the dispute between Rēzeknes Siltumtīkli and Latgales Enerģija in this respect went back to the previous year (see paragraphs 193 ff. above).

[1274]   C-138, see paragraph 255 above.

[1275]   C-137, see paragraph 228 above.

above), such undertaking was assumed also by the City Council, which was one of the parties privy to that agreement, and not only by Rēzeknes Siltumtīkli;[1276] this could only mean that the City Council would be bound to give Rēzeknes Siltumtīkli any directions as may be required.

829.   The sequence of events which followed suggests an intention on the Municipality's part then to use Rēzeknes Enerģija as an instrument in connection with Latgales Enerģija's removal, which culminated in Rēzeknes Enerģija's bringing its claim for a freezing order against Latgales Enerģija on 27 December 2007:

(i)     on 28 September 2007 the Municipality decided to establish Rēzeknes Enerģija;[1277]

(ii)    Rēzeknes Enerģija was incorporated by the Municipality on 2 October 2007 and, immediately thereafter, Rēzeknes City Council applied for a loan in an amount of LVL 4 million which was arranged in the first week of October 2007 (see paragraphs 260 ff. above);

(iii)   on 4 October 2007 the Regulator warned Latgales Enerģija that the licences might be revoked;[1278]

(iv)    one week later, on 9 October 2007, the Municipality declared an energy crisis;[1279]

(v)     the Regulator took over Latgales Enerģija's zone on 11 October 2007;[1280]

(vi)    on 12 October 2007, the Municipality adopted a decision appointing Rēzeknes Enerģija as the "person in charge" of the provision of heating services in Rēzekne;[1281] and

---

[1276]   C-26, see paragraph 286 above.
[1277]   C-142; see also paragraph 258 above.
[1278]   C-22, see paragraph 262 above.
[1279]   C-24, see paragraph 264 above.
[1280]   C-23, see paragraph 274 above.
[1281]   C-25, see paragraph 275 above.

237

(vii)   at a meeting the same day attended by the Mayor, representatives of Latgales Enerģija, and representatives of Rēzeknes Siltumtīkli and Rēzeknes Enerģija, the Mayor made the following, telling remark: "In the light of the crisis situation, <u>in the name of the new company [i.e. Rēzeknes Enerģija], we</u> are claiming that before 14 October, 6·00 P.M. [Latgales Enerģija] to deliver the service activity area and to ensure that the people from Rēzekens Enerģija can start fulfilment of the obligations as defined by the Regulator and the [Municipality]".[1282]

830.   These facts are sufficient in order for the Tribunal to conclude, on the balance of probabilities, that the Respondent did direct Rēzeknes Siltumtīkli and Rēzeknes Enerģija to bring their respective claims against Latgales Enerģija.  In reaching such a conclusion, the Tribunal takes into account the Respondent's failure to offer any witness of fact for cross-examination on this point.

### (3)   CLAIMS FOR BREACH OF ARTICLE 3(1) OF THE TREATY (FAIR AND EQUITABLE TREATMENT, FULL PROTECTION AND SECURITY; NO ARBITRARY OR DISCRIMINATORY MEASURES WITH RESPECT TO THE INVESTMENT)

831.   Article 3(1) of the BIT reads as follows:

Article 3
Protection and Treatment of Investments

1.   Each Contracting Party shall at all times ensure fair and equitable treatment of the investments made by investors of the other Contracting Party as well as their full security and protection in its territory.

Neither Contracting Party shall by arbitrary or discriminatory measures impair the management, maintenance, use, enjoyment or disposal of investments made by investors of the other Contracting Party.

### (A)   THE APPLICABLE STANDARD OF TREATMENT

832.   Fair and equitable treatment is the first standard of investment protection mentioned in the first sub-paragraph of Article 3(1) of the BIT.

---

[1282] <u>C-147</u>, page 12 (emphasis supplied).

833. There has been considerable debate as to the content of this standard, including as to whether it confers protection going beyond the minimum standard of treatment required as a matter of customary international law.

834. The Tribunal considers that, as is now recognized in multiple awards, the standard is concerned with "[p]rotection of legitimate expectations (…); [g]ood faith (…) [and] [t]ransparency, consistency, non-discrimination", as was noted by the *Biwater Gauff* tribunal.[1283]   In *Saluka* the tribunal concluded on the standard of fair and equitable treatment as follows: "A foreign investor whose interests are protected under the Treaty is entitled to expect that the Czech Republic will not act in a way that is manifestly inconsistent, non-transparent, unreasonable (*i.e.* unrelated to some rational policy) or discriminatory (*i.e.* based on unjustifiable distinctions)".[1284]   Although made in the specific context of NAFTA, the views expressed by the *Waste Management* tribunal have been influential, and have frequently been referred to both with respect to NAFTA claims and claims under treaties that refer solely to an obligation to accord fair and equitable treatment, *i.e.* without any reference to the customary international law minimum standard of treatment.  That tribunal stated that the NAFTA standard of fair and equitable treatment is breached

> (…) by conduct attributable to the State and harmful to the claimant if the conduct is arbitrary, grossly unfair, unjust or idiosyncratic, is discriminatory and exposes the claimant to sectional or racial prejudice, or involves a lack of due process leading to an outcome which offends judicial propriety – as might be the case with a manifest failure of natural justice in judicial proceedings or a complete lack of transparency and candour in an administrative process.  In applying that standard it is relevant that the treatment is in breach of representations made by the host State which were reasonably relied on by the claimant.[1285]

835. One important element of the standard of fair and equitable treatment is the protection of the investor's legitimate expectations.  The Tribunal considers, in line with the views expressed by various other tribunals, that for the investor's expectations to be protected by the standard of fair and equitable treatment:

---

[1283]  *Biwater Gauff v. Tanzania*, <u>CLA-36</u> ¶ 602.

[1284]  *Saluka v. Czech Republic*, <u>CLA-21</u> ¶ 309.

[1285]  *Waste Management v. Mexico*, <u>CLA-15</u> ¶ 98.

(i)      the investor's expectations must be "legitimate";[1286] indeed "reasonable and legitimate";[1287]

(ii)     more is required than a "basic expectation", as has been referred to in various cases, including *Biwater Gauff*;[1288]

(iii)    there must have been reliance by the investor with respect to making the investment;[1289] and

(iv)     that reliance must be reasonable.[1290]

836.    Whereas stability and predictability of the legal environment have been regarded as concrete renderings of the fair and equitable treatment standard in a number of decisions,[1291] these cannot be absolute requirements, and have often been weighed against further criteria, and most notably the right of the host State to exercise its general legislative power and enforce laws and regulations to protect the public interest.  Thus, the *Saluka* tribunal noted that "[n]o investor may reasonably expect that the circumstances prevailing at the time the investment is made remain totally unchanged";[1292] the *El Paso* tribunal went a step further, holding that it was unable to follow the line of cases in which fair and equitable treatment had been viewed as implying the stability of the legal and business framework.[1293]

837.    The Tribunal considers that reasonableness on the part of the investor in relying on representations by the State means *inter alia* that it is a matter for the investor to evaluate the risk inherent in the proposed investment taking into account all relevant circumstances; investment tribunals have held that the investor would in principle have to take the consequences following from its own failure in this respect.[1294]

---

[1286]   *Saluka v. Czech Republic*, <u>CLA-21</u> ¶ 302; *El Paso v. Argentina*, <u>CLA-39</u> ¶ 359.

[1287]   *Rumeli v. Kazakhstan*, <u>CLA-34</u> ¶ 609; *Biwater Gauff v. Tanzania*, <u>CLA-36</u> ¶ 602.

[1288]   *Biwater Gauff v. Tanzania*, <u>CLA-36</u> ¶ 602.

[1289]   *Biwater Gauff v. Tanzania* <u>CLA-36</u> ¶ 602.

[1290]   *Waste Management v. Mexico*, <u>CLA-15</u> ¶ 98.

[1291]   See *e.g. CMS v. Argentina*, <u>RLA-30</u> ¶¶ 274; 276.

[1292]   *Saluka v. Czech Republic*, <u>CLA-21</u> ¶ 305.

[1293]   *El Paso v. Argentina*, <u>CLA-39</u> ¶ 352

[1294]   *MTD v. Chile*, <u>CLA-18</u> ¶ 164; *Biwater Gauff v. Tanzania*, <u>CLA-36</u> ¶ 601.

838.   Moreover, the breach by a State of a representation made in a contract may not suffice to give rise to a breach of the standard of fair and equitable treatment since a distinction must be made between pure contract claims and treaty claims.   The Tribunal considers that, as a general rule, a breach of contract is unlikely on its own to amount to a breach of the standard of fair and equitable treatment, and the State would have to have acted in its sovereign capacity.[1295]

839.   Good faith is generally regarded as a fundamental part of the fair and equitable standard of protection.   The Tribunal considers that a breach of good faith does not require proof of an intention to harm the investment or the investor,[1296] but such an intention or motive, if found to exist, may be relevant.[1297]   The Tribunal considers that the following finding by the *Saluka* tribunal is of assistance: the host State is required to implement its policies

> (…) *bona fide* by conduct that is, as far as it affects the investors' investment, reasonably justifiable by public policies and that such conduct does not manifestly violate the requirements of consistency, transparency, even-handedness and non-discrimination. In particular, any differential treatment of a foreign investor must not be based on unreasonable distinctions and demands, and must be justified by showing that it bears a reasonable relationship to rational policies not motivated by a preference for other investments over the foreign-owned investment.[1298]

840.   Full protection and security is the second standard of investment protection mentioned in the first sub-paragraph of Article 3(1) of the BIT.   The Tribunal considers that the standard of full protection and security seeks specifically to protect the physical integrity of the investment against the use of force.[1299]   Full protection and security does not provide for strict liability,[1300] but rather requires the host State to exercise due diligence in the treatment of the investment.[1301]   The Tribunal notes that certain decisions have held that the standard did not protect only the physical integrity of the investment, but had a broader scope which includes the investor's rights.[1302]   The

---

[1295]   See *e.g. Waste Management v. Mexico*, <u>CLA-15</u> ¶ 115.

[1296]   *El Paso v. Argentina*, <u>CLA-39</u> ¶ 357.

[1297]   See *e.g. Waste Management v. Mexico*, <u>CLA-15</u> ¶ 138.

[1298]   *Saluka v. Czech Republic*, <u>CLA-21</u> ¶ 307.

[1299]   *Saluka v. Czech Republic*, <u>CLA-21</u> ¶ 484.

[1300]   *Tecmed v. Mexico*, <u>CLA-17</u> ¶ 177; *Saluka v. Czech Republic*, <u>CLA-21</u> ¶ 484.

[1301]   *Saluka v. Czech Republic*, <u>CLA-21</u> ¶ 484.

[1302]   *ELSI*, <u>CLA-24</u> ¶¶ 109-111; *Azurix v. Argentina*, <u>CLA-19</u> ¶¶ 406, 408; *Siemens v. Argentina*, <u>CLA-11</u> ¶ 303; *AES v. Hungary*, <u>CLA-38</u> ¶ 13.3.2.

*Biwater Gauff* tribunal mentioned the stability of the investor's environment, including the commercial and legal environment.[1303]

841.    The protection against arbitrary and discriminatory measures which impair the management, maintenance, use, enjoyment or disposal of investments is the third standard of investment protection established in Article 3(1) of the BIT.  The Tribunal considers that a measure may be characterized as arbitrary if it is "founded on prejudice or preference rather than on reason or fact"[1304] or constitutes a "willful disregard of due process of law, an act which shocks, or at least surprises, a sense of juridical propriety".[1305]  The Tribunal considers that a measure which is arbitrary or discriminatory is likely also to violate the fair and equitable treatment standard considering the elements of the fair and equitable treatment set out above (see paragraphs 832 and 834 above).  For there to be a breach of this limb of Article 3(1), there must be not only one or more arbitrary or discriminatory measures but also impairment to the management, maintenance, use, enjoyment or disposal of an investment.  This is a familiar formulation, but the Tribunal nonetheless notes the broad scope of what is prohibited in terms of impairment.

<div align="center">(B)    WHETHER THE RESPONDENT IS IN BREACH OF ARTICLE 3(1) OF THE BIT</div>

842.    The Tribunal will examine *(i)* the claim rested on a breach of the Claimant's expectations based on the Long-Term Agreement (see paragraphs 844 ff. below), *(ii)* the claim based on the Municipality's delay in approving the heat supply development plan for the City (see paragraphs 855 ff. below), *(iii)* the claim based on the Municipality's refusal to consent to the Claimant's investments in the heating system (see paragraphs 888 ff. below), *(iv)* the claims based on the Regulator's refusal to set a new tariff (see paragraphs 899 ff. below), *(v)* the claims based on the Municipality's and the Regulator's conduct in connection with the energy crisis (see paragraphs 923 ff. below), the claims based on the Regulator's warning and the revocation of the licences by the Regulator (see paragraphs 988 ff. below) and the claims based on the Municipality's conduct subsequent to the revocation of the licences (see paragraphs 1028 ff. below).   The Tribunal will finally consider the cumulative effect of the

---

[1303]   *Biwater Gauff v. Tanzania*, CLA-36 ¶ 729.

[1304]   *Lauder v. Czech Republic*, CLA-29 ¶ 221; see also *El Paso v. Argentina*, CLA-39 ¶ 319.

[1305]   *ELSI*, CLA-24 ¶ 128; *Siemens v. Argentina*, CLA-11 ¶ 318; *El Paso v. Argentina*, CLA-39 ¶ 319.

measures taken by the Regulator and the Municipality (see paragraphs 1060 ff. below).

843.     The Tribunal's finding on whether the Respondent acted in breach of Article 3(1) of the BIT is set out in paragraph 1066 below.

> (i)     *The Claim Rested on a Breach by the Respondent of the Claimant's Expectations Based on the Long-Term Agreement*

844.     The Claimant relies on a number of expectations, and most notably the expectation that Latgales Enerģija would recover the investment made by the Claimant and earn a profit as provided in the Long-Term Agreement (see paragraph 675 above).   The Tribunal dismisses this claim.

845.     The Claimant emphasised, in replying to the Respondent's arguments, that its claims are Treaty claims,[1306] pointing out that the rights asserted in these arbitration proceedings are not "mere contractual claims" and are distinct from the claims asserted by Latgales Enerģija in the Latvian courts based on the contracts or the licences.[1307]

846.     The Tribunal finds that its role is to determine whether the Claimant is entitled to assert a claim for breach of the standards of protection in Article 3(1) of the BIT, not whether it is liable in contract under the terms of the Long-Term Agreement. However, the claim that Latgales Enerģija would be entitled to use the assets, create new assets and make a profit as provided by the Long-Term Agreement is in substance a contractual claim brought under the veil of a breach of the investor's legitimate expectations.

847.     The Tribunal notes that the Respondent did not, in particular, guarantee the profitability of the investment under Article 3(1) of the BIT; neither did the terms of the Long-Term Agreement for that matter, contrary to the Claimant's submission. The Claimant could not therefore reasonably have such an expectation when the Long-Term Agreement was made on 28 January 2005.

---

[1306] Cl. Rep. ¶ 77.
[1307] Cl. Rep. ¶¶ 94-95.

848. Investment tribunals have consistently found that BITs are not an insurance against business risks.[1308]

849. In the present case the Claimant, a company active *inter alia* in the heating business, was aware of certain risks inherent in the investment and must be deemed to have assumed them unless they were expressly excluded; its investment in Latvia related to activities which the Claimant has been carrying out in its own country according to the representations made to the Respondent.[1309]  Whereas both Lithuania and Latvia had gradually embraced a system of market economy after regaining independence in the early 1990s, the privatization of district heating utilities was a new page of history for the City of Rēzekne when the Claimant decided to invest there, as contended by the Respondent.  When the Claimant summarised the current position of the heating system in Rēzekne in the PowerPoint presentation made to the Municipality on 25 November 2004, it identified by the same token some of the specific risks possibly affecting the profitability of the investment under consideration, in particular the fact that the infrastructure would have to be replaced and a change in the type of fuel had to be introduced.[1310]

850. The Claimant has provided no precise answer to the Respondent's allegation that its due diligence was at best insufficient and its decision to invest "overconfident"; when asked whether any due diligence had been made to assess the legal, financial and technical risks, Mr. Strioga answered that his company had hired local lawyers to obtain advice on Latvian law, but he could not remember whether any due diligence report had been received.[1311]  The Tribunal notes that due diligence by the Claimant was contemplated as a possible condition precedent to the entry into force of the February 2005 Agreement by Clause 5 of the same agreement.[1312]

851. Moreover, the Claimant does not contend that it received any specific assurances by the Latvian authorities regarding the review of the tariff.  The Regulator's and the

---

[1308]  In the context of the fair and equitable treatment standard, see *e.g. MTD v Chile*, CLA-18 ¶ 178 and *Biwater Gauff v. Tanzania*, CLA-36 ¶ 601 referring to *Waste Management v. Mexico*, CLA-15.

[1309]  See the Claimant's PowerPoint presentation of 25 November 2004, C-41 [page 1].

[1310]  C-41 [pages 2-3].

[1311]  Transcript, Day 1, 29/13-30/9.

[1312]  C-8.

Municipality's conduct in relation to the tariffs proposed by Latgales Enerġija in 2006 and 2007 will be examined in due course (see paragraphs 899 ff. below).

852.   Certain specific complaints made by the Claimant are dealt with in the following sections of the present Award: *(i)* the complaint that the Respondent disappointed the Claimant's legitimate expectation that the Regulator would not depart from its 2005 practice is dealt with in paragraphs 910 ff. below; *(ii)* the complaint that the Respondent disappointed the Claimant's legitimate expectation that the Municipality would pay for the natural gas is dealt with in paragraphs 925 ff. below; *(iii)* the complaint that the interview given by the Mayor and the Municipality's attempts to attract a new operator in the summer of 2007 disappointed the Clamant's legitimate expectation that the Municipality would not actively seek to replace Latgales Enerġija is dealt with in paragraphs 938 ff. below; *(iv)* the complaint that the Respondent disappointed the Claimant's expectations that the Municipality would not actively prevent Latgales Enerġija from operating its business and would comply with the undertaking to have the attachment lifted is dealt with in paragraphs 950 ff. below; *(v)* the complaint that the Respondent disappointed the Claimant's legitimate expectation that Latgales Enerġija would be able to use the assets for the production, transmission and distribution of thermal energy for 30 years is dealt with in paragraph 1044 below; *(vi)* the complaint that the Respondent disappointed the Claimant's legitimate expectation that Latgales Enerġija would not be required to hand over the leased assets to Municipality-owned companies is dealt with in paragraph 1048 below.

853.   Finally and in any event, the Tribunal considers that the expectations relied upon by the Claimant (see paragraph 675 above) relate to mere contractual obligations[1313] and/or represent in essence an alternative way to plead arbitrary conduct or conduct contrary to good faith.[1314]   Insofar as the Claimant has relied on mere contractual obligations, such complaints must be dismissed for the reason set out in paragraph 846 above.   Insofar as the Claimant has presented other alleged breaches of Article 3(1) of the BIT clothed as breaches of the investor's legitimate expectations, such attempts must fail under the heading of a breach of the investor's legitimate

---

[1313]   See paragraph 675 above, in particular: (i); (iii) and (xiii) in that the Claimant's complaint may be understood as referring to a breach of the February 2005 Agreement; and (v); (vi); (vii); (ix); (xii) and (xiv).

[1314]   See paragraph 675 above, in particular (iii), (iv), (v), (vi), (viii), (x), (xi), (xii), (xiii) and (xiv).

expectations; the Tribunal will examine the substance of the complaint and determine whether the Respondent has acted in breach of Article 3(1) of the BIT in the following sections of the present Award.

854.    <u>The Tribunal's Conclusion and Finding</u>.  The Tribunal therefore dismisses this claim.

> (ii)    *The Claim Based on Delay by the Municipality in the Adoption of a Heat Supply Development Plan for the City of Rēzekne*

855.    The Claimant claims that the delay by the Municipality in the adoption of a heat supply development plan for the City is a breach of the fair and equitable treatment standard, both *per se* and because the non-existence of such a plan caused the Regulator to deny Latgales Enerġija's applications for a new tariff in 2006 and 2007; the Claimant further contends that the Regulator's and the Municipality's conduct amount to an abuse of power amounting to arbitrary measures that resulted in its investment being irreparably impaired.  The Tribunal will examine only the delay claim in this section; the Regulator's decisions will be examined in the following sub-section of this Award (see paragraph 899 below).  The Respondent alleges that the delay was caused by the Claimant's failure to prepare a proper draft for the heat supply development plan with due dispatch and the Claimant's refusal to provide relevant information to the Municipality as to the planned investments.

856.    The issues arising for determination are as follows:

> (i)    Whose duty was it to establish and adopt a heat supply development plan for the City of Rēzekne as a matter of Latvian law?

> (ii)   Was there any delay in the establishment and adoption of such plan that is attributable to the Municipality?

> (iii)  If a finding of delay is made, does such delay on the part of the Municipality amount to a breach of Article 3(1) of the BIT?

The Tribunal's finding is set out in paragraph 887 below.

857.    The Claimant contends in these arbitration proceedings that the establishment and approval of a heat supply development plan for the City of Rēzekne was the duty of

the Municipality, whereas the Respondent submits that such duty was delegated by the Municipality to Latgales Enerģija.

858.    The Tribunal finds that it was the duty of the Municipality to prepare and approve a heat supply development plan for the City of Rēzekne; Latgales Enerģija had a duty to cooperate and provide the information required, as contemplated by the February 2006 Agreement, in order that the heat supply development plan be complete.

859.    The regulatory context consists of the following enactments: the Energy Act,[1315] the Municipalities Act,[1316] the Public Utility Regulators Act[1317] and the Methodology for Calculation of Tariffs for Public Utilities in the Fields Regulated by Local Municipalities[1318] enacted pursuant to the Public Utility Regulators Act. The Public Administration Act[1319] contains provisions relevant to the issue of delegation. The provisions of these enactments relevant for present purposes are as follows:

(i)    Section 51 of the Energy Act,[1320] as it was in force when the Long-Term Agreement and the February 2005 Agreements were made, provided that the Municipality had to determine the development of heating supply.[1321] The Respondent has not contested the application of this particular provision. Neither Party has contended that the change in the subsequent versions of Section 51(2) of the Act from the expression "Local governments (…)

---

[1315]  CLA-48, see paragraph 38 above.

[1316]  CLA-46, see paragraph 38 above.

[1317]  CLA-49, see paragraph 38 above.

[1318]  C-35.

[1319]  CLA-52, see paragraph 38 above.

[1320]  CLA-48, see paragraph 38 above. The provisions of the Energy Act relevant for present purposes cover the licensing of energy supply merchants (Sections 5 ff.), the natural gas supply sytem (Sections 41 ff.), the heating supply system (Sections 46 ff.), increase of energy efficiency (Sections 53 ff.) and energy crisis (Sections 59 ff.).

[1321]  Section 51 of the Energy Act reads as follows:

> (1)    Local governments, when performing their permanent functions as prescribed by law, shall organise heating supply in the administrative territory thereof, as well as promote competition in the heating supply and fuel market.

> (2)    Local governments, within the scope of the development plan of their administrative territory, determine the development of heating supply and coordinate it with regulator taking into account the provisions of the environmental protection and the protection of cultural monuments, as well as the possibilities to use local energy resources and evaluating the safety of heating supply and long-term marginal costs.

determine (…)" to the expression "Local governments (…) may determine (…)" has any particular consequences in the present case.[1322]

(ii)     Section 14(2)(1) of the Municipalities Act[1323] provides that in order to perform their functions, local governments have "the duty" to prepare a development programme for the territory of the relevant local government and to ensure the implementation of the territorial development plan.   Section 15(1) further specifies the functions of local governments, the first item of which is "to organise for residents the provision of utilities (water supply and sewerage; supply of heat (…)) irrespective of the ownership of the private property".

(iii)    Section 16(6) of the Public Utility Regulators Act[1324] provides that the "Municipal regulator, issuing the licence to the public service provider shall take into account the development plans for the administrative territory of relevant municipality in the context of the development of regulated sectors as well as the regulations of the municipality".

(iv)    The Methodology[1325] deals with the the calculation of the thermal energy tariffs (Clauses 3 ff.).   Clause 17 provides that the forecasted thermal energy consumption balance shall be drawn up "in accordance with the heat supply system development plan (concept) of the corresponding local government".   Clause 23.3 provides that "[e]fficiency changes in the boiler room (Dhk.) are determined based on the investments used for this purpose in accordance with the approved heat supply system development plan of the corresponding local government".   Clause 27 refers to the same plan in relation to the necessary investment.

860.  The licences granted to Latgales Enerġija and the contracts signed by the Municipality and its wholly-owned companies with Latgales Enerġija mention more than one type of development plan.

---

[1322] CLA-48 p. 22.
[1323] CLA-46.
[1324] CLA-49.
[1325] C-35.

(i)     The licences mention "the development plan of the City of Rēzekne" in Clause 1 (see paragraph 132 above); then in Clause 7.1 they mention "the long-term development plan of SIA "Latgales Enerģija"" (see paragraph 133 above). These provisions point to the existence of two different plans, one issued by the Municipality for the City of Rēzekne, another by the operator.

The clear language of the licences shows that one is therefore dealing with two distinct concepts of a long-term development plan. The Parties' submissions have not taken that distinction into account until after the Hearing.

The Regulator's 3 June 2008 decision revoking the licences refers to Clause 7 of the licences and states that the long-term development plan mentioned therein is "the company's long-term development plan".[1326] This is clearly a plan other than "the development plan of the City of Rēzekne" mentioned in Clause 1 of the licences.

(ii)    The February 2005 Agreement contains no mention of any development plan of any kind. The February 2006 Agreement contains an express term in Clause 1.2 (see the verbatim quotation in paragraph 171 footnote 163 above). Under this provision it was the Council's duty "to coordinate and approve the guidelines for development of heating supply system of the city of Rēzekne prepared by the operator and the Council".

It is common ground between the Parties that despite the use of the word "guidelines" this expression refers to the heat supply development plan for the City contemplated by the provisions mentioned above of the Public Utility Regulators Act and the Methodology.

861.    There is no doubt that it was the responsibility of the Rēzekne City Council to prepare a development plan for the City of Rēzekne. When the Long-Term Agreement and the February 2005 Agreement were entered into by Latgales Enerģija, no such plan was in existence and the Rēzekne City Council had therefore a general duty to act, as confirmed by the Regulator's letter of 12 October 2005 to the Rēzekne City Council enquiring into whether there was "an effective and coordinated development plan of

---

[1326] C-29 [page 6], ¶ 9.

the city heating supply containing planned and already made investments of 'Latgales Enerǧija' Ltd. in development and improvement of the city heating supply".[1327]

862.   The Claimant would have been entitled to make its decision to invest in Rēzekne conditional upon the adoption of such a plan, but it did not.  The failure to do so is a risk undertaken by the Claimant, as pointed out by the Respondent.

863.   However, the position fundamentally changed in 2006 when the Municipality and Latgales Enerǧija executed the February 2006 Agreement.[1328]   Under Clause 1.2 of the February 2006 Agreement (see the verbatim quotation in paragraph 171 footnote 163 above) the Rēzekne City Council undertook a duty to coordinate and approve such plan and Latgales Enerǧija undertook to cooperate in good faith with the Council because Clause 1.2 of the February 2006 Agreement must be read against the background of the general principle of Latvian law whereby contracts are to be performed in good faith.[1329]

864.   It is in dispute between the Parties whether the main duty to provide a heat development plan for the City of Rēzekne lay on the City Council or Latgales Enerǧija; the Respondent has contended at the Hearing that such a duty had been delegated to Latgales Enerǧija in accordance with Section 15(3) of the Municipalities Act[1330] and Section 40 and Section 41 of the Public Administration Act[1331].[1332]

---

[1327]   C-69.

[1328]   C-17.

[1329]   Latvian Civil Code, CLA-55, Art. 1.  This provision deals with good faith in general and reads as follows:

Rights shall be exercised and duties performed in good faith.

[1330]   CLA-46, see paragraph 38 above.  Sect. 15(3) reads as follows:

The local government may delegate the tasks arising from each autonomous function of the administration to a private individual or another public person.  Procedures for, types and restrictions of the delegation of the administration tasks shall be determined by State Administration Structure Law [*i.e.* the Public Administration Act].

[1331]   CLA-52, see paragraph 38 above.  Sects. 40 and 41 of the Public Administration Act read as follows:

Section 40.  Basic Provisions for Delegation

(1)   A public person may delegate a private individual and another public person (hereinafter – authorised person) such tasks that include administrative decision making. Such delegation is authorised only if the authorised person can perform the relevant task more effectively.

865.   The Tribunal finds that the Rēzekne City Council did not delegate the task to prepare, coordinate, let alone approve, the heat supply development plan for the City of Rēzekne to Latgales Enerǵija.

866.   First, the Respondent has failed to show that the requirements of Section 40 and Section 41 of the Public Administration Act were met, and that there was any enactment or contract that provided for such delegation.  Clause 1.2 of the February 2006 Agreement (quoted in paragraph 171 footnote 163 above) did not delegate this task to Latgales Enerǵija.  Neither did the licences, since all licences expressly refer to "the development plan of the City of Rēzekne" in Clause 1 (see paragraph 132 above) and then refer to a different document to be prepared by Latgales Enerǵija in Clause 7.1 (see the verbatim quotation in paragraph 133 above), as a comparison between Clause 1 and Clause 7.1 shows.

867.   Secondly, the conduct of the Rēzekne City Council from 2006 onwards can be consistent only with the proposition that the Council had not delegated to Latgales Enerǵija the task to prepare the heat supply development plan for the City; had there

---

<div style="font-size:smaller">

(2)   An administration task may be delegated to a private individual by an external regulatory enactment or by an external regulatory enactment or contract made by public person.

(3)   Administration tasks may be delegated to another public person in cases laid down in law. In such case, the provisions of this Chapter shall be applied, insofar as the special legal norms of other laws do not lay down otherwise.

Section 41. Subject-matter of Delegation

(1)   A public person may delegate administration tasks, the performance of which is in the competence of such public person or its institution. When delegating administration tasks, the relevant public person shall be responsible for the performance of the function as a whole.

(2)   The following administration tasks may not be delegated:
  1)   sectoral policy-making and development planning;
  2)   co-ordination of the activities of the sector;
  3)   supervision of institutions and administrative officials;
  4)   approval of the budget of public persons, distribution of financial resources at the level of programmes and sub-programmes, and control of financial resources.

(3)   In addition to that referred to in Paragraph two of this Section the following may not be delegated to a private individual:
  1)   issuance of administrative acts, except cases when it is provided for in an external regulatory enactment;
  2)   administration tasks related to the performance of the functions of the external and internal security of the State, except cases when it is provided for in law;
  3)   other administration tasks, which by their nature may be performed only by State institutions.

[1332]   Respondent's Closing Argument, Slides 13-14.

</div>

been such a delegation in place, the Council would not have seen the need for a number of the actions that it took.

When Latgales Enerģija on 15 November 2006 sent the Council its 44-page draft[1333] as a contribution to the preparation of the heat supply development plan, this text contained a sentence suggesting that the performance of certain Municipality functions had been delegated to Latgales Enerģija;[1334] the Council reacted to the point, denying that it had ever transferred any heat supply functions to Latgales Enerģija.[1335]

Then some six months later the Rēzekne City Council set up a Working Group to produce the heat supply development plan for the City.[1336]   It is relevant in this context that the Working Group was set up by a formal decision of the Rēzekne City Council and was presided over by Mr. Ivars Locis, the Council's Deputy Executive Director.[1337]

It is finally also relevant that the heat supply development plan for the City was formally adopted by a decision of the Rēzekne City Council on 21 September 2007.[1338]

---

[1333]   R-31.

[1334]   R-31 [page 5]: "Considering that based on the agreement regarding lease of the local government heat supply systems entered into with the Rēzekne City Council and the reference included therein regarding the duty of LLC Latgales Enerģija to provide for heat supply to the objects connected to the centralised heat supply system of the city according to the agreement and the requirements of legal acts, the company has taken over from the City Council the duties specified in Section 15 of the Law on Local Governments [The Municipalities Act]. i.e. ensuring provision of utilities or, more particularly, heat supply.  In connection with this LLC Latgales Enerģija is performing its activities and thereby also planning and development [sic] of centralised heat supply in Rēzekne City".

[1335]   C-106: "The submitted document does not meet the provisions of the applicable legislation and does not correspond to the actual state of heat supply in the city of Rēzekne, as follows: 1. (…); 2. (…); 3. The claim that the Rēzekne City Council has transferred heat supply functions to Latgales enerģija SIA does not correspond to the legal or the actual situation; 4. (…)".

[1336]   In its letter dated 9 July 2007 the City Council described the respective contribution of the Municipality and the operator as follows: "Rēzekne City Council (…) has set up a work group for formulation of the city development strategy, where it would be necessary to include the chapter of the strategy on heating supply system prepared by the Operator.  For the purposes of more successful and efficient cooperation and to help the Operator to prepare its chapter of the strategy, the representatives of the Operator are being invited to the meetings of the said work group" (C-128 [page 8]).

[1337]   R-30 [page 1].

[1338]   C-137.

868.    Having determined that the Rēzekne City Council was in charge of preparing, coordinating and approving the heat supply development plan for the City, and in fact carried out such responsibilities, and that Latgales Enerģija had a contractual obligation to cooperate in good faith with the Council in order to reach that objective, the Tribunal turns to the question whether there was any delay on the part of the Municipality, taking into account, amongst other things, the manner in which Latgales Enerģija cooperated with the Municipality.

869.    The Tribunal's analysis will focus on the period from 20 January 2006, when Latgales Enerģija sent its first draft to the Rēzekne City Council, until 21 September 2007, the date when the heat supply development plan for the City was finally approved by the Rēzekne City Council.   It took twenty months in order for the heat supply development plan for the City to be made.   Considering that the February 2006 Agreement made on 10 February 2006 provided in its Clause 1.2 that the plan would have to be approved by 28 February 2006, something clearly went wrong.

870.    On 20 January 2006 Latgales Enerģija sent the Rēzekne City Council its draft "Guidelines for the development of the Rēzekne City heat supply system"[1339] (see paragraph 164 above).   The Council in fact received this draft,[1340] but did not acknowledge receipt of it to Latgales Enerģija; so Latgales Enerģija sent the Council two reminders on 10 May 2006 and 19 October 2006;[1341] no answer by the Council is in evidence to either reminder.

The Rēzekne City Council studied Latgales Enerģija's 44-page draft: Ms. Abramova, Deputy Chair of the City Council, first wrote to the Mayor on 27 January 2006 suggesting that the draft Guidelines received from Latgales Enerģija should undergo wider consultation;[1342] the Mayor's answer to this formal communication (if any) is not in evidence.   Then on 19 May 2006 the Chairman of Rēzekne City Task Force for the Supervision of Heat Energy Affairs Mr. Zeile wrote to the Mayor stating *inter alia* that whereas "in principle" the guidelines proposed by Latgales Enerģija "are correct

---

[1339] C-44.

[1340] R-25 [page 1].

[1341] C-91; C-96.

[1342] R-25 [page 1].

(…), they must be supported by figures and justified".[1343]  In this communication Mr. Zeile set out five proposals, including the need for a feasibility study on the heat supply options for the City, and he concluded that it would be necessary to develop a short-term and a long-term concept of heat supply for the City.  Apart from the comment that Latgales Enerģija's proposal must be supported by figures, the Chairman of the Task Force expressed no criticism as to Latgales Enerģija's draft Guidelines in its communication to the Mayor.  There is no evidence that Mr. Zeile's comments to the Mayor were in any way relayed to Latgales Enerģija or that Latgales Enerģija was contacted by the Rēzekne City Council in May 2006 or afterwards, before November 2006.

871.   Clause 1.2 of the February 2006 Agreement contemplated the approval by the Municipality of the heat supply development plan of the City by 28 February 2006.  It is common ground that no plan was discussed and approved by 28 February 2006.

872.   There is no evidence on the record that the Rēzekne City Council promptly informed Latgales Enerģija that the draft Guidelines submitted by Latgales Enerģija in January 2006 were not a sufficient basis in order for work to start on the part of the Municipality.  The Mayor was not called by the Respondent to give evidence as a witness; neither were Ms. Adamova or Mr. Zeile for that matter.

873.   The Council did not contact Latgales Enerģija with respect to the heat supply development plan for the City until after Latgales Enerģija had written to the Council on 19 October 2006.[1344]  In this letter Latgales Enerģija relied on Clause 5 of the February 2006 Agreement (quoted in paragraph 174 above footnote 164) and indicated that, unless the heat supply development plan for the City was adopted within two months, Latgales Enerģija would deduct the whole amount corresponding to the reduction on the tariffs that it had granted pursuant to the February 2006 Agreement from the rent owed to Rēzeknes Siltumtīkli.  This letter followed, and was probably prompted by, the Regulator's decision of 13 October 2006 by which the Regulator had refused to accept the new tariff proposed by Latgales Enerģija since

---

[1343]   R-25 [pages 2-3].

[1344]   C-96; the 10 May 2006 reminder was not answered.

one of the reasons for that decision was, in substance, that there was no heat supply development plan in place in the City of Rēzekne.[1345]

874.   The Rēzekne City Council started to criticise Latgales Enerģija's conduct of early 2006 with respect to the heat supply development plan almost two years after receiving the draft Guidelines in January 2006.  Thus, in a letter of 15 November 2007 to the Ministry for Regional Development and Local Government Affairs the Council stated that it had no document to approve by 28 February 2006[1346] and that Latgales Enerģija sent its first drafts to the Council only on 15 November 2006.[1347] However, the Council's explanations to the Ministry were factually inaccurate in that they failed to mention that the Council had received Latgales Enerģija's first draft Guidelines on 20 January 2006.

The same inaccuracy is contained in Rēzekne City Council's letter to Latgales Enerģija dated 10 December 2007.[1348]

875.   The Tribunal finds that by 20 January 2006 the City Council had received draft Guidelines by Latgales Enerģija on which it was possible to work, as confirmed both by Ms. Adamova and Mr. Zeile to the Mayor of Rēzekne, which conclusion is further supported by the fact that the Rēzekne City Council and Latgales Enerģija agreed on 10 February 2006 (Clause 1.2 of the February 2006 Agreement) that the heat supply development plan for the City would be approved by the Council by 28 February 2006.

876.   As the heat supply development plan for the City was not approved by 28 February 2006, Latgales Enerģija did not immediately complain to the Municipality.

877.   On 10 May 2006 Latgales Enerģija wrote to the Rēzekne City Council seeking comments on its 20 January 2006 draft Guidelines.  No answer by the Council is in evidence.  On 19 May 2006 Mr. Zeile wrote to the Mayor about Latgales Enerģija's draft Guidelines and gave his own proposals.  No answer by the Mayor is in evidence.  Then the first communication in which Latgales Enerģija complained of a breach of

---

[1345] C-19, see also paragraph 184 above and paragraph 901 below.
[1346] R-28 [page 4].
[1347] R-28 [page 2].
[1348] R-29 [page 18].

the February 2006 Agreement by the Municipality is dated 19 October 2006,[1349] followed by further letters.[1350]

878.     On 3 November 2006 the Mayor requested Latgales Enerġija to provide the Council with "the heat supply development plan for the 2006-2009 period"; the letter specifically mentioned important points which had to be specified in such plan, but omitted any reference to the draft Guidelines received in January 2006.[1351]

879.     On 15 November 2006 Latgales Enerġija sent the Council two drafts: a one-page draft for the period 2006-2009[1352] and a 22-page draft for the period 2006-2014.[1353]

880.     On 29 December 2006 the Rēzekne City Council criticised the drafts received from Latgales Enerġija in a one-page letter setting out eight comments.[1354]   The letter mentioned the existence of a working group that had met to review Latgales Enerġija's drafts of 15 November 2006.

881.     In 2007 the Rēzekne City Council decided to constitute the Working Group and the implementation of that decision took five months: announced on 29 December 2006,[1355] then again on 19 February 2007,[1356] the Working Group was in fact constituted only on 11 May 2007[1357] despite the fact that its president and a significant number of other members were members of the City Council (see paragraph 213 above).

882.     On 30 May 2007 the Regulator requested Latgales Enerġija to provide "information regarding the approved Rēzekne City heat supply development plan" by 8 June 2007.[1358] The Regulator, which had sent its previous enquiry to the Rēzekne City

---

[1349] C-96.

[1350] C-121.

[1351] C-97.

[1352] C-99.

[1353] R-31.2.

[1354] C-106; see paragraph 190 above.

[1355] C-106.

[1356] C-114.

[1357] R-30.1.

[1358] C-122.

Council in 2005,[1359] did not explain the reasons for which it now addressed its request to Latgales Enerġija.  On 6 June 2007 Latgales Enerġija replied asking the Regulator to turn to the Municipality in accordance with the provisions of the Municipality Act and the Energy Act.[1360]

883.   The first meeting of the Working Group took place on 14 May 2007.[1361]  After the Working Group was constituted, it met at regular intervals from May to September 2007; Mr. Ivars Paurs was called in as an expert at the end of July 2007.  The heat supply development plan for the City was finalised in less than five months.

884.   In this period, the Rēzekne City Council had repeatedly to request information from Latgales Enerġija.  The discussion between the parties was complicated by the dispute relating to whose primary responsibility it was to produce a heat supply development plan for the City.   In addition, Latgales Enerġija complained that its repair and investment proposals had not been answered by Rēzeknes Siltumtīkli.

885.   Aside from these aspects, the finalisation of the heat supply development plan for the City was delayed to an extent also by Latgales Enerġija's apparent reluctance to provide the Working Group with all the information required, as shown by the repeated requests which the Rēzekne City Council had to send to Latgales Enerġija.[1362]  However, the Respondent has not provided concrete evidence in these proceedings as to the delay caused by Latgales Enerġija.

---

[1359]  C-69, see paragraph 150 above.

[1360]  C-123.

[1361]  R-30.1.

[1362]  See C-124 of 12 June 2007 [mentioning prior repeated requests without any precise indication].

C-128 [pages 7 ff.] of 9 July 2007, to which a 19-page document was attached which is not in evidence. This letter complains in strong terms that Latgales Enerġija is reluctant to provide information and refers to the minutes of the Working Group in general terms.  The Working Group concluded in fact on 31 July 2007 at a meeting not attended by Latgales Enerġija that the information requested from the operator had not been provided (R-30 [page 29]), a point disputed by Latgales Enerġija's representative at the 8 August 2007 meeting (R-30 [page 32]).

C-128 [page 15] of 19 July 2007, requesting Latgales Enerġija to provide the missing information by 24 July 2007.

C-128 [page 15] mentions the following:

(i)  the planned investments in developing the city's heat supply system infrastructure (heating pipelines, boiler houses, scope of reconstruction, energy efficiency measures), updated information as of July 2007;

886.   <u>The Tribunal's Conclusion and Finding</u>.  The better part of the year 2006 and almost half of 2007 were characterised by the Rēzekne City Council's inaction and delay with respect to the establishment of the heat supply development plan for the City.  As from 13 October 2006, when the Regulator refused to approve a tariff proposed by Latgales Enerġija relying *inter alia* on the absence of an approved heat supply development plan for the City, it became clear that the Municipality's delay would in fact prevent the Regulator from accepting any new tariff proposed by Latgales Enerġija until such a plan had been approved.

The Tribunal does not accept the Respondent's contention that Latgales Enerġija could have relied on "more general development documents and relied on its own business scenario" since the Regulator's decision did not mention that Latgales Enerġija had failed to do so.

Considering the position adopted by the Regulator, it must have been clear to the Municipality that, confronted with ever rising prices of natural gas, Latgales Enerġija's position would become ever more difficult.  Yet the Municipality's inaction continued and further significant delay accrued.  Any delay as may have been caused by Latgales Enerġija's failure promptly to provide the Working Group with all the information required is insignificant by comparison to the delay caused by Rēzekne City Council.

---

(ii)   the time schedule relating to the planned investments and repair and overhaul of the heat supply system;

(iii)   the planned sources of financing for the necessary investments (own funds, credit); and

(iv)   information as to how the planned investment will affect energy efficiency measures, thermal energy production and supply tariff.

<u>C-128</u> [page 31] of 31 July 2007 requesting Latgales Enerġija to provide information still outstanding.

<u>C-128</u> [page 31] requests the following:

(i)   updated capacities of boiler houses;

(ii)   heat loads: by district, in winter and summer;

(iii)   the potential for developing heat loads;

(iv)   suggestions for the centralised heat supply zone (CHS), requirements for consumers in such zone;

(v)   the load on networks (how many MWh/km? should such networks be retained?); and

(vi)   how suited the existing diameters of the existing piping to consumer load were.

Latgales Enerġija was also asked to describe the self-cost of thermal energy generation and provide information as to current tariffs and actual costs as well as measures to reduce self-costs.

258

The Respondent's complaint that Latgales Enerģija belatedly contacted the Rēzekne City Council in May 2006 after sending its proposal in January 2006 is devoid of any foundation; upon receipt of such proposal, it was a matter for the Council to react and contact Latgales Enerģija, which the Council failed to do.

887.   The Tribunal finds that the Council's conduct, in the circumstances recalled above, appears to be founded on prejudice or preference rather than on reason or fact, *i.e.* it was arbitrary and falls short of the duties further outlined in paragraphs 841 ff. above with respect to Article 3(1) of the BIT.

(iii)   *The Claim Based on the Municipality's Refusal to Consent to Investments into the Heating System*

888.   The Claimant claims that the Municipality breached its expectations that it would comply with requests to provide consent for the making of investments into the heating system and that Latgales Enerģija could modernise and improve the system; that the Municipality's refusal to provide consent to investments (including as to cogeneration) was an act of harassment, and that Latgales Enerģija was thereby unable to invest the full amount of EUR 1.5 million into the heating system in the first three years of the lease.   The Respondent opposed this claim in contemporaneous correspondence, denying that the investments to be made by Latgales Enerģija were sufficient.

The Tribunal's finding is set out in paragraph 898 below.

889.   This complaint includes two points: *(i)* the Municipality's refusal to consent to investments to be made by Latgales Enerģija to the Assets, and *(ii)* the Claimant's failure to comply with the minimum investment required in the first three-year period of the lease in accordance with Clause 7.1.1 of the Long-Term Agreement (see paragraph 92 above).

890.   The Claimant has filed three documents in support of this claim: Latgales Enerģija's letter to the Mayor of Rēzekne dated 6 March 2007,[1363] Latgales Enerģija's letter to Rēzeknes Siltumtīkli dated 18 April 2007[1364] and Latgales Enerģija's letter to

---

[1363] C-116.
[1364] C-118.

Rēzeknes Siltumtīkli dated 13 July 2007[1365] as well as Mr. Strioga's first Witness Statement.[1366]

The first letter refers to repair or investment proposals allegedly made by Latgales Enerģija and it points out that the Rēzekne City Council's and Rēzeknes Siltumtīkli's failure to answer will result in the investment made by Latgales Enerģija to fall short of the minimum amount contractually agreed of EUR 1.5 million.

The second letter restates the content of the first letter without reference to the amount of EUR 1.5 million; in addition, it mentions Rēzeknes Siltumtīkli's failure to grant permission for the installation of cogeneration equipment as well as new boilers at Rīgas iela and Atbrīvošanas alejā 155a.

The third letter refers to four previous letters by Latgales Enerģija to Rēzeknes Siltumtīkli or the Rēzekne City Council that have allegedly remained unanswered; none of those letters is in evidence.  One of such letters is said to have requested permission for the installation of the cogeneration facility and two 30 MW water boilers.

891.  Almost one year later, on 15 May 2008 Rēzeknes Siltumtīkli wrote to the Rēzekne City Council and the Regulator pointing out that Latgales Enerģija had failed to invest the minimum amount of EUR 1.5 million in the first three years of operation in breach of Clause 7.1.1 of the Long-Term Agreement.[1367]  Five days later the Rēzekne City Council made the same point, amongst other things, in a letter to Latgales Enerģija.[1368]  In its answer dated 2 June 2008 Latgales Enerģija restated *inter alia* that Rēzeknes Siltumtīkli had withheld its consent to the building of the cogeneration station.[1369]

892.  The burden of proof is on the Claimant as to *(i)* Latgales Enerģija's alleged proposals for repairs to and investments into the heating system, *(ii)* the alleged refusal by Rēzeknes Siltumtīkli and the Rēzekne City Council to approve Latgales Enerģija's

---

[1365] C-129.

[1366] CWS-1 ¶¶ 14; 60-64.

[1367] C-231.

[1368] C-178.

[1369] C-179 [page 2].

proposals and *(iii)* the reason(s) for which Rēzeknes Siltumtīkli's and/or the Rēzekne City Council's approval was required.  The Respondent has not answered this claim.

893.   The Tribunal has already noted that Latgales Enerģija's proposals are not in evidence (see paragraph 209 above); Mr. Strioga's evidence fails to provide details as to the proposed investments, apart from cogeneration which is specifically mentioned.

894.   Cogeneration has been dealt with in a patchy manner in the pleadings.  One must first determine whether cogeneration was part of the Rēzekne Project or was simply a possible option.  Clause 2.10 of the February 2005 Agreement (quoted in paragraph 103 above) provides that the Municipality will not get involved in the installation of cogeneration stations with third parties.  Clause 7.1.1 of the Long-Term Agreement does mention cogeneration,[1370] but it does so by reference to the Gas Supply Agreement.

In its first comprehensive memorial of 6 December 2013 the Claimant contended that cogeneration had been an important part of the investment ever since the beginning[1371] and it referred to the "cogeneration project",[1372] but it also stated that cogeneration was simply a "possibility" according to the Gas Supply Agreement.[1373] In its Reply the Claimant then contended that "the Municipality's requirement for cogeneration was contractually recognised in the Long Term Agreement".[1374]

895.   The witness evidence and the scant documentary evidence on cogeneration does not justify the conclusion that the Muncipality was under an obligation to Latgales Enerģija to adopt a cogeneration project.

---

[1370]   Art. 7.1.1 of the Long-Term Agreement (C-4) reads as follows:

The Operator within three years as of the Agreement entering into force undertakes to invest into the Heat supply facilities either in the Assets or new assets in the amount not less than EUR 1,500,000 (one million and five hundred thousand Euros) in order to background obligations against AS ,,Latvijas Gaze'' assumed by the Lessor concerning gasification and cogeneration according to an agreement no. 1580 dated 23 April 2004.

[1371]   Cl. Mem. ¶ 83.
[1372]   Cl. Mem. ¶ 85.
[1373]   Cl. Mem. ¶ 20.
[1374]   Cl. Rep. ¶ 116(5).

Mr. Strioga's evidence on cogeneration is to the effect that all permissions required were received.[1375]   However, only Latvenergo's statement is in evidence, and it is dated 22 February 2006;[1376] Latgales Enerģija's proposal (if any) is not in evidence. The Tribunal further notes that Mr. Jautakis refers more generally to a "plan" in his first Witness Statement.[1377]

Cogeneration was a much-discussed item within the Working Group for the preparation of the heat supply development plan for the City, and the final plan of 21 September 2007 expressly mentions cogeneration.[1378]

The plan for the City was issued in the middle of the energy crisis at a time when the investor and the Municipality's differences had grown into a full-blown dispute. Whereas the Claimant complains of a lack of approval on the part of the Municipality of offers allegedly made, the Municipality in turn complained of a lack of information as to planned investments on the part of Latgales Enerģija.[1379]

896.    The Tribunal finds that the Claimant has failed to prove that the Muncipality was under an obligation to Latgales Enerģija to realise a cogeneration project.  It follows that until and unless a specific project had been agreed upon by the Municipality and Latgales Enerģija, Latgales Enerģija had no right to carry out a cogeneration project. In the circumstances that have been recalled, the Tribunal cannot conclude in the absence of sufficient documentary evidence that the Claimant's alleged offers were offers proper which called for a decision on the part of the Municipality, rather than "a plan", as stated by Mr. Jautakis in his evidence.  Such offers, if final and sufficiently detailed, would have been contained in documents, especially insofar as investments were concerned.

897.    The Tribunal further finds that the Claimant's reminders in Exhibits C-116, C-118 and C-129 are insufficient to prove Latgales Enerģija's alleged proposals as to repairs and investments.

---

[1375]  Transcript, Day 2, 12/13-19.
[1376]  C-87.
[1377]  CWS-2 ¶ 79.
[1378]  C-213 p. 22.
[1379]  C-128 [page 15].

898.  **The Tribunal's Conclusion and Finding**.  The Tribunal finds that the Claimant has failed to prove its claim that Rēzeknes Siltumtīkli and/or the Rēzekne City Council dismissed or failed to answer Latgales Enerģija's proposals for repairs and investment, including as to cogeneration, and dismisses such claim.

As to the Claimant's claim that Rēzeknes Siltumtīkli and/or the Rēzekne City Council's alleged refusal caused Latgales Enerģija's failure to comply with the minimum investment required under Clause 7.1.1 of the Long-Term Agreement, such point is relevant only in the context of the revocation of the licences by the Regulator; the Tribunal will examine such point in that context (see paragraphs 1021 ff. below).

> (iv)  *The Claims Based on the Regulator's Repeated Refusals to Set a new Tariff*

899.  The Regulator's decisions as to the tariff relevant for the purposes of this Award are as follows:

| Date | Exh. | ¶ in this Award | Summary | Court decisions | | | |
|---|---|---|---|---|---|---|---|
| | | | | Date | Exh. | ¶ in this Award | Summary |
| 19.12.05 | C-14 C-15 C-82 | 154 | Decision No. 19 new tariff: LVL 27.60/29.02/MWh[1380] | | | | |
| 13.10.06 | C-19 R-35 | 184 | Decision No. 17 *denying* the application for a new tariff | No decision made on the challenge, see ¶ 186 above | | | |
| 11.06.07 | C-21 | 233 | Decision No. 12 *denying* the application for a new tariff | 15.04.09 | C-192 | 392 | Application to set aside *dismissed* |
| | | | | 24.09.09 | R-1 | 395 | Application for a fresh time limit to be set for a final appeal *denied* |
| 09.11.07 | C-27 | 239 | Decision No. 28 new tariff: LVL 33.90 to LVL 42.40/MWh[1381] | | | | |
| 07.12.07 | C-28 | 240 | Decision No. 35 *revoking* Decision No. 28 of 09.11.07 | 30.10.09 | *Not in evidence* | 243, 400 | Application to set aside *dismissed* |
| | | | | 23.09.10 | R-4 | 401 | Appeal *dismissed* |

900.  The Claimant complains that its expectations were breached by the Respondent in that *(i)* the Regulator, having reversed its previous practice, refused to set new tariffs relying on the absence of a Development Plan, and that *(ii)* the Regulator revoked on 7 December 2007 the tariff approved on 9 November 2007 in non-transparent

---

[1380]  The lower tariff is for residents, the other for other users.

[1381]  This is a uniform tariff for all users, the values indicated in this table are the lowest and the highest rate.

conditions and wrongly, as a result of the Municipality's interference; the 7 December 2007 decision was arbitrary and discriminatory; more generally, the Respondent breached the standard of fair and equitable treatment due to the Regulator's arbitrary and discriminatory refusal to calculate a new tariff where a new tariff was critical due to factors outside the operator's control, especially in light of the increase in the price of natural gas. The Respondent denies that the Municipality interfered with the Regulator and contends that the Regulator acted independently within the scope of its duties and prerogatives; in the period from 2005 to 2007 Latgales Enerģija applied four times for a new tariff and the Regulator issued a new tariff in 2005.

The Tribunal's findings are set out in paragraphs 903, 911, 918 and 922 below.

901.   <u>The Regulator's Decision of 13 October 2006.</u>   The Regulator's decision of 13 October 2006 refusing the tariff proposed by Latgales Enerģija rested on two grounds: *(i)* the rates proposed by Latgales Enerģija did not show changes in boiler house efficiency in line with investments and the plan of heating supply development approved by the Municipality and *(ii)* the proposed rates were not based on costs fully substantiated (*e.g.* the salaries to be paid by Latgales Enerģija) as required by Section 19 of the Public Utility Regulators Act.[1382]  The Claimant's complaints relate only to the first reason given by the Regulator; the Claimant has not contested the second reason on which the Regulator's decision is based.

902.   The Tribunal finds that the Regulator's refusal to approve a new tariff was therefore stated to be due also to Latgales Enerģija's failure to substantiate its own costs. In such circumstances, the Regulator was entitled to refuse to approve the tariff proposed by Latgales Enerģija on that ground alone. The decision was based on principles of law, the most fundamental of which was the principle whereby the Regulator must ensure that the new rates proposed by an operator must be based on costs that have been duly substantiated. This is far from an outlandish concern as it is the Regulator's duty to protect end-users.

903.   <u>The Tribunal's Conclusion and Finding.</u>   The Tribunal finds that the Regulator's decision of 13 October 2006 cannot therefore be characterised as arbitrary or as

---

[1382]   <u>CLA-49</u>, see paragraph 38 above.

frustrating the investor's legitimate expectations since the investor was under a duty to provide the required information to the Regulator in accordance with Latvian law and failed to do so.

904.  <u>The Regulator's Decision of 11 June 2007</u>.  The Regulator's decision of 11 June 2007 refusing the tariff proposed by Latgales Enerǵija is based on the following grounds: *(i)* Latgales Enerǵija failed to provide an accurate calculation of the fuel costs in accordance with Clause 23(1) of the Methodology in two respects: *first*, the balance sheet of the predictable thermal energy consumption must be prepared in accordance with the heat supply development plan approved by the Municipality (Section 17 of the Methodology) and no such plan existed in the City of Rēzekne; such plan was necessary to determine expected changes in house boiler efficiency (the "Dhk" coefficient) and such coefficient had not been included in Latgales Enerǵija's calculation; *secondly*, two further coefficients (the boiler house net efficiency index "hnetokom" and the index of expected changes of heating network "Dhst.") had not been included by Latgales Enerǵija; and *(ii)* Latgales Enerǵija failed to provide the Regulator both with the long-term development plan required by Clause 6.3 of the licences and the prospective one-year plan of operation to be provided every year under Clause 7.1 of the licences (see paragraphs 133 above).  In an *obiter* the Regulator added that the development plan had not been approved "due to the applicant's fault".

905.  As a consequence, the Regulator found that the rates submitted by Latgales Enerǵija failed to comply with the requirements of Clauses 17, 23(1), 23(2), 23(3) and 23(6) of the Methodology (<u>C-35</u>) and Latgales Enerǵija's proposal must therefore be dismissed *inter alia* under Sections 1, 9(1)(1) and (3), 9(2), 19(1) and (4) of the Public Utility Regulators Act.

906.  The Regulator's decision was upheld on appeal by the Administrative District Court on 15 April 2009.[1383]  On the issue of coefficients, the court noted that there was no dispute that three coefficients[1384] prescribed by the Methodology were not used by Latgales Enerǵija due to the fact that "the city of Rēzekne [had] not developed and

---

[1383]  <u>C-192</u>.
[1384]  Dhk, hnetokm and Dhst.

approved [a] heating system development plan",[1385] thereby accepting a point argued by Latgales Enerģija in its application to set aside,[1386] namely that all three coefficients depended on the existence of a development plan.  However, the court went on to find that the three coefficients were prescribed by the Methodology; a failure to apply them in the calculation of the tariff meant that a tariff so calculated was inaccurate, and therefore unacceptable, since such tariff would give rise to undue costs for end-users.[1387]  On Latgales Enerģija's complaint that the Regulator's reversal of its prior practice was unlawful, the court accepted that the Regulator had set a new tariff in 2005 without applying the three coefficients in dispute.  However, Latgales Enerģija's reliance on the 2005 tariff could be protected only provided that the situation in 2005 and in 2007 was the same.  The court found that such was not the case, holding *(i)* that the Regulator had already rejected a tariff proposed by Latgales Enerģija in 2006 and *(ii)* "(…) that in 2005 the situation of heat supplies in Rēzekne was different and namely, in 2005 a different heat supply operator (the Applicant) has commenced their operations in the city and it was necessary to ensure the heat to the city.  Without approval of the tariffs, there was a risk that the city is left without heat supply".[1388]

907.   The Regulator's 11 June 2007 decision raises two main issues, namely whether the fair and equitable treatment standard is breached by a decision which requires the operator to calculate a proposed new tariff by using coefficients which are not available due to no fault of the operator, and whether the Regulator was bound by its previous practice.

908.   Not without hesitation, the Tribunal concludes that the Regulator's decision is neither arbitrary nor discriminatory *per se* insofar as it puts end-user protection first and requires compliance with coefficients which would have been available if the heat supply development plan for the City had been approved by the Municipality.

The Regulator's *dictum* stating that the non-existence of the plan was due to the operator's fault is nevertheless unwarranted because it was not for the Regulator to

---

[1385] C-192 ¶ 23.7.

[1386] C-125.

[1387] C-192 ¶ 23.7.

[1388] C-192 p. 209, ¶ 9.

266

express an opinion on a dispute between the Rēzekne City Council and Latgales Enerģija; it is significant that the Administrative District Court did not repeat such statement in its decision.

909.   Whether the reversal of the Regulator's 2005 practice was lawful is first and foremost a matter of Latvian law.  It was examined by the Administrative District Court, which found that the situation in 2007 was not the same as in 2005.  The Tribunal considers that the reason given by the court based on the distinction between the situation in 2007 and in 2005 recalled in paragraph 906 above is not compelling; yet the Tribunal is mindful of the fact that it is not for an investment tribunal to second guess the courts of the host State, although this Tribunal has reached this conclusion not without reluctance in the present case as it would seem to be almost self-evident that it was vital to ensure that heating could be provided to the City in 2007 as it was in 2005.

910.   The Claimant has contended that it relied on the fact that the Regulator would not change its 2005 practice, *i.e.* that the Regulator would continue to consider and accept proposals for a new tariff, if need be, despite the absence of a heat supply development plan for the City.   However, the Long-Term Agreement and the February 2005 Agreements were entered into by Latgales Enerģija in January and February 2005 respectively, and the Regulator's decision setting a new tariff was made in December 2005.  There is no evidence of any specific representations or assurances by the Regulator to the Claimant or Latgales Enerģija that new tariffs could still be adopted despite the fact that there was no heat supply development plan in place for the City; the Claimant has not discharged its burden of proof in this respect.

911.   The Tribunal's Conclusion and Finding.  The Regulator's 11 June 2007 decision is ultimately based on the Regulator's duty to protect end-users and it cannot be said to amount to bad faith, wilful disregard of due process of law, to be founded on preference or prejudice rather than reason or fact, or not to bear any reasonable relationship to some rational policy or otherwise to be in breach of Article 3(1) of the BIT.

912.   The Regulator's Decisions of 9 November and 7 December 2007.  The Regulator's decision of 9 November 2007 set a new tariff upon Latgales Enerģija's proposal; in

the meantime the Municipality's heat supply development plan for the City had been adopted on 21 September 2007 (see paragraph 228 above).

On 7 December 2007 the Regulator revoked its 9 November 2007 decision on the grounds that: *(i)* that it had received a letter by Rēzeknes Enerģija indicating an amount of natural gas planned to be supplied by Latvijas Gāze that was different from the amount indicated by Latgales Enerģija in its application for a new tariff, *(ii)* that the tariff approved on 9 November 2007 was not calculated in accordance with the actual situation in accordance with Clause 22(1) of the Methodology and *(iii)* that Latgales Enerģija had "knowingly submitted (…) false information" and obtained a new tariff "by illegal means", as a consequence of which its conduct was "unlawful".

The 7 December 2007 decision did not set out the applicable tariff further to the revocation of the Regulator's 9 November 2007 decision.

913.    On 23 September 2010 the Administrative Regional Court dismissed Latgales Enerģija's appeal against the decision of the Administrative Regional Court of 30 October 2009, upholding the Regulator's decision of 7 December 2007; the 23 September 2010 decision confirms that the reasons stated in the 30 September 2009 decision were sound as a matter of Latvian law.[1389]  Only the 23 September 2010 decision is in evidence, but the 30 October 2009 decision is summarised therein; both decisions deal with the amount of natural gas that was properly to be taken into consideration for the purposes of the Methodology and the consequences which such amount would have on the price of gas sold by Latvijas Gāze, which are both highly technical matters.

914.    Latgales Enerģija was not heard before the 7 December 2007 decision was made. This decision was not made purely on technical grounds since the Regulator found that Latgales Enerģija had deliberately submitted information known to be false, to the detriment of the public interest, and that its conduct was therefore unlawful.

915.    The Tribunal finds that the fact that Latgales Enerģija was accused of such wrongdoing in the decision without being heard amounts to a procedural irregularity, all the more so in a case in which such accusation rested on information unilaterally

---

[1389] R-4.

provided by Rēzeknes Enerģija to the Regulator.  However, the Tribunal considers that it is relevant that the Regulator's 7 December 2007 decision was subject to judicial review before two successive Latvian courts, which upheld the Regulator's decision, and as to which it is not suggested that there was any denial of justce.  The Tribunal considers that the irregularity in the procedure of the Regulator should be weighed alongside the existence of an avenue of appeal and, not without reluctance, the Tribunal finds that such irregularity is not serious enough to give rise to a breach of due process amounting to a breach of Article 3(1) of the BIT.

916.   The Tribunal further dismisses the Claimant's complaint that the Regulator's 7 December 2007 decision was arbitrary and/or discriminatory.  The issue in dispute went to the question whether the rates proposed by Latgales Enerģija for a particular user group were based on an accurate calculation.  The Regulator's decision involved the determination of technical issues under the Methodology as well as the quantity of natural gas that had to be purchased from Latvijas Gāze as it purported to correct a mistake in the 9 November 2007 decision due to the inaccurate quantity of natural gas taken into account by Latgales Enerģija.

917.   The Tribunal considers that the Claimant has failed to show that the Regulator's 7 December 2007 decision was based on prejudice or preference rather than reason or fact.

918.   The Tribunal's Conclusion and Finding.   The Tribunal therefore dismisses the Claimant's complaints that the Regulator's decision of 7 December 2007 constitutes a breach of due process, that it is arbitrary and it was made in bad faith, in breach of Article 3(1) of the BIT.

919.   The Regulator's Alleged Failures to Set a New Tariff Taking into Account the Increase in Electricity and Natural Gas Prices.  The Tribunal must finally consider the Claimant's complaint that the Regulator breached the standard of fair and equitable treatment by refusing to set a new tariff in circumstances in which a new tariff was critical due to factors outside the operator's control, especially in light of the increase in natural gas and electricity prices.

920.   The Regulator's 11 June 2007 decision was not arbitrary in itself, as the Tribunal has found in paragraph 911 above.  However, as found in paragraph 886 above, the

Municipality bears responsibility for the fact that there was no heat supply development plan in place for the City when the Regulator made this decision.

921. When the Public Utility Commission authorised an increase in the price of natural gas on 28 March 2007 (see paragraph 231 above), the price of natural gas had increased by between 55% and 129% from the rate included in the December 2005 tariff calculations according to the Claimant. The Respondent has not specifically challenged these figures.

Owing to the absence of a heat supply development plan for the City, Latgales Enerģija was effectively deprived of its statutory right to propose a new tariff where the costs of the heat supply had increased by more than 5% for factors beyond its control (Clause 13 of the Methodology). This was actually so regardless of the tariff that Latgales Enerģija might propose to the Regulator. The situation was all the more unfair to the Claimant because Latgales Enerģija had in fact consented to decreasing the rates charged to end-users under the February 2006 Agreement in consideration *inter alia* for the Municipality's undertaking to have the heat supply development plan for the City approved by the end of February 2006 (see paragraphs 173, 177 and 180 above).

Having said this, the Tribunal has already found in paragraph 886 above that the Municipality's delayed approval of the heat supply development plan for the City prevented a review of the tariffs by the Regulator. Responsibility for such a state of affairs lies with the Municipality, not the Regulator.

922. <u>The Tribunal's Conclusion and Finding</u>. The Tribunal therefore dismisses this claim.

(v) *The Claims Based on the Municipality's and the Regulator's Conduct in Connection with the Energy Crisis*

923. There are multiple claims made by the Claimant in relation to the Municipality's and the Regulator's conduct in connection with the energy crisis of September/October 2007. The following table provides a synoptic view of the main events in chronological order.

[Page intentionally left blank in part]

270

LE = Latgales Enerģija/LG = Latvijas Gāze/RCC = Municipality/RE = Rēzeknes Enerģija/RS = Rēzeknes Siltumtīkli

| Date | Exh. | See ¶ above | Regulator's conduct -- Summary | RCC's conduct – Summary | LE's conduct – Summary | Conduct by others Summary |
|---|---|---|---|---|---|---|
| 11.06.07 | C-21 | 233 | Decision No. 12 *denying* LE's application for a new tariff | | | |
| 25.07.07 | C-130 | 246 | | | LE informs RS that it has not paid the full invoiced amount | |
| 11.09.07 | C-153, ¶¶ 12-13 | 237(i). 259 | | | LE has difficulties in providing heating as from this day | LG stops supply of natural gas |
| 13.09.07 | C-134 | 251 | | Mayor's interview | | |
| 21.09.07 | C-137 C-213 | 192, 228 | | Heating Supply Development Strategy approved by RCC | | |
| | C-138 [page 3] | 255, 303 | | | | RS obtains the attachment on LE's movable property and bank account |
| 28.09.07 | C-142 | 258 | | RCC's decision to establish RE | | |
| 02.10.07 | C-206 | 260 | | RE incorporated by RCC | | |
| 03.10.07 | R-20 [page 8] | 261 | | | | Local Government Loan and Guarantee Control and Monitoring Council *supports* RCC's decision to apply for a loan from the Treasury in an amount of LVL 4 million to be paid for the increase in RE's capital |
| 04.10.07 | R-20 [page 9] | 261 | | RCC's application to the Treasury for a loan of LVL 4 million for the increase in RE's share capital | | |
| | C-22 | 262 | Regulator's warning to LE (licences may be revoked) | | | |
| 09.10.07 | R-20 [page 1] | 261 | | RCC's decision No. 393 It is decided to invest funds in the amount of LVL 4 million for the increase in RE's capital | | |
| | C-24 | 264 | | RCC's decision No. 388 Declaration of an energy crisis | | |
| | C-145 [pages 2-6] | 268 | | Energy Crisis Committee First Meeting | | |
| 10.10.07 | C-145 [page 1] | 269 | | RCC directs LE to provide heating within 24 hours | | |
| 11.10.07 | C-23 | 274 | Regulator's decision No. 26 It is decided to take over LE's zone (appeals by LE *dismissed* on 30.03.10 and 24.11.11, R-3) | | | |
| 12.10.07 | C-25 | 275 | | RCC's decision No. 425 It is decided to appoint RE as the person in charge of providing thermal energy in the territory of Rēzekne | | |
| 13.10.07 | C-147 | 276 | | Energy Crisis Committee Third Meeting | | |
| 17.10.07 | C-150 | 282 | | | | Latgale Regional Court *revoking* the decision of 21.09.07 on attachment LG resumes supply of natural gas |
| 25.10.07 | C-26 | 286 | | October 2007 Agreement by the Claimant, LE, RCC, RS and RE | | |
| 26.10.07 | | 290 | | | | RS challenges the decision of 17.10.07 |
| 09.11.07 | C-27 | 239 | Regulator's decision No. 28 *approving* a new tariff | | | |
| 07.12.07 | C-28 | 240 | Regulator's decision No. 35 *revoking* the decision of 09.11.07 (appeals by LE *dismissed* On R-4) | | | |
| 11.12.07 | C-162 | 299 | Regulator's objection to the assignment by LE to LE Remonts | | | |

271

924. The Tribunal will examine the Claimant's claims in relation to the following circumstances: *(i)* the failure by the Municipality to pay the balance of Latvijas Gāze's invoices to Rēzeknes Siltumtīkli prior to mid-September 2007; *(ii)* the interview given by the Mayor of the City of Rēzekne on 13 September 2007; *(iii)* the steps taken by the Municipality to set up Rēzeknes Enerģija and obtain a loan from the Treasury in an amount of LVL 4 million from 28 September 2007 onwards; *(iv)* the attachment of Latgales Enerģija's assets obtained by Rēzeknes Siltumtīkli and the failure by the Rēzekne City Council and Rēzeknes Siltumtīkli to have the attachment lifted in accordance with the October 2007 Agreement; *(v)* the declaration of an energy crisis by the Rēzekne City Council on 9 October 2007; *(vi)* the Regulator's decision to take over Latgales Enerģija's zone on 11 October 2007; and *(vii)* the appointment of Rēzeknes Enerģija by the Rēzekne City Council as the person in charge of providing thermal energy on 12 October 2007.

> a. *The failure by the Municipality to pay the balance of Latvijas Gāze's invoices to Rēzeknes Siltumtīkli prior to mid-September 2007*

925. The Claimant complains of a breach of its legitimate expectations that Latgales Enerģija would receive natural gas to be able to provide heating services and the Municipality would abide by the contractual arrangements in relation to the supply of such natural gas, and would in particular pay Latvijas Gāze. Relying on different legal theories the Respondent contends that only Latgales Enerģija had a duty to pay for the natural gas delivered.

The Tribunal's finding is set out in paragraph 937 below.

926. The Claimant rests its legitimate expectations on a combined reading of Clause 2.3 of the Long-Term Agreement[1390] and Clause 4 of the February 2005 Agreement.[1391]

927. The Respondent contends that Clause 4 of the February 2005 Agreement deals only with cases of delay in the completion of the infrastructure for the use of natural gas by Latvijas Gāze and does not avail the Claimant's case. It is the Respondent's case that

---

[1390] C-4, quoted in paragraph 80 above.

[1391] C-8, quoted in paragraph 104 above, as amended by Clause 6 of Amendment No. 3 to the Gas Supply Agreement (C-81).

Latgales Enerģija undertook to pay for the gas for a number of reasons: first, because the Long-Term Agreement is to be characterised as the transfer of a business as a whole as a matter of Latvian law (*Betriebsübergang*); and, secondly, because Latgales Enerģija tacitly undertook such an obligation to pay.

928.  The Claimant's argument is based on Clause 4 of the February 2005 Agreement. Each paragraph of Clause 4 contemplates a specific case.  According to the first paragraph, the Municipality shall indemnify Latgales Enerģija of the losses incurred in case the completion of the natural gas infrastructure by Latvijas Gāze has been delayed due to the fault of the Municipality or a third party and Latgales Enerģija has therefore had to use heavy fuel oil rather than natural gas.  According to the second paragraph, the Municipality shall pay Latvijas Gāze any losses and/or contractual penalties which Latvijas Gāze may claim from *(inter alios)* Latgales Enerģija based on the Municipality's obligations undertaken under the Gas Supply Agreement "on purchase of a specified amount of gas for the needs of the city of Rēzekne".

929.  The Municipality had undertaken a minimum purchase obligation under Clauses 3.1 ff. of the Gas Supply Agreement,[1392] the breach of which was sanctioned by a contractual penalty according to Clause 3.4 of the same agreement.

930.  The Tribunal finds that the reference by Clause 4, second paragraph, of the 2005 February Agreement to the "purchase of a specified amount of gas" is to be read against the background of the take-or-pay obligations undertaken by the Municipality under the Gas Supply Agreement with Latvijas Gāze.  It follows that the interpretation and construction of Clause 4 of the February 2005 Agreement advanced by the Claimant is inconsistent with a plain reading of the express terms of the provision under consideration.

931.  Whether the second paragraph of Clause 4 of the February 2005 Agreement is capable of applying each year, or is related to the first year of operation in which a delay has occurred with respect to the date of completion of the natural gas infrastructure, as contended by the Respondent, is irrelevant for present purposes.  The Tribunal finds that what is relevant is the absence of an express term in the February 2005

---

[1392]  C-40.

273

Agreement to the effect that Latgales Enerģija would have no duty to pay for the natural gas used on the basis that such duty was solely on the Municipality.

932.   The Respondent argues that Latgales Enerģija was bound to pay for the gas on the basis that the Long-Term Agreement is to be characterised as a contract making provision for a transfer of business as a whole (*Betriebsübergang*).

933.   The Tribunal finds that such argument is unsound because it is contradicted by the negotiations between the Parties and the express terms of the Long-Term Agreement. The Long-Term Agreement is stated to be a contract between a lessor (Rēzeknes Siltumtīkli) and an operator (Latgales Enerģija) relating to certain assets (as defined in Clause 1.1(a) of the same agreement).   Moreover, the Claimant's PowerPoint presentation of 25 November 2004 made an express distinction between a "lease of RS property" and "lease of RS itself ('lease of business')".[1393]   The Long-Term Agreement was made as a lease of Rēzeknes Siltumtīkli's assets and the legal concept of a *Betriebsübergang* prayed in aid by the Respondent, which corresponds to a "lease of RS itself ('lease of business')", is therefore the concept which the parties eventually discarded, as proved by the express terms of the Long-Term Agreement.

934.   The Respondent's final argument is based on an alleged tacit agreement by Latgales Enerģija.   When the gas started to be supplied from 7 November 2005 onwards, no contract in writing was made between Rēzeknes Siltumtīkli and/or the Municipality on the one hand, and Latgales Enerģija on the other, despite the fact that Latgales Enerģija would start to use the natural gas.   Even subsequently, when it became clear that Latvijas Gāze had no interest in having a direct contractual relationship with Latgales Enerģija, Rēzeknes Siltumtīkli and/or the Municipality and Latgales Enerģija did not enter into a contract in writing in relation to the natural gas used by Latgales Enerģija.   It is common ground that Rēzeknes Siltumtīkli invoiced Latgales Enerģija on the basis of invoices received from Latvijas Gāze.   Latgales Enerģija paid such invoices directly to Latvijas Gāze until May 2007 without raising any objections as to the tariff underlying Latvijas Gāze's invoices.   These facts are described in

---

[1393]   C-41 [page 4].

Ms. Rogozina's first Witness Statement[1394] on which the Respondent has itself relied;[1395] such facts are therefore common ground.

935. A contract relating to the natural gas used by Latgales Enerġija, not reduced to writing, has thereby come into being between Latgales Enerġija and Rēzeknes Siltumtīkli, to whose installations the natural gas was supplied by Latvijas Gāze.  For the purposes of this Award, which is not concerned with the determination of the respective contractual rights and duties of Rēzeknes Siltumtīkli, the Rēzekne City Council and Latgales Enerġija, it is irrelevant whether Latgales Enerġija's duty to pay for the natural gas used ultimately arises under an amendment of the Long-Term Agreement, as found by the Latvian courts, or is the term of an independent contract not reduced to writing between Rēzeknes Siltumtīkli and Latgales Enerġija which arose out of a consistent, continuous and uncontested course of dealing.

936. The Tribunal finds that neither the Long-Term Agreement nor the February 2005 Agreement contains any terms determining which party is liable for the payment of natural gas as between the Municipality and Rēzeknes Siltumtīkli on the one hand, and Latgales Enerġija on the other.  As these are the main contracts pursuant to which the investment was made, it follows that the Claimant could not, at the time of the investment, reasonably expect, based on such contracts, that the Municipality would pay for the natural gas supplied by Latvijas Gāze, considering in particular that *(i)* Latgales Enerġija would in fact use the gas to provide heating services and *(ii)* Latgales Enerġija would therefore have to be reasonably expected to pay for the gas used.

937. The Tribunal's Conclusion and Finding.  The Municipality's failure to pay the balance outstanding for the natural gas supplied by Latvijas Gāze is not, therefore, a breach of Article 3(1) of the BIT in itself.

---

[1394]  CWS-3 ¶¶ 31 ff.
[1395]  Respondent's Closing Argument, Slide 15; see also Cl. Mem. ¶ 139; Cl. Rep. Tribunal ¶ 42.

>    *b.  The interview given by the Mayor of the City of Rēzekne on 13 September 2007 and the Municipality's alleged attempts to attract a new investor in the summer of 2007*

938.    The Claimant complains that the Municipality breached its expectation that the Council would not actively seek to replace Latgales Enerģija as the operator, and took steps in anticipation of, or with the deliberate intent to cause, Latgales Enerģija's removal.  The Claimant further claims that the Municipality's attempt to attract a new operator in the summer of 2007 is a breach of Article 3(1) of the BIT.

>    The Tribunal's finding is set out in paragraphs 943 and 946 below.

939.    On 13 September 2007 the Mayor of Rēzekne gave an interview to explain the situation two days after Latvijas Gāze had stopped supplying natural gas.[1396]

940.    The interview purported to explain the current difficulties and allay the fears of the population.[1397]  However, in the process, Latgales Enerģija was vilified in the public eye; it was portrayed as a company that had failed to comply with its obligations whilst benefitting from a contract detrimental to the City's interests, and a company whose conduct had been improper in its attempted contacts with the Regulator.[1398]

941.    The Tribunal finds that the interview was misleading in content as it was imbalanced in tone, and the fact that the interview was given in difficult circumstances for the Municipality is no excuse.  The overall tone of the interview raises an inference that the Mayor of Rēzekne took the view that Latgales Enerģija was part of the problem.

942.    Moreover, the reference made by the Mayor to a new company ready to appear if need be may raise an inference that the replacement of Latgales Enerģija was already

---

[1396]  C-134, quoted in paragraph 251 above.

[1397]  "The City Council can easily pay the debt to Latvijas Gāze.  The debt amount is small (…) Tomorrow (14 September), six companies that provide heating in Latvia will receive letters (…) and an offer to take up provision of heating in our city (…) much has been done to solve the problem, but it has not been publicly advertised.  For three months, I have been negotiating with several companies persuading them that Rēzekne has a future (…) in case of necessity a new company, large, serious and reliable, would appear here".

[1398]  "Everybody knows that the lease agreement with the company Latgales enerģija is disadvantageous for the City (…) Latgales Enerģija is thus trying to impose a pressure on the Regulator (…) as of the beginning of operations Latgales Enerģija did not pay a santims for depreciation (…) [i]n relation to taking over the debt of Rēzeknes siltumūkli, Latgales enerģija did not take it over (…)".

part of the Municipality's agenda, a point which the Tribunal will discuss in paragraph 944 below.

943.   <u>The Tribunal's Conclusion and Finding</u>.  In his interview of 13 September 2007 the Mayor of Rēzekne publicly displayed an utter lack of even-handedness towards Latgales Enerģija.  Nevertheless, the Tribunal finds that such event does not reach the threshold of a breach of Article 3(1) of the BIT.

944.   As to the specific claim that the Municipality attempted to attract a new operator in the summer of 2007, the Tribunal finds that such a claim is not supported by any evidence and must be dismissed.

The burden of proof is on the Claimant.  The interview, given in circumstances which were difficult also for the Mayor, is not sufficient evidence in itself.  The primary purpose of the interview was to reassure the public.  The statement that the Mayor had been in contact with a number of companies for some three months may have been used to this effect, and may or may not be accurate, and would therefore need to be confirmed by further and more compelling evidence.  However, there are no further elements on the record warranting a finding that the Municipality in fact attempted to attract a new operator in the summer of 2007.

945.   The same is true of the offers which, the Mayor indicated, would be sent to several companies on 14 September 2007; nothing in the record confirms such declaration.

946.   <u>The Tribunal's Conclusion and Finding</u>.  The Tribunal finds that the Claimant's claim that the Municipality attempted to attract new investors in the summer of 2007, and would send offers to several companies in September 2007 is unproven in point of fact.

> c.   *The steps taken by the Municipality to set up Rēzeknes Enerģija and to obtain a loan from the Treasury in an amount of LVL 4 million (28 September/9 October 2007)*

947.   In addition to the complaint mentioned in paragraph 938 above, the Claimant claims that the Municipality attempted to regain control of the heating system by incorporating Rēzeknes Enerģija before declaring an energy crisis, which is a breach of good faith.  The Respondent answered at the Hearing that as Latgales Enerģija had

<div align="center">277</div>

indicated that it had paid for the gas less than had been invoiced, there was a risk that Latgales Enerģija could end up in bankruptcy.  Therefore the Municipality had a duty to adopt an alternative plan as a precaution and, accordingly, it went on to establish Rēzeknes Enerģija.[1399]

The Tribunal's finding is set out in paragraph 949 below.

948.  On 28 September 2007 the Rēzekne City Council reportedly took the decision to establish Rēzeknes Enerģija;[1400] the Respondent did not challenge the information contained in this exhibit.  On 2 October 2007 Rēzeknes Enerģija was incorporated.[1401] The Rēzekne City Council applied to the Local Government Loan and Guarantee Control and Monitoring Council, seeking approval of its decision to apply to the Treasury for a loan of LVL 4 million in order that Rēzeknes Enerģija's capital could be increased; the Council granted the approval sought by the Municipality on 3 October 2007.[1402]  On 4 October 2007 the Rēzekne City Council applied to the Treasury[1403] which granted the loan on the following day. [1404]  On 9 October 2007 the Rēzekne City Council decided to apply the loan to the capital increase of Rēzeknes Enerģija.[1405]

949.  The Tribunal's Conclusion and Finding.  The Tribunal finds that the establishment of Rēzeknes Enerģija is not in itself a breach of Article 3(1) of the BIT, but the Claimant could succed if it proved that such step was taken to pave the way for actions that contravene Article 3(1) of the BIT; this is a point which the Tribunal will examine in paragraphs 968 ff. below.

---

[1399]  Transcript, Day 1, 118-119.
[1400]  C-142, see paragraph 258 above.
[1401]  C-206.
[1402]  R-20 [page 8].
[1403]  R-20 [page 9].
[1404]  R-20 [page 10].
[1405]  R-20 [page 1].

> d. *The attachment of Latgales Enerģija's assets obtained by Rēzeknes Siltumtīkli (21 September 2007) and the failure by the Rēzekne City Council to have the attachment lifted*

950.     The Claimant complains that the Respondent breached its expectations that the Municipality would not actively prevent Latgales Enerģija from operating its business and would comply with the undertaking to have the attachment lifted; that the attachment was an act of harassment on the part of Rēzeknes Siltumtīkli and later, in addition, by Rēzeknes Enerģija; that due process was denied as the attachments were intended to paralyse Latgales Enerģija's commercial activities; and, finally, that applying for the attachments and refusing to have them lifted was an act of bad faith, was arbitrary and discriminatory.  The Respondent replies that the lawsuits brought by Rēzeknes Siltumtīkli and Rēzeknes Enerģija against Latgales Enerģija for (*inter alia*) unpaid natural gas were based on two commercial agreements entered into by two commercial companies which were not the arm of the Municipality; such lawsuits were the consequence of Latgales Enerģija's failure to pay the full amount due for the natural gas received and used.

The Tribunal's finding is set out in paragraph 952 below.

951.     The Claimant has contended that Rēzeknes Siltumtīkli's claim was unfounded and that the bulk of the claim was represented by a dispute that had been simmering since 2006; the timing of Rēzeknes Siltumtīkli's action was calculated to disrupt Latgales Enerģija's operations.  The Respondent answered at the Hearing that after Latgales Enerģija had indicated that it had paid for the gas less than had been invoiced, there was a risk of bankruptcy.[1406]  Rēzeknes Siltumtīkli is a commercial company and not an arm of the Municipality which, as the sole shareholder, is entitled to act only in line with commercial principles, as opposed to political considerations.[1407]

952.     <u>The Tribunal's Conclusion and Finding</u>.   The Tribunal finds that the fact that Rēzeknes Siltumtīkli applied for an attachment to secure its claims for payment against Latgales Enerģija arising under the Long-Term Agreement is not in itself a breach of Article 3(1) of the BIT; neither is, in itself, the fact that Rēzeknes Siltumtīkli applied for the attachment to be reinstated in breach of the undertaking

---

[1406] Transcript, Day 1, 118-119.

[1407] Respondent's Closing Argument, Slide 8.

contained in the October 2007 Agreement.  However, the Tribunal will also have to determine whether these circumstances call for a different conclusion when considered as part of the wider context of the energy crisis (see paragraphs 964 ff. below).

     *e. The declaration of an energy crisis by the Rēzekne City Council on 9 October 2007*

953. In addition to the first complaint mentioned in paragraph 938 above the Claimant claims that the energy crisis was of the Municipality's own making and it was therefore declared in bad faith; moreover, the Municipality refused to have the attachment lifted, which would have enabled Latgales Enerģija to provide heating to the City.  Finally, the energy crisis was declared on 9 October 2007 before Latgales Enerģija had an opportunity to answer the Regulator's warning of 4 October 2007.  The Claimant complains that the Municipality's actions in September and October 2007 were arbitrary and discriminatory, and the crisis was a tool used by the Municipality in an attempt to force Latgales Enerģija into relinquishing some or all of the heating system.

The Respondent takes the view that Latgales Enerģija caused the crisis by its own failure to pay for the natural gas used, and the Municipality had little choice but to act to protect the public interest in accordance with Latvian law.

The Tribunal's finding is set out in paragraphs 961 and 973 below.

954. The energy crisis was declared by decision No. 388 of the Rēzekne City Council on 9 October 2007, which established the Energy Crisis Committee, chaired by the Mayor.[1408]  The decision is stated to be based on Sections 59(1), 62(1) and 70(1) of the Energy Act;[1409] it does not contain any findings of fact, but simply sets out the statutory requirement set out in Section 59(1) of the Energy Act.  This provision states that an energy crisis is declared when the supply of energy or fuel to energy supply merchants or energy users is jeopardized or disturbed to such an extent that energy supply merchants cannot forecast and eliminate such a danger or disturbance in the ordinary course of business.

---

[1408] C-24.
[1409] CLA-48.

The investor alleges that Latgales Enerģija was not heard before the energy crisis was declared; decision No. 388 does not state otherwise; the Respondent has not rebutted the Claimant's allegation in this respect.

955.   The first meeting of the Energy Crisis Committee took place on 9 October 2007 in the afternoon.   The Mayor asked Latgales Enerģija's representative, Mr. Meļņikovs, whether Latgales Enerģija would be able to supply heating within 24 hours;[1410] Latgales Enerģija answered that it needed to have the attachment lifted,[1411] whereupon the Mayor requested Latgales Enerģija to supply heating within 24 hours, or the Municipality would apply to the Regulator to have Latgales Enerģija's licences transferred to the Municipality.   According to the minutes, Mr. Meļņikovs reiterated that the bank account must be unblocked.[1412]

During this meeting the Mayor announced that the Municipality was ready to provide heat supply through Rēzeknes Enerģija, the company that the City Council had just set up and endowed with a capital of LVL 4 million loaned from the Treasury a few days beforehand (see paragraphs 258 and 948 above; see also paragraph 968 below).

956.   On 10 October 2007 the Mayor confirmed in writing the Municipality's ultimatum in order that Latgales Enerģija provide heating within 24 hours.[1413]

957.   The Municipality's decision declaring an energy crisis was not challenged by Latgales Enerģija before the Latvian courts.

958.   The Tribunal must first determine whether it was a reasonable course of action for the Municipality to declare an energy crisis.

959.   The Claimant has confined itself to contending that the Municipality had requested the start of the heating season on 1 October 2007 in Rēzekne whereas the Municipality of Livani had started three days later, but there is no evidence that the

---

[1410]   C-145 [page 4].
[1411]   Mr. Meļņikovs appears to refer to a "counter-claim" in C-145 [page 5]; however, that was the application for the discharge or the setting aside of the attachment, C-143, see also paragraph 304 below.
[1412]   C-145 [page 6].
[1413]   C-145 [page 1].

decision to start the heating season in Rēzekne was arbitrary or otherwise taken in bad faith.

960.   There is hardly any direct evidence as to the concrete effects of the interruption of heating services on the population.  The period for which Latgales Enerģija's difficulties have lasted (*i.e.* from 11 September to 17 October 2007) is based on an admission made by Latgales Enerģija (see paragraph 259 footnote 289 above) which was not challenged by the Respondent, which confined itself to alleging "non-procurement by SIA 'Latgales enerģija' at all or in substantially insufficient service level of heat to kindergartens, schools and the largest area of the Rēzekne city (and so, affecting adversely a huge population)".[1414]   The decision declaring an energy crisis[1415] provides no information in this respect; the Regulator's warning of 4 October 2007[1416] refers to information as to insufficient heating provided by the administration, *i.e.* the local Board of Education.

961.   The Tribunal's Conclusion and Finding.  The Tribunal finds that the declaration of an energy crisis by the Municipality is not, in itself, an arbitrary decision, contrary to the Claimant's submissions.  When it was declared on 9 October 2007, heating services had been insufficient as from 11 September 2007 and the Municipality's duty to act cannot therefore be reasonably doubted.  The Claimant has failed to indicate in particular what other actions by the Municipality would have been more reasonable or appropriate under the circumstances.

962.   The Tribunal must next determine whether the energy crisis was declared in good faith and whether the Municipality complied with Article 3(1) of the BIT in that difficult situation.  To answer those questions the Tribunal must consider three specific points: *(i)* the ultimatum issued to Latgales Enerģija on 9/10 October 2007, *(ii)* the fact that Latgales Enerģija's bank accounts were attached further to Rēzeknes Siltumtīkli's proceedings brought against Latgales Enerģija and *(iii)* the sudden emergence of Rēzeknes Enerģija.

---

[1414]  Resp. Obj. J. & C-Mem. ¶ 3.25.
[1415]  C-24.
[1416]  C-22.

963.   During the 9 October 2007 meeting of the Energy Crisis Committee Latgales Enerģija was summoned to provide heating within 24 hours.  That was a measure that would hardly solve anything as Latgales Enerģija had stated during the meeting that it was unable to provide heating services unless its bank account could be freed and used again.

This calls for an examination of the attachment on Latgales Enerģija's bank account and the rise of Rēzeknes Enerģija.

964.   The fact that Rēzeknes Siltumtīkli had obtained an attachment on Latgales Enerģija's bank account on 21 September 2007 needs to be carefully considered in the context of the Municipality's ultimatum of 9/10 October 2007.  The question is whether the Municipality could in good faith request Latgales Enerģija to provide heating within 24 hours whilst it was aware of the fact that Latgales Enerģija's bank account had been attached further to the proceedings brought by the Municipality's wholly-owned Rēzeknes Siltumtīkli and Latgales Enerģija would be unable to provide heating unless it was able to use its bank account.

965.   It should be recalled that the Tribunal has already concluded that the Municipality directed Rēzeknes Siltumtīkli to bring a suit against Latgales Enerģija in paragraph 830 above.  The Tribunal considers that it follows that the Municipality's ultimatum was not issued in good faith on 9/10 October 2007.

The Tribunal further considers that the breach of good faith on the part of the Municipality is compounded by the fact that on 25 October 2007 the Municipality and Rēzeknes Siltumtīkli executed the October 2007 Agreement, which provided in its first clause that the attachment had to be lifted (or the decision lifting the attachment should not be challenged) as a matter of urgency.[1417]

966.   The Tribunal finds that the Respondent's contention that the October 2007 Agreement did not give rise to enforceable obligations, but only to best-effort duties,[1418] is without foundation as far as the duty to have the attachment lifted in accordance with

---

[1417]  C-26, Clause (a).
[1418]  Resp. Rej. ¶ 23.

Clause *(a)* is concerned.   Such a contractual obligation was binding on the Municipality and Rēzeknes Siltumtīkli in the Tribunal's view.[1419]

967.   The Tribunal considers that it is relevant that Rēzeknes Siltumtīkli acted in breach of the October 2007 Agreement almost immediately after 25 October 2007 by challenging the court decision that had discharged the attachment (see paragraph 290 above).

Such conduct is evidence of the Municipality's readiness to take steps capable of harming the investor's position in Rēzekne.

The Respondent's contention that no party brought any proceedings in the Latvian courts relating to the breach of the October 2007 Agreement is without merit.

968.   Finally, the Tribunal must consider the sudden emergence of Rēzeknes Enerģija, the Municipality's newly-constituted and wholly-owned subsidiary (see paragraphs 258 and 948 above).  The Municipality announced in the afternoon of 9 October 2007 that "[t]he Municipality has a mechanism to ensure heat supply – we are ready to provide heat supply with the intermediation of municipality SIA Rēzeknes Enerģija".[1420]

969.   The Respondent explains that resort to Rēzeknes Enerģija was simply a precaution (see paragraph 947 above) intended by the Municipality to offer Latgales Enerģija an opportunity to continue the business (paragraph 991 below) and a measure which was within the Municipality's discretion as a matter of Latvian law.

This is not, however, the more plausible explanation for the Municipality's conduct in the Tribunal's view.  One must consider, on the one hand, that the Municipality had endowed Rēzeknes Enerģija with a capital of LVL 4 million a few days before it

---

[1419]   The October 2007 Agreement was made in a situation of crisis by all interested parties and it contemplated the course of action to be followed; the first series of actions was to be taken within a week of its date of execution ("Phase I") and having the lifting of the attachment was the first item contemplated by the October 2007 Agreement, Clause *(a)*.  Insofar as the Respondent contends that the October 2007 Agreement made provision for further steps in Phase III which possibly included amendments to be made to the Long-Term Agreement, that contention is accurate in itself, but it is not dispositive in the present case, as the parties expressly agreed that the lifting of the attachment was the first thing to be made; such duty was on Rēzeknes Siltumtīkli as the party having obtained the attachment and on the Municipality as Rēzeknes Siltumtīkli's sole shareholder, which was privy to the October 2007 Agreement.

[1420]   C-145 [page 3].

declared the energy crisis, and, on the other hand, that the Municipality's conduct in relation to the attachment on Latgales Enerģija's bank account disclosed an intention towards the investor that was hostile.  The decision to fund Rēzeknes Enerģija with a capital of LVL 4 million represented a "serious financial burden" according to the Respondent's own words.[1421]   The establishment of Rēzeknes Enerģija was not, therefore, simply a precaution; it was part of the Municipality's plan to have another company ready to take over Latgales Enerģija's position practically at the same time when the Regulator issued its warning to Latgales Enerģija that the licences might be revoked.

970. The Tribunal finally considers that the Respondent has failed to explain in these proceedings how a newly-established company devoid of any track record could be considered as the most appropriate solution to bring the energy crisis to an end; all employees of Rēzeknes Siltumtīkli had in fact been taken over by Latgales Enerģija in 2005 (see paragraph 112 above).  The Respondent did not call any witnesses from the Municipality or Rēzeknes Enerģija to explain when the decision to incorporate Rēzeknes Enerģija was first considered and to explain the policy pursued by the Municipality before and during the energy crisis.

971. One aspect of the discussions that preceded the finalisation of the heat supply development plan for the City further confirms that the Rēzekne City Council had considered replacing Latgales Enerģija before the energy crisis was declared, when two representatives of the Council suggested "editorial changes" in order to ensure that Latgales Enerģija should be mentioned by name only once in the heat supply development plan for the City, and that any further reference should be made anonymously to the "operator" (see paragraphs 224 and 227 above).

This circumstance raises yet another inference that the Rēzekne City Council had already considered replacing Latgales Enerģija in or about early September 2007, and that such prospect was concrete enough to influence the wording of the draft heat supply development plan for the City as early as 11 September 2007.

---

[1421] Respondent's Opening Argument, Slide 17.

972.   When the declaration of an energy crisis was made on 9 October 2007 heating in some schools had not been provided by almost a week.  The Tribunal finds that the fact that the Municipality declared an energy crisis without waiting until Latgales Enerģija had answered the Regulator's warning of 4 October 2007 is not *per se* a breach of Article 3(1) of the BIT.

973.   <u>The Tribunal's Conclusion and Finding</u>.  The Tribunal finds that the Municipality breached Article 3(1) of the BIT in October 2007, and especially after 25 October 2007, on the basis that the attachment of Latgales Enerģija's bank account, considered in the context of the energy crisis, and Rēzeknes Siltumtīkli's repudiation of its duty to have such attachment discharged (or not to challenge a decision lifting the attachment) are attributable to the Municipality; the ultimatum issued by the Municipality to Latgales Enerģija on 9/10 October 2007 was a measure inconsistent with good faith and the announcement that its newly-established, wholly-owned subsidiary Rēzeknes Enerģija was henceforth ready to provide heating services in the middle of the energy crisis appears to have been founded on prejudice or preference rather than on reason or fact, *i.e.* was arbitrary in a manner inconsistent with Article 3(1) of the BIT.

### f.   *The Regulator's decision taking over Latgales Enerģija's zone (11 October 2007)*

974.   The Claimant complains that the Regulator's decision of 11 October 2007 to take over Latgales Enerģija's zone was based on circumstances created by the Municipality and the Regulator's previous unjustified decisions; that such a decision was an act of harassment against the investor; that such a decision was arbitrary and discriminatory and amounts to a denial of due process insofar as the Regulation did not wait until Latgales Enerģija had been able to answer the Regulator's warning of 4 October 2007. The Respondent takes the view that this decision was the consequence of Latgales Enerģija's inability to provide good-quality, uninterrupted heating services and that such a decision was in accordance with Latvian law.[1422]

---

[1422]   The Respondent regards this as a "decision to suspend" the licences (Resp. Obj. J. & C-Mem. ¶ 3.21(2)).  This is inaccurate; a decision to suspend the licence is based on Sect. 18(7) of the Energy Act whereas a decision to take over the territorial area of a service provider is based on Sect. 28 of the same Act; the Regulator's decision is stated to be based on the latter provision.

The Tribunal's finding is set out in paragraph 982 below.

975.   On 11 October 2007 the Regulator decided to take over Latgales Enerģija's zone under Section 28(1)(3) of the Public Utility Regulators Act[1423].[1424]   The decision indicated that the Ministry or the Municipality in charge would have to appoint a person responsible for the utility under consideration in accordance with Section 28(2) of the Public Utility Regulators Act.   As stated in the decision, such appointment is temporary according to this provision.   The Regulator's decision is based on the Rēzekne City Council's application of the same day informing the Regulator that Latgales Enerģija had been unable to provide heating to six schools and/or kindergartens upon the Council's request of the previous day and that the Regulator had therefore to decide whether to take over the zone; that decision called for the respective interests of the public and Latgales Enerģija to be weighed, and the scales came down in favour of the public interest.

---

[1423]   Sect. 28 of the Public Utility Regulators Act reads as follows (CLA-49):

  (1)    The Regulator shall take a decision on the necessity to take over the territorial area of the licence of a provider of public utilities:
    1)  if the licence of the provider of public utilities is to be cancelled (revoked);
    2)  if the term of validity of the licence of a provider of public utilities expires in six months and the provider of utilities does not wish to continue the provision of such public utilities for which a new licence is required; or
    3)  if a provider of public utilities for some reason is unable to ensure continuous, safe and qualitative public utilities.

  (2)    If the Regulator takes a decision to take over the territorial area of a licence of a provider of public utilities, the Regulator shall, within 10 working days, notify the responsible ministry of the relevant regulated sector or the relevant local government thereof. The responsible ministry of the relevant regulated sector or the local government in whose territory the provider of public utilities is located shall appoint temporarily a person responsible for the public utilities determined in the licence of the provider of public utilities in order to take the measures to encourage merchants to take over the provision of public utilities in the territorial area of the licence.

  (3)    In order to ensure the realisation of the activities determined in this Section, the person responsible for the public utilities determined in the licence of a provider of public utilities shall inform the Regulator or the local government regarding the performance of his or her tasks and is entitled to choose the methods for tendering, competition or selection of applicants.

[1424]   C-23.

976.   Latgales Enerģija's applications to have that decision set aside were dismissed by the Latvian courts.[1425]

977.   The Tribunal finds that the Claimant's contention that the Regulator should have waited until it had received Latgales Enerģija's answer to the warning of 4 October 2007 may have some merit, but it is not dispositive.  The Regulator's 4 October 2007 warning did not relate to the taking over of Latgales Enerģija's zone and the Claimant's argument is not, therefore, compelling in the Tribunal's view.

978.   Latgales Enerģija was not heard before the 11 October 2007 decision was made, which is a procedural irregularity in the Tribunal's view.

979.   The decision to take over a licencee's zone is a measure that has considerable effects on the operator as a matter of Latvian law.  This is shown not only by the requirements which have to be met under Section 28(1) of the Public Utility Regulators Act, which relate to situations in which the public interest is affected, but also by the consequences which follow from such a decision, as the licencee is replaced by another provider on a temporary basis.  Such temporary appointment is made according to Section 28(2) of the Public Utility Regulators Act "in order to take the measures to encourage merchants to take over the provision of public utilities in the territorial area of the licence".

980.   The Tribunal finds that although the Regulator's decision amounts to a significant interference with the operator's position, it is relevant that two successive Latvian courts dealt with Latgales Enerģija's appeal or application for judicial review.  The Tribunal therefore finds that the Regulator's 11 October 2007 decision does not amount to a breach of due process amounting to a violation of Article 3(1) of the BIT.

981.   The Tribunal further finds that the Regulator's 11 October 2011 is neither arbitrary nor discriminatory and does not amount to a breach of good faith.  It is relevant that Latgales Enerģija expressly admitted that the provision of heating was interrupted and/or that it was insufficient from 11 September to 14 October 2007, as the Tribunal

---

[1425]   R-3, see paragraphs 402 ff. above.

has recalled.[1426]   Such circumstances squarely fall within Section 28(1)(3) of the Public Utility Regulators Act.

982.   <u>The Tribunal's Conclusion and Finding</u>.   The Tribunal denies the Claimant's complaint that the Regulator's 11 October 2011 decision amounts to a breach of Article 3(1) of the BIT.

> g.   *The Rēzekne City Council's decision to appoint Rēzeknes Enerģija as the person in charge of providing thermal energy (12 October 2007)*

983.   The Claimant complains that the appointment of Rēzeknes Enerģija was made in breach of good faith and due process, was arbitrary and discriminatory and was an act of harassment on the part of the Municipality.   The Respondent replies that it was a reasonable decision to make under the circumstances, and one which was within the statutory discretion of the Municipality as a matter of Latvian law.

The Tribunal's finding is set out in paragraph 987 below.

984.   On 12 October 2007 the Rēzekne City Council appointed Rēzeknes Enerģija as the person in charge of providing heating services in the City of Rēzekne.[1427]   The appointment was temporary according to Section 28(2) of the Regulatory of Public Utilities Act.[1428]

985.   The appointment of Rēzeknes Enerģija must be considered in the context of the energy crisis declared by the Municipality taking into account the Municipality's conduct as a whole.   The Tribunal has found, first, that the Municipality's conduct on 9 and 10 October 2007 was not in accordance with Article 3(1) of the BIT (see paragraph 973 above); secondly, that the announcement in the middle of the energy crisis that its newly-established Rēzeknes Enerģija was henceforth ready to take over the heating services was likewise not in accordance with Article 3(1) of the BIT (see paragraphs 973 above).

---

[1426]  See paragraph 960 above.
[1427]  <u>C-25</u>.
[1428]  <u>CLA-49</u>, quoted in paragraph 975 footnote 1423 above.

<div align="center">289</div>

986. The appointment of Rēzeknes Enerǵija by the Municipality is the continuation and achievement of measures that were not in accordance with Article 3(1) of the BIT. It follows that such appointment is likewise not in accordance with Article 3(1) of the BIT.

987. <u>The Tribunal's Conclusion and Finding</u>. The Tribunal finds that the Municipality's appointment of Rēzeknes Enerǵija is a breach of Article 3(1) of the BIT.

<div align="center">

(vi) *The Claims Based on the Warning and the Revocation of the Licences by the Regulator (4 October 2007/3 June 2008)*

</div>

988. The Claimant claims that the Regulator ought to have suspended the licences and granted Latgales Enerǵija an opportunity to remedy any breaches of the licences as may have been suspected before issuing a warning; instead the Regulator issued a warning and then revoked the licences, which is a breach of due process. The Claimant asserts that the Regulator revoked the licences in bad faith as the revocation was based on events which did not amount to a breach of the licence conditions and had, in any event, been caused by the Municipality. Finally, the Claimant argues that the revocation of the licences was arbitrary and discriminatory. The Respondent replies that Latgales Enerǵija was sanctioned for its failure to provide continuous and reliable heating services, and in accordance with the provisions of an investment regime which it had accepted; the Claimant has only itself to blame for its failure to carry out a proper due diligence with respect to the regulatory and commercial risks inherent in the investment it made.

The Tribunal's findings are set out in paragraphs 1000, 1004, 1024 and 1027 below.

989. On 4 October 2007 the Regulator sent Latgales Enerǵija a warning stating that the licences might be revoked after 4 January 2008.[1429] The Regulator's warning

---

[1429] <u>C-22</u>. See also paragraphs 266 ff. above. The Regulator recalled that the licence holder had the following duties under the conditions of the licences:

(i) *Clause 1:* to provide uninterrupted and good-quality public utility services (<u>C-22</u> ¶1);

(ii) *Clause 7.1:* by 31 December of each year, to submit a plan of activity for the following year in accordance with its long-term development plan, including data about the planned amount of production, transfer, distribution and sale of thermal energy and measures to improve quality and safety (<u>C-22</u> ¶ 2);

(iii) *Clause 7.2:* by 31 March of each year, to submit a report regarding the results of the previous year (<u>C-22</u> ¶ 3);

(iv) *Clause 6.3:* to prepare a long-term development plan (<u>C-22</u> ¶ 4).

summoned Latgales Enerģija to provide explanations by 4 November 2007 on the following breaches:

(i)     Latgales Enerģija had failed to submit the plan of operations for 2006 and 2007 in accordance with Clause 7.1 of the licence conditions;

(ii)    Latgales Enerģija had failed to submit the results of 2005 and 2006 in accordance with Clause 7.2 of the licence conditions;

(iii)   the draft guidelines submitted to the Municipality on 19 December 2006 were found to be incomplete and had not been approved, as a consequence of which Latgales Enerģija had also failed to comply with Clause 6.3 of the licence conditions; and

(iv)    the Municipality and the Board of Education had stated that there was no heating in three school institutions and heating problems in six other institutions.

990.    On 30 October 2007 Latgales Enerģija answered the Regulator's warning contending that the proceedings initiated with the warning should be brought to an end, vigorously denying that the first three points set out above amounted to a breach, but admitting in point of fact that it had experienced difficulties in providing uninterrupted heating services from 11 September to 17 October 2007.[1430]   Such difficulties could, however, be explained by the attachment obtained by the Municipality and by Rēzeknes Siltumtīkli on its bank account which was a deliberate action.

991.    The Regulator's warning was sent on 4 October 2007 in the middle of the energy crisis; Latgales Enerģija's answer was sent on 30 October 2007 after the supply of natural gas had been resumed on 17 October 2007.  The October 2007 Agreement was made on 25 October 2007.

It is common ground that Latgales Enerģija in fact continued to provide heating services despite the Regulator's decision to take over Latgales Enerģija's zone on 11

---

[1430]  C-153.

October 2007 and the appointment of Rēzeknes Enerģija as the person in charge of providing those services on the following day.  At the Hearing the Respondent explained that Latgales Enerģija was given an "opportunity (…) to continue the business" as Rēzeknes Enerģija had been set up only to make sure that a solution would be available in case there had been further problems in the supply of heating services or Latgales Enerģija went bankrupt.[1431]  The Tribunal has already noted in paragraph 969 above that the Municipality's alleged intention to give Latgales Enerģija an opportunity to continue with the business was in fact contradicted by the Municipality's apparent readiness to take actions adversely affecting the investment in breach of good faith.

992.    On 29 November 2007 Latgales Enerģija informed the Regulator that it might find itself in a situation in which providing heating services would be difficult or even impossible due to the proceedings brought against it by Rēzeknes Siltumtīkli which had resulted in an attachment of its bank account.[1432]

993.    On 4 December 2007 Latgales Enerģija assigned its claims for payment against end-users to LE Remonts (see paragraph 298 above).  On 11 December 2007 the Regulator objected to such assignment and requested Latgales Enerģija to explain the situation, pointing out that several laws and regulations had been breached on the basis that the invoices issued by Latgales Enerģija in November 2007 did not indicate Latgales Enerģija's bank account.[1433]  A further complaint related to the failure by Latgales Enerģija to maintain accurate payment records.  The Regulator pointed out that such violations of applicable laws and regulations amounted to a further breach of the licence conditions and could be a further ground upon which the licences could be revoked.  Latgales Enerģija's failure to provide its long-term development plan was pointed out again by the Regulator.  Finally, the Regulator took the view that Latgales Enerģija had transferred profits to its parent company in breach of Clause 5 of the licences.

---

[1431]  Transcript, Day 1, 118-119; 119/3-8.

[1432]  C-158, see paragraph 293 above.

[1433]  C-162.

994.    On 19 December 2007 Latgales Enerģija denied being in breach of any laws and regulations in a detailed letter.[1434]

995.    On 20 May 2008 the Rēzekne City Council put Latgales Enerģija on notice, *inter alia*, that it had failed to invest the minimum amount of EUR 1.5 million in the first three years of operation;[1435] Rēzeknes Siltumtīkli had directed the Rēzekne City Council's and the Regulator's attention to such circumstance on 15 May 2007.[1436] Latgales Enerģija replied that the Council's letter was incomprehensible if account was taken of the fact that Rēzeknes Siltumtīkli had not yet consented to the construction of the building of a cogeneration station.[1437]

996.    On 3 June 2008 the Regulator revoked the licences as a matter of urgency.[1438] The decision recalled the Regulator's warning of 4 October 2007[1439] and was stated to be based on the reasons set out therein and a dismissal of the explanations provided by Latgales Enerģija on 30 October 2007, in particular that the difficulties in providing uninterrupted heating services had been caused by third parties.[1440]

997.    In addition, the Regulator rested its decision to revoke the licences on the following reasons:

(i)     Latgales Enerģija had continued to pay only part of the invoices for the gas used, which warranted the conclusion that Latgales Enerģija's performance fell short of its duty to provide good-quality and uninterrupted heating services;[1441]

(ii)    Latgales Enerģija had sold heating services at non-authorised rates;

(iii)   Latgales Enerģija's invoice to the end-users indicated a bank account of a third party, which was a breach of the terms of the contract with end-users and of

---

[1434]   C-166.
[1435]   C-178.
[1436]   C-231, see also paragraph 891 above.
[1437]   C-179 [page 2].
[1438]   C-29.
[1439]   C-22, see paragraph 989 above.
[1440]   C-153.
[1441]   C-29 ¶¶ 10.1; 12.1.

the Regulations on the Supply and Use of Thermal Energy [*not in evidence*] and gave rise to multiple breaches of Latvian law; and

(iv)     Latgales Enerģija had failed to invest the minimum amount of EUR 1.5 million as stated in Rēzeknes Siltumtīkli's letter of 15 May 2008.[1442]

It was therefore necessary to revoke the licences as a matter of urgency to protect the end-users' interest.

998.   On 5 June 2008 Latgales Enerģija brought proceedings to have the Regulator's decision set aside; on 6 May 2010 Latgales Enerģija's application was finally dismissed.[1443]

999.   On the Claimant's *first complaint* based on *breach of due process*, the Tribunal notes, as a preliminary point, that the revocation of a licence is the most radical sanction contemplated by the Public Utility Regulators Act[1444] which makes a clear distinction between suspension (Section 18(7)) and revocation of a licence (Section 18(3)). Further to the 4 October 2007 warning the Regulator directly imposed the revocation of licences on 3 June 2008.[1445]

---

[1442] <u>C-231</u>, see paragraph 333 above.

[1443] <u>R-2</u>, see paragraphs 390 ff. above.

[1444] <u>CLA-49</u>.

[1445] Sect. 18 of the Public Utility Regulators Act (<u>CLA-49</u>) reads as follows:

(1)     A substantiated proposal to make amendments to the conditions of a licence issued or to cancel (revoke) a licence shall be submitted by a provider of public utilities to the Regulator in accordance with the procedure determined by the Cabinet.

(2)     The Regulator shall amend the conditions of a licence issued if:

1)   amendments to the regulatory enactments concerning the type of regulated public utilities have come into force;

2)   economically substantiated provision of public utilities cannot be ensured in another way in the territorial area of the licence; and

3)   a provider of public utilities has submitted a substantiated proposal.

(3)     The Regulator shall cancel (revoke) a licence issued to a provider of public utilities if the provider of public utilities:

1)   fails to comply with or violates the conditions of the licence issued to it;

2)   fails to comply with or violates the requirements for providing the public utilities determined by regulatory enactments;

3)   has been declared as being subject to liquidation;

4)   has submitted a substantiated proposal; or

5)   within 12 months from the day of issue of the licence has not commenced provision of public utilities (if the commencement

294

However, it is relevant, and indeed dispositive in the Tribunal's view that Latgales Enerģija's complaint was considered and dismissed by two successive Latvian courts.[1446]

1000. <u>The Tribunal's Conclusion and Finding</u>.   The Tribunal finds that insofar as the Regulator's decision to revoke the licences is based on reasons stated in the Regulator's warning, there was no breach of due process as Latgales Enerģija was put on notice of the Regulator's position on 4 October 2007.

1001. A further point must be addressed at this juncture since the Regulator rested its decision to revoke the licences on further grounds than those set out in the warning (see paragraphs 997 and 989 above) and the Claimant regards this too as a breach of due process.   In the Tribunal's view, it is relevant, again, that the Regulator's decision was reviewed by the Latvian courts.   In addition, the Tribunal notes the following.

---

date for the provision of public utilities has not been determined in the licence).

(4)    The Regulator shall give a provider of public utilities a written warning notice regarding the amendments to the conditions of a licence at least 30 days in advance. In the case determined in Paragraph two, Clause 3 of this Section the Regulator shall determine the warning time period.

(5)    The Regulator shall give a provider of public utilities a written warning notice regarding the cancellation (revocation) of a licence at least three months in advance. In the cases determined in Paragraph three, Clauses 3, 4 and 5 of this Section, as well as, when cancelling (revoking) the licence in accordance with the Administrative Procedure Law, the Regulator shall determine the warning time period.

(6)    If a licence is cancelled (revoked), the State fee for the regulation of public utilities paid by the provider of public utilities in accordance with Section 30 of this Law shall not be reimbursed.

(7)    The Regulator shall suspend the validity of a licence issued if there are justified suspicions regarding the fact that the provider of public utilities fails to comply with or violates the conditions of the licence issued to it or the requirements for provision of public utilities determined in regulatory enactments.

(8)    The time period restrictions for the revocation of a lawful administrative act determined by the Administrative Procedure Law shall not be applied when making amendments to a licence or cancelling (revoking) a licence in accordance with this Law.

(9)    The Regulator shall take a decision regarding the issue of a licence, cancellation (revocation) of a licence granted, refusal to grant a licence, regarding the amendments to the conditions of a licence or suspension or renewal of the validity of a licence within a month following the day of the receipt of the submission and all the documents determined in regulatory enactments or all the information necessary for taking the decision.

[1446]   R-2, see paragraphs 390 ff. above.

1002.   Basic requirements of transparency and fairness require in principle that the Regulator should set out the ground(s) on which it may ultimately revoke a licence in its warning in a comprehensive manner; this is all the more so where the Regulator decides not to suspend a licence and not to give the operator time to remedy a breach, but issues a warning that may directly result in the operator's licence being revoked. If further grounds of revocation are then added by the Regulator in informal correspondence, due process may be breached where the operator reasonably fails fully to appreciate the significance of such correspondence or is not given an opportunity to put its position before the Regulator as to such additional grounds for revocation.

1003.   Having considered the detailed correspondence exchanged between the Regulator and/or the Municipality on the one hand, and Latgales Enerġija on the other, in the period between the warning and the revocation of the licences, the Tribunal must examine two questions, namely *(i)* whether the operator was adequately informed by the Regulator of any additional grounds capable of giving rise to the revocation of the licences and *(ii)* whether the operator was given an opportunity to put its case before the Regulator as to such additional grounds before the licences were revoked.

1004.   <u>The Tribunal's Conclusion and Finding</u>.   Subsequent to the Regulator's warning Latgales Enerġija put its case to the Regulator in a detailed manner.[1447]   The Tribunal therefore finds that the Regulator's decision to revoke the licences was not made in breach of due process as Latgales Enerġija was given an opportunity to answer the Regulator's letters as well as the Municipality's criticism.   In addition, Latgales Enerġija had an opportunity to put its case against the Regulator's decision before two successive Latvian courts.

1005.   The Tribunal must now turn to the Claimant's *second complaint* that the Regulator's decision to revoke the licences was made in *breach of good faith,* which calls for an examination of the reasons given by the Regulator for the revocation of the licences.

1006.   The *first reason* given by the Regulator in its decision revoking the licences, already set out in the Regulator's warning, is the breach by Latgales Enerġija of its duty to

---

[1447]   <u>C-162</u>; <u>C-166</u>; <u>C-174</u>; <u>C-175</u>; <u>C-231</u>; <u>C-178</u>; <u>C-179</u>.

provide the Regulator with the plans contemplated by Clauses 7 and 6 of the licences. There is no doubt that the Regulator has a duty to revoke a licence where the operator is found to be in breach of the licence conditions (Section 18(3)(1) of the Public Utility Regulators Act[1448]) and that the operator is bound to comply with the licence conditions and provide the Regulator with the information required by such conditions. The Regulator has also a duty to monitor compliance by the operator with the licence conditions (Section 16(5) of the same Act).[1449]

1007. The licences were granted by the Regulator on 30 May 2005 and the information that Latgales Enerģija had to provide to the Regulator was in principle due by 31 December of each year (Clause 7.1 of the licences) and by the first quarter of the year (Clause 7.2 of the licences). Clause 6 of the licences does not set a time limit in relation to the operator's long-term development plan.

It is not in dispute that Latgales Enerģija failed to provide the Regulator with any of the plans required by the licence conditions in 2005 and 2006. However, the Regulator did not ask Latgales Enerģija to comply with the licence conditions, either in 2005 or in 2006. The year 2005 was significant also because on 19 December 2005 the Regulator set a new tariff further to Latgales Enerģija's application. Yet the Regulator did not mention Latgales Enerģija's failure to provide the plans contemplated by the licences until the 4 October 2007 warning.

1008. The Tribunal takes this to be an indication that the Regulator did not regard Latgales Enerģija's failure to provide the plans contemplated by the licences as a breach which would be sufficient *per se* to attract the revocation of the licences, but that such a failure was regarded as relevant only in the wider context of Latgales Enerģija's failure to provide uninterrupted heating services from 11 September to 17 October 2007.

1009. In any event, the Regulator's complaint, contained in the 4 October 2007 warning, that Latgales Enerģija failed to provide the operator's long-term development plan

---

[1448] CLA-49, quoted in paragraph 999 footnote 1445 above.

[1449] Sect. 16(5) of the Public Utility Regulators Act (CLA-49) reads as follows:
> (5)     The Regulator shall supervise the fulfilment of licence conditions and the conformity of public utilities with licence conditions.

under Clause 6 of the licences appears unreasonable if account is taken of the fact that the Municipality had issued its own development plan for the City only on 21 September 2007, with a delay which the Tribunal has found to be in breach of Article 3(1) of the BIT.  Latgales Enerġija was entitled to be granted reasonable time after 21 September 2007 in order to provide the Regulator with its long-term development plan.  Latgales Enerġija's failure to provide a long-term plan could not, therefore, reasonably be considered on 4 October 2007 to be a ground upon which the licences could be revoked.

1010.  Latgales Enerġija's failure to provide the Regulator with the documents contemplated by the licence conditions is therefore insufficient, in the circumstances described above, to warrant the revocation of the licences.

1011.  The *second reason* given by the Regulator in its decision revoking the licences, already set out in the Regulator's warning, is Latgales Enerġija's failure to provide uninterrupted heating services.  The warning contains limited factual information as to the extent of the interruption in the heating services[1450] and so does the revocation decision.[1451]

1012.  After the Regulator's warning of 4 October 2007 Latgales Enerġija had in fact provided heating services for seven months and a half without any interruption, from 17 October 2007 onwards, until the licences were revoked on 3 June 2008 as a matter of urgency.

The Tribunal concludes that the Regulator did not regard the interruption in the provision of heating services, which was the main potential ground for revocation set out in the warning, as a reason sufficient to revoke the licences; Latgales Enerġija would not otherwise have been allowed to continue to provide heating services for a period of seven months and a half.

It is therefore necessary to examine the further reasons, not set out in the Regulator's warning, on which the Regulator rested the decision to revoke the licences.

---

[1450]  C-22 ¶ 6.
[1451]  C-29 ¶ 10.

1013. The *first reason* for the revocation not mentioned in the warning is that Latgales Enerġija had continued to pay and was still paying only part of the price for the natural gas used, which had resulted in an interruption of the heating services and which might be the cause of further interruptions in the future (see paragraph 997(i) above).

1014. The Tribunal finds that this was a ground on which the Regulator was reasonably entitled to revoke the licences.

1015. As found in paragraphs 935 and 936 above, the duty to pay for the natural gas delivered was on Latgales Enerġija. The energy crisis had been directly caused by Latgales Enerġija's failure to pay the full price for the natural gas received and used from June 2007 onwards.[1452] Latgales Enerġija did not deny that it had failed to pay the full amount; it argued in its correspondence with the Regulator that the matter was pending in court and the arrangement in place for the supply of natural gas was illegal *inter alia* on the ground that Rēzeknes Enerġija had not been licenced to sell natural gas.[1453]

1016. In June 2008 the Regulator was therefore justifiably insecure as to whether Latgales Enerġija would be able, ready and willing to pay the full price for the natural gas.

1017. The *second reason* relied upon by the Regulator that was not set out in the warning was that Latgales Enerġija had been selling heating services at non-authorised rates on the ground that the tariff approved by the Regulator on 11 November 2007 had been revoked on 7 December 2007 and the 9 November 2007 tariff was therefore inapplicable (see paragraph 997(ii) above).

1018. The Tribunal dismissed the Claimant's complaint that the Regulator's 7 December 2007 decision was made in breach of due process and was arbitrary and contrary to good faith in paragraphs 915 and 916 above. The Tribunal therefore finds that reliance by the Regulator on such decision cannot amount to a breach of Article 3(1) of the BIT.

---

[1452] C-130.
[1453] C-179 p. 3.

1019.   The *third reason* relied upon by the Regulator in its decision revoking the licences that was not mentioned in the warning was that Latgales Enerģija's invoices to the end-users indicated a bank account of a third party, which was a breach of applicable regulations in itself, and caused a number of further technical breaches of Latvian law (see paragraph 997(iii) above).

1020.   The Tribunal finds that the Regulator's position based on an alleged technical breach of Latvian law is not consistent with *bona fide* reliance on a rational policy.  Latgales Enerģija's assignment to LE Remonts was an attempt to overcome the effects of the attachment of its bank account which the Municipality and Rēzeknes Siltumtīkli had refused to have lifted, unreasonably and contrary to good faith as the Tribunal found in paragraphs 964, 967 and 973 above, in order to continue to provide heating services.  The Regulator's position was tantamount to endorsing, if not indirectly supporting, the Municipality's and Rēzeknes Siltumtīkli's unreasonable conduct and could not therefore be a sound basis for a decision made in good faith and based on a rational policy.

1021.   The *fourth reason* relied upon by the Regulator in its decision revoking the licences that was not mentioned in the warning was that Latgales Enerģija had failed to invest the minimum amount of EUR 1.5 million as stated in Rēzeknes Siltumtīkli's letter of 15 May 2008.[1454]

1022.   The Tribunal finds that the Regulator's decision falls short of the requirements of *bona fide* reliance on a rational policy since this was a purely contractual matter between Latgales Enerģija and Rēzeknes Siltumtīkli.[1455]  In addition, the Regulator's decision does not indicate how such a failure would be relevant under the applicable law; nor does it indicate whether the Regulator made any findings of fact of its own and the basis for such findings of fact, as the decision simply quotes from a letter by Rēzeknes Siltumtīkli.

1023.   To sum up, the Regulator was entitled to revoke the licences on 3 June 2008 on the basis of at least one sound reason, namely that Latgales Enerģija had failed to pay the full price for the natural gas used in the past twelve months.  This is a separate and

---

[1454]  C-231, see paragraph 333 above.
[1455]  See Clause 7.1.1 of the Long-Term Agreement, C-4.

independent ground for revocation,[1456] therefore the Regulator's decision does not amount to a breach of Article 3(1) of the BIT.

Latgales Enerġija does not deny that it was still not paying the entire price charged for the natural gas in its letter to the Regulator of 2 June 2008.  Such a failure had already been one of the main causes of the 9 October 2007 energy crisis.  There was no reason for the Regulator to believe that such a failure could not trigger a new crisis again.

1024.  The Tribunal's Conclusion and Finding.  The Tribunal finds that Latgales Enerġija's failure to pay the full price of the natural gas received and used was a sufficient reason upon which the Regulator was entitled to revoke the licences without infringing the requirements of good faith.  The revocation of the licences is not therefore a breach of Article 3(1) of the BIT in itself.  The Claimant's claim must therefore be dismissed.

1025.  The Claimant finally argues in a *third complaint* that the Regulator's decision to revoke the licences was *arbitrary and discriminatory*.

1026.  The Tribunal dismisses this claim.  The Regulator was entitled to revoke the licences, as found in paragraph 1023 above, on the basis that Latgales Enerġija's failure to pay the full price for the natural gas represented a risk likely to give rise to further problems and disruption in the following winter season.  That reason was clear and sound; the Claimant's complaint of arbitrariness and discrimination is without merit.

1027.  The Tribunal's Conclusion and Finding.   The Claimant's complaint that the Regulator's decision revoking the licences was arbitrary and discriminatory is dismissed.

> (vii)   *The Claims Based on the Municipality's Conduct Subsequent to the Revocation of the Licences (From 3 July 2008 Onwards)*

1028.  The Claimant complains that the Municipality's conduct subsequent to the Regulator's decision to revoke the licences is in breach of Article 3(1) of the BIT.  The Tribunal will consider *(i)* the appointment of Mr. Locis by the Rēzekne City

---

[1456]  See the approach of the NAFTA tribunal in *Azinian  v. Mexico*, RLA-8 ¶ 104, in which the tribunal found that certain Mexican judgments having annulled a concession were not arbitrary on the basis that the cause of nullity could be rested on one ground.

Council as the person in charge of organising district heating, and the appointment by Mr. Locis of Rēzeknes Enerģija as the person temporarily in charge of the transmission, distribution and sale, and of Rēzeknes Siltumtīkli as the person temporarily in charge of the production of thermal energy, *(ii)* the Municipality's decision directing Latgales Enerģija to provide immediate access to the assets, *(iii)* the decision authorising the forcible recovery of the assets, and *(iv)* the forcible recovery of the buildings and the boilers.

> a. *The appointment of Mr. Locis by the Municipality as the person in charge of organising district heating (13 June 2008) and the appointment of Rēzeknes Siltumtīkli and Rēzeknes Enerģija as the temporary producer, respectively provider and seller of thermal energy (13 June 2008)*

1029.   The Claimant complains that the Municipality's attempts to appoint other individuals or entities it owned to provide heating services in place of Latgales Enerģija were acts of harassment and a breach of the Claimant's expectations that the Municipality would not seek to replace Latgales Enerģija and take over the heating system.  The preconditions for the appointment of Rēzeknes Enerģija were not met and such decision was made in breach of due process and in bad faith.  The Respondent has not commented in detail on the different measures taken by the Municipality subsequent to the revocation of the licences; however, emphasis was placed by the Respondent on the fact that the Municipality was under a duty ultimately to appoint an interim provider for the heating in Rēzekne.

The Tribunal's findings are set out in paragraphs 1034 and 1036 below.

1030.   On 13 June 2008 the Rēzekne City Council appointed its deputy executive director, Mr. Ivars Locis, as the person in charge of organising the provision of heating in the city of Rēzekne.[1457]   The decision indicated that such appointment was temporary, pending the appointment of a new provider.

1031.   On the same day Mr. Locis, acting as the person in charge under the Council's Decision No. 270, made a decision (decision No. 1) as a matter of urgency and appointed *(i)* Rēzeknes Siltumtīkli as the person temporarily in charge of the

---

[1457]  Decision No. 270, C-30.

production of thermal energy and *(ii)* Rēzeknes Enerģija as the person temporarily in charge of the transmission, distribution and sale of thermal energy.[1458]  The decision stated that it would take effect forthwith and an application for judicial review would not stay its enforceability.

1032.   There is no evidence that those decisions were challenged by Latgales Enerģija (see paragraph 343 above).

1033.   The Municipality's decision to appoint the person in charge of the provision of heating supply in the City of Rēzekne was stated to be based on Section 28(2) of the Public Utility Regulators Act[1459] and was the consequence of the revocation of the licences, which is not in itself a breach of Article 3(1) of the BIT.

1034.   This decision does not, therefore, in itself constitute a violation of Article 3(1) of the BIT.

1035.   The appointment of Rēzeknes Siltumtīkli and Rēzeknes Enerģija by Mr. Locis was not only, however, one of the consequences following from the revocation of the licences.[1460]   It represents the extension and the further formalisation of the Municipality's initiative taken back in September 2007 to replace the investor by a local entity under the Municipality's control (see paragraphs 968-969 and 973 above). However, the Tribunal considers that since the decision to revoke the licences does not constitute a breach of Article 3(1) of the Treaty, the measures taken by the Municipality in June 2008 to implement that decision are not in themselves a breach of this provision.

1036.   <u>Tribunal's Conclusion and Finding.</u>  The Tribunal dismisses the Claimant's claim.

> *b.  The decision ordering Latgales Enerģija to provide immediate access to the leased assets (14 July 2008)*

1037.   The Claimant complains that the Respondent breached its expectations that Latgales Enerģija would not be required to hand over the leased assets to the Municipality-owned companies.  The Claimant complains that the Municipality's decision ordering

---

[1458]  <u>C-181</u>.

[1459]  <u>CLA-49</u>, see paragraph 975 footnote 1423 above.

[1460]  <u>C-181</u>.

Latgales Enerģija to hand over the assets represented an act of harassment; and that that decision was also made in bad faith.  Finally, the decision was made by circumventing the procedure involving the "responsible person" and the Municipality relied on its public law powers to that effect, in breach of due process, with a view to regaining control over the heating system.  The Respondent has not commented in detail on the different measures taken by the Municipality subsequent to the revocation of the licences; however, emphasis was placed by the Respondent on the fact that the revocation of the licences and the appointment of interim providers for the heating services meant that Latgales Enerģija had to return the assets.

The Tribunal's finding is set out in paragraph 1047 below.

1038.   On 14 July 2008 the Rēzekne City Council ordered Latgales Enerģija immediately to provide access to the boiler houses to Rēzeknes Siltumtīkli and transfer any other materials required for the production of heating to Rēzeknes Siltumtīkli and Rēzeknes Enerģija.[1461]

1039.   The Rēzekne City Council referred to Rēzeknes Siltumtīkli and Rēzeknes Enerģija as the "lawful providers of heating services" and recalled that Latgales Enerģija was no longer entitled to provide heating services further to the Regulator's decision revoking the licences and no longer able to perform the Long-Term Agreement, for the termination of which Rēzeknes Siltumtīkli had sent a thirty-day termination notice on 28 June 2008.  On 27 June 2008 Mr. Locis had requested Latgales Enerģija to transfer all leased assets on 7 July 2008 to Rēzeknes Siltumtīkli and Rēzeknes Enerģija, but Latgales Enerģija had refused to comply with that decision.

The Council concluded that, on the one hand, it followed from its duty to ensure public heating that it had to ensure access to the heating supply system if the interests of the residents of Rēzekne were jeopardised.  On the other hand, the rights of use relating to public assets granted to Latgales Enerģija under the Long-Term Agreement were not absolute and could be limited in certain cases, provided that such limitation was justified by the public interest and complied with the principle of proportionality.  The Court found that the existence of a direct threat to the public interest made it

---

[1461]  Decision No. 316, C-33, see also paragraph 349 above.

unnecessary to hear Latgales Enerġija on the basis that heating had been stopped on 3 June 2008, and both Latgales Enerġija's views and prior conduct indicated that Latgales Enerġija was opposed to the idea that Rēzeknes Siltumtīkli and Rēzeknes Enerġija should be allowed to run the heating system.

1040.    The decision came into force forthwith, it was to be complied with as a matter of urgency and it expressly stated that any application for judicial review filed with the administrative courts would not stay its enforceability.

1041.    It is common ground that Latgales Enerġija refused to comply with this decision of its free will.[1462]

1042.    Latgales Enerġija's application to have the 14 July 2008 decision set aside was dismissed by the Administrative District Court on 25 May 2010.[1463]

1043.    The Municipality decision of 14 July 2008 is not in itself contrary to Article 3(1) of the BIT; the Tribunal dismisses the Claimant's claim.

1044.    The Claimant received no unqualified assurance from the Municipality that the Long-Term Agreement would last for a period of 30 years; the Long-Term Agreement contains in particular express terms under which it could be terminated by Rēzeknes Siltumtīkli.   Similarly, the Claimant received no unqualified assurance from the Regulator that the licences would be in force for 20 years as they contained express conditions and were stated to be governed by certain Latvian laws and regulations; both the law and the express licence conditions contemplated events which might result in the licences ceasing to be effective before the expiry of the 20-year period. On this basis, the Claimant did not receive any unqualified assurance that the leased assets would not be taken over before such periods had expired.   The Claimant's claim must therefore be dismissed insofar as it is rested on a breach of the Claimant's legitimate expectations.

---

[1462]  See also <u>CWS-4</u> ¶ 30.
[1463]  <u>R-5</u>, see paragraph 397 above.

1045.   The 14 July 2008 decision appears to be one of the consequences ultimately following from the Regulator's decision to revoke the licences.  The Municipality did not act in bad faith in making that decision.

1046.   The Claimant's complaint that the Municipality sought to bypass the prerogative of the "person in charge" is without merit: by its decision of 27 June 2008 the "person in charge"[1464] had in fact ordered Latgales Enerģija to transfer all assets to Rēzeknes Siltumtīkli and Rēzeknes Enerģija, to which the Municipality's decision presently under consideration refers.  Latgales Enerģija expressly declined to comply with that decision as stated in its letter of 7 July 2008 on the basis that it had challenged both the Regulator's decision to revoke the licences and the Regulator's decision to take over its zone.[1465]

1047.   The Tribunal's Conclusion and Finding.   The Tribunal dismisses the Claimant's claim.

c.   *The Municipality's decision authorising the forcible recovery of the assets (15 September 2008)*

1048.   The Claimant complains that the Respondent breached its expectations that Latgales Enerģija would not be required to hand over the leased assets to the Municipality-owned companies and the Municipality's decision authorising the enforcement of such decision amounted to harassment in breach of Article 3(1) of the BIT.

The Tribunal's finding is set out in paragraph 1050 below.

1049.   On 15 September 2008 the Rēzekne City Council authorised the enforcement of its decision of 14 July 2008 by forcible means.[1466]  The Council rested its decision on Section 66 of the Administrative Procedure Act, stating that the use of force was necessary due to Latgales Enerģija's refusal to comply with the 14 July 2008 decision of its free will, and considering that such was the only means to access the assets leased to Latgales Enerģija under the Long-Term Agreement; there were no other less intrusive means, and the resort to force was therefore proportionate.

---

[1464] C-31.

[1465] C-32.

[1466] C-186.

1050.   The Tribunal's Conclusion and Finding.   The Tribunal dismisses the Claimant's complaint for the same reasons that are stated in paragraphs 1043-1045 above, *mutatis mutandis*.   The Municipality's decision authorising the enforcement of its 14 July 2008 decision by forcible means is not in itself tainted by any breach of Article 3(1) of the BIT, and it relates to a decision which is unobjectionable in itself.

> ### d.   The forcible recovery of the buildings and boilers (16 September 2008)

1051.   The Claimant contends that the use of armed police to enforce the Council's decision was an excessive and inappropriate exercise of public powers, especially considering the fact that the decision to be enforced had been appealed; such excess amounts to a breach of the standard of full protection and security under Article 3(1) of the BIT.[1467]

The Respondent counters that Latgales Enerģija had refused to comply with a decision ordering that the assets be transferred and the Respondent was therefore left with no choice but to enforce that decision; no actual force was used and no evidence was provided by the Claimant as to the alleged use of force.[1468]

The Tribunal's finding is set out in paragraph 1058 below.

1052.   Latgales Enerģija complained to the Administrative District Court that the forcible enforcement of the 14 July 2008 decision was unlawful; the complaint was dismissed.[1469]

1053.   The Claimant alleged that its personnel was forcibly evicted from Latgales Enerģija's premises[1470] and that "these executive decisions were enforced by armed local and state police and the Municipality (through its wholly-owned company), who, on 16 September 2008, forcibly entered Latgales Enerģija's premises, expelled its employees and appropriated all of Latgales Enerģija's assets used to operate the heating system".[1471]   Counsel for the Claimant in his closing statement simply

---

[1467] RfA ¶ 114.
[1468] Resp. Obj. J. & C-Mem. ¶ 3.25.
[1469] R-6, see paragraph 396 above.
[1470] RfA ¶ 119.
[1471] Cl. Mem. ¶ 244.

recalled that Latgales Enerģija's employees were "forced off the premises, and you heard Ms. Uškāne speak to that".[1472]

The Tribunal notes, first of all, that such allegation was not made in the proceedings challenging the legality of the enforcement of the Rēzekne City Council's decision No. 316 by forcible means.[1473]

1054.   Ms. Uškāne was able to give evidence at the Hearing only as to the events in the main administrative building and the customers' services centre, not the boilers.

The main administrative building was taken over by police early in the morning before the employees arrived for work; the locks were changed and the employees were not allowed into the building.[1474]

The customers' service centre was taken over a few days later when the employees were working within and a representative of Rēzeknes Enerģija ordered them to leave the building immediately, or the police would evict them on the same day.[1475]   The employees were able to liaise with management and decided to lock the building and leave before the police arrived.[1476]

In her Witness Statement Ms. Uškāne further stated that the employees working at the customers' service centre were able to recover their belongings as well as documents from their office a few days later ("… they allowed us peacefully and in a calm way to take out our property and documents from the building").[1477]

1055.   Ms. Uškāne's Witness Statement mentions that the police officers carried guns ("…the police were already there, with guns, preventing us from going into the building…").[1478]   Asked in cross-examination whether any guns were showing, Ms. Uškāne answered that she was told so, and then referred to what she saw a couple of

---

[1472] Transcript, Day 4, 12/19-21.
[1473] R-6 ¶ 14, see also paragraph 396 above.
[1474] CWS-4 ¶ 35; confirmed at the Hearing, Transcript, Day 2, 88/1-8.
[1475] CWS-4 ¶ 37; confirmed at the Hearing, Transcript, Day 2, 88/1-8.
[1476] CWS-4 ¶ 37; confirmed at the Hearing, Transcript, Day 2, 88/1-8.
[1477] CWS-4 ¶ 37.
[1478] CWS-4 ¶ 35.

weeks later, when she drove by the customer service centre and saw a man standing before the entry and carrying a gun or a weapon akin to a gun.[1479]

At the Hearing, however, Ms. Uškāne did not confirm that she had seen police officers carrying guns.[1480]

There is no allegation in Ms. Uškāne's Witness Statement that any threats were made against her, or any other employee, by any police officer showing a gun or removing a gun from its duty holster.  In cross-examination Ms. Uškāne confirmed that she was not threatened with a gun.[1481]

Ms. Uškāne added that that had been an unpleasant moment with the police[1482] and that they filed a complaint with the prosecutor's office.[1483]

1056.  The Tribunal notes that the forcible recovery of buildings and boilers was made pursuant to two decisions of the Municipality, made on 14 July and 15 September 2008, which the Tribunal found to be unobjectionable in themselves (see paragraphs 1043 and 1050 above), after Latgales Enerģija declined to comply with the decision ordering that the assets should be returned to the Municipality.

1057.  The Tribunal finds that the intervention by the Latvian police was peaceful.  The Respondent has not challenged the Claimant's allegation that police officers were armed.  No threats were made against any employee.  Although it is understandable that such an experience may have alarmed, and perhaps frightened, law-abiding citizens not used to being confronted by police, the Tribunal finds that there is no evidence of an excessive exercise of public powers.  On the evidence before the Tribunal, the forcible recovery of buildings and boilers remained entirely within the confines of reasonable law enforcement.

---

[1479]  Transcript, Day 2, 93/25-94/20.
[1480]  See Respondent's Closing Argument, Slide 22.
[1481]  Transcript, Day 2, 98/8-12.
[1482]  Transcript, Day 2, 98/17-18.
[1483]  Transcript, Day 2, 98/24-99/4.

1058. <u>The Tribunal's Conclusion and Finding</u>.  The forcible recovery of buildings and boilers does not, in itself, infringe the full protection and security standard of Article 3(1) of the BIT.  The Tribunal dismisses the Claimant's claim.

1059. At this juncture the Tribunal will consider whether the Municipality's conduct in 2007 and 2008, considered as a whole including those individual measures which the Tribunal found unobjectionable, amounts to a breach of Article 3(1) of the BIT.

(viii)   *The Cumulative Effects of the Respondent's Individual Actions*

1060. The Claimant claims that if the cumulative effect of the individual measures taken by the Latvian authorities and the Municipality-owned companies is considered, the Tribunal should make a finding of a creeping breach of Article 3(1) of the BIT.  The Respondent's defence is based on the proposition that the Claimant decided to make the investment without any thorough due diligence and must therefore be taken to have assumed identifiable risks in relation to certain aspects of the investment.

1061. The enquiry advocated by the Claimant by definition includes acts and measures which, seen in isolation, are not a breach of Article 3(1) of the BIT.[1484]

1062. In the present case, the first acts and measures considered by the Tribunal, following the chronology, were found to be inconsistent with the obligations under Article 3(1) of the BIT (in particular the delay by the Municipality to coordinate and approve a heat supply development plan for the City, see paragraphs 886 ff. above; the Municipality's failure to direct Rēzeknes Siltumtīkli to have the attachment on Latgales Enerģija's bank account lifted, see paragraph 973 above; the Municipality's ultimatum in order that Latgales Enerģija provide heating services within 24 hours, see paragraph 973 above and the establishment of a new wholly-owned subsidiary with the intention to replace Latgales Enerģija, see paragraph 987).

However, other measures were found by the Tribunal to be unobjectionable under Article 3(1) of the BIT as long as they were considered in isolation; the most important measure is the revocation of the licences (see paragraphs 1004 and 1024

---

[1484] *El Paso v. Argentina*, <u>CLA-39</u> ¶¶ 515 ff.

above) and the decisions taken subsequently to implement the revocation and have the Assets returned to Rēzeknes Siltumtīkli.

1063.  The Tribunal finds that the approach advocated by the Claimant is appropriate as a matter of law and that it is therefore appropriate to revisit the facts according to a more global approach.

1064.  However, subject to the following paragraph, having considered the evidence as a whole, the Tribunal is disinclined to find a global breach of Article 3(1) of the BIT in the present case, as the Regulator's final decision to revoke the licences was based on a concern to protect the public interest and rested on at least one sound ground.

1065.  The Claimant is nevertheless entitled to succeed on its claim that the Municipality's actions justifying the claims which the Tribunal granted in paragraphs 887, 973 and 987 above amount to arbitrary measures impairing the management, maintenance, use, enjoyment or disposal of its investment.  In the above paragraphs, the Tribunal has found that the conduct of the Respondent was arbitrary in a manner inconsistent with Article 3(1) of the BIT.  As to impairment of the management, maintenance, use, enjoyment or disposal of the Claimant's investment (as defined in paragraph 521 above) the conduct for which the Respondent is responsible is one of the principal causes that ultimately resulted in the Claimant being unable to recover loans granted to Latgales Enerģija and having to pay a guarantee in respect of Latgales Enerģija's unpaid debts to third parties.  The Tribunal finds that such conduct and measures on the part of the Municipality amount to arbitrary measures impairing the use, enjoyment or disposal of the Claimant's investment in breach of Article 3(1), second paragraph, of the BIT.

(C)    THE TRIBUNAL'S FINDING

1066.  The Tribunal therefore concludes that the Respondent has breached Article 3(1) of the BIT based on the specific findings in paragraphs 887, 973, 987 and 1065 above.

(4)    CLAIM FOR EXPROPRIATION UNDER ARTICLE 4(1) OF THE TREATY

1067.  The Claimant complains that the Municipality of Rēzekne combined with the Regulator, Rēzeknes Siltumtīkli and Rēzeknes Enerģija to give rise to an energy crisis, for which the Regulator and the Municipality then sanctioned Latgales Enerģija

311

over a period of some twelve months, the ultimate sanction being the revocation of the licences followed by the forcible recovery of buildings and boilers and the termination of the Long-Term Agreement. These actions destroyed the value of the Claimant's investment. In addition, the Claimant complains of an outright expropriation on 16 September 2008 as the Respondent forcibly took over the leased infrastructure. The Respondent denies any breach of the BIT; it replies that the recovery of buildings and boilers of 16 September 2008 was the lawful enforcement required after Latgales Enerġija had declined to comply with the 14 July 2008 decision and surrender the assets.

The Tribunal's finding is set out in paragraph 1101 below.

1068.   The Claimant's definition of its investment covers two main points:

(i)     the shares in Latgales Enerġija, whose value was rendered worthless by the Respondent's actions and omissions; and

(ii)    the loans and guarantees provided to Latgales Enerġija, which were not reimbursed, as well as the payment of Rēzeknes Siltumtīkli's debts and the transfer of know how.

1069.   The Claimant contends that its investment in Rēzekne was expropriated by the Respondent in breach of Article 4(1) of the BIT without prompt, adequate and effective compensation; such expropriation was not in the public interest and was discriminatory.

1070.   Article 4 of the BIT reads as follows:

<div align="center">Article 4<br>Expropriation and Compensation</div>

1.      Neither Contracting Party shall expropriate, nationalize or take similar measures (hereinafter referred to as "expropriation") against investments of investors of the other Contracting Party in its territory, unless:

a)      such expropriation is in the public interest and legal procedure is applied;

b)      such expropriation is carried out without discrimination;

c)      prompt, adequate and effective compensation is given.

<div align="center">312</div>

2.      The compensation mentioned in point (c) of the paragraph (1) of this Article shall be equivalent to the market value of the expropriated investments immediately before the expropriation occurred or the impending expropriation became public knowledge and shall be paid without undue delay.   The compensation shall include interest calculated on the LIBOR basis from the date of expropriation.   The compensation shall be effectively realizable and freely transferable.

3.      Investors, whose assets are being expropriated, have a right to prompt review by the appropriate judicial or administrative authorities of the expropriating Contracting Party to determine whether such expropriation, and any compensation therefor conforms to the principles of this Article and the laws of the expropriating Contracting Party.

4.      Investors of one Contracting Party who suffer losses in respect of their investments in the territory of the other Contracting Party owing to war, a state of national emergency, insurrection, riot or other similar events, shall be accorded by the other Contracting Party, treatment no less favourable than that accorded to investors of any third State.   Any resulting compensation shall be paid without undue delay and shall be freely transferable.

1071.   The Tribunal has to determine whether the Respondent expropriated the Claimant's investment directly, on 16 September 2008, or indirectly, in breach of Article 4(1) of the BIT.

(A)      THE APPLICABLE STANDARD OF TREATMENT

1072.   A State may expropriate an investment directly under Article 4(1), by transfer of title ("outright taking"), or indirectly, by measures that fall short of a direct taking.   This last point is made clear by the expression "or similar measures" in Article 4(1).

1073.   The Tribunal considers that Article 4(1) offers protection in the case of so-called "creeping expropriation", where the host State achieves "the same result" as with an outright taking of property.[1485]   As the *Generation Ukraine* tribunal observed, such form of expropriation takes place in a situation where "a series of acts attributable to the State *over a period of time* culminate in the expropriatory taking of such property".[1486]

---

[1485]   American Law Institute, *Restatement (Third) Foreign Relations of the United* (1987*)* as quoted in: C. McLachlan, L. Shore, M. Weiniger, *International Investment Arbitration: Substantive Principles*, Oxford 2007, <u>CLA-8</u> ¶ 8.78.

[1486]   *Generation Ukraine v. Ukraine*, <u>CLA-30</u> ¶ 20.22 (original emphasis).

313

1074.   Indirect expropriation requires a *certain degree of interference with the investment* on the part of the State.   Commentators have used various formulae to express this requirement: in order to amount to expropriation, such interference has to be unreasonable, to cause the investment to be neutralized or useless and to cause the investor to be practically deprived, in whole or in significant part, of the use and enjoyment of its investment.[1487]

1075.   The arbitral decisions involving indirect expropriation have similarly focussed on the degree of State interference.[1488]   The test adopted by the *Tecmed* tribunal was whether the investor "was radically deprived of the economical use and enjoyment of its investments, as if the rights related thereto (…) had ceased to exist (…) the measures adopted by a State, whether regulatory or not, are an indirect de fact expropriation if they are irreversible and permanent and if the assets or rights subject to such measure have been affected in such a way that "… any form of exploitation thereof …." has disappeared".[1489]   The *Tecmed* tribunal added a statement which is relevant to shareholders' claims: "Under international law the owner is also deprived of property where the use or enjoyment of benefits related thereto is exacted or interfered with to a similar extent (…)".[1490]

1076.   Tribunals have found that no indirect expropriation could be found to exist *(i)* where the State's interference with the investor's business was reasonable[1491] or *(ii)* where the investor was still able to operate and benefit from its investment.[1492]   This approach was followed in the *BG Group* award.[1493]

1077.   In any event, the fact that an investment has become worthless does not *per se* mean that there was an act of expropriation since investment always entails risk as observed by the *Generation Ukraine* tribunal.[1494]

---

[1487]   L.Y. Fortier and S. Drymer, "Indirect Expropriation and the Law of International Investment: I Know It When I See It", 19 ICSID Review 293, <u>CLA-10</u> p. 305.

[1488]   *Pope & Talbot v. Canada*, <u>RLA-13</u>/<u>CLA-43</u> ¶¶ 99-104, especially ¶ 102.

[1489]   See *Tecmed v. Mexico*, <u>CLA-17</u> ¶¶ 115-116; see also *Siemens v. Argentina*, <u>CLA-11</u> ¶¶ 267-273.

[1490]   *ibidem.*

[1491]   *Genin v. Estonia*, <u>CLA-28</u> ¶ 363; see also paragraph 1080 below on "*regulatory expropriation*".

[1492]   *Pope & Talbot v. Canada*, <u>RLA-13</u>/<u>CLA-43</u> ¶¶ 99-104, especially ¶¶ 100-102.

[1493]   See *BG Group v. Argentina*, <u>CLA-12</u> ¶¶ 270-271.

[1494]   *Generation Ukraine v. Ukraine*, <u>CLA-30</u> ¶ 20.30.

1078.  Certain tribunals have highlighted as a further aspect of the degree of State interference the *duration* of such interference.[1495]

1079.  In order to determine whether the measures taken by a State amount to expropriation, the *effect* of such measures on the investment is often regarded as a crucial test. Whereas it has been said that "[t]he government's intention is less important than the effect of the measures on the owner of the assets", some relevance must be attached to *intention*, as observed by the Tribunal in paragraph 829 above, and any evidence of expropriatory intention should be carefully weighed.[1496]

1080.  States have often raised the defence that where a general regulation enacted in the public interest interferes with an investment, it is within the State's "police powers" and it does not amount to an expropriation under international law provided that it is not discriminatory.  Such a defence has been raised by the host State both in cases in which the measure was in the form of a general regulation (such as in *Pope & Talbot*) and in cases in which it is an individual decision made in relation to one particular investor, such as a decision to revoke a licence or an authorisation (as in *Tecmed*).

1081.  The tribunal in *Genin v. Estonia* found that the revocation of a banking licence, although it was stated to be based on very technical grounds, was neither arbitrary nor discriminatory and was justified considering the serious and reasonable misgivings expressed by the Central Bank of Estonia regarding the investor's management, its operations and its investments; the investor's claims made under the US-Estonia BIT were rejected, including a claim for unlawful expropriation.[1497]

1082.  The NAFTA tribunal in *Feldman v. Mexico* stated that:[1498]

> [I]t is much less clear [than defining direct expropriation] when governmental action that interferes with broadly-defined property rights – an "investment" under NAFTA, Article 1139 – crosses the line from valid regulation to a compensable taking, and it is fair to say that no one has come up with a fully satisfactory means of drawing this line.

---

[1495]  *Wena Hotels v. Egypt*, CLA-14; *Tecmed v. Mexico*, CLA-17 ¶ 116.

[1496]  *Tecmed v. Mexico*, CLA-17 ¶ 116.

[1497]  *Genin v. Estonia*, CLA-28 ¶¶ 361, 363, 365, 369-371.

[1498]  *Marvin Feldmann v. Mexico*, ICSID Case No. ICSID Case No. ARB(AF)/99/1, 16 December 2002, RLA-5 ¶ 100 (no expropriation found).

1083.   In spite of this difficulty, investment tribunals, in particular since *Saluka* and *Methanex*, have endorsed the principle that legitimate regulatory action cannot be regarded as compensable "expropriation".   In this respect, in the *Saluka* case, the tribunal held with reference to the BIT between the Netherlands, the Czech Republic and the Slovak Republic that:[1499]

> It is now established in international law that States are not liable to pay compensation to a foreign investor when, in the normal exercise of their regulatory powers, they adopt in a non-discriminatory manner *bona fide* regulations that are aimed at the general welfare.

1084.   It further found that:[1500]

> [T]he principle that a State does not commit an expropriation and is thus not liable to pay compensation to a dispossessed alien investor when it adopts general regulations that are "commonly accepted as within the police power of States" forms part of customary international law today.

1085.   As a consequence, the tribunal focused on the permissibility of the regulatory State action which, in its view, removed it from the ambit of an indirect expropriation even though in effect it destroyed the value of the investment affected.[1501]   As a result, the forced administration of a bank in which the Dutch investor had invested was not considered a breach of the prohibition against expropriation contained in the applicable BIT.

1086.   The *Saluka* tribunal largely relied on the reasoning of the NAFTA tribunal in the *Methanex* case which had held that:[1502]

> [A]s a matter of general international law, a non-discriminatory regulation for a public purpose, which is enacted in accordance with due process and, which affects, inter alios, a foreign investor or investment is not deemed expropriatory and compensable unless specific commitments had been given by the regulating government to the then putative foreign investor contemplating investment that the government would refrain from such regulation.

---

[1499] *Saluka v. Czech Republic*, CLA-21 ¶ 255.

[1500] *Saluka v. Czech Republic*, CLA-21 ¶ 262.

[1501] *Saluka v. Czech Republic*, CLA-21 ¶ 276: "(...) in imposing the forced administration of IPB on 16 June 2000 the Czech Republic adopted a measure which was valid and permissible as within its regulatory powers, notwithstanding that the measure had the effect of eviscerating Saluka's investment in IPB".

[1502] *Methanex Corporation v. United States of America*, NAFTA Arbitral Tribunal, Final Award on Jurisdiction and Merits, 3 August 2005, RLA-31 Sect. IV D, ¶ 7.

1087.   The Tribunal also notes that certain investment tribunals have considered that a balancing of interests may be required.  For instance, in *LG&E* the tribunal held:[1503]

> In order to establish whether State measures constitute expropriation (…), the Tribunal must balance two competing interests: the degree of the measure's interference with the right of ownership and the power of the State to adopt its policies.

1088.   However, it then added (albeit, invoking a proportionality test, which is controversial):[1504]

> With respect to the power of the State to adopt its policies, it can generally be said that the State has the right to adopt measures having a social or general welfare purpose.  In such a case, the measure must be accepted without any imposition of liability, except in cases where the State's action is obviously disproportionate to the need being addressed. The proportionality to be used when making use of this right was recognized in *Tecmed*, which observed that "whether such actions or measures are proportional to the public interest presumably protected thereby and the protection legally granted to investments, taking into account that the significance of such impact, has a key role upon deciding the proportionality.

(B)   WHETHER THE RESPONDENT IS IN BREACH OF ARTICLE 4(1) OF THE BIT

1089.   The Tribunal will first consider the Claimant's claim that the investment was expropriated on 16 September 2008 in breach of Article 4(1) of the BIT.

The Tribunal's finding is set out in paragraph 1098 below.

1090.   The recovery of the buildings and boilers by personnel of Rēzeknes Siltumtīkli and local police that took place on 16 September 2008 cannot be viewed in isolation as it was based on the Rēzeknes City Council's decision No. 449 of 15 September 2008[1505] that allowed the enforcement of the Council's previous decision of 14 July 2008[1506] ordering Latgales Enerģija to surrender the assets; this decision was in turn based on the Regulator's 3 June 2008 decision to revoke the licences.[1507]   The Claimant has itself relied on the date of 3 June 2008 as the "primary date for the expropriation of its investment" in support of its claim for damages.[1508]   One must therefore consider

---

[1503]   *LG&E v. Argentina*, CLA-31 ¶ 189.
[1504]   *LG&E v. Argentina*, CLA-31 ¶ 195.
[1505]   C-186.
[1506]   C-33.
[1507]   C-33.
[1508]   Cl. Mem. ¶ 344.

these decisions before deciding whether the 16 September 2008 events amount to an unlawful expropriation.

1091.   The Tribunal finds that Latgales Enerģija was deprived of the right to provide heating services in the City of Rēzekne as a consequence of the Regulator's 3 June 2008 decision;[1509] the subsequent decisions were required simply to implement that decision as Latgales Enerģija declined to surrender the assets of its own will.   The question is therefore whether the Regulator's 3 June 2008 decision was valid and permissible as being within the Regulator's regulatory police powers despite the effects that it had on the Claimant's investment.   The Respondent has not rested its defence on the concept of "regulatory expropriation"; however, that is in substance the defence advanced by the Respondent when it argues that the Municipality and the Regulator were entitled, as a matter of Latvian law, to take the measures they took due to Latgales Enerģija's failure to comply with the licence conditions and that such measures do not amount to an unlawful expropriation contrary to Article 4(1) of the BIT.

1092.   The Regulator's 3 June 2008 decision revoking the licences, discussed in paragraphs 1006 ff. above, is based on six main reasons.   The Tribunal has found that the revocation of the licences was not against good faith and that the Regulator was entitled to revoke the licences on the basis that *(i)* Latgales Enerģija had failed to pay the full price of the natural gas from June 2007 onwards, which is an admitted fact, and *(ii)* Latgales Enerģija had a duty to pay for the natural gas used.   The Regulator's finding that such a failure to pay could give rise to further interruptions in the provision of heating services was not a breach of Article 3(1) of the BIT.

1093.   The reasons for which the Regulator's 3 June 2008 decision does not amount to a breach of Article 3(1) of the BIT apply *mutatis mutandis* when one turns to the question whether this decision amounts to a breach of Article 4(1) of the BIT.

---

[1509]   The Council's 14 July 2008 decision states the following (<u>C-33</u> [page 12]): "Thus, as it results from Regulator's decision No 10 of 3 June 2008, together with cancellation of the licences the Operator has lost not only the legal grounds to provide heating, but it also cannot perform the activities included in the subject of the Agreement".   The Claimant relies on this date too as the primary date for the expropriation of its investment, Cl. Mem. ¶ 344.

Having considered Latgales Enerġija's failure to pay the full amount for the natural gas over a twelve-month period, the Regulator was justifiably insecure that there would be no further interruptions in heating services in the future.  The Tribunal therefore finds that the Regulator's 3 June 2008 revoking the licences does not amount to a breach of Article 4(1) of the BIT.

1094.  The Tribunal has already noted that the Regulator's 3 June 2008 decision is stated to be based on a number of further reasons which the Tribunal finds not to be persuasive; the presence of such reasons in the Regulator's decision does not affect the validity of the reason which this Tribunal finds to be a sufficient and valid ground upon which the licences could be revoked.

1095.  The decisions made by the Municipality further to the Regulator's 3 June 2008 decision revoking the licences, in particular the Council's 14 June 2008 and 15 September 2008 decisions, are mere implementation measures which do not constitute a breach of Article 4(1) of the BIT.  The Rēzekne City Council's decision of 14 June 2008 ordering Latgales Enerġija to surrender the assets is stated to be based on the Regulator's 3 June 2008 decision revoking the licences[1510] and the 15 September 2008 decision[1511] orders the enforcement of the 14 June 2008 decision.

1096.  The Claimant's submission that Latgales Enerġija's shares were rendered worthless by the actions of the local Latvian authorities is unproven in the Tribunal's opinion.  This submission is based mainly on the proposition that Latgales Enerġija was stripped of its licences and of its 30-year concession.[1512]  However, the Tribunal has found the revocation of the licences not to be inconsistent with Articles 3(1) and 4(1) of the BIT.  The burden on the Claimant is to prove *(i)* that Latgales Enerġija's shares are "worthless" despite the continued existence of this company, and *(ii)* that such value is the result of the Respondent's actions which the Tribunal has found to be in breach of Art. 3(1) of the BIT.  The Tribunal finds that the Claimant has failed to discharge that burden.

---

[1510] C-33 pp. 1, 3.

[1511] C-186.

[1512] Cl. Mem. ¶¶ 342-343.

1097.  The Claimant's contention that the Respondent's action caused the loss of the value of the loans and guarantees issued in support of Latgales Enerġija's business has been dealt with by the Tribunal as a matter of Article 3(1) of the BIT (see paragraph 1140 below) and there is therefore no need to discuss this matter under the separate head of expropriation.

1098.  The Tribunal's Conclusion and Finding.  The Regulator acted within its statutory discretion when it revoked the licences.  The Respondent's measures did not therefore constitute an unlawful expropriation contrary to Article 4(1) of the BIT on 16 September 2008 when buildings and boilers were taken over, on 15 September 2008 when the forcible enforcement of the 14 July 2008 decision was ordered, on 14 July 2008 when Latgales Enerġija was ordered to surrender the infrastructure or on 3 June 2008 when the licences were revoked.

1099.  The Tribunal further dismisses the Claimant's claim for unlawful expropriation insofar as it is based on an alleged creeping expropriation.

1100.  The Claimant has relied on the measures taken by the Municipality and/or the Regulator, through action or inaction, from the beginning of 2006 until 16 September 2008.  As the Tribunal found that the Regulator's 3 June 2008 decision revoking the licences and the Municipality's 14 June and 15 September 2008 decisions do not constitute a violation of Arts. 3(1) and 4(1) of the BIT, it may be doubtful whether there is any scope left, as a matter of law, in order for the Claimant to argue that the measures taken by the Respondent, considered as a whole, amount to a creeping expropriation.  The Municipality's conduct in 2006 and 2007 and the Regulator's conduct in 2007 were unfair and inequitable in a number of respects and amount, in any event, to arbitrary measures impairing the enjoyment of the Claimant's investment.  Such breaches did not, however, have an expropriatory effect; in particular, the Regulator's 13 October 2006 decision dismissing the new rates proposed by Latgales Enerġija was based *inter alia* on Latgales Enerġija's failure to substantiate its costs.  If the Tribunal considers the Municipality's and the Regulator's conduct in the wider context of a period ending on 16 September 2008, the conclusion is the same.

(C)     THE TRIBUNAL'S FINDING

1101.   The Tribunal dismisses the Claimant's claim based on a breach of Article 4(1) of the BIT.

**(5)     CLAIMS FOR BREACH OF THE MOST FAVOURED NATION CLAUSE UNDER ARTICLE 3(2) OF THE TREATY**

1102.   The Claimant finally complains of a breach by the Respondent of Article 2(2) and Article 3(1) of the Latvia-Romania BIT[1513] which it considers applicable as a result of the Treaty's MFN Clause contained in Article 3(2) of the BIT.

1103.   Article 3(2) of the BIT reads as follows:

Article 3
Protection and Treatment of Investments

2.      Each Contracting Party, subject to its laws and international agreements, shall accord to the investments made by investors of the other Contracting Party treatment no less favourable than that accorded to the investments made by investors of any third State.

1104.   The relevant provisions of the Latvia-Romania BIT read as follows:[1514]

Article 2
Promotion, Admission

(1)     (…)

(2)     When a Contracting Party shall have admitted an investment in its State territory, it shall, in accordance with its national laws and regulations, grant the necessary permits in connection with such an investment, including authorisations for engaging top managerial and technical personnel of their choice, regardless of citizenship, on a non-discriminatory basis.

Article 3
Protection, Treatment

(1)     Each Contracting Party shall protect within its State territory investments made in accordance with its national laws and regulations by investors of the other Contracting Party and shall not impair by unreasonable or discriminatory measures the management, maintenance, use, enjoyment, extension, sale or liquidation of such investments. In particular, each Contracting Party or its competent authorities shall issue the necessary authorisations mentioned in Article 2, paragraph (2) of this Agreement.

---

[1513]  Latvia-Romania BIT, CLA-22.

[1514]  Latvia-Romania BIT, CLA-22.

321

1105.   According to Article 2(2) and Article 3(1) of the Latvia-Romania BIT, the duty on the host State to grant the necessary permits in connection with an admitted investment is based on the law of the host State.   Investment tribunals have interpreted similar provisions contained in BITs as meaning that "[a]ll that an investor may expect is that the law be applied".[1515]

1106.   The Tribunal dismisses the Claimant's claim based on the Latvia-Romania BIT.

1107.   First, it is doubtful that the concept of a "necessary permit" or "necessary authorisation" "in connection with the investment" is to be interpreted and construed so as to include the heat supply development plan for the City of Rēzekne, which is part of the management and planning duties of the Municipality; this document was not, in any event, issued by the Municipality as a permit and does not represent an authorisation allowing any particular action on the part of the Operator.

1108.   Secondly, it is similarly doubtful that the Regulator's decisions approving a new tariff proposed by Latgales Enerģija falls in the category of permits contemplated by the provisions prayed in aid by the Claimant.   The Claimant's position has not been substantiated in this respect.

1109.   Thirdly, any necessary permits have to be granted by the host State only "in accordance with its national laws and regulations".   Therefore, the granting or issuing of permits has to be made only provided that it is in accordance with national law.

1110.   Finally, the Tribunal has found that the Regulator was entitled to revoke the licences as a matter of Latvian law and that such decision does not amount to a breach of Article 3(1) and Article 4(1) of the BIT.

1111.   Thus, the Tribunal does not have to examine whether the MFN clause of the Treaty may be read so as to allow the Claimant to invoke Article 2(2) and Article 3(1) of the Latvia-Romania BIT.

1112.   The Parties have abstained from addressing this issue and the Tribunal notes that, although the question does not concern the controversial *Maffezini* issue whether and

---

[1515]   *MTD v. Chile*, CLA-18 ¶ 205.

322

to what extent procedural benefits can be imported via an MFN clause, the specific formulation of the MFN clause making a host State's obligation to grant MFN treatment "subject to its laws and international agreements" casts doubt whether it can be relied upon to import standards contained in other treaties at all because it may be limited to *de facto* treatment under national law.

### E.   THE TRIBUNAL'S DECISION ON LIABILITY

1113.   The Tribunal finds that the Respondent has breached of Article 3(1) of the BIT as found by the Tribunal in paragraph 1066 above.

## VIII.   *QUANTUM*

1114.   In this section, the Tribunal will first restate the Parties' prayers for relief on *quantum* (A) before summarizing the respective cases on *quantum* submitted by the Claimant (B) and the Respondent (C).  The Tribunal will then state the reasons for its decision on *quantum* (D) before setting out its decision (E).

### A.   THE PARTIES' PRAYERS FOR RELIEF ON *QUANTUM*

#### (1)   THE CLAIMANT

1115.   The Claimant sought damages in an amount of EUR 8,390,000.[1516]  After the Hearing the Claimant filed a third Expert Report in which this amount was reduced to EUR 7,800,000 (in case the appropriate control premium was found to be 20%), or, alternatively, EUR 7,440,000 (in case the appropriate control premium was found to be 10%), excluding pre-judgment interest.[1517]  This amount is broadly in line with the minimum amount set out in the Request for Arbitration (EUR 7,000,000);[1518] the Claimant's submissions filed subsequent to the Request for Arbitration contain claims for higher amounts (EUR 9,820,000[1519] and EUR 8,380,000[1520]).

---

[1516] Cl. Skeleton ¶ 22.
[1517] CES-4 ¶ 6.
[1518] RfA ¶ 169.
[1519] Cl. Mem. ¶ 370.
[1520] Cl. Rep. ¶ 178.

(2)     THE RESPONDENT

1116.   The Respondent seeks the dismissal of the Claimant's claim for damages.

B.      THE CLAIMANT'S CASE ON *QUANTUM*

1117.   The Parties have approached *quantum* with expropriation and expropriatory breaches in mind.

(1)     THE PRINCIPLES

1118.   The Claimant submits that Latvia's expropriation of its investment was unlawful according to the provisions of the BIT, which does not deal with compensation for unlawful expropriation.  Recourse must therefore be had to the principles of customary international law and reliance is placed on the decision of the PCIJ in the *Factory at Chorzów* case and on Articles 31 ff. of the 2001 ILC Articles.  Because the BIT prohibits *prima facie* any expropriation and the Claimant's investment has been expropriated unlawfully, it follows that the compensation must not be limited to the value of the undertaking; the Claimant is entitled to "full reparation" for the injury caused by the Respondent's internationally wrongful acts.[1521]

(A)     CALCULATION OF THE CLAIMANT'S LOSS DUE TO UNLAWFUL EXPROPRIATION

1119.   The Claimant submits that its investment in Latvia has been rendered worthless by Latvia's breaches of the BIT, as a consequence of which Latgales Enerġija was stripped of its licences and its 30-year concession under the Long-Term Agreement. The measure of the loss is represented by the difference between the value of Latgales Enerġija, had those breaches not occurred, and Latgales Enerġija's market value as at 3 June 2008 (or, alternatively, as at 16 September 2008).

1120.   The Claimant relies on Dr. Hesmondhalgh's Expert Reports, based on a DCF analysis in order to value E energija's investment as at 3 June 2008; the total compensation for the expropriation of the Claimant's investment was of EUR 9,460,000 according to Dr. Hesmondhalgh's first Expert Report.[1522]  Dr. Hesmondhalgh reviewed Mr. Peer's

---

[1521]  Cl. Mem. ¶¶ 326 ff.
[1522]  Cl. Mem. ¶¶ 342 ff.

324

first Expert Report and revised her estimate of damages downwards from EUR 9,240,000 to EUR 7,970,000 (when using a 10% control premium) in her second Expert Report; the amounts set out in Dr. Hesmondhalgh's third Expert Report are EUR 7,800,000 (when using a 20% control premium) and EUR 7,440,000 (when using a 10% control premium).

1121. The Claimant made a number of specific points in its Reply Memorial on *quantum*. On the repayment of the loans, it contended that even if Latgales Enerġija had made no profits after June 2008, the loans would have been repaid in the ordinary course of business since the repayments were provided for by the heat tariffs.[1523]  In relation to the "ongoing administrative costs", they would not have been incurred if Latgales Enerġija had been permitted to continue with its business and operate the system.  In its Memorial the Claimant explained that such costs were incurred because it was "not possible to initiate insolvency proceedings",[1524] an explanation which was not restated in the Claimant's Reply.[1525]

### (2)   DAMAGE CAUSED BY BREACHES OTHER THAN EXPROPRIATION

#### (A)   THE PRINCIPLES

1122. Reliance is placed by the Claimant on Article 36 of the ILC Articles as the BIT does not contain any provisions on compensation for a breach of Article 3(1).[1526]

#### (B)   CALCULATION OF THE CLAIMANT'S LOSS DUE TO OTHER BREACHES OF THE BIT

1123. The amount calculated by Dr. Hesmondhalgh's first Expert Report is of EUR 9,820,000 (calculation with a 20% control premium) and EUR 9,240,000 (calculation with a 10% control premium); the calculation is the same as that relating

---

Dr. Hesmondhalgh's first Expert Report calculates the full amount of compensation at EUR 9,820,000 and the amount of damages arising from the Regulator's refusal to accept a new tariff at EUR 320,000. The first Expert Report determined the market value of the Claimant's 58% shares in Latgales Enerġija at EUR 5,280,000 (based on a 20% control premium); in addition, compensation should include *(i)* the revenue attributable to the sale of excess carbon credits (EUR 70,000), *(ii)* compensation for the written-off loans and the called-upon guarantee in an amount of EUR 1,310,000 and EUR 1,860,000 respectively and *(iii)* the costs to keep Latgales Enerġija in existence (EUR 940,000).

[1523]  Cl. Rep. ¶ 102.
[1524]  Cl. Mem. ¶ 356.
[1525]  Cl. Rep. ¶ 105.
[1526]  Cl. Mem. ¶ 358.

to the damages for unlawful expropriation, to which an amount of EUR 360,000 (calculation with a 20% control premium) is added for loss of revenue due to Latvia's breach of the provisions of the BIT before the date of expropriation with respect to the heat supply development plan for the City and the Regulator's refusal to set a new tariff in 2006.[1527]  Dr. Hesmondhalgh reviewed Mr. Peer's first Expert Report and revised her estimate of damages downwards from EUR 9,240,000 to EUR 7,970,000 (when using a 10% control premium) in her Second Expert Report.

## C.   THE RESPONDENT'S CASE ON *QUANTUM*

1124.   The Respondent submits that the overwhelming part of the damages claimed by the Claimant are based on inflated alleged future cash flows as the Long-Term Agreement was capable of generating nil in cash flow; the Claimant has failed to prove that its business was profitable at all.[1528]  Reliance is placed on Mr. Peer's First and Second Expert Reports.  The Respondent further submits that the Claimant has failed to show that the remaining part of the alleged damage was caused by the alleged breach of the BIT, and objects that the Claimant's approach is further flawed by attempts at double-counting and a disregard for the mitigation duty binding on any claimant.[1529]  The Respondent has not further dealt with the Claimant's case on *quantum* and has referred to KPMG's First and Second Expert Reports.

1125.   In a Post-Hearing Brief the Respondent submitted that the dispute had been finally settled under the terms of a Settlement Agreement entered into by the Claimant and Rēzeknes Siltumtīkli on 25 October 2007.[1530]

## D.   THE REASONS FOR THE TRIBUNAL'S DECISION ON *QUANTUM*

### (1)   THE PRINCIPLES

1126.   The Tribunal found that there is no compensable expropriation in the present case, but that the Respondent has breached Article 3(1) of the BIT[1531] in a number of respects.[1532]

---

[1527]  Cl. Mem. ¶¶ 358 ff.
[1528]  Resp. Rej. ¶¶ 35-36.
[1529]  Resp. Obj. J. & C-Mem. ¶¶ 2.1 ff.
[1530]  R-33; Resp. P-H (PO8) ¶ 23.

1127. The provisions of the BIT deal with compensation in relation only to expropriation (Article 4(1) and (2) of the BIT); they are silent, in particular, as to compensation for breaches of Article 3(1) of the BIT.

The Respondent's breaches of Article 3(1) of the BIT amount to an internationally wrongful act as this provision gives rise to an international obligation on the Respondent and the Tribunal has found the breaches of this provision to be attributable to the Respondent (Article 2 of the ILC Articles[1533]).

Under Article 31 of the ILC Articles the State responsible for an internationally wrongful act must make "full reparation for the injury caused" by such act; that is also the principle set out by the PCIJ in the *Factory at Chorzów* decision.[1534] In the present case it is common ground that reparation must take the form of financial compensation or damages.

1128. Financial compensation of the damage caused by an internationally wrongful act "shall cover any financially assessable damage including loss of profits insofar as it is established" (Article 36(2) of the ILC Articles).

1129. In order to be recoverable, the damage must have been caused by the State's internationally wrongful act complained of by the investor, Article 31 of the ILC Articles. Causation is, similarly, a requirement in the PCIJ decision in the *Factory at Chorzów* decision as expressed by the formula "as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed".[1535] The requirement of

---

[1531] BIT, CLA-1.

[1532] The most important breaches are as follows: *(i)* the delayed approval of the heat supply development plan for the City in the period from 20 January 2006 to 20 September 2007; *(ii)* the Regulator's inability to consider Latgales Enerġija's proposals for a new tariff in 2007 caused by the delayed approval of the heat supply development plan for the City; *(iii)* certain aspects of the Municipality's conduct during the October 2007 energy crisis.

[1533] ILC Articles, CLA-7.

[1534] *Factory at Chorzów,* 13 September 1928, PCIJ Series A, No. 17 ("*Chorzów*"), CLA-23.

[1535] *Chorzów*, CLA-23 p. 47 (emphasis supplied).

327

causation has been applied in a number of awards in investment disputes.[1536]   The burden of proof in relation to causation is on the Claimant.[1537]

### (A)   THE PRINCIPLES APPLIED

1130.   The Tribunal must first deal with the Respondent's contention that the "financial differences" between the Parties were finally settled under the terms of a Settlement Agreement made by the Claimant and Rēzeknes Siltumtīkli on 25 October 2007.[1538] The Tribunal dismisses the Respondent's defence.

1131.   This agreement states that Rēzeknes Siltumtīkli shall pay the Claimant an amount of some LVL 600,000 and that five days upon receipt of such payment the Claimant shall cancel certain notes registered in the Land Registry with respect to the real estate owned by Rēzeknes Siltumtīkli.   Clause 3 of this agreement provides that following such payment the Claimant "shall have no claims to property" of Rēzeknes Siltumtīkli.

The Respondent's contention that the Parties settled all their differences "under legal documents concluded up to that date" and that this agreement "gives a wide reference to settling all claims in general"[1539] is based on an impermissible reading of such agreement that does not contain any expression to the effect that all claims between the Claimant and Rēzeknes Siltumtīkli had been finally settled.   The Agreement of 25 October 2007 has a subject-matter which is expressly and narrowly defined in relation to a payment intended to permit the cancellation of a note (akin to a charge, a lien or a mortgage) relating to land, and it settles any claims that the Claimant may have had against property of Rēzeknes Siltumtīkli.   There is no connection between this agreement and the claims made by the Claimant against the Respondent in this arbitration.

1132.   The expert opinions relied upon by the Claimant are entirely based on the proposition that the Claimant was the victim of an unlawful expropriation in June 2008.   The

---

[1536]   See *e.g. Tradex Hellas v. Albania*, CLA-26 ¶ 200, referring to *ELSI,* CLA-24; *Saluka v. Czech Republic*, CLA-21 ¶ 480; *Biwater Gauff v. Tanzania*, CLA-36 ¶¶ 778 ff., similarly referring to *ELSI*, CLA-24 ¶ 786.

[1537]   See *e.g. Tradex Hellas v. Albania*, CLA-26 ¶ 200; *Biwater Gauff v. Tanzania*, CLA-36 ¶ 787.

[1538]   R-33.

[1539]   Resp. P-H (PO8) ¶ 23 (original emphasis).

Tribunal finds that this approach is accordingly of little assistance given the finding that the revocation of the licences was justified and does not amount to a compensable expropriation.

The non-expropriatory damage was dealt with as a fraction of the overall damage caused by the alleged unlawful expropriation and the Regulator's refusal to accept a new tariff in the period from October 2006 to October 2007, corresponding to an amount of EUR 360,000 according to the Dr. Hesmondhalgh's first Expert Report.

1133. The Tribunal must next consider the Claimant's contentions that "Latvia is in breach of various treaty obligations, all of which stem from the same set of facts and produce the same end result: E energija's investment in Latvia has been rendered completely worthless by the actions of the local Latvian authorities"[1540] and that, with specific reference to Latvia's breaches of the BIT provisions other than Article 4(1), "the damages flowing from the expropriation of E energija's investment overlap to a large degree with those flowing from Latvia's other breaches of the BIT"[1541] and that "Latvia's breaches of the Fair and Equitable Treatment standard, including the obligation of full security and protection, and its application of arbitrary and discriminatory measures all resulted in the same outcome: Latgales Enerģija's licences were stripped from it and the Long-Term Agreement terminated".[1542]

1134. The Claimant thereby contends in essence that the damage it suffered is the same, whether the Tribunal finds that there was an unlawful expropriation or a creeping breach of the fair and equitable treatment standard having expropriatory effects, the assumption being that the Tribunal will find at least one or the other. The Tribunal finds this approach to be inconsistent with its findings whereby the Regulator's revocation of the licences was justified and whereby only certain actions or omissions of the Respondent breached Article 3(1) of the BIT; the Tribunal did not, in particular, find that the Respondent's actions were expropriatory if their cumulative effect was considered.

---

[1540] Cl. Mem. ¶¶ 342-344.
[1541] Cl. Mem. ¶ 358.
[1542] Cl. Mem. ¶ 359.

1135.  It is a matter for the Claimant to prove the damage caused by the Respondent's breaches of Article 3(1) of the BIT.

1136.  The Tribunal will first examine whether the Claimant has established that the Respondent's breaches of Article 3(1) caused its alleged lost profits.

The Tribunal has considered in particular the following facts: *(i)* the infrastructure of the heating system in Rēzekne was old and dilapidated (Mr. Strioga characterised the Rēzekne situation as being a "terrible technical situation");[1543]  *(ii)* Latgales Enerġija admittedly did not replace the "Soviet-type old boilers" in Rēzekne,[1544] apart perhaps from the installation of one new Viessmann boiler, but concentrated essentially on repairs and maintenance;[1545]  *(iii)* the Municipality's heat supply development plan for the City contemplated the reconstruction of boiler houses, but spelled out that the operator's "investment into the reconstruction of heating boilers should not affect the increase in tariffs" as it was the Municipality's expectation that gas consumption for generation and auxiliary heating consumption would drop significantly after the reconstruction;[1546]  *(iv)* the Long-Term Agreement and the February 2005 had opened a new page in the history of local administration which had not ever dealt with a private investor before 2005, and the contracts signed by Latgales Enerġija contained few specific assurances with respect to the Claimant's investment on the part of the Municipality, and none on the part of the Regulator that was not privy to such contracts; and *(v)* cogeneration was not covered by the contracts signed by Latgales Enerġija and the terms of such contracts do not warrant a finding that the Municipality was under a contractual duty to Latgales Enerġija to proceed with a cogeneration project, as the Tribunal has found.

Having considered the evidence as a whole, the Tribunal is satisfied that the Claimant has not discharged its burden of proof in relation to the existence of future profits. The Tribunal has also found that the Claimant has failed to discharge its burden of proof in relation to the allegation that Latgales Enerġija's shares have become

---

[1543]  Transcript, Day 2, 8/1-7.

[1544]  Transcript, Day 2, 8/4-9/17 [Strioga].

[1545]  As acknowledged in the 30 October 2007 letter to the Regulator, C-153 p. 6, ¶ 21.

[1546]  C-213 p. 24.

worthless due to the breaches of Article 3(1) of the BIT found by the Tribunal (see paragraph 1096 above).

1137.  The Tribunal finds that the Claimant is entitled to compensation for the actual proven losses (*damnum emergens*) suffered as a consequence of the Respondent's breaches of Article 3(1) of the BIT.

1138.  The Tribunal rejects the claim relating to the "administrative costs" to maintain Latgales Enerģija after 3 June 2008 or 16 September 2008.  The Claimant has failed to give a compelling explanation for what appears to be essentially a commercial decision made in its own interest to continue to fund Latgales Enerģija, rather than a decision dictated by requirements of Latvian law; if any such requirements dictated such decisions, the Claimant has failed to discharge its burden of proof in this respect.

1139.  The Claimant has considered the damage caused by the Respondent's breaches of Article 3(1) of the BIT separately from the damage caused by the alleged unlawful expropriation only to a limited extent, namely under the heading of the "2006/2007 damages".[1547]  These damages are to compensate the Claimant for the losses allegedly suffered as a consequence of the Regulator's 13 October 2006 decision denying Latgales Enerģija's proposal for a new tariff.  However, the Tribunal found that the Regulator's 13 October 2006 decision does not amount to a breach of Article 3(1) of the BIT.  The Tribunal therefore dismisses this claim.

1140.  The Tribunal must next consider the amount of EUR 3,170,000,[1548] represented by loans made to Latgales Enerģija in an amount of EUR 1,310,000,[1549] and a guarantee paid to Danske Bank in respect of Latgales Enerģija's debts, in an amount of EUR 1,860,000.[1550]   These figures were not challenged by the Respondent or the Respondent's expert.[1551]  The Respondent has objected that Latgales Enerģija would not have been able to repay the loan based on Mr. Peer's revised cash flow

---

[1547] ER Hesmondhalgh I p. (iv), ¶¶ 11 ff.; 63.
[1548] ER Hesmondhalgh I p. iv ¶¶ 2(iii); p. 18 ¶ 64; ER Hesmondhalgh II p. (viii) ¶ 16; p. 28.
[1549] Cl. Mem. ¶¶ 355; 361(3); ER Hesmondhalgh I p. 18, ¶ 64; ER Hesmondhalgh II p. viii.
[1550] Cl. Mem. ¶¶ 355; 361(4); ER Hesmondhalgh' I pp. 18-19, ¶ 65.
[1551] ER Peer III ¶ 5.2.2.

estimates[1552] and that there was no evidence that the Claimant had paid the amount of the guarantee to Danske Bank.

1141.  The Tribunal regards such figures as representing an actual loss suffered by the Claimant and finds that they are therefore recoverable in principle.  The Respondent's first objection is therefore without merit insofar as it fails to take into account the distinction between actual losses and lost profits.

1142.  As to the Respondent's second objection relating to the payment by the Claimant of the amount of the guarantee provided to Danske Bank, such objection has already been dismissed by the Tribunal (see paragraph 410 above).

1143.  The Tribunal must now determine whether the Claimant is entitled to a sum of EUR 3,170,000 in consideration of the fact that, on the basis of the totality of the evidence before the Tribunal, such loss arises from a conjunction of different causes. Whereas the Tribunal has found that the Municipality significantly contributed to the difficult situation in which Latgales Enerģija found itself, and did so deliberately and in breach of Article 3(1) of the BIT, the Tribunal has also found that the Claimant's losses were caused by the fact that Latgales Enerģija's heating business came to an end due to its decision to stop paying the full price for the natural gas used and the revocation of the licences by the Regulator that followed, which the Tribunal found not to amount to a breach of Latvia's obligation under the BIT.

1144.  The Tribunal must therefore determine to what extent the Claimant's actual loss was caused by the Respondent's breaches of Article 3(1) of the BIT.  Having weighed all the evidence examined in the present Award, the Tribunal finds that the Claimant and the Respondent have contributed to the losses suffered by the Claimant to an extent that is, all in all, broadly equivalent and that the Claimant should therefore be awarded 50% of the actual losses mentioned above.

1145.  The Tribunal therefore awards the Claimant a sum of EUR 1,585,000 (50% of EUR 3,170,000) as financial compensation for the damage caused by the Respondent's internationally wrongful act.

---

[1552] ER Peer I ¶ 6.5.1.

### (2)    INTEREST

#### (A)    THE CLAIMANT'S POSITION

1146.   The Claimant contends that the Tribunal should depart from Article 4(2) of the BIT insofar as this provision contemplates a calculation of interest based on the LIBOR basis with respect to the compensation to be paid by the Respondent for a lawful expropriation; the Claimant argues that a departure from this provision is justified on the basis that its claim is for unlawful expropriation.

1147.   The date from which interest should be awarded is the date of expropriation[1553] or the date on which the loss was incurred.[1554]

1148.   The Claimant argues that the LIBOR rate has dropped so considerably after 2008 as to be inappropriate for the calculation of interest.   The Claimant suggests a rate of interest that reflects the interest that it must pay on its borrowings, to be compounded quarterly.   Interest should be awarded at the following yearly rates and should be compounded quarterly: 6.58% for 2008, 4.36% for 2009, 3.73% for 2010, 4.13% for 2011 and 2.56% for 2012 until the date of the final award, and at the rate of 2.56%, compounded quarterly, from the date of the award until payment by the Respondent.[1555]

#### (B)    THE RESPONDENT'S POSITION

1149.   The Respondent has not answered the Claimant's case on interest.

#### (C)    THE TRIBUNAL'S REASONS

1150.   The Tribunal finds that interest on the sum awarded is due and the Tribunal is satisfied that the rates claimed by the Claimant are more appropriate than the LIBOR rate; the Respondent has not challenged those rates.   In any event, the LIBOR rate applies to expropriation under Article 4(2) of the BIT and the Tribunal has found that there is no compensable expropriation in the present case, so that there would be no compelling reason to apply a LIBOR-based interest in the present case.

---

[1553] Cl. Mem. ¶ 364.
[1554] Cl. Skeleton ¶ 23(3).
[1555] Cl. Mem. ¶¶ 363 ff.; Cl. Skeleton ¶ 23.

1151.   The Claimant's case for compound interest has remained unchallenged throughout these proceedings.   The Tribunal finds that simple interest would not represent reparation for the injury caused.   The Tribunal will therefore award compound interest.   The Tribunal notes, however, that the Claimant has not provided any substantive reasons in support of its claim that interest should be compounded quarterly other than the proposition that "any interest should be compounded quarterly, since to award simple interest would not reflect commercial reality".[1556].   In the absence of any reason that justifies granting quarterly compounding, the Tribunal takes the view that annual compounding would be appropriate in view of recent trends in investment arbitration.

1152.   The date from which interest is awarded is 1 January 2008 as the Claimant has failed to indicate any interest rate for the year 2007.

### (D)   Tribunal's Finding on Interest

1153.   The Tribunal awards interest on the sum of EUR 1,585,000 as from 1 January 2008, to be compounded annually, at the following rates: 6.58% for 2008, 4.36% for 2009, 3.73% for 2010, 4.13% for 2011 and 2.56% for 2012 until the date of the final award, and at the rate of 2.56%, compounded annually, from the date of the award until payment by the Respondent.

## E.   The Tribunal's Decision on *Quantum*

1154.   The Tribunal awards the Claimant a sum of EUR 1,585,000 (one million five hundred eighty-five thousand Euro) with interest thereon as from 1 January 2008, to be compounded annually, at the following rates: 6.58% for 2008, 4.36% for 2009, 3.73% for 2010, 4.13% for 2011 and 2.56% for 2012 until the date of the final award, and at the rate of 2.56%, compounded annually, from the date of the award until payment by the Respondent.

## IX.   COSTS

1155.   The Claimant's prayer for relief with respect to its costs is set out in paragraphs 442 and 443 above.   The Claimant sought an award of costs in a total amount of

---

[1556]   Cl. Mem. ¶ 365.

EUR 3,083,279.25, including a success fee, or, alternatively, an award of costs in a total amount of EUR 1,688,928.85, without a success fee.

1156. The Respondent's prayer for relief with respect to its costs is set out in paragraphs 447 and 448 above.  The Respondent sought an award of costs in an amount of no less than EUR 166,555.28.

1157. The Article 61(2) of the ICSID Convention provides:

> In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.

1158. Article 47(1)(j) of the ICSID Arbitration Rules states that the award shall contain any decision of the Tribunal regarding the cost of the proceedings.

1159. Absent agreement between the Parties, the Tribunal has broad discretion under these provisions to decide which Party bears the costs of the arbitration and to which extent.

1160. The Tribunal must exercise its discretion judicially and consider the Parties' positions as a whole.  Prof. Reinisch has set out the criteria which a tribunal should take into account in the exercise of its discretion in his dissenting opinion and the Tribunal is broadly in agreement with the presentation of such criteria.  The main question arising for determination in the present case is not, however, what such criteria should be, but how they should be applied to the circumstances of the present case.

1161. The Claimant succeeded with its claim for a breach of Article 3(1) of the BIT, but its claim for breach of Article 4(1) of the BIT as well as all other claims were dismissed. All claims were made to seek compensation for one and the same alleged damage. The Claimant's success on its Article 3(1) claim was clear-cut, especially in so far as the Municipality's delay in dealing with the heat supply development plan was concerned.   The further aspects of this claim required a number of facts to be disentangled and analysed in relation to the conduct of the Municipality in the context of the October 2007 energy crisis, but the breach of Article 3(1) of the BIT by the Municipality found by the Tribunal was similarly a clear breach.

1162.   The assistance which the Respondent provided to the Tribunal was limited, not only due to the brief pleadings which discussed the documentary evidence in the most perfunctory manner, but also to the absence of any witnesses presented by the Respondent to explain the Municipality's conduct.

1163.   The Claimant succeeded with its claim for damages only to an extent of approximately 15-22% (depending on whether one considers the amount of the original claim for EUR 7 million or the higher claim for EUR 9.82 million, excluding the claim for costs).

1164.   Each Party has defended its case in good faith in these proceedings.

1165.   In these circumstances and considering that the claims were not frivolous, were pursued and defended in good faith and with all due expedition, the Tribunal considers that the Claimant is in principle entitled to be awarded costs and finds that the Respondent should be ordered to pay a fair share of the Claimant's costs.  The Tribunal determines that such fair share shall be 50% of the costs incurred by the Claimant, to the exclusion of any success fee, subject to an examination of the amounts claimed.

1166.   The costs of the arbitration, including the fees and expenses of the Tribunal and ICSID's administrative fees and direct expenses, amount to (in USD):

| Arbitrators' fees and expenses | |
| --- | --- |
| Dr. Paolo Michele Patocchi | 439,869.94 |
| Prof. Dr. August Reinisch | 105,052.24 |
| Mr. Samuel Wordsworth QC | 54,372.88 |
| ICSID's administrative fees | 160,000.00 |
| Direct expenses | 83,645.35 |
| **Total** | **842,940.41** |

1167.   The above costs have been paid out of the advances made by the Parties in equal parts.[1557]   As a result, each Party's share of the costs of arbitration amounts to USD 421,470.21.

1168.   The Tribunal finds that the Claimant shall be entitled to 50% of the amounts of EUR 744,946 (legal fees and expenses of Salans/Vinson & Elkins), EUR 300,478 (legal fees and expenses of Sorainen), EUR 29,462 (Dr. Blumberga's Expert Opinion) and its share of the costs of the arbitration USD 421,470.21 (ICSID/Tribunal) plus the lodging fee (USD 25,000); *i.e.* a total amount of EUR 1,074,886.00 and USD 446,470.21.   The Tribunal makes no award of costs with respect to the Expert Reports of Dr. Hesmondhalgh.   This amount in turn represents 43% of the amount of costs and fees claimed by the Claimant excluding any success fee.

## X.   AWARD

For the reasons set out above, the Tribunal decides as follows:

(1)      The Respondent's objections to jurisdiction are denied; the Tribunal has jurisdiction to hear the Claimant's claims under Article 25 of the ICSID Convention and Article 7(2) of the BIT.

(2)      The Respondent breached Article 3(1) of the BIT.

(3)      The Respondent shall pay the Claimant compensation in the amount of EUR 1,585,000 (one million five hundred eighty-five thousand Euro).

(4)      The Respondent shall pay the Claimant compound interest on the amount of EUR 1,585,000.00, compounded annually, at the following rates: 6.58% for 2008, 4.36% for 2009, 3.73% for 2010, 4.13% for 2011 and 2.56% for 2012 until the date of the present Award; and at the rate of 2.56%, compounded annually, from the date of the present Award until payment by the Respondent.

---

[1557] The remaining balance will be reimbursed to the parties in proportion to the payments that they advanced to ICSID.

(5)     The Respondent shall pay the Claimant an amount of EUR 1,074,886.00 for the Claimant's costs and fees.

(6)     The Respondent shall pay the Claimant an amount of USD 446,470.21 for the Claimant's share of the costs of the arbitration plus the lodging fee.

(7)     All other claims are dismissed.

Prof. Dr. August Reinisch
Arbitrator

Date:   17 December 2017

Mr. Samuel Wordsworth QC
Arbitrator

Date:   14 December 2017

Dr. Paolo Michele Patocchi
President of the Tribunal

Date:   21 December 2017

339

**Interest calculation**

| Year end | Rate | Cumulative | Annual | |
|---|---|---|---|---|
| | | € 1,585,000.00 | € 0.00 | |
| 2008 | 6.58% | € 1,689,293.00 | € 104,293.00 | |
| 2009 | 4.36% | € 1,762,946.17 | € 73,653.17 | |
| 2010 | 3.73% | € 1,828,704.07 | € 65,757.89 | |
| 2011 | 4.13% | € 1,904,229.55 | € 75,525.48 | |
| 2012 | 2.56% | € 1,952,977.82 | € 48,748.28 | |
| 2013 | 2.56% | € 2,002,974.05 | € 49,996.23 | |
| 2014 | 2.56% | € 2,054,250.19 | € 51,276.14 | |
| 2015 | 2.56% | € 2,106,838.99 | € 52,588.80 | |
| 2016 | 2.56% | € 2,160,774.07 | € 53,935.08 | |
| 2017 | 2.56% | € 2,216,089.89 | € 55,315.82 | |
| 2018 | 2.56% | € 2,272,821.79 | € 56,731.90 | |
| 2019 | 2.56% | € 2,331,006.03 | € 58,184.24 | |
| 2020 | 2.56% | € 2,367,363.95 | € 36,357.92 | (as at 11 August 2020) |
| **TOTALS** | | **€ 2,331,006.03** | **€ 782,363.95** | |

2020 daily   € 163.04  (€2,331,006.03/366)

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**UAB E ENERGIJA (LITHUANIA)**

Claimant

and

**REPUBLIC OF LATVIA**

Respondent

**ICSID Case No. ARB/12/33**

---

**DECISION ON RECTIFICATION**

---

*Members of the Tribunal*
Dr. Paolo Michele Patocchi, President of the Tribunal
Prof. Dr. August Reinisch, Arbitrator
Mr. Samuel Wordsworth QC, Arbitrator

*Secretary of the Tribunal*
Ms. Geraldine R. Fischer

*Date of dispatch to the Parties:* 3 May 2018

REPRESENTATION OF THE PARTIES

*Representing UAB E energija (Lithuania)*:

Mr. Mark Beeley
Mr. Alexander Slade
Vinson & Elkins RLLP
20 Fenchurch Street
24th Floor
London EC3M 3BY
United Kingdom

and

Mr. Agris Repšs
ZAB Sorainen
Kr. Valdemāra iela 21
LV-1010 Riga
Republic of Latvia

*Representing the Republic of Latvia*:

Mr. Jānis Citskovskis
Ms. Inese Gailīte
Ms. Ilze Dubava
Ms. Nērika Lizinska
State Chancellery, Latvia
Brīvības Boulevard 36
LV-1520 Riga
Republic of Latvia

i

TABLE OF CONTENTS

I.   PROCEDURAL HISTORY.................................................................................... 1

II.  RECTIFICATION .............................................................................................. 2

     A.   The Respondent's Case on Rectification.................................................. 2

     B.   The Claimant's Case on Rectification ..................................................... 2

     C.   The Tribunal's Decision on Rectification ............................................... 3

III. COSTS ........................................................................................................... 5

     A.   The Parties' Positions ............................................................................. 5

     B.   The Tribunal's Decision on Costs ........................................................... 5

IV.  DECISION...................................................................................................... 7

## I.    PROCEDURAL HISTORY

1.    On 22 December 2017, the Tribunal rendered the award in the case *UAB E energija (Lithuania) v. Republic of Latvia* (ICSID Case No. ARB/12/33) (the "Award"), which was dispatched on the same day to the Parties by the Secretariat of the International Centre for Settlement of Investment Disputes (ICSID).

2.    On 26 January 2018, the Tribunal informed the ICSID Secretariat of a clerical mistake in paragraph 1168 and points 5 and 6 of the Award's operative part, noting that the Tribunal had no authority to rectify this error on its own motion, and asked the Secretariat to forward its communication to the Parties.   On the same day, the Secretariat of ICSID notified such letter to the Parties.

3.    On 2 February 2018, pursuant to Article 49(2) of the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States (the "ICSID Convention") and Rule 49 of the ICSID Rules of Procedure for Arbitration Proceedings (the "Arbitration Rules"), the Respondent submitted a request for rectification of the Award (the "Request") to the Secretary-General of ICSID.   A signed copy of the Request was later submitted on 5 February 2018.  The Request was also accompanied by the lodging fee.

4.    On 7 February 2018, the Secretary-General of ICSID registered the Request and notified the Parties of its registration.

5.    On 8 February 2018, the Tribunal acknowledged receipt of the Request and set out a briefing schedule for the Request.

6.    On 21 February 2018, the Claimant filed its observations on the Respondent's Request.

7.    On 28 February 2018, the Respondent filed its reply to the Claimant's observations.

8.    On 8 March 2018, the Claimant filed its rejoinder to the Respondent's reply.

## II.    RECTIFICATION

### A.    THE RESPONDENT'S CASE ON RECTIFICATION

9.      The Respondent submits that the Award contains an arithmetic error in paragraph 1168 that is repeated in points 5 and 6 of its operative part.

10.     In paragraph 1165 of the Award, the Respondent notes that the Tribunal ordered it to pay 50% of the costs incurred by the Claimant to the exclusion of any success fee and subject to an examination of the amounts claimed.  The Tribunal found in paragraph 1168 of the Award that the Claimant was entitled to 50% of the amounts of EUR 744,946 (Legal fees and expenses of Salans/Vinson&Elkins), EUR 300,478 (Legal fees and expenses of Sorainen), EUR 29,462 (Dr. Blumberga's Expert Opinion) and USD 421,470.21 (the Claimant's share of the costs of arbitration) and USD 25,000 (the lodging fee).

11.     According to the Respondent, the Claimant was therefore entitled to the amounts of EUR 537,443 and USD 223,235.11.  The Respondent submits that the Award erroneously indicates the total amounts due by the Respondent to be EUR 1,074,886.00 and USD 446,470.21 in paragraph 1168 and points 5 and 6 of the operative part.

### B.    THE CLAIMANT'S CASE ON RECTIFICATION

12.     The Claimant states that the Tribunal violated the confidentiality of its deliberations by sending the Parties the letter dated 26 January 2018 informing them of an error contained in points 5 and 6 of the Award's operative part (see paragraph 2 above).  According to the Claimant, such letter raises questions as to whether the Tribunal prejudged any application for correction.  The Claimant accepts that there is a *prima facie* contradiction in the Award between paragraph 1165 and the figures contained in paragraph 1168.  According to the Claimant, the Tribunal is best placed to know which of these two paragraphs was in error.

13.     However, the Claimant notes that if the costs awarded to it are reduced to EUR 537,443 and USD 223,235.11, it would recover only a total amount of approximately EUR 613,241 before interest.  According to the Claimant, such an outcome would be surprising notably because the Tribunal had found, among others, that *(i)* Latvia had

2

violated the BIT on multiple occasions, *(ii)* Latvia's breaches of the BIT were clear-cut and *(iii)* Latvia had to provide full restitution to the Claimant.

14.     The Claimant further considers such a reduction "extraordinary" in circumstances where the costs incurred by the Claimant were very reasonable and proportionate and were increased by the Respondent's objections to jurisdiction.

15.     The Claimant finally made a number of statements criticising the Tribunal's decision and letter of 26 January 2018 that are irrelevant for present purposes as the Tribunal's decision on costs is open to review only insofar as it contains a clerical, arithmetical or similar error.

## C.     THE TRIBUNAL'S DECISION ON RECTIFICATION

16.     Article 49(2) of the ICSID Convention reads as follows:

> (2)     The Tribunal upon the request of a party made within 45 days after the date on which the award was rendered may after notice to the other party decide any question which it had omitted to decide in the award, and shall rectify any clerical, arithmetical or similar error in the award.   Its decision shall become part of the award and shall be notified to the parties in the same manner as the award.   The periods of time provided for under paragraph (2) of Article 51 and paragraph (2) of Article 52 shall run from the date on which the decision was rendered.

17.     Rules 49(3) and 49(4) of the ICSID Arbitration Rules provide:

> (3)     The President of the Tribunall shall consult the members on whether it is necessary for the Tribunal to meet in order to consider the request.   The Tribunal shall fix a time limit for the parties to file their observations on the request and shall determine the procedure for its consideration.

> (4)     Rules 46-48 shall apply, *mutatis mutandis,* to any decision of the Tribunal pursuant to this Rule.

18.     The present decision deals solely with the Respondent's Request submitted pursuant to Article 49(2) of the ICSID Convention.

3

19.   Article 49(2) of the ICSID Convention and ICSID Arbitration Rule 49(3) and (4) allow the Tribunal to rectify any clerical, arithmetical or similar error upon a party's request made within 45 days after the award was issued, after hearing the parties.

20.   There is no dispute between the Parties that the Request was filed within the prescribed time limit and accompanied by the relevant lodging fee.

21.   In paragraph 1165 of the Award the Tribunal ordered the Respondent to pay 50% of the costs incurred by the Claimant to the exclusion of any success fee and subject to an examination of the amounts claimed.

22.   In paragraph 1168 of the Award the Tribunal determined that the Claimant was entitled to 50% of the amounts of EUR 744,946 (legal fees and expenses of Salans/Vinson & Elkins), EUR 300,478 (legal fees and expenses of Sorainen), EUR 29,462 (Dr. Blumberga's Expert Opinion), USD 421,470.21 (the Claimant's share of the costs of the arbitration) and USD 25,000 (lodging fee).  No award of costs was made with respect to the Expert Reports of Dr. Hesmondhalgh.

23.   Paragraph 1168 of the Award erroneously indicates the total amounts due by the Respondent to be EUR 1,074,886 and USD 446,470.21.  Such erroneous amounts were reproduced in points 5 and 6 of the operative part of the Award.

24.   The 50% reduction ordered by the Tribunal in paragraphs 1165 and 1168 of the Award was not reflected in the amounts awarded to the Claimant in paragraph 1168 and the operative part of the Award.  This is an obvious, inadvertent clerical mistake, which falls within the scope of ICSID Convention Article 49(2).

25.   The correct total amounts that should have been indicated in paragraph 1168 and in points 5 and 6 of the operative part of the Award are therefore EUR 537,443 and USD 223,235.11.

26.   The Tribunal therefore rectifies paragraph 1168 and points 5 and 6 of the operative part of the Award which shall now read as follows:

Paragraph 1168:  The Tribunal finds that the Claimant shall be entitled to 50% of the amounts of EUR 744,946 (legal fees and expenses of Salans/Vinson & Elkins), EUR 300,478 (legal fees and expenses of Sorainen), EUR 29,462 (Dr. Blumberga's

Expert Opinion) and its share of the costs of the arbitration USD 421,470.21 (ICSID/Tribunal) plus the lodging fee (USD 25,000); *i.e.* a total amount of EUR 537,443 and USD 223,235.11.  The Tribunal makes no award of costs with respect to the Expert Reports of Dr. Hesmondhalgh.   This amount in turn represents 43% of the amount of costs and fees claimed by the Claimant excluding any success fee.

Point (5):  The Respondent shall pay the Claimant an amount of EUR 537,443 for the Claimant's costs and fees.

Point (6):  The Respondent shall pay the Claimant an amount of USD 223,235.11 for the Claimant's share of the costs of the arbitration plus the lodging fee.

## III.   COSTS

### A.   THE PARTIES' POSITIONS

27.   The Respondent requests that the lodging fee of USD 10,000 be waived as the error in the Award was not due to its fault or omission.   Alternatively, the Respondent requests that the lodging fee be split between the Parties, considering that the error under consideration equally affects both Parties.

28.   The Claimant requests that the lodging fee be borne entirely by the Respondent.

### B.   THE TRIBUNAL'S DECISION ON COSTS

29.   ICSID Arbitration Rule 49(1)(d) requires the Party seeking a rectification of the award to pay a lodging fee.

30.   According to ICSID Arbitration Rule 49(2) the Secretary-General shall register the request and notify the parties of the registration "upon receipt of the request and of the lodging fee".

5

31.     Regulation 16 of the ICSID Administrative and Financial Regulations reads as follows:

> The party or parties (if a request is made jointly) wishing to institute a conciliation or arbitration proceeding, requesting a supplementary decision to, or the rectification, interpretation, revision or annulment of an arbitral award, or requesting resubmission of a dispute to a new Tribunal after the annulment of an arbitral award, shall pay to the Centre a non-refundable fee determined from time to time by the Secretary-General.

32.     No provision in the ICSID Convention, the ICSID Arbitration Rules or the ICSID Administrative and Financial Regulations contemplates a waiver of the lodging fee. In any event, that would be a matter for the Secretary-General, not the Tribunal.

33.     The Tribunal therefore rejects the Respondent's request that the lodging fee paid by the Respondent be waived.

34.     Article 61(2) of the ICSID Convention provides the following:

> In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.

35.     ICSID Arbitration Rule 47(1)(j) states that the award shall contain the Tribunal's decision regarding the costs of the proceedings. Such Rule is applicable in the present case *mutatis mutandis* (Rule 49(4) of the ICSID Arbitration Rules).

36.     The Parties have not made any other requests regarding the allocation of costs in relation to the procedure following the Respondent's Request. Absent agreement between the Parties, the Tribunal has broad discretion under these provisions to decide which Party shall bear the costs of the present procedure. The lodging fee is the sole point in dispute.

37.     The Tribunal considers that none of the Parties bear any responsibility for the error contained in paragraph 1168 and points 5 and 6 of the operative part of the Award. Nonetheless, the Respondent is the beneficiary of the rectification.

6

38.   The Tribunal, therefore, decides that the lodging fee due for the registration of the Request shall be borne entirely by the Respondent.

## IV.   DECISION

For the reasons set out above, the Tribunal decides as follows:

(1)   Paragraph 1168 of the Award dated 22 December 2017 is amended as follows:

"The Tribunal finds that the Claimant shall be entitled to 50% of the amounts of EUR 744,946 (legal fees and expenses of Salans/Vinson & Elkins), EUR 300,478 (legal fees and expenses of Sorainen), EUR 29,462 (Dr. Blumberga's Expert Opinion) and its share of the costs of the arbitration USD 421,470.21 (ICSID/Tribunal) plus the lodging fee (USD 25,000); *i.e.* a total amount of EUR 537,443 and USD 223,235.11.  The Tribunal makes no award of costs with respect to the Expert Reports of Dr. Hesmondhalgh.  This amount in turn represents 43% of the amount of costs and fees claimed by the Claimant excluding any success fee."

(2)   Point 5 of the operative part of the Award dated 22 December 2017 is amended as follows:

"The Respondent shall pay the Claimant an amount of EUR 537,443 for the Claimant's costs and fees."

(3)   Point 6 of the operative part of the Award dated 22 December 2017 is amended as follows:

"The Respondent shall pay the Claimant an amount of USD 223,235.11 for the Claimant's share of the costs of the arbitration plus the lodging fee."

(4)   The Respondent is responsible for the lodging fee.

_____
Samuel Wordsworth QC
Arbitrator
Date: 22 April 2018

_____
Prof. August Reinisch
Arbitrator
Date: 25 April 2018

_____
Dr. Paolo Michele Patocchi
President
Date: 19 April 2018



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW  |  WASHINGTON, DC 20433  |  USA
TELEPHONE +1 (202) 458 1534  |  FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

### UAB E ENERGIJA (LITHUANIA)

### v.

### REPUBLIC OF LATVIA

### (ICSID CASE NO. ARB/12/33) – ANNULMENT PROCEEDING

I hereby certify that the attached document is a true copy of the *ad hoc* Committee's Decision on Annulment dated April 8, 2020.

Meg Kinnear
Secretary-General

Washington, D.C., April 8, 2020

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the annulment proceeding between

**UAB E energija (Lithuania)**

Claimant

and

**Republic of Latvia**

Respondent

ICSID Case No. ARB/12/33 – Annulment Proceeding

---

# DECISION ON ANNULMENT

---

**Members of the *ad hoc* Committee**
Ms. Loretta Malintoppi, President
Prof. Geneviève Bastid Burdeau
Dr. Andrés Rigo Sureda

**Secretary of the *ad hoc* Committee**
Dr. Jonathan Chevry

*Date of dispatch to the Parties:* April 8, 2020

## REPRESENTATION OF THE PARTIES

*Representing UAB E energija (Lithuania)*:

Mr. James Loftis
Vinson & Elkins LLP
1001 Fannin Street
Suite 2500
Houston, TX 77002
USA
 and
Mr. Alexander Slade
Ms. Sophie Freelove
Vinson & Elkins RLLP
20 Fenchurch Street
24th Floor
London EC3M 3BY
United Kingdom
 and
Mr. Agris Repšs
Mr. Valts Nerets
Ms. Agita Sprūde
Sorainen
Kr. Valdenmara iela 21
LV-1010 Riga
Republic of Latvia

*Representing the Republic of Latvia*:

Ms. Nērika Lizinska
Mr. Dainis Pudelis
Legal Department
State Chancellery of Latvia
Brīvības Boulevard 36
LV-1520 Riga
Republic of Latvia
 and
Mr. Noah Rubins QC
Mr. Ben Juratowitch QC
Dr. Daniel Müller
Ms. Nora Bellec
Freshfields Bruckhaus Deringer LLP
2, rue Paul Cézanne
75008 Paris
France

i

TABLE OF CONTENTS

I.      INTRODUCTION AND PARTIES ................................................................. 1

II.     PROCEDURAL HISTORY ........................................................................ 1

III.    BACKGROUND ON THE ARBITRATION AND THE AWARD ...................... 9

        1.   Factual Background ................................................................. 10

        2.   The Arbitral Proceeding and the Award ................................. 11

IV.     ANNULMENT LEGAL STANDARDS ........................................................ 14

        A.   Scope of Annulment ............................................................... 15

             1.   The Parties' Positions ..................................................... 15

                  a.   Latvia's Position ...................................................... 15

                  b.   UAB E energija's Position ....................................... 16

             2.   The Committee's Analysis ............................................... 16

        B.   Manifest Excess of Powers (ICSID Convention Article 52(1)(b)) ............................ 18

             1.   The Parties' Positions ..................................................... 18

                  a.   Latvia's Position ...................................................... 18

                  b.   UAB E energija's Position ....................................... 18

             2.   The Committee's Analysis ............................................... 20

        C.   Failure to State Reasons (ICSID Convention Article 52(1)(e)) ................................. 22

             1.   The Parties' Positions ..................................................... 22

                  a.   Latvia's Position ...................................................... 22

                  b.   UAB E energija's Position ....................................... 24

             2.   The Committee's Analysis ............................................... 25

V.      THE APPLICATION FOR ANNULMENT .................................................. 26

        A.   The Tribunal's Decision on the Applicable Law ..................... 27

             1.   Latvia's Position ............................................................ 27

             2.   UAB E energija's Position .............................................. 29

             3.   The Committee's Analysis ............................................... 30

        B.   The Tribunal's Findings on Causation ................................... 37

             1.   Latvia's Position ............................................................ 37

             2.   UAB E energija's Position .............................................. 40

             3.   The Committee's Analysis ............................................... 41

        C.   The Tribunal's Decision on Quantum .................................... 50

1.   Latvia's Position .................................................................. 50

2.   UAB E energija's Position.................................................... 51

3.   The Committee's Analysis.................................................... 52

D.   The Tribunal's Reasoning on Interest ........................................ 56

1.   Latvia's Position .................................................................. 56

2.   UAB E energija's Position.................................................... 58

3.   The Committee's Analysis.................................................... 59

E.   The Tribunal's Decision on Jurisdiction .................................... 62

1.   Latvia's Position .................................................................. 62

a.   Latvia's position on the termination of the BIT by operation of Article 59(1) of the VCLT .................................................... 62

b.   Latvia's argument that EU Law prevails over the BIT ................ 64

c.   Latvia's argument on the waiver of the consent requirement during the Arbitration .................................................... 65

d.   Latvia's argument that the Award should be annulled pursuant to Article 52(1)(b) and Article 52(1)(e) of the ICSID Convention ...................................... 66

2.   UAB E energija's Position.................................................... 67

a.   UAB E energija's argument that Latvia has waived its jurisdictional objection regarding the validity of Article 7 of the BIT...................................... 68

b.   UAB E energija's arguments on the validity of Article 7 of the BIT ........... 69

c.   UAB E energija's position on the grounds for annulment advanced by Latvia .................................................... 70

3.   The Committee's Analysis.................................................... 71

a.   The Parties' arguments on the validity of Article 7 of the BIT and related legal questions .................................................... 72

b.   Latvia's argument that the Award should be annulled pursuant to Article 52(1)(b) and Article 52(1)(e) of the ICSID Convention ...................................... 76

VI.   COSTS .................................................................................................. 79

A.   Latvia's Costs Submissions................................................................ 79

B.   UAB E energija's Costs Submissions ................................................ 80

C.   The Fees and Expenses of the Committee and of the Centre ............ 81

D.   The Committee's Decision on Costs ................................................. 81

VII.   DECISION.......................................................................................... 82

iii

## I.       INTRODUCTION AND PARTIES

1.       This case concerns the outcome of a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Lithuania-Latvia Agreement on the Promotion and Protection of Investments (the "**BIT**"), which entered into force on July 23, 1996, and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, dated October 14, 1966 (the "**ICSID Convention**").

2.       The Claimant in the Arbitration proceeding and the Respondent in the annulment proceeding is UAB E energija (Lithuania), a company incorporated under the laws of the Republic of Lithuania ("**UAB E energija**" or the "**Claimant**").

3.       The Respondent in the Arbitration proceeding and the Applicant in the annulment proceeding is the Republic of Latvia ("**Latvia**," the "**Respondent**," or the "**Applicant**").

4.       The Claimant and the Respondent are collectively referred to as the "**Parties**." The Parties' representatives and their addresses are listed above on page (i).

5.       The dispute in the original proceeding and the findings of the Award are summarized in Section III below.

6.       In this annulment proceeding, Latvia invokes two grounds for annulment: (i) the Tribunal manifestly exceeded its powers (Article 52(1)(b) of the ICSID Convention); and (ii) the Tribunal failed to state the reasons on which the Award was based (Article 52(1)(e) of the ICSID Convention). The Committee notes that in its Application for Annulment, Latvia referred to a third ground for annulment, namely a serious departure from a fundamental rule of procedure, under Article 52(1)(d) of the ICSID Convention (*see* Application for Annulment, paragraphs 4, 23). However, this ground for annulment is no longer mentioned in Latvia's Memorial and Reply and was not mentioned at the Hearing. Consequently, it is not addressed in this Decision.

## II.      PROCEDURAL HISTORY

7.       On August 15, 2012, ICSID received a Request for Arbitration from UAB E energija against Latvia (the "**RfA**").

1

8.      On October 15, 2012, the Secretary-General of ICSID registered the RfA in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

9.      On June 12, 2013, a Tribunal composed of Dr. Paolo Michele Patocchi, a national of Switzerland, President, appointed by the Chairman of the Administrative Council; Mr. Samuel Wordsworth, a national of the United Kingdom, appointed by the Claimant; and Prof. August Reinisch, a national of Austria, appointed by the Respondent, was constituted.

10.     On October 10, 2013, the Tribunal issued Procedural Order No. 1, with a procedural calendar. The Parties accordingly filed the following submissions:

- The Claimant's Memorial on Jurisdiction and the Merits dated December 6, 2013;

- The Respondent's Request for Bifurcation dated April 18, 2014, as amended on May 12, 2014;

- The Claimant's Response to the Respondent's Request for Bifurcation dated May 19, 2014;

- The Claimant's Reply on the Merits and Counter-Memorial on Preliminary Objections dated October 10, 2014;

- The Respondent's Rejoinder on the Merits and Reply on Preliminary Objections dated December 12, 2014; and

- The Claimant's Rejoinder on Preliminary Objections dated January 2, 2015.

11.     From February 23 through February 27, 2015, the Tribunal held a hearing on jurisdiction and the merits in London.

12.     On March 20, 2015, the Parties filed their post-hearing briefs.

13.     On June 1, 2015, the Parties filed their reply post-hearing briefs.

14.     On October 11, 2017, the Tribunal declared the proceeding closed in accordance with ICSID Arbitration Rule 38(1).

15. On December 22, 2017, the Tribunal rendered its Award; attached to which was the dissenting opinion of Prof. August Reinisch.

16. On February 7, 2018, the Secretary-General registered a request for the rectification of the Award filed by Latvia to correct certain clerical errors.

17. On May 3, 2018, the Tribunal, after having consulted the Parties, issued its decision on the rectification of the Award correcting clerical errors.

18. On August 30, 2018, ICSID received an Application for Annulment (the "**Application**") from Latvia, with a request for the stay of enforcement of the Award. The Application for Annulment was made within the time-period provided in Article 52(2) of the ICSID Convention. Latvia sought annulment of the Award based on the following three grounds:

- The Tribunal *manifestly exceeded its powers* because it allegedly failed to decide the Parties' dispute on applicable law.[1] Latvia further claims that the Tribunal had no jurisdiction,[2] and that Latvia's consent to arbitrate was lacking further to Latvia's accession to the EU, rendering the BIT incompatible with EU law.[3]

- The Tribunal *departed from the fundamental rules of procedure* because, according to Latvia, the Tribunal dismissed Latvia's objection that evidence on the alleged payment provided by the Claimant to Danske Bank was insufficient.[4]

- The Tribunal *failed to state reasons* because, according to Latvia, (i) it failed to provide reasons as to the connection between the loss incurred (also unexplained and lacking causality) and the breaches of Article 3(1) of the BIT on arbitrary and discriminatory measures;[5] (ii) it failed to give reasons for the evidential basis of the damages claim;[6] (iii) its reasoning on the quantum was flawed and lacking;[7] and (iv) its reasoning on interest

---

[1] Application, ¶¶ 8-12.

[2] Application, ¶¶ 32-36.

[3] Application, ¶¶ 22-36.

[4] Application, ¶¶ 19-23. As noted above, this ground of annulment was not mentioned in Latvia's subsequent written submissions nor at the Hearing.

[5] Application, ¶¶ 13-18.

[6] Application, ¶¶ 19-23.

[7] Application, ¶¶ 24-26.

3

was deficient because it omitted to identify the basis for the Claimant's entitlement to interest, the reasoning on compound interest was vague and unsupported, and the date from which interest would run was not justified legally.[8]

19.   On September 4, 2018, the Secretary-General registered the Application and informed the Parties of the provisional stay of enforcement of the Award.

20.   By letter of September 11, 2018, ICSID informed the Parties that it intended to recommend to the Chairman of the Administrative Council the appointment of Ms. Loretta Malintoppi, a national of Italy, as President of the *ad hoc* Committee (the "**Committee**"), with Mr. Makhdoom Ali Khan, a national of Pakistan, and Mr. Ucheora Onwuamaegbu, a national of the Nigeria, serving as co-members. The Centre invited the Parties to provide any comments on the proposed appointments by September 18, 2018.

21.   By letter of September 18, 2018, UAB E energija confirmed that it had no objection to the proposed Committee Members. By letter of the same date, Latvia confirmed that it also did not object to the proposed Members; however, it noted that according to his CV, Mr. Onwuamaegbu also holds British nationality, with Mr. Samuel Wordsworth, the arbitrator appointed by the Claimant in the original proceeding also being a British national.

22.   By email of September 18, 2018, the Centre confirmed that Mr. Onwuamaegbu's British nationality disqualified him as a candidate and stated that it would revert shortly with a third potential Member.

23.   By letter of September 20, 2018, ICSID proposed Prof. Geneviève Bastid Burdeau, a national of France, as a third Member of the Committee and transmitted certain disclosures of Ms. Malintoppi.

24.   By letters of September 27, 2018, both Parties confirmed their agreement to the proposed Committee Members, provided Prof. Bastid Burdeau had no further disclosures.

25.   By letter of October 1, 2018, the Centre transmitted Prof. Bastid Burdeau's confirmation that she had no conflicts in the case and informed the Parties that the Chairman of the Administrative Council would proceed to make the appointments.

---

[8] Application, ¶¶ 27-31.

26.     By letter of October 2, 2018, the Centre confirmed that the Chairman of the Administrative Council had made the appointments and that the Centre was in the process of seeking the Members' official acceptance of their appointments.

27.     By letter of October 5, 2018, the Secretary-General informed the Parties that all of the Members had accepted their appointments and the Committee was constituted in accordance with Article 52(3) of the ICSID Convention.  Its Members were: Ms. Loretta Malintoppi (Italian), President; Prof. Geneviève Bastid Burdeau (French), and Mr. Makhdoom Ali Khan (Pakistani); all members appointed by the Chairman of the Administrative Council.

28.     By letter of October 10, 2018, the Committee invited the Parties to confirm their availability for a first session by telephone conference on November 20, 2018, which both Parties did.

29.     By letter of October 29, 2018, the Committee asked Latvia to confirm if its request for the stay of enforcement of the Award included in the Application was maintained; if so, the Committee invited UAB E energija to state whether it opposed the request for the stay of enforcement by November 12, 2018.  Additionally, the Parties were invited to confer on a timetable for written submissions by November 15, 2018.

30.     By letter of October 31, 2018, Latvia confirmed that it maintained its request for the stay of enforcement of the Award and asked that, should UAB E energija object, the Committee extend the provisional stay of enforcement beyond the 30-day period foreseen in ICSID Arbitration Rule 54(2).

31.     By letter of November 1, 2018, ICSID transmitted a draft Procedural Order No. 1 and a draft agenda for the first session to the Parties.

32.     By letter of November 9, 2018, UAB E energija confirmed that it did not object to the stay of enforcement of the Award.

33.     By letter of November 13, 2018, the Committee confirmed that the stay of enforcement of the Award would remain in effect until a final decision on the Application.

34.     By email of November 15, 2018, the Parties submitted their proposed changes to draft Procedural Order No. 1.

35.     On November 20, 2018, the Committee held a first session by telephone conference.

36.     On November 21, 2018, the Committee issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters. Procedural Order No. 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from April 10, 2006, that the procedural language would be English, and that the place of proceeding would be Paris, France. Procedural Order No. 1 also sets out the agreed schedule for the proceeding, which was later modified by agreement of the Parties.

37.     On November 23, 2018, the European Commission (the "**Commission**") filed its First Application for Leave to Intervene as a Non-Disputing Party (the "**First Application to Intervene**").

38.     By email of November 27, 2018, the Committee invited the Parties to provide their comments on the First Application to Intervene by December 12, 2018, with observations on the other side's comments due by December 19, 2018.

39.     By letter of December 5, 2018, Latvia confirmed that it had no objection to the First Application to Intervene.

40.     By letter of December 12, 2018, UAB E energija objected to the First Application to Intervene.

41.     By letter of December 19, 2018, Latvia provided its observations on UAB E energija's December 12, 2018 letter. By email of December 20, 2018, UAB E energija confirmed that it had no further comments.

42.     On January 4, 2019, the Committee issued Procedural Order No. 2 rejecting the Commission's First Application to Intervene.

43.     On February 15, 2019, Latvia filed its Memorial on Annulment (the "**Memorial**") with supporting documentation.

44.     On June 7, 2019, UAB E energija filed its Counter-Memorial on Annulment (the "**Counter-Memorial**") with supporting documentation.

45.     By emails of July 26, 2019, the Parties informed the Committee that they had agreed to short extensions for the filing of the two remaining submissions on annulment. By email of the same date, the Centre informed the Parties of the Committee's agreement to the changes.

46.     By letter of August 7, 2019, the Centre transmitted a new disclosure from Ms. Malintoppi to the Parties. Neither of the Parties raised objections.

6

47.     On August 16, 2019, Latvia submitted its Reply on Annulment (the "**Reply**") with supporting documentation.

48.     By email of September 26, 2019, the Committee invited the Parties to confirm their availabilities for the pre-hearing call to be held on December 13, 2019. By emails of September 27 and September 30, 2019, the Parties confirmed their availabilities for the proposed time.

49.     By letter of October 9, 2019, the Centre informed the Parties that Mr. Khan had submitted his resignation in accordance with ICSID Arbitration Rule 8(2) and that the proceeding was therefore suspended under ICSID Arbitration Rule 10(2) until the vacancy was filled under ICSID Arbitration Rule 11(1).

50.     By letter of October 17, 2019, ICSID informed the Parties of its intention to propose Dr. Andrés Rigo Sureda, a national of Spain, as a Member of the Committee and invited the Parties to provide any comments by October 24, 2019.

51.     By letter of October 22, 2019, Latvia confirmed that it had no objection to the appointment of Dr. Rigo Sureda. By letter of October 23, 2019, UAB E energija also confirmed that it had no objection.

52.     By letter of October 24, 2019, the Centre informed the Parties that Dr. Rigo Sureda had accepted his appointment and the Committee was therefore reconstituted as of that date.

53.     On October 25, 2019, UAB E energija filed its Rejoinder on Annulment (the "**Rejoinder**") along with supporting documentation.

54.     On November 25, 2019, the Centre received the Commission's Second Application to Intervene, dated November 20, 2019, along with accompanying annexes (the "**Second Application to Intervene**").

55.     By email of November 26, 2019, the Committee invited the Parties to provide their comments on the Second Application to Intervene by December 10, 2019.

56.     On December 10, 2019, the Parties provided their comments on the Second Application to Intervene.

57.     On December 13, 2019, the Committee held a pre-hearing conference by teleconference.

7

58.     On December 16, 2019, the Committee issued Procedural Order No. 3 rejecting the Commission's Second Application to Intervene.

59.     By letter of December 23, 2019, the President of the Committee made further disclosures to the Parties. Neither of the Parties raised objections.

60.     On January 9, 2020, Latvia filed a request for the Committee to decide on the admissibility of new evidence. By email of the same date, the Committee invited UAB E energija to provide its comments on the request by January 10, 2020.

61.     By letter of January 10, 2020, Latvia notified the Committee of exhibits from the original Arbitration on which it intended to rely during the Hearing.

62.     By email of January 10, 2020, UAB E energija confirmed that it had no objection to Latvia's request of January 9, 2020, but objected to Latvia's use of the exhibits listed in its letter of January 10, 2020.

63.     By email of January 11, 2020, the Committee provisionally admitted the documents listed in Latvia's January 10, 2020 letter while inviting Latvia to explain how it intended to rely on them.

64.     By letter of January 13, 2020, Latvia provided its response to the Committee's January 11, 2020 email.

65.     On January 13 and 14, 2020, a Hearing on Annulment was held in Paris (the "**Hearing**"). The following persons were present at the Hearing:

*Ad hoc Committee*:
| | |
|---|---|
| Ms. Loretta Malintoppi | President |
| Prof. Geneviève Bastid Burdeau | Member |
| Dr. Andrés Rigo Sureda | Member |

*ICSID Secretariat*:
| | |
|---|---|
| Dr. Jonathan Chevry | Acting Secretary of the *ad hoc* Committee |

*For UAB E energija*:
*Counsel*
| | |
|---|---|
| Mr. James Loftis | Partner, Vinson & Elkins |
| Mr. Alexander Slade | Counsel, Vinson & Elkins |
| Ms. Sophie Freelove | Associate, Vinson & Elkins |
| Mr. Valts Nerets | Senior Associate, Sorainen |
| Ms. Agita Sprūde | Senior Associate, Sorainen |

8

| | |
|---|---|
| *Parties* | |
| Ms. Raminta Barauskienė | COO, E energija |
| Ms. Žydruolė Azukienė | General Legal Counsel, E energija |
| Mr. Aleksas Jautakis | CFO, E energija |
| Mr. Gediminas Uloza | CEO, E energija |
| | |
| ***For Latvia***: | |
| *Counsel* | |
| Mr. Ben Juratowitch QC | Freshfields Bruckhaus Deringer |
| Dr. Daniel Müller | Freshfields Bruckhaus Deringer |
| Ms. Nora Bellec | Freshfields Bruckhaus Deringer |
| Ms. Claire Rohou | Freshfields Bruckhaus Deringer |
| | |
| *Parties* | |
| Ms. Nērika Lizinska | State Chancellery of Latvia |
| Mr. Dainis Pudelis | State Chancellery of Latvia |
| | |
| ***Court Reporter***: | |
| Mr. Trevor McGowan | The Court Reporter Ltd. |

66.    As instructed by the Committee at the Hearing, the Parties submitted on January 30, 2020 the corrections to the Hearing transcript agreed by the Parties, and on January 31, 2020 their respective statements of costs. On January 31, 2020, each Party filed its statement of costs.

67.    On February 14, 2020, the Secretary-General informed the Parties that Dr. Jonathan Chevry, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal in the present case.

68.    On March 19, 2020, the Committee declared closed the proceeding.


## III.    BACKGROUND ON THE ARBITRATION AND THE AWARD

69.    Both Latvia and UAB E energija present in their submissions short summaries of the dispute brought before the Arbitral Tribunal and of the arbitral Award resulting from this dispute.[9]

70.    The present section aims to recall the main points agreed by the Parties in their summaries (or, at the very least, advanced by one Party and not challenged by the other) on the factual background to the dispute (**1.**), and on the arbitral proceeding and the Award (**2.**), as completed whenever necessary by the Committee's own reading and understanding of the Award.

---

[9] Applicant's Memorial, Section II, ¶¶ 5-15; Claimant's Counter-Memorial, Section II, ¶¶ 4-12.

### 1.   Factual Background

71.   The Arbitration was initiated by the Claimant, UAB E energija, against the Respondent, the Republic of Latvia, in relation to the Claimant's right under a 30-year concession agreement for the production and sale of thermal energy in the Latvian city of Rēzekne.[10]

72.   The concession agreement was concluded in 2005 between SIA Latgales Energija ("**Latgales**") – a Latvian company controlled by UAB E energija and Rēzeknes Siltumtīkli ("**Siltumtīkli**") – a public company fully owned by the municipal authority of Rēzekne (the "**Rēzekne Municipality**" or the "**Municipality**").[11] Prior to the agreement, Siltumtīkli oversaw heating supply services in Rēzekne.[12]  The license agreement provided that Latgales would take over Siltumtīkli's activities and assume its debts.[13] The license agreement further provided that Latgales was to review, upgrade and operate the heating supply system in Rēzekne.[14]  Pursuant to the license and Latvian law, the tariffs that Latgales could charge for its services were set by a Latvian central regulatory authority (the "**Regulator**").[15] Further to the conclusion on the license agreement, Latgales and the Municipality concluded a separate agreement, which provided, among other things, that the Municipality would not interfere in the performance of the agreement.[16]

73.   Soon after the conclusion of the license, and due the rise of natural gas prices, Latgales filed a number of applications for tariffs increase with the Regulator.[17] Latvia's authorities rejected these tariff increases ostensibly because the Rēzekne Municipality had not adopted a "heat supply development plan" (an investment program required by Latvian law for heat supply services).[18] The failure to increase tariffs eventually resulted in Latgales being unable to pay the full amount of its gas invoices, the gas supplier refusing to deliver, and Latgales experiencing difficulties in providing heating to certain areas of the city of Rēzekne.[19]

---

[10] Applicant's Memorial, ¶ 5; Claimant's Counter-Memorial, ¶ 6.

[11] Applicant's Memorial, ¶ 7; Claimant's Counter-Memorial, ¶ 6.

[12] Applicant's Memorial, ¶ 7; Claimant's Counter-Memorial, ¶¶ 6-7.

[13] Applicant's Memorial, ¶ 7; Claimant's Counter-Memorial, ¶¶ 6-7.

[14] Applicant's Memorial, ¶ 7; Claimant's Counter-Memorial, ¶¶ 6-7.

[15] Applicant's Memorial, ¶ 8; Claimant's Counter-Memorial, ¶ 8.

[16] Claimant's Counter-Memorial, ¶ 7.

[17] Claimant's Counter-Memorial, ¶ 9(a).

[18] Applicant's Memorial, ¶ 9; Claimant's Counter-Memorial, ¶ 9.  *See also*, Award (AR-0003), ¶¶ 132, 207-266.

[19] Applicant's Memorial, ¶ 9; Claimant's Counter-Memorial, ¶ 9.  *See also*, Award (AR-0003), ¶¶ 207-266.

74.     In September 2007, the Rēzekne Municipality declared an energy crisis, and subsequently, Siltumtīkli began filing legal claims against Latgales in court, obtaining thereunder the attachment of Latgales's bank accounts.[20]    Soon after, the Municipality incorporated a new, wholly-owned public operator company, SIA Rēzeknes Enerģija ("**Rēzeknes Energija**"), whose purpose was soon revealed to be providing heating services in Rēzeknes.[21] In October 2007, the Municipality initiated the process to appoint its two wholly-owned companies, Siltumtīkli and Rēzeknes Energija, to take over Latgales' activities. By October 2008, the Municipality eventually terminated the license, seizing all of the Latgales' assets and investments without compensation.[22]

75.     After four years of unsuccessful negotiations, UAB E energija, as controlling shareholder of Latgales, initiated ICSID Arbitration proceedings claiming that Latvia breached its BIT obligations, including the fair and equitable treatment and full protection and security standards under the BIT Article 3(1), and the obligation not to expropriate foreign investment without compensation under the BIT Article 4(1).[23]

## 2.    The Arbitral Proceeding and the Award

76.     In the annulment proceeding, Latvia argues that the Claimant had alleged, in the original Arbitration, 73 breaches of the Lithuania-Latvia BIT.[24]   UAB E energija does not to take issue with this number. The total amount of damages sought by the Claimant in the Arbitration was EUR 8.39 million.[25]

---

[20] Applicant's Memorial, ¶ 9; Claimant's Counter-Memorial, ¶ 9.  *See also*, Award (AR-0003), ¶¶ 245-361.

[21] Applicant's Memorial, ¶ 9; Claimant's Counter-Memorial, ¶ 9.  *See also*, Award (AR-0003), ¶¶ 245-361.

[22] Applicant's Memorial, ¶ 9; Claimant's Counter-Memorial, ¶ 9.  *See also*, Award (AR-0003), ¶¶ 245-361.

[23] Applicant's Memorial, ¶¶ 10-11; Claimant's Counter-Memorial, ¶¶ 10-11.

[24] Applicant's Memorial, ¶ 11. Relying on several sections of the Award, Latvia explains this number as follows: "[t]he Claimant made 18 separate claims for unlawful expropriation…; 41 claims for breach of the FET standard, including 14 claims in respect of the need for transparent and consistent state conduct…, 12 claims for harassment…, five claims for procedural impropriety and failure to accord due process…, and ten claims for breaches of good faith…; one claim for breach of the FPS standard…; 12 claims for arbitrary and discriminatory measures…; and one claim under the MFN clause…." *See* Applicant's Memorial, ¶ 11, fn. 17 (citing Award (AR-0003), ¶¶ 375, 681, 685, 689, 691, 701, 707).  *See also*, Transcript Day 1, p. 26, lines 13-14.

[25] Applicant's Memorial, ¶ 11. After the original Arbitration hearing, UAB E energija reduced its damages claim to 7.8 million. *See* Award (AR-0003), ¶ 1115.

77.     In the Arbitration, Latvia raised two general jurisdictional objections on issues that are irrelevant to the present annulment proceeding,[26] which were both rejected by the Tribunal.[27]  The Tribunal's decision on these two objections is not a ground for the challenge of the Award.

78.     On the merits, the Tribunal found that the following three series of measures were arbitrary in a manner inconsistent with Article 3(1) of the BIT:[28]

- the Municipality's inaction and delay with respect to the establishment of the "heat supply development plan" (which served as an excuse for refusing the tariff increases);[29]

- the measures (analyzed collectively) taken by the Municipality in the context of its declaration of the energy crisis and relating to, among other things, the initiation (through Siltumtīkli) of legal actions against Latgales, the attachment of Latgales' bank accounts and the failure to have this attachment lifted, as well as the ultimatum issued by the Municipality against Latgales ordering it to resume heating services with 24 hours;[30] and

- the announcement by the Municipality in the midst of the energy crisis that Rēzeknes Energija–a newly-established wholly owned subsidiary of the Municipality–was ready to take over the heating services; and the subsequent appointment of Rēzeknes Energija.[31]

79.     The conclusion of the Tribunal's reasoning on liability based on Article 3(1) of the BIT reads as follows:

> 1065. The Claimant is […] entitled to succeed on its claim that the Municipality's actions justifying the claims which the Tribunal granted in paragraphs 887 [*i.e.*

---

[26] The first jurisdictional objection related to UAB E energija's internal documents authorizing the Request for Arbitration. According to Latvia, UAB E energija failed to comply with the pre-conditions to arbitration found in these internal documents. The second objection pertained to UAB E energija's alleged delay in the submission of its Request for Arbitration (42 months after the period authorized in the BIT). According to Latvia, this delay showed UAB E energija's bad faith and caused Latvia to understand that the claims would not be pursued beyond negotiations. Because of this delay, Latvia objected to the Tribunal's jurisdiction based on the lack of legal dispute within the meaning of Article 25 of the ICSID Convention. *See* Award (AR-0003), Section V, ¶¶ 449-553.

[27] Applicant's Memorial, ¶ 12; Claimant's Counter-Memorial, ¶ 12. *See also*, Award (AR-0003), Section V, ¶¶ 449-553.

[28] The Committee takes note of the reference by UAB E energija in its Counter-Memorial on Annulment to a breach that the Tribunal would have found with respect to "The fact that the Municipality had issued its own development plan for the city of Rēzekne only on 21 September 2007." *See* Claimant's Counter-Memorial, ¶ 12(c) (citing Award (AR-0003), ¶ 1009). This point was not discussed further during the annulment proceedings by the Claimant.

[29] Award (AR-0003), ¶ 887.

[30] Award (AR-0003), ¶ 973.

[31] Award (AR-0003), ¶ 987.

delay by the Municipality to coordinate and approve a heat supply development plan for the City], 973 [*i.e.* measures taken against Latagles subsequent to the declaration of an energy crisis] and 987 [*i.e.* the Municipality's appointment of Rēzeknes Energija] above amount to arbitrary measures impairing the management, maintenance, use, enjoyment or disposal of its investment. In the above paragraphs, the Tribunal has found that the conduct of the Respondent was arbitrary in a manner inconsistent with Article 3(1) of the BIT. As to impairment of the management, maintenance, use, enjoyment or disposal of the Claimant's investment (as defined in paragraph 521 above) the conduct for which the Respondent is responsible is one of the principal causes that ultimately resulted in the Claimant being unable to recover loans granted to Latgales Enerģija and having to pay a guarantee in respect of Latgales Enerģija's unpaid debts to third parties. The Tribunal finds that such conduct and measures on the part of the Municipality amount to arbitrary measures impairing the use, enjoyment or disposal of the Claimant's investment in breach of Article 3(1), second paragraph, of the BIT.

(C). THE TRIBUNAL'S FINDING

1066. The Tribunal therefore concludes that the Respondent has breached Article 3(1) of the BIT based on the specific findings in paragraphs 887, 973, 987 and 1065 above. [32]

80. The Tribunal rejected the other claims brought forward by UAB E energija, including the claim for expropriation of its investment.[33]

81. On damages, the Tribunal rejected the Claimant's claim for lost profits, finding that the Claimant failed to discharge "its burden of proof in relation to the existence of future profits."[34] The Tribunal found nonetheless that the Claimant was "entitled to compensation for the actual proven losses (*damnum emergens*) suffered as a consequence of the Respondent's breaches of Article 3(1) of the BIT."[35]

82. The Tribunal identified two heads of loss that could result in actual damages for the Claimant, namely:

- loans made by the Claimant to Latgales (for a total amount of EUR 1.31 million), which Latgales was unable to reimburse;[36] and

---

[32] Award (AR-0003), ¶¶ 1065-1066.

[33] Award (AR-0003), ¶ 1101.

[34] Award (AR-0003), ¶ 1136.

[35] Award (AR-0003), ¶ 1137.

[36] Award (AR-0003), ¶ 1140.

- a guarantee paid by the Claimant in the amount of EUR 1.86 million to a Latvian bank named Danske Bank in respect of the debts owed by Latgales to various creditors.[37]

83. The Tribunal noted that these two heads of loss represented "an actual loss suffered by the Claimant" and found that they were "therefore recoverable in principle."[38]  The Tribunal then went on to consider whether the Claimant was entitled to the total amount of these two heads of loss (*i.e.* 1.31 + 1.86 = EUR 3.17 million). The Tribunal decided that this was not the case and awarded only 50% of the total amount of the costs associated with the loans and the bank guarantee.[39]

84. The Tribunal further awarded interest, compounded annually, at different rates, from January 1, 2008 until payment by the Respondent.[40]

85. Finally, on costs, the Tribunal decided that the Claimant was entitled to reimbursement of part of its legal costs, as well as of its share of the ICSID Arbitration costs.[41] The Tribunal however declined the request from the Claimant that the Tribunal include a success fee for its lawyer.[42] In a short dissent, Prof. Reinisch explained that he disagreed with the Tribunal's decision on costs and explained that, in his view, the Tribunal should have left both Parties to bear their own costs and share of the ICSID Arbitration.[43] The issue of costs and Prof. Reinisch's dissent are not subject of dispute between the Parties in the present annulment proceeding.


## IV.    ANNULMENT LEGAL STANDARDS

86. In the interest of efficiency, this Decision focuses only on questions that must be answered in order to address the grounds of annulment advanced by the Applicant. The summaries of the Parties' positions that appear herein are not intended to capture all the points made during this annulment proceeding, but, rather, to present the points that, in the Committee's view, call for the greatest attention. The Committee has taken into account the full range of arguments raised by each Party.

---

[37] Award (AR-0003), ¶ 1140.

[38] Award (AR-0003), ¶ 1141.

[39] Award (AR-0003), ¶ 1145.

[40] Award (AR-0003), ¶ 1153.

[41] Award (AR-0003), ¶ 1167.

[42] Award (AR-0003), ¶ 1165.

[43] Award (AR-0003), ¶ 1160.

The Committee has also given due consideration to the legal authorities cited by the Parties, including other awards and annulment decisions, but has reached its own conclusions.

87.    In the present section, the Committee addresses the Parties' positions on the scope of the annulment process under the ICSID Convention (**A.**), and on the two grounds of annulment advanced by Latvia, namely (**B.**) "manifest excess of powers" (ICSID Convention Article 52(1)(b)), and (**C.**) "failure to state reasons" (ICSID Convention Article 52(1)(e)).

## A.    SCOPE OF ANNULMENT

### 1.    The Parties' Positions

88.    While the Parties agree on the general principle that the function of an annulment committee is not to serve as an avenue of appeal,[44] Latvia and UAB E energija differ on several aspects of the ICSID annulment process.

#### a.    Latvia's Position

89.    Latvia recognizes, as does UAB E energija, that Article 52 of the Convention constitutes "an exceptional remedy."[45] Yet, Latvia claims that UAB E energija makes "an extreme characterization" of this consideration, and that, contrary to what UAB E energija asserts, Article 52 does not provide for "any particular restriction or deference beyond enumerated standards."[46] Latvia relies on *RSM v. Saint Lucia* to argue that "there is no presumption one way or another about an annulment process,"[47] and that "[t]he provisions in Article 52 may be described as exceptional in the sense that Article 52 provides limited grounds for annulment but that has no impact on the way the provisions are to be interpreted and applied by the Committee."[48]

90.    Further, while Latvia admits that it is not the role of *ad hoc* committees to make findings on the facts presented and assessed during the arbitral proceedings, Latvia argues nonetheless that "*ad hoc*

---

[44] Applicant's Memorial, ¶ 33; Applicant's Reply, ¶ 5; Claimant's Counter-Memorial, ¶¶ 13(a) and 19.

[45] Applicant's Reply, ¶ 6.

[46] Applicant's Reply, ¶ 6.

[47] Applicant's Reply, ¶ 6 (citing *RSM Production Corporation v. Saint Lucia*, ICSID Case No. ARB/12/10, Decision on Annulment, April 29, 2019 (ARLA-0103), ¶ 151 ("*RSM v. St. Lucia*")). *See also*, Transcript Day 2, p. 6, lines 21-25 (referring to *Capital Financing Holdings S.A. v. Republic of Cameroon*, ICSID Case No. ARB/15/18, Decision on Annulment, October 25, 2019 (ARLA-106), ¶ 117).

[48] Applicant's Reply, ¶ 6 (citing *RSM v. Saint Lucia* (ARLA-0103), ¶ 151).

committees do not sit in splendid isolation from facts."[49]   As explained by Latvia, *ad hoc* committees "do not make factual findings, but they do properly consider the evidence, factual and expert, as the context in which they determine whether the Tribunal stated reasons."[50]

91.     More specifically, with respect to evidentiary issues, Latvia observes that while "[a]n annulment committee should not therefore seek to determine conclusively the impact of evidence that has been ignored," it should however "annul an award where it is able to ascertain that the evidence in question 'at least had the potential to be relevant to the final outcome of the case.'"[51]

### b.  *UAB E energija's Position*

92.     UAB E energija stresses that ICSID annulment proceedings are not appellate proceedings, and annulment under Article 52 of the ICSID Convention is "an exceptional remedy."[52] Referring to ICSID precedents and the ICSID Convention's drafting history, UAB E energija contends that "*ad hoc* committees have a well-defined, limited role in reviewing ICSID awards"[53] and that annulment should not be considered as "a remedy against an incorrect decision."[54] Hence, according to UAB E Energija, "the nature of the ICSID annulment remedy is so exceptional that, even if an *ad hoc* committee finds an annullable error, annulment is not automatic."[55]

### 2.  **The Committee's Analysis**

93.     As recalled above, the Parties agree on at least two important aspects regarding the scope of the annulment process, which are also well-established in ICSID case law: the fact that annulment is

---

[49] Transcript Day 2, p. 14, lines 8-9.

[50] Transcript Day 2, p. 14, lines 10-13.

[51] Applicant's Memorial, ¶ 33 (citing, *TECO Guatemala Holdings, LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment, April 5, 2016 (ARLA-0061), ¶ 135 ("*TECO v. Guatemala*")).

[52] Claimant's Counter-Memorial, ¶ 18.

[53] Claimant's Counter-Memorial, ¶ 18 (citing *inter alia*, *Maritime International Nominees Establishment v. Republic of Guinea*, ICSID Case No. ARB/84/4, Decision of the *Ad hoc* Annulment Committee, December 14, 1989 (ARLA-0012), ¶ 4.04 ("*MINE v. Guinea*"); *AES Summit Generation Limited and AES-Tisza Erömü Kft v. Republic of Hungary*, ICSID Case No. ARB/07/22, Decision of the *ad hoc* Committee on the Application for Annulment, June 29, 2012 (ACLA-0020), ¶ 17 ("*AES v. Hungary*")).

[54] Claimant's Counter-Memorial, ¶ 21 (citing *Amco Asia Corporation and others v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on the Applications by Indonesia and Amco Respectively for Annulment and Partial Annulment, December 17, 1992 (ACLA-0003), ¶ 1.17 ("*Amco* II"); *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Decision on Annulment, December 23, 2010 (ACLA-0017), ¶ 84 ("*Fraport v. Philippines*"); *Alapli Elektrik B.V. v. Republic of Turkey*, ICSID Case No. ARB/08/13, Decision on Annulment, July 10, 2014 (ARLA-0056), ¶ 33.

[55] Claimant's Counter-Memorial, ¶ 22.

an exceptional remedy and that annulment proceedings are not appeals from an arbitral award. The Committee need not elaborate further on these uncontroversial points.

94.     In addition, the Committee notes that Article 52 of the ICSID Convention aims at protecting the fundamental integrity of arbitral tribunals' decisions and the fulfilling of basic procedural guarantees. As noted by the committee in *CDC Group v. Seychelles*, "[b]ecause of its focus on procedural legitimacy, annulment is 'an extraordinary remedy for unusual and important cases.'"[56] Furthermore, annulment is not an inquiry into the substance of the award nor is it a remedy against a flawed or incorrect decision.

95.     The Committee further finds that, if an applicant could have raised an objection in the original Arbitration but failed to do so, it is precluded from invoking that objection as a ground for annulment.

96.     With respect to evidentiary issues, it is not a committee's role to decide whether a tribunal rightly assessed the evidence before it. Only the Tribunal could weigh and appreciate the probative value and the relevance of the evidence submitted in the Arbitration proceedings. The Committee shares the position taken by the *Daimler v. Argentina* annulment committee when it stated as follows:

> "If this Committee were to undertake a careful and detailed analysis of the respective submissions of the parties before the Tribunal… and annul the Award on the ground that its understanding of facts or interpretation of law or appreciation of evidence is different from that of the Tribunal, it will cross the line that separates annulment from appeal."[57]

---

[56] *CDC Group Plc v. Republic of the Seychelles*, ICSID Case No. ARB/02/14, Decision on Annulment, June 29, 2005 (ARLA-0029), ¶ 34 ("*CDC v. Seychelles*"). Footnotes omitted.

[57] *Daimler Financial Services A.G. v. Argentine Republic*, Decision on Annulment, January 7, 2015 (ARLA-0057), ¶ 186 ("*Daimler v. Argentina*").

### B.  MANIFEST EXCESS OF POWERS (ICSID CONVENTION ARTICLE 52(1)(B))

#### 1.  The Parties' Positions

##### a.  Latvia's Position

97.  Latvia considers that annulment committees have often considered that the ground of annulment under Article 52(1)(b) "involves two requirements: first, that the arbitral tribunal committed an 'excess of power,' and second, that it is 'manifest.'"[58]

98.  Regarding the first requirement, Latvia argues that excess of powers occurs when an ICSID tribunal "fails to apply the proper applicable law to the dispute before it"[59] or where a tribunal purports to exercise a jurisdiction that it does not possess.[60]

99.  Regarding the second requirement, Latvia contends that an excess of powers can be characterized as manifest when "it is obvious, clear or self-evident, and discernible without the need for an elaborate analysis of the award,"[61] and that "[a]n excess of powers is manifest if it can be discerned with little effort and without deeper analysis."[62]

##### b.  UAB E energija's Position

100.  UAB E energija agrees with Latvia that Article 52(1)(b) provides for a dual requirement: (i) an excess of powers, which is (ii) manifest.[63] Such "two-step analysis" is the favored approach because "excess of powers is a *sine qua non* for the need to gauge the manifestness of the excess, and allows

---

[58] Applicant's Memorial, ¶ 20 (citing, *inter alia*, *Standard Chartered Bank (Hong Kong) Limited v. Tanzania Electric Supply Company Limited*, ICSID Case No. ARB/10/20, Decision on Annulment, August 22, 2018 (ARLA-0072), ¶ 181 ("*Standard Chartered v. TANESCO*"); *OI European Group BV v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Decision on the Application for Annulment, December 6, 2018 (ARLA-0074), ¶ 180).

[59] Applicant's Memorial, ¶ 21.

[60] Applicant's Memorial, ¶ 120 (stating that "a decision on the merits by an arbitral that in fact lacks jurisdiction to decide the parties' dispute" should be considered as "the most obvious example of an excess of power," and citing in support of this statement, *TECO v. Guatemala* (ARLA-0061), ¶ 77).

[61] Applicant's Memorial, ¶ 22 (citing, *inter alia*, *Impregilo SpA v. Argentine Republic*, ICSID Case No. ARB/07/17, Decision of the *ad hoc* Committee on the Application for Annulment, January 24, 2014 (ARLA-0053), ¶ 128 ("*Impregilo v. Argentina*"); *Daimler v. Argentina* (ARLA-0057), ¶¶ 156, 158, 186; *Gambrinus, Corp v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/31, Decision on Annulment, October 3, 2017 (ARLA-0066), ¶ 167).

[62] Applicant's Reply, ¶ 19 (citing Christoph Schreuer et al., *The ICSID Convention: A Commentary* (2nd ed. 2009) (ARLA-0037), p. 938, ¶ 135 ("Schreuer et al.")).

[63] Claimant's Counter-Memorial, ¶¶ 24-25 (citing, *inter alia*, *Klöckner Industrie-Anlagen GmbH v. United Republic of Cameroon*, ICSID Case No. ARB/81/2, Decision on Annulment, May 3, 1985 (ARLA-0009), ¶ 17 ("*Klöckner v. Cameroon*"); *Sempra Energy v. Argentine Republic,* ICSID Case No. ARB/02/16, Decision on Annulment, June 29, 2010 (ACLA-0013), ¶ 212 ("*Sempra v. Argentina*")).

a more cogent analysis of what constitutes a breach, on one hand, and, on the other, what makes it manifest."[64] According to UAB E energija, there is such an excess of powers "where a tribunal acts outside of what it was authorized to do based on the parties' consent."[65]

101.   On the issue of applicable law more specifically, UAB E energija agrees with Latvia that "annulment may exist where a tribunal has disregarded the applicable law."[66] Yet, UAB E energija insists that "it is for the Tribunal, not the *ad hoc* Committee, to determine the relevant provisions of the applicable law, their content, their relevance and their legal effect and a tribunal's decision on such issues cannot amount to a manifest excess of power."[67] As a result, "a ground for annulment can only be established where a tribunal has disregarded the law agreed upon by the parties in its entirety."[68]

102.   With respect to findings on jurisdiction, UAB E energija notes that "several *ad hoc* committees considered allegations that a tribunal's decision on jurisdiction amounted to a manifest excess of powers under Article 52(1)(b) of the ICSID Convention."[69] It argues that ICSID *ad hoc* committees have nonetheless "been careful to avoid surpassing the limits of the annulment powers when applicants ask them to review tribunals' determinations on jurisdictional issues made in exercise of their express power under Article 41 of the ICISD Convention."[70] Hence, according to UAB E energija, a decision on jurisdiction may trigger the annulment of an award, but "only where it is obvious that a tribunal lacked or exceeded its jurisdiction,"[71] and "[a]n *ad hoc* committee may not

---

[64] Claimant's Counter-Memorial, ¶ 25 (citing *Sempra v. Argentina* (ACLA-0013), ¶ 12).

[65] Claimant's Counter-Memorial, ¶ 27 (citing *CDC v. Seychelles* (ARLA-0029), ¶ 40). *See also*, Claimant's Counter-Memorial, ¶ 39 (stating that "to be successful on these grounds [applicable law and jurisdiction], an applicant must demonstrate that the tribunal failed to decide the Parties' dispute with respect to the applicable law or declined jurisdiction based on a clear, unquestionable, manifest, departure from the parties' agreement.").

[66] Claimant's Counter-Memorial, ¶ 37.

[67] Claimant's Counter-Memorial, ¶ 37.

[68] Claimant's Counter-Memorial, ¶ 37.

[69] Claimant's Counter-Memorial, ¶ 38.

[70] Claimant's Counter-Memorial, ¶ 38.

[71] Claimant's Counter-Memorial, ¶ 34 (citing *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Decision on Annulment, September 1, 2009 (ACLA-0010), ¶¶ 68-69 ("*Azurix v. Argentina*"); *Fraport v. Philippines* (ACLA-0017), ¶ 44, finding that "the Committee will not intervene where the Tribunal's decision on its jurisdiction was not unreasonable.").

enter upon an assessment of whether a tribunal made a correct assessment of the content of the applicable law."[72]

103.     According to UAB E energija, "[t]o be manifest, the excess of powers must be easily recognizable without deeper analysis, *i.e.*, it must be 'self-evident rather than the product of elaborate interpretations one way or the other,'"[73] and "a manifest excess of powers only exists where a tribunal obviously acted outside of its mandate."[74]

### 2.   The Committee's Analysis

104.     In general terms, Article 52(1)(b) of the ICSID Convention contains a dual requirement: an "excess of powers" must exist and it must be "manifest." The latter requirement has been interpreted by *ad hoc* committees as a *prima facie* test: an excess of powers that is "obvious," "clear," "self-evident," or "easily recognizable."[75] The Committee adds that, in order to ascertain whether the original

---

[72] Claimant's Counter-Memorial, ¶ 36 (citing *Duke Energy International Peru Investments No. 1 Ltd. v. Republic of Peru,* ICSID Case No. ARB/03/28, Decision on Annulment, March 1, 2011 (ARLA-0045), ¶¶ 212-213 ("*Duke Energy v. Peru*"); *Hussein Nuaman Soufraki v. The United Arab Emirates,* ICSID Case No. ARB/02/7, Decision of the *ad hoc* Committee on the Application for Annulment of Mr. Soufraki, June 5, 2007 (ARLA-0034), ¶¶ 85-86 ("*Soufraki v. UAE*")).

[73] Claimant's Counter-Memorial, ¶ 30 (citing *Wena Hotels Ltd. v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Decision on Annulment, February 5, 2002 (ARLA-0023), ¶ 25 ("*Wena v. Egypt*")).

[74] Claimant's Counter-Memorial, ¶ 32.

[75] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic,* ICSID Case No. ARB/97/3, Decision on the Argentine Republic's Request for Annulment of the Award Rendered on August 20, 2007, August 10, 2010 (ACLA-0015), ¶ 245 ("*Vivendi* II") ("must be 'evident'"); *Repsol YPF Ecuador S.A. v. Empresa Estatal Petróleos del Ecuador (Petroecuador),* ICSID Case No. ARB/01/10, Decision on the Application for Annulment, January 8, 2007 (ACLA-0006), ¶ 36 ("obvious by itself"); *Azurix v. Argentina* (ACLA-0010), ¶ 68 ("obvious"); *Soufraki v. UAE* (ARLA-0034), ¶ 39 ("obviousness") (citing *Webster's Revised Unabridged Dictionary* (1913) ("'clear,' 'plain,' 'obvious,' 'evident'….")); *CDC v. Seychelles* (ARLA-0029), ¶ 41 (citing *Wena v. Egypt* (ARLA-0023), ¶ 25 ("clear or 'self-evident'")); *MCI,* ¶ 49 (citing *Wena v. Egypt* (ARLA-0023), ¶ 25) ("self-evident"); *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Decision of the *ad hoc* Committee, March 25, 2010 (ARLA-0042), ¶ 96 ("*Rumeli v. Kazakhstan*") ("evident on the face of the Award"); *Helnan International Hotels A/S v. Arab Republic of Egypt,* ICSID Case No. ARB/05/19, Decision of the *ad hoc* Committee, June 14, 2010 (ARLA-0043), ¶ 55 ("*Helnan v. Egypt*") ("obvious or clear"); *Malicorp Limited v. Arab Republic of Egypt,* ICSID Case No. ARB/08/18, Decision on the Application for Annulment of Malicorp Limited, July 3, 2013 (ARLA-0050), ¶ 56 ("*Malicorp v. Egypt*") ("both obvious and serious"); *Tza Yap Shum v. Republic of Peru*, ICSID Case No. ARB/07/6, Decision on Annulment, February 12, 2015 (ACLA-0024), ¶ 82 ("*Tza Yap Shum v. Peru*") ("must be evident"); *SGS Société Générale de Surveillance S.A. v. Republic of Paraguay*, ICSID Case No. ARB/07/29, Decision on Annulment, May 19, 2014 (ARLA-0055), ¶ 122 ("textually obvious and substantively serious"); *Libananco Holdings Co. Limited v. Republic of Turkey*, ICSID Case No. ARB/06/8, Decision on Annulment, May 22, 2013 (ACLA-0022) ¶ 82 ("*Libananco v. Turkey*") ("'self-evident,' 'clear,' 'plain on its face' or 'certain'"); *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment of the Award, November 2, 2015 (ACLA-0026), ¶ 57 ("*Occidental v. Ecuador*") ("perceived without difficulty"); *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey,* ICSID Case No. ARB/11/28, Decision on Annulment, December 30, 2015 (ACLA-0027), ¶ 56 ("*Tulip v. Turkey*") ("obvious, clear or easily recognizable"); *Ioan Micula,*

20

tribunal committed an excess of powers and whether such excess was "manifest," an *ad hoc* committee might have to review the record of the original Arbitration proceedings in order to assess the Parties' submissions in the annulment proceedings in their proper procedural and factual context.

105.   Latvia asserts that the Tribunal in this case manifestly exceeded its powers in two respects, because: (i) it exercised a jurisdiction that it did not possess, and (ii) it failed to apply the proper applicable law. The Committee will therefore address in turn the legal standard concerning an alleged manifest excess of powers by the Tribunal with respect to these two allegations.

106.   With regard to jurisdiction, *ad hoc* committees have generally recognized that an award may be annulled if a tribunal asserted jurisdiction when there was no jurisdiction, when the tribunal exceeded the scope of its jurisdiction, or when the tribunal asserted its jurisdiction over an issue that is not encompassed in the consent of the Parties.[76] Some *ad hoc* committees have held that the requirement that an excess of powers be "manifest" also encompasses the need to show that the excess be material to the outcome of the case.[77] At the same time, committees have also consistently acknowledged that arbitral tribunals are the judges of their own competence and have the power to decide whether or not they have jurisdiction on the basis of the parties' arbitration agreement and the mandatory jurisdictional requirements of the ICSID Convention. Moreover, as held in *Fraport*

---

*Viorel Micula and others v. Romania*, ICSID Case No. ARB/05/20, Decision on Annulment, February 26, 2016 (ARLA-0060), ¶ 123 ("*Micula v. Romania*") ("evident, obvious, clear or easily recognizable"); *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Annulment, February 1, 2016 (ACLA-0028), ¶ 173 ("*Total v. Argentina*"); *TECO v. Guatemala* (ARLA-0061), ¶¶ 77, 181. *See also,* Schreuer et al. (ARLA-0037), p. 938.

[76] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, July 3, 2002 (ARLA-0024), ¶ 86 ("*Vivendi I*"); *Patrick Mitchell v. Democratic Republic of Congo*, ICSID Case No. ARB/99/7, Decision on the Application for Annulment of the Award, November 1, 2006 (ARLA-0032), ¶¶ 47, 48, 67 ("*Patrick Mitchell v. Congo*"); *CMS Gas Transmission Company v. Argentine Republic,* ICSID Case No. ARB/01/8, Decision of the *ad hoc* Committee on the Application for Annulment of the Argentine Republic, September 25, 2007 (ACLA-0009), ¶ 47 (quoting *Klöckner v. Cameroon* (ARLA-0009), ¶ 4); *Azurix v. Argentina* (ACLA-0010), ¶ 45 (quoting *Klöckner v. Cameroon* (ARLA-009), ¶ 4); *Industria Nacional de Alimentos, S.A. and Indalsa Perú, S.A. (formerly Empresas Lucchetti, S.A. and Lucchetti Perú, S.A.) v. Republic of Peru*, ICSID Case No. ARB/03/4, Decision on Annulment, September 5, 2007 (ARLA-0035), ¶ 99 ("*Lucchetti v. Peru*"); *MCI*, ¶ 56 (quoting *Lucchetti v. Peru* (ARLA-0035), ¶ 99); *Occidental v. Ecuador* (ACLA-0026), ¶¶ 49-51; *Tulip v. Turkey* (ACLA-0027), ¶ 55; *EDF International S.A., SAUR International S.A. and León Participaciones Argentinas S.A. v. Argentine Republic*, ICSID Case No. ARB/03/23, Decision on Annulment, February 5, 2016 (ACLA-0029), ¶ 191; *Total v. Argentina* (ACLA-0028), ¶ 242; *Micula v. Romania* (ARLA-0060), ¶ 125; *TECO v. Guatemala* (ARLA-0061), ¶ 77.

[77] *Vivendi* I (ARLA-0024), ¶ 86 ("clearly capable of making a difference to the result"); *Soufraki v. UAE* (ARLA-0034), ¶ 40 ("at once be textually obvious and substantially serious"); *Fraport v. Philippines (ACLA-0017)*, ¶ 44 ("demonstrable and substantial and not doubtful"); *AES v. Hungary* (ACLA-0020), ¶ 31; *Impregilo v. Argentina* (ARLA-0053), ¶ 128 ("obvious, self-evident, clear, flagrant and substantially serious"); *Libananco v. Turkey* (ACLA-0022), ¶ 102; *Total v. Argentina* (ACLA-0028), ¶ 308.

21

389

*v. Philippines*, a committee "must determine the reasonableness of the Tribunal's approach in light of the evidence and submissions which were before the Tribunal and not on the basis of new evidence."[78]

107.    As to the applicable law, while failure to apply the applicable law is a ground for annulment, the incorrect application or interpretation of that law cannot give rise to annulment.[79] Some committees have stressed in that regard that a fine line exists between a failure to apply the proper law and its erroneous application.[80] This was aptly summarized by the *ad hoc* committee in *Enron v. Argentina,* when it observed that:

> "[T]here is a distinction between non-application of the applicable law (which is a ground for annulment), and an incorrect application of the applicable law (which is not), although this is a distinction that may not always be easy to draw." [81]

108.    Committees however differ as to whether an egregious error in the application of the proper law may amount to a failure to apply the proper law. In this regard, the Committee shares the view of the *ad hoc* committee in *Occidental v. Ecuador* which held as follows:

> "Misinterpretation or misapplication of the proper law to be applied to the merits, even if serious, does not justify annulment. In exceptional circumstances, however, a gross or egregious error of law could be construed to amount to a failure to apply the proper law, and could give rise to the possibility of annulment. But the threshold for applying this exceptional rule must be set very high – otherwise the annulment mechanism permitted by the Convention would expand into a prohibited appeal system on the merits."[82]

C.    **FAILURE TO STATE REASONS (ICSID CONVENTION ARTICLE 52(1)(E))**

1.    **The Parties' Positions**

a.    *Latvia's Position*

109.    According to Latvia, the purpose of the requirement to state reasons is to ensure that the parties to a dispute can understand the basis on which an ICSID arbitral tribunal came to its decision.[83] The

---

[78] *Fraport v. Philippines* (ACLA-0017), ¶ 45.

[79] Aron Broches, "Observations on the Finality of ICSID Awards" *in Selected Essays: World Bank, ICSID, and Other Subjects of Public and Private International Law* 299 (1995) (ARLA-0080), ¶¶ 354-355.

[80] *Soufraki v. UAE* (ARLA-0034), ¶ 85. *See also, Klöckner v. Cameroon* (ARLA-0009), ¶ 60.

[81] *Enron Creditors Recovery Corporation (previously Enron Corporation) & Ponderosa Assets, L.P. v. Argentine Republic*, Decision of the *ad hoc* Committee, July 30, 2010 (ACLA-0014), ¶ 68.

[82] *Occidental v. Ecuador* (ACLA-0026), ¶ 56 (footnotes omitted).

[83] Applicant's Memorial, ¶ 30.

ground contained in Article 52(1)(e) is connected to the obligation found in Article 48(3) for the tribunal to issue an award dealing "with every question submitted to the Tribunal," and stating "the reasons upon which it is based."[84] As stated in the *MINE v. Guinea* annulment committee's decision, "the award must enable one 'to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion.'"[85]  In Latvia's own words, "the award must demonstrate, through reasons, that it is not arbitrary on any material point.  It can be wrong, so long as it is reasoned; but it cannot through a failure of reasoning, leave the reader thinking that it may be arbitrary."[86]

110.   According to Latvia, ICSID tribunals have "a duty to render an award that allows readers to comprehend and follow its reasoning."[87]  As a result, "ICSID awards are susceptible to annulment for a failure to state reasons if the arbitral tribunal offered no reasons for its decision, or gave reasons that were unintelligible, contradictory, or frivolous, on a point that was essential to the outcome of the case."[88] Latvia further argues that "[i]ncoherent reasoning"[89] and "contradictory"[90] reasoning by an ICSID tribunal can constitute a failure to give reasons in the sense of Article 52(1)(e).[91] Latvia also contends that "perfunctory" arguments in an ICSID tribunal's reasoning can lead to annulment on the basis of Article 52(1)(e).[92]  In support, Latvia refers to the decision in *Klöckner v. Cameroon*, where the committee found that "'two genuinely contradictory reasons cancel each other out' and therefore must be equated to the absence of any reasons to explain the basis for the decision,"[93] and to an extract of a widely-cited commentary of the ICSID Convention where the authors explain that, in the context of Article 52(1)(e), "[n]o doubt frivolous perfunctory

---

[84] Applicant's Memorial, ¶ 28.

[85] Applicant's Reply, ¶ 12 (citing *MINE v. Guinea* (ARLA-0012), ¶ 5.09).

[86] Transcript Day 1, p. 48, lines 8-12.

[87] Transcript Day 1, p. 52, lines 21-22.

[88] Applicant's Memorial, ¶ 29 (citing, *inter alia*, *Vivendi* I (ARLA-0024), ¶ 65; and Schreuer et al. (ARLA-0037), p. 1008, ¶ 377.

[89] Applicant's Memorial, ¶ 31 (citing *Klöckner v. Cameroon* (ARLA-0009), ¶ 120; *Amco Asia Corp v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on the Application for Annulment, May 16, 1986 (ARLA-0010), ¶ 43; *Soufraki v. UAE* (ARLA-0034), ¶¶ 122-123).

[90] Applicant's Memorial, ¶ 31 (citing *Klöckner v. Cameroon* (ARLA-0009), ¶ 116; *Patrick Mitchell v. Congo* (ARLA-0032), ¶ 21; *Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Decision on the Annulment Application of Caratube International Oil Company LLP, February 21, 2014 (ARLA-0054), ¶ 102; *Standard Chartered v. TANESCO* (ARLA-0072), ¶¶ 610-611).

[91] Applicant's Memorial, ¶ 34.  *See also*, Transcript Day 1, p. 50, lines 18-20, and p. 51, lines 11-17 (quoting from *Soufraki v. UAE* (ARLA-0034), ¶¶ 122 and 126); Applicant's Memorial, ¶ 31.

[92] Transcript Day 2, p. 48, lines 8-12.

[93] Applicant's Memorial, ¶ 31.  *See also*, Applicant's Reply, ¶ 14 (citing *Klöckner v. Cameroon* (ARLA-0009), ¶ 151).

or absurd arguments by a tribunal would not amount to 'reasons'."[94] In sum, according to Latvia, the test should be "whether in light of the evidence, factual and expert, that the Tribunal has referred to, the reasons on the issue of causation were adequately coherent so as to explain logically the conclusions reached in the award."[95]

111.   Finally, Latvia argues that "[a]nnulment of an ICSID award based on a failure to state reasons requires the applicant to demonstrate that the deficiency of reasoning relates to an issue that is relevant to the tribunal's overall decision in the award."[96] In other words, the failure to state reasons has to relate to an issue that is material to the outcome of the case in order to trigger the annulment of the award.[97]

### b.   UAB E energija's Position

112.   Like Latvia, UAB E energija submits that the standard of Article 52(1)(e) is related to the requirement contained in Article 48(3) of the ICSID Convention, namely that an award "shall state the reasons upon which it is based."[98]

113.   UAB E energija insists, however, on the idea that Article 52(1)(e) does not warrant an evaluation of the quality or persuasiveness of the tribunal's reasoning. In UAB E energija's words, "as long as reasons have been stated, even if they are incorrect, unconvincing or non-exhaustive, the award cannot be annulled on this ground."[99]

114.   UAB E energija also agrees with Latvia that an award can be annulled on the ground found in Article 52(1)(e) when there is a failure to state reasons and when "the absent reasons [are] necessary to the tribunal's decision."[100] In other words, "the award may be annulled where there is a failure to answer an outcome-determinative question which leads to a failure of intelligibility of a tribunal's reasoning."[101]

---

[94] Schreuer et al (ARLA-0037), p. 998, ¶ 344.

[95] Transcript Day 1, p. 55, lines 19-24.

[96] Applicant's Memorial, ¶ 32 (citing *Standard Chartered Bank v. TANESCO* (ARLA-0072), ¶ 609).

[97] Applicant's Memorial, ¶ 39 (explaining that "[i]f reasons are absent on a material issue […], the Award must be annulled.").

[98] Claimant's Counter-Memorial, ¶ 40.

[99] Claimant's Counter-Memorial, ¶ 95 (citing *Micula v. Romania* (ARLA-0060), ¶ 135).

[100] Claimant's Counter-Memorial, ¶ 42 (citing *MINE v. Guinea* (ARLA-0012), ¶ 5.13).

[101] Claimant's Counter-Memorial, ¶ 47.

115.     Based on a review of ICSID annulment committees' case law, UAB E energija concludes that "to be successful, Latvia must show that there is a complete lack of reasons or that it is impossible to follow or infer the tribunal's reasoning on a determinative finding."[102]

### 2.    The Committee's Analysis

116.     Article 48(3) of the ICSID Convention provides that an award shall state the reasons upon which it is based.[103] ICSID Arbitration Rule 47(1)(i) provides that the award shall contain "the decisions of the Tribunal on every question submitted to it, together with the reasons upon which the decision is based."

117.     Several committees have held that it does not matter for purposes of annulment whether the tribunal's reasoning is correct or convincing; what matters is that the flow of the reasoning can be followed to its conclusion. Both Parties have referred to the holding by the *MINE v. Guinea* committee that "the requirement to state reasons is satisfied as long as the award enables one to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion, even if it made an error of fact or of law. This minimum requirement is in particular not satisfied by either contradictory or frivolous reasons."[104]

118.     Indeed, awards must be drafted in such a way that the reasoning should logically follow and be understood. The *Micula v. Romania* committee noted in this regard:

> "Unreasoned awards can be annulled, because parties should be able to ascertain to what extent a tribunal's findings are based on a correct interpretation of the law and on a proper evaluation of the facts. However, as long as reasons have been stated, even if incorrect, unconvincing or non-exhaustive, the award cannot be annulled on this ground. Article 52(1)(e) does not permit an enquiry into the quality or pervasiveness of the reasons."[105]

119.     The Committee notes that reasons need not be explicitly stated as long as the reader can understand the decision reached by the tribunal. However, even though reasons can be implicitly inferred from a tribunal's reasoning, an *ad hoc* committee should not strive to reconstruct those reasons, or, to use the words of the *Klöckner v. Cameroon* committee, it should not:

---

[102] Claimant's Counter-Memorial, ¶ 49.

[103] Claimant's Counter-Memorial, ¶ 40.

[104] *MINE v. Guinea* (ARLA-0012), ¶ 5.09. *See also, AMCO* II (ACLA-0003), ¶ 1.18.

[105] *Micula v. Romania* (ARLA-0060), ¶ 135.

> "[D]eal '*ex post facto*' with questions submitted to the Tribunal which the Award left unanswered. The only role of the Committee here is to state whether there is one of the grounds for annulment set out in Article 52 of the Convention, and to draw the consequences under the same article. In this sense, the Committee defends the Convention's legal purity."[106]

120.    The Committee also shares the view of the *ad hoc* committee in *Standard Chartered Bank v. TANESCO*, when it stated that:

> "[A]n annulment proceeding is not concerned with how the tribunal appreciated the arguments and evidence submitted by the parties or the conclusion it arrived therefrom. Instead, it is merely concerned that such assessment or evaluation indeed took place, on a fair and equitable basis, and that the findings of the Tribunal were based in its appreciation and analysis of said evidence and arguments, and thus is not arbitrary."[107]

121.    As to the argument made by Latvia that, for an award to be annulled on this ground, the failure to state reasons has to relate to an issue that is material to the outcome of the case, the Committee notes that only failure to address a matter that would have been decisive for the outcome of the case could amount to a failure to state reasons leading to the annulment of the award.[108]

## V.    THE APPLICATION FOR ANNULMENT

122.    According to Latvia, the Award suffers from five distinct defects in the Tribunal's findings on (i) applicable law, (ii) causation, (iii) quantum, (iv) interest and (v) jurisdiction. Latvia argues that due to each of these defects (taken together or separately), the Award should be annulled based on either or both manifest excess of power and failure to state reasons. UAB E energija objects to Latvia's application for annulment, arguing that the Tribunal's findings on the five aforementioned issues are not defective, and that, even if they were, they would not give rise to annullable errors based on the grounds invoked by Latvia.

123.    In the present section, the Committee addresses the Tribunal's decision on the applicable law (**A.**), findings on causation (**B.**), decision on quantum (**C.**), reasoning on interest (**D.**), and decision on jurisdiction (**E.**). [109]

---

[106] *Klöckner v. Cameroon* (ARLA-0009), ¶¶ 143-151.

[107] *Standard Chartered v. TANESCO* (ARLA-0072), ¶ 61.

[108] See, *Suez v. Argentina* (ACLA-0033), ¶ 163.

[109] At the Hearing, Latvia focused on the issue of causation, and connected it to the issue of quantum and interest. *See* Transcript Day 1, p. 5 lines 7-20; p. 5 line 24 – p. 6 line 8. While the Committee sees the reasons why Latvia decided

26

### A. THE TRIBUNAL'S DECISION ON THE APPLICABLE LAW

#### 1. Latvia's Position

124.   Latvia submits that the Tribunal's decision on the law to be applied to the Arbitration was deficient and that the Award should be annulled based on both Articles 52(1)(b) and Articles 52(1)(e) of the ICSID Convention.

125.   According to Latvia, "[a]n ICSID Tribunal will exceed its powers if it fails to apply the proper applicable law to the dispute before it."[110]  Latvia refers to Article 42(1) of the ICSID Convention, and contends that, pursuant to this provision, "the application of the proper law is an essential element of the parties' consent to arbitrate and circumscribes the powers of an ICSID tribunal."[111]

126.   Latvia submits that the Tribunal failed to address the Parties' dispute regarding the appropriate sources of law.[112]  In particular, it claims that "[w]hile the Tribunal decided that there was an implicit agreement between the Parties that the primary sources of applicable law would be the BIT, 'general international law' and Latvian law, the Tribunal failed to resolve the Parties' dispute as to whether the PECL [Principles of European Contract Law], the UNIDROIT Principles and the Trans-Lex Principles formed part of 'general international law.'"[113] According to Latvia, the Tribunal should have made a determination as to the applicability of those principles, especially since Latvia relied on them in the Arbitration.[114] It argues that the Tribunal "ignored these principles,"[115] and that this should be considered as a failure "to identify and apply the correct applicable law."[116] Such failure, which is "a serious defect in the Tribunal's Award,"[117] constitutes

---

to group these three issues during the Hearing, the present decision addresses the three issues separately, for the sake of clarity.

[110] Applicant's Memorial, ¶ 21 (citing, *inter alia*, *Malicorp v. Egypt* (ARLA-0050), ¶ 48; *Standard Chartered v. TANESCO* (ARLA-0072), ¶ 282).

[111] Applicant's Memorial, ¶ 21 (citing *Helnan v. Egypt* (ARLA-0043), ¶ 41).

[112] Applicant's Memorial, ¶¶ 25-26; Applicant's Reply, ¶¶ 7-10.

[113] Applicant's Memorial, ¶ 25, citing the Award (AR-0003), ¶ 792.

[114] Applicant's Reply, ¶ 9.

[115] Applicant's Reply, ¶¶ 10 and 20 (noting that "the Tribunal offered no explanation as to why the PECL, the UNIDROIT Principles and the Trans-Lex Principles were inapplicable, nor why no further reference to these principles was in order.").

[116] Applicant's Memorial, ¶ 26.

[117] Applicant's Memorial, ¶ 26. *See also*, Applicant's Reply, ¶ 18 (explaining that "The tribunal did not err in the application of the law agreed between the parties. It ignored altogether general principles of law, comprising the PECL, the UNIDROIT Principles and the Trans-Lex Principles, despite the fact that the Respondent relied on them. This is not simply an error in the application of the law or an 'inadvertent oversight of a detail in the law.'").

a "manifest excess of power," because it is both "textually obvious and substantively serious,"[118] and because Latvia's "substantive defenses to liability based on the application of the PECL, the UNIDROIT Principles and the Trans-Lex Principles were essential to the question of liability and could have led the Tribunal to reach a different decision."[119] Consequently, the Award should be annulled.[120]

127.  Furthermore, Latvia contends that "[t]he Tribunal's disregard for the Parties' dispute regarding the scope and content of the applicable law also amounts to a failure to state reasons on an essential issue of consequence for the outcome of the case."[121]

128.  More specifically, Latvia submits that in its written submissions in the Arbitration, it advanced defenses to liability under the BIT which were based on principles codified in the PECL.[122] In addition, Latvia contends that, during the hearing on the merits in the Arbitration, it explained, in response to a question asked by the Tribunal, the practical implications that would result from an application of the PECL in the case.[123] While Latvia demonstrated during the Arbitration proceedings that the PECL (as well as the UNIDROIT Principles and the Trans-Lex Principles) were relevant to the outcome of the dispute, the Tribunal did not address the applicability of these principles and offered no explanation for this.  Latvia further argues that, even if the Tribunal implicitly decided that the above-referred principles were inapplicable, "it offered no reasoning to support such a conclusion."[124]

129.  Latvia concludes that, as a result, the Award should be annulled pursuant to Article 52(1)(e) of the ICSID Convention for a "failure to state the reasons" on which it is based.[125]

130.  At the Hearing, Latvia decided not to refer to the question of applicable law, explaining that it was "content to rely on its written submissions."[126]

---

[118] Applicant's Memorial, ¶ 27 (citing, *inter alia*, *Soufraki v. UAE* (ARLA-0034), ¶ 40).

[119] Applicant's Memorial, ¶ 27.

[120] Applicant's Memorial, ¶ 23; Applicant's Reply, ¶ 21.

[121] Applicant's Memorial, ¶ 34.

[122] Applicant's Memorial, ¶ 36; Applicant's Reply, ¶ 15.

[123] Applicant's Memorial, ¶ 37.

[124] Applicant's Reply, ¶ 12.

[125] Applicant's Reply, ¶ 16.

[126] *See* Transcript Day 1, p. 5 lines 20-21.

## 2.   UAB E energija's Position

131.   According to UAB E energija, there is no basis to annul the Award with respect to the Tribunal's decision on the applicable law. Latvia's position on the applicable law is misguided because Latvia never argued in the Arbitration proceedings that "PECL, UNIDROIT Principles or Trans-Lex Principles formed part of the applicable law for the purposes of UAB E energija's claims under the BIT."[127] While UAB E energija admits that Latvia did refer to these principles in the Arbitration, it contends that Latvia did so "only as what it described as an 'extra verification' of the interpretation of the commercial contracts under their proper applicable law (Latvia law)."[128] As a result, according to UAB E energija, there was no dispute between the Parties as to the applicability of these principles, and the Tribunal could not have erred when it ruled not to decide on the applicability of these principles in its Award.[129]

132.   In addition, UAB E energija argues that the Tribunal in any event "*did* make a decision on the applicable law, and did thereby consider Latvia's arguments (such as they may have been) in relation to the PECL, UNIDROIT Principles and the Trans-Lex Principles."[130]  According to UAB E energija, the Tribunal "was very clear as to the applicable law"[131] and therefore abided by the "obligation to identify the applicable law to the dispute pursuant to Article 42(1) of the ICSID Convention."[132]

133.   Based on these considerations, UAB E energija submits that the Tribunal "did not fail to apply the applicable law"[133] and that "there is no difficulty for a normal reader of the Award to understand the Tribunal's arguments and to follow its line of reasoning leading up to its final conclusions."[134]

---

[127] Claimant's Counter-Memorial, ¶ 56; Claimant's Rejoinder, ¶ 16.

[128] Claimant's Rejoinder, ¶ 16.

[129]  Claimant's Counter-Memorial, ¶ 58. *See also*, Transcript Day 1, p. 137, lines 5-6 (explaining that during the Arbitration, there was an "agreement between the parties that the relevant contracts concluded by the local Latvian parties were governed by Latvian law. The parties did not dispute that.").

[130] Claimant's Counter-Memorial, ¶ 65 (emphasis in the original). *See also*, Transcript Day 1, p. 142, line 24 – p. 143, line 2 (explaining that "the Tribunal did state its reasons for its decision on the applicable law. It did so by reference to Article 42 of the Convention").

[131] Claimant's Counter-Memorial, ¶ 66.

[132] Claimant's Counter-Memorial, ¶ 67.  *See also*, Claimant's Rejoinder, ¶ 17.

[133] Claimant's Counter-Memorial, ¶ 70.

[134] Claimant's Counter-Memorial, ¶ 71.

UAB E energija therefore concludes that the Tribunal's decision on the applicable law does not constitute a manifest excess of power and the Tribunal did not fail to state reasons.[135]

### 3. The Committee's Analysis

134. The Committee recalls that, although the matter of the Tribunal's alleged failure to explain its decision on the applicable law was not addressed by Latvia in its oral submissions at the Hearing, Latvia confirmed at the Hearing that the submissions made in its written pleadings in this regard were maintained.[136]

135. Latvia claims that the Tribunal failed to apply the PECL, UNIDROIT Principles or Trans-Lex Principles as part of general international law, in spite of the fact that Latvia claimed that they were relevant to the Tribunal's determination. Latvia asserts that the Tribunal implicitly rejected these principles but provided no reasoning for the rejection. *Ergo*, the Tribunal failed to state reasons for its decision and the Award should be annulled on this ground. In addition, the fact that the Tribunal disregarded these general principles in spite of the Respondent's reliance on them also constitutes a manifest excess of power.

136. UAB E energija, for its part, argues that Latvia did not rely on these principles as part of the applicable law in the original Arbitration but merely invoked them for the interpretation of the relevant commercial contracts which were governed by Latvian law. In UAB E energija's opinion, Latvia's claims must fail for three reasons: (i) because the arguments that it makes in these annulment proceedings were not raised in the Arbitration; (ii) because the Tribunal provided reasons for its findings on the applicable law; and (iii) because, even if there was a failure to apply the relevant principles invoked by Latvia, such failure was not material to the outcome of the case and does not justify annulment.[137]

137. In proceeding with its analysis, the Committee is mindful not to engage in a process of *ex post facto* interpretation of Latvia's arguments in the Arbitration. Having said that, the Committee also considers it necessary to review these arguments in order to ascertain whether the Tribunal failed to consider the proper applicable law and thus exceeded its powers and/or failed to state reasons under Articles 52(1)(b) and (e) of the ICSID Convention, as Latvia alleges in these proceedings.

---

[135] Claimant's Counter-Memorial, ¶ 71.
[136] Transcript Day 1, p. 111, lines 6-11.
[137] Transcript Day 1, p. 138, lines 1-10.

138.    Latvia argued in its written submissions in the Arbitration that the applicable law was composed of both Latvian law and international law and that the PECL, UNIDROIT Principles or Trans-Lex Principles formed part of the latter. For instance, the Counter-Memorial referred to the PECL Principles as "general principles of law recognized by civilized nations" pursuant to Article 38(1)(c) of the ICJ Statute[138] and as "guiding principles" in contractual interpretation.[139]

139.    In the Rejoinder, Latvia referred to "general principles of law as suitable when gaps and uncertainties exist as to the particular situation" and mentioned the PECL Principles in that context.[140] The UNIDROIT and Trans-Lex Principles were also referred to in the Rejoinder as "inherent principles guiding the conclusion, interpretation and application of contractual terms in international business contracts."[141] Latvia added in the same pleading that:

> "additional justification for invocation of PECL is the need to have a neutral viewpoint (in the sense of international law) over the disputed aspects pertaining to commercial matters underlying the Concession Agreement and related commercial agreements (...) The Tribunal can have a neutral criterion in determining these matters, instead of indulging into a tedious and quarrelsome task of deciphering exactly what result stems from formal application of Latvian law (being the applicable law to the commercial agreements)."[142]

140.    In addition, Latvia stated in the Rejoinder, in dealing with the Settlement Agreement: "Respondent also contends that the same result is achieved, when analyzing the Settlement Agreement from the standpoint of its formal applicable law (Latvian law)."[143] Apart from this reference made with respect to the Settlement Agreement, the Committee observes that nowhere in its submissions in the original Arbitration did Latvia explain what impact these principles would have had on the outcome of the case if they were specifically applied as part of the applicable law.

141.    Thus, it can be concluded that, to the extent that Latvia relied on the PECL, UNIDROIT Principles or Trans-Lex Principles in its written pleadings, it did so because in its view these principles reflected a general practice and provided guidance in the interpretation and application of contracts, offering a "neutral criterion" of interpretation. It also appears that Latvia never relinquished Latvian

---

[138] Chart at Claimant's Counter-Memorial, ¶ 54, citing Arbitration Counter-Memorial, ¶ 3.10.

[139] Chart at Claimant's Counter-Memorial, ¶ 54, citing Arbitration Counter-Memorial, ¶ 3.16. *See also,* ¶ 3.37.

[140] Chart at Claimant's Counter-Memorial, ¶ 54, citing Arbitration Rejoinder, ¶ 18.

[141] Chart at Claimant's Counter-Memorial, ¶ 54, citing Arbitration Rejoinder, ¶ 19.

[142] Chart at Claimant's Counter-Memorial, ¶ 54, citing Arbitration Rejoinder, ¶ 20.

[143] Chart at Claimant's Counter-Memorial, ¶ 54, citing Arbitration Rejoinder, ¶ 24.

law as the proper applicable law to the contracts but referred to these principles as additional considerations to be employed in the process of interpretation.

142.    This conclusion is confirmed further by Latvia's arguments at the hearing in the Arbitration, where only Latvian law and international law were mentioned in the analysis of the applicable law and no reference to any of these principles was made at all. It is particularly telling in this regard that Slides 7 and 8 of Latvia's opening presentation, entitled "Applicable Law (1)" and "Applicable Law (2)," respectively listed Latvian law "as a starting point" and international law "as a supervisor with BIT standards."[144] In Slide 8, Latvia provided a list of the different elements of Latvian law and international law that applied but did not expressly include the PECL, UNIDROIT Principles or Trans-Lex Principles.[145]

143.    It follows that Latvia did not expressly, or clearly, formulate an argument in the Arbitration – as it does in these proceedings – that the PECL, UNIDROIT Principles or Trans-Lex Principles formed part of the applicable law for purposes of the Claimant's claims pursuant to the BIT. Instead, Latvia recognized that international law applied in the case but the relevant contracts were governed by Latvian law. For instance, in its Rejoinder in the Arbitration, Latvia stated:

> "[W]hile the Treaty and other public international law provisions (such as customary rules, general principles of law) are obviously the sole legal rules applicable in this case under international law, it also needs emphasizing that Treaty (both expressly and implicitly) authorizes application of compatible national law provisions. For these reasons, Respondent`s treatment of the Concession Agreement and the related agreements as commercial is concordant with the nature and contents of those documents, as well as legal provisions of applicable Latvian law (…). That is, treatment of those agreements as commercial complies both with the sense and meaning of the Treaty, as well as applicable Latvian law."[146]

144.    It was on the basis of this case as pleaded by Latvia in the Arbitration that the Tribunal decided the matter of the applicable law in the Award. With these considerations in mind, the Committee turns to the Tribunal's findings as reflected in the Award.

145.    The passages of the Award on the applicable law are at paragraphs 582-584 (summarizing the Claimant's position), 717-718 (summarizing the Respondent's position) and 790-793 (containing

---

[144] Respondent's Opening Presentation in the Arbitration, dated February 23, 2015 (AC-0011), pp. 9-10.

[145] Respondent's Opening Presentation in the Arbitration, dated February 23, 2015 (AC-0011), p. 10.

[146] Chart at Claimant's Counter-Memorial, ¶ 54, citing Arbitration Rejoinder, ¶¶ 14-15.

the Tribunal's reasoning). In particular, in describing the Respondent's position, the Tribunal noted as follows:

> "As the 'concession arrangement' was 'basically spelled out in commercial agreements', the Respondent invokes the application of the Principles of European Contract Law, the 2010 UNIDROIT Principles of International Commercial Contracts and the Trans-Lex Principles which may be considered as general principles of law recognised by civilized nations within the meaning of Article 38(1)(c) of the Statute of International Court of Justice, contending that the application of such principles is suitable where specific issues are to be decided and gaps are found to exist in the abstract principles set out in an investment treaty."[147]

146.    In providing its reasons for the decision on liability, the Tribunal observed that – given its finding that the dispute was within its jurisdiction under the BIT and the ICSID Convention – it had to turn to Article 42 of the Convention in order to determine the applicable law.[148] On that basis, the Tribunal held as follows:

> "In the Tribunal's view, acceptance of the offer to arbitrate in Article 7 of the BIT establishes an implicit agreement that the applicable law consists primarily of the standards of protection contained in the BIT, but that recourse may be had to general international law as well as to the domestic law of Latvia."[149]

147.    The Tribunal further considered that:

> "[I]t is not in dispute that *(i)* Article 1(1) of the BIT refers to Latvian laws and regulations, *(ii)* such laws and regulations apply to the actions of Latvian executive and judicial authorities and *(iii)* the agreements entered into by Latgales Enerģija with the Municipality, Rēzeknes Siltumtīkli and Rēzeknes Enerģija are governed by such laws and regulations. As follows from the preceding paragraph, the Tribunal considers that it is empowered by Article 42(1) of the ICSID Convention to interpret and apply such laws and regulations in so far as necessary to determine the dispute that has been referred to it.[150]

148.    Thus – after a short introduction explaining Latvia's position – the Award does not discuss further Latvia's arguments on the PECL, the UNIDROIT Principles and the Trans-Lex Principles. Latvia contends that the Tribunal failed to identify and apply the applicable law because it "simply ignored

---

[147] Award (AR-0003), ¶ 718.

[148] Award (AR-0003), ¶¶ 790-791.

[149] Award (AR-0003), ¶ 792.

[150] Award (AR-0003), ¶ 793.

these principles," "with no reasons given."[151] in spite of the arguments advanced by Latvia in the Arbitration.

149.    The Committee does not agree with Latvia's position. As explained below, the Committee finds that the fact that the Tribunal did not address all of Latvia's arguments on the applicable law does not constitute a failure to apply the law agreed by the Parties and thus does not amount to a manifest excess of powers. Further, the Committee considers that there was no failure to state reasons.

150.    With regard to the allegation that the Tribunal manifestly exceeded its powers, the Committee finds that the Tribunal interpreted and applied the correct applicable law, which in its view consisted "primarily of the standards of protection contained in the BIT" and added that "recourse may be had to general international law as well as to the domestic law of Latvia."[152] The Award further recalls that it was undisputed between the Parties that Article 1 of the underlying BIT refers to Latvian laws and regulations, that these laws and regulations applied to the actions of the Latvian executive and judicial authorities and that the contracts were also governed by Latvian laws and regulations.[153] On this basis, the Tribunal concluded that it had the power under Article 42(1) of the ICSID Convention to interpret and apply such laws and regulations. Thus, the reasoning of the Tribunal on the applicable law follows the proper logical sequence and is clear and comprehensive.

151.    The Committee shall not speculate as to the possible reasons why the Tribunal chose not to address Latvia's arguments on the PECL, UNIDROIT Principles or Trans-Lex Principles in the Award and whether it may have found this "unnecessary" as asserted by UA E energija in these annulment proceedings.[154] The fact remains that Latvia itself – as shown by the record of the Arbitration before this Committee – argued that "the Treaty and other public international law provisions (such as customary rules, general principles of law) are obviously the sole legal rules applicable in this case under international law."[155] In addition, Latvia stated that "it also needs emphasizing that Treaty (both expressly and implicitly) authorizes application of compatible national law provisions."[156] This was Latvia's primary case and the Award properly addressed and decided that case providing the necessary reasons in that regard.

---

[151] Applicant's Reply, ¶¶ 10 and 15.

[152] Award (AR-0003), ¶ 792.

[153] Award (AR-0003), ¶ 793.

[154] Claimant's Counter-Memorial, ¶ 67.

[155] Chart at Claimant's Counter-Memorial, ¶ 54, citing Arbitration Rejoinder, ¶¶ 14-15.

[156] Arbitration Rejoinder, ¶ 14.

152.  This conclusion is corroborated by the way the Tribunal described Latvia's arguments on the application of the PECL, UNIDROIT Principles or Trans-Lex Principles when it stated that Latvia contended that these "*may* be considered as general principles of law recognised by civilized nations within the meaning of Article 38(1)(c) of the Statute of the International Court of Justice, contending that the application of such principles is suitable *where specific issues are to be decided and gaps were found to exist in the abstract principles set out in an investment treaty*."[157] It appears from this statement that the Tribunal understood Latvia's position to rely on these principles only as secondary sources. This also appears to be the correct interpretation in the light of the position advanced by Latvia in the Arbitration as recalled above.

153.  Moreover, Latvia did not explain in the Arbitration – nor does it now – whether, or how, the result would have been different if the Tribunal had expressly applied the principles in question. Latvia's Memorial on Annulment states that the "Tribunal's error was potentially material to the outcome of the case because … the Respondent's substantive defences based on the application of the PECL, the UNIDROIT Principles and the Trans-Lex Principles could have led the Tribunal to reach a different decision on liability."[158] However, this is a vague and hypothetical statement which does not explain why the application of those principles would have yielded a different result on liability.

154.  Further, as recalled above, the argument as to the potential impact to the outcome of the case of the application of these principles appears to be an after-thought since Latvia's submissions in the Arbitration did not put much weight on these principles, nor did they state that these principles, if specifically applied, would have led to different conclusions as to the outcome. To the contrary, the Committee is of the view that, in the light of the position advanced by Latvia in the Arbitration, the fact that the Tribunal did not expressly refer to the PECL and the UNIDROIT Principles in the Award is of no consequence to the outcome of the Arbitration. What matters is that the Tribunal did not misinterpret or misapply the proper applicable law or that it did so in a gross or egregious manner. It follows that there was no manifest excess of powers for failure to apply the applicable law.

155.  As to the alleged failure to state reasons, the Tribunal did provide reasons for its conclusions, which were reached on the basis of the applicable law. The section of the Award entitled "Applicable Law" sufficiently and clearly explains the Tribunal's reasoning in this regard: the Tribunal based

---

[157] Award (AR-0003), ¶ 718, referring to Latvia's Objections to Jurisdiction and Counter-Memorial, ¶ 3.10-3.11; Rejoinder ¶ 18-20. Emphasis added.

[158] Applicant's Memorial, ¶ 40.

35

its decision on Article 42 of the ICSID Convention and the relevant provisions of the BIT, according to which "the applicable law consists primarily of the standards of protection contained in the BIT, but that recourse may be had to general international law as well as the domestic law of Latvia." In the following parts of the Award, the Tribunal proceeded to apply international law to the BIT violations, and Latvian law to the contracts and to interpret the duties and powers of the Regulator, which were governed by that law.

156.    The fact that there was no specific mention in the reasoning of the Award of the PECL, the UNIDROIT Principles and the Trans-Lex Principles is not in the Committee's opinion sufficient ground to annul the Award for a failure to state reasons. As held by other annulment committees, a tribunal is not under the obligation to address every single argument made by a party, particularly if it is not decisive for the outcome.[159]

157.    Indeed, the Committee finds that, as explained above, on Latvia's own case in the Arbitration, international law and Latvian laws and regulations applied to the case. Even though Latvia argued that the principles may also be taken into account as part of the applicable law, there is no indication in the record that the express application of these principles by the Tribunal would have led to a different decision.

158.    As held by the *ad hoc* committee in the *Soufraki v. UAE* Decision on Annulment, which was cited with favour by Latvia:

> "It is also possible that a tribunal may give reasons for its award without elaborating the legal and factual bases of such reasons. So long as those reasons in fact make it possible to connect the facts or law of the case to the conclusions reached in the award, annulment may appropriately be avoided."[160]

159.    The Committee also concurs with the following position of the *Soufraki* committee:

> "[T]he Committee considers that, with regard to the reasoning of the award, if the Committee can make clear – without adding new elements previously absent – that apparent obscurities are, in fact, not real, that inadequate statements have no consequence on the solution, or that succinct reasoning does not actually overlook pertinent facts, the Committee should not annul the initial award. For example, as regards the ground that the award has failed to state the reasons on which it is based, if the *ad hoc* Committee can 'explain' the Award by clarifying reasons that seemed absent because they were only implicit, it should do so."[161]

---

[159] *TECO v. Guatemala* (ARLA-0061), ¶125; *Tza Yap Shum v. Peru* (ACLA-0024), ¶ 119.

[160] *Soufraki v. UAE* (ARLA-0034), ¶ 128.

[161] *Soufraki v. UAE* (ARLA-0034), ¶ 24.

160.    In the present instance, the Committee finds that even though the Tribunal omitted to refer to the PECL, the UNIDROIT Principles and the Trans-Lex Principles in the Award, it did not fail to provide a clear or complete reasoning on a material point. To paraphrase Latvia's own arguments in these annulment proceedings, when it comes to this matter, the Award is not "arbitrary on a material point" and it does not "through a failure of reasoning, leave the reader thinking that it may be arbitrary."[162] Furthermore, even if the Tribunal had specifically mentioned these principles in its analysis on the applicable law, there is no reason to believe – based on Latvia's own pleaded case in the Arbitration – that such specific mention would have had an impact on the Tribunal's decision and changed the outcome of the case.

161.    In the light of the above considerations, the Committee finds that annulment of the Award under Article 52(1)(b) and (1)(e) of the ICSID Convention with regard to the applicable law is not warranted and dismisses Latvia's request.

## B. THE TRIBUNAL'S FINDINGS ON CAUSATION

### 1. Latvia's Position

162.    According to Latvia, the Tribunal failed to establish or explain "how Latvia's breaches of the BIT caused [UAB E energija] to suffer the two specific heads of 'loss' that the Tribunal identified in the Award."[163] Latvia contends that such failure constitutes an annullable error pursuant to Article 52(1)(e) of the ICSID Convention.

163.    By way of background, Latvia recalls that the Tribunal found that only three impugned acts out of the 73 separate breaches alleged by UAB E energija constituted a breach of the BIT,[164] and that the Tribunal awarded damages to UAB E energija under the following two headings:

- "outstanding shareholder loans that the Claimant had granted to Latgales Enerġija and which had allegedly not been repaid (the **Shareholder Loans**);"[165] and

---

[162] Transcript Day 1, p. 48, lines 8-12.

[163] Applicant's Memorial, ¶ 42.

[164] Applicant's Memorial, ¶¶ 11-12 and 42; Transcript Day 1, p. 27, line 16 – p. 28, line 4. Latvia refers specifically to: (i) the Municipality's inaction and delay with respect to the establishment of a heat supply development plan, (ii) the declaration of an "energy crisis" by the Municipality and the consequences that this entailed for Latgales Enerġija, and (iii) the Municipality's appointment of Rēzekne Enerġija – a company owned by the Municipality – as the company responsible for district heating in Rēzekne.

[165] Applicant's Memorial, ¶ 47.

- "a payment by the Claimant under a bank guarantee that had been issued to cover the performance of certain obligations in relation to the Project (the **Danske Bank Guarantee**)."[166]

164. However, according to Latvia, the Tribunal failed to establish the causal link between the three breaches and these two items,[167] even though it ruled that such causal link was required to award damages.[168]

165. To support this argument, Latvia refers, by way of background, to the factual parts of the Award where the Tribunal discussed the issue of the Shareholder Loans and the Danske Bank Guarantee,[169] as well as to exhibits and extract of the expert reports that were cited by the Tribunal to explain its factual findings on these loans and guarantee.[170]   Latvia then points toward the sections of the Award where the Tribunal reached its conclusion on causation and damages, arguing that the Tribunal failed to consider "whether there was any evidence that the Shareholder Loans would have been repaid, and that the Danske Bank Guarantee would not have been drawn down, in the absence of the specific State conduct that it had determined was in breach of the BIT."[171]

166. In particular, Latvia focuses on paragraphs 1140 to 1144 of the Award,[172] where the Tribunal refers to the Shareholder Loans and Danske Bank Guarantee, and to the potential monetary losses that could result from them for UAB E energija.[173]

---

[166] Applicant's Memorial, ¶ 47.

[167] Applicant's Memorial, ¶ 48 (explaining that "[t]he Tribunal simply stated that it regarded these items 'as representing an actual loss suffered by the Claimant and … therefore recoverable in principle.'").

[168] Applicant's Memorial, ¶¶ 48-49.

[169] Award (AR-0003), ¶¶ 377-380; 406-410; 411-413.

[170] Assignment Agreement No. 100/2008/0625, June 25, 2008, Arbitration Exhibit C-182 (AR-0013); Assignment Agreement No. 2009/08/11-01, Arbitration Exhibit C-197 (AR-0012); *Hansel Realty Management Spain S.L. v. Latgales Energija, SIA* (Case No 3-12/4490/18), Decision of the District Court, Arbitration Exhibit C-198 (AR-0014); Extract from E energija accounts, Financial Statements for the fiscal year ended September 30, 2010, Arbitration Exhibit C-0200 (AR-0015); First Witness Statement of Aleksas Jautakis, December 2013 (extract), exhibited as CWS-2 in the Arbitration; Expert Report of Dr Serena Hesmondhalgh (the Brattle Group), December 2013 (extract), exhibited as ER Hesmondhalgh I in the Arbitration; Expert report of Michael Peer (KPMG), April 17, 2014 (extract), exhibited as ER Peer I in the Arbitration.

[171] Applicant's Memorial, ¶ 51.

[172] Applicant's Memorial, ¶¶ 48-49. *See also*, Transcript Day 1, p. 33, lines 17-18 (arguing that the part of the Award starting at ¶1140 should be seen as "the crux of the matter").

[173] Award (AR-0003), ¶¶ 1140-1144.

38

167. According to Latvia, the Tribunal's reasoning in these paragraphs is both "incoherent"[174] and "perfunctory,"[175] because the Tribunal fails to identify the causation between the breach of the BIT and the losses suffered by UAB E energija, and because "evidence that [the Tribunal] described did not support the conclusion that it reached, and [the Tribunal] cited no evidence that did support that conclusion."[176]  Specifically, Latvia argues that while the Tribunal admitted, in paragraphs 1143 and 1144 of the Award, that it had to determine "whether the Claimant is entitled" to damages,[177] and "to what extent the Claimant's actual loss was caused by the Respondent's breaches of Article 3(1),"[178] the Tribunal failed to make this determination, and instead reached the conclusion, in paragraph 1144, that "the Claimant and the Respondent have contributed to the losses suffered by the Claimant to an extent that is, all in all, broadly equivalent and that the Claimant should therefore be awarded 50% of the actual losses mentioned above."  According to Latvia, the Tribunal did not give any reasons for this conclusion other than saying that it reached this finding after "[h]aving weighed all the evidence examined in the present Award."[179]  For Latvia, this statement ("having weighed all the evidence…") "does not allow the reader to understand how the Tribunal when from A to B to the conclusion."[180] Latvia therefore contends that the Tribunal's finding on causation, and on the resulting loss, is "arbitrary."[181]  In Latvia's counsel's own words, "To an objective reader who had paid attention to the factual part of the award, and to the factual and expert evidence that the Tribunal itself had referred to, it would be difficult to reach any conclusion other than that this was an arbitrary baby-splitting exercise because the Tribunal had found breaches and did not want to leave the Claimant empty-handed."[182]

168. According to Latvia, the Tribunal's lack of reasoning on the issue of causation was exacerbated by UAB E energija's own failure to argue "for a causal link between the limited breaches of […] the BIT ultimately established and the damages it claimed to have suffered" during the Arbitration.[183]  Latvia emphasizes that UAB E energija "never sought to establish a causal link between the treaty

---

[174] Transcript Day 1, p. 38, line 21.
[175] Transcript Day 2, p. 5, lines 3-6.
[176] Transcript Day 2, p. 5, lines 7-9.
[177] Award (AR-0003), ¶ 1143.
[178] Award (AR-0003), ¶ 1144.
[179] Transcript Day 1, p. 65, lines 15-16.
[180] Transcript Day 1, p. 66, lines 19-21.
[181] Transcript Day 1, p. 67, line 4.
[182] Transcript Day 1, p. 67, lines 16-23.
[183] Applicant's Reply, ¶ 23.

39

breaches for which Latvia was held responsible and any specific type or amount of damage claimed."[184] The Tribunal in fact "recognized this flaw in [UAB E energija]'s case"[185] when it confirmed that UAB E energija's "approach to causation was 'inconsistent with its findings whereby the Regulator's revocation of the licenses was justified and whereby only certain actions or omissions of the Respondent breached Article 3(1) of the BIT.'"[186] Yet, "the Tribunal upheld damages claims for non-payment of the Shareholder Loans and the Danske Bank Guarantee drawdown, which suffered from precisely the same flaw in causation"[187] and "offered no explanation for this difference in conclusion."[188]

169.    Latvia further argues that, contrary to UAB E Energija's allegations, it did raise causation defenses on the two above-referred loss claims during the Arbitration, as recorded by the Tribunal in the Award, and that the issue of causation was material for the Tribunal's decision. According to Latvia, had the Tribunal reasoned on the causation points made by Latvia during the Arbitration, "it is likely that the Claimant would have been awarded no damages," especially because it is on this basis that the Tribunal rejected other claims for losses made by UAB E Energija.[189]

### 2.    UAB E energija's Position

170.    UAB E energija contends that: (i) the Tribunal did demonstrate causation between Latvia's specific violations of the BIT and the losses it suffered; (ii) the Tribunal did establish causation and explained the reasons in the Award; and (iii) as a result, there is no ground for annulment of the Award.[190]

171.    With respect to the Parties' positions in the Arbitration, UAB E energija argues that the damages suffered from the alleged breaches, which the Tribunal eventually rejected, overlapped with the three breaches for which the Tribunal found a violation of the BIT, and that it demonstrated that there was a causal link between all these breaches and the damages claimed.[191] In addition, UAB E energija insists that Latvia fails to point to any submission in the Arbitration in which it advanced

---

[184] Applicant's Reply, ¶ 27.

[185] Applicant's Reply, ¶ 27.

[186] Applicant's Reply, ¶ 27. *See also,* ¶ 1134 of the Award.

[187] Applicant's Reply, ¶ 27.

[188] Applicant's Reply, ¶ 27.

[189] Applicant's Reply, ¶¶ 29-31.

[190] Claimant's Counter-Memorial, ¶ 77.

[191] Claimant's Counter-Memorial, ¶¶ 79-80.

the argument now presented in the annulment proceeding, *i.e.* that the losses suffered in the form of the Shareholder loans and the Danske Bank Guarantee were not caused by the violations of the BIT that the Tribunal identified.[192]

172.    UAB E energija argues that "the Tribunal was clear as to the reasons for awarding damages to E energija."[193] Quoting from the Award, UAB E energija submits that the Tribunal "very clearly concluded that there was a causal link between Latvia's actions and [UAB E energija]'s losses."[194] In particular, UAB E energija focuses on the parts of the Award where the Tribunal first established that "the conduct for which the Respondent is responsible is one of the principal causes that ultimately resulted in the Claimant being unable to recover loans granted to Latgales Energija and having to pay a guarantee"[195] and that the amounts that UAB E energija had to pay for the Shareholder loans and the Danske Bank Guarantee constituted "an actual loss suffered by the Claimant" which should therefore be recovered.[196]

173.    Finally, UAB E energija recalls that "[a]nnulment committees do not have the power to review the adequacy of the reasons set forth by the tribunal in its award, or their correctness," and that the committees' role is "limited to analyzing whether a reader can understand how the tribunal arrived at its conclusion."[197] According to UAB E energija, in the present case, the Tribunal "presented a reasoned and evidence-based explanation as to why it awarded E energija part of the quantum claimed," and therefore the Award cannot be annulled pursuant to Article 52(1)(e).

### 3.   The Committee's Analysis

174.    Latvia contends that the Tribunal failed to give reasons as to the causal link between the Claimant's loss and Latvia's breaches of Article 3(1) of the BIT. For Latvia, "a vague reference to contributory fault cannot replace an explanation of the causal link between the breaches and the loss."[198] UAB E energija, for its part, asserts that it is clear that the Award decided the issue of causation, that the

---

[192] Claimant's Rejoinder, ¶ 29.

[193] Claimant's Counter-Memorial, ¶ 83.

[194] Claimant's Counter-Memorial, ¶ 84.

[195] Claimant's Counter-Memorial, ¶ 84 (citing Award (AR-0003), ¶ 1065 (emphasis in the original)).

[196] Claimant's Counter-Memorial, ¶ 88 (citing Award (AR-0003), ¶ 1141 (emphasis in the original)).

[197] Claimant's Counter-Memorial, ¶ 93. *See also*, Claimant's Rejoinder, ¶ 34 (explaining that "in an annulment process the examination of the reasons presented by a tribunal in an award cannot be transformed into a re-examination of the correctness of the factual and legal premises on which the award is based" and that "[t]he Committee does not have the power to review the correctness of the reasons set forth by the Tribunal in its award.").

[198] Applicant's Reply, ¶ 31.

Tribunal's logic can be followed, the reasoning is explained and the decision is based on the evidence and Parties' submissions.[199] UAB E energija further indicates that Latvia did not raise causation arguments in relation to the Shareholders Loans and the Danske Bank Guarantee in the Arbitration, as it does in these annulment proceedings.[200]

175.    Before it begins its analysis, the Committee stresses that it is not within its remit to review the merits of the Award or replace the Tribunal's decisions with its own. As recognized by ICSID case law and doctrine alike, "annulment is only concerned with the legitimacy of the process of decision: it is not concerned with its substantive correctness."[201] In this regard, the Committee shares the view of the *Soufraki* committee that an *ad hoc* committee "has to verify the *existence* of reasons as well as their *sufficiency* – that they are adequate and sufficiently reasonably to bring about the result reached by the Tribunal – but it cannot look into their *correctness*."[202] In other words, as also observed by Latvia's counsel at the Hearing in these proceedings, the question on annulment is not whether the Tribunal was right or wrong on the merits, but whether, in the light of the evidence before the Tribunal, the reasons provided on the issue of causation were "adequately coherent so as to explain logically the conclusions reached in the award."[203]

176.    To determine whether Latvia correctly asserts that the Tribunal provided no reasons justifying the causal link between the conduct found to be wrongful and the harm suffered by the Claimant, the Committee will review the relevant parts of the Award.

177.    To begin with, at paragraph 521, the Tribunal decided, for purposes of its jurisdiction *ratione materiae*, that the loans provided by Claimant to Latgales to fund its operations in Rēzekne, the guarantee provided in relation to the loans granted by Latvijas Unibanka, and the guarantee provided in relation to a loan granted by Sampo Banka (which later became Danske Bank) constituted an investment under Article 1(1)(c) of the BIT.

---

[199] Transcript Day 1, p. 148, lines 13-19 (explaining that "the Tribunal clearly identified the relevant aspects of the causation decision that it needed to identify: it identified the breaches of the BIT, it identified the amount of the loss, it identified the causation between the two. It explained, to use Latvia's expression, how it proceeded from point A through point B to point C.").

[200] Claimant's Rejoinder, ¶¶ 28-29.

[201] Schreuer *et al.* (ARLA-0037), p. 901. *See also, CDC v. Seychelles* (ARLA-0029), ¶ 41; *Lucchetti v. Peru* (ARLA-0035), ¶ 97.

[202] *Soufraki v. UAE* (ARLA-0034), ¶ 131. Emphasis in the original.

[203] Transcript Day 1, p. 55, lines 23-24.

178.    With regard to liability, the Tribunal's findings as to whether Latvia was in breach of Article 3(1) of the BIT are contained at paragraphs 842-1113 of the Award. The specific breaches found by the Tribunal were "founded on prejudice or preference rather than on reason or fact,"[204] and were therefore "arbitrary in a manner inconsistent with Article 3(1) of the BIT"[205] were as follows: (i) the delay and inaction by the Rēzekne Municipality's Council in adopting a heat supply development plan for the city of Rēzekne;[206] (ii) the attachment of Latgales' bank account, the failure to have the attachment discharged, together with the ultimatum issued to Latgales and the announcement that the newly established Municipality-owned company Rēzeknes Energija was ready to provide energy services in the middle of an energy crisis[207]; and (iii) the appointment of Rēzeknes Energija as the entity in charge of providing heating services to the city of Rēzekne.[208]

179.    The next relevant passage is at paragraph 1065, where the Tribunal expressly referred to Latvia's conduct as one of the principal causes that led to the Claimant's inability to recover Latgales' loans and having to pay a guarantee. This paragraph reads as follows:

> "As to impairment of the management, maintenance, use, enjoyment or disposal of the Claimant's investment (as defined in paragraph 521 above) the conduct for which the Respondent is responsible is one of the principal causes that ultimately resulted in the Claimant being unable to recover loans granted to Latgales Enerģija and having to pay a guarantee in respect of Latgales Enerģija's unpaid debts to third parties. The Tribunal finds that such conduct and measures on the part of the Municipality amount to arbitrary measures impairing the use, enjoyment or disposal of the Claimant's investment in breach of Article 3(1), second paragraph, of the BIT."[209]

180.    Later on in the Award, in the context of its analysis on *quantum*, the Tribunal first stated the principles underlying its decision and then recalled its finding that there was no compensable expropriation but that the Respondent breached Article 3(1) of the BIT in a number of respects.[210] The Tribunal also mentioned that the provisions of the BIT deal with compensation in relation to expropriation but are silent with regard to compensation for breaches of Article 3(1).[211]

---

[204] Award (AR-0003), ¶ 887.
[205] Award (AR-0003), ¶ 1065.
[206] Award (AR-0003), ¶ 887.
[207] Award (AR-0003), ¶ 973.
[208] Award (AR-0003), ¶ 987.
[209] Award (AR-0003), ¶ 1065.
[210] Award (AR-0003), ¶ 1126.
[211] Award (AR-0003), ¶ 1127.

181.    In respect of causation in particular, the Tribunal noted the following:

> "In order to be recoverable, the damage must have been caused by the State's internationally wrongful act complained of by the investor, Article 31 of the ILC Articles. Causation is, similarly, a requirement in the PCIJ decision in the *Factory at Chorzów* decision as expressed by the formula 'as far as possible, wipe out all the <u>consequences</u> of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed'. The requirement of causation has been applied in a number of awards in investment disputes. The burden of proof in relation to causation is on the Claimant."[212]

182.    In the sections of the Award that followed this paragraph, the Tribunal applied the principles to the facts of the case. In particular, at paragraph 1132, the Tribunal stated that the expert opinions relied upon by the Claimant were "entirely based on the proposition that the Claimant was the victim of an unlawful expropriation in June 2008." This approach was found to be "of little assistance" by the Tribunal, given that it held that the revocation of the licenses was justified and did not amount to expropriation.[213]

183.    The Tribunal then went on to respond to the Claimant's argument that the damage it suffered was the same, whether the breach was due to an unlawful expropriation or "a creeping breach of the fair and equitable standard having expropriatory effects."[214] In that regard, the Tribunal recalled that it did not find that "the Respondent's actions were expropriatory if their cumulative effect was considered."[215]

184.    Having established that it was for the Claimant "to prove the damage caused by the Respondent's breaches of Article 3(1) of the BIT,"[216] the Tribunal proceeded to examine whether the breaches caused the alleged lost profits.[217] After consideration of a series of relevant facts, the Tribunal concluded as follows:

> "Having considered the evidence as a whole, the Tribunal is satisfied that the Claimant has not discharged its burden of proof in relation to the existence of future profits. The Tribunal has also found that the Claimant has failed to discharge its burden of proof in relation to the allegation that Latgales Enerģija's shares have

---

[212] Award (AR-0003), ¶ 1129. Emphasis in the original. Footnotes omitted.

[213] Award (AR-0003), ¶ 1132.

[214] Award (AR-0003), ¶ 1134.

[215] *Ibid*.

[216] Award (AR-0003), ¶ 1135.

[217] Award (AR-0003), ¶ 1136.

become worthless due to the breaches of Article 3(1) of the BIT found by the Tribunal.[218]

(…)

The Tribunal finds that the Claimant is entitled to compensation for the actual proven losses (*damnum emergens*) suffered as a consequence of the Respondent's breaches of Article 3(1) of the BIT."[219]

185.   In the following two paragraphs, the Tribunal considered and dismissed the Claimant's administrative costs claims and the claim regarding the 2006 and 2007 damages.[220]   It then examined the amounts relating to the loans and the Danske Bank guarantee and noted that the relevant figures were not challenged by the Respondent or its expert. The Tribunal observed that Latvia "objected that Latgales Enerģija would not have been able to repay the loan based on Mr. Peer's [Latvia's expert] revised cash flow estimates and that there was no evidence that the Claimant had paid the amount of the guarantee to Danske Bank."[221] The Tribunal went on to state that it regarded "such figures as representing an actual loss suffered by the Claimant and finds that they are therefore recoverable in principle. The Respondent's first objection is therefore without merit insofar as it fails to take into account the distinction between actual losses and lost profits."[222]As to the Respondent's objection relating to the payment by the Claimant of the amount of the guarantee provided to Danske Bank, the Tribunal referred to its previous decision dismissing this objection  (at paragraph 410 of the Award).

186.   With particular regard to the loans and the Danske Bank guarantee, the Tribunal first found that the Claimant was entitled to damages for the losses actually proven and suffered "as a consequence of the Respondent's breaches of Article 3(1) of the BIT" (at paragraph 1137). Subsequently, the Tribunal noted that the relevant amounts had not been challenged by the Respondent and its expert (at paragraph 1140).

187.   The Tribunal concluded as follows:

> 1143. The Tribunal must now determine whether the Claimant is entitled to a sum of EUR 3,170,000 in consideration of the fact that, on the basis of the totality of the evidence before the Tribunal, such loss arises from a conjunction of different causes. Whereas the Tribunal has found that the Municipality significantly

---

[218] Award (AR-0003), ¶ 1136.

[219] Award (AR-0003), ¶ 1137.

[220] Award (AR-0003), ¶¶ 1138-1139.

[221] Award (AR-0003), ¶ 1140. Footnotes omitted.

[222] Award (AR-0003), ¶ 1141.

contributed to the difficult situation in which Latgales Enerģija found itself, and did so deliberately and in breach of Article 3(1) of the BIT, the Tribunal has also found that the Claimant's losses were caused by the fact that Latgales Enerģija's heating business came to an end due to its decision to stop paying the full price for the natural gas used and the revocation of the licences by the Regulator that followed, which the Tribunal found not to amount to a breach of Latvia's obligation under the BIT.

1144. The Tribunal must therefore determine to what extent the Claimant's actual loss was caused by the Respondent's breaches of Article 3(1) of the BIT. Having weighed all the evidence examined in the present Award, the Tribunal finds that the Claimant and the Respondent have contributed to the losses suffered by the Claimant to an extent that is, all in all, broadly equivalent and that the Claimant should therefore be awarded 50% of the actual losses mentioned above.

1145. The Tribunal therefore awards the Claimant a sum of EUR 1,585,000 (50% of EUR 3,170,000) as financial compensation for the damage caused by the Respondent's internationally wrongful act.

188.  Thus, based on its review of the reasoning of the Tribunal with regard to causation, the Committee notes that the Tribunal's analysis proceeded as follows: (i) the Tribunal first established the existence of an investment for purposes of the BIT, (ii) it then moved on to identify the specific breaches of the BIT, (iii) it indicated that Latvia's conduct was one of the principal causes that led to the Claimant's inability to recover Latgales' loans and having to pay a guarantee, (iv) it recalled and applied the relevant principles applying to compensation (also mentioning that the BIT was silent with regard to compensation other than relating to expropriation), (v) it concluded that the Claimant had not proven future profits and was entitled to compensation only for the actual proven losses suffered as a consequence of the Respondent's breaches of Article 3(1) of the BIT, (vi) it found that the Claimant's loss arose from a conjunction of different causes, and having weighed all the evidence, and (vii) it concluded that both Parties contributed to the losses suffered by the Claimant to a broadly equivalent extent and awarded the Claimant 50% of the actual losses "as financial compensation for the damage caused by the Respondent's internationally wrongful act."[223]

189.  In the Committee's opinion, this logical sequence shows that the Tribunal did not fail to establish causation of loss as Latvia argues. Even if the Committee were to accept Latvia's argument that the Claimant "did not articulate a case on causation with respect to the three breaches of the BIT that the Tribunal identified in the Award,"[224] the Tribunal's reasoning in granting those damages

---

[223] Award (AR-0003), ¶ 1145.

[224] Applicant's Memorial, ¶ 46.

follows from its finding that the Claimant's harm was caused by Latvia's conduct in breach of Article 3(1). The Award also makes it clear that the Claimant was only entitled to "actual proven losses" and not to future profits because it had not met its burden of proof in that regard.[225] It is therefore immaterial that the Tribunal did not explain "how it weighed the evidence, what that evidence was and why it produced a particular result."[226]

190. The Committee is not persuaded by the extensive arguments made by Latvia at the Hearing in connection with both causation and quantum. It is also the Committee's understanding that some of the arguments made by Latvia in these annulment proceedings, such as those relating to the loans and the bank guarantee and arguments based on the *quantum* expert evidence, were not formulated in those terms before the Tribunal. To the extent that this is the case, the Committee notes that a failure to state reasons cannot be invoked in annulment proceedings with regard to arguments that were not advanced in the original arbitration. As held by the *ad hoc* committee in *Wena v. Egypt*, "The award cannot be challenged under Article 52(1)(e) for a lack of reasons in respect of allegations and arguments, or parts thereof, that have not been presented during the proceeding before the Tribunal."[227]

191. As the Award states (and Latvia recognizes), the facts of the case were "uncontested to a considerable extent."[228] Latvia nevertheless contends that the issue is "whether, in the context of the largely uncontested facts, there was a causal relationship between the facts found to be wrongful and the loss for which compensation was awarded."[229] Latvia also finds the Tribunal's statement that the amounts relating to the loans and the Danske Bank guarantee were "recoverable in principle" "deeply problematic" and "incoherent."[230] In essence, for Latvia, the Tribunal misinterpreted the point that the Respondent and its expert were making.[231]

192. The Committee finds that the kind of appreciations that Latvia is requesting the Committee to make go well beyond the scope of review that must be carried out by an annulment committee. The Committee cannot enquire whether the Tribunal wrongly assessed the evidence before it or whether it reached the correct decision on the merits on the basis of that evidence. With regard to this

---

[225] Award (AR-0003), ¶¶ 1136-1137.

[226] Transcript Day 1, p. 40, lines 21-22.

[227] *Wena v. Egypt* (ARLA-0023), ¶ 82. *See also, MINE v. Guinea* (ARLA-0012), ¶ 4.04.

[228] Award (AR-0003), ¶ 52. *See also,* Transcript, Day 1, p. 8, lines 13-14.

[229] Transcript, Day 1, p. 8, lines 15-19.

[230] Transcript Day 1, p. 37, lines 12-20.

[231] *Ibid.*

particular ground of annulment, the Committee must determine whether the Tribunal gave reasons explaining its decision on causation; nothing more nothing less. To cite Professor Schreuer's *Commentary* on the ICSID Convention, on which both Parties have relied:

> "Once an *ad hoc* committee starts looking into whether the tribunal's explanation is sufficient to constitute a statement of reasons, it has already embarked upon a quality control of the award. The formal test of the presence of a statement of reasons blends into a substantive test of adequacy and correctness and the distinction between annulment and appeal… becomes blurred."[232]

193.   In this instance, the Committee finds that the Tribunal carefully analyzed and reviewed in its Award the evidentiary record (including the expert evidence) and the Parties' submissions before it drew its conclusions on causation. The Award also refers on several occasions to the causes that led to the damages and expressly states that the losses that had been proven by the Claimant were caused by Latvia's conduct in breach of Article 3(1) of the BIT. Thus, the Tribunal did explain its thought process and its reasoning plainly follows the sequence of the findings made in the Award. It should be noted, incidentally, that – while it is true that the Parties' *quantum* experts opined on the basis of the alleged unlawful expropriation claimed by the Claimant – the Tribunal acknowledged as much. In any event, this matter is not relevant for purposes of causation, a topic which was not addressed by the experts.

194.   Latvia also argued at the Hearing that the Tribunal engaged in an "arbitrary baby-splitting exercise because the Tribunal had found breaches and did not want to leave the Claimant empty-handed."[233] In this regard, the Committee notes that Latvia does not challenge the Award on the basis of a manifest excess of powers.[234] The application for annulment on this ground concerns a failure to state reasons because in Latvia's opinion the Tribunal stated that it had "weighed the evidence examined in the present Award" failing to identify the law on causation and without explaining what evidence it relied on and why it was relevant.[235] Similar arguments were made in Latvia's written submissions.[236]

---

[232] Schreuer et al. (ARLA-0037), p. 1003. Footnote and cross-reference omitted.

[233] Transcript Day 1, p. 67, lines 16-23.

[234] It should be noted that, at the Hearing, Latvia's counsel stated that, had the Tribunal acknowledged that this "baby-splitting exercise" was in fact a judgment "*in equity*", there would have been a manifest excess of power (*see* Transcript, Day 1, p. 67, line 24 – p. 68, line 4).

[235] Transcript Day 1, p. 65, line 13 – p. 66, line 6.

[236] Applicant's Memorial, ¶¶ 48-49.

195. The Committee accepts the argument that more detailed reasoning could have been provided by the Tribunal with respect to its decision that there had been contributory fault. However, before reaching this conclusion, the Tribunal had already examined the evidence on the record, including the expert evidence in detail, and had considered whether damages should be awarded under international law and the BIT.

196. Furthermore, the Tribunal did explain how the Parties contributed to the loss. For instance, it clearly stated at paragraph 1143 of the Award that the Municipality "significantly contributed to the difficult situation in which Latgales Energija found itself, and did so deliberately and in breach of Article 3(1) of the BIT." At the same time, the Tribunal also found in the same paragraph that the Claimant's losses "were caused by" the fact that Latgales Energija's heating business ended due to Claimant's "decision to stop paying the full price for natural gas used."

197. It is not uncommon for tribunals to use their discretion to estimate how damages should be apportioned once it is established that both parties contributed to the loss. The Committee finds the following statement by the *MTD v. Chile* committee particularly apposite in this regard:

> "As is often the case with situations of comparative fault, the role of the two parties contributing to the loss was very different and only with difficulty commensurable, and the Tribunal had a corresponding margin of estimation. Furthermore, in an investment treaty claim where contribution is relevant, the respondent's breach will normally be regulatory in character, whereas the claimant's conduct will be different, a failure to safeguard its own interests rather than a breach of any duty owed to the host State. In such circumstances, it is not unusual for the loss to be shared equally. International tribunals which have reached this point have often not given any 'exact explanation' of the calculations involved. In the event, the Tribunal having analysed at some length the failings of the two parties, there was little more to be said – and no annullable error in not saying it."[237]

198. The Committee agrees with this position.

199. In the light of the above, the Committee rejects Latvia's request to annul the Award on the basis of Article 52(1)(e) of the ICSID Convention with regard to causation.

---

[237] *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment, March 21, 2007 (ARLA-0033), ¶ 101.

### C. THE TRIBUNAL'S DECISION ON QUANTUM

#### 1. Latvia's Position

200. Latvia argues that the Tribunal did not provide reasons for its finding on the losses that UAB E energija suffered in relation to the Danske Bank Guarantee (*i.e.* one of the two headings for damages which the Tribunal elected to consider).[238] As a result, the Award should be annulled for a failure to state reasons pursuant to Article 52(1)(e) of the ICSID Convention.

201. Latvia's arguments on the lack of reasons in the Tribunal's decision on quantum are closely connected to its argument on causation. According to Latvia, the Tribunal failed to state reasons as to whether Latvia's conduct found to be wrongful under the BIT "caused the specific losses for which compensation was awarded."[239]

202. Latvia contends that, in the relevant part of the Award where the Tribunal reached its decision on the losses suffered by UAB E energija, the Tribunal did nothing but assert that the sums which UAB E energija paid resulted in "actual losses for the Claimant," and did not take into account some financial considerations relating to the payment (including possible offsets that UAB E energija could have benefitted from when proceeding to the payment of the Guarantee).[240]

203. Latvia takes issue with the Tribunal awarding UAB E Energija the sum of EUR 1,585,000, which corresponds to 50% of the aggregate amount of the Shareholder Loans and the Danske Bank Guarantee. According to Latvia, "there are [...] no reasons provided for how and why even the 100% total constituted a loss to the Claimant in the first place, and still less that those three specific breaches that the Tribunal found caused 50% of that loss."[241]

204. Although Latvia admits that the Committee's role is not to assess "whether the Tribunal considered the expert reports on damages or all the factual evidence presented by the Parties that could potentially bear on this issue,"[242] it submits that the Committee "<u>must</u> take issue with a complete absence of any discussion of the issue and the relevant evidence in the Award."[243] According to

---

[238] Applicant's Memorial, ¶¶ 62-63.

[239] Transcript Day 1, p. 6, lines 3-5.

[240] Applicant's Memorial, ¶ 61.

[241] Transcript Day 1, p. 68, line 23 – p. 69, line 2.

[242] Applicant's Memorial, ¶ 65.

[243] Applicant's Memorial, ¶ 65 (emphasis in original – citing *MINE v. Guinea* (ARLA-0012), ¶¶ 6.98-6.108).

Latvia, the Tribunal failed to do so and "[w]ithout this reasoning, it is unclear to an informed reader how the Tribunal was able to decide that the Claimant was entitled to compensation equal to the full amount of all payments made under the Danske Bank Guarantee."[244]

205.    Latvia further contends that the Tribunal's failure to elaborate on this quantum issue was material to the outcome of the case, as the damages awarded in relation to this claim correspond to "almost 60%"[245] of the total damages in the case. It disputes UAB E energija's argument that Latvia seeks to re-open the Tribunal's decision on quantum.[246] According to Latvia, it must be allowed to provide the factual and legal elements to prove its annulment claim, and that is what it has done.[247]

### 2.    UAB E energija's Position

206.    UAB E energija alleges that Latvia's argument constitutes nothing but an attempt to "re-evaluat[e] the evidence" and introduce "new merits arguments."[248] Such attempt should be barred as it falls outside the scope of the Committee's "power of review."[249]

207.    UAB E energija insists specifically on the fact that Latvia's damages defenses in connection with the Danske Bank Guarantee were raised at a very late stage in the Arbitration and failed to challenge key evidentiary aspects.[250] According to UAB E energija, Latvia's arguments on the financial considerations relating to the payment of the Danske Bank guarantee are new. They cannot be the "basis for the Committee to find a failure to give reasons based on an argument that Latvia failed to raise during the Arbitration."[251]

208.    For UAB E energija, it is clear that the Tribunal fully assessed the elements requiring analysis with respect to its damages claim in the Arbitration, and that as a result Latvia's annulment application on quantum is unfounded. This is even more so as "the annulment of quantum decisions face

---

[244] Applicant's Memorial, ¶ 65.

[245] Applicant's Memorial, ¶ 66.

[246] Applicant's Reply, ¶ 40.

[247] Applicant's Reply, ¶ 40 (citing *RSM v. Saint Lucia* (ARLA-0103), ¶ 153: "Obviously, the annulment stage is not one where facts not before the Tribunal can be introduced. At the same time, the arguments raised on annulment are those that relate to the grounds for annulment, which themselves need not have been raised in the original arbitration. An applicant cannot be inhibited from raising arguments in annulment relating to the interpretation or application of Article 52 that best support its position.")

[248] Claimant's Counter-Memorial, ¶ 100.

[249] Claimant's Counter-Memorial, ¶ 100.

[250] Claimant's Counter-Memorial, ¶ 102.

[251] Claimant's Counter-Memorial, ¶ 105.

'additional hurdles', given that: '*ad hoc* committees have consistently held that tribunals have a wide margin of discretion with respect to the calculation of damages.'"[252]

209.  Finally, according to UAB E energija, Latvia does not argue that the Tribunal failed to state reasons when reaching its findings on quantum, but rather that the Tribunal's reasoning was "flawed."[253] In support of this contention, UAB E energija quotes from Latvia's Memorial where it states that "proper assessment of causation would have changed the Tribunal's decision on quantum."[254] According to UAB E energija, this very formulation demonstrates that Latvia itself admits that its application falls outside the scope of review under Article 52(1)(e) of the ICSID Convention. In UAB E energija's words, "Latvia cannot point to any question that the Tribunal failed to address. Rather, it resorts to creating an argument (that it failed to raise in the Arbitration), with which it asserts the Tribunal failed to deal."[255]

### 3.  The Committee's Analysis

210.  As seen from the summaries of the Parties' positions above, Latvia's arguments on quantum and causation are closely related. Latvia alleges that the Award contains no reasons at all as to how UAB E energija suffered any loss with regard to the loans it provided to Latgales to fund its operations in Rēzekne and with regard to the Danske Bank guarantee. This argument repeats some of the points made about the same transactions in the context of causation. UAB E energija in short contends that Latvia is asking the Committee to annul the Award "on the basis that the Tribunal failed to give reasons to explain its decision on an argument that was never made."[256]

211.  The Committee does not agree with Latvia's argument that the Tribunal's reasoning on quantum "leaves the reader unable to understand the factual and legal premises that led the Tribunal's decision to award damages to the Claimant."[257] To the contrary, the Committee – reading the relevant paragraphs of the Award sequentially – has no difficulty discerning the reasoning of the Tribunal, however succinct.

---

[252] Claimant's Counter-Memorial, ¶ 109 (citing, *inter alia*, *Occidental v. Ecuador* (ACLA-0026), ¶ 412; *Duke Energy v. Peru* (ARLA-0045), ¶ 256.

[253] Claimant's Rejoinder, ¶ 45.

[254] Claimant's Counter-Memorial, ¶ 113, quoting Applicant's Memorial, ¶ 55.

[255] Claimant's Counter-Memorial, ¶ 113.

[256] Transcript Day 1, p. 153, lines 23-25. *See also*, Claimant's Counter-Memorial, ¶ 100.

[257] Applicant's Memorial, ¶ 58.

212.   As recalled above with respect to the loans and the Danske Bank guarantee, the Tribunal found that the figures provided by UAB E energija's expert, Dr. Hesmondhaigh, had not been challenged by Latvia or its expert (Mr. Peer), but also noted that Latvia contested that Latgales Energija would not be able to repay the loan based on Latvia's expert's revised cash flow estimates. The Tribunal added that there was no evidence that UAB E energija had paid the amount of the guarantee to Danske Bank.[258] The Tribunal had already found in a preceding paragraph that, "[h]aving considered the evidence as a whole," the Tribunal was satisfied that the Claimant had not discharged its burden of proof in relation to future profits.[259]

213.   The Tribunal had also held that the Claimant was only entitled to compensation for "the actual proven losses (*damnum emergens*) suffered [by the Claimant] as a consequence of the Respondent's breaches of Article 3(1) of the BIT."[260] It logically follows that, in the light of its finding that the figures corresponding to the loans were "actual losses suffered by the Claimant," and as such "recoverable in principle," the Tribunal rejected Latvia's objection that Latgales would not be able to repay the loan based on Latvia's expert's revised cash flow estimates. In the Tribunal's view, Latvia's objection also "fail[ed] to take into account the distinction between actual losses and lost profits."[261]

214.   Latvia disagrees with the Tribunal's conclusion that the argument made by the Respondent's expert, Mr. Peer, that Latgales could not pay its debts to the shareholders because it did not have sufficient cash flow was "without merit insofar as it fails to take into account the distinction between actual losses and lost profits."[262] Latvia argues that the Tribunal's finding is "incoherent" and confuses heads of loss with causation, the matter on which Mr. Peer opined.[263] However, the Committee is of the view that Latvia's arguments concern an appreciation of the merits of the Tribunal's ruling rather than a failure by the Tribunal to state reasons under Article 52(1) of the ICSID Convention. The Tribunal followed a clear line of reasoning and it did provide reasons in the Award for its assessment of the documentary and expert evidence. To the extent that it dismissed the arguments made by Latvia and its expert before it, the Tribunal did so with reasons.

---

[258] Award (AR-0003), ¶ 1140.

[259] Award (AR-0003), ¶ 1136.

[260] Award (AR-0003), ¶ 1137.

[261] Award (AR-0003), ¶ 1141.

[262] Award (AR-0003), ¶ 1141.

[263] Transcript, Day 1, p. 38, lines 18-23.

215.     The Committee also agrees with the position expressed by a number of ICSID tribunals and *ad hoc* committees that arbitral tribunals enjoy a margin of appreciation in providing reasons with regard to quantum.[264] In *Rumeli v. Kazakhstan* for instance, the *ad hoc* Committee held that "[t]ribunals are generally allowed a considerable measure of discretion in determining issues of quantum."[265]

216.     Counsel for Latvia spent considerable time at the hearing reviewing certain documents that were in the evidence of the Arbitration while recalling that the Tribunal gave "over the following hundreds of paragraphs [of the Award], a detailed recitation of the facts."[266] Attention was devoted to an assignment agreement between Latgales and UAB E energija which was signed on June 25, 2008 (defined in the Award as the "**2008 Assignment Agreement**").[267] It was recalled that this assignment was successfully challenged by the third-party debtor before the Latvian courts and the decision was overturned in appeal in 2013. Another document that was examined was an "Arrangement on Assignment Agreement" dated June 30, 2009 through which Latgales and UAB E energija cancelled the assignment between them of debts owed to Latgales by the third party and entered into a new loan agreement for the same amount. All of this factual background is recalled in the Award, at paragraphs 378-380 and 410-413.

217.     Particular consideration was given by Latvia's counsel to another document, which is also in the record of the annulment proceedings as Exhibit AR-12: the Assignment Agreement dated August 11, 2009.[268] This document, which is also mentioned in the Award (at paragraph 413), shows that the Claimant had assigned its right to claim from Latgales to a Spanish company, Hansel Management Realty Spain SL. The Award recalls, on the basis of the testimony of the chief financial officer of the Claimant, Mr. Jautakis, that no moneys had been recovered from Latgales in spite of a judgment by the Riga District Court.

218.     Following its review of the factual context and its analysis of the evidence and Mr. Jautakis' witness statement, Latvia argued at the hearing that the debt "was not owed any longer by Latgales to the Claimant; it was owed by Hansel to the Claimant."[269] On this basis, Latvia states that the Committee's task is "to determine whether  the Tribunal provided reasons as to how the Claimant's

---

[264] *See e.g. Wena v. Egypt* (ARLA-0023) ¶ 91; *Duke Energy v. Peru* (ARLA-0045), ¶¶ 256-258.

[265] *Rumeli v. Kazakhstan* (ARLA-0042), ¶ 146.

[266] Transcript, Day 1, p. 9, lines 5-6.

[267] Assignment Agreement No. 100/2008/0625, June 25, 2008, Arbitration Exhibit C-182 (AR-0013).

[268] Assignment Agreement No. 2009/08/11-01, Arbitration Exhibit C-197 (AR-0012).

[269] Transcript, Day 1, p. 26, lines 3-4.

loss of the loan amount could have been caused by Latvia's unlawful treatment of Latgales, in circumstances where Claimant had assigned that loan for full value to Hansel, and Hansel had not paid the Claimant what it owed."[270]

219. The Committee notes that the Award repeatedly states that Mr. Jautakis' evidence, and the explanations and allegations contained in his two witness statements, were not challenged by Latvia. Moreover, the Award recalls that Mr. Jautakis was not cross-examined at the hearing.[271]

220. With regard to the Danske Bank guarantee, the Award states that the Claimant referred to this payment in its memorial and Latvia did not dispute this evidence in its counter-memorial.[272]  In addition, Mr. Jautakis' evidence in this regard was not challenged by Latvia at the hearing. [273] The Award further notes that Latvia challenged the fact that the Claimant paid the amount of the Danske Bank guarantee for the first time in its post-hearing submission. The Tribunal dismissed the objection based on the documentary evidence and clearly stated that: "If the Respondent intended to challenge the statement made by Danske Bank to the Claimant's auditors, it should have raised this point in its pleadings and called the auditors and cross-examined them at the Hearing."[274]

221. It follows that, if the Tribunal did not consider the arguments that Latvia makes in these proceedings, it is because Latvia itself chose not to make arguments challenging the evidence submitted by UAB E energija. In the Committee's view, it cannot be said that the Tribunal failed to give reasons for its decision or that it did not rely on the evidence on the record in order to reach that decision. Once the Tribunal decided that the Claimant was only entitled to damages for the actual proven losses and that the loans and bank guarantee represented such losses, the reasons underlying the decision had clearly been provided and could be easily understood. Latvia disagrees with the Tribunal's assessment of the evidence examined in order to reach that decision, but that is not a ground for annulment. The time for Latvia to advance its arguments in that regard, and to challenge the evidence presented by the Claimant, was during the Arbitration, not in these proceedings. It is not for this annulment Committee to re-assess the evidence and verify the correctness of the Tribunal's rulings. As held by the *MINE v. Guinea* committee, "Annulment is

---

[270] Transcript, Day 1, p. 64, lines 7-13.

[271] Award (AR-0003), ¶¶ 315, 409 and 520.

[272] Award (AR-0003), ¶ 409.

[273] Award (AR-0003), ¶ 409.

[274] Award (AR-0003), ¶ 410.

not a remedy against an incorrect decision. Accordingly, an *ad hoc* Committee may not in fact reverse an award on the merits under the guise of applying Article 52."[275]

222. On the basis of the above, the Committee rejects Latvia's request to annul the Award on the basis of Article 52(1)(e) of the ICSID Convention with regard to *quantum*.

### D. THE TRIBUNAL'S REASONING ON INTEREST

#### 1. Latvia's Position

223. Latvia argues that the Tribunal's four-paragraph decision on interest "lacks any stated legal or factual basis"[276] and that, therefore, the Award should be annulled pursuant to Article 52(1)(e) of the ICSID Convention.[277]

224. Latvia explains, by way of background, that the Tribunal ordered Latvia to pay interest on damages awarded, accruing from January 1, 2008, at various rates compounded annually.[278] Latvia notes that the Tribunal considered that "[t]he Respondent has not answered the Claimant's case on interest"[279] and, eventually concluded that "annual compounding would be appropriate in view of recent trends in investment arbitration."[280] According to Latvia, "[t]he Tribunal's reasoning on Latvia's liability to pay interest on the compensation granted in the Award was either absent or so cursory and conclusory that it amounted to no reasons at all."[281]

225. First, Latvia stresses that the Tribunal failed to identify any legal basis for the Claimant's alleged entitlement to interest, and therefore "'put the horse before the cart' by failing to identify an essential predicate for its decision – a principled legal basis under the applicable law for it to make

---

[275] *MINE v. Guinea* (ARLA-0012), ¶ 4.04.

[276] Applicant's Reply, ¶ 49.

[277] Applicant's Memorial, ¶ 68; Applicant's Reply, ¶ 49.

[278] Applicant's Memorial, ¶¶ 69-70.

[279] Applicant's Memorial, ¶ 69 (citing Award (AR-0003), ¶ 1151).

[280] Applicant's Memorial, ¶ 70 (citing Award (AR-0003), ¶ 1151).

[281] Applicant's Memorial, ¶ 73.

an award of interest."[282] This omission is even more flagrant as UAB E energija itself failed in the Arbitration to point to any legal source for the Tribunal's power to award interest.[283]

226.   Second, Latvia submits that "the Tribunal's reasoning with respect to the appropriate compounding interval for its award of interest in this case is so vague and unsupported that it amounts to no reason at all."[284] Latvia takes issue especially with the Tribunal's reference to the "recent trends in investment arbitration"[285] to justify its decision on the annual compounding interest. According to Latvia, the Tribunal failed to explain what it meant by "recent trends," and why "such 'trends' were relevant to its decision to award compound interest."[286]

227.   Third, Latvia criticizes the Tribunal's one-sentence decision on the date from which interest would accrue,[287] which reads as follows: "[t]he date from which interest is awarded is 1 January 2008 as the Claimant has failed to indicate any interest rate for the year 2007."[288] According to Latvia, such decision "is no more than an unsupported conclusion,"[289] and is all the more problematic because, at the dates referred to by the Tribunal, UAB E energija had not yet suffered losses with regard to the two heads of losses identified by the Tribunal (i.e. the Shareholder Loans and the Danske Bank Guarantee).[290] In the words of Latvia's counsel, the Tribunal "gave no reasons at all concerning the start date being 1st January 2008, except that the Claimants [sic] had not provided an interest rate for 2007. The Tribunal also provided no reason for why 2007 would have been the correct

---

[282] Applicant's Memorial, ¶ 75.

[283] Applicant's Memorial, ¶ 75 (noting, with respect, that the Claimant's reference to Article 4(2) of the BIT, which does refer to interest payable in case of a lawful expropriation was "inapposite given the Tribunal's rejection of the Claimant's expropriation claims.").

[284] Applicant's Memorial, ¶ 76.

[285] Applicant's Memorial, ¶ 76 (citing Award (AR-0003), ¶ 1151).

[286] Applicant's Memorial, ¶ 76.

[287] Applicant's Memorial, ¶ 77.

[288] Applicant's Memorial, ¶ 77 (citing Award (AR-0003), ¶ 1152, where the Tribunal found that "[t]he date from which interest is awarded is 1 January 2008 as the Claimant has failed to indicate any interest rate for the year 2007.").

[289] Applicant's Memorial, ¶ 77.

[290] Applicant's Reply, ¶ 46 (stating that "[t]he date of 1 January 2008 appears to be entirely divorced from the facts underlying the bank guarantee and shareholder loan claims. The Danske Bank Guarantee was called only 18 months later, on 30 June 2009, and the Claimant paid the guarantee amount only in November 2012. Meanwhile, the shareholder loan was only transferred to the Claimant in February 2008, and there is no indication in the Award when the loan was written off." (Footnotes omitted)).

point in time for interest to run on loss suffered years after, and of course there could be no such reason."[291]

228.   Finally, Latvia submits that the Tribunal's determination on interest was material to the outcome of the case, given that the interest awarded to the Claimant constituted a substantial part of Latvia's overall liability under the Award.[292]

### 2.   UAB E energija's Position

229.   UAB E energija rejects all of Latvia's arguments on the Tribunal's decision on interest. The Tribunal provided clear reasoning on the award of interest, on the compounding interval it applied, and on the date selected for the accrual of interest.[293]

230.   UAB E energija emphasizes that Latvia did not challenge in the Arbitration the Claimant's case for compound interest, and that as a result, the decision to award such compound interest necessarily remained at the discretion of the Tribunal. UAB E energija argues that the decision with respect to the date selected for the accrual of the interest is fully justified by the fact that Latvia did not provide the applicable interest rate for the year 2007. UAB E energija notes that such decision worked actually "to Latvia's advantage,"[294] and in any event does not lack an explanation.

231.   Finally, as to the Tribunal's reference to the "recent trends in investment arbitration," UAB E energija argues that such reference was made "in the context of the Tribunal's recognition of E energija's case that simple interest would not reflect commercial reality"[295] and that the Tribunal's reasoning is therefore clear and sufficient.[296] In any event, UAB E energija recalls that "Article 52(1)(e) of the ICSID Convention does not permit any inquiry into the quality or persuasiveness of reasons,"[297] and the fact that Latvia does not like this reference to "recent trends" is therefore irrelevant.[298]

---

[291] Transcript Day 1, p. 71, line 221 – p. 72, line 3.
[292] Applicant's Memorial, ¶ 79; Applicant's Reply, ¶ 48.
[293] Claimant's Counter-Memorial, ¶ 117.
[294] Claimant's Counter-Memorial, ¶ 122.
[295] Claimant's Counter-Memorial, ¶ 125.
[296] Claimant's Counter-Memorial, ¶ 125.
[297] Claimant's Counter-Memorial, ¶ 123.
[298] Claimant's Counter-Memorial, ¶¶ 123, 127.

### 3.   The Committee's Analysis

232.   Latvia contends that the Award sets out its reasoning on interest in "four short paragraphs" and fails to explain the legal basis for the Tribunal's decision to award compound interest, for the use of this type of interest, or for the date from which the interest accrues.[299] Latvia also argues that the Tribunal's decision in this regard is material since a different finding on interest "could have resulted in a substantial reduction of the amount awarded."[300] For its part, UAB E energija asserts that the reasoning of the Tribunal is clear and sufficient and based on the finding that UAB E energija was due full reparation for the injury caused by Latvia's unlawful conduct. UAB E energija also recalls that Latvia did not answer the Claimant's case on interest in the original Arbitration.[301]

233.   The Committee finds that the legal foundation of the Tribunal's decision on compound interest is clearly explained by the statement that this type of interest should be awarded in order to achieve full reparation for the injury caused.[302] It is worth citing the actual reasoning; it reads as follows:

> "The Claimant's case for compound interest has remained unchallenged throughout these proceedings. The Tribunal finds that simple interest would not represent reparation for the injury caused. The Tribunal will therefore award compound interest."[303]

234.   This sentence should be read in connection with the Tribunal's previous finding that, "[u]nder Article 31 of the ILC Articles the State responsible for an internationally wrongful act must make 'full reparation for the injury caused' by such act; that is also the principle set out by the PCIJ in the *Factory at Chorzow* decision."[304]

235.   The Tribunal's reasoning logically follows. Full reparation for the injury caused must include compound interest in order to, as held in the well-known passage of the *Chorzow Factory* judgment, "wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed."[305] For the Tribunal, an award of simple interest was not capable of affording "full reparation for the injury caused" by Latvia's

---

[299] Applicant's Reply, ¶¶ 42-43.

[300] Applicant's Reply, ¶ 48.

[301] Claimant's Rejoinder, ¶ 48. *See also,* Transcript Day 1, p. 159, lines 12-25.

[302] Award (AR-0003), ¶ 1151.

[303] Award (AR-0003), ¶ 1151.

[304] Award (AR-0003), ¶ 1127.

[305] *Factory at Chorzów* case, P.C.I.J., Judgment on the Merits, September 13, 1928, Collection of Judgment No. 13, Series A, No. 1, 1928 (ACLA-0049), p. 47. *See also*, Award (AR-0003), ¶ 1129.

wrongful act, only compound interest could. The Committee has no difficulty understanding this reasoning, which was clear and sufficient, albeit concise.

236.  It is also a fact (recalled in the Award[306]) that Latvia did not advance its own position on interest and did not rebut the Claimant's case in this regard. In these proceedings, Latvia denies this and refers to paragraph 36 of the Rejoinder on the Merits filed in the Arbitration, where it made the following generic statement about the Claimant's claims for damages: "In other words, Claimant has not proved with a sufficient certainty (to avoid heavy speculations) that its business was profitable at all. In any case, Respondent denies that any damages that the Claimant has allegedly sustained was caused by Respondent."[307] The Committee reads this statement as amounting to a general denial of the Claimant's quantum case but not as advancing a specific argument on interest. Consequently, the Tribunal had to make its decision on this point without having had the benefit of Latvia's position given that the award of interest was a matter that Latvia chose not to address in the Arbitration.

237.  With regard to the award of compound interest, Latvia objects that the Tribunal's statement that annual compounding was "appropriate in view of recent trends in investment arbitration"[308] further confirms the lack of reasoning on compound interest because there was no explanation and no citation of authority.[309] The Committee considers that, while it might have been preferable for the Tribunal to cite legal authority in support of its statement, the Tribunal was referring to an unquestionable trend in the investment case law, a trend which Latvia does not deny. It is not as if the Tribunal made up out of thin air an unsubstantiated legal conclusion. The absence of a specific citation for this uncontroversial statement does not amount to a failure to state reasons and is not a ground of annulment under Article 52(1)(e) of the ICSID Convention.

238.  Latvia also contends that the Tribunal gave no reasons to explain why the start date of the interest should be January 1, 2008. Latvia acknowledges that the breaches occurred in 2006 and 2007 but recalls that the Claimant claimed interest from the date of the expropriation or from the date when

---

[306] Award (AR-0003), ¶¶ 1149-1150.

[307] Respondent's Rejoinder on the Merits and Reply on Preliminary Objections, December 12, 2014, ¶ 36.

[308] Award (AR-0003), ¶ 1151.

[309] Applicant's Memorial, ¶ 76.

the loss was incurred. For Latvia, it was necessary for the Tribunal to provide reasons why interest should be awarded starting from a date before any compensable harm had been suffered.[310]

239.    It is true that, in deciding the date from which interest should start running, the Tribunal simply held: "The date from which interest is awarded is 1 January 2008 as the Claimant has failed to indicate any interest rate for the year 2007."[311] Indeed, as recalled in the Award, the Claimant asked for interest to be compounded quarterly at certain interest rates for the years 2008-2012 until the date of the final award and from that date until actual payment.[312] The Tribunal explained that it was satisfied that the rates provided by the Claimant were more appropriate than the LIBOR rate and recalled that those rates had not been challenged by Latvia.[313] The Tribunal also observed that the LIBOR rate applied to compensation for expropriation under the BIT but, since no expropriation had been found, there was "no compelling reason to apply a LIBOR-based interest in the present case."[314]

240.    On Latvia's case, the Tribunal's conclusion that interest should start running from January 1, 2008 was incorrect because that date was long before any losses were actually suffered. However, in the Committee's opinion, what that means is that Latvia and the Tribunal disagree as to the dates when UAB E energija's losses (other than expropriation) were actually suffered.

241.    As discussed above, Latvia made a number of arguments in these annulment proceedings on the losses arising from the loans and the Danske Bank guarantee which had not been submitted to the Tribunal in the original Arbitration proceedings. However, the Tribunal made its decision on the basis of the Parties' pleadings and the evidence in the record of the Arbitration. On that basis, the Award is not lacking in reasoning. To the extent that questions exist that go to the substance of the Tribunal's decision, there is no ground for annulment for failure to state reasons. As held by the *Wena v. Egypt* committee,

> "The ground for annulment of Article 52(1)(e) does not allow any review of the challenged Award which would lead the *ad hoc* Committee to reconsider whether the reasons underlying the Tribunal's decisions were appropriate or not, convincing or not. As stated by the *ad hoc* Committee in *MINE*, this ground for annulment refers to a 'minimum requirement' only. This requirement is based on

---

[310] Transcript Day 1, p. 71, lines 18-24.

[311] Award (AR-0003), ¶ 1152.

[312] Award (AR-0003), ¶ 1148.

[313] Award (AR-0003), ¶ 1150.

[314] Award (AR-0003), ¶ 1150.

the Tribunal's duty to identify, and to let the parties know, the factual and legal premises leading the Tribunal to its decision. If such sequence of reasons has been given by the Tribunal, there is no room left for a request for annulment under Article 52(1)(e)."[315]

242.     On the basis of the above, the Committee rejects Latvia's request to annul the Award on the basis of Article 52(1)(e) of the ICSID Convention with regard to interest.

### E.   THE TRIBUNAL'S DECISION ON JURISDICTION

#### 1.   Latvia's Position

243.     Latvia's final argument for annulment relates to the jurisdiction of the Tribunal. According to Latvia, the Tribunal did not consider the issue of jurisdiction in full and failed to address whether the BIT, and in particular its Article 7(2), was still in force and applicable as between Latvia and Lithuania in 2012.[316]

244.     Latvia's challenge to the Tribunal's conclusions on jurisdiction *ratione voluntatis* is two-fold: Latvia argues that the BIT was terminated by operation of Article 59(1) of the Vienna Convention on the Law of Treaties (the "**VCLT**" or "**Vienna Convention**") (**a.**), and that European Union Law ("**EU Law**") prevails over Article 7 of the BIT referring to ICSID arbitration (**b.**).

245.     In reply to a defense developed by UAB E energija in its Counter-Memorial on Annulment, Latvia also explains that it did not waive any consent requirement during the Arbitration (**c.**). Finally, Latvia submits that because of the Tribunal's erroneous findings on jurisdiction, the Award should be annulled both pursuant to Article 52(1)(b) and Article 52(1)(e) of the ICSID Convention (**d.**).

##### a.   *Latvia's position on the termination of the BIT by operation of Article 59(1) of the VCLT*

246.     Latvia invokes Article 59(1) of the VLCT,[317] which provides:

A treaty shall be considered as terminated if all the parties to it conclude a later treaty relating to the same subject-matter and:

---

[315] *Wena v. Egypt* (ARLA-0023), ¶ 79.

[316] Applicant's Memorial, ¶¶ 80, 82-83.

[317] Applicant's Memorial, ¶¶ 88-89 (citing 1969 Vienna Convention (ARLA-0006) and noting that "Latvia and Lithuania acceded to the Vienna Convention on 3 June 1993 and on 14 February 1992, respectively. In accordance with Article 4 of the Vienna Convention, the rules of the Vienna Convention apply therefore to the BIT between Latvia and Lithuania.").

(a) It appears from the later treaty or is otherwise established that the parties intended that the matter should be governed by that treaty; or

(b) The provisions of the later treaty are so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time.[318]

247.  According to Latvia, the conditions for Article 59 to apply are met and, as a result, the BIT should be considered as terminated due to the entry into force of the EU treaties for Latvia and Lithuania following their accession to the EU on May 1, 2004.[319]

248.  First, Latvia explains that the BIT and the EU treaties relate to the same subject matter. The rights and obligations contained in the BIT and in the EU treaties do not need to be identical for the criteria relating to the "same subject-matter" to be satisfied.[320] Given that the EU treaties regulate the protection of investments within EU Member States, as does the BIT, the EU treaties and the BIT have the same subject matter.[321] In response to UAB E energija's defense on this issue, Latvia further contends that it does not matter that the EU treaties have a wider object and scope than the BIT.[322] What matters is that there is "sameness" in the rights and obligations contained in the treaties.[323]

249.  Second, Latvia argues, in response to UAB E energija's position, that Latvia and Lithuania intended that the EU treaties should prevail. As explained by Latvia, Article 59(1) does not require that parties to two treaties with the same subject matter expressly indicate that one treaty takes precedence over the other; it is sufficient that they consider one treaty to apply between them in respect to issues governed by the other. Further, Latvia argues that "[w]hen acceding to the EU, Latvia and Lithuania accepted that the EU treaties and EU law would apply fully in their mutual relations, and that the treaties and EU law, including the law governing intra-EU investments would take precedence over agreements concluded between them before the entry into force of the EU Treaties."[324] To support this argument further, Latvia refers to a declaration made jointly by EU Member States on the issue of intra-EU BITs, which allegedly makes clear that EU Member States

---

[318] Applicant's Memorial, ¶ 89 (citing Vienna Convention (ARLA-0006), Article 59(1)).

[319] Applicant's Memorial, ¶ 98. *See also*, Transcript Day 1, p. 80, lines 6-11.

[320] Applicant's Memorial, ¶ 91; Applicant's Reply, ¶ 55.

[321] Applicant's Memorial, ¶ 91; Applicant's Reply, ¶ 55.

[322] Reply, ¶¶ 56-57 (citing, *inter alia*, *Landesbank Baden-Württemberg et al v. Kingdom of Spain*, ICSID Case No. ARB/15/45) Decision on the "Intra-EU" Jurisdictional Objection, February 25, 2019 (ARLA-0102), ¶ 171 ("*Landesbank v. Spain*")).

[323] Applicant's Memorial, ¶ 91; Reply, ¶ 54. *See also*, Transcript Day 1, p. 88, lines 9-24.

[324] Applicant's Reply, ¶ 59.

consider that EU law prevails over their intra-EU-BIT obligations.[325] This declaration constitutes a "subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions" in the sense of Article 31(3)(a) of the VCLT and should therefore have been taken into account by the Tribunal when interpreting the EU treaties and EU law and their relations with intra-EU BITs.[326]

250.    Finally, Latvia rebuts UAB E energija's argument that the BIT cannot be terminated automatically and that there is a need to follow the termination procedure described in Article 65 of the VCLT. According to Latvia, this is incorrect as "Article 59 makes clear that termination is 'implied' by the conclusion of a later treaty, which necessarily excludes any additional formal process."[327]

### b. Latvia's argument that EU Law prevails over the BIT

251.    According to Latvia, even if the BIT was not terminated by virtue of Article 59(1) of the VCLT, Article 7 of the BIT is nevertheless invalid, because it is incompatible with Latvia's and Lithuania's obligations under the EU treaties. In support, Latvia refers to (i) the EU principle of primacy of the EU treaties which Latvia and Lithuania have accepted in their mutual relation, (ii) Article 30 of the VCLT, and (iii) the recent judgment by Court of Justice of the European Union (the "**CJEU**") in the case of *Achmea BV v. Slowakische Republik* (the "***Achmea* decision**").

252.    First, on the principle of primacy, Latvia contends that "[i]n their mutual relations, Latvia and Lithuania accepted a special conflict rule in respect of the EU treaties" which is that "[t]he EU treaties and the law that derives from them impose absolute primacy over all other laws, including international treaties concluded between Member States."[328]

253.    Second, with respect to Article 30 of the VCLT, Latvia notes that this provision provides, in its relevant part:

---

[325] Applicant's Reply, ¶ 61 (citing the Declaration of the Representatives of the Governments of the Member States on Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union, January 15, 2019, (ARLA-0075), p. 2).

[326] Applicant's Reply, ¶ 61.

[327] Applicant's Reply, ¶ 63 (citing "Draft Articles on the Law of Treaties," ILC Yearbook, 1966, vol II, p. 177, (ARLA-0004), p. 252, ¶ (1) of the commentary to Article 56).

[328] Applicant's Reply, ¶ 67. *See also,* Applicant's Memorial, ¶¶ 111-115.

> 1. Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs.
>
> […]
>
> 3. When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.[329]

254.    According to Latvia, in application of Article 30, because the BIT and the EU treaties have the same subject-matter, "the BIT, even if it remains in force, can apply between them only to the extent that its provisions are compatible with EU law."[330]

255.    Third, Latvia refers to the *Achmea* decision, to argue that the BIT and EU law are, in fact, incompatible with each other. Latvia recalls the background and procedural history leading up to the *Achmea* decision,[331] and argues that, following this decision, which was later supported by the Commission,[332] Article 7 of the BIT is incompatible with the EU treaties based on EU law and with the principle of primacy of the EU treaties. According to Latvia, "[t]herefore, in accordance with Article 30(3) of the Vienna Convention, Article 7 of the BIT is inapplicable as between Latvia and Lithuania. It cannot serve as a valid offer to arbitrate, nor as 'consent in writing' for purposes of Article 25 of the ICSID Convention."[333]

### c.    Latvia's argument on the waiver of the consent requirement during the Arbitration

256.    As further explained below, UAB E energija developed an argument in its Counter-Memorial that Latvia either waived its right to object to jurisdiction of the Tribunal or should be estopped from now raising such an argument in the annulment proceeding. Latvia argues that this argument is misguided.[334]

---

[329] Applicant's Memorial, ¶ 100 (citing 1969 Vienna Convention (ARLA-0006), Article 30(1) and (3)).

[330] Applicant's Memorial, ¶ 101.

[331] Applicant's Memorial, ¶¶ 102-106 (citing Case C-284/16 *Slowakische Republik v. Achmea BV*, Judgment, March 6, 2018, ECLI:EU:C:2018:158 (ARLA-0069) ("*Slowakische Republik v. Achmea*")).

[332] Applicant's Memorial, ¶ 107 (citing "Protection of intra-EU investments," Communication from the Commission to the European Parliament and the Council, COM (2018) 547 final, July 19, 2018 (ARLA-0071), p. 2.

[333] Applicant's Memorial, ¶ 110.

[334] Applicant's Reply, ¶¶ 82-91.

257.   According to Latvia, it did not accept during the Arbitration process "that it had made a standing offer to arbitrate."[335] In addition, Latvia submits that ICSID tribunals carry a duty to establish their own jurisdiction, regardless of possible objections raised by the parties,[336] a principle which it says finds its source under general international law,[337] and which has been applied by arbitral tribunals in the ICSID context.[338]

258.   Latvia therefore concludes that "[i]t is a well-established principle of international law that 'a State may not be compelled to submit its disputes to arbitration without its consent'"[339] and that "[n]either acquiescence nor estoppel could validly replace the consent required under Article 25(1) of the ICSID Convention."[340]

### d.   Latvia's argument that the Award should be annulled pursuant to Article 52(1)(b) and Article 52(1)(e) of the ICSID Convention

259.   Latvia argues that because the Tribunal lacked jurisdiction *ratione voluntatis* to decide the Parties' dispute, the Award must be annulled for manifest excess of powers.[341] Latvia further submits that the Tribunal's failure to address the consequence of the accession to the EU of Latvia and Lithuania constitutes a failure to state reasons on which the Award was based.[342]

260.   First, on the issue of manifest excess of power, Latvia refers to UAB E energija's concession that "[t]here is an excess of powers where a tribunal acts outside of what it was authorized to do based on the parties' consent" and argues that "[t]his is *a fortiori* the case where no consent was given."[343]

261.   Latvia argues that the Tribunal's excess of power is manifest, because nowhere in the Award did the Tribunal examine whether the consent to its jurisdiction was validly given.[344] According to

---

[335] Applicant's Reply, ¶ 83.

[336] Applicant's Reply, ¶ 84.

[337] Applicant's Reply, ¶ 87 (citing, *inter alia*, the decision of the International Criminal Tribunal for the former Yugoslavia held in the *Tadić* case, *Prosecutor v. Duško Tadić a/k/a "Dule"* (ICTY Case No IT-94-1-AR72) Appeals Chamber, Decision, October 2, 1995 (ARLA-0087), ¶ 18).

[338] Applicant's Reply, ¶¶ 85-86 and 89 (citing, *inter alia*, *Landesbank v. Spain* (ARLA-0102), ¶ 91; and Schreuer et al. (ARLA-0037), p. 518, ¶ 1).

[339] Applicant's Reply, ¶ 90.

[340] Applicant's Reply, ¶ 91.

[341] Applicant's Memorial, ¶ 118.

[342] Applicant's Memorial, ¶ 118.

[343] Applicant's Reply, ¶ 99.

[344] Applicant's Memorial, ¶ 121; Applicant's Reply, ¶ 102.

Latvia, the situation in the present case is similar to the one in *Patrick Mitchell v. Congo* where the *ad hoc* committee found a manifest excess of power due to the tribunal's decision to accept jurisdiction on the basis of an investment whose existence had not been clearly established in the arbitration, and decided to annul the award.[345]

262. Second, with respect to the alleged failure to state reason, Latvia notes that the Tribunal announced that it would "determine whether … the Parties consented to ICSID jurisdiction under Article 7 of the BIT and Article 25(1) of the ICSID Convention."[346] Yet, Latvia contends, "the Tribunal did not explain its decision (to the extent such a decision was made at all) concerning the existence of consent."[347]

263. According to Latvia, failure to address jurisdictional issues, and in particular an issue relating to the consent to arbitration, is particularly serious[348] and the Tribunal's ignorance and failure in this regard were all the more material to the outcome of the case.[349]

264. Latvia therefore concludes that "[t]he Tribunal should have examined the issue of the compatibility of the BIT and EU law" and that such "examination would have resulted in the dismissal of the Claimant's claims for lack of jurisdiction."[350] According to Latvia, "[t]he Tribunal therefore failed to give reasons on an issue that was necessary or essential to the outcome of the case and the resulting Award should be annulled under Article 52(1)(e) of the ICSID Convention."[351]

### 2. UAB E energija's Position

265. According to UAB E energija, Latvia has waived its jurisdictional objection regarding the validity of Article 7 of the BIT, given that it did not pursue this objection during the Arbitration (**a.**). In addition, the Tribunal had jurisdiction given that the agreement to arbitrate contained in Article 7 of the BIT remained valid (**b.**), and therefore there are no grounds for annulment of the Award regarding any alleged lack of jurisdiction (**c.**).

---

[345] Applicant's Reply, ¶ 102 (citing *Patrick Mitchell v. Congo* (ARLA-0032), ¶¶ 45-46).

[346] Applicant's Reply, ¶ 92.

[347] Applicant's Reply, ¶ 92.

[348] Applicant's Reply, ¶ 94 (citing *Mihaly International Corporation v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/00/2, Award, March 15, 2002 (ARLA-0089), ¶ 56).

[349] Applicant's Memorial, ¶ 128.

[350] Applicant's Memorial, ¶ 129.

[351] *Ibid*.

### a. *UAB E energija's argument that Latvia has waived its jurisdictional objection regarding the validity of Article 7 of the BIT*

266.   UAB E energija stresses that Latvia did not raise during the arbitral proceeding a jurisdictional objection based on the alleged invalidity of Article 7 of the BIT due to either the termination of BIT after Latvia's accession to the EU, or to the consequence of the *Achmea* decision.[352] This is not challenged by Latvia. For that reason, UAB E energija argues that "Latvia has waived any jurisdictional objection regarding the applicability of Article 7(2) of the BIT or is estopped from arguing that Article 7(2) is invalid."[353]

267.   In particular, while UAB E energija recognizes that ICSID arbitral tribunals have either rejected the argument that a party can waive an intra-EU objection[354] or affirmed that intra-EU objections could be entertained on an *ex officio* basis,[355] UAB E energija contends that the situation in those cases is different than the one at hand. According to UAB E energija, the decisions in those other ICSID cases "were decisions taken by the tribunals constituted in those cases, and were arguments raised by the State parties in the course of the arbitrations."[356] UAB E energija argues that here, Latvia "agree[d] throughout the course of the Arbitration that it had validly consented to arbitrate E energija's claim, notwithstanding the EC's position on intra-EU BITs," and as a result "cannot now resile from its clearly expressed consent to arbitrate."[357]

268.   UAB E energija further insists that the "time to raise the jurisdictional objection regarding an alleged failure on the part of Latvia to consent to the arbitration is well past."[358] According to UAB E energija, Latvia was, at the time of the arbitral proceeding, well aware of the various discussions within the EU about the validity of intra-EU BITs, or of the intra-EU related objections raised before other arbitral tribunals. Hence, as UAB E energija argues, Latvia could have raised such intra-EU objection, but it elected not to do so. As a result, Latvia should be considered having

---

[352] Claimant's Counter-Memorial, ¶ 132.

[353] Claimant's Counter-Memorial, ¶ 132.

[354] Claimant's Counter-Memorial, ¶ 133 (citing, *inter alia*, *Marfin Investment Group Holdings S.A. et al v. Republic of Cyprus*, ICSID Case No. ARB/13/27, Award, July 26, 2018 (ACLA-0037), ¶ 578 ("*Marfin v. Cyprus*")).

[355] Claimant's Counter-Memorial, ¶ 135 (*Mr. Jürgen Wirtgen et al v. The Czech Republic*, PCA Case No. 2014-03, Final Award, October 11, 2017 (ACLA-0036), ¶ 250 ("*Wirtgen v. Czech Republic*")).

[356] Claimant's Counter-Memorial, ¶ 136.

[357] Claimant's Counter-Memorial, ¶ 136.

[358] Claimant's Rejoinder, ¶ 95.

validly consented to arbitrate and having therefore waived its right to raise any such intra-EU objection.[359]

### b. UAB E energija's arguments on the validity of Article 7 of the BIT

269. UAB E energija agrees with Latvia that the question of the applicability of Article 7 of the BIT is a question of international law, governed by the VCLT. However, according to UAB E energija, Latvia incorrectly interprets and applies Articles 59 and 30 of the VCLT.

270. First, UAB E energija maintains that "the EU treaties do not relate to the same subject-matter as the BIT, at least for the purposes of Articles 59 and 30 of the VCLT"[360] and that this finding has been consistently reached by arbitral tribunals.[361]

271. UAB E energija also discusses the other conditions for Article 59 of the VCLT to apply, given that it is clearly not "established" in accordance with Article 59(1)(a) that Latvia and Lithuania intended the EU treaties to govern the relevant matters instead of the BIT.[362] UAB E energija stresses that "BITs do not only concern the obligations of states but also the rights of individuals."[363] As a result, Latvia cannot argue that the termination of such agreements need not to follow the procedure provided for by Article 65 of the VCLT. According to UAB E energija, "[t]o consider such treaties terminated or inapplicable without any notification to individuals as right-holders (or indeed without any notification at all) and contrary to their express terms, in circumstances where an entire arbitration has already taken place and an award rendered (with the full, informed, consent of both parties) clearly goes against the principles of legal certainty, legitimate expectations and non-retroactivity."[364] As a result, UAB E energija concludes that the BIT cannot be found to be terminated by operation of Article 59 of the VCLT.

272. Second, on the issue of the alleged prevalence of EU law over the BIT, UAB E energija notes that (i) "the *Achmea* ruling is not binding in the present ICSID proceedings"[365] given that "[t]he CJEU

---

[359] Claimant's Rejoinder, ¶¶ 95-108.

[360] Claimant's Counter-Memorial, ¶ 149.

[361] Claimant's Counter-Memorial, ¶¶ 143-145, 149; Claimant's Rejoinder, ¶ 58 (citing, *inter alia*, *European American Investment Bank AG (Austria) v. The Slovak Republic*, PCA Case No. 2010-17, Award on Jurisdiction, October 22, 2012 (ARLA-0048), ¶ 185 ("*EURAM v. Slovakia*").

[362] Claimant's Counter-Memorial, ¶¶ 151-157; Claimant's Rejoinder, ¶ 62.

[363] Claimant's Rejoinder, ¶ 66.

[364] Claimant's Rejoinder, ¶ 66.

[365] Claimant's Counter-Memorial, ¶ 164.

has no role or authority within international law, and its decisions are not concerned with international law,"[366] and that (ii) in any event, the present case is distinct from the *Achmea* situation, as the Tribunal's jurisdiction is based on the ICSID Convention, operating in conjunction with Article 7(2) of the BIT.[367]

273.   Further, UAB E energija also disputes the findings of the CJEU in the *Achmea* decision, noting that "as a matter of public international law, the substantive finding of the CJEU in *Achmea* is wrong" given that "[i]n the context of public international law, there is a presumption against conflict of treaties"[368] and that "[i]f it is possible to interpret treaties so that no incompatibility arises, this course of action is preferred to a finding of conflict."[369]

274.   Finally, UAB E energija submits that, even if the *Achmea* decision was considered to be correct and binding on the Committee, its consequence would not be the invalidation of Article 7 of the BIT.[370] According to UAB E energija, even "if the CJEU in *Achmea* was right as a question of EU law, the only consequence is that Latvia may be in breach of EU law vis-à-vis the EC and other Member States. Even if this were the case, it could not, and does not, affect the entirely separate international law obligations in the BIT and, specifically, E energija's right established in the BIT to accept the standing offer to arbitrate disputes."[371]

### c.   *UAB E energija's position on the grounds for annulment advanced by Latvia*

275.   UAB E energija rejects both annulment grounds put forward by Latvia on the issue of the Tribunal's jurisdiction.  According to UAB E energija, "Latvia's arguments regarding the Tribunal's alleged manifest excess of powers are mostly beside the point, as they focus on the existence of consent to arbitration, and not the manifest nature of the alleged excess of powers."[372] UAB E energija thus argues that, in any event, "[i]n the present situation, the alleged lack of jurisdiction can in no way be considered 'manifest.' As a matter of international law, the overwhelming consensus is that

---

[366] Claimant's Counter-Memorial, ¶ 164.

[367] Claimant's Counter-Memorial, ¶ 166.

[368] Claimant's Counter-Memorial, ¶ 167 (citing A. Gourgourinis, "After *Achmea*: Maintaining the EU Law Compatibility of Intra-EU BITs Through Treaty Interpretation" in Mistelis and Lavranos (eds), *European Investment Law and Arbitration Review* (Brill-Nijhoff 2018) (ACLA-0045), pp. 297 *et seq*).

[369] Claimant's Counter-Memorial, ¶ 167.

[370] Claimant's Counter-Memorial, ¶¶ 169-170.

[371] Claimant's Counter-Memorial, ¶ 171.

[372] Claimant's Rejoinder, ¶ 91.

the *Achmea* decision has no bearing on a tribunal's jurisdiction under a bilateral investment treaty. Even if this Committee were to disagree, there could be no basis for finding the Tribunal's failure to address the argument to be a 'manifest' excess of powers."[373]

276.     On the issue of the alleged failure to state reasons, UAB E energija argues that "Latvia's submissions disregard the Award, where the Tribunal clearly considered the question of consent of the parties and made a reasoned decision on the existence of consent. … [T]he Tribunal carefully considered all the preliminary objections of the Respondent regarding jurisdiction, and specifically analyzed the question of the Parties' consent to ICSID jurisdiction."[374]

277.     According to UAB E energija, the Award clearly stated the reasons on which its jurisdictional decision, and specifically its decision on the consent of the parties, was based. UAB E energija therefore concludes that the conditions of Article 52(1)(e) of the ICSID Convention are not fulfilled in the present case.

### 3.   The Committee's Analysis

278.     Latvia contends that the Tribunal did not properly address the issue of consent to jurisdiction because it failed to examine whether Latvia's offer to arbitrate contained in Article 7(2) of the BIT still existed and was valid at the time UAB E energija accepted it with its Request for Arbitration. For Latvia, under international law, the BIT "was either terminated or Article 7 was inapplicable because Latvia and Lithuania, the two parties to the BIT, became both Member States to the European Union and acceded to the EU treaties on 1st May 2004."[375] While Latvia's primary argument is that the BIT was terminated by operation of Article 59(1) of the VCLT, Latvia also submits that Article 7 of the BIT is inapplicable because it is incompatible with the EU treaties pursuant to Article 30(3) of the VCLT.[376] Latvia invokes two grounds of annulment in this regard: failure to state reasons under Article 52(1)(e), because the Tribunal did not provide reasons on this issue, and manifest excess of powers under Article 52(1)(b) because the Tribunal exercised a jurisdiction that it did not have.

---

[373] Claimant's Counter-Memorial, ¶ 181.

[374] Claimant's Rejoinder, ¶ 85.

[375] Transcript Day 1, p. 80, lines 7-11; Applicant's Memorial, ¶¶ 111-115.

[376] Applicant's Memorial, ¶¶ 99-110, Reply, ¶¶ 71-79.

279.    UAB E energija's position is that Latvia did not argue in the Arbitration that its consent to arbitration was invalid. UAB E energija states that "the whole arbitration proceeded on the very clear premise that both parties had already agreed to the jurisdiction of the Tribunal."[377] The Tribunal considered the issue of consent and found that consent was established, so there was no failure to state reasons. Latvia introduces a new argument, *i.e.* that written consent was no longer valid, that it did not make in the Arbitration, so the matter was not before the Tribunal. Latvia has waived this new argument or is now estopped from making it before the Committee. For UAB E energija, "the Tribunal's approach was reasonable and there can be no question of a manifest excess of powers."[378]

###### a.    The Parties' arguments on the validity of Article 7 of the BIT and related legal questions

280.    As recalled above, both Parties extensively discussed in their submissions the question of whether the Latvia-Lithuania BIT had been terminated by virtue of Articles 59(1) or 30 of the VCLT when the Claimant accepted the offer to arbitrate in Article 7(2). The Parties also expressed views on some related topics, notably: the *Achmea* decision of March 6, 2018 and the Declaration on the legal consequences of the *Achmea* decision and on investment protection signed by the EU Member States on January 15, 2019 (the "**2019 Declaration**").

281.    The Committee considers that these questions, which have been raised for the first time in these annulment proceedings and were not before the Tribunal, do not need to be addressed and decided by this Committee as they are irrelevant for purposes of annulment of the Award.

282.    The Committee agrees that the only question before it is whether "the manner in which the Tribunal carried out its functions met the requirements of the ICSID Convention."[379]   In other words, the Committee has to decide whether the Award should be annulled because the Tribunal's lack of analysis as to the legal consequences of the alleged incompatibility between Article 7(2) of the BIT with the EU treaties amounts to grounds of annulment for manifest excess of powers pursuant to Article 52(1)(b) of the ICSID Convention and/or failure to state reasons under Article 52(1)(e). In order to make this decision, any *ex post facto* events (such as the *Achmea* decision or the 2019 Declaration) and new arguments made by the Parties have no role to play.

---

[377] Transcript Day 1, p. 165, lines 3-5.
[378] Transcript Day 1, p. 198, lines 6-7.
[379] *Lucchetti v. Peru* (ARLA-0035), ¶ 97.

283.  Latvia does not dispute that it did not argue in the Arbitration – as it does in these proceedings – that its consent was no longer valid in 2012, when UAB E energija filed the Request for Arbitration. Latvia however contends that the Tribunal should have raised the argument about the inapplicability of Article 7 of the BIT on its own initiative because, "even in the absence of an objection on a jurisdictional issue, a tribunal has the authority and indeed the obligation (…) to establish its jurisdiction. (…) [T]hus, even in the absence of a specific objection concerning Latvia's consent to arbitrate, the Tribunal was not free to disregard the issue as it did."[380] Latvia adds that at least two members of the Tribunal were "well aware of the issue" because they served as arbitrators in cases where intra-EU BIT objections had been raised.[381]

284.  In response to a question from the President of the Committee at the Hearing as to the relevance of the legal issues relating to the validity of intra-EU BITs for purposes of the annulment decision, counsel from Latvia clarified that the relevance of the outcome of the legal issues for these annulment proceedings is different for each annulment ground.[382] When it comes to failure to state reasons, counsel stated that it does not matter whether or not Latvia is correct on its assessment of the legal issues. What matters is that the Tribunal was aware of the issues, had an obligation to address them and yet it did not.[383] With regard to manifest excess of powers, Latvia contended that the excess of powers was manifest because the Tribunal did not deal with these issues at all.[384] Latvia added that the issue of the validity of Article 7 has to be examined by the Committee because its task "is to objectively determine whether the Tribunal had jurisdiction."[385] For Latvia, "the issue of jurisdiction is an objective one" that "has to be determined under the law, and objectively."[386]

285.  Starting with Latvia's allegation that the Tribunal was aware of the legal issues that have been pleaded in these annulment proceedings, it goes without saying that the Tribunal could not have been aware of legal developments which had not yet taken place at the time, such as the *Achmea* decision and the 2019 Declaration.

286.  While it is true that at the time the original Arbitration proceedings were on-going, in 2012-2017, a debate existed as to whether the investor-State arbitration clauses contained in BITs concluded

---

[380] Transcript Day 1, p. 106, line 13 – p. 107, line 1.
[381] Transcript Day 2, p. 29, line 23 – p. 30, line 17.
[382] Transcript Day 2, p. 107, lines 9-11.
[383] Transcript Day 2, p. 107, line 12 – p. 109, line 1.
[384] Transcript Day 2, p. 109, line 15 – p. 110, line 4.
[385] Transcript Day 2, p. 109, lines 21-22.
[386] Transcript Day 2, p. 109, lines 15, 19-20.

between EU Member States are contrary to EU law and thus inapplicable, it is not until the *Achmea* decision of the CJEU of March 6, 2018 (*i.e.* three months after the Award was rendered) that there was an actual decision officially stating the CJEU's position the matter.

287. By way of background, it may be useful to recall that already in 2006 the Commission had expressed the view that the so-called intra-EU BITs were incompatible with EU law and thus had to be terminated.[387] However, at the time, the Commission's position was that intra-EU BITs were not automatically terminated due to their incompatibility with EU law, but, rather, specific termination by the member States was required. To the extent that investor-State tribunals were called to decide the matter in the presence of preliminary objections raised by respondent States, they uniformly rejected the claims of incompatibility and upheld their jurisdiction.[388] The opinion of the Advocate General, Mr. Wathelet, on the *Achmea* case had been issued on September 19, 2017[389], *i.e.* three months before the Tribunal rendered the Award, but the Advocate General had taken the position that the underlying intra-EU BIT in *Achmea* was not incompatible with EU law and the EU treaties, in other words the opposite of what the CJEU finally held in 2018.

288. As things presently stand, a number of EU States appearing as respondents in investment arbitration proceedings have raised jurisdictional objections based on the incompatibility of BITs with the EU treaties and EU law. Moreover, the Commission has filed applications to intervene as *amicus curiae* in many intra-EU investment arbitrations. However, to date, while some tribunals have allowed EU interventions as *amici*, this objection to jurisdiction has never been upheld by investment tribunals. This led the *Blusun v. Italy* tribunal to state in its 2016 award:

> "Overall the effect of these decisions is a unanimous rejection of the intra-EU objection to jurisdiction. The tribunal in each case has found that the relevant BIT or the ECT was intended to bring about binding obligations between EU Member

---

[387] EC Letter of January 13, 2006, quoted in *Eastern Sugar BV v. Czech Republic*, SCC Case No. 088/2004, Partial Award, March 27, 2007 (ACLA-0007), ¶ 19 ("*Eastern Sugar v. Czech Republic*"); European Commission Observations, July 7, 2010, quoted in *Eureko BV v. The Slovak Republic*, PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, October 26, 2010 (ARLA-0044), ¶ 180.

[388] *See*, for instance, amongst the cases that are on the record, *Eastern Sugar v. Czech Republic* (ACLA-0007), ¶¶ 160, 165, 167-8, 175, 180; *Rupert Binder v. Czech Republic*, Award on Jurisdiction (UNCITRAL Rules), June 6, 2007 (ACLA-0008), ¶¶ 60-1, 63-6; *Jan Oostergetel and Theodora Laurentius v. The Slovak Republic*, UNCITRAL, Decision on Jurisdiction, April 30, 2010 (ACLA-0012), ¶ 190 ("*Jan Oostergetel v. Slovakia*"); *EURAM v. Slovakia* (ARLA-0048), ¶¶ 185-6, 191-7, 209-10, 212, 218, 234, 236, 238, 248-87; *Ioan Micula, Viorel Micula and others v. Romania*, ICSID Case No. ARB/05/20, Award, December 11, 2013 (ARLA-0052), ¶¶ 319, 321, 326, affirmed on Annulment, *Micula v. Romania* (ARLA-0060), ¶¶ 189, 191-2, 195, 201-2; *Rockhopper Italia S.p.A., Rockhopper Mediterranean Ltd, and Rockhopper Exploration Plc v. Italian Republic*, ICSID Case No. ARB/17/14, Decision on the Intra-EU Jurisdiction Objection, June 26, 2019 (ACLA-0060), ¶ 146 ("*Rockhopper v. Italy*").

[389] *Slowakische Republik v. Achmea* (ACLA-35).

States. The tribunals found no contradiction between the substantive provisions of EU law and the substantive or dispute resolution provisions of the BITs. No such system for investor-State arbitration exists in EU law, and it would be incorrect to characterise such disputes as inter-State disputes such that Article 267 of the TFEU could be said to preclude jurisdiction. These conclusions support those adopted by the Tribunal in this case."[390]

289.    In a nutshell, this was the state of the law and jurisprudence on this matter and the general context in which the Arbitration was being conducted. In addition, it is important to stress that in the present case, unlike others that were on-going at the time, the Commission did not file an *amicus* application nor did Latvia raise a jurisdictional objection regarding the incompatibility of Article 7(2) with EU law of its own accord.

290.    Thus, at the time when the Tribunal was hearing this case, there was general uncertainty and no conclusive position had been expressed by EU institutions on whether investor-State dispute resolution clauses contained in intra-EU BITs − such as Article 7(2) of the Latvia-Lithuania BIT in this case − were incompatible with EU law or the EU treaties. Moreover, the case law of investment tribunals had universally upheld[391] (and has continued to uphold, even after the *Achmea* decision was rendered by the CJEU, as shown by the *Blusun v. Italy* quotation above) the validity of intra-EU BITs. Investment tribunals also consistently rejected the argument that intra-EU BITs related to the same "subject-matter" as the EU treaties and found Articles 59 and 30 of the VCLT not applicable.[392] It follows that, given that there was no clear resolution on these difficult issues at the time the Tribunal rendered the Award, and given the consistent rejection of the intra-EU jurisdictional objection by investment tribunals, it cannot be said that, even if the Tribunal had considered this question, it would have rejected its jurisdiction.

---

[390] *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, December 27, 2016, ¶ 303 ("*Blusun v. Italy*"). While the *Blusun v. Italy* award is not on the record, the Committee notes that it is cited *verbatim* in *Rockhopper v. Italy* (ACLA-0060), ¶ 145. In any event, the Committee shares the view of other ICSID tribunals and committees that, when applying the law, it should not be bound by the sources invoked by the Parties. Pursuant to the principle *iura novit curia* (sometimes referred to as *iura novit arbiter* in the international arbitration context), this Committee is entitled to form its own opinion of the meaning of the law, as long as it does not surprise the Parties with a legal theory that was not subject to debate and that they could not anticipate. For a similar approach, *see Quiborax S.A. and Non Metallic Minerals S.A. v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Award, September 16, 2015, ¶ 92.

[391] *See Rockhopper v. Italy* (ACLA-0060), ¶ 146 and *Blusun v. Italy*, ¶¶ 277-292, 302-303.

[392] *See Jan Oostergetel v. Slovakia* (ACLA-0012); *PL Holdings S.a.r.l. v. Republic of Poland*, SCC Case No. V2014/163, Partial Award, June 28, 2017 (ACLA-34); *Wirtgen v. Czech Republic* (ACLA-0036); *Marfin v. Cyprus* (ACLA-0037); *UP and C.D Holdings Internationale v. Hungary*, ICSID Case No. ARB/13/35, Award, October 9, 2018 (ACLA-39); *United Utilities (Tallinn) B.V. v. Republic of Estonia*, ICSID Case No. ARB/14/24, Award, June 21, 2019 (ACLA-59); *Rockhopper v. Italy* (ACLA-0060). See ¶ references in Transcript Day 2, p. 97, lines 15-24.

291.    The Committee agrees that the Tribunal might have been generally aware of the issue of the inter-play between EU law and EU treaties and intra-EU BITs. Having said that, Latvia itself should also have been aware of this debate and yet, not only did it not raise the preliminary objection that the Tribunal lacked jurisdiction *ratione voluntatis*, it also participated actively in the Arbitration thus *de facto* accepting the existence of a valid arbitration agreement. In the circumstances, the fact that the Tribunal did not discuss *proprio motu* whether the offer to arbitrate contained in Article 7(2) was still valid and could have been accepted by UAB E energija when it filed the Request for Arbitration in this case, is not surprising.

### b.   Latvia's argument that the Award should be annulled pursuant to Article 52(1)(b) and Article 52(1)(e) of the ICSID Convention

292.    It is undisputed that Latvia only raised one objection relating to consent, regarding the lack of the Claimant's internal authorisation for instituting the arbitral proceedings. It is also a fact that the Award contains a section on the Parties' consent to jurisdiction, where the Tribunal recalled the Parties' positions and determined *inter alia* that the Parties had consented to ICSID jurisdiction under Article 7 of the BIT and Article 25(1) of the ICSID Convention.

293.    The Tribunal's conclusions on the Parties' consent to jurisdiction are as follows:

> 499. The Tribunal finds that the Respondent offered to submit certain disputes to ICSID arbitration under Article 7 of the BIT provided *(i)* that the investor gave the host State a notice of dispute in writing including a detailed statement (Article 7(1) of the BIT), and *(ii)* that the Parties endeavoured to settle their dispute amicably in the six months following the notification of the notice of dispute (Article 7(2) of the BIT).

> 500. The Respondent did not dispute that these requirements were met.

> 501. The Tribunal concludes that the two requirements in Article 7(1) and 7(2) of the BIT were met in the present case. First, the Claimant delivered its Notice of Dispute on 2 September 2008 to the Respondent, thereby complying with Article 7(1) of the BIT. Secondly, the Respondent accepts that negotiations with the Claimant started on 1 September 2008 and continued until 14 July 2010 with a final meeting on 1 April 2011 without any settlement being reached. The Parties therefore tried to settle their dispute amicably for more than six months before the Claimant submitted the dispute to ICSID, as required by Article 7(2) of the BIT.

> 502. The Tribunal also finds that the Claimant accepted the Respondent's offer contained in the BIT to settle the dispute by ICSID arbitration by filing its Request for Arbitration on 15 August 2012. The Tribunal therefore concludes that the requirement of consent under Article 7(2) of the BIT was met, as was the requirement of "consent in writing" under Article 25(1) of the ICSID Convention.

76

294. The paragraphs cited above show that the Tribunal did examine whether it had jurisdiction, and complied with the *kompetenz-kompetenz* principle, as embodied in Article 41 of the ICSID Convention. The Tribunal reached the conclusion that the requirement of consent under Article 7(2) of the BIT was met on the basis of the Parties' arguments and the cases they pleaded before it. Specifically, with regard to Latvia's case, in addition to the absence of a specific objection to jurisdiction based on lack of consent under Article 7(2) of the BIT, the Tribunal's conclusions must have also been informed by Latvia's procedural conduct *de facto* accepting the validity of Article 7 of the BIT throughout the Arbitration.[393] Failure to raise a specific objection as to the applicability of Article 7(2), coupled with Latvia's conduct during the Arbitration, must have been interpreted by the Tribunal as an implicit consent to jurisdiction.

295. As recognized by in Schreuer's *Commentary* of the ICSID Convention, "the tribunal may rely on a party's failure to invoke the non-existence of its consent as an indication of its consent."[394] It is also important to stress in this regard that, while failure to raise jurisdictional objections may be interpreted as an implicit consent to jurisdiction, the objective legal requirements contained in Article 25 of the Convention: *i.e.* the existence of a legal dispute arising out of an investment and the nationality requirement cannot be replaced by the parties' agreement.[395]

296. The fact that the matter of lack of consent as an objection to the Tribunal's jurisdiction is being advanced for the first time in these annulment proceedings cannot be ignored. An argument that was not before the original tribunal cannot form the basis of a manifest excess of power in annulment proceedings. As held by the *ad hoc* committee in *Lahoud v. Congo*:

> " L'argument ayant été nouvellement soulevé dans la présente procédure d'annulation, le Tribunal n'a pas pu, par définition, commettre un excès de pouvoir manifeste dans le cadre de l'examen d'une question qui n'a pas été introduite." [396]

297. The Committee finds that a party that has not raised a preliminary objection to the tribunal's jurisdiction "as early as possible" and "no later than the expiration of the time limit fixed for the filing of the counter-memorial," in conformity with Rule 41(1) of the Arbitration Rules, has waived its preliminary objections. Consequently, these cannot be reintroduced in annulment proceedings

---

[393] See the examples provided in the Claimant's Rejoinder, ¶ 97.

[394] Schreuer et al. (ARLA-0037), p. 530, ¶ 50.

[395] Schreuer et al. (ARLA-0037), p. 529, ¶ 49.

[396] *Antoine Abou Lahoud et Leila Bounafeh-Abou Lahoud c/ République Démocratique du Congo,* Affaire CIRDI No. ARB/10/4, Décision sur la Demande en annulation de la République Démocratique du Congo, ¶ 149.

to argue that the Tribunal manifestly exceeded its powers. As noted in the Schreuer's *Commentary* in connection with the principle of *forum prorogatum* in the ICSID context:

> "[A] party that has indicated its consent during the proceedings either explicitly or by pleading on the merits of the case without objecting that consent was lacking, defective or too narrow is precluded from raising such an objection later on. This preclusion would apply in the original proceedings as well as to any annulment proceedings."[397]

298.   In the Committee's opinion, there is nothing objectionable in the fact that the Tribunal limited its analysis on jurisdiction to the Parties' pleaded positions. This is not a situation where the Tribunal failed to examine its jurisdiction *ratione voluntatis*; it did so, but on the basis of the arguments advanced before it by the Parties and in the light of the Parties' procedural conduct. The Tribunal could have raised this jurisdictional question in the form of a question addressed to Latvia in the course of the proceedings in order to make sure of Latvia's consent to jurisdiction, but failure to do so cannot result in the extreme consequence of annulling the Award. The position taken by the Tribunal is reasonable and justified in the circumstances and it is not the Committee's role to second-guess the Tribunal's approach.

299.   As held by the *Rumeli v. Kazakhstan* committee:

> "An *ad hoc* committee will not annul an award if the tribunal's approach is reasonable or tenable, even if the committee might have taken a different view on a debatable point of law."[398]

300.   Thus, in the light of all the factors examined above, the Committee finds that there was no manifest excess of powers and the fact that the Tribunal failed to raise the question does not amount to a ground for annulment of the Award under Article 52(1)(b).

301.   As to an alleged absence of reasons, there is no such failure in this case as the Tribunal did explain how it reached the conclusion that Latvia had provided its consent to arbitration. Latvia now disagrees on the basis of new arguments introduced for the first time in these annulment proceedings. But, as already noted in several instances in this Decision, annulment committees are not courts of appeal and annulment proceedings cannot be used to formulate new arguments which

---

[397] Schreuer et al. (ARLA-0037), p. 225, ¶ 498.
[398] *Rumeli v. Kazakhstan* (ARLA-0042), ¶ 96.

should have been introduced during the original arbitration. As held by the *ad hoc* committee in *Klöckner v. Cameroon*, *ad hoc* proceedings cannot:

> "be used by one party to complete or develop an argument which it could and should have made during the arbitral proceeding or help that party retrospectively to fill gaps in its arguments."[399]

302.  Therefore, the Committee finds that the Tribunal did provide reasons in the Award for its decision that Latvia offered to submit the dispute to arbitration under Article 7 of the BIT. The Tribunal reached its conclusions on the basis of the arguments advanced by the Parties; if no reasons were provided regarding the arguments made by Latvia in these annulment proceedings, it is because they had not been submitted to the Tribunal for its consideration.

303.  In the light of the above considerations, the Committee rejects Latvia's request to annul the Award on the basis of Article 52(1)(b) and 52(1)(e) of the ICSID Convention with regard to the Tribunal's decision on jurisdiction.

## VI.    COSTS

304.  The Parties made their submissions on cost during the Hearing, and later submitted statements of costs.[400]

### A.  LATVIA'S COSTS SUBMISSIONS

305.  In its submission on costs, Latvia argues that the issues debated in the annulment proceedings are serious ones, and that while it considers its arguments to be "very strong,"[401] it also recognizes that they are not based on any errors made by UAB E energija.  Latvia further recalls that UAB E energija has "an award in its favour involving three breaches […] of the investment treaty."[402]

306.  In light of this, Latvia submits that, irrespective of the outcome of the annulment proceeding, it "does not seek costs from the Claimant in these annulment proceedings,"[403] and that "the

---

[399] *Klöckner v. Cameroon* (ARLA-0009), ¶ 83.

[400] *See* above, ¶ 66.

[401] Transcript Day 2, p. 117, line 17.

[402] Transcript Day 2, p. 117, lines 19-21.

[403] Transcript Day 2, p. 117, lines 22-23.

appropriate order for the Annulment Committee to make would be for costs to lie where they fall, and for the costs of the Committee and ICSID to be shared equally between the parties."[404]

307.    In its Statement on Costs, Latvia provides for the following information:

| TYPE OF FEES AND EXPENSES | RESPONDENT/ LAW FIRM | AMOUNT | |
|---|---|---|---|
| | | EUR | USD |
| ICSID filing fee | Republic of Latvia | | 25,000.00 |
| Advances on the costs of the *ad hoc* Committee and ICSID | Republic of Latvia | | 330,000.00 |
| | Freshfields Bruckhaus Deringer | 489,648.72 | |
| Party expenses (travel and accommodation for the Hearing held on 13 and 14 January 2020) | Republic of Latvia | 3,943.44 | |
| **Total** | | **493,592.16** | **355,000.00** |

## B.  UAB E ENERGIJA'S COSTS SUBMISSIONS

308.    In its submission on costs, UAB E energija observes that both Parties have requested that the Committee award costs, and further asks the Committee to consider interest in its decision.[405]

309.    UAB E energija further notes that the costs of the Annulment proceedings are likely to be "significant in proportion to the [A]ward,"[406] and that both Parties agree that "full reparation … is correct standard of relief in a treaty arbitration."[407] As a result, UAB E energija submits that if the Award is upheld, the Committee should award UAB E energija "its cost and interest."[408]

310.    In its Statement on Costs, UAB E energija claims for legal and other costs for the Annulment Proceedings in a total amount of EUR 373,119.96, corresponding to:

- legal fees of Vinson & Elkins and Sorainen in an amount of EUR 350,000.00;

- Vinson & Elkins and Sorainen disbursements in an amount of EUR 18,052.76;

---

[404] Transcript Day 2, p. 117, line 24 – p. 118, line 3.

[405] Transcript Day 2, p. 103, lines 15-19.

[406] Transcript Day 2, p. 103, line 22.

[407] Transcript Day 2, p. 104, lines 1-2.

[408] Transcript Day 2, p. 103, lines 24-25.

- E energija expenses of EUR 5,067.20.

## C.  THE FEES AND EXPENSES OF THE COMMITTEE AND OF THE CENTRE

311.    The costs of the annulment proceeding, including the fees and expenses of the Committee, ICSID's administrative fees and direct expenses, amount to (in USD):

| Committee Members' fees and expenses | |
|---|---|
| Ms. Loretta Malintoppi | 74,780.15 |
| Prof. Geneviève Bastid Burdeau | 42,051.57 |
| Mr. Makhdoom Ali Khan (prior to his resignation) | 3,187.50 |
| Dr. Andrés Rigo Sureda | 38,748.04 |
| ICSID's administrative fees | 84,000.00 |
| Direct expenses | 20,989.87 |
| **Total** | **263,757.13** |

## D.  THE COMMITTEE'S DECISION ON COSTS

312.    According to Article 52(4) of the ICSID Convention, Chapter VI of the Convention, entitled the "Cost of the Proceeding," "shall apply *mutatis mutandis* to proceedings before the Committee." In this connection, the relevant provision of Chapter VI is Article 61(2), which provides:

> "In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award."

313.    ICSID Arbitration Rule 53 further provides that the provisions of the Rules "shall apply *mutatis mutandis* to any procedure relating to [...] annulment of an award and to the decision of the [...] Committee." Rule 47 further specifies that "the [decision of a Committee] shall be in writing and shall contain [...] any decision of the [Committee] regarding the cost of the proceeding."

314.    On the basis of these provisions, the Committee has discretion to decide how to allocate the fees and expenses of Committee members, the Centre's administrative fees and direct expenses, and the Parties' fees and expenses.

315.    Given that the Committee found Latvia's grounds for annulment to be without merit and on that basis rejected its Application for Annulment in its entirety, the Committee concludes that Latvia

should be wholly responsible for the Committee's fees and expenses and for ICSID's administrative fee and direct expenses. Each Party should be responsible for its legal fees. In the circumstances, a decision regarding interest to be awarded on the costs of these annulment proceedings (as requested by UAB E energija) is not needed.

## VII.   DECISION

316.   For the reasons set forth above, the *ad hoc* Committee decides as follows:

(1) The Application for Annulment of the Republic of Latvia is rejected in its entirety;

(2) The Applicant shall bear the costs of the proceeding as set out in paragraph 311 above, in the amount of USD 263,757.13;

(3) The stay of enforcement is lifted.

Geneviève Bastid Burdeau
*Ad hoc* Committee Member

Date:  April 6, 2020

Andrés Rigo Sureda
*Ad hoc* Committee Member

Date:  April 6, 2020

Loretta Malintoppi
President of the *ad hoc* Committee

Date:  April 6, 2020

83